1  ROBINS KAPLAN LLP
David B. Shemano (State Bar No. 176020)
2  dshemano@robinskaplan.com
James P. Menton, Jr. (State Bar No. 159032)
3  jmenton@robinskaplan.com
2049 Century Park East, Suite 3400
4  Los Angeles, CA  90067
Telephone:    310-552-0130
5  Facsimile:    310-229-5800

6  Special Litigation Counsel for Alfred H. Siegel,
Chapter 7 Trustee

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10             **LOS ANGELES DIVISION**

11

12  In re                                    Case No.  2:11-bk-62283-RN

13  GENIUS PRODUCTS, LLC,                     Chapter 7

14              Debtor.

15

   ALFRED H. SIEGEL, CHAPTER 7              Adv. No.
16  TRUSTEE FOR THE ESTATE OF
   GENIUS PRODUCTS, LLC,
17                                           **COMPLAINT FOR (1) AVOIDANCE AND
              Plaintiff,                     RECOVERY OF FRAUDULENT**
18                                           **TRANSFERS, (2) RECOVERY OF**
       v.                                    **IMPROPER DIVIDENDS, (3) BREACH OF**
19                                           **FIDUCIARY DUTIES, AND (4)**
   THE WEINSTEIN COMPANY LLC, and           **DECLARATORY JUDGMENT**
20  THE WEINSTEIN COMPANY                    **CONCERNING LIABILITY BASED UPON**
   HOLDINGS LLC,                            **ALTER-EGO**
21
              Defendants.
22

23

24        Plaintiff Alfred H. Siegel, Chapter 7 Trustee (the "Trustee") for the estate (the "Estate") of

25  Genius Products, LLC (the "Debtor"), alleges as follows:

26                    **JURISDICTION AND VENUE**

27        1.      On December 27, 2011 (the "Petition Date"), an involuntary bankruptcy petition

28  was filed against the Debtor in United States Bankruptcy Court for the Central District of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  California, Los Angeles Division (the "Bankruptcy Court"), by (a) World Wrestling

2  Entertainment, Inc., the holder of a judgment in the approximate amount of $6,000,000, (b)

3  Thought Equity Motion, Inc., the holder of an arbitration award in the approximate amount of

4  $463,000, and (c) LD Entertainment, the holder of a claim in the approximate amount of

5  $2,100,000.

6        2.      The involuntary petition was unopposed and an order for relief was entered on

7  May 4, 2012.

8        3.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

9  §§ 157(b) and 1334(b).  This adversary proceeding arises under title 11, United States Code (the

10  "Bankruptcy  Code"), and arises in and relates to Case No. 2:11-bk-62283-RN pending in the

11  Bankruptcy Court.

12        4.      This action is a core proceeding in which the Bankruptcy Court may enter a final

13  judgment.

14        5.      Venue in this judicial district is proper pursuant to 28 U.S. C. § 1409(a).

15                                    **PARTIES**

16        6.      Plaintiff is the appointed chapter 7 trustee for the Debtor's Estate.   Under section

17  323 of the Bankruptcy Code, the Trustee is the representative of the Debtor's Estate and has the

18  capacity to bring this action.

19        7.      Defendant The Weinstein Company LLC ("TWC") is a production and distribution

20  company launched in October 2005 by Bob and Harvey Weinstein, the brothers who founded

21  Miramax Films in 1979.  TWC is a business entity headquartered in New York, New York, with

22  an office and operations in Los Angeles, California.

23        8.      TWC is a subsidiary of Defendant The Weinstein Company Holdings LLC ("TWC

24  Holdings").  TWC Holdings is a business entity headquartered in New York, New York, with an

25  office and operations in Los Angeles, California.

26        9.      At all times relevant to the allegations herein, TWC Holdings was an insider of the

27  Debtor within the meaning of section 101(31) of the Bankruptcy Code because, among other

28  things, TWC Holdings was: (a) a person in control of the Debtor and (b) an affiliate of the Debtor

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    because TWC Holdings owned more than 20 percent of the Debtor's outstanding voting

2    securities.

3            10.    At all times relevant to the allegations herein, TWC was an insider of the Debtor

4    within the meaning of section 101(31) of the Bankruptcy Code because, among other things,

5    TWC was: (a) a person in control of the Debtor and (b) an affiliate of the Debtor because TWC

6    Holdings, the holder of more than 20 percent of the Debtor's outstanding voting securities, owned

7    more than 20 percent of TWC's outstanding voting securities.

8            11.    Each of TWC and TWC Holdings is controlled by Bob and Harvey Weinstein and

9    TWC and TWC Holdings are collectively referred to herein as "Weinstein."  At all times relevant

10   to the allegations herein, TWC Holdings controlled TWC, TWC was an instrumentality of TWC

11   Holdings, TWC and TWC Holdings had no meaningful independence or separateness from each

12   other, are alter egos of each other, are principal and agent of each other, and each should be

13   deemed liable for the actions and liabilities of the other.

14   **THE RELATIONSHIP BETWEEN THE DEBTOR AND WEINSTEIN**

15           12.    The Debtor was originally formed by TWC Holdings as The Weinstein Company

16   Funding LLC ("TWC Funding") pursuant to a Certificate of Formation filed in the office of the

17   Secretary of State of the State of Delaware on May 10, 2005. At the time of formation, TWC

18   Funding was wholly-owned and controlled by TWC Holdings.

19           13.    On or about December 5, 2005, TWC and Genius Products, Inc. ("GPI"), entered

20   into an Interim Distribution Agreement granting GPI the exclusive right to distribute Weinstein

21   home video products ("Videos") in the United States.  Under the agreement, GPI was responsible

22   for manufacturing, merchandising, marketing, and distributing the Videos, as well as for billing

23   and collection.  In exchange, GPI received a distribution fee plus reimbursement of certain

24   expenses, and all remaining proceeds were to be paid to TWC.

25           14.    On or about July 21, 2006, TWC Holdings and GPI entered into the Amended and

26   Restated Limited Liability Company Agreement of Genius Products, LLC (the "Operating

27   Agreement").  A copy of the Operating Agreement is attached as Exhibit A.  Pursuant to the

28   Operating Agreement, among other things, (a) TWC Funding changed its name to Genius

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

1   Products, LLC, (b) GPI contributed its business and assets to the Debtor, and received in

2   exchange a 30% membership interest in the Debtor, and (c) TWC Holdings retained a 70%

3   membership interest in the Debtor.

4   15.    Concurrently, on or about July 17, 2006, TWC, as licensor, and the Debtor, as

5   licensee, entered into a Distribution Agreement (the "Distribution Agreement").  A copy of the

6   Distribution Agreement is attached as Exhibit B.  Pursuant to the Distribution Agreement, among

7   other things, TWC granted the Debtor the exclusive right to distribute Videos in the United States

8   upon terms substantially similar to the terms set forth in the Interim Distribution Agreement.

9   Thereafter, the Debtor distributed Videos in the home video market in accordance with the terms

10   of the Distribution Agreement.

11   16.    On or about January 1, 2009, the Debtor, GPI, TWC, TWC Holdings and other

12   parties entered into a Purchase and Sale Agreement (the "Purchase Agreement").  Pursuant to the

13   Purchase Agreement, TWC Holdings agreed to transfer majority ownership of the Debtor to a

14   restructuring investment firm called Quadrant Management, Inc.  Further, the Debtor and TWC

15   agreed to settle all monetary obligations owing to TWC by the Debtor on an accrued basis for all

16   distribution activity pursuant to the Distribution Agreement through September 30, 2008.  In

17   connection with the settlement, (a) the Debtor issued to TWC a promissory note in the principal

18   amount of $20 million (the "TWC Note"), (b) the Debtor agreed to pay to TWC up to an

19   additional $43.3 million, subject to the satisfaction by TWC of certain conditions set forth in the

20   Purchase Agreement, and (c) the Debtor agreed to pay to TWC a further amount to the extent the

21   estimate of amounts payable from October through and including December 2008 was less than

22   the actual amounts determined to be payable for such period.

23   17.    In connection with the Purchase Agreement, effective January 1, 2009, the Debtor

24   and TWC entered into an Amended and Restated Distribution Agreement (the "Amended

25   Distribution Agreement").  A copy of the Amended Distribution Agreement is attached as Exhibit

26   C.

27   18.    In connection with the Purchase Agreement, on or about September 15, 2009, the

28   Debtor, TWC and other parties agreed to the terms of a Binding Restructuring Term Sheet

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

1    Agreement (the "Restructuring Agreement").  Pursuant to the Restructuring Agreement, the

2    Amended Distribution Agreement was terminated, the parties entered into a new service

3    agreement pursuant to which the Debtor continued to distribute Videos, and the Debtor agreed to

4    make various payments to TWC as set forth in the Restructuring Agreement.

5        19.    Sometime after September 15, 2009, Vivendi Entertainment acquired the

6    operations and distribution rights held by the Debtor, and the Debtor subsequently ceased

7    operations.

8              **WEINSTEIN'S CONTROL AND DOMINATION OF THE DEBTOR**

9        20.    While the Debtor was structured by Weinstein as an independent company in 2006

10   purportedly under independent management, the Debtor's appearance of independence was a

11   sham that was intended to and did mislead third parties.  Weinstein (a) exercised ultimate control

12   over all of the Debtor's material business decisions for the benefit of Weinstein, (b) treated the

13   Debtor as an operating division of Weinstein for the benefit of Weinstein, and (c) dictated the

14   terms of the Distribution Agreement and Amended Distribution Agreement for the benefit of

15   Weinstein.

16       The Operating Agreement

17       21.    Pursuant to the Operating Agreement, the Debtor was prohibited from entering

18   into any material business transaction without the consent of TWC Holdings, and Weinstein was

19   entitled to usurp any corporate opportunity presented to the Debtor.  If the Debtor was presented

20   with any business opportunity, the Debtor was required to present the opportunity to TWC

21   Holdings.  If Weinstein determined in its discretion to engage in the opportunity, the Debtor was

22   prohibited from engaging in the opportunity.  If Weinstein determined in its discretion not to

23   engage in the opportunity, the Debtor was still prohibited from pursuing the opportunity if the

24   opportunity was competitive with Weinstein's business, unless TWC Holdings explicitly

25   consented in its discretion.

26       22.    While GPI was nominally the Debtor's Managing Member, the Operating

27   Agreement prevented GPI from making any material decision without the consent of TWC

28   Holdings. By way of example, GPI, as Managing Member, was required to obtain TWC

- 5 -

1   Holdings' approval to, among other actions, utilize subdistributors or licensees, or outsource any

2   functions relating to the Debtor's performance under the Distribution Agreement.

3       23.    TWC Holdings' control also extended directly to GPI.  As part of the 2006

4   transaction described in paragraphs 14 and 15 above, TWC Holdings was granted preferred stock

5   in GPI, which preferred stock granted TWC Holdings: (a) the right to elect five of the seven GPI

6   directors, (b) majority voting power over actions requiring approval of GPI's stockholders, and

7   (c) the right to approve any material decision GPI might make with respect to the Debtor.

8       The Distribution Agreement

9       24.    At the time the Distribution Agreement was entered into in 2006, Weinstein was on

10  both sides of the transaction.  TWC was the licensor, while at the same time TWC Holdings was

11  the controlling member of the licensee with decision-making authority for the licensee.  In fact,

12  the Distribution Agreement was executed by Larry Madden, TWC's Executive Vice President and

13  Chief Financial Officer at the time, on behalf of both TWC and the Debtor.  Accordingly, the

14  terms of the Distribution Agreement were not the product of arms'-length bargaining by

15  independent parties, but dictated by Weinstein to the Debtor, which Weinstein controlled.

16      25.    The terms of the Distribution Agreement gave TWC, and not the Debtor, ultimate

17  control over all aspects of the distribution of the Videos.  TWC, and not the Debtor, had ultimate

18  control over (a) which titles would be distributed by the Debtor, (b) the timing of the distribution

19  by the Debtor, (c) the pricing of the Videos, (d) the marketing strategy for the Videos, (e) the

20  marketing budget for the Videos, (f) the manufacture and distribution of the Videos by the Debtor,

21  (g) the artwork and design layout for the Videos, (h) the right to extend credit to the Debtors'

22  customers, (i) the manner of distribution of the Videos by the Debtor, including sales methods and

23  policies, (j) all marketing materials, media spends, and media buys, (k) all of the Debtors' return

24  policies, rebates, refunds, credits and discounts, (l) the number of Videos to be replicated and

25  shipped to the Debtor's customers, and (m) the number and identity of the Debtor's employees

26  dedicated to selling and marketing Videos.

27      26.    The terms of the Distribution Agreement were onerous and one-sided in favor of

28  TWC.  There was no practical possibility that the Debtor could operate profitably while bound to

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 6 -

1   the terms of the Distribution Agreement, and no truly independent distributor would have entered

2   into the Distribution Agreement.  By way of example:

3        a.    While a market distribution fee for an independent home video distributor

4   of titles included in the Weinstein library would be in the range of 15% to 17.5% of net receipts,

5   the Debtor was only entitled to a distribution fee of 5% of net receipts.  Further, if a title

6   performed better than expected, the Debtor's distribution fee with respect to the title was

7   retroactively reduced to as low as 3%.

8        b.    While a market reserve for the return of Videos by customers would be in

9   the range of 25% to 30%, the Debtor was only entitled to a reserve of 17.5%.

10        c.    While market terms would have required the Debtor to dedicate one or two

11   employees exclusively to the Weinstein titles, the Debtor was required to employ approximately

12   40 people at an annual cost of approximately $2 million dedicated exclusively to administering

13   the Weinstein titles.  Market terms and industry norms would have permitted substantially all of

14   the Debtor's employees to work across product lines.  The expense of these dedicated employees

15   was paid from the Debtor's overhead and was not a recoupable expense under the Distribution

16   Agreement.

17        d.    While market terms and industry norms would have permitted the Debtor

18   to select the replicator for the videos, which would have permitted the Debtor to hire the most

19   economical replicator and obtain the benefit of a volume discount all of the Debtor's titles, TWC

20   had the right to select and did select the Debtor's replicator for the Weinstein titles.  Upon

21   information and belief, TWC negotiated advance payments from the chosen replicator directly to

22   TWC, which was then recouped by the replicator through a higher per unit cost charged by the

23   replicator to the Debtor.

24        e.    While market terms and industry norms would have permitted the Debtor

25   to negotiate and distribute titles for third parties in the Debtor's discretion, TWC had the right to

26   veto and usurp any proposed third party transaction.  Upon information and belief, TWC

27   exercised its veto rights to require the Debtor to expend resources on unprofitable Weinstein titles

28   instead of profitable third party titles.

- 7 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    f.    While market terms and industry norms would have provided both the

2    Debtor and TWC the right to extend, or not extend, the term of the Distribution Agreement, only

3    TWC had the right to extend, or not extend, the term.

4    g.    While market terms and industry norms would have provided the Debtor

5    with the exclusive right to distribute Videos in all formats and technologies, the Debtor was not

6    granted any rights with respect to Videos distributed in Blu-Ray and other new formats, which

7    enabled TWC to usurp the marketing subsidies paid by manufacturers to distributors with respect

8    to such new formats.

9    h.    While market terms and industry norms would have permitted the Debtor

10    to outsource or sublicense to third parties any functions where such outsourcing or sublicensing

11    would be economical, the Debtor was prohibited from outsourcing or sublicensing any function

12    without TWC's consent.

13    i.    While the Debtor was required to recoup its expenses on a title by title

14    basis, TWC, and not the Debtor, had ultimate control over all material aspects of the distribution

15    of each title, so the Debtor had no capability to control or minimize its expenses on a title by title

16    basis.  For example, the Debtor had no right not to distribute a title once designated by TWC for

17    distribution, and TWC had the right to approve the budget for each release.  Upon information

18    and belief, TWC required the Debtor to spend more money on titles than were reasonably

19    required for the titles.  Further, TWC, and not the Debtor, controlled the initial release dates and

20    had consent rights to all marketing strategies.  Upon information and belief, TWC required the

21    Debtor to distribute certain titles on specific key dates instead of permitting the Debtor to release

22    a more marketable competitor's title at the same time.

23    j.    While market terms and industry norms would have permitted the Debtor

24    to sell Videos to customers as determined by the Debtor based upon the characteristic of the title

25    in order to maximize sales, the Debtor was penalized for any sales to wholesalers in excess of

26    12.5% of net receipts.

27    k.    While the Debtor was required to pay significant costs and expenses in

28    advance of the actual distribution of a title, including marketing costs to generate customer

- 8 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  awareness of a title, the Debtor's interest expense from the date the expense was incurred to the

2  date the expense was reimbursed or recouped was not a recoupable expense.

3            l.       While TWC had ultimate authority to determine the number of Videos that

4  would be replicated and distributed, with the cost to be paid by the Debtor, the Debtor had no

5  right to sell excess inventory at a discount without TWC's consent.  At the end of the term of the

6  Distribution Agreement, the Debtor had no extended period to sell any excess inventory and all

7  such inventory had to be destroyed.

8            m.      While market terms and industry norms would have permitted the Debtor

9  to recoup the expense of creative services such as key art, illustration, packaging design, logos

10  and title treatment, the Debtor was prohibited from recouping such expenses unless the service

11  was outsourced to a third party, which the Debtor was prohibited from doing unless TWC

12  consented.

13       27.      In summary, through its control of both sides of the transaction, Weinstein dictated

14  the terms of the Distribution Agreement so that substantially all of the revenue from the home

15  video distribution of the titles was transferred to Weinstein, while substantially all of the expenses

16  of the distribution were paid by the Debtor.  The effect of Weinstein's scheme was to utilize the

17  Distribution Agreement to transfer to Weinstein, as a result of Weinstein's ownership of the

18  Debtor, the Debtor's cash by charging the Debtor above-market rates in the Distribution

19  Agreement instead of the net revenues that could be obtained if the Distribution Agreement

20  reflected market terms and industry norms.

21       The Purchase Agreement and Amended Distribution Agreement

22       28.      By late 2008, Weinstein's scheme to use the Debtor as an instrumentality was

23  coming to an end.  The Debtor was running out of cash and on the verge of bankruptcy.

24  Weinstein entered into the Purchase Agreement to extricate itself from the relationship with the

25  Debtor at minimum cost to Weinstein.  In negotiating the terms of the Purchase Agreement,

26  Weinstein dictated the terms that related to the relationship between the Debtor and TWC,

27  including the purported amounts owed by the Debtor to TWC.

28       29.      In connection with the Purchase Agreement, TWC and the Debtor entered into the

1    Amended Distribution Agreement, which went into effect as of January 1, 2009.  In

2    acknowledgement that the terms of the Distribution Agreement were onerous and made it

3    impossible for the Debtor to operate profitably, TWC modified the Distribution Agreement in an

4    attempt to provide the Debtor with marginally more operating flexibility and cash flow while the

5    transactions contemplated by the Purchase Agreement were consummated.  However, as a

6    purported "incentive" for TWC to enter into the Amended Distribution Agreement, TWC granted

7    itself the right to certain "Licensor Incentive Amounts," which obligated the Debtor to pay to

8    TWC up to an additional $12,000,000 based upon distribution fees owed to the Debtor that

9    accrued in 2009.

10         30.    Notwithstanding the modifications set forth in the Amended Distribution

11    Agreement, the terms of the Amended Distribution Agreement remained onerous and one-sided in

12    favor of TWC, and there was no practical possibility that the Debtor could operate profitably

13    while complying with the terms of the Amended Distribution Agreement.  No truly independent

14    distributor would have entered into the Amended Distribution Agreement.

15        The Restructuring Agreement

16         31.    Pursuant to the Restructuring Agreement, the Amended Distribution Agreement

17    was terminated, the parties entered into a new service agreement pursuant to which the Debtor

18    continued to distribute Videos, and the Debtor agreed to make various payments to TWC as set

19    forth in the Restructuring Agreement.  The terms of the Restructuring Agreement were onerous

20    and one-sided in favor of TWC, and there was no practical possibility that the Debtor could

21    operate profitably while complying with the terms of the Restructuring Agreement.  No truly

22    independent distributor would have entered into the Restructuring Agreement

23        **THE DEBTOR'S TRANSFERS TO WEINSTEIN WHILE INSOLVENT**

24         32.    Weinstein's scheme necessitated that the Debtor operate at a loss.  The Debtor's

25    publicly reported net loss for the year ended December 31, 2006, was approximately $19.7

26    million. The Debtor's publicly reported net loss for the year ended December 31, 2007, was

27    approximately $18.8 million. On March 17, 2008, GPI publicly reported that "the [Debtor] may

28    [n]ever achieve or sustain profitability in the future." The Debtor's publicly reported net loss for

1    the nine months ended September 30, 2008, was approximately $89.8 million.  On September 30,

2    2008, the Debtor's publicly reported total assets were disclosed to be worth approximately $113

3    million (exclusive of purported goodwill estimated at $68 million), while current liabilities were

4    in the amount of $195 million.  On March 30, 2009, GPI publicly reported that "[b]ased on

5    current operating results, the [Debtor] will fall short of generating enough cash flow from

6    continuing operations to timely meet its financial commitments and obligations."

7         33.      In order for the Debtor to operate at a loss to facilitate the Weinstein scheme, the

8    Debtor needed third parties to extend credit, which borrowed funds could be used to make

9    transfers to Weinstein and pay overhead expenses.  To obtain such borrowed funds, the Debtor

10   entered into distribution agreements with third party licensors at market terms.  Pursuant to the

11   distribution agreements, the Debtor was obligated to timely pay proceeds to the licensors after

12   retention of the negotiated distribution fee.  Instead, the Debtor used the proceeds to make

13   transfers to Weinstein and pay overhead expenses, thereby turning the third party licensors into

14   unsecured creditors who were not paid timely.  Certain of the third party licensors who were not

15   paid timely were never paid the amount owed and are creditors of the Estate.  Consequently, the

16   Debtor's nominal independence was intended by Weinstein to mislead third parties to do business

17   with the Debtor for the benefit of Weinstein.

18        34.      At the time of the execution of the Distribution Agreement and at all times

19   thereafter, (a) the Debtor was insolvent, as that term is defined at section 101(32) of the

20   Bankruptcy Code and as such term is used in section 3439.02 of the California Code of Civil

21   Procedure, or was rendered insolvent as a result thereof, and/or (b) the Debtor was engaged in

22   business or a transaction, or was about to engage in business or a transaction, for which its

23   remaining assets were unreasonably small in relation to such business or transaction, and/or (c)

24   the Debtor intended to incur, or believed or reasonably should have believed that it would incur,

25   debts beyond the Debtor's ability to pay as such debts matured.

26        35.      At the time of the execution of the Purchase Agreement, the TWC Note, the

27   Amended Distribution Agreement, and at all times thereafter, (a) the Debtor was insolvent, as that

28   term is defined at section 101(32) of the Bankruptcy Code and as such term is used in section

- 11 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   3439.02 of the California Code of Civil Procedure, or was rendered insolvent as a result thereof,

2   and/or (b) the Debtor was engaged in business or a transaction, or was about to engage in

3   business or a transaction, for which its remaining assets were unreasonably small in relation to

4   such business or transaction, and/or (c) the Debtor intended to incur, or believed or reasonably

5   should have believed that it would incur, debts beyond the Debtor's ability to pay as such debts

6   matured.

7   36.    At the time of the execution of the Restructuring Agreement and at all times

8   thereafter, (a) the Debtor was insolvent, as that term is defined at section 101(32) of the

9   Bankruptcy Code and as such term is used in section 3439.02 of the California Code of Civil

10  Procedure, or was rendered insolvent as a result thereof, and/or (b) the Debtor was engaged in

11  business or a transaction, or was about to engage in business or a transaction, for which its

12  remaining assets were unreasonably small in relation to such business or transaction, and/or (c)

13  the Debtor intended to incur, or believed or reasonably should have believed that it would incur,

14  debts beyond the Debtor's ability to pay as such debts matured.

15  37.    From and after December 27, 2007, the Debtor transferred $130,459,452.57 to

16  TWC on account of obligations under the Distribution Agreement, the Purchase Agreement, the

17  TWC Note, the Amended Distribution Agreement and/or the Restructuring Agreement (the

18  "Transfers"). A list of the Transfers identifying specific dates and amounts is attached hereto as

19  Exhibit D. Each of the Transfers constituted a transfer of the Debtor's property within four years

20  of the Petition Date. At the time of each of the Transfers and at all times thereafter, (a) the Debtor

21  was insolvent, as that term is defined at section 101(32) of the Bankruptcy Code and as such term

22  is used in section 3439.02 of the California Code of Civil Procedure, or was rendered insolvent as

23  a result thereof, and/or (b) the Debtor was engaged in business or a transaction, or was about to

24  engage in business or a transaction, for which its remaining assets were unreasonably small in

25  relation to such business or transaction, and/or (c) the Debtor intended to incur, or believed or

26  reasonably should have believed that it would incur, debts beyond the Debtor's ability to pay as

27  such debts matured.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 12 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1

## FIRST CLAIM FOR RELIEF

2

**(Avoidance of Fraudulent Transfer –
11 U.S.C. § 544(b)(1) and Cal. Civ. Code § 3439.04(a)(1))**

3

4      38.      The Trustee realleges and incorporates herein by reference each and every

5   allegation in paragraphs 1 through 37 above, as if set forth fully herein.

6      39.      The Debtor entered into the Distribution Agreement, the Purchase Agreement, the

7   Amended Distribution Agreement, the TWC Note, and the Restructuring Agreement, and made

8   the Transfers, with the actual intent to hinder, delay, or defraud its creditors.

9      40.      There exists, and has existed through the Debtor's bankruptcy case, at least one

10   creditor holding an unsecured claim allowable under section 502 of the Bankruptcy Code or that

11   is not allowable by reason of section 502(e) of the Bankruptcy Code who would have the right to

12   avoid, under section 3439.04(a)(1) of the California Civil Code, each of the Transfers.

13      41.      By reason of the foregoing, pursuant to section 3439.04(a)(1) of the California

14   Civil Code, as made applicable to this adversary proceeding by section 544(b)(1) of the

15   Bankruptcy Code, the Debtor may avoid (a) each of the Transfers against TWC and TWC

16   Holdings, and (b) all obligations incurred under the Distribution Agreement, the Purchase

17   Agreement, the Amended Distribution Agreement, the TWC Note, and the Restructuring

18   Agreement.

19

## SECOND CLAIM FOR RELIEF

20

**(Avoidance of Fraudulent Transfer –
11 U.S.C. § 544(b)(1) and Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05)**

21

22      42.      The Trustee realleges and incorporates herein by reference each and every

23   allegation in paragraphs 1 through 37 above, as if set forth fully herein.

24      43.      The Debtor's execution of the Distribution Agreement constituted an incurrence of

25   an obligation by the Debtor.

26      44.      The Debtor's execution of the Purchase Agreement constituted an incurrence of an

27   obligation by the Debtor.

28      45.      The Debtor's execution of the TWC Note constituted an incurrence of an

1   obligation by the Debtor.

2        46.    The Debtor's execution of the Amended Distribution Agreement constituted an

3   incurrence of an obligation by the Debtor.

4        47.    The Debtor's execution of the Restructuring Agreement constituted an incurrence

5   of an obligation by the Debtor.

6        48.    Each request by TWC that the Debtor distribute a title in accordance with the

7   Distribution Agreement, the Amended Distribution Agreement, or the Restructuring Agreement,

8   constituted an incurrence of an obligation by the Debtor.

9        49.    The Debtor did not receive reasonably equivalent value in exchange for the

10   Distribution Agreement, its obligation to distribute each title requested by TWC pursuant to the

11   Distribution Agreement, and its obligation to pay amounts to TWC pursuant to the Distribution

12   Agreement.

13        50.    The Debtor did not receive reasonably equivalent value in exchange for the

14   Purchase Agreement and its obligation to pay amounts to TWC pursuant to the Purchase

15   Agreement.

16        51.    The Debtor did not receive reasonably equivalent value in exchange for the TWC

17   Note and its obligation to pay amounts to TWC pursuant to the TWC Note.

18        52.    The Debtor did not receive reasonably equivalent value in exchange for the

19   Amended Distribution Agreement, its obligation to distribute each title requested by TWC

20   pursuant to the Amended Distribution Agreement, and its obligation to pay amounts to TWC

21   pursuant to the Amended Distribution Agreement.

22        53.    The Debtor did not receive reasonably equivalent value in exchange for the

23   Restructuring Agreement, its obligation to distribute each title requested by TWC pursuant to the

24   Restructuring Agreement, and its obligation to pay amounts to TWC pursuant to the Restructuring

25   Agreement.

26        54.    Each of the Transfers was made on account of the Debtor's obligations under the

27   Distribution Agreement, the Purchase Agreement, the TWC Note, the Amended Distribution

28   Agreement, or the Restructuring Agreement.

- 14 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    55.    There exists, and has existed through the Debtor's bankruptcy case, at least one

2    creditor holding an unsecured claim allowable under section 502 of the Bankruptcy Code or that

3    is not allowable by reason of section 502(e) of the Bankruptcy Code who would have the right to

4    avoid, under section 3439.04(a)(2) or 3439.05 of the California Civil Code, each of the Transfers.

5    56.    By reason of the foregoing, pursuant to sections 3439.04(a)(2) and 3439.05 of the

6    California Civil Code, as made applicable to this adversary proceeding by section 544(b)(1) of the

7    Bankruptcy Code, the Debtor may avoid (a) each of the Transfers against TWC and TWC

8    Holdings, and (b) all obligations incurred under the Distribution Agreement, the Purchase

9    Agreement, the Amended Distribution Agreement, the TWC Note, and the Restructuring

10   Agreement.

**THIRD CLAIM FOR RELIEF**

**(Recovery Of Fraudulent Transfers -- 11 U.S.C. § 550)**

13   57.    The Trustee realleges and incorporates herein by reference each and every

14   allegation in paragraph 1 to 56 above, as if set forth fully herein.

15   58.    The Transfers are avoidable pursuant to section 544 of the Bankruptcy Code.

16   59.    All obligations incurred under the Distribution Agreement, the Purchase

17   Agreement, the Amended Distribution Agreement, the TWC Note, and the Restructuring

18   Agreement ("Obligations") are avoidable pursuant to section 544 of the Bankruptcy Code.

19   60.    TWC was the initial transferee of the Transfers, or a person for whose benefit the

20   Transfers were made.

21   61.    TWC Holdings was a subsequent transferee of the Transfers, or a person for whose

22   benefit the Transfers were made.

23   62.    By reason of the foregoing, the Trustee may recover, for the benefit of the Estate,

24   the property transferred by the Transfers, or the value of such property, from TWC and TWC

25   Holdings pursuant to section 550(a) of the Bankruptcy Code.

**FOURTH CLAIM FOR RELIEF**

**(Recovery Of Improper Dividends -- Delaware Corp. Code § 18-607)**

28   63.    The Trustee realleges and incorporates herein by reference each and every

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  allegation in paragraph 1 to 37 above, as if set forth fully herein.

2      64.    The Transfers were distributions to members within the meaning of Delaware

3  Corp. Code § 18-607.

4      65.    After giving effect to each Transfer, the Debtor's liabilities exceeded the fair value

5  of the Debtor's assets.

6      66.    By reason of the foregoing, the Trustee may recover, for the benefit of the Estate,

7  the property transferred by the Transfers, or the value of such property, from TWC Holdings

8  pursuant to Delaware Corp. Code § 18-607.

9  **FIFTH CLAIM FOR RELIEF**

10  **(Breach of Fiduciary Duty of Due Care)**

11      67.    The Trustee realleges and incorporates herein by reference each and every

12  allegation in paragraph 1 to 66 above, as if set forth fully herein.

13      68.    As the controlling member of the Debtor, TWC Holdings owed a fiduciary duty of

14  care to the Debtor.  As such, TWC Holdings was required to act in good faith, in a manner TWC

15  Holdings believed to be in the best interest of the Debtor and with such care, including reasonable

16  inquiry, as an ordinarily prudent person in a like position would use under such circumstances.

17      69.    TWC Holdings breached its fiduciary duty of due care to the Debtor by, among

18  other things:

19      a.    causing the Debtor to enter into the Distribution Agreement, the Purchase

20  Agreement, TWC Note, Amended Distribution Agreement, and the Restructuring Agreement

21  upon terms that were onerous, one-sided, and favored Weinstein over the Debtor;

22      b.    preventing the Debtor from undertaking profitable business opportunities;

23      c.    requiring the Debtor to pursue unprofitable business opportunities;

24      d.    requiring the Debtor to make fraudulent transfers to TWC and TWC

25  Holdings; and

26      e.    requiring the Debtor to make improper dividends to TWC Holdings.

27      70.    As a proximate result of the acts and omissions alleged herein, the Debtor has been

28  damaged in an amount subject to proof at trial.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2

## **SIXTH CLAIM FOR RELIEF**

### **(Breach of the Fiduciary Duty of Loyalty)**

3    71.    The Trustee realleges and incorporates herein by reference each and every

4    allegation in paragraph 1 to 66 above, as if set forth fully herein.

5    72.    As the controlling member of the Debtor, TWC Holdings owed a fiduciary duty of

6    undivided loyalty to the Debtor.  As such, TWC Holdings was required to refrain from doing

7    anything that would work injury to the Debtor or to deprive the Debtor of profit or advantage

8    which its skill and ability might properly bring to it, or enable it to make in the reasonable and

9    lawful exercise of its powers.

10    73.    TWC Holdings breached its fiduciary duty of loyalty to the Debtor by, among

11    other things:

12        a.    causing the Debtor to enter into the Distribution Agreement, the Purchase

13    Agreement, TWC Note, Amended Distribution Agreement, and the Restructuring Agreement

14    upon terms that were onerous, one-sided and favored Weinstein over the Debtor, for the benefit of

15    Weinstein;

16        b.    preventing the Debtor from undertaking profitable business opportunities

17    for the benefit of Weinstein;

18        c.    requiring the Debtor to pursue unprofitable business opportunities for the

19    benefit of Weinstein.

20        d.    requiring the Debtor to make fraudulent transfers to TWC and TWC

21    Holdings; and

22        e.    requiring the Debtor to make improper dividends to TWC Holdings.

23    74.    At all relevant times, TWC Holdings was acting in its own self-interest and for its

24    own benefit, in violation of its duty of loyalty to the Debtor.

25    75.    As a proximate result of the acts and omissions alleged herein, the Debtor and its

26    creditors have been damaged in an amount subject to proof at trial.

27

28

- 17 -

1                                   **SEVENTH CLAIM FOR RELIEF**

2                           **(Declaratory Relief -- Alter-Ego/Instrumentality)**

3         76.     The Trustee realleges and incorporates herein by reference each and every

4 allegation in paragraph 1 to 37 above, as if set forth fully herein.

5         77.     Weinstein exercised control and dominance over the Debtor to the extent that the

6 Debtor had no meaningful independence or separateness from Weinstein.  Weinstein treated the

7 Debtor as an operating division and utilized the Debtor as a mere shell, instrumentality and

8 conduit to conduct Weinstein's business.

9         78.     The Debtor was inadequately capitalized by Weinstein to conduct the business

10 Weinstein required the Debtor to conduct.

11         79.     There would be an inequitable result if Weinstein was not liable for the debts and

12 liabilities of the Debtor.

13         80.     An actual, present and justiciable controversy has arisen concerning the liability of

14 Weinstein for the debts of the Debtor.

15         81.     By reason of the foregoing, the Trustee is entitled to a declaratory judgment that

16 TWC and TWC Holdings are each liable for the debts of the Debtor.

17         **WHEREFORE**, the Trustee prays for judgment on his Complaint as follows:

18         A.     On the First and Second Claims for Relief, avoidance of the Transfers and

19 Obligations for the benefit of the Estate.

20         B.     On the Third Claim for Relief, recovery of the property transferred by the

21 Transfers, or the value of such property, from TWC and TWC Holdings pursuant to section 550

22 of the Bankruptcy Code.

23         C.     On the Fourth Claim for Relief, recovery of the property transferred by the

24 Transfers, or the value of such property, from TWC Holdings pursuant to Delaware Corp. Code §

25 18-607.

26         D.     On the Fifth and Sixth Claims for Relief, judgment for damages in an amount

27 subject to proof at trial.

28         E.     On the Seventh Claim for Relief, judgment that TWC and TWC Holdings are each

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   liable for the debts of the Debtor.

2       F.      On all Claims for Relief, for pre-judgment and post-judgment interest at the

3   highest rate allowed by law, costs of suit incurred herein, and such other and further relief as the

4   Court deems just and proper.

5

6   DATED: May 8, 2015                    **ROBINS KAPLAN LLP**

7                                         By: _David B. Shemano_____

8                                             David B. Shemano
                                              James P. Menton, Jr.

9
                                          Special Litigation Counsel for Alfred H. Siegel,
10                                        Chapter 7 Trustee

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 19 -