Alan R. Friedman (SBN 241904)
    afriedman@foxrothschild.com
Mette H. Kurth (SBN 187100)
    mkurth@foxrothschild.com
Fox Rothschild LLP
1800 Century Park East Suite 300
Los Angeles, CA 90067-1506
Telephone:    310-598-4150
Facsimile:    310-556-9828

Attorneys for The Weinstein Company LLC
and The Weinstein Company Holdings LLC

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re | Case No. 2:11-bk-62283-RN |
| GENIUS PRODUCTS, LLC, | Chapter 7 |
| Debtor. | |
| ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE FOR THE ESTATE OF GENIUS PRODUCTS, LLC, | Adv. No. 2:15-ap-1241-RN |
| Plaintiff, | **DEFENDANTS' MOTION TO DISMISS THE CHAPTER 7 TRUSTEE'S COMPLAINT** |
| v. | |
| THE WEINSTEIN COMPANY LLC and THE WEINSTEIN COMPANY HOLDINGS LLC, | Date:  To be determined |
| | Time:  To be determined |
| Defendants. | Place: U.S. Bankruptcy Court |
| | Edward R. Royal Federal Bldg. |
| | Courtroom 1645 |
| | 255 East Temple Street |
| | Los Angeles, CA 90012 |
| | Judge:  Hon. Richard M. Neiter |

Defendants The Weinstein Company LLC and The Weinstein Company Holdings, LLC

("Defendants") hereby respectfully request that this Court dismiss each cause of action in the

complaint filed in the above-captioned adversary proceeding (the "Complaint").  Defendants bring

1  this motion pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and Federal Rule of

2  Bankruptcy Procedure 7012 and 7009.  This motion is based on the accompanying Memorandum of

3  Points and Authorities, which is incorporated herein, Defendants' Request for Judicial Notice filed

4  herewith, the exhibits attached to the Declaration of Stephen Scibelli, dated July 2, 2015, the exhibits

5  attached to the Declaration of Alan Friedman, dated July 6, 2015, the Court's files in this adversary

6  proceeding and the related chapter 7 case, and such other evidence and argument as may properly

7  come before the Court at any hearing on this motion

8        There are good and sufficient grounds for granting this motion.

9        The Trustee's fraudulent transfer claims (Counts I – III) are predicated on his allegations that

10  the Debtor did not receive reasonably equivalent value under agreements the Debtor entered into

11  with Defendants and, in some instances, additional parties, because the agreements allegedly were

12  "not the product of arm's length bargaining by independent parties" and are agreements "no truly

13  independent distributor would have entered into."  However, as set forth in the Memorandum of

14  Points and Authorities, and as substantiated by the agreements themselves, by documents

15  incorporated by reference in the Complaint, and by judicially noticeable documents filed with the

16  SEC, every agreement the Trustee challenges was negotiated at arm's length by independent parties

17  for reasonable value.  The Trustee's allegations that Defendants were able to "dictate" "onerous"

18  terms are unsupported by fact and contradicted by documents properly before the Court on this

19  motion, including the agreements themselves and admissions in the Trustee's Complaint.  Under

20  established Rule 12(b)(6) precedent, the Trustee's conclusory allegations (i) are not entitled to a

21  presumption of truth, and (ii) do not state a "plausible" claim upon which relief may be granted.

22        The Trustee's remaining claims, for breach of fiduciary duty, recovery of allegedly improper

23  dividends under Delaware Corp. Code § 18-607, and for a declaration that Defendants are alter egos

24  of the Debtor (Counts IV – VII), are also deficient as a matter of law.  First, they are barred by the

25  statutes of limitations.  Second, they are barred by releases the Debtor granted to Defendants.  Third,

26  the Trustee's improper dividend claim, alleged against TWC Holdings alone, additionally fails both

27  because, as the Trustee admits (Compl. ¶ 37), the challenged "Transfers" (i) were contractual

28  payments and, thus, were not "distributions" under § 18-607, and (ii) were not paid to a member of

1   Debtor, which is a separate requirement of § 18-607.  Fourth, the fiduciary duty claims, also alleged

2   against TWC Holdings alone, fail because TWC Holdings did not, as a matter of law, owe a

3   fiduciary duty to the Debtor.  And, fifth, the Trustee's declaratory judgment claim fails because there

4   is no independent alter ego claim for relief under California law and, even if there was, the Trustee

5   lacks standing to assert it and has failed to allege facts necessary to support it.

6        **WHEREFORE,** Defendants The Weinstein Company LLC and The Weinstein Company

7   Holding LLC respectfully request that the Court enter an order:

8        1.      Granting this Motion;

9        2.      Dismissing the Complaint with prejudice and without leave to amend, for failure to

10               state any claims; and

11       3.      Granting such further relief as is just and appropriate.

12   Dated: July 6, 2015                          **FOX ROTHSCHILD LLP**

13                                                By: */s/ Mette H. Kurth*
                                                  Alan R. Friedman
14                                                Mette H. Kurth
                                                  Attorneys for Defendants
15                                                The Weinstein Company LLC and
                                                  The Weinstein Company Holdings LLC
16

17

18

19

20

21

22

23

24

25

26

27

28

1

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ............................................................................1

II.   PROCEDURAL HISTORY................................................................................4

III.  FACTUAL BACKGROUND .............................................................................5

A.    The Distribution Agreement and the Operating Agreement Were The Product
       Of Arm's Length Bargaining Between Unaffiliated Parties.....................................5

      1.    The Distribution Agreement and the Operating Agreement........................6

      2.    The December 5, 2005 Interim Distribution Agreement Additionally
             Confirms the *Bona Fides* of the Distribution Agreement..............................8

B.    The Purchase Agreement and the Distribution Agreement Were Negotiated At
       Arm's Length Between Unaffiliated Parties.....................................................9

C.    The Restructuring Agreement Was Based Upon Arm's Length Negotiation
       Between Unaffiliated Parties .....................................................................10

IV.   LEGAL ARGUMENT.....................................................................................11

A.    Pleading Standards Under Rule 12(b)(6) .........................................................11

B.    The Court Need Not Accept As True Allegations Contradicted By Documents
       the Court Can Consider Under the Incorporation by Reference Doctrine Or
       Which Are Subject to Judicial Notice............................................................13

C.    The Trustee's Fraudulent Transfer Claims Should Be Dismissed ............................16

      1.    Count I (Actual Fraud) and Count II (Constructive Fraud) Are
             Insufficiently Pled As a Matter of Law.............................................16

      2.    Because The Debtor Received Reasonably Equivalent Value In
             Exchange For The Transfers, The Trustee Cannot State A Claim For
             Actual Or Constructive Fraudulent Transfers ........................................19

D.    The Debtor Released the Non-Bankruptcy Law Claims .......................................25

      1.    The Releases Bar The Trustee's Breach Of Fiduciary Duty Claims ...........25

      2.    The Releases Bar The Trustee's Alter-Ego/Instrumentality Claim .............26

      3.    The Release Bars The Improper Dividend Claim With Respect To
             Transfers Made On Or Before September 15, 2009 ..................................27

E.    The Fiduciary Duty and Improper Dividend Claims Independently Fail Because
       They Are Time-Barred...............................................................................27

i

1         1.     Delaware Law Applies to the Fiduciary Duty and Improper Dividend Claims ............................................................................................27

2.     The Fiduciary Duty Claims are Time-Barred and Do Not Relate Back .......28

3.     The Improper Dividend Claim is Also Time-Barred ...................................30

F.   Count IV (Improper Dividend) Fails To State a Claim Because The Alleged Transfers to TWC Were Not Improper "Distributions" Under 6 Del. C. § 18-607........................................................................................................31

1.     The Transfers to Non-Member TWC Were Not § 18-607 "Distributions" ...............................................................................31

2.     The Transfers Were Contractual Payments, Which Are Not § 18-607 "Distributions" ...............................................................................31

G.  The Breach of Fiduciary Duty Claims (Counts V And VI) Fail Because TWC Holdings Owed No Fiduciary Duty to the Debtor ......................................32

H.  The Trustee's Alter Ego Claim (Count VII) Fails Because Such a Claim Is Not Recognized Under California Law And, in Any Event, The Trustee Has No Standing To Assert It ...........................................................................32

I.   The Complaint Should be Dismissed Without Leave to Amend .................35

V.    CONCLUSION..............................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Abrego Abrego v. The Dow Chem. Co.,
    443 F.3d 676 (9th Cir. 2006) ................................................................... 13

In re AFI Holding, Inc.,
    525 F.3d 700 (9th Cir. 2008) ................................................................... 19

Ahcom, Ltd. v. Smeding,
    623 F.3d 1248 (9th Cir. 2010) ........................................................ 32, 33, 34

Alberts v. HCA, Inc. (In re Greater Southeast Comm. Hosp. Corp. I),
    No. 04-10366, 2012 WL 589269 (Bankr. D.D.C. Feb. 22, 2012) .............................. 23

Annod Corp. v. Hamilton & Samuels,
    123 Cal.Rptr.2d 924 (Cal. Dist. Ct. App. 2002) .................................... 20, 22

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)........................................................... 11, 12, 22

Automotriz Del Golfo De California v. Resnick,
    47 Cal.2d 792 (Cal. 1957)..................................................................... 34

Barsoumian v. Aurora Loan Servs., LLC,
    No. CV 12-4368 PA AGRX, 2012 WL 6012984 (C.D.Cal. Dec. 3, 2012)................................ 18

Becher v. Northwestern Mut. Life Ins. Co.,
    No. CV 10-6264, 2010 WL 5138910 (C.D. Cal. Dec. 9, 2010) ................................. 27

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)........................................................... 11, 12, 22

Bly-Magee v. California,
    236 F.3d 1014 (9th Cir. 2001) ................................................................... 18

Branch v. Tunnell,
    14 F.3d 449 (9th Cir. 1994) ................................................................... 13

Brandt v. Widin Corp. (In re 3DFX Interactive Inc.),
    389 B.R. 842 (Bankr. N.D. Cal. 2008) ........................................ 12, 22, 23

Colony Cove Props., LLC v. City of Carson,
    640 F.3d 948 (9th Cir. 2011) ................................................... 12, 20

Communist Party of United States of America v. 522 Valencia, Inc.,
    35 Cal.App.4th 980 (Cal. Ct.App. 1995) ...................................... 33, 34

Daniels-Hall v. Nat'l Educ. Ass'n,
   629 F.3d 992 (9th Cir. 2010) ................................................................... 15, 17, 21

David B. Lilly Co., Inc. v. Fisher,
   18 F.3d 1112 (3rd. Cir. 1994) ................................................................... 28

Davis v. HSBC Bank Nevada, N.A.,
   691 F.3d 1152 (9th Cir. 2012) ................................................................. 12

Dofflemyer v. W.F. Hall Printing Co.,
   558 F. Supp. 372 (D. Del. 1983) .............................................................. 28

Dunham v. Envtl. Chem. Corp.,
   No. C 06-03389, 2006 WL 2374703 (N.D. Cal. August 16, 2006) ...................... 14, 15

F.D.I.C. v. Faigin,
   No. CV 12-03448, 2013 WL 3389490 (C.D. Cal. Jul 8, 2013) ........................... 27

Feeley v. NHAOCG, LLC,
   62 A.3d 649 (Del. Ch. Nov. 28, 2012) ...................................................... 32

Gens v. Wachovia Mortgage Corp.,
   C.A. No. 10-CV-01073-LHK, 2011 WL 1791601 (N.D. Cal. May 10, 2011) ........... 13

Gordon v. City of Oakland,
   627 F.3d 1092 (9th Cir. 2010) ................................................................. 34

Hennessey's Tavern, Inc. v. Am. Air Filter Co.,
   204 Cal.App.3d 1351 (1988) ................................................................... 33

Holguin v. Dish Network LLC,
   229 Cal.App.4th 1310 (2014) .............................................................. 14, 15

Imbert v. LCM Interest Holding LLC,
   No. 7845-ML, 2013 WL 1934563 (Del. Ch., May 7, 2013) ............................... 32

Hoffman v. Fay (In re SCI Real Estate Investments, LLC),
   No. 2:11-BK-15975-PC, 2013 WL 1829648 (Bankr. C.D. Cal May 1, 2013) ... 12, 16, 17, 18, 19

Isaacson, Stolper & Co. v. Artisan's Sav. Bk.,
   330 A.2d 130 (Del. 1974) ...................................................................... 28

Jordan v. Kroneberger (In re Jordan),
   392 B.R. 428 (Bankr. D. Id. 2008) ........................................................... 21

Keller v. United States,
   667 F. Supp. 1351 (S.D. Cal. 1987) .......................................................... 30

Knievel v. ESPN,
   393 F.3d 1068 (9th Cir. 2005) ................................................................. 13

<u>Krommenhoek v. Natural Resources Recovery, Inc. (In re Treasure Valley</u>
<u>Opportunities, Inc.)</u>,
    166 B.R. 701 (Bankr. D. Id. 1994) ........................................................................ 24

<u>Kuroda v. SPJS Holdings, L.L.C.</u>,
    No. 4030-CC, 2010 WL 925853 (Del. Ch. Mar. 16, 2010) ..................................... 32

<u>Lidow v. Super. Ct.</u>,
    206 Cal.App. 4th 351 (2012) .................................................................................. 28

<u>Limestone Dev. Corp. v. Vill. Of Lemont, Ill.</u>,
    520 F.3d 797 (7th Cir. 2008) ................................................................................. 12

<u>Marshack v. Wells Fargo Bank (In re Walters)</u>,
    163 B.R. 575 (Bankr. C.D.Cal. 1994) ............................................................... 19, 24

<u>Martell v. Trilogy Ltd.</u>,
    872 F.2d 322 (9th Cir. 1989) ................................................................................. 29

<u>Neilson v. Union Bank of CA, N.A.</u>,
    290 F. Supp.2d 1101 (C.D. Cal. 2003) ................................................................... 34

<u>OCUC of Fitness Holdings Int'l., Inc. v. Hancock Park Cap. II, LP (In re Fitness</u>
<u>Holdings Int'l, Inc.)</u>,
    714 F.3d 1141 (9th Cir. 2013) ............................................................................... 24

<u>Oklahoma Firefighters Pension & Ret. Sys. v. Ixia</u>,
    No. 13-08440, 2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ................................. 13

<u>Parrino v. FHP, Inc.</u>,
    146 F.3d 699, 706 (9th Cir. 1998) .......................................................................... 13

<u>Pellerin v. Stuhley (In re Destro)</u>,
    675 F.2d 1037 (9th Cir. 1982) ............................................................................... 25

<u>Peltz v. Hatten</u>,
    279 B.R. 710 (D. Del. 2002) .................................................................................. 22

<u>Reese v. Malone</u>,
    747 F.3d 557 (9th Cir. 2014) ................................................................................. 13

<u>Sandoval v. Ali</u>,
    34 F.Supp.3d 1031 (N.D. Cal. Mar. 28, 2014) ....................................................... 34

<u>Screen Capital Intern. Corp. v. Library Asset Acquisition Co., Ltd.</u>,
    510 B.R. 248 (C.D. Cal. 2014) ............................................................................... 16

<u>Shroyer v. New Cingular Wireless Servs., Inc.</u>,
    622 F.3d 1035 (9th Cir. 2010) ............................................................................... 12

In re Silicon Graphics Inc. Sec. Litig.,
    183 F.3d 970 (9th Cir. 1999) ............................................................... 13

Smith v. Arthur Andersen LLP,
    421 F.3d 989 (9th Cir. 2005) ............................................................... 25

Sonora Diamond Corp. v. Superior Court,
    83 Cal.App.4th 523 (2000) ................................................................. 34

Swartz v. KPMG LLP,
    476 F.3d 756 (9th Cir. 2007) ............................................................... 18

Telesaurus VPC, LLC v. Power,
    623 F.3d 998 (9th Cir. 2010) ............................................................... 11

Tomaselli v. Transamerica Ins. Co.,
    25 Cal.App.4th 1269 (1994) ............................................................... 33

In re Tyson Foods, Inc.,
    919 A.2d 563 (Del. Ch. 2007) ............................................................ 28

In re United Energy Corp.,
    944 F.2d 589 (9th Cir. 1991) ............................................................... 19

In re Verisign, Inc., Deriv. Litig.,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) .............................................. 27

Willard v. Abn Amro Mortgage Group, Inc., et al.,
    No. 05-cv-00893, 2005 WL 2889788 (W.D. Okla. Oct. 7, 2005) ....... 13

Williams v. Boeing Co.,
    517 F.3d 1120 (9th Cir. 2008) ............................................................. 29

Zimmerman v. Crothall,
    62 A.3d 676 (Del. Ch. 2013) .............................................................. 32

**Statutes**

6 Del. C. § 18–1101(b) ............................................................................ 31

6 Del. C. § 18-607 ................................................ 1, 4, 26, 27, 28, 30, 31

10 Del. C. § 8106 .................................................................................... 28

11 U.S.C. § 108(a)(2) ............................................................................. 29

11 U.S.C. § 548 ....................................................................................... 24

11 U.S.C. § 550 ....................................................................................... 16

Cal. Civ. Code § 1642 .................................................................. 13, 14, 15

Cal. Civ. Code. § 3439.03 .................................................................................................. 23

Cal. Civ. Code. § 3439.04 ................................................................................... 17, 18, 19,20

Cal. Civ. Code, § 3439.08 .................................................................................................. 20

Cal. Civ. Code § 3439.95 ................................................................................................... 18

Cal. Corp. Code § 2116 ...................................................................................................... 27

**Other Authorities**

Fed.R.Bankr.P. 7012 .......................................................................................................... 11

Fed.R.Bankr.P. 7015 ..................................................................................................... 4, 29

Fed. R. Civ. P. 4(m) ........................................................................................................... 29

Fed. R.Civ. P. 8(a) ....................................................................................................... 16, 18

Fed. R. Civ. P. 9(b) .................................................................................................. 16, 17, 18

Fed. R. Civ. P. 12(b)(6) ..................................................... 1, 5, 11, 12, 13, 18, 30, 34

Fed. R.Civ.P. 15(c) ...................................................................................................... 29, 30

Fed. R. Evid. 201 ............................................................................................................... 20

RESTATEMENT (SECOND) CONTRACTS ¶ 202 (1981) ....................................................... 14

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants The Weinstein Company LLC ("TWC") and The Weinstein Company Holdings LLC ("TWC Holdings") submit this memorandum in support of their motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Complaint of Alfred H. Siegel, Chapter 7 Trustee ("Trustee") for the Estate of Genius Products, LLC (the "Debtor").  The Trustee purports to assert claims of actual and constructive fraudulent transfers, breach of fiduciary duty and payment of improper dividends under Del. Corp. Code § 18-607.  In addition, he seeks a declaratory judgment that Defendants are both alter egos of the Debtor.

## I.   PRELIMINARY STATEMENT

The Trustee's Complaint is based on his allegations that the agreements between the Debtor and Defendants, pursuant to which the Debtor distributed TWC DVDs and TWC Holdings obtained, and later sold, a 70% ownership interest in the Debtor, were "onerous," "not the product of arm's length bargaining by independent parties" and agreements that "no truly independent distributor would have entered into."  These allegations are fiction and the product of 20/20 hindsight.  The Trustee has not alleged facts to support them.  Further, documents the Court may consider on this Rule 12(b)(6) motion demonstrate that every agreement the Trustee challenges was negotiated at arm's length by independent parties for reasonable value.

The duplicity of the Complaint's allegations begins with the first two agreements the Trustee challenges – the Distribution Agreement and the Operating Agreement, both dated as of July 17, 2006.  Compl. ¶¶ 21-27.  These agreements were negotiated at arm's length between Defendants and Genius Product, Inc. ("GPI") prior to the existence of any relationship between them.  Moreover, GPI was represented in this negotiation by (i) outside counsel (Morrison & Foerster, LLP), (ii) special counsel with respect to the Distribution Agreement, and (iii) investment advisor Jefferies & Company, Inc. ("Jefferies"), who issued an opinion that the transactions the Trustee challenges were "fair."  Further, neither agreement became binding until after the shareholders of GPI, which was a public company, (i) received an SEC-filed proxy statement, dated June 29, 2006 (the "Proxy Statement"), which described the terms of the agreements and attached copies as exhibits, and (ii)

1    voted to approve the transaction with Defendants.

2           The Proxy Statement and its exhibits contradict the Trustee's unsupported allegations that

3    those agreements were not at arm's length and were not between independent parties.  GPI's Board

4    stated in the Proxy Statement that owning 30% of the Debtor was "more attractive to our

5    shareholders than owning 100% of Genius's existing business."  See Ex. AF-1, Proxy Statement at

6    22/395.  The Master Contribution Agreement, dated December 5, 2005 (the "Contribution

7    Agreement"), between GPI and Defendants, confirms that the Distribution Agreement and Operating

8    Agreement were between independent parties.[1]  At the time the Contribution Agreement was

9    negotiated, GPI owned 100% of the distribution business it agreed to contribute to the Debtor if

10   GPI's shareholders approved the Distribution Agreement and Operating Agreement pursuant to the

11   Proxy Statement.  The Contribution Agreement, which was executed months before the Proxy

12   Statement was issued, (i) required GPI and Defendants to negotiate and attach forms of the

13   Distribution Agreement and Operating Agreement as exhibits to the Contribution Agreement, and

14   (ii) required those fully negotiated agreements to be executed in substantially the same form when,

15   and if, GPI's shareholders approved them pursuant to the Proxy Statement.  See Ex. SS-1,

16   Contribution Agreement at ¶¶ 5.3-5.4, 6.2(l), Exs. D and F thereto.[2]

17          In short, the Trustee's allegations challenging the Distribution Agreement and the Operating

18   Agreement are not "plausible" and are not entitled to a presumption of truthfulness.

19          The Trustee's challenge to the other agreements on which he sues – i.e.,  the December 31,

20   2008 Purchase Agreement, the related Amended Distribution Agreement and the September 15,

21   2009 Restructuring Agreement (Comp. ¶¶ 18, 28-31) – is equally unfounded.  His repetition of the

22

23   [1] The Court should take judicial notice of the Proxy Statement and the Contribution Agreement, both
     of which were filed with the SEC and whose authenticity is not subject to question.  See Defendants'
24   Request for Judicial Notice ("RJN") at 1-2.   In addition, the Contribution Agreement is properly
     before the Court under the "incorporation by reference" doctrine.  See Section IV(B) below.
25
     [2] True and correct copies of Exhibits AF-1 – AF-4 are attached to the Declaration of Alan R.
26   Friedman in Support of Defendants' Motion to Dismiss the Chapter 7 Trustee's Complaint dated
     July 6, 2015 filed contemporaneously herewith.  True and correct copies of Exhibits SS-1 – SS-5 are
27   attached to the Declaration of Stephen Scibelli in Support of Defendants' Motion to Dismiss the
     Chapter 7 Trustee's Complaint dated July 2, 2015 ("Scibelli Decl.") filed contemporaneously
28   herewith.  Mr. Scibelli is the Associate General Counsel & Vice President of Business and Legal
     Affairs of TWC.  See Scibelli Decl. at ¶1.

2

1  formulaic allegations that they were not entered into at arm's length and that "no truly independent

2  distributor would have entered into [them]," (Compl. ¶¶30, 31) is contradicted by allegations in the

3  Complaint, by the agreements themselves and by an SEC-filed Form 8-K, dated February 23, 2009

4  (the "Form 8-K"), that describes the challenged transactions.

5      The Complaint *admits* that Quadrant Management, Inc. ("Quadrant"), an independent

6  restructuring firm, was a party to the Purchase Agreement and that Quadrant obtained "majority

7  ownership of the Debtor" under the terms of that agreement.  Compl. ¶ 16.  This alone refutes the

8  Trustee's allegation that the Purchase Agreement was not an arm's length agreement because

9  Quadrant participated in its negotiation and agreed to become the Debtor's "majority" owner

10  pursuant to its terms.  And there is more.  The Purchase Agreement provided that Defendants would

11  cease to hold any membership interest in the Debtor and that the Operating Agreement would be

12  amended to reflect, among other things, "the elimination of the right of [the Defendants] to assert

13  any management, control or voting rights over the Debtor."  See Ex. SS-2, Purchase Agreement

14  ¶¶ 1.10(a) and (c).  Further, the Form 8-K confirms Quadrant "negotiate[ed] the restructuring of the

15  [Debtor's] payment obligations to TWC" in connection therewith.  See Ex. AF-2, Form 8-K at 5, 6.[3]

16      In the light of the foregoing, the Trustee's non-fact based allegations that TWC "dictated" the

17  terms of the Purchase Agreement, "including the purported amounts owed by the Debtor," Compl. ¶

18  28, and that the Amended Distribution Agreement was not an arm's length agreement negotiated by

19  independent parties are utterly "implausible."  Defendants had no ability to "dictate" terms to

20  Quadrant – the new "majority owner" of the Debtor. Compl. ¶ 16.  If Quadrant did not deem the

21  terms of the Purchase Agreement or the Amended Distribution Agreement acceptable, it would

22  simply have walked away and those agreements would not have come into effect.  Instead, it chose

23

24

25

26

27

28

---

[3] The Court should take judicial notice of the Form 8-K and the Press Release ("Press Release")
attached thereto that GPI furnished to the SEC.  The Press Release described Quadrant as "having in
excess of $3.0 billion in assets under management and a thirty year investment track record . . . .").
See Ex. AF-2, Press Release at 3; RJN at 3.

1   to proceed with them and obtain majority control of the Debtor. Compl. ¶ 16.[4]

2          Finally, the Trustee's non-fraudulent transfer claims (Counts IV – VII) are legally deficient

3   for independent reasons. First, they are barred by the statutes of limitations. See Section IV(E)

4   below. Second, they are barred by releases the Debtor granted to Defendants. See Section IV(D)

5   below. Third, the Trustee's improper dividend claim under 6 Del. C. § 18-607 (Count IV)

6   independently fails because, as the Trustee admits (Compl. ¶37), the alleged Transfers the Trustee

7   challenges (i) were contractual payments and, thus, were not "distributions" under § 18-607, and (ii)

8   were not paid to a member of Debtor, which is an independent§ 18-607 requirement. See Section

9   IV(F) below. Fourth, the fiduciary duty claims (Counts V and VI) against TWC Holdings fail,

10  because TWC Holdings did not, as a matter of law owe a fiduciary duty to the Debtor. See Section

11  IV(G) below. And, fifth, the Trustee's request for declaratory judgment that the Defendants are alter

12  egos of the Debtor fails because no such independent claim to pierce the corporate veil exists and,

13  even if it did, the Trustee lacks standing to assert the claim. See Section IV(H), below.

14         Accordingly, all of the Trustee's claims should be dismissed as a matter of law.

15

16                          **II.    PROCEDURAL HISTORY**

17         This bankruptcy case commenced with the filing of an involuntary petition for relief under

18  chapter 7 of the Bankruptcy Code on December 27, 2011 (the "Petition Date"). Compl. ¶ 3. On

19  May 4, 2012, the Court entered the Order for Relief. Id. at ¶ 4. On May 1, 2014, the Trustee

20  initiated an adversary preceding that named TWC as a defendant. On May 2, 2014, the Trustee filed

21  an amended complaint that, again, only named TWC as a defendant (the "Initial Complaint"). See

22  Ex. AF-3, Initial Complaint, Adv. No. 14-01286, [DE 2]. Thereafter, the response deadline to the

23  Initial Complaint was extended several times. See e.g., Adv. No. 14-01286, [DE 8, 9, 11- 12, 14, 16,

24  18, 20, 22, 24, 26, 28, 30, 32].

25

26  _____

[4] The Trustee's allegations challenging the terms of the Restructuring Agreement (Compl. ¶ 18) are,

27  if anything, more implausible. This agreement was executed more than eight months after Quadrant
    took control of the Debtor. Compl. ¶ 16. The Trustee's allegation that "no truly independent
    distributor would have entered into it" (Compl. ¶ 31), thus, is contradicted by the Trustee's own

28  allegations and also the Form 8-K. See Ex. AF-2, Form 8-K at 6 (Quadrant obtained controlling
    interest of Debtor in or about December 31, 2008).

                                        4

After reviewing documents provided by TWC, the Trustee decided to dismiss the Initial Complaint, subject to TWC entering into a tolling agreement.  On December 4, 2014, TWC and the Trustee entered into a Stipulation and Tolling Agreement (the "Initial Tolling Stipulation"), which the Court approved, pursuant to which  the Trustee and TWC agreed that "[t]he running of time under any statutes of limitations applicable to any claim asserted in the Complaint in the Adversary Proceeding and any claim permitted to relate back to the filing date of the Complaint under Rule 7015 of the Federal Rules of Bankruptcy Procedure … shall be tolled from the date of the filing of the Original Complaint through and including February 2, 2015."  Bankr. No. 11-62283, [DE 91] at ¶ 1(a) and [DE 93].  On December 17, 2014, the Trustee dismissed the Initial Complaint and Adversary Action 14-01286.  See Notice of Dismissal, Adv. No. 14-01286 [DE 34].  TWC and the Trustee extended the Initial Tolling Stipulation on February 2, 2015 (Bankr. No. 11-62283 [DE 96], February 20, 2015 (Bankr. No. 11-62283 [DE 102], March 13, 2015 (Bankr. No. 11-62283 [DE 107, 110] and April 10, 2015 (Bankr. No. 11-62283 [DE 116] (collectively with the Initial Tolling Stipulation, the "Tolling Stipulation").

On May 8, 2015, the Trustee initiated this Adversary Proceeding.  See Ex. AF-4, Complaint [DE 1].  The Trustee's Complaint differs in two material respects from the Initial Complaint: (i) it adds TWC Holdings as a new defendant, and (ii) it asserts claims that were not included in the Initial Complaint and are not subject to the Tolling Stipulation.

### III.    FACTUAL BACKGROUND

**A.    The Distribution Agreement and the Operating Agreement Were The Product Of Arm's Length Bargaining Between Unaffiliated Parties**

The Trustee alleges that the Distribution Agreement and Operating Agreement, both of which are dated as of July 17, 2006, were not the product of arm's length bargaining by independent parties (Compl. ¶ 24) and that "no truly independent distributor would have entered into the Distribution Agreement." Compl. ¶ 26.  Not only is the Complaint bereft of supporting factual allegations, but also the allegations it does contain, e.g., that Defendants were "on both sides of the transaction," (Compl. ¶ 24) are not entitled to a presumption of truth under established Rule 12(b)(6) precedent.

5

1.    **The Distribution Agreement and the Operating Agreement**

In December 2005, months before entering into the Distribution Agreement and the Operating Agreement, TWC and GPI, two independent companies, entered into the Contribution Agreement.  The Contribution Agreement required forms of the Distribution and Operating Agreements to be attached as exhibits to the Contribution Agreement, which necessarily required GPI and Defendants to fully negotiate those agreements *prior to* executing the Contribution Agreement.  See Ex. SS-1, Contribution Agreement ¶¶ 1.2, 1.3(c).  Accordingly, the Trustee's conclusory allegations that their terms were not negotiated at arm's length between independent parties are without factual basis.

Special note should be taken of the Trustee's assertion that Defendants were on "both sides" of the Distribution Agreement because TWC's CFO executed the Distribution Agreement for both TWC and Debtor.  Compl. ¶ 24.  *This allegation is entirely misleading.*  The arm's length Contribution Agreement that was negotiated and executed by GPI, on the one hand, and Defendants, on the other hand, *six months before TWC's CFO executed the Distribution Agreement required* (i) the Distribution Agreement to be entered into between TWC and another TWC entity (Ex. SS-1, Contribution Agreement at p. 1 and ¶ 1.5), (ii) the name of the TWC entity to be changed to "Genius Products, LLC" effective as of the closing (id. ¶ 1.4), and (iii) GPI to own 30% of Genius Products, LLC upon the closing (id. at ¶ 1.3(a)).  Accordingly, the Trustee's allegation that Defendants were on "both sides" of the Distribution Agreement based on the manner in which it was executed is contradicted by documents properly before the Court on this motion and, thus, not entitled to a presumption of truth.

The Contribution Agreement – an agreement the Trustee ignored in the Complaint even though it is the predicate for agreements that he sues under – required GPI to file the Proxy Statement and obtain shareholder approval of the Operating Agreement and Distribution Agreement as a condition of closing.  See Ex. SS-1, Contribution Agreement, ¶¶ 3.4(c), 6.2(l).  The Proxy Statement contained detailed descriptions of the terms of the Distribution Agreement and the Operating Agreement.  Further, copies of those agreements and of the Contribution Agreement were attached as Exhibits to the Proxy Statement.  See Ex. AF-1, Proxy Statement at 9/395, App. A, C, D.

6

The Proxy Statement expressly stated that the "Transaction" for which GPI sought shareholder approval included the Distribution Agreement and the Operating Agreement.  Id. at 13-14/395. Accordingly, every term of these agreements was independently negotiated by GPI, with the assistance of its legal and financial advisors, and, thereafter, disclosed to and approved by GPI's shareholders.  Id. at App. A, C, D.

Further, in contrast to the Trustee's 20/20 hindsight challenge to the value of these agreements, the Proxy Statement identified, among others, the following benefits:

- The opportunity to "improve our competitive position … [and] increase our market share with retailers."  Id. at 135/395;

- The "opportunity to transform our product offering and accelerate our revenue and earnings growth."  Id. at 19/395, 23/395;

- The "potential to significantly enhance our position as distributor of high-quality content to the home video market."  Id. at 59/395; and

- The opportunity "to leverage our increasing retail sales volume from our new relationship with The Weinstein Company to improve the distribution and sale of our other owned and licensed content."  Id. at 130/395.

Perhaps most relevant to the Trustee's second-guessing allegations, the Proxy Statement also stated:

> The *Distribution Agreement is a valuable and highly sought-after right and,* when combined with our employees, management team and existing distribution business *will help transform the Distributor into a large and well-recognized entertainment distributor*.

Id. at 21/395 (emphasis added).

Finally, the Proxy Statement describes the eight month history of meetings, due diligence and arm's length negotiation of the Contribution Agreement, the Distribution Agreement and the Operating Agreement.  Id. 53-60/395.  The description includes the active role of GPI's counsel, Morrison & Foerster, in these negotiations, GPI's engagement of special counsel to assist with the Distribution Agreement (id. at 54-57/395), and advice GPI's financial advisor, Jefferies, provided throughout the process.  Id. at 58/395.  The Proxy Statement also sets forth Jefferies' unqualified

7

1    conclusion that the transactions the Trustee challenges were "fair." Id. at 58/395.[5] Significantly,

2    Jefferies based its opinion on, among other things, its review of drafts of the Distribution Agreement

3    and the Operating Agreement. Id. at App. B-2, 279/395.

4           While the Complaint singles out specific provisions of the Distribution Agreement as

5    allegedly "onerous" and "one-sided," these allegations are made without factual support and in

6    disregard of the documented and unassailable arm's length process through which the terms of the

7    Distribution Agreement were negotiated. The Trustee's second-guessing of the negotiated terms

8    GPI's shareholders approved and Jefferies opined were fair, is not entitled to any presumption of

9    truth. See Section IV(C)(1) below; RJN at 2.

        2.    **The December 5, 2005 Interim Distribution Agreement Additionally
              Confirms the *Bona Fides* of the Distribution Agreement**

12          The Trustee admits that before the Debtor distributed TWC DVDs, TWC and GPI entered

13   into an Interim Distribution Agreement, dated December 5, 2005 (the "Interim Distribution

14   Agreement"), which granted GPI the right to distribute TWC DVDs in exchange for "a distribution

15   fee plus reimbursement of certain expenses." Compl. ¶ 13. At the time of its negotiation,

16   Defendants and GPI were independent, and the Trustee does not allege otherwise.

17          *The Trustee admits that the terms of the Interim Distribution Agreement and the Distribution*

18   *Agreements are "substantially similar."* Compl. ¶ 15 (emphasis added). Thus, GPI's own action in

19   entering into the Interim Distribution Agreement contradicts the Trustee's non-fact based allegation

20   that "no independent distributor" would agree to the terms of the Distribution Agreement. GPI

21   agreed in the Interim Distribution Agreement to distribute TWC's motion pictures on DVDs through

22   December 31, 2008 on admittedly "substantially similar" terms to those that the Trustee challenges

23   in this lawsuit *even if Defendant never obtained any ownership of Debtor or GPI.* See Ex. SS-3,

24   Interim Distribution Agreement at ¶ 1 (definition of License Term).[6]

25

26   _____
     [5] The Jefferies' fairness opinion is Appendix B to the Proxy Statement. See Ex. AF-1, Proxy
27   Statement at 278/395 et seq.

28   [6] The Court may consider the Interim Distribution Agreement under the incorporation by reference
     doctrine. See Section IV(B) below.

**B.      The Purchase Agreement and the Distribution Agreement Were Negotiated At Arm's Length Between Unaffiliated Parties**

On December 31, 2008, Quadrant, Quadrant's affiliate ("GNP"), Defendants and the Debtor entered into the Purchase Agreement.  As the Trustee admits, Quadrant purchased "majority ownership of the Debtor" from TWC Holdings under the Purchase Agreement.  Compl. ¶ 16; see also Ex. SS-2, Purchase Agreement, ¶¶ 1.4, 1.6.  Further, pursuant to the Purchase Agreement, TWC Holdings ceased to be a member of the Debtor, the TWC Holdings-related members of GPI's Board of Directors resigned, the parties agreed to amend the Operating Agreement to "eliminate[e]" Defendants' right "to assert any management, control or voting rights over the Debtor," and the Debtor and TWC entered into the Amended Distribution Agreement.  See id. ¶¶ 1.09, 1.10(a) and (c); see also Ex. AF-2, Form 8-K at 3, 6 (disclosing change in control and director resignations).[7]

Although the Complaint alleges – without factual support – that TWC "dictated the terms" of the Purchase Agreement "related to the relationship between the Debtor and TWC" (Compl. ¶ 28), this is not plausible.  Quadrant became the "majority" owner of the Debtor (Compl. ¶ 16) and Quadrant's affiliate paid TWC Holdings $20 million pursuant to the Purchase Agreement.  See Ex. SS-2, Purchase Agreement, ¶ 1.2.  Further, "Quadrant since September 2008 … negotiate[d] the restructuring of the [Debtor's] payment obligation to TWC…."  See Ex. AF-2, Form 8-K at 5. Plainly, if Quadrant did not approve the terms of the Purchase Agreement, it would have walked away and the Purchase Agreement and related Amended Distribution Agreement would not have been executed.  The Trustee's conclusory allegations that Defendants had the ability to "dictate" "onerous" terms to Quadrant under these circumstances are not entitled to a presumption of truth.

The Purchase Agreement contained other relevant provisions.  First, In Section 4.4(a), the Debtor, among others, released Defendants from "all claims . . . known or unknown, suspected or unsuspected, contingent or fixed, now existing or arising in the future, (i) based on actions, inactions, events or circumstances occurring or existing on or before the date of the Closing [of the transactions contemplated by the Purchase Agreement], or (ii) arising under or relating to any and all of other

---

[7] This Court can consider the Purchase Agreement under the incorporation by reference doctrine, see Section IV(B) below, and take judicial notice of the Form 8-K and the Press Release.  See RJN at 3.

1   prior or presently existing agreements or relationships between or among any of the parties to this

2   Agreement."  See Ex. SS-2, Purchase Agreement, ¶ 4.4(a).  As discussed in Section IV(D) below,

3   this release applies to claims that the Debtor purports to assert in this lawsuit.[8]

4          Second, the negotiation and execution of the Amended Distribution Agreement was a

5   required "closing transaction" under the Purchase Agreement.   See Ex. SS-2, Purchase Agreement,

6   ¶¶ 1, 1.8; Compl. ¶ 17.  This requirement further demonstrates the implausibility of the Trustee's

7   allegation that "[n]o truly independent distributor would have entered into the [2008] Distribution

8   Agreement."  Compl. ¶ 30.  Quadrant would not have conditioned its becoming the Debtor's

9   majority owner on the execution of the Amended Distribution Agreement if it did not consider that

10  agreement favorable to the Debtor.  The Trustee's unsupported allegation to the contrary defies

11  common sense.

12         Third, the Purchase Agreement required the Debtor to issue and deliver to TWC Holdings a

13  subordinated promissory note in the amount of $20 million (the "TWC Note").  See Ex. SS-2,

14  Purchase Agreement at ¶ 1.1.  Although the Trustee seeks to recover payments the Debtor allegedly

15  made to Defendants under the Note (Compl. ¶ 54), no such payments were made.  Quadrant's

16  affiliate (GNP) acquired the TWC Note from TWC Holdings on the date it was issued.  See Ex. SS-

17  2, Purchase Agreement at ¶ 1.2; Ex. AF-2, Form 8-K at 2.

18      C.    The Restructuring Agreement Was Based Upon Arm's Length Negotiation
              Between Unaffiliated Parties
19

20         The last agreement the Trustee challenges is the Restructuring Agreement, which was

21  attached to a Memorandum of Understanding between TWC, TWC Portfolio Funding LLC and the

22  Debtor, dated as of September 15, 2009 (the "MOU").  Compl. ¶¶ 18, 31.  The Complaint does not

23  allege any facts regarding the terms of the Restructuring Agreement or its negotiation.  Nevertheless,

24  the Trustee invokes his incantation that it was "onerous", "one-sided" and that "no truly independent

25  distributor would have entered into [it]."  Id.  Despite these conclusory allegations, the Restructuring

26

27  ----
    [8] Section 4.4(c) of the Purchase Agreement excluded from the release, in relevant part, "the parties'
    respective … (ii) rights, obligations or covenants under the  Distribution Agreement with respect to
28  periods or events subsequent to [the January 1, 2009] Closing…."  See Ex. SS-2, Purchase
    Agreement, ¶ 4.4(c).

1    Agreement was entered into more than eight months after (i) Quadrant took control of the Debtor

2    (Complaint ¶ 16), (ii) TWC Holdings ceased to be a member of Debtor or hold any seats on GPI's

3    Board of Directors, and (iii) Defendants agreed to the "elimination of" their ability to assert any

4    management, control or voting rights over the Debtor.  See Ex. SS-2, Purchase Agreement ¶¶ 1.9,

5    1.10(a) and (c); Ex. AF-2, Form 8-K at 6.  As such, the Trustee's lack of independence allegations

6    and his second-guessing the unspecified terms of the Restructuring Agreement are, again, without

7    factual basis.

8        The Restructuring Agreement states that it is an attachment to the MOU.  In turn, the MOU

9    states that the "transaction" that included the Restructuring Agreement also included a "Settlement

10    Agreement" of even date with the MOU (the "Settlement Agreement").  Ex. SS-4, MOU at ¶ 1.  As

11    such, the Settlement Agreement may properly be considered on this motion because it is part of the

12    same transaction upon which the Trustee sues.  See Section IV(B), below.  In the Settlement

13    Agreement, among other things, Defendants released the Debtor from its obligations to make

14    payments due under the Purchase Agreement and the Debtor released Defendants "from any and all

15    claims . . . known or unknown, suspected or unsuspected, contingent or fixed, now existing or

16    arising in the future (collectively, "Claims"), (i) based on actions, inactions, events or circumstances

17    occurring or existing on or before the date hereof [i.e., September 15, 2009] or (ii) arising under or

18    relating to any and all prior or presently existing agreements or relationships between or among any

19    of the Parties."  See Ex. SS-5, Settlement Agreement, ¶¶ 4.1, 4.2.

20                              **IV.    LEGAL ARGUMENT**

21        Under established Rule 12(b)(6) pleading standards, the Trustee's Complaint fails to state

22    any claims against the Defendants as a matter of law.

23        **A.    Pleading Standards Under Rule 12(b)(6)**

24        Pursuant to Rule 12(b)(6), made applicable by Rule 7012 of the Federal Rules of Bankruptcy

25    Procedure, a complaint may be dismissed if it fails to state a claim upon which relief can be granted.

26    Fed.R.Civ.P. 12(b)(6);  Fed.R.Bankr.P. 7012.  To survive a motion under Rule 12(b)(6), "a

27    complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

28    plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.

1    _Twombly_, 550 U.S. 544, 570 (2007)).  Moreover, a complaint must contain specific facts, "more

2    than labels and conclusions, and a formulaic recitation of the elements of a cause of action."

3    _Twombly_, 550 U.S. at 555; _Telesaurus VPC, LLC v. Power_, 623 F.3d 998, 1003 (9th Cir. 2010) (on

4    motion to dismiss, courts disregard allegations that "are no more than conclusions," such as

5    "threadbare recitals of a cause of action, supported by mere conclusory statements.") (citations

6    omitted).  Nor is a court, on a Rule 12(b)(6) motion, "bound to accept as true a legal conclusion

7    couched as a factual allegation**.**"   _Twombly_, 550 U.S. at 555 (citations omitted).

8         The factual allegations in the Complaint must be sufficient to raise a plaintiff's right to relief

9    above a "speculative level."  _Id._; _Davis v. HSBC Bank Nevada, N.A._, 691 F.3d 1152, 1159 (9th Cir.

10   2012).  A claim only has "facial plausibility when the plaintiff pleads factual content that allows the

11   court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

12   _Ashcroft_, 556 U.S. at 678-79 ("determining whether a complaint states a plausible claim for relief …

13   requires the court to draw on its own judicial experience and common sense"); _see also_ _Shroyer v._

14   _New Cingular Wireless Servs., Inc._, 622 F.3d 1035, 1044 (9th Cir. 2010) (affirming Rule 12(b)(6)

15   dismissal for failure to state "a plausible claim" when complaint failed to set forth facts supporting

16   conclusory allegations).

17        Indeed, _Twombly_ also "teaches that a defendant should not be forced to undergo costly

18   discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the

19   plaintiff has a substantial case."  _Limestone Dev. Corp. v. Vill. Of Lemont, Ill._, 520 F.3d 797, 802-

20   03 (7th Cir. 2008) (_cited in_ _Hoffman v. Fay (In re SCI Real Estate Investments, LLC)_, No. 2:11-BK-

21   15975-PC, 2013 WL 1829648, at *2 (Bankr. C.D. Cal. May 1, 2013)).  This aspect of _Twombley_ is

22   clearly implicated here, where the Trustee's claims attack arm's length agreements based on 20/20

23   hindsight allegations that are contradicted by the parties' contemporaneous agreements and

24   judicially noticeable SEC filings.  _See_ _Brandt v. Widin Corp. (In re 3DFX Interactive Inc.)_, 389 B.R.

25   842, 865 (Bankr. N.D. Cal. 2008) ("[I]t is not the place of fraudulent transfer law to reevaluate or

26   question those transactions with the benefit of hindsight").

27        Under the foregoing precedent, none of the Trustee's claims satisfies the "plausibility"

28   threshold required to state a claim under Rule 12(b)(6).

12

**B.**    **The Court Need Not Accept As True Allegations Contradicted By Documents the Court Can Consider Under the Incorporation by Reference Doctrine Or Which Are Subject to Judicial Notice**

It is a well-settled that this Court "need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint." Colony Cove Props., LLC v. City of Carson, 640 F.3d 948, 955 (9th Cir. 2011).  The "incorporation by reference" doctrine prevents plaintiffs from "surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." Parrino v. FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998) (citation omitted), superseded by statute on other grounds, Abrego Abrego v. The Dow Chem. Co., 443 F.3d 676, 681–82 (9th Cir. 2006).

Thus, the doctrine permits courts to take into account documents "'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999) (quoting Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994) (alteration in original), abrogated on other grounds, Reese v. Malone, 747 F.3d 557, 569 (9th Cir. 2014).  Further, the incorporation by reference doctrine also applies when the plaintiff's claim depends on the contents of a document whose authenticity is not in dispute, "even though the plaintiff does not explicitly allege the contents of that document in the complaint." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (citations omitted); see also Oklahoma Firefighters Pension & Ret. Sys. v. Ixia, No. 13-08440, 2015 WL 1775221 at *14 (C.D. Cal. Apr. 14, 2015) (permitting documents "not expressly referenced in the complaint" to be incorporated by reference because they were "related to plaintiff's allegations"); Willard v. Abn Amro Mortgage Group, Inc., et al., C.A. No. 05-cv-00893, 2005 WL 2889788, at *1 (W.D. Okla. Oct. 7, 2005) (considering loan documents "selectively referenced" in, but not attached to, complaint on Rule 12(b)(6) motion; ruling that documents demonstrated that plaintiffs could not state claim);  Gens v. Wachovia Mortgage Corp., C.A. No. 10-CV-01073-LHK, 2011 WL 1791601, at *3 (N.D. Cal. May 10, 2011) aff'd, 503 F. App'x 533 (9th Cir. 2013) (under incorporation by reference doctrine, court may consider "documents that are connected to the loan transaction at issue").  Further, in applying the incorporation by reference doctrine, "[s]everal

13

1    contracts relating to the same matters, between the same parties, and made as parts of substantially

2    one transaction, are to be taken together."  Cal. Civ. Code § 1642.

3            Based upon the foregoing authorities, the Interim Distribution Agreement, the Contribution

4    Agreement, the Purchase Agreement and the Settlement Agreement (see Ex. SS-1 - SS-3, SS-5) are

5    all properly before the Court under the "incorporation by reference" doctrine.  Accordingly, the

6    Court should not accept as true allegations in the Complaint that are contradicted by those

7    agreements:

8            •    The Interim Distribution Agreement is incorporated by reference in the Complaint

9    because, among other things, the Trustee refers to it and alleges that its terms are "substantially

10    similar" to the Distribution Agreement.  Compl. ¶¶ 13, 15; see also Section III(A)(2) above

11    (discussing Interim Distribution Agreement); Ex. SS-3 (copy of Interim Distribution Agreement).

12            •    The Purchase Agreement is also incorporated by reference.  Among other things, the

13    Trustee alleges that (i) Defendants "dictated" its terms (Compl. ¶ 28), (ii) it was entered into with the

14    actual intent to hinder, delay or defraud creditors (Compl. ¶39); (iii) it supports the Trustee's

15    constructive fraud claim (Compl. ¶¶ 44, 50, 54, and 56); and (iv) its execution constituted a breach

16    of TWC Holding's alleged fiduciary duties.  Compl. ¶¶ 69, 73.

17            •    The MOU is incorporated by reference.  The MOU is attached to the Restructuring

18    Agreement, such that they comprise a single document.  See Ex. SS-4, MOU at 1 (stating that

19    Restructuring Agreement is "attached hereto").  The Trustee refers to and asserts claims based upon

20    the Restructuring Agreement. See, e.g., Compl. ¶ 31 (Restructuring Agreement was "onerous and

21    one-sided in favor of TWC" and that "no truly independent distributor would have entered into

22    [it]"); Compl. ¶ 26 (seeking to avoid obligations under Restructuring Agreement); Compl. ¶¶ 69(c),

23    73(c) (alleging that its execution constituted breach of fiduciary duty).  Because the Restructuring

24    Agreement is incorporated by reference, so is the MOU because both agreements were part of the

25    same transaction.  See Cal. Civ. Code § 1642; see also Dunham v. Envtl. Chem. Corp., No. 06-

26    03389, 2006 WL 2374703, *5 (N.D. Cal. August 16, 2006) ( "a 'writing is interpreted as a whole,

27    and all writings that are part of the same transaction are interpreted together.'") (quoting

28    RESTATEMENT (SECOND) CONTRACTS ¶ 202 (1981)); Holguin v. Dish Network LLC, 229 Cal.App.4th

1310, 1320 (2014) (where two or more written instruments are executed contemporaneously, with

reference to the other, for purpose of attaining preconceived object, they must be construed

together).  See Ex. SS-4, MOU (attaching Restructuring Agreement).

- The Settlement Agreement is also incorporated by reference.  The MOU establishes

that the same "transaction" that includes the Restructuring Agreement also includes the Settlement

Agreement.  See Ex. SS-4, MOU at ¶ 1 ("The parties agree that the Transaction will be upon the

terms set forth on the following agreements dated of even date herewith: (a) the [Restructuring

Agreement] attached hereto . . . , (b) the Settlement Agreement . . . .").  As such, it is incorporated by

reference in the Trustee's allegations challenging the Restructuring Agreement.  See Cal. Civ. Code

§ 1642; Dunham, 2006 WL 2374703 at *5; Holguin, 229 Cal.App.4th at 1320.

- The Contribution Agreement is incorporated by reference.[9]  The Trustee's claims

based on the Distribution Agreement and the Operating Agreement are predicated upon the

Contribution Agreement, which required that those agreements be negotiated and attached as

exhibits to the Contribution Agreement. See Ex. SS-1, Contribution Agreement at ¶¶ 1.2, 1.3(c); see

also Ex. SS-3, Interim Distribution Agreement at 1 (fourth WHEREAS Clause) (pursuant to

Contribution Agreement, TWC and the Debtor "will enter into a distribution agreement . . . in the

form attached to the Master Contribution Agreement").  Further, the Operating Agreement reflects

that it and the Contribution Agreement are part of the same transaction.  See Ex. AF-4, Compl., Ex.

A thereto, Operating Agreement at ¶ 4.3 ("Concurrently with the execution of this Agreement,

Genius shall, pursuant to the Master Contribution Agreement, contribute to the Company all of the

assets, rights and properties required to be contributed by Genius therein . . . .").  Additionally, the

Contribution Agreement is the only agreement that gives meaning to the Trustee's allegation that

"GPI contributed its business and assets to the Debtor," (Compl. ¶14) because the Contribution

Agreement specifies the assets to be contributed.  See Ex. SS-1, Contribution Agreement ¶ 1.1.

Finally, the Contribution Agreement also is incorporated by reference based upon the Trustee's

allegations that the Debtor did not receive reasonably equivalent value in exchange for the 2006

Distribution Agreement (Compl. ¶ 19) because the Distribution Agreement was only part of the

---

[9] The Court should also take judicial notice of the Contribution Agreement.  See RJN at 2.

larger transaction provided for in the Contribution Agreement.  See Ex. SS-1, Contribution

Agreement at ¶ 1.2; Ex. AF-1, Proxy Statement at 13-16/395; Cal. Civ. Code § 1642; Dunham, 2006

WL 2374703 at *5; Holguin, 229 Cal.App.4th at 1320.

Finally, as discussed in the RJN and not repeated here, the Court can take judicial notice of

the Proxy Statement, the Form 8-K and the Press Release.  The authenticity of each of these publicly

filed documents is not subject to dispute.  See RJN at 3; see also Daniels-Hall v. Nat'l Educ. Ass'n,

629 F.3d 992, 998 (9th Cir. 2010) (courts are not "required to accept as true allegations that

contradict  . . . matters properly subject to judicial notice").

### C.    The Trustee's Fraudulent Transfer Claims Should Be Dismissed

The Trustee's fraudulent transfer claims (Counts I and II) and, thereby, his claim to recover

the Transfers under 11 U.S.C. § 550 (Count III), should be dismissed for multiple reasons.

### 1.    Count I (Actual Fraud) and Count II (Constructive Fraud) Are Insufficiently Pled As a Matter of Law

The Trustee fails to state a claim in Counts I and II because he fails to include sufficient

factual allegations as required under Fed. R.C.P. Rules 8(a) and 9(b).  Rule 9(b) provides that "[i]n

alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud

or mistake."  The pleading with particularity requirement applies to claims under the California

Uniform Fraudulent Transfer Act ("CUFTA"), such as the Trustee's Count I.  See In re SCI Real

Estate Investments, LLC, 2013 WL 1829648 at *4-*7 (dismissing CUFTA actual fraudulent transfer

claim for failing to satisfy Rule 9(b) and CUFTA constructive fraud claim for failing to satisfy Rule

8(a)); see also Screen Capital Intern. Corp. v. Library Asset Acquisition Co., Ltd., 510 B.R. 248, 256

(C.D. Cal. 2014) ("Claims of avoidance and recovery of an actual fraudulent transfer are subject to

the heightened pleading standards of Rule 9(b)").

### (i)    Actual Fraud (Count I)

The Trustee's claim for intentional fraudulent transfers (Count I) fails because the Trustee

has not set forth facts that establish that the Debtor (or Defendants) intended to defraud, hinder or

delay creditors when the relevant agreements were executed or at the time of the Transfers.  The

Trustee merely alleged that "[t]he Debtor entered into the Distribution Agreement, the Purchase

1    Agreement, the Amended Distribution Agreement, the TWC Note, and the Restructuring

2    Agreement, and made the Transfers, with the actual intent to hinder, delay or defraud its creditors."

3    Compl. ¶ 39.  These conclusory allegations are insufficient.

4         As in SCI Real Estate, 2013 WL 1829648 at *5, in which the Court dismissed an actual

5    fraudulent transfer claim under CUFTA, the Trustee here failed to allege facts supporting his "actual

6    intent" allegations.  At best, the Trustee asserts two bare legal conclusions, i.e., that Defendants are

7    "insiders" (Compl. ¶ 10) and that the Debtor was "insolvent."  Compl. ¶¶ 34-36.  SCI Real Estate is

8    instructive as to the shortcomings of those allegations:

9              [a]bsent the following facts, [the Trustee's] Complaint fails to state a

10             plausible claim to recover an actual fraudulent transfer under … Cal. Civ.

11             Code. § 3439.04(a)(1): 1) The value of [the property] … on the date of the

12             transfer, together with facts forming the basis of such valuation; … 3)

13             Facts that form the basis for [the] assertion that "the Debtors were

14             insolvent…." 4) Facts that form the basis for [the] assertion that "the

15             Defendants knew that the value of the consideration received by the

16             Debtors… was not of reasonably equivalent value."

17   2013 WL 1829648 at *5.

18        The Trustee's failure to allege facts sufficient to satisfy Rule 9(b) here is understandable –

19   there was no fraud or intent to hinder, delay or defraud creditors.  The Distribution Agreement and

20   the Operating Agreement were fully disclosed in the Proxy Statement, approved by GPI's

21   shareholders and reviewed in connection with Jefferies' issuance of its opinion that the challenged

22   transactions were "fair."  See Ex. AF-1, Proxy Statement at App. B-2, 279/395.  Similarly, the

23   Purchase Agreement and the Amended Distribution Agreement were described in the Form 8-K, and

24   they were entered into with Quadrant, an independent company, who agreed to take control of the

25   Debtor after negotiating their terms.  See Compl. ¶ 16; Ex. AF-2, Form 8-K at 2-4.  Moreover, each

26   of the Contribution Agreement, Proxy Statement, the Form 8-K and the Purchase Agreement belies

27   the Trustee's core actual fraud allegation – i.e., that the agreements he sues upon were not negotiated

28   at arm's length.  Because the foundation of the Trustee's Complaint need not be taken as true, see,

1    e.g. Daniels-Hall, 629 F.3d at 998 (court need not accept allegations that contradict "exhibits"

2    attached to complaint or matters properly subject to "judicial notice"), the Court should dismiss the

3    Trustee's actual fraud claim (Count I) for failure to state a claim.[10]

4                        (ii)      Constructive Fraud (Count II)

5            Similarly, the Trustee's constructive fraud allegations fail to satisfy Rule 8(a).  See SCI Real

6    Estate, 2013 WL 1829648 at *6 (constructive fraud claims must satisfy Rule 8(a)).  As this Court

7    explained in SCI Real Estate, "At its core, a constructive fraudulent transfer has two elements:

8    reasonable equivalent value and insolvency.  [The Trustee's] Complaint does not state sufficient

9    facts to plausibly show that on the date of the transfer the Debtors were actually insolvent or

10   received less than was given to Defendants."  See id. at *6 (granting Rule 12(b)(6) dismissal of

11   constructive fraud claim for failing to satisfy Rule 8(a)'s pleading requirements) (internal citation

12   and quotation omitted).  The same is true here.  The Trustee has insufficiently alleged "insolvency."

13   The Trustee's "value" allegations fare no better.  In explaining the deficiency of the "value"

14   allegations under Rule 8(a) in SCI Real Estate, the Court stated:

15               [a]bsent the following facts, [the Trustee's] Complaint fails to state a

16               plausible claim to recover a constructive fraudulent transfer under …

17               Cal. Civ. Code. § 3439.04(a)(2) or 3439.95:  1. The value of the

18               [property] … conveyed by each Defendant to SCI Inc. on the date of

19               the transfer, together with facts forming the basis for such valuation;  2.

20               The value of the [property] … conveyed to each Defendant by SCI Inc.

21               on the date of the transfer, together with facts forming the basis for

22               such valuation;  3. Facts that form the basis for [the Trustee's] assertion

23               that "the Debtors were actually insolvent at the time the Constructive

---

[10] Count I is additionally deficient under Rule 9(b) because the Complaint improperly refers to Defendants collectively as "Weinstein" (Compl. ¶ 11) and fails to plead with particularity with respect to each of TWC and TWC Holdings separately.  See e.g., Compl. ¶¶ 20-21, 24, 27-28, 32-33. "If there are multiple defendants a complaint may not lump the defendants together; rather, it must differentiate between the defendants such that each defendant is separately informed of its alleged participation in the fraud."  Barsoumian v. Aurora Loan Servs., LLC, No. CV 12-4368 PA AGRX, 2012 WL 6012984, at *2 (C.D.Cal. Dec. 3, 2012) (dismissing fraud claim with prejudice for failure to satisfy requirements of Rule 9(b) (quoting Swartz v. KPMG LLP, 476 F.3d 756, 764–65 (9th Cir. 2007)); Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001) (same).

1    Fraudulent Transfers were made to each of the Defendants."

2    Id.  Likewise here, the Trustee has not alleged facts that compare the value conveyed to and from the

3    Defendants.  Further, he disregards the contrary statements in the Proxy Statement and the

4    provisions of the Contribution Agreement that establish the arm's length negotiation of the

5    Distribution Agreement.  See Ex. AF-1, Proxy Statement at 53-60/395; Ex. SS-1, Contribution

6    Agreement at 1.  These documents show that the Distribution Agreement was valuable, was the

7    product of substantial due diligence, was approved by GPI's Board and its shareholders, and was

8    confirmed to be "fair" by Jefferies.  See Ex. AF-1, Proxy Statement at App. B-2, 279/395.  Indeed,

9    GPI's Directors, in recommending shareholder approval, stated:

10    "[O]ur management believes that owning a 30% equity interest in

11    the [Debtor], with its future prospects as a home video distributor

12    for TWC's films, is more attractive for our stockholders than

13    owning 100% of Genius Products' existing business."

14    Id. at 14/395, 22/395.[11]  Moreover, the Trustee has not alleged facts that form the basis for his

15    assertion that the Debtor was insolvent at the time of each Transfer.

16    In the light of the foregoing, the Court should follow SCI Real Estate and dismiss Count II

17    for failure to state a claim.

18        **2.    Because The Debtor Received Reasonably Equivalent Value In Exchange
         For The Transfers, The Trustee Cannot State A Claim For Actual Or
19         Constructive Fraudulent Transfers**

20    Even disregarding the pleading deficiencies discussed in the prior section, the Trustee's

21    claims for actual and constructive fraudulent transfers under CUFTA still fail for three independent

22    reasons:  (i) each of the relevant agreements is the result of arm's length bargaining through which

23    reasonably equivalent value was given; (ii) the Trustee cannot use hindsight to attack the value

24    received by the Debtor; and (iii) the Debtor received reasonably equivalent value in exchange for the

25    Transfers as a matter of law because each Transfer satisfied an antecedent debt.[12]

26

27    _____
[11] Similarly, the Trustee also disregards the provisions of the Purchase Agreement and his own
Complaint that demonstrate that the Purchase Agreement and the related Amended Distribution
28    Agreement were negotiated with an independent party.  See Compl. ¶ 16 and Section III(B) above.

19

   (i)  <u>The Agreements Upon Which the Trustee Purports to Rely Were
Entered Into At Arm's Length for Reasonably Equivalent Value</u>

"A transfer or obligation is not voidable under paragraph (1) of subdivision (a) of Section

3439.04, against a person who took in good faith and for a reasonably equivalent value or against

any subsequent transferee or obligee." <u>See</u> Cal. Civ. Code, § 3439.08(a).  Similarly, a transfer for

reasonably equivalent value bars a constructive fraudulent transfer claim under Cal. Civ. Code,

§ 3439.04(2).  <u>See, e.g</u>, <u>Annod Corp. v. Hamilton & Samuels</u>, 123 Cal.Rptr.2d 924, 929 (Cal. Dist.

Ct. App. 2002) (applying prior version of CUFTA; CUFTA only applies to transfers made without

receipt of reasonably equivalent value).  Because the Trustee has not, and cannot, plead around

§ 3439.08(c), his fraudulent transfer claims should be dismissed as a matter of law.

   The predicate for the Trustee's fraudulent transfer claims is his allegation that none of the

challenged agreements arose from arm's length bargaining and that "no truly independent distributor

would have entered into [them]."  <u>See, e.g.</u>, Compl. ¶¶ 24, 26.  These allegations are devoid of any

facts and are contradicted by documents properly before the Court under the incorporation by

reference doctrine and under FRE 201.  Thus:

- The Distribution Agreement and Operating Agreement were negotiated at arm's length in
  2005 by independent companies who were represented by skilled professionals.  <u>See</u> Ex.
  AF-1, Proxy Statement, 53-60/395.

- GPI's attorneys and investment advisors assisted it in conducting due diligence and
  negotiating the Distribution Agreement and the Operating Agreement.  <u>Id.</u> at 55/395.

- GPI's financial advisor, after reviewing drafts of the Distribution Agreement and the
  Operating Agreement, opined that the transaction with Defendants was "fair."  <u>Id.</u> at 58/395;
  <u>see also</u> Ex. SS-1, Contribution Agreement, ¶ 3.21.

---

[12]  The Ninth Circuit has held that "California's fraudulent transfer statutes are similar in form and
substance to the Bankruptcy Code's fraudulent transfer provisions" and, therefore, "cases analyzing
the Bankruptcy Code provisions are persuasive authority" with respect to the CUFTA.  <u>In re AFI
Holding, Inc.</u>, 525 F.3d 700, 703 (9th Cir. 2008).  <u>Accord</u>, <u>Marshack v. Wells Fargo Bank (In re
Walters)</u>, 163 B.R. 575, 581 (Bankr. C.D.Cal. 1994) (citing <u>In re United Energy Corp.</u>, 944 F.2d
589, 594 (9th Cir. 1991)).

- The transaction was "transform[ative]" to GPI's distribution business and created the ability to "improve [its] competitive position … and market share…."  Ex. AF-1, Proxy Statement at 135/395, 21/395.

See Section III(A)(1) above (describing other benefits).  Because the statements in the Proxy Statement and the Contribution Agreement contradict the Trustee's non-fact supported allegations that the agreements were not negotiated at arm's length, the Trustee's claim that reasonably equivalent value was provided are not entitled to be taken as true.  See e.g., Colony Cove Props, LLC, 640 F.3d at 955 ("Court need not accept as true conclusory allegations that are contradicted by documents  referenced in the complaint"); Daniels-Hall, 629 F.3d at 998 (courts are not "required to accept as true allegations that contradict … matters properly subject to judicial notice").  See also Jordan v. Kroneberger (In re Jordan), 392 B.R. 428, 441-42 (Bankr. D. Id. 2008) ("Indirect benefits, as well as direct benefits, may constitute value if sufficiently concrete and identifiable.").

The same is true with respect to the Purchase Agreement, the Amended Distribution Agreement and the Restructuring Agreement.  The Trustee's conclusory allegations that these agreements were not at arm's length, that "no truly independent distributor" would enter into them and that TWC "dictated" their terms, Complaint ¶ 28, are contradicted by (i) Quadrant's presence as a party to the Purchase Agreement, (ii) Quadrant's role in negotiating the Purchase Agreement and the Amended Distribution Agreement, and (iii) Quadrant's assumption of majority control of the Debtor pursuant to Purchase Agreement.  Thus:

- The Complaint (¶ 16) admits and the Form 8-K states that Quadrant obtained a controlling interest in the Debtor through the Purchase Agreement. See Ex. AF-2, Form 8-K at 6.
- The Purchase Agreement and the Form 8-K disclose the resignation from GPI's Board of the TWC-related Directors.  See Ex. SS-2, Purchase Agreement ¶ 1.9; Ex. AF-2, Form 8-K at 6-7 (also disclosing appointment of Quadrant's President as GPI's Chairman).
- The Purchase Agreement required that the Amended Distribution Agreement be entered into as a "closing transaction" and the Operating Agreement amended to eliminate Defendants' right to manage or control the Debtor.  See Ex. SS-2, Purchase Agreement, ¶¶ 1, 1.8, 1.10(c).

21

1    • The Form 8-K provides that "Quadrant since September 2008, among other services, …

2        negotiat[ed] the restructuring of the [Debtor's] payment obligations to TWC …."  See Ex.

3        AF-2, Form 8-K at 5.

4    Quadrant was free to walk away at any time prior to entering into the Purchase Agreement.  The fact

5    that it did not demonstrates that Quadrant – an experienced investor – believed that the negotiated

6    terms of the Purchase Agreement and Amended Distribution Agreement were sufficiently favorable

7    to the Debtor for Quadrant to execute those agreements and become the Debtor's majority owner

8    and provide $20 million in debt financing.  See Ex. AF-2, Form 8-K at 5.  The same is true with the

9    Restructuring Agreement, which the Trustee admits was entered into more than eight months after

10   Quadrant became the controlling owner of the Debtor.  Compl. ¶18.

11       In short, the Trustee's fraudulent transfer claims fail.  They do not pass Ashcroft's "common

12   sense" test; they lack "facial plausibility;" and they do not "allow the Court to draw the reasonable

13   inference that the defendant is liable for the misconduct alleged."  Ashcroft, 556 U.S. at 679.

14                           (ii)    The Trustee's 20/20 Hindsight Challenge to the Value the Debtor
                                     Received Fails As a Matter of Law

15

16       The Trustee's challenge to the value the Debtor received is classic "Monday morning

17   quarterbacking."  The Trustee was not present when the agreements providing for payment of the

18   Transfers were negotiated, and he has alleged no facts sourced to any participant in any such

19   negotiations to support his "legal conclusions couched as . . . factual allegation[s]," see Twombly,

20   550 U.S. at 555, that they were "onerous" and that TWC "dictated" their terms.  Nor has he alleged

21   any facts to support accepting his after-the-fact questioning of the arm's length terms that (i) GPI,

22   represented by Morrison & Foerster and Jefferies, negotiated in the Distribution Agreement and the

23   Operating Agreement, and (ii) Quadrant negotiated in the Purchase Agreement, the Amended

24   Distribution Agreement and the Restructuring Agreement.

25       The Trustee's "hindsight" allegations are without legal basis:

26               When sophisticated parties make reasoned judgments about the value of

27               assets that are supported by then prevailing marketplace values and by the

28               reasonable perceptions about growth, risks, and the market at the time, **it**

22

1                      **is not the place of fraudulent transfer law to reevaluate or question**

2                      **those transactions with the benefit of hindsight**.

3 Brandt, 389 B.R. at 865 (emphasis added) (quoting Peltz v. Hatten, 279 B.R. 710, 737-38 (D. Del.

4 2002), aff'd sub nom. In re USN Comm., Inc., 60 Fed.Appx. 401 (3d Cir. 2003)); see also Annod

5 Corp., 123 Cal.Rptr.2d at 934 (ruling that challenged transfers were made in exchange for

6 reasonably equivalent value; reasoning that certain aspects "may have been a bad deal for the

7 landlord, but that that was the risk the landlord took and [the court] will not rewrite the lease…").

8        In Brandt, a chapter 11 trustee filed an adversary complaint against nVidia, which had

9 entered into a pre-petition asset purchase agreement with the debtor (a publicly traded

10 semiconductor company).  The trustee alleged that the $70 million purchase price did not constitute

11 reasonably equivalent value, that the assets transferred were valued at over $140 million and that the

12 agreed deal structure was "fundamentally unfair."  Brandt, 389 B.R. at 862. The Court disagreed,

13 explaining: "*[t]he price nVidia agreed to pay and 3DFX agreed to accept after arm's length*

14 *negotiations* by sophisticated well-represented parties who were well-informed regarding the market

15 that existed at the time *is a better gauge than a theoretical value crafted only in hindsight*." Id. at

16 887 (emphasis added); see also Alberts v. HCA, Inc. (In re Greater Southeast Comm. Hosp. Corp. I),

17 No. 04-10366, 2012 WL 589269, *13 (Bankr. D.D.C. Feb. 22, 2012) ("[T]he purpose of fraudulent

18 transfer law is not to allow the debtor to re-trade a transaction struck in good faith and arrived at by

19 arm's length negotiations. Such a transfer should not be a viable target of fraudulent transfer law")

20 (citation omitted).

21        While the Debtor's distribution business did not perform in the manner anticipated when the

22 parties entered into the Contribution Agreement, filed the Proxy Statement and entered into the

23 agreements the Trustee challenges in the Complaint, that does not negate either the unequivocal

24 arm's length negotiation between independent parties that preceded the execution of each of those

25 agreements or the reasonableness of the value exchanged.  No entertainment industry venture is free

26 from risk, and the Debtor's agreements with TWC were no exception.  In fact, the Proxy Statement

27 disclosed multiple risks that could impact the Debtor's success including, without limitation, the

28 uncertain success of TWC's theatrical releases and uncertainty over the continuing viability of the

market for DVDs.  See Ex. AF-1, Proxy Statement at 43-49/395.  The cases cited above make clear that the Trustee cannot, as a matter of law, assert a plausible claim for relief on his fraudulent transfer claims based upon his hindsight challenge to their arm's length negotiated terms.

(iii)   The Trustee's Admission that the Transfers were Paid Pursuant to the Debtor's Contractual Obligations Establishes that They Were in Exchange For Reasonably Equivalent Value

Under CUFTA Section 3439.03: "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied…." (emphasis added).[13]  Here, the Trustee admits that "[e]ach of the Transfers was made on account of the Debtor's obligations under the Distribution Agreement, the Purchase Agreement, the TWC Note, the Amended Distribution Agreement and/or the Restructuring Agreement."  Compl. ¶ 54.  In other words, the Trustee admits that each Transfer was made in satisfaction of the Debtor's contractual antecedent debt under the alleged agreements.  As such, each Transfer was made in exchange for "value" and cannot, as a matter of law, be the basis for a claim under CUFTA.  See OCUC of Fitness Holdings Int'l., Inc. v. Hancock Park Cap. II, LP (In re Fitness Holdings Int'l, Inc.), 714 F.3d 1141, 1146 (9th Cir. 2013) (citations omitted).  The Ninth Circuit explained:

> [T]o the extent a transfer is made in satisfaction of a 'claim,' (i.e., a 'right to payment'), that transfer is made for 'reasonably equivalent value' for purposes of § 548(a)(1)(B)(i).  And a determination that a transfer was made for 'reasonably equivalent value' precludes a determination that it was constructively fraudulent under § 548(a)(1)(B).

Id. (citation omitted).

In Fitness Holdings, the Ninth Circuit ruled that the creditors' committee could not recover, as a constructively fraudulent transfer, pre-petition loan repayments that the debtor made to its sole shareholder.  Fitness Holdings, 714 F.3d. at 1145-46.  Other courts have also ruled that payments in satisfaction of contractual obligations are made in exchange for reasonably equivalent value.  See e.g., Marshack v. Wells Fargo Bank (In re Walters), 163 B.R. 575, 581 (C.D.Cal. 1994) (transfers

---

[13] Similarly, 11 U.S.C. § 548(d)(2)(A) states that "value" means "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor…."

1    from debtor to defendants on personal guaranty "resulted in a dollar-for-dollar reduction in Debtor's

2    liability under the initial Guaranty," and "[a] proportionate reduction in rights or liability constitutes

3    an exchange of reasonably equivalent value for fraudulent transfer purposes under the Bankruptcy

4    Code or California state law.") (citation omitted); <u>Krommenhoek v. Natural Resources Recovery,</u>

5    <u>Inc. (In re Treasure Valley Opportunities, Inc.)</u>, 166 B.R. 701, 702-704 (Bankr. D. Id. 1994) (same).

6         Here, the Trustee admits that the Transfers were each in satisfaction of a debt, *i.e.*, the

7    Debtor's antecedent contractual obligations to TWC.  Compl. ¶¶ 37, 54.  Thus, each Transfer was a

8    dollar-for-dollar reduction in the Debtor's contractual liability, which, as a matter of law, constituted

9    reasonably equivalent value and establishes a full defense to the Trustee's claims.  Accordingly, the

10   Trustee's fraudulent transfer claims should be dismissed on this additional, independent basis.

11        **D.**    **The Debtor Released the Non-Bankruptcy Law Claims**

12        Counts IV through VII of the Complaint (collectively, the "<u>Non-Bankruptcy Law Claims</u>")

13   fail because the Debtor released these claims.  Paragraph 4.4 of the Purchase Agreement and

14   Paragraph 4.1 of the Settlement Agreement contain broad releases (the "<u>Releases</u>") pursuant to

15   which the Debtor released Defendants from all claims (i) based on actions, inactions, events or

16   circumstances occurring or existing on or before September 15, 2009, respectively; and/or (ii)

17   arising under or relating to any and all other prior or presently existing agreements or relationships

18   between or among any of the parties.  <u>See</u> Ex. SS-2, Purchase Agreement, ¶ 4.4(a) (release through

19   January 1, 2009); Ex. SS-5, Settlement Agreement, ¶ 4.1 (release through September 15, 2009).

20        The Debtor's release of the Non-Bankruptcy Law claims precludes the Trustee from

21   asserting any released claim against Defendants.  <u>See</u> <u>Pellerin v. Stuhley (In re Destro)</u>, 675 F.2d

22   1037, 1040 (9th Cir. 1982) (bankruptcy trustee "is subject to all claims and defenses which might

23   have been asserted against the bankrupt but for the filing of the petition") (citation omitted); <u>Smith v.</u>

24   <u>Arthur Andersen LLP</u>, 421 F.3d 989, 1002 (9th Cir. 2005) (same).[14]

25        **1.**    **The Releases Bar The Trustee's Breach Of Fiduciary Duty Claims**

26        Count V (breach of fiduciary duty of care) and Count VI (breach of fiduciary duty of loyalty)

27   (together, the "<u>fiduciary duty claims</u>"), which are asserted against TWC Holdings alone, are barred

28   _____

[14] The limited exceptions to the Releases do not apply to the Non-Bankruptcy Claims.

1    by the Release.  The Trustee alleges that TWC Holdings breached its fiduciary duties to the Debtor

2    by: (i) causing the Debtor to enter into the Distribution Agreement, the Purchase Agreement, the

3    TWC Note, the Amended Distribution Agreement and the Restructuring Agreement upon terms that

4    were onerous and one-sided; (ii) preventing the Debtor from undertaking profitable business

5    opportunities; (iii) requiring the Debtor to pursue unprofitable business opportunities; (iv) requiring

6    the Debtor to make fraudulent transfers to Defendants; and (v) requiring the Debtor to pay improper

7    dividends to TWC Holdings.  Compl. ¶¶ 69, 73.

8         First, the only basis for the Trustee's fiduciary duty claims is TWC Holding's alleged status

9    as the "controlling member" of Debtor.  See Compl. ¶¶ 68, 72.  However, TWC Holdings admittedly

10   ceased to be "controlling member" of the Debtor as of December 31, 2008.  Compl. ¶ 16; see also

11   Ex. SS-2, Purchase Agreement ¶ 1.10(a); Ex. AF-2, Form 8-K at 6.  Accordingly, and independent

12   of the Releases, the Trustee's fiduciary duty claims fail to state a claim, as a matter of law, to the

13   extent they are based on actions occurring after December 31, 2008.

14        Second, because all actions TWC Holdings took during the period that it was an alleged

15   "controlling member" of the Debtor are squarely within the pre-September 15, 2009 time period for

16   which the Debtor released all claims under the Releases, no breach of fiduciary duty claim can be

17   stated.  Further, because the alleged fiduciary duty breaches relate to actions taken in connection

18   with agreements that are the subject of the Releases, these claims are again within the scope of the

19   Releases.  As such, Counts V and VI must be dismissed.

20              **2.        The Releases Bar The Trustee's Alter-Ego/Instrumentality Claim**

21        Count VII is also barred by the Releases because it, too, is based upon actions, events or

22   circumstances occurring or existing on or before December 31, 2008, *i.e.*, the date that TWC

23   Holdings ceased to be a member of the Debtor.  In Count VII, the Trustee seeks a declaratory

24   judgment that the Debtor is an alter-ego or instrumentality of Defendants.  Compl. ¶¶ 76-81.  The

25   Complaint sets forth conclusory allegations that Defendants exercised "control and domination" of

26   the Debtor and treated it as an "operating division."  Compl. ¶¶ 20, 77.  Putting aside the absence of

27   allegations of fact to support the claimed alter ego relationship, see Section IV(H) below, the claim

28   still fails.  Under the Purchase Agreement, Quadrant assumed control of the Debtor and GPI on or

before January 1, 2009.  Accordingly, even assuming *arguendo* that an alter ego relationship did exist – and it did not – it ended, at the latest, on December 31, 2008, and, thus, is barred by the Releases.

### 3.    The Release Bars The Improper Dividend Claim With Respect To Transfers Made On Or Before September 15, 2009

In Count IV, which is asserted only against TWC Holdings, the Trustee seeks to recover the Transfers pursuant to Delaware Corporate Code § 18-607.  The Trustee alleges that the "Transfers" were "distributions to members within the meaning of § 18-607" and are recoverable under that statute because the Debtor's liabilities allegedly "exceeded the value of the Debtor's assets" after giving effect to each Transfer.  Compl. ¶¶ 64-65.  To the extent the Trustee could state a claim under § 18-607 – which he cannot (see Section IV(F) below) – the claim would be limited to transfers made after September 15, 2009, because as discussed above, the Releases bar any claim against TWC Holdings for the period prior to September 15, 2009.

### E.    The Fiduciary Duty and Improper Dividend Claims Independently Fail Because They Are Time-Barred

The Initial Complaint, filed on May 2, 2014, set forth eight causes of action against TWC alone, consisting of avoidance and recovery of fraudulent transfer claims and a claim against TWC under §18-607.  See Bankr. C.D.Cal. Adv. No. 14-01286, [DE 2].  TWC Holdings was not named as a defendant, nor was it mentioned in the Initial Complaint.  See Ex. AF-3, Initial Complaint.  The Initial Complaint also did not allege that TWC or any of its affiliates (i) dominated or controlled the Debtor, or (ii) owed fiduciary duties to the Debtor.  Id.  As discussed below, the Trustee's fiduciary duty claims and improper dividend claim (Counts IV – VI) are time barred and, thus, fail as a matter of law for this additional reason.

### 1.    Delaware Law Applies to the Fiduciary Duty and Improper Dividend Claims

California courts recognize the internal affairs doctrine, which requires courts to look to the state of incorporation for the law applicable to the internal affairs of the corporation.  See F.D.I.C. v. Faigin, No. CV 12-03448, 2013 WL 3389490, *10 (C.D. Cal. Jul 8, 2013) (applying internal affairs

27

doctrine to determine applicable law); see also Cal. Corp. Code § 2116 (codifying internal affairs

doctrine).  The internal affairs doctrine applies to statutes of limitations.  See In re Verisign, Inc.,

Deriv. Litig., 531 F. Supp. 2d 1173, 1215 (N.D. Cal. 2007) (applying Delaware statute of limitations

to fiduciary duty claim under internal affairs doctrine).

Here, Delaware law applies to the fiduciary duty and improper dividend claims because they

concern the internal affairs of the Debtor, which is a Delaware limited liability company.  See Comp.

¶ 12; see also, Becher v. Northwestern Mut. Life Ins. Co., No. CV 10-6264, 2010 WL 5138910, *2

(C.D. Cal. Dec. 9, 2010) ("Claims involving breach of fiduciary duties are routinely considered

'internal affairs' . . .  as are claims related to the declaration and payment of dividends.") (citation

omitted); Lidow v. Super. Ct., 206 Cal.App. 4th 351, 363 (2012) ("[T]he payment of dividends to

shareholders  . . . involve[s] matters of internal corporate governance and thus, fall[s] within a

corporation's internal affairs") (citations omitted).[15]   Under Delaware law, the fiduciary duty claims

and the dividend claim are each subject to a three year statute of limitation.  See Dofflemyer v. W.F.

Hall Printing Co., 558 F. Supp. 372, 379 (D. Del. 1983) ("[T]he Delaware three-year statute of

limitations, 10 Del.C. § 8106, applies to the common law claims of mismanagement and breach of

fiduciary duty") (citation omitted); 6 Del. C. § 18-607(c) (no liability "for the amount of the

distribution after the expiration of 3 years from the date of the distribution").

## 2.    The Fiduciary Duty Claims are Time-Barred and Do Not Relate Back

In Delaware, the statute of limitations applicable to breaches of fiduciary duty "begins to run

at the time that the cause of action accrues, which is generally when there has been a harmful act by

a defendant." In re Tyson Foods, Inc., 919 A.2d 563, 584 (Del. Ch. 2007) (citation omitted); David

B. Lilly Co., Inc. v. Fisher, 18 F.3d 1112, 1117 (3rd. Cir. 1994) ("Under Delaware law, the statute of

limitations generally 'begins to run at the time of the wrongful act, and, ignorance of a cause of

action, absent concealment or fraud, does not stop it.'") (quoting Isaacson, Stolper & Co. v.

Artisan's Sav. Bk., 330 A.2d 130, 132 (Del. 1974)).  Because TWC Holdings ceased to be a

"controlling" member of the Debtor on December 31, 2008, if TWC Holdings breached an alleged

---

[15] Moreover, the Debtor agreed to the application of Delaware law in the Operating Agreement.  See
Ex. AF-4, Compl., Ex. A thereto, Operating Agreement at ¶ 11.4.

1    fiduciary duty owed to the Debtor it must have done so prior to that date.  See Compl. ¶¶ 16, 68, 72;

2    Ex. SS-2, Purchase Agreement ¶ 1.10(a); Ex. AF-2, Form 8-K at 6.  As discussed below, the three

3    year statutes of limitations bar these claims.

4         First, with respect to any alleged fiduciary duty breaches occurring on or before December

5    27, 2008, which covers virtually all of the alleged breaches (Compl. ¶¶ 69, 73), the three year statute

6    of limitations expired prior to the December 27, 2011 "Petition Date."  Compl. ¶ 1.  Accordingly,

7    any claim based upon conduct occurring on or before December 27, 2008 is barred.  Second, even

8    assuming that Section 108(a) of the Bankruptcy Code extends the Trustee's time to file fiduciary

9    duty claims accruing during the four days from December 28 – 31, 2008 for an additional period of

10   two years following entry of the Order of Relief, see 11 U.S.C. § 108(a)(2), i.e., until May 3, 2014

11   (Compl. ¶ 2), this does not preserve the Trustee's claims.  The Trustee did not assert his fiduciary

12   duty claims until months after May 4, 2014.  Accordingly, all claims for the period from December

13   28 – 31, 2008 are also time barred.

14        The Tolling Stipulation does not save the fiduciary duty claims.  The Tolling Stipulation only

15   tolled (i) claims asserted in the Initial Complaint, and (ii) claims permitted to relate back to the filing

16   date of the Initial Complaint under Rule 7015.  Neither prong applies here.  First, the fiduciary duty

17   claims were not asserted in the Initial Complaint.  Second, the claims do not relate back.  Where, as

18   here, an amended complaint changes the party against whom a claim is asserted, the claim relates

19   back to the original complaint only if *all* of the following requirements are met:  (1) the claim

20   against the added defendant arises out of the conduct, transaction, or occurrence set forth in the

21   original complaint; *and* (2) if, within the period provided by Rule 4(m) for serving the summons and

22   complaint, the party to be added (i) has received such notice of the action that he will not be

23   prejudiced in maintaining a defense; *and* (ii) knew or should have known that, but for a mistake

24   concerning the identity of the proper party, the action would have been brought against him.  See

25   Fed.R.Civ.P. 15(c)(1)(C)(i)-(ii).  These requirements cannot be satisfied here.

26        The fiduciary duty claims against TWC Holdings do not arise out of the conduct, transactions

27   or occurrences set out in the Initial Complaint (Ex. AF-3).  Under Rule 15(c), "[c]laims arise out of

28   the same conduct, transaction, or occurrence if they 'share a common core of operative facts' such

1   that *the plaintiff will rely on the same evidence to prove each claim*." Williams v. Boeing Co., 517

2   F.3d 1120, 1133 (9th Cir. 2008) (quoting Martell v. Trilogy Ltd., 872 F.2d 322, 325–26 (9th Cir.

3   1989) (emphasis added). Here, the Initial Complaint never mentions TWC Holdings, fiduciary

4   duties or TWC Holdings allegedly causing the Debtor to take any of the actions the Trustee now

5   alleges constitutes breach of fiduciary duty. Compl. ¶¶ 69, 73; see also Ex. AF-3, Initial Complaint.

6   Accordingly, the fiduciary duty claims do not share a common core of operative facts with the

7   claims asserted in the Initial Complaint and would require additional evidence to prove. As such, the

8   fiduciary duty claims do not relate back. [16]

9   ### 3.    The Improper Dividend Claim is Also Time-Barred

10   The Trustee bases his improper dividend claim (Count IV) against TWC Holdings on

11   Transfers paid *to TWC* between December 27, 2007 and January 6, 2010. See Compl. ¶ 37. This

12   claim also does not relate back. First, the claim arises out of different conduct than the § 18-607

13   claim alleged in the Initial Complaint, which was alleged against TWC. Different evidence would

14   be required to establish how payments to TWC could constitute "distributions" to TWC Holdings

15   under § 18-607. Second, even assuming *arguendo* that TWC Holdings received timely notice of the

16   Initial Complaint, there would have been no basis for TWC Holdings to think that, but for a mistake

17   as to the identity of the proper party, the § 18-607 claim would have been brought against it. The

18   Initial Complaint alleged that the Transfers were paid to TWC and Exhibit A to the Initial Complaint

19   identified "The Weinstein Company, LLC" as the "payee" for every Transfer. Further, when the

20   Initial Complaint was filed, it was a matter of public record that TWC Holdings was a former

21   member of the Debtor. It was, therefore, reasonable for TWC Holdings to infer that the Trustee

22

23   [16]   Even assuming *arguendo* that TWC Holdings received notice of the Initial Complaint within the required period of its filing, the fiduciary duty claims fail to relate back under Rule 15(c) for a

24   second reason: There is no basis for TWC Holdings to have known that, but for a mistake as to the identity of the proper party, the claims would have been brought against it. See Rule 15(c)(1)(C)(ii).

25   Nothing in the Initial Complaint suggested any mistake in naming TWC as the sole defendant. The only payments challenged in the Initial Complaint were payments made to TWC. See Ex. AF-3,

26   Initial Complaint ¶ 7. Further, publicly available documents since 2006 identified TWC Holdings as the 70% owner of the Debtor from July 2006 through December 2008. Accordingly, even if TWC

27   Holdings knew of the Initial Complaint, it was reasonable for TWC Holdings to infer that the Trustee did not err in failing to allege claims against it. See Keller v. United States, 667 F. Supp.

28   1351, 1356-58 (S.D. Cal. 1987), aff'd, 930 F.2d 920 (9th Cir. 1991) (finding no relation back and granting Rule 12(b)(6) motion where defendant reasonably could infer that plaintiff's inaction after learning of defendant's activities was intentional decision not to pursue action against defendant).

intentionally chose not to pursue TWC Holdings in respect of its claims in the Initial Complaint

challenging payments made to TWC.  See Keller, 667 F. Supp. at 1356-58.[17]

**F.**  **Count IV (Improper Dividend) Fails To State a Claim Because The Alleged Transfers to TWC Were Not Improper "Distributions" Under 6 Del. C. § 18-607**

The Transfers at issue are payments the Debtor made to TWC.  Compl. ¶ 37.  This claim

fails, as a matter of law, because (i) the Transfers were made to a non-member, and, separately, (ii)

the Transfers were not "distributions" under § 18-607, but rather were contractual payments.

**1.**  **The Transfers to Non-Member TWC Were Not § 18-607 "Distributions"**

Between July 21, 2006 (the date of the Operating Agreement) and December 31, 2008 (the

date of the Purchase Agreement), TWC Holdings was a member of the Debtor.  Compl. ¶¶ 14, 16;

see also Ex. SS-2, Purchase Agreement, ¶ 1.10(a) (directing removal of TWC Holdings as member

of Debtor under Operating Agreement).  The Trustee does not, and cannot, allege that TWC was

ever a member of the Debtor.  Accordingly, the Trustee's claim fails as a matter of law.  Section 18-

607 expressly applies only to "[a] limited liability company['s] distributions *to a member*."  See 6

Del. C. § 18-607(a) (emphasis added).  Because the Trustee admits that the Transfers were made to a

non-member, they cannot be recovered under 6 Del. C. § 18-607.  See Compl. ¶ 37 and Ex. D

thereto (identifying "The Weinstein Co. LLC" as "payee" for every Transfer).

**2.**  **The Transfers Were Contractual Payments, Which Are Not § 18-607 "Distributions"**

Contractual payments are not "distributions" under Section 18-607.  See 6 Del. C. § 18-607

(a) ("[T]he term 'distribution' shall not include amounts constituting reasonable compensation for

present or past services").  The Complaint specifically admits that the Transfers were payments the

Debtor made to TWC on account of contractual obligations.  See Compl. ¶ 37 ("Transfers were

made on account of obligations under the Distribution Agreement, the Purchase Agreement, the

TWC Note, the Amended Distribution Agreement and/or the Restructuring Agreement.")  Thus,

---

[17]  Even if the § 18-607 could relate back – which it cannot – under the three year limitations period, the last Transfer for which the Trustee could seek recovery must have occurred within three years of the petition date.  Accordingly, all Transfers on or before December 27, 2008 would be barred.

1    under Section 18-607, the Transfers, again, were not distributions.

2    **G.      The Breach of Fiduciary Duty Claims (Counts V And VI) Fail Because TWC**
3    **Holdings Owed No Fiduciary Duty to the Debtor**

4        Delaware limited liability companies are creatures of contract. See 6 Del. C. § 18–1101(b)

5    ("[i]t is the policy of this chapter [of the Delaware Limited Liability Company Act] to give the

6    maximum effect to the principle of freedom of contract."). Thus, the starting point for determining

7    the fiduciary duties applicable to members of a Delaware LLC is the governing contract between the

8    parties – which, in this case, is the Operating Agreement. See Zimmerman v. Crothall, 62 A.3d 676,

9    701-702 (Del. Ch. 2013) ("[T]he Court must closely examine and interpret the LLC's governing

10   instrument to determine the parameters of the fiduciary relationship.") (citations omitted).

11       The Operating Agreement identifies GPI as the Managing Member and TWC Holdings as a

12   Member of the Debtor. See Ex. AF-4, Compl., Ex. A thereto, Operating Agreement at 6-7. It only

13   imposes fiduciary duties on the Managing Member. See id. at ¶ 5.1. Because the Operating

14   Agreement does not impose fiduciary duties on TWC Holdings, the Trustee's fiduciary duty claims

15   fail: "Delaware law imposes no default fiduciary duties on non-managing, non-controlling members

16   of limited liability companies." Imbert v. LCM Interest Holding LLC, No. 7845-ML, 2013 WL

17   1934563, *7 (Del. Ch., May 7, 2013) (citing Kuroda v. SPJS Holdings, L.L.C., No. 4030-CC, 2010

18   WL 925853, at *8 (Del. Ch. Mar. 16, 2010); Feeley v. NHAOCG, LLC, 62 A.3d 649, 662-663 (Del.

19   Ch. Nov. 28, 2012) (same). Because TWC Holdings did not owe any fiduciary duties, the Trustee

20   cannot state a fiduciary duty claim.

21   **H.      The Trustee's Alter Ego Claim (Count VII) Fails Because Such a Claim Is Not**
22   **Recognized Under California Law And, in Any Event, The Trustee Has No**
     **Standing To Assert It**

23       The Trustee seeks a declaratory judgment that the Debtor was an alter ego of the Defendants

24   and that the Defendants "are each liable for the debts of the Debtor." Compl. ¶¶ 76-81. The Ninth

25   Circuit has expressly held that such a claim is not viable as a matter of law and that a bankruptcy

26   trustee has no standing to assert it. See Ahcom, Ltd. v. Smeding, 623 F.3d 1248, 1252 (9th Cir.

27   2010) ("[W]e conclude that California law does not recognize an alter ego claim or cause of action

28

                                            32

1    that will allow a corporation and its shareholders to be treated as alter egos for purposes of all the

2    corporation's debts.").

3        In Ahcom, the Ninth Circuit addressed whether a creditor of a corporation in bankruptcy has

4    standing to assert a claim against the corporation's sole shareholder on an alter ego theory or

5    whether that claim belongs to the corporation's bankruptcy trustee. Id. at 1250. The Ninth Circuit

6    reversed the holding of the District Court that the Trustee had standing to assert the claim. Id. The

7    Court concluded that, under California law, "there is no such thing as a substantive alter ego claim at

8    all: 'A claim against a defendant, based on the alter ego theory, is not itself a claim for substantive

9    relief, e.g., breach of contract or to set aside a fraudulent conveyance, but rather procedural….'"

10    Ahcom, 623 F.3d at 1251 (quoting Hennessey's Tavern, Inc. v. Am. Air Filter Co., 204 Cal.App.3d

11    1351 (1988). The Court further held that a trustee may not assert a general alter ego claim because

12    "no California court has recognized a freestanding general alter ego claim that would require a

13    shareholder to be liable for all of a company's debts…." Id. at 1252. Because this is exactly what

14    the Trustee seeks (Compl. ¶ 81), pursuant to binding Ninth Circuit precedent, Count VII fails to state

15    a viable claim.

16        Moreover, even overlooking the foregoing legal deficiency, the Trustee still has failed to

17    state a claim that Defendants are alter egos of the Debtor so as to gain Defendants' assets for the

18    Debtor. "Alter ego is a limited doctrine, invoked only where recognition of the corporate form

19    would work an injustice to a third person." Communist Party of United States of America v. 522

20    Valencia, Inc., 35 Cal.App.4th 980, 995 (Cal. Ct.App. 1995) (quoting Tomaselli v. Transamerica Ins.

21    Co., 25 Cal.App.4th 1269, 1285 (1994)). The Court in Communist Party reversed the trial court's

22    judgment that the plaintiff was an alter ego of the defendants. Id. at 996. The Court explained:

23            Alter ego is utilized to prevent two parties with the same interest from

24            inequitably using the corporate form to thwart a third party's rights; it is

25            not designed to unite two separate entities with opposing interests for the

26            benefit of the one claiming to control the other. In this case, there is no

27            third party; respondent claims that it itself is identical to the corporations.

28            Respondents have cited no case authority, and we have found none, in

33

1       which rather than being used to reach behind the corporate form to attach

2       liability to another individual or entity, the alter ego doctrine has been

3       employed to establish a relationship of identity between the defendant

4       corporation and the plaintiff itself, in order to allow the plaintiff to obtain

5       for itself the assets of the corporation.

6  Id. at 995.  Here, the Trustee asserts that Defendants are the Debtor's alter egos and, therefore, the

7  Defendants' assets are available for the Debtor's benefit to pay its debts to creditors.  As in

8  Communist Party of United States of America, 35 Cal.App.4[th] at 995, the Trustee asserts a claim

9  beyond the limits of alter ego liability.  As such, the alter ego claim fails as a matter of law for this

10  independent reason.[18]

11        In addition to the foregoing flaws with the Trustee's alter ego claim, he also has not, and

12  cannot allege, a sufficient factual basis to assert the claim.  There are two requirements for the

13  application of the alter ego doctrine: "(1) that there be such unity of interest and ownership that the

14  separate personalities of the corporation and individual no longer exist and (2) that, if the acts are

15  treated as those of the corporation alone, an inequitable result will follow."  See, e.g., Automotriz

16  Del Golfo De California v. Resnick, 47 Cal.2d 792, 796 (Cal. 1957) (citation omitted).  Courts

17  repeatedly dismiss alter ego claims at the pleading stage.  See, e.g, Neilson v. Union Bank of CA,

18  N.A., 290 F. Supp.2d 1101, 1116, 1118 (C.D. Cal. 2003) (granting Rule 12(b)(6) motion to dismiss

19  alter ego claim; "[c]onclusory allegations of 'alter ego' status are insufficient to state a claim"; "a

20  plaintiff must allege specifically both the elements of alter ego liability, as well as facts supporting

21  each"); Sandoval v. Ali, 34 F.Supp.3d 1031, 1040 (N.D. Cal. Mar. 28, 2014) (same).  "In assessing

22  alter ego, courts consider the commingling of funds and other assets of the entities, the holding out

23  by one entity that it is liable for the debts of the other, identical equitable ownership of the entities,

24  use of the same offices and employees, use of one as a mere shell or conduit for the affairs of the

25  other, inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate

26

27  [18] Moreover, the Ninth Circuit has explained that the "Trustee may assert only claims belonging to
the debtor corporation and has no standing generally to sue third parties on behalf of the estate's
28  creditors.  Ahcom, 623 F.3d at 1250.  Thus, the Trustee has no standing to bring the alter ego claim
on behalf of a creditor.

1    records, and identical directors and officers." <u>Sandoval</u>, 34 F.Supp.3d at 1040 (<u>citing</u> <u>Sonora</u>

2    <u>Diamond Corp. v. Superior Court</u>, 83 Cal.App.4th 523, 538–39 (2000)).

3        Because the Trustee has not pleaded the required elements, his alter ego claim must be

4    dismissed for this additional reason.

5        **I.    The Complaint Should be Dismissed Without Leave to Amend**

6        In addition to dismissal, the Court should deny the Trustee leave to amend the Complaint

7    because any proposed amendment would be futile.  <u>See</u> <u>Gordon v. City of Oakland</u>, 627 F.3d 1092,

8    1094 (9th Cir. 2010) (affirming district court's denial of leave to amend where amendment would be

9    futile) (citations omitted).  Here, based upon the arguments set forth above, amendment of the

10   Complaint would be futile.  The Trustee's admissions in the Complaint, the agreements that the

11   Trustee relies upon and the documents that are appropriately incorporated by reference and/or with

12   respect to which the Court may take judicial notice, establish that the Trustee cannot amend the

13   Complaint to overcome the legal defects in his claims.

14        **V.    CONCLUSION**

15       The Trustee's Complaint fails to state a claim for relief against either The Weinstein

16   Company, LLC or The Weinstein Company Holdings, LLC.  Accordingly, this Court should dismiss

17   the Trustee's Complaint in its entirety with prejudice.

18   Dated: July 6, 2015                **FOX ROTHSCHILD LLP**

19                                By: */s/ Mette H. Kurth*_____
                                     Alan R. Friedman
20                                   Mette H. Kurth
                                     Attorneys for Defendants
21                                   The Weinstein Company LLC and
                                     The Weinstein Company Holdings LLC
22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Fox Rothschild, LLP, 1800 Century Park E, Suite 300, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): _____
DEFENDANTS' MOTION TO DISMISS THE CHAPTER 7 TRUSTEE'S COMPLAINT _____
_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
07/06/2015_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:
David B. Shermano    dshermano@robinskaplan.com
James P. Menton, Jr.    JPMenton@rkmc.com
Michael B. Lubic    michael.lubic@klgates.com        Manoj D. Ramia    manoj.ramia@klgates.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
Hon. Richard M. Neiter
U.S. Bankruptcy Court
255 E. Temple Street
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 7/6/15 | Claudia LeBrane | *Claudia LeBrane* |
|--------|-----------------|-------------------|
| *Date* | *Printed Name*  | *Signature*       |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.