# Exhibit AF-1

DEFR14A 1 ddefr14a.htm DEFINITIVE PROXY STATEMENT (REVISED) FOR GENIUS PRODUCTS, INC.

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# SCHEDULE 14A
### (Rule 14a-101)

## INFORMATION REQUIRED IN PROXY STATEMENT
## SCHEDULE 14A INFORMATION
### Proxy Statement Pursuant to Section 14(a) of the
### Securities Exchange Act of 1934

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

| | | | |
|---|---|---|---|
| ☐ | Preliminary Proxy Statement | ☐ | **Confidential, for Use of the Commission** |
| ☒ | Definitive Proxy Statement (revised) | | **Only (as permitted by Rule 14a-6(e)(2))** |
| ☐ | Definitive Additional Materials | | |
| ☐ | Soliciting Material Pursuant to §240.14a-11(c) or §240.14a-12 | | |

# GENIUS PRODUCTS, INC.
### (Name of Registrant as Specified in Its Charter)

### N/A
### (Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)

Payment of Filing Fee (check the appropriate box):

☐ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(4) or 0-11.

  (1) Title of each class of securities to which transaction applies:

  _____

  (2) Aggregate number of securities to which transaction applies:

  _____

  (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

  _____

  (4) Proposed maximum aggregate value of transaction:

  _____

  (5) Total fee paid:

  _____

☒   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for
    which the offsetting fee was paid previously. Identify the previous filing by registration number, or the Form or
    Schedule and date of filing.

(1)   Amount previously Paid:

_____

(2)   Form, schedule or Registration Statement No.:

_____

(3)   Filing party:

_____

(4)   Date filed:

_____

**Table of Contents**

**genius products, inc.**

June 29, 2006

Dear Stockholder:

You are cordially invited to attend a Special Meeting of Stockholders of Genius Products, Inc. (the "Company") to be held at our office at 2230 Broadway, Santa Monica, California 90404 at 9:00 a.m. local time on July 21, 2006, to consider and vote on the following proposals:

*Proposal 1:*    To approve the contribution of substantially all of the Company's assets to The Weinstein Company Funding LLC pursuant to a Master Contribution Agreement, dated as of December 5, 2005, by and among the Company, The Weinstein Company LLC, The Weinstein Company Holdings LLC and The Weinstein Company Funding LLC, as amended.

*Proposal 2:*    To approve the amendment and restatement of the Company's certificate of incorporation in the form attached as Appendix E to this Proxy Statement, and to approve the sub-proposals described in the attached Notice of Special Meeting of Stockholders.

*Proposal 3:*    To approve an amendment and restatement of our 2004 Stock Incentive Plan to (i) increase the number of shares of common stock available for issuance under the plan from 7,500,000 shares to 13,500,000 shares, provided that the proposed transaction with The Weinstein Company is consummated, and (ii) prohibit option repricings under the Plan without receipt of stockholder approval for such repricings.

*Proposal 4:*    To approve adjournments of the special meeting, if necessary, to permit further solicitation of proxies if there are not sufficient votes at the time of the meeting to approve one or more of the proposals described above.

We encourage you to vote on all the matters listed in the enclosed Notice of Special Meeting of Stockholders. The Board of Directors unanimously recommends a vote **FOR** each of the proposals and sub-proposals listed in the Notice.

Whether or not you plan to attend the Special Meeting in person, it is important that your shares be represented and voted at the meeting. After reading the enclosed Notice and Proxy Statement, please submit your proxy or voting instructions by telephone, or by using a traditional proxy or instruction card. If you choose to vote by traditional proxy or instruction card, please sign, date and mail the card in the envelope provided.

All stockholders of record on June 21, 2006 are invited to attend the Special Meeting. No ticket is required for admission.

I look forward to greeting those of you who are able to attend the Special Meeting in person. Thank you for your continued support.

Sincerely,

**Trevor Drinkwater**
*Chief Executive Officer*

This Proxy Statement is dated June 29, 2006 and is first being mailed to stockholders of Genius Products on or about that date.

**YOUR VOTE IS IMPORTANT. PLEASE PROMPTLY SUBMIT YOUR PROXY
BY TELEPHONE OR MAIL.**

**Table of Contents**

**GENIUS PRODUCTS, INC.**

2230 Broadway

Santa Monica, CA 90404

―――――――

**NOTICE OF SPECIAL MEETING OF STOCKHOLDERS**

A Special Meeting (the "Special Meeting") of the Stockholders of Genius Products, Inc. (the "Company") will be held at our office at 2230 Broadway, Santa Monica, California 90404 at 9:00 a.m. local time on July 21, 2006, for the following purposes:

*Proposal 1:*   A proposal to approve the contribution of substantially all of the Company's assets to The Weinstein Company Funding LLC pursuant to a Master Contribution Agreement, dated as of December 5, 2005, by and among the Company, The Weinstein Company LLC, The Weinstein Company Holdings LLC and The Weinstein Company Funding LLC, as amended (the "Transaction").

*Proposal 2:*   A proposal to approve the amendment and restatement of the Company's certificate of incorporation, in the form attached as Appendix E to this Proxy Statement, with the following sub-proposals:

  • 2A—a proposal to approve a provision restricting the acts or activities in which the Company may engage to certain limitations arising under the Transaction documents;

  • 2B—a proposal to approve the increase of the number of authorized shares of common stock from 100,000,000 to 300,000,000 shares and the increase of the number of authorized shares of all classes of stock from 110,000,000 to 310,000,000 shares;

  • 2C—a proposal to approve a provision authorizing Series W Preferred Stock and establishing the rights, preferences and powers, and the qualifications, limitations and restrictions, of Series W Preferred Stock;

  • 2D—a proposal to modify the rights, preferences and powers, and the qualifications, limitations and restrictions, of Common Stock;

  • 2E—a proposal to approve a provision by which the Company elects out of the Delaware law restricting business combinations with interested stockholders; and

  • 2F—a proposal to approve a provision by which the Company renounces the Company's interest or expectancy in, or in being offered the opportunity to participate in, corporate opportunities engaged in by TWC (including its affiliates and related persons).

*Proposal 3:*   A proposal to approve an amendment and restatement of our 2004 Stock Incentive Plan to (i) increase the number of shares of common stock available for issuance under the plan from 7,500,000 shares to 13,500,000 shares, provided that the proposed transaction with The Weinstein Company is consummated, and (ii) prohibit option repricings under the Plan without receipt of stockholder approval for such repricings.

*Proposal 4:*   A proposal to approve adjournments of the Special Meeting, if necessary, to permit further solicitation of proxies if there are not sufficient votes at the time of the meeting to approve one or more of the proposals described above.

Only stockholders of record at the close of business on June 21, 2006 are entitled to notice of, and to vote at, the meeting and any adjournments thereof. All stockholders are cordially invited to attend the meeting in person.

*If stockholders wish to approve the Transaction, then they **must** approve Proposal 1 relating to the Transaction **and** Proposal 2 relating to the amendment and restatement of our certificate of incorporation, including each of the related sub-proposals included in Proposal 2.*

**Table of Contents**

WHETHER OR NOT YOU PLAN TO ATTEND IN PERSON, YOU ARE URGED TO FILL IN THE ENCLOSED PROXY AND TO SIGN AND FORWARD IT IN THE ENCLOSED BUSINESS REPLY ENVELOPE, WHICH REQUIRES NO POSTAGE IF MAILED IN THE UNITED STATES. IT IS IMPORTANT THAT YOUR SHARES BE REPRESENTED AT THE MEETING IN ORDER THAT THE PRESENCE OF A QUORUM MAY BE ASSURED. ANY STOCKHOLDER WHO SIGNS AND SENDS IN A PROXY MAY REVOKE IT BY EXECUTING A NEW PROXY WITH A LATER DATE, BY WRITTEN NOTICE OF REVOCATION TO THE SECRETARY OF THE COMPANY AT ANY TIME BEFORE IT IS VOTED, OR BY ATTENDING THE MEETING AND VOTING IN PERSON.

YOUR VOTE IS IMPORTANT REGARDLESS OF THE NUMBER OF SHARES OF STOCK THAT YOU HOLD. YOUR COOPERATION IN PROMPTLY RETURNING YOUR PROXY WILL HELP LIMIT EXPENSES INCIDENT TO PROXY SOLICITATION.

By Order of the Board of Directors

Santa Monica, California
June 29, 2006

**Trevor Drinkwater**
**Member of the Board, President and Chief Executive Officer**

Table of Contents

## TABLE OF CONTENTS

| | |
|---|---:|
| **SUMMARY OF THE TRANSACTION** | 3 |
| The Companies | 3 |
| Summary of the Transaction | 4 |
| The Distribution Agreement | 6 |
| Accounting Policies Relating to the Transaction | 7 |
| Excluded Assets | 7 |
| Contingent Dividend Right | 8 |
| The LLC Agreement | 8 |
| Redemption Rights under the LLC Agreement | 8 |
| Class G Units and Class W Units in the Distributor | 9 |
| Termination Provisions of Contribution Agreement | 9 |
| Restrictions on Competing Transactions | 9 |
| Restrictions on our Business Following the Closing | 9 |
| Reasons for the Transaction | 10 |
| Risk Factors | 10 |
| Recommendation of our Board of Directors | 10 |
| Opinion of Genius Products' Financial Advisor to our Board of Directors | 10 |
| Our Directors Following the Transaction | 11 |
| Interests of Directors, Executive Officers and Affiliates | 11 |
| No Appraisal Rights | 11 |
| Location, Time and Date of The Special Meeting | 11 |
| Record Date and Voting Rights for the Special Meeting | 11 |
| **QUESTIONS AND ANSWERS ABOUT THE TRANSACTION** | 12 |
| **QUESTIONS AND ANSWERS ABOUT THE SPECIAL MEETING** | 17 |
| **SELECTED CONSOLIDATED FINANCIAL DATA** | 20 |
| **UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL INFORMATION** | 21 |
| **SUPPLEMENTAL UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL INFORMATION** | 26 |
| **ACCOUNTING POLICIES RELATING TO THE TRANSACTION** | 30 |
| **RISK FACTORS** | 31 |
| Risks Related to the Transaction | 31 |
| Risks Related to Our Business Following the Transaction | 33 |
| **CAUTIONARY STATEMENT CONCERNING FORWARD LOOKING INFORMATION** | 37 |
| **PROPOSAL 1: APPROVAL OF THE CONTRIBUTION OF SUBSTANTIALLY ALL OF OUR ASSETS PURSUANT TO THE CONTRIBUTION AGREEMENT** | 38 |
| The Transaction | 38 |
| The Companies | 39 |
| The Weinstein Company Holdings LLC | 41 |
| The Weinstein Company Funding LLC | 41 |
| Background of the Transaction | 41 |
| Regulatory Matters | 46 |
| Reasons for the Transaction | 47 |
| Recommendation of our Board of Directors | 48 |
| Opinion of Genius Products' Financial Advisor to Our Board of Directors | 49 |
| Interests of Directors, Executive Officers and Affiliates | 57 |
| No Appraisal Rights | 58 |

i

**Table of Contents**

| | |
|---|---|
| Certain United States Federal Income Tax Consequences | 58 |
| **MATERIAL AGREEMENTS AND DOCUMENTS RELATING TO THE TRANSACTION** | 59 |
| **SERIES W PREFERRED STOCK TO BE ISSUED TO TWC** | 59 |
| **THE CONTRIBUTION AGREEMENT** | 62 |
| Assets to be Contributed by Genius Products | 62 |
| Excluded Assets | 62 |
| Assumed Liabilities | 63 |
| Excluded Liabilities | 63 |
| Consideration | 64 |
| Closing Date | 64 |
| Assets and Liabilities of the Distributor | 64 |
| Creation of New Distributor | 65 |
| Representations and Warranties | 65 |
| Pre-Closing Covenants | 66 |
| Additional Agreements | 68 |
| Contingent Dividend Right | 68 |
| Conditions to Closing | 69 |
| Termination | 71 |
| Termination Fees | 72 |
| Survival of Covenants, Representations and Warranties | 73 |
| Indemnification by TWC | 73 |
| Indemnification by Genius Products | 74 |
| Limitations on Indemnification | 74 |
| Expenses | 75 |
| **THE LLC AGREEMENT** | 75 |
| Purposes of the Distributor | 75 |
| Term | 75 |
| Remuneration to Members | 76 |
| Voting Rights | 76 |
| Admission of Additional Members | 76 |
| Withdrawals or Resignations | 76 |
| Members' Meetings; Quorum; Votes | 76 |
| Devotion of Time; Company Opportunities; Other Activities | 76 |
| Content Acquisition Opportunities | 77 |
| Classes of Units | 79 |
| Capital Accounts | 80 |
| Initial Contributions by Genius Products | 80 |
| Additional Capital Contributions | 80 |
| Withdrawal of Capital Contributions | 81 |
| Repurchase of Class W Units | 81 |
| Redemption Rights of Holder of Class W Units | 83 |
| Redemptions | 85 |
| Management through the Managing Member | 85 |
| Limitations on the Authority of the Managing Member | 85 |
| Officers | 86 |
| Right of First Negotiation for Genius Products Financings | 86 |
| Distributions | 87 |
| Tax Distributions | 87 |
| Allocations of Net Income and Net Losses | 87 |

ii

**Table of Contents**

| | |
|---|---|
| Distributions in Kind | 88 |
| Liability for Amounts Distributed | 88 |
| Performance of Duties; Liability of Members | 88 |
| Exculpation and Indemnification | 88 |
| Insurance | 89 |
| Transfer of Interests | 89 |
| Restrictions on Transfer | 89 |
| Dissolution and Winding Up | 89 |
| Accounting, Records and Reporting by Members | 90 |
| Amendments | 90 |
| Costs | 91 |
| **THE DISTRIBUTION AGREEMENT** | **91** |
| Grant of Rights | 91 |
| Certain Important Defined Terms | 91 |
| Exclusivity | 93 |
| Manufacturing | 93 |
| Marketing and Advertising | 94 |
| Distribution | 94 |
| Approvals and Controls; Restrictions | 95 |
| Delivery of Materials | 97 |
| Expenses | 97 |
| Application of Gross Receipts | 98 |
| Deemed Distribution Fee | 99 |
| True-Up Payments | 99 |
| Returned Units | 99 |
| Subdistributor/Sublicensee Fees | 99 |
| Excessive Sales to Wholesalers | 99 |
| Security Interest | 100 |
| Accounting and Payment | 100 |
| No Minimum Sales Warranty | 100 |
| Proprietary Rights | 100 |
| Representations and Warranties | 101 |
| Indemnity | 101 |
| Early Termination | 101 |
| Buy-Back Right | 103 |
| Most Favored Nations | 103 |
| **ADDITIONAL AGREEMENTS RELATED TO THE TRANSACTION** | **104** |
| Voting Agreements | 104 |
| Services Agreement | 104 |
| Registration Rights Agreement | 104 |
| **REQUIRED VOTE** | **105** |
| **PROPOSAL 2, INCLUDING SUB-PROPOSALS 2A-2F: APPROVAL OF THE AMENDMENT AND RESTATEMENT OF OUR CERTIFICATE OF INCORPORATION** | **106** |
| Sub-Proposal 2A—Approval of a provision restricting the acts or activities in which the Company may engage to certain limitations arising under the Transaction documents | 106 |
| Sub-Proposal 2B—Approval of the increase of the number of authorized shares of common stock from 100,000,000 to 300,000,000 shares and the increase of the number of authorized shares of all classes of stock from 110,000,000 to 310,000,000 shares | 106 |

iii

**Table of Contents**

| | |
|---|---|
| Sub-Proposal 2C—Approval of a provision authorizing Series W Preferred Stock and establishing the rights, preferences and powers, and the qualifications, limitations and restrictions, of Series W Preferred Stock | 108 |
| Sub-Proposal 2D—Approval of the modification of the rights, preferences and powers, and the qualifications, limitations and restrictions, of Common Stock | 108 |
| Sub-Proposal 2E—Approval of a provision by which the Company elects out of the Delaware law restricting business combinations with interested stockholders | 109 |
| Sub-Proposal 2F—Approval of a provision by which the Company renounces the Company's interest or expectancy in, or in being offered the opportunity to participate in, corporate opportunities engaged in by TWC (including its affiliates and related persons) | 109 |
| **PROPOSAL 3: APPROVAL OF AN AMENDMENT AND RESTATEMENT OF OUR 2004 STOCK INCENTIVE PLAN TO (i) INCREASE THE NUMBER OF SHARES OF COMMON STOCK AVAILABLE FOR ISSUANCE UNDER THE PLAN FROM 7,500,000 SHARES TO 13,500,000 SHARES, PROVIDED THAT THE PROPOSED TRANSACTION WITH THE WEINSTEIN COMPANY IS CONSUMMATED, AND (ii) PROHIBIT OPTION REPRICINGS UNDER THE PLAN WITHOUT RECEIPT OF STOCKHOLDER APPROVAL FOR SUCH REPRICINGS** | **112** |
| **PROPOSAL 4: APPROVAL OF ADJOURNMENTS OF THE SPECIAL MEETING, IF NECESSARY, TO PERMIT FURTHER SOLICITATION OF PROXIES IF THERE ARE NOT SUFFICIENT VOTES AT THE TIME OF THE MEETING TO APPROVE ONE OR MORE OF THE PROPOSALS DESCRIBED ABOVE** | **117** |
| **BUSINESS OF GENIUS PRODUCTS** | **118** |
| **MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS** | **126** |
| **EXECUTIVE COMPENSATION** | **139** |
| **SECURITY OWNERSHIP OF BENEFICIAL OWNERS AND MANAGEMENT** | **145** |
| **MARKET PRICE AND DIVIDEND DATA** | **147** |
| **STOCKHOLDER PROPOSALS FOR THE 2006 ANNUAL MEETING** | **147** |
| **EXPERTS** | **148** |
| **OTHER MATTERS** | **148** |
| **WHERE YOU CAN FIND MORE INFORMATION** | **148** |
| **INDEX TO FINANCIAL STATEMENTS OF GENIUS PRODUCTS** | **FS-1** |

**APPENDICES**

> APPENDIX A—MASTER CONTRIBUTION AGREEMENT AND FIRST, SECOND, THIRD AND FOURTH AMENDMENTS THERETO
>
> APPENDIX B—OPINION OF JEFFERIES & COMPANY, INC. AND JEFFERIES' RELATED SIDE LETTER
>
> APPENDIX C—AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF GENIUS PRODUCTS, LLC
>
> APPENDIX D—DISTRIBUTION AGREEMENT
>
> APPENDIX E—AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
>
> APPENDIX F—2004 STOCK INCENTIVE PLAN, AS AMENDED

iv

**Table of Contents**

**GENIUS PRODUCTS, INC.**
2230 Broadway
Santa Monica, CA 90404

---

**PROXY STATEMENT**

---

**Solicitation of Proxies**

This Proxy Statement is furnished in connection with the solicitation of proxies by the board of directors of Genius Products, Inc., a Delaware corporation ("we," "us," "our," the "Company" or "Genius Products"), for use at the Special Meeting of Stockholders to be held at our office at 2230 Broadway, Santa Monica, California 90404 on July 21, 2006 at 9:00 a.m. local time and at any and all adjournments thereof (the "Special Meeting"), for the purposes set forth in the accompanying Notice of Special Meeting of Stockholders. Accompanying this Proxy Statement is the board of directors' proxy for the Special Meeting, which you may use to indicate your vote as to the proposals described in this Proxy Statement.

In addition to these mailed proxy materials, our officers, directors and employees and The Altman Group, 1200 Wall Street West, Third Floor, Lyndhurst, New Jersey 07071 may also solicit proxies in person, by telephone, or by other means of communication. Officers, directors and employees will not be paid any additional compensation for soliciting proxies, but The Altman Group will be paid its customary fee of approximately $6,500 plus out-of-pocket expenses if it solicits proxies. We also may reimburse brokerage firms, banks and other agents for the cost of forwarding proxy materials to beneficial owners.

**Revocation of Proxies**

All Proxies that are properly completed, signed and returned to us prior to the Special Meeting, and that have not been revoked, will be voted in favor of the proposals described in this Proxy Statement unless otherwise directed. A stockholder may revoke his or her proxy at any time before it is voted either by filing with the Secretary of the Company, at its principal executive offices, a written notice of revocation or a duly executed proxy bearing a later date or by attending the Special Meeting and expressing a desire to vote his or her shares in person.

**Record Date and Voting**

The close of business on June 21, 2006 has been fixed as the record date for the determination of stockholders entitled to notice of and to vote at the Special Meeting and any adjournment of the Special Meeting. As of the record date, we had outstanding 60,972,626 shares of common stock, par value $.0001 per share.

Each stockholder of record is entitled to one vote for each share held on all matters to come before the meeting. All proxies that are returned will be counted by the Inspector of Elections in determining the presence of a quorum and on each issue to be voted on for which a vote was cast. An abstention from voting or a broker non-vote will not be counted in the voting process. Abstentions will be counted towards the vote total for each proposal, and will have the same effect as "Against" votes. Broker non-votes will not be counted for purposes of determining whether any of the proposals are approved and will have the same effect as "Against" votes on those proposals that must be approved by a majority of our outstanding shares of common stock (Proposals 1 and 2, including Sub-Proposals 2A-2F).

Stockholders may revoke any proxy before it is voted by attendance at the meeting and voting in person, by executing a new proxy with a later date, or by giving written notice of revocation to the Secretary of the Company.

1

**Table of Contents**

The shares represented by proxies that are returned properly signed will be voted in accordance with each stockholder's directions. If the proxy card is signed and returned without direction as to how they are to be voted, the shares will be voted as recommended by our board of directors.

**Mailing of Proxy Statement and Proxy Card**

Our principal executive offices are located at 2230 Broadway, Santa Monica, California 90404. This Proxy Statement is dated June 29, 2006, and this Proxy Statement and the accompanying proxy card are first being mailed to stockholders on or about that date.

2

Table of Contents

## SUMMARY OF THE TRANSACTION

This summary highlights selected information from this Proxy Statement relating to the Transaction (Proposal 1) and related matters, but does not contain all of the information that may be important to you. To better understand the Transaction and related matters, you should read this entire document carefully, including the Master Contribution Agreement, as amended, attached as *Appendix A* to this Proxy Statement (as amended, the "Contribution Agreement"), the opinion of Jefferies & Company, Inc. and Jefferies' related side letter attached as *Appendix B* to this Proxy Statement and the other documents attached as appendices to this Proxy Statement.

In addition, important business and financial information about Genius Products is contained in this Proxy Statement. You may obtain copies of our public filings with the Securities and Exchange Commission without charge by following the instructions in the section entitled "Where You Can Find More Information".

We have included page references parenthetically to direct you to a more complete description of the topics presented in this summary.

**The Companies (See pages 39 - 41)**

The following companies are parties to the Master Contribution Agreement:

### Genius Products, Inc.

Genius Products, Inc. ("we", "us", "our", the "Company" or "Genius Products") is an entertainment company that produces, publishes, licenses and distributes films, videos and music on digital versatile discs ("DVDs"), universal mini discs ("UMDs") and compact discs ("CDs"), under a variety of branded and non-branded names. Our products are sold at traditional, direct response, mail order and internet retailers nationwide and, to a lesser extent, internationally.

Genius Products is a publicly traded corporation incorporated in the State of Delaware. Our common stock trades on the Over-the-Counter Bulletin Board under the symbol, "GNPI.OB". For more information, please visit our website at www.geniusproducts.com; however, the information on our website is not a part of this Proxy Statement. Our address is 2230 Broadway, Santa Monica, CA 90404, and our telephone number is 310-829-4509.

### The Weinstein Company LLC

The Weinstein Company LLC ("TWC") is a motion picture company founded by brothers Robert Weinstein and Harvey Weinstein (together, the ''Weinsteins'') in April, 2005, and is indirectly wholly-owned by The Weinstein Company Holdings LLC. From 1979 to March 2005, the Weinsteins were Co-Chairmen of Miramax Film Corp., a company they founded and, in 1993, sold to Walt Disney Pictures and Television ("Disney"). On March 29, 2005, the Weinsteins and Disney jointly announced the termination of the Weinsteins' employment contracts with Disney.

As part of the Disney separation, Disney, Miramax and an affiliate of TWC entered into an agreement which, among other things, gives the TWC affiliate the right to acquire from Miramax (i) Miramax's rights to more than 80 films and film projects, a number of which have been released, are complete and ready for release or are in post-production, and a majority of which are in development; (ii) the rights to produce, co-finance and co-distribute sequels to a number of established film franchises, including *Scary Movie* (the next installment of which, *Scary Movie 4*, has been released), *Scream* and *Spy Kids* series; and (iii) Miramax's rights to 12 television

3

Table of Contents

projects in varying stages of development and production. The agreement also assigns to the TWC affiliate the Dimension Films name, under which more than 60 films have been theatrically released to date. The Miramax name and the Miramax Library (which includes both Miramax and Dimension titles) remain property of Disney. In addition, TWC has, to date, separately acquired rights to more than 25 additional projects from various parties, a number of which are completed or in post-production.

### The Weinstein Company Holdings LLC

The Weinstein Company Holdings LLC ("TWC Holdings") is the ultimate parent company of TWC and The Weinstein Company Funding LLC ("TWC Funding"), and was formed in May, 2005. TWC Holdings currently owns, directly or indirectly, 100% of each of TWC and TWC Funding. After the closing of the Transaction, TWC Holdings will own directly 100% of TWC and 69% of TWC Funding, and will own indirectly 1% of TWC Funding through a first-tier subsidiary of TWC Holdings named W-G Holding Corp. After the closing, the remaining 30% of TWC Funding will be owned by Genius Products.

### The Weinstein Company Funding LLC

TWC Funding is currently a direct and indirect wholly-owned subsidiary of TWC Holdings. After the closing of the Transaction, TWC Funding will become the Distributor (defined below) and will carry on the business of Genius Products. Prior to the closing, the business activities of TWC Funding will have involved serving as the borrower under previous financing arrangements of TWC Holdings, and as a holding company of other rights and assets related to TWC's operations.

### Summary of the Transaction (See pages 38 - 39)

On December 5, 2005, Genius Products and TWC entered into the Master Contribution Agreement, and the parties amended the Master Contribution Agreement on March 15, April 26, May 30 and June 28, 2006. A copy of the Master Contribution Agreement and the amendments thereto are attached as *Appendix A* to this Proxy Statement. Under the Contribution Agreement, we have agreed with TWC to form a new business venture (referred to as the "Distributor") that will operate all of the existing businesses of Genius Products and become the exclusive distributor of digital versatile discs ("DVDs") and other forms of home video for certain filmed entertainment products produced by TWC.

The Contribution Agreement provides that, on or prior to the closing, the following events will occur (referred to as the "Transaction"):

- TWC will enter into a Distribution Agreement with TWC Funding, which will become the Distributor. TWC Funding will transfer away substantially all its assets and liabilities, so that at the closing, it will have no material assets or liabilities, other than with respect to or arising under the Distribution Agreement.

- The name of the Distributor will be changed to "Genius Products, LLC";

- We will contribute substantially all of our existing operations, assets (including cash) and certain of our liabilities to the Distributor in exchange for a 30% equity interest in the Distributor in the form of Class G Units;

- We will become the managing member of the Distributor, although TWC Holdings will have the ability to control us and appoint a majority of our board of directors, among other rights more fully described below;

- The remaining 70% equity interest in the Distributor will be held directly (69%) and indirectly (1% through W-G Holding Corp., a first-tier subsidiary) by TWC Holdings and will take the form of Class

4

Table of Contents

W Units in the Distributor. The holders of Class W Units will have the right to require that the Distributor redeem their Units for up to 70% of the outstanding common stock of Genius Products, Inc., (with such percentage subject to adjustment based on certain events) or, under certain circumstances, cash; and

- We will amend our Certificate of Incorporation to authorize Series W Preferred Stock and issue to TWC Holdings and its first-tier subsidiary (W-G Holding Corp.) 100 shares of our Series W Preferred Stock. These shares will have no material economic value but will immediately give TWC Holdings certain control rights over our company, including a 70% voting interest and the right to elect five out of seven directors on our Board of Directors (three of whom must be independent directors).

The following documents will be adopted or executed in connection with the closing of the Transaction:

- The Distributor will adopt an Amended and Restated Limited Liability Company Agreement in the form attached as *Appendix C* to this Proxy Statement (the "LLC Agreement");

- The Distributor will enter into the Distribution Agreement with TWC in the form attached as *Appendix D* to this Proxy Statement (the "Distribution Agreement");

- Genius Products will adopt an amended and restated certificate of incorporation in the form attached as *Appendix E* to this Proxy Statement; and

- We will enter into the other documents and agreements described below under Proposal 1 (beginning on page 103).

Following the closing, the Distributor will carry on our existing business, and our primary asset will consist of our 30% equity interest in the Distributor, evidenced by our Class G Units in the Distributor. Since our entire business will be conducted by the Distributor, our current stockholders will only be entitled to benefit from 30% of the net profits, if any, that are generated by the Distributor, including net profits from our existing businesses that we are contributing to the Distributor and from the new business of distributing home video products for TWC's films. However our management believes that owning a 30% equity interest in the Distributor, with its future prospects as a home video distributor for TWC's films, is more attractive for our stockholders than owning 100% of Genius Products' existing business.

Under the Distribution Agreement, the Distributor will earn a fee of between 3% and 6% on net sales of home video products, depending on the level of sales compared to theatrical box office revenues for the films released on home video. The Distributor will collect the proceeds from sales of home video products, and will remit these proceeds to TWC, minus the Distributor's distribution fee of 3% to 6%, cost of goods sold (including manufacturing expenses) and certain marketing expenses. Genius Products will only be entitled to 30% of the net profits, if any, that are generated by the Distributor.

We chose to structure the proposed Transaction in the manner described above, including operating our businesses after the closing through a limited liability company in which each party holds a participating interest, because we believe it is a tax efficient structure to conduct a joint enterprise. Because a limited liability company is taxed as a partnership, its earnings can be distributed to its members with only a single level of taxation. In addition, earnings that are reinvested by the parties in the business will result in an increase in tax basis in their respective membership interests, thus decreasing subsequent taxes if and when the interests are sold.

Following the closing, Genius Products, Inc. will remain a publicly-traded company and our existing shares of common stock will remain outstanding and held by our public stockholders. Although TWC is not a public company, we do not intend that the Transaction will be part of any "going private" transaction or series of transactions by Genius Products.

5

Table of Contents

The following diagram illustrates the structure of the Transaction and the relationships among the parties to the Transaction as of the closing of the Transaction:



We expect to finance the business of the Distributor after closing through its cash flow from operations and the cash contributed from Genius Products at closing. On December 6, 2005, we closed a $32 million private placement financing in which we issued 16,000,000 shares of our common stock at a purchase price of $2.00 per share and five-year warrants to purchase 4,800,000 shares of common stock with an exercise price of $2.40 per share. We completed this financing in order to be able to satisfy a condition to the closing of the Transaction that we have available for immediate use and contribution to the Distributor at least $25 million in cash. TWC has agreed to waive this condition provided that we have available cash of $12 million at closing. We intend that available cash, less certain amounts permitted to be retained under the Contribution Agreement, will be contributed to the Distributor at closing and be used to help finance the operations of the Distributor in the future. Our cash position was $18.6 million at March 31, 2006 and $45.6 million at May 31, 2006.

We have agreed with the investors in the private placement financing to register for resale with the Securities and Exchange Commission their shares of common stock purchased in the financing and shares issuable upon exercise of warrants issued to them in the financing. We have registered these shares for resale; however Genius Products will not receive any portion of the proceeds from the sale of these shares by the investors.

**The Distribution Agreement (See pages 91 - 103 and Appendix D)**

Under the Distribution Agreement, TWC will grant a license to the Distributor to manufacture, promote and sell in the United States and its territories and possessions, through December 31, 2010 (or December 31, 2013 if TWC extends the term), DVDs, videocassettes and other forms of pre-recorded home video of certain motion pictures which TWC has the right to distribute on home video. These motion pictures will include films produced by TWC as well as films which TWC acquires or obtains the right to distribute on home video.

6

Table of Contents

The Distribution Agreement provides that the Distributor will earn a fee of between 3% and 6% on net sales of these home video products, depending on the level of these sales compared to theatrical box office revenues for the same films. The Distributor will collect the proceeds from sales of home video products and will remit these proceeds to TWC, minus the Distributor's distribution fee of 3% to 6%, cost of goods sold (including manufacturing expenses) and certain marketing expenses.

The Distribution Agreement contains complex provisions relating to payments, permitted expenses and other adjustments, and the foregoing discussion is intended only as a summary. For further information regarding the Distribution Agreement, we urge you to review the discussion beginning on page 91 of this Proxy Statement under "Proposal 1—Material Agreements And Documents Relating To The Transaction—4. The Distribution Agreement", and the full text of the Distribution Agreement appearing in Appendix D to this Proxy Statement.

**Accounting Policies Relating to the Transaction (See page 30)**

At the closing of the Transaction, we will contribute to the Distributor all of our operating business, including substantially all of our assets, except for $1 million cash and certain liabilities, and receive a 30% equity interest in the Distributor. We intend to account for our investment in the Distributor on our financial statements using the equity method of accounting.

Under the equity method of accounting, only our investment in and amounts due to and from the equity investee will be included in our consolidated balance sheet. As a result, we will record an asset on our balance sheet related to our investment interest in the Distributor. The Transaction represents a non-monetary exchange of a business controlled by Genius Products for a non-controlling interest in the Distributor. Accordingly, the amount to be initially recorded for Genius Products' investment in the Distributor will be partially based on Genius Products' fair value as determined by reference to the quoted market prices of Genius Products' shares for a reasonable time before and after the announcement of the Transaction and partially based on the historical basis of the net assets surrendered in the Transaction. On our statement of operations, we will record our 30% share of the Distributor's profit or loss as equity in net earnings (losses) from investee. We expect to record a gain upon consummation of the Transaction and that this gain will be based on the difference between the fair market value of assets contributed and the net book value, reduced for the portion of the gain associated with the retained economic interest in the Distributor. The carrying amount of our investment in the Distributor will subsequently be adjusted to recognize our share of the earnings or losses of the Distributor after the Transaction. Pursuant to APB 18, we will be required to periodically assess whether a decrease in value of the investment has occurred which is other than temporary and which should be recognized immediately resulting in an impairment loss.

Commencing on December 5, 2005 through the closing date, we have been operating under an interim distribution agreement with TWC and are recording the results from titles we first released for TWC in March 2006 on our financial statements. After closing, substantially all of our revenue and expenses as well as the results from releasing TWC product will be reflected in the financial statements of the Distributor. Subsequent to the Transaction, we will include separate quarterly and audited annual financial statements of the Distributor in a note to our financial statements.

**Excluded Assets (See pages 62 - 63)**

The assets excluded from the assets to be contributed by Genius Products in the Transaction include, among other things:

- certain claims, demands, rights or causes of action, and any cash, assets or other property recovered by Genius Products therefrom;

7

Table of Contents

- any recovery of cash, assets or other property received by Genius Products that represents a return of or on any amounts or obligations previously paid or incurred by Genius Products in connection with the excluded liabilities described below beginning on page 63;

- benefit plans and contracts of insurance of Genius Products for employee group medical, dental and life insurance plans;

- all insurance policies of Genius Products, to the extent that the parties mutually agree that any such items should not be transferred to the Distributor, and subject to the obligation of the Distributor to reimburse Genius Products for the costs thereof as provided in the Services Agreement described below under "Services Agreement", to the extent that the Distributor receives the benefits of these plans, contracts and policies; and

- all rights of Genius Products under the Contribution Agreement and the other agreements relating to the Transaction.

**Contingent Dividend Right (See pages 68 - 69)**

The Contribution Agreement provides that, within 30 days following the closing of the Transaction or such later time as is practicable, we will issue to our stockholders of record on the date of the closing (to the extent practicable) an instrument (the "Contingent Dividend Right") entitling the holder to receive from Genius Products cash payments from time to time after the closing solely based on cash received by Genius Products from the exercise or conversion, after the closing of the Transaction, of options, warrants or other convertible securities that were issued and outstanding as of the closing date. These cash payments will only be made when, as and if declared by the board of directors of Genius Products pursuant to a vote of a committee of the board consisting only of directors not appointed by TWC, but we will have no obligation to make or declare such payments. For the reasons discussed on page 68, we cannot provide a reliable estimate of the future value or cash proceeds likely to be paid to holders of the Contingent Dividend Rights.

**The LLC Agreement (See pages 75 - 91 and Appendix C)**

At the closing of the Transaction, we would become party to the LLC Agreement, which governs the ownership and management of the Distributor. Under the LLC Agreement, Genius Products would be the initial Managing Member of the Distributor, with the power and authority to manage and direct the business and affairs of the Distributor under the terms and conditions of the LLC Agreement. However, the LLC Agreement requires that Genius Products obtain TWC Holdings' approval before taking many actions. The LLC Agreement also provides that many content acquisition opportunities must first be presented to TWC Holdings before Genius Products may pursue those opportunities.

In addition, the LLC Agreement provides that TWC Holdings or its designee will become the Managing Member of the Distributor, instead of Genius Products, if we become insolvent or bankrupt, if we violate the membership interest transfer restrictions in the LLC Agreement or a lender forecloses on a security interest granted with respect to our Class G Units in the Distributor.

**Redemption Rights under the LLC Agreement (See pages 83 - 85)**

Under the LLC Agreement, the holders of Class W Units (consisting of TWC Holdings and its first-tier subsidiary named W-G Holding Corp.) will have the right to require the Distributor to redeem all or a portion of their Class W Units in exchange for new shares of common stock of Genius Products which would give such holders an aggregate of 70% of our outstanding common stock after giving effect to the issuance of the new shares (with such percentage subject to adjustment based on certain events) or, under certain circumstances, cash. Although the new shares of common stock would dilute our existing stockholders, we would receive in exchange

8

Table of Contents

for our new shares an equivalent pro rata amount of Class W Units in the Distributor (subject to certain adjustments), so that the indirect pro rata interests of our pre-redemption stockholders in the Distributor (our primary operating asset) would remain substantially unchanged.

At the request of the Distributor and with the consent of the holder of Class W Units requesting redemption, the Distributor may deliver cash in lieu of Genius common stock for the redeemed Class W Units. If the Distributor makes this election, the cash redemption price would likely be funded by either existing cash of the Distributor or by the sale by Genius Products of new shares of common stock to investors and the contribution of the cash proceeds to the Distributor by Genius.

**Class G Units and Class W Units in the Distributor (See page 79)**

At the closing of the Transaction, we will receive Class G Units representing a 30% equity interest in the Distributor as of the closing of the Transaction. We will not acquire any ownership in TWC or any of its affiliates as a result of the Transaction, other than the Distributor. TWC Holdings, directly and indirectly through W-G Holding Corp., will hold Class W Units in the Distributor following the closing of the Transaction representing an initial 70% equity interest in the Distributor, which may be increased following the closing if we are required to satisfy our indemnification obligations under the Contribution Agreement. The Class W Units will give TWC Holdings a $60 million liquidation preference, which is the right to receive the first $60 million in proceeds resulting from any liquidation of the Distributor before Genius Products receives any of the proceeds.

**Termination Provisions of Contribution Agreement (See pages 71 - 72)**

The Contribution Agreement contains customary termination provisions which, under certain circumstances in the event of a termination under the Contribution Agreement, may subject us to liability for the payment of a $4,000,000 termination fee or reimbursement of expenses, and includes a provision which permits either party to terminate the agreement if the transaction fails to close by July 21, 2006.

**Restrictions on Competing Transactions (See page 68)**

The Contribution Agreement contains customary covenants restricting us prior to the closing from, among other things, soliciting, encouraging or accepting any competing business combination transaction, and our board of directors from withdrawing or modifying its approval or recommendation of the Transaction, subject to the board's fiduciary obligations.

**Restrictions on our Business Following the Closing (See pages 76 - 78)**

Following the closing of the Transaction, we will be required to devote all of our time and business efforts to serving as the managing member of the Distributor and the other "Genius Permitted Activities" listed below on pages 76 - 78. The Distributor's activities will be limited to the performance of the Distribution Agreement and the conduct of the business currently conducted by us. In addition, we and the Distributor will be required to offer to TWC the opportunity to acquire new content of which we become aware, before we or the Distributor would be permitted to exploit such new content.

9

Table of Contents

**Reasons for the Transaction (See pages 47 - 48)**

We are proposing to enter into the Transaction because we believe that the Transaction is in the best interests of Genius Products and our stockholders. In reaching the decision to approve the Transaction and our entry into the Contribution Agreement and related agreements and documents, our board of directors and a special committee of independent directors considered a variety of factors, including:

- Current working capital constraints have hindered our progress in taking full advantage of our position in the retail market by impeding our ability to acquire high quality content;

- TWC currently has rights to over 80 projects in various stages of development resulting from the separation from Disney described above, many of which the Distributor will have the exclusive right to distribute in the United States;

- The Weinsteins have an established track record as film producers, as demonstrated by their work with Miramax and Disney;

- TWC is well financed, having raised a total of approximately $1.2 billion to date, including $490 million in equity, a $500 million film securitization and approximately $200 million from other commercial relationships (although none of these funds will be available to the Distributor); and

- The distribution rights available from TWC present an opportunity to transform our product offering and accelerate our revenue and earnings growth. Under these distribution rights, the Distributor will earn a fee of between 3% and 6% on net sales of home video products, depending on the level of sales compared to theatrical box office revenues for the films released on home video. The Distributor will collect the proceeds from sales of home video products, and will remit these proceeds to TWC, minus the Distributor's distribution fee of 3% to 6%, cost of goods sold (including manufacturing expenses) and certain marketing expenses. Genius Products will only be entitled to benefit from 30% of the net profits, if any, that are generated by the Distributor.

For additional information regarding the reasons for the Transaction, please see the section entitled, "The Transaction—Reasons for the Transaction", beginning on page 47. For additional information regarding the Distribution Agreement and distribution fee, please see "4. The Distribution Agreement" beginning on page 91.

**Risk Factors (See pages 31 - 36)**

The Transaction may not achieve the expected benefits for our company because of risks and uncertainties, including those discussed in the section below entitled "Risk Factors", beginning on page 31, which we urge you to read and consider carefully.

**Recommendation of our Board of Directors (See page 48)**

Our board of directors unanimously approved the Transaction, the Contribution Agreement and related agreements and documents, and unanimously recommends that our stockholders vote "FOR" each of the proposals in this Proxy Statement.

**Opinion of Genius Products' Financial Advisor to our Board of Directors (See pages 48 - 57 and Appendix B)**

In connection with the Transaction, our financial advisor, Jefferies & Company, Inc., referred to herein as "Jefferies", rendered its opinion to our board of directors to the effect that, as of December 5, 2005, based upon Jefferies' review of drafts of the relevant transaction documents as described in the opinion, and based upon the qualifications, limitations and assumptions set forth in the opinion, the consideration to be received by Genius Products pursuant to the Contribution Agreement is fair, from a financial point of view, to Genius Products. A copy of Jefferies' opinion and Jefferies' related side letter dated June 28, 2006 is attached as *Appendix B* to this Proxy Statement. We urge you to read this opinion carefully in its entirety for information with respect to the assumptions made, matters considered and limits of review in connection with the opinion.

10

Table of Contents

**Our Directors Following the Transaction (See page 60)**

Effective as of the closing of the Transaction, our board of directors will be reconstituted to consist of seven directors, the holders of shares of our Series W Preferred Stock (initially, TWC Holdings and its first-tier subsidiary, W-G Holding Corp.) will have the right to elect five directors (three of whom at the time of their election must be independent directors) and the holders of our common stock will have the right to elect the remaining two directors. If the Transaction closes, then we expect that one or more of the directors elected by our stockholders at our 2005 annual meeting of stockholders may resign from our board of directors and five individuals selected by TWC Holdings and its first-tier subsidiary, W-G Holding Corp., will be appointed to the board. As of the date of this Proxy Statement, we do not know which directors may remain on or be appointed to our board following the closing of the Transaction and which directors may resign.

**Interests of Directors, Executive Officers and Affiliates (See pages 57 - 58)**

Some of our directors and executive officers have agreements or arrangements providing them with interests in the Transaction that are different from, or in addition to, the interests of our stockholders.

As described below, Trevor Drinkwater, Rodney Satterwhite, Michael Radiloff and Mitch Budin are parties to employment agreement amendments under which they will each receive a grant of additional stock options, rights to severance payments upon termination and other benefits. These employment agreement amendments only become effective upon the closing of the Transaction.

In addition, the vesting of all unvested stock options outstanding at the time of the closing of the Transaction, including options held by our directors and executive officers, automatically will accelerate upon the closing of the Transaction. However, pursuant to their employment agreement amendments, each of Messrs. Budin, Satterwhite and Radiloff have agreed to waive the accelerated vesting of a portion of their existing stock options, and Mr. Drinkwater has agreed to restrictions on the sale or transfer of a portion of the shares of our common stock represented by his existing stock options.

**No Appraisal Rights (See page 58)**

Under the applicable provisions of the Delaware General Corporation Law, our stockholders will have no right to seek appraisal of their shares of common stock in connection with the Transaction.

**Location, Time and Date of The Special Meeting (See pages 1, 18)**

The Special Meeting will be held at our office at 2230 Broadway, Santa Monica, California 90404 at 9:00 a.m. local time on Friday, July 21, 2006.

**Record Date and Voting Rights for the Special Meeting (See pages 18 - 19)**

Holders of record of our common stock at the close of business on June 21, 2006 will be entitled to vote at the Special Meeting or any adjournment of the Special Meeting. On the record date, 60,972,626 shares of our common stock were outstanding and entitled to vote at the Special Meeting and at any adjournments thereof. Each share of our common stock is entitled to one vote on each matter to be voted upon at the Special Meeting.

11

Table of Contents

## QUESTIONS AND ANSWERS ABOUT THE TRANSACTION

### What is the Transaction?

The Transaction is summarized above in the section entitled, "Summary of the Transaction". For additional information regarding the Transaction, please see the section below entitled "Proposal 1—The Transaction".

### What is Genius Products contributing in the Transaction?

We will be contributing substantially all of our assets and certain liabilities to a new business venture that will be named Genius Products, LLC (referred to in this Proxy Statement as the "Distributor"), and we will receive in return a 30% equity interest in the Distributor and become the managing member of the Distributor. The other 70% of the equity of the Distributor will be held directly by TWC Holdings (69%) and indirectly (1%) through a first-tier subsidiary of TWC Holdings named W-G Holding Corp. Following the closing, the Distributor will continue to carry on our existing business using our current assets and employees (who are expected to transfer to the Distributor), and the Distributor will also distribute DVDs and home video products for TWC's films.

### What is TWC contributing in the Transaction?

TWC will be contributing home video distribution rights pursuant to the exclusive Distribution Agreement it will enter into with the Distributor prior to the closing of the Transaction (for details regarding the Distribution Agreement, please see the section below entitled "Proposal 1—Material Agreements And Documents Relating To The Transaction—4. Distribution Agreement" beginning on page 91). We believe that the Distribution Agreement is a valuable and highly sought-after right and, when combined with our employees, management team and existing distribution business, will help transform the Distributor into a large and well-recognized entertainment distributor. Under the Distribution Agreement, the Distributor will earn a fee of between 3% and 6% on net sales of home video products, depending on the level of these sales compared to theatrical box office revenues for the same films.

### What is the relationship between TWC Holdings, TWC and TWC Funding?

TWC Holdings currently owns, directly or indirectly, 100% of each of TWC and TWC Funding. After the closing of the Transaction, TWC Holdings will own directly 100% of TWC and 69% of TWC Funding, and will own indirectly 1% of TWC Funding through a first-tier subsidiary of TWC Holdings named W-G Holding Corp. After the closing, the remaining 30% of TWC Funding will be owned by Genius Products.

### Will our stockholders retain control of Genius Products?

No. Following the closing, Genius Products, Inc. will remain a publicly-traded company and our existing shares of common stock will remain outstanding and held by our public stockholders. However, at closing we will amend our Certificate of Incorporation to authorize Series W Preferred Stock and issue to TWC Holdings, together with its first-tier subsidiary named W-G Holding Corp. an aggregate of 100 shares of Series W Preferred Stock. These shares will have no material economic value but will immediately give TWC Holdings together with its first-tier subsidiary, W-G Holding Corp., certain control rights over our company, including a 70% voting interest and the right to elect five out of seven directors on our Board of Directors (three of whom must be independent directors).

As discussed further below, TWC Holdings and its first-tier subsidiary, W-G Holding Corp., will be able to redeem their aggregate 70% interest in the Distributor for new shares of our common stock, but in the case of such a redemption the voting rights of the Series W Preferred Stock will be reduced so that the aggregate voting rights of TWC Holdings together with its first-tier subsidiary, W-G Holding Corp., will remain unchanged (initially at 70%).

12

Table of Contents

*How will the redemption rights of the TWC Holdings operate?*

The 70% interest in the Distributor that will be held directly (69%) and indirectly (1%) by TWC Holdings will take the form of Class W Units in the Distributor. The holders of Class W Units will have the right to require that the Distributor redeem their Units for 70% of the outstanding common stock of Genius Products (with such percentage subject to adjustment based on certain events) or, under certain circumstances, cash. If the Class W Units are redeemed for stock, Genius Products will issue new shares of common stock in exchange for the Class W Units being redeemed. Although the new shares of common stock will dilute our existing stockholders, we will receive in exchange for our new shares an equivalent pro rata amount of Class W Units in the Distributor (subject to certain adjustments), so that the indirect pro rata interests of our pre-redemption stockholders in the Distributor (our primary operating asset) will remain substantially unchanged.

At the request of the Distributor and with the consent of the holder of Class W Units requesting redemption, the Distributor may deliver cash in lieu of Genius common stock for the redeemed Class W Units. If the Distributor makes this election, the cash redemption price would likely be funded by either existing cash of the Distributor or by the sale by Genius Products of new shares of common stock to investors and the contribution of the cash proceeds to the Distributor by Genius.

*Will any of the consideration that we receive in the Transaction be distributed to our stockholders?*

No. We will receive Class G Units as part of our contribution of assets to the Distributor. However, we are not permitted to distribute to our stockholders any of these Class G Units in the Distributor.

*Will Genius Products or its stockholders acquire any ownership interest in TWC as a result of the Transaction?*

No. Neither Genius Products nor its stockholders will acquire any ownership interest in TWC as a result of the Transaction, and TWC's capital will not be available to us. We expect to finance the business of the Distributor after closing through its cash flow from operations and the cash contributed from Genius Products at closing. However, we will be an affiliate of TWC since TWC Holdings, which is the parent company of TWC, will control a majority of the voting power of Genius Products and will have the right to elect or appoint a majority of our directors.

*Why are we proposing to undertake the Transaction?*

We are proposing to undertake the Transaction because we believe that the Transaction is in the best interests of Genius Products and our stockholders. Although our current stockholders will only be entitled to benefit from 30% of the net profits, if any, that are generated by the Distributor, our management believes that owning a 30% equity interest in the Distributor is more attractive than owning 100% of Genius Products' existing business. In reaching this decision, our board of directors considered a variety of factors, including:

- Current working capital constraints have hindered our progress in taking full advantage of our position in the retail market by impeding our ability to acquire high quality content;

- TWC currently has rights to over 80 projects in various stages of development resulting from the separation from Disney described below, many of which the Distributor will have the exclusive right to distribute in the United States;

- The Weinsteins have an established track record as film producers, demonstrated by their work with Miramax and Disney;

- TWC is well financed, having raised a total of approximately $1.2 billion to date, including $490 million in equity, a $500 million film securitization and approximately $200 million from other commercial relationships (although none of these funds are expected to be available to the Distributor); and

13

Table of Contents

- The distribution rights available from TWC present an opportunity to transform our product offering and accelerate our revenue and earnings growth. Under these distribution rights, the Distributor will earn a fee of between 3% and 6% on net sales of home video products, depending on the level of sales compared to theatrical box office revenues for the films released on home video. The Distributor will collect the proceeds which it receives from sales of home video products, and will remit these proceeds to TWC, minus the Distributor's distribution fee of 3% to 6%, cost of goods sold (including manufacturing expenses) and certain marketing expenses. Genius Products will only be entitled to benefit from 30% of the net profits, if any, that are generated by the Distributor.

We chose to structure the proposed Transaction with TWC in the manner described in this Proxy Statement, including operating our businesses after the closing through a limited liability company in which each party holds a participating interest, because we believe it is a tax efficient structure to conduct a joint enterprise. Because a limited liability company is taxed as a partnership, its earnings can be distributed to its members with only a single level of taxation. In addition, earnings that are reinvested by the parties in the business will result in an increase in tax basis in their respective membership interests, thus decreasing subsequent taxes if and when the interests are sold.

For additional information regarding the reasons for the Transaction, please see the section entitled "The Transaction—Reasons for the Transaction".

### What are TWC and TWC Holdings receiving in the Transaction?

Under the Distribution Agreement, the Distributor will manufacture, promote and sell in the United States and its territories and possessions, DVDs, videocassettes and other forms of pre-recorded home video of motion pictures produced by TWC, as well as films which TWC acquires or obtains the right to distribute on home video. The Distributor will collect the proceeds which it receives from sales of home video products, and will remit these proceeds to TWC, minus the Distributor's distribution fee of 3% to 6%, cost of goods sold (including manufacturing expenses) and certain marketing expenses.

TWC will gain access to the home video distribution capabilities and the distribution operations of Genius Products (which are being contributed to the Distributor at the closing) in exchange for a fee of 3% to 6% of sales. In addition, TWC Holdings, the ultimate parent company of TWC, will directly and indirectly own 70% of the Distributor. Therefore, TWC Holdings will also be entitled to benefit from 70% of the net profits, if any, that are generated by the Distributor, including any profits from the 3%-6% distribution fee paid by TWC as well as any profits from other businesses of Genius Products.

### Are there risks that the stockholders of Genius Products should consider in connection with the Transaction?

Yes. The Transaction may not achieve the expected benefits for our company because of the risks and uncertainties discussed in the section below entitled "Risk Factors", which we urge you to read and consider carefully. Our board of directors identified and considered a variety of potentially negative factors in its deliberations concerning the Transaction, including:

- Following the closing of the Transaction, our business, results of operations and financial condition will depend substantially on the quality and financial performance of TWC's theatrical releases;

- If we do not achieve target home video distribution rates for TWC's films or meet other performance criteria following the closing of the Transaction, TWC may terminate the Distribution Agreement, which would have a material adverse effect on our business, results of operations and financial condition;

- As a result of the Transaction and the related issuance to TWC Holdings of shares of Series W Preferred Stock in Genius Products, TWC Holdings will gain the ability to control Genius Products and to appoint

14

Table of Contents

a majority of our board of directors. The Series W Preferred Stock to be issued to TWC Holdings will provide TWC Holdings at least a majority of the total voting power of our outstanding stock;

- TWC Holdings' direct and indirect ownership of Class W Units in the Distributor will give it the right to receive the first $60 million in proceeds resulting from any liquidation of the Distributor, before Genius Products receives any of the proceeds;

- The ownership interests of our current stockholders in our assets will be significantly diluted as a result of the Transaction;

- Under the Distribution Agreement, the Distributor would assume the financial risk of customers' nonpayment or delay in payment, which could have a material adverse effect on our business, results of operations and financial condition;

- The Transaction would make it difficult for another party to acquire Genius Products or otherwise effectuate a change of control; and

- Various other risks associated with the Transaction and the businesses of Genius Products, TWC and the Distributor described in the section below entitled "Risk Factors".

***Will the stockholders of Genius Products have dissenters' or appraisal rights relating to the Transaction?***

No. The Delaware General Corporation Law governs stockholders' rights in connection with the Transaction. Under the applicable provisions of the Delaware General Corporation Law, our stockholders will have no right to seek appraisal of their shares of common stock in connection with the Transaction.

***Have any stockholders of Genius Products committed to vote in favor of the Transaction?***

Yes. Certain stockholders of Genius Products who beneficially owned or controlled approximately 32.2% of our common stock as of the record date have entered into agreements with TWC to vote their shares in favor of the proposals described in this Proxy Statement. These stockholders also delivered proxies to TWC entitling it to vote those shares in favor of the Transaction at the Special Meeting. See the section entitled, "Proposal 1—Additional Agreements related to the Transaction".

***When is the closing of the Transaction expected to occur?***

We are working with TWC to complete the Transaction as quickly as possible and expect to complete the Transaction shortly after obtaining the requisite stockholder approval at the Special Meeting. However, we cannot predict the exact timing of the closing of the Transaction because the Transaction is subject to several conditions. For a description of the conditions to the closing of the Transaction, see the section entitled, "Proposal 1—The Contribution Agreement—Conditions to Closing".

***What will happen if the Transaction is not approved?***

We will not proceed with the Transaction if it is not approved by our stockholders. In some circumstances, if the Contribution Agreement is terminated, we would become liable for the payment of a $4,000,000 termination fee or reimbursement of expenses. Under the Contribution Agreement, we would be liable for the $4,000,000 termination fee if:

- Either we or TWC terminates the Contribution Agreement based on our board's receipt of a superior proposal as defined in the Contribution Agreement;

- TWC terminates the Contribution Agreement because of our uncured material breach of the Contribution Agreement, which was willful and knowing;

15

**Table of Contents**

- TWC terminates the Contribution Agreement under circumstance in which our board of directors changes or does not affirm its approval of this Transaction or approves a competing transaction, or other types of alternative competing transactions are commenced; or

- Either we or TWC terminates the Contribution Agreement because the closing has not occurred on or prior to July 21, 2006 and (i) a competing transaction proposal is disclosed prior to July 21, 2006 and (ii) within 12 months after such termination we enter into a definitive agreement with the person or group making the competing superior proposal.

In addition, we would be liable for the payment of TWC's expenses, not to exceed $750,000, if either we or TWC terminates the Contribution Agreement because (i) our stockholders do not approve the Transaction and our proposed amended and restated certificate of incorporation, or (ii) we announce our intention to disclose confidential information of TWC or such information is required to be disclosed. Either party may terminate the Contribution Agreement if the Transaction fails to close by July 21, 2006.

If the Transaction is not completed, we will continue to own the assets that we otherwise would have contributed to the Distributor in connection with the Transaction. However, subject to any stockholder approval requirements under Delaware law, we may engage in one or more alternative transactions with TWC or we may decide to pursue other strategic partners to acquire all or a portion the assets that we otherwise would have contributed in the Transaction.

16

**Table of Contents**

## QUESTIONS AND ANSWERS ABOUT THE SPECIAL MEETING

*What proposals will stockholders be voting on at the Special Meeting?*

The following matters are scheduled to be voted on at the Special Meeting:

| | |
|---|---|
| *Proposal 1:* | A proposal to approve the contribution of substantially all of the Company's assets to The Weinstein Company Funding LLC pursuant to a Master Contribution Agreement, dated as of December 5, 2005, by and among the Company, TWC, The Weinstein Company Holdings LLC and The Weinstein Company Funding LLC, as amended. |
| *Proposal 2:* | A proposal to approve the amendment and restatement of the Company's certificate of incorporation, in the form attached as *Appendix E* to this Proxy Statement, with the following sub-proposals: |

- 2A—a proposal to approve a provision restricting the acts or activities in which the Company may engage to certain limitations arising under the Transaction documents;

- 2B—a proposal to approve the increase of the number of authorized shares of common stock from 100,000,000 to 300,000,000 shares and the increase of the number of authorized shares of all classes of stock from 110,000,000 to 310,000,000 shares;

- 2C—a proposal to approve a provision authorizing Series W Preferred Stock and establishing the rights, preferences and powers, and the qualifications, limitations and restrictions, of Series W Preferred Stock;

- 2D—a proposal to modify the rights, preferences and powers, and the qualifications, limitations and restrictions, of Common Stock;

- 2E—a proposal to approve a provision by which the Company elects out of the Delaware law restricting business combinations with interested stockholders; and

- 2F—a proposal to approve a provision by which the Company renounces the Company's interest or expectancy in, or in being offered the opportunity to participate in, corporate opportunities engaged in by TWC (including its affiliates and related persons).

| | |
|---|---|
| *Proposal 3:* | A proposal to approve an amendment and restatement of our 2004 Stock Incentive Plan to (i) increase the number of shares of common stock available for issuance under the plan from 7,500,000 shares to 13,500,000 shares provided the proposed transaction with The Weinstein Company is consummated, and (ii) prohibit option repricings under the plan without stockholder approval of such repricings. |
| *Proposal 4:* | A proposal to approve adjournments of the Special Meeting, if necessary, to permit further solicitation of proxies if there are not sufficient votes at the time of the meeting to approve one or more of the proposals described above. |

If any other matter is properly presented for approval at the Special Meeting, your proxy (one of the individuals named on your proxy card) will vote your shares in his or her discretion.

*How many votes are needed to approve each proposal?*

The votes required to approve each proposal are as follows:

- *Proposal 1:* To be approved, Proposal 1 must receive a "For" vote from the majority of our outstanding shares of common stock, voting either in person or by proxy.

- *Proposal 2:* To be approved, Proposal 2 (including each related sub-proposal) must receive a "For" vote from the majority of our outstanding shares of common stock, voting either in person or by proxy.

- *Proposal 3:* To be approved, Proposal 3 must receive a "For" vote from the majority of our outstanding shares of common stock present either in person or by proxy at the Special Meeting.

- *Proposal 4:* To be approved, Proposal 4 must receive a "For" vote from the majority of our outstanding shares of common stock present either in person or by proxy at the Special Meeting.

Table of Contents

*What is the quorum requirement?*

A quorum of stockholders is necessary to hold a valid meeting. Under our bylaws, a quorum will be present if the holders of at least a majority of the outstanding shares of common stock are represented at the meeting in person or by proxy. On the record date, there were 60,972,626 shares of common stock outstanding. Thus, at least 30,486,314 shares must be represented in person or by proxy at the annual meeting to have a quorum.

Your shares will be counted toward the quorum only if you submit a valid proxy (or one is submitted on your behalf by your broker, bank or other nominee) or if you vote in person at the meeting. Abstentions and broker non-votes will be counted towards the quorum requirement. If there is no quorum, the chairman of the meeting or a majority of the votes present at the meeting may adjourn the meeting to another date.

*Who is soliciting my proxy?*

Genius Products' board of directors.

*How does the Genius Products board of directors recommend that I vote on the matters proposed?*

Genius Products' board of directors recommends that stockholders vote "FOR" each of the matters submitted at the Special Meeting. If you wish to approve the Transaction, then you must approve Proposal 1 relating to the Transaction and Proposal 2 relating to the amendment and restatement of our certificate of incorporation, including each of the related sub-proposals included in Proposal 2.

*Can I still sell my shares in Genius Products?*

Yes. Neither the Contribution Agreement nor the Transaction will affect your right to sell or otherwise transfer your shares in Genius Products.

*Who is entitled to vote at the Special Meeting?*

Only holders of record of common stock as of the close of business on June 21, 2006 will be entitled to notice of the Special Meeting and will be entitled to vote at the Special Meeting.

*Where and when is the Special Meeting?*

The Special Meeting will be held at our office at 2230 Broadway, Santa Monica, California 90404 at 9:00 a.m. local time on July 21, 2006.

*Where can I vote my shares?*

You can vote your shares where indicated by the instructions set forth on the proxy card, or you can attend and vote your shares in person at the Special Meeting.

*If my shares are held in "street name" by my broker, will my broker vote my shares for me?*

Your broker may not be permitted to exercise voting discretion with respect to the matters to be acted upon. Thus, if you do not give your broker or nominee specific instructions, your shares may not be voted on those matters, and will not be counted in determining the number of shares necessary for approval. You should follow the directions provided by your broker regarding how to instruct your broker to vote your shares.

*May I change my vote after I have mailed my signed proxy card?*

Yes. Just send in a written revocation or a later dated, signed proxy card before the Special Meeting or attend the Special Meeting and vote in person. Simply attending the Special Meeting, however, will not revoke your proxy—you would have to vote at the Special Meeting in order to revoke your proxy.

Table of Contents

***What does it mean if I receive more than one proxy card?***

If you receive more than one proxy card, your shares are registered in more than one name or are registered in different accounts. Please complete, sign and return each proxy card to ensure that all of your shares are voted.

***What do I need to do now?***

Please vote your shares as soon as possible, so that your shares may be represented at the Special Meeting. You may vote by signing and dating your proxy card and mailing it in the enclosed return envelope, or you may vote in person at the Special Meeting.

***How are votes counted?***

Votes will be counted by the inspector of election appointed for the meeting, who will separately count "For", "Against" and "Abstain" votes, abstentions and broker non-votes. "Broker non-votes" occur when a nominee holding shares for a beneficial owner does not vote on a particular proposal because the nominee does not have discretionary voting power with respect to that proposal and has not received instructions with respect to that proposal from the beneficial owner (despite voting on at least one other proposal for which it does have discretionary authority or for which it has received instructions). Abstentions will be counted towards the vote total for each proposal, and will have the same effect as "Against" votes. Broker non-votes will not be counted for purposes of determining whether any of the proposals are approved and will have the same effect as "Against" votes on those proposals that must be approved by a majority of our outstanding shares of common stock (Proposals 1 and 2, including Sub-Proposals 2A-2F).

***Who is paying for this proxy solicitation?***

We will pay for the entire cost of soliciting proxies. In addition to these mailed proxy materials, our officers, directors and employees and The Altman Group, 1200 Wall Street West, Third Floor, Lyndhurst, New Jersey 07071 may also solicit proxies in person, by telephone, or by other means of communication. Officers, directors and employees will not be paid any additional compensation for soliciting proxies, but The Altman Group will be paid its customary fee of approximately $6,500 plus out-of-pocket expenses if it solicits proxies. We also may reimburse brokerage firms, banks and other agents for the cost of forwarding proxy materials to beneficial owners.

***Whom should I contact if I have questions?***

If you have any questions about any of the proposals on which you are voting, or would like additional copies of this proxy statement, without charge, you may call or write to:

Corporate Secretary
Genius Products, Inc.
2230 Broadway
Santa Monica, CA 90404
Telephone: (310) 829-4509
Facsimile: (310) 453-0074

**You may also obtain additional information about us from documents filed with or furnished to the United States Securities and Exchange Commission, referred to as the "SEC", by following the instructions in the section entitled, "Where You Can Find More Information".**

***How can I find out the results of the voting at the Special Meeting?***

We intend to publish final voting results in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2006.

**Table of Contents**

## SELECTED CONSOLIDATED FINANCIAL DATA

The following table sets forth selected summary historical financial data of Genius Products. The information presented below is derived from our audited financial statements as of December 31, 2001, 2002, 2003, 2004 and 2005 and our unaudited financial statements as of March 31, 2006. This information is only a summary. You should read it together with our historical financial statements and accompanying notes contained elsewhere in this Proxy Statement. Historical results are not necessarily indicative of future results.

| | Years Ended December 31, | | | | | Quarter Ended March 31, |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| **Statement of Operations data:** | | | | | | |
| Net revenues | $ 1,348,768 | $ 2,143,700 | $ 3,068,506 | $16,629,932 | $ 22,327,729 | $ 28,583,327 |
| Total costs of revenues | 645,043 | 1,591,547 | 2,149,510 | 13,893,434 | 22,882,308 | 23,180,506 |
| Gross Profit (Loss) | 703,725 | 552,153 | 918,996 | 2,736,498 | (554,579) | 5,402,821 |
| Operating expenses: | | | | | | |
| Product development | 335,984 | 384,883 | 428,465 | 956,521 | 1,127,481 | 746,877 |
| Sales and marketing | 414,897 | 382,465 | 1,020,860 | 2,166,785 | 2,582,527 | 5,522,719 |
| General and administrative | 2,285,976 | 2,536,878 | 2,081,651 | 5,107,547 | 11,036,118 | 4,895,095 |
| Severance | — | — | — | — | 2,745,422 | — |
| Gain on sale | — | — | — | — | (1,351,710) | (40,267) |
| Total costs and expenses | 3,681,900 | 4,895,773 | 5,680,486 | 22,124,287 | 39,022,146 | 34,304,930 |
| Loss from operations | (2,333,132) | (2,752,073) | (2,611,980) | (5,494,355) | (16,694,417) | (5,721,603) |
| Interest expense and other, net | (93,100) | (35,209) | (129,896) | (551,013) | (465,303) | 47,841 |
| Loss before provision for income taxes | (2,426,232) | (2,787,282) | (2,741,876) | (6,045,368) | (17,159,720) | (5,673,762) |
| Provision for income taxes | (800) | (800) | (800) | (800) | (800) | — |
| Net loss | $(2,427,032) | $ (2,788,082) | $ (2,742,676) | $ (6,046,168) | $(17,160,520) | $ (5,673,762) |
| Basic and diluted loss per common share: | | | | | | |
| Net loss per share | $ (0.48) | $ (0.20) | $ (0.16) | $ (0.25) | $ (0.42) | $ (0.09) |
| Basic and diluted weighted average common shares | 5,016,717 | 13,838,743 | 17,574,405 | 23,826,584 | 40,400,112 | 60,474,572 |

| | At December 31, | | | | | March 31, 2006 |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | |
| **Balance Sheet data:** | | | | | | |
| Cash and cash equivalents | $ 27,998 | $ 745,993 | $ 941,332 | $ 1,223,881 | $ 30,597,164 | $ 18,402,355 |
| Working capital | (514,900) | 590,395 | 1,150,233 | 60,177 | 21,441,257 | 15,693,462 |
| Total assets | 894,612 | 2,283,029 | 5,575,128 | 12,996,166 | 76,365,002 | 108,053,431 |
| Redeemable common stock | 499,450 | 465,777 | 490,932 | 395,172 | 414,471 | 419,296 |
| Deferred gain, related party | — | — | — | — | 1,212,353 | 1,172,086 |
| Total shareholders' equity | $ (701,384) | $ 1,053,360 | $ 2,722,554 | $ 4,431,860 | $ 55,187,918 | $ 50,104,653 |

Earnings per share is computed using primary shares outstanding as fully diluted shares would be anti-dilutive.

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

## UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL INFORMATION

The following tables present the unaudited pro forma consolidated financial information of Genius Products and its subsidiaries, adjusted to give effect to the proposed Transaction with TWC. The unaudited pro forma consolidated financial information should be read in conjunction with, and is qualified in its entirety by reference to, Genius Products' consolidated financial statements and the notes thereto and the related "Management's Discussion and Analysis of Financial Condition and Results of Operations", each of which is included elsewhere in this Proxy Statement.

The unaudited pro forma consolidated statement of operations for the year ended December 31, 2005 and the three months ended March 31, 2006 gives effect to the Transaction as if it had occurred as of January 1, 2005 excluding the gain resulting from the net assets transferred. The unaudited pro forma consolidated balance sheet as of March 31, 2006 gives effect to the Transaction as if it had occurred as of March 31, 2006. The pro forma adjustments are described in the accompanying notes and are based upon available information and certain assumptions that management believes are reasonable including: (i) because TWC was not fully operational during the year ended December 31, 2005, the accompanying pro forma statement of operations is based only on the individual historical statement of operations for Genius Products for the year ended December 31, 2005. For pro forma purposes, the historical results for Genius Products have been adjusted to reflect only its proportionate share of its net loss; (ii) the exclusion of the effect of convertible Class W Units; (iii) no intercompany balances at December 31, 2005; (iv) the contributed assets and liabilities to the Distributor; and (v) no additional specifically identifiable intangible assets. The pro forma financial information does not purport to represent what the results of operations or financial condition of Genius Products actually would have been had the Transaction occurred on such dates or to project its results of operations or financial condition for any future date or period.

21

**Table of Contents**

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**UNAUDITED PRO FORMA CONSOLIDATED BALANCE SHEET**

**AS OF MARCH 31, 2006**

|  | Historical | Pro Forma Adjustments(1) | Pro Forma |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 18,402,355 | $(17,402,355)(2) | $ 1,000,000 |
| Accounts receivable, net of allowance for doubtful accounts and sales returns of $8,366,779 | 42,038,129 | (42,038,129) | — |
| Inventories, net | 9,441,962 | (9,441,962) | — |
| Prepaid expenses | 565,460 | (565,460) | — |
| Notes receivable, related party | — | — | — |
| Total current assets | 70,447,906 | (69,447,906) | 1,000,000 |
| Restricted cash | 300,650 | (300,650) | — |
| Property and equipment, net | 620,489 | (620,489) | — |
| Production masters, net of accumulated amortization of $2,635,911 | 5,195,468 | (5,195,468) | — |
| Film library, net of accumulated amortization of $1,765,826 | 15,092,735 | (15,092,735) | — |
| Notes receivable, related party | 1,712,353 | (1,712,353) | — |
| Investment in Distributor | — | 108,518,532(3) | 108,518,532 |
| Goodwill | 14,487,917 | (14,487,917) | — |
| Deposits and other | 195,913 | (195,913) | — |
| Total assets | $108,053,431 | $ 1,465,101 | $109,518,532 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 13,542,394 | $(13,542,394) | $ — |
| Notes payable | 200,000 | (200,000) | — |
| Remittance to licensor | 17,730,485 | (17,730,485) | — |
| Accrued expenses | 6,410,420 | (6,410,420) | — |
| Deferred revenue | 16,262,426 | (16,262,426) | — |
| Customer deposits | 189,423 | (189,423) | — |
| Debentures payable | — | — | — |
| Redeemable common stock | 419,296 | (419,296) | — |
| Total current liabilities | 54,754,444 | (54,754,444) | — |
| Deferred gain, related party, net of current portion | 1,172,086 | (1,172,086) | — |
| Deferred tax liability | 1,380,338 | 22,128,450(4) | 23,508,788 |
| Total liabilities | 57,306,868 | (33,798,080) | 23,508,788 |
| Stockholders' equity | | | |
| Preferred stock, $.0001 par value; 10,000,000 shares authorized; no shares outstanding | — | — | — |
| Common stock, $.0001 par value; 100,000,000 shares authorized; 60,622,626 shares outstanding | 6,062 | — | 6,062 |
| Additional paid-in capital | 95,152,144 | — | 95,152,144 |
| Accumulated deficit—beginning | (38,737,881) | — | (38,737,881) |
| Accumulated deficit—CY | (5,673,762) | 35,263,182(5) | 29,589,420 |
| Total stockholders' equity | 50,746,563 | 35,263,182 | 86,009,745 |

| | | | |
|---|---|---|---|
| Total liabilities and stockholders' equity | $108,053,431 | $ 1,465,101 | $109,518,532 |

22

Table of Contents

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**UNAUDITED PRO FORMA CONSOLIDATED STATEMENT OF OPERATIONS**

**YEAR ENDED DECEMBER 31, 2005**

| | Historical | Pro Forma Adjustments(6) | Pro Forma |
|---|---|---|---|
| Revenues: | | | |
| Video and DVD | $ 24,804,906 | $(24,804,906) | $ — |
| Theatrical | 750,883 | (750,883) | — |
| Audio | 5,992,065 | (5,992,065) | — |
| Royalties, licensing and other | 745,054 | (745,054) | — |
| Gross revenues | 32,292,908 | (32,292,908) | — |
| Sales returns, discounts and allowances | (9,965,179) | 9,965,179 | — |
| Net revenues | 22,327,729 | (22,327,729) | — |
| | | | |
| Costs and expenses | | | |
| Cost of revenues: | | | |
| Video and DVD | 13,664,813 | (13,664,813) | — |
| Theatrical | 2,130,182 | (2,130,182) | — |
| Audio | 3,814,478 | (3,814,478) | — |
| Amortization of production masters and film library | 2,973,303 | (2,973,303) | — |
| Warehouse expense and other | 299,532 | (299,532) | — |
| Total cost of revenues | 22,882,308 | (22,882,308) | — |
| Gross profit (loss) | (554,579) | 554,579 | — |
| | | | |
| Operating expenses (income): | | | |
| Product development | 1,127,481 | (1,127,481) | — |
| Sales and marketing | 2,582,527 | (2,582,527) | — |
| General and administrative | 11,036,118 | (11,036,118) | — |
| Severance | 2,745,422 | (2,745,422) | — |
| Gain on sale, related party | (1,351,710) | 1,351,710 | — |
| Total operating expenses | 16,139,838 | (16,139,838) | — |
| Loss from operations | (16,694,417) | 16,694,417 | — |
| Interest expense and other, net | (465,303) | 465,303 | — |
| Loss before provision for income tax | (17,159,720) | 17,159,720 | — |
| Provision for income tax | 800 | — | 800 |
| Loss before equity earnings from investee | (17,160,520) | 17,159,720 | (800) |
| Equity in net loss from investee | — | (5,147,916)(7) | (5,147,916) |
| Net loss | $(17,160,520) | $ 12,011,804 | $(5,148,716) |
| | | | |
| Basic and diluted net loss per share | $ (0.42) | $ 0.29 | $ (0.13) |
| | | | |
| Basic and diluted weighted average shares | 40,400,112 | 40,400,112 | 40,400,112 |

23

**Table of Contents**

### GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### UNAUDITED PRO FORMA CONSOLIDATED STATEMENT OF OPERATIONS

### THREE MONTHS ENDED MARCH 31, 2006

| | Historical | Pro Forma Adjustments(6) | Pro Forma |
|---|---|---|---|
| Revenues: | | | |
| Video and DVD | $36,206,585 | $(36,206,585) | $ — |
| Theatrical | 70,435 | (70,435) | — |
| Audio | 776,554 | (776,554) | — |
| Royalties, licensing and other | 373,061 | (373,061) | — |
| Gross revenues | 37,426,635 | (37,426,635) | — |
| Sales returns, discounts and allowances | (8,843,308) | 8,843,308 | — |
| Net revenues | 28,583,327 | (28,583,327) | — |
| | | | |
| Costs and expenses | | | |
| Cost of revenues: | | | |
| Video and DVD | 22,044,632 | (22,044,632) | — |
| Theatrical | 103,705 | (103,705) | — |
| Audio | 594,921 | (594,921) | — |
| Amortization of production masters and film library | 311,089 | (311,089) | — |
| Warehouse expense and other | 126,159 | (126,159) | — |
| Total cost of revenues | 23,180,506 | (23,180,506) | — |
| Gross profit (loss) | 5,402,821 | (5,402,821) | — |
| | | | |
| Operating expenses (income): | | | |
| Product development | 746,877 | (746,877) | — |
| Sales and marketing | 5,522,719 | (5,522,719) | — |
| General and administrative | 4,895,095 | (4,895,095) | — |
| Severance | — | — | — |
| Gain on sale, related party | (40,267) | 40,267 | — |
| Total operating expenses | 11,124,424 | (11,124,424) | — |
| Loss from operations | (5,721,603) | 5,721,603 | — |
| Interest expense and other, net | 47,841 | (47,841) | — |
| Loss before provision for income tax | (5,673,762) | 5,673,762 | — |
| Provision for income tax | — | — | — |
| Loss before equity earnings from investee | (5,673,762) | 5,673,762 | — |
| Equity in net loss from investee | — | (1,702,129)(7) | (1,702,129) |
| Net loss | $(5,673,762) | $ 3,971,633 | $(1,702,129) |
| | | | |
| Basic and diluted net loss per share | $ (0.09) | $ 0.07 | $ (0.03) |
| | | | |
| Basic and diluted weighted average shares | 60,474,572 | 60,474,572 | 60,474,572 |

24

Table of Contents

**Notes to Unaudited Pro Forma Consolidated Financial Statements**

(1) Represents Genius Products' contribution of substantially all of it net assets to the Distributor, except for $1.0 million of cash, and records Genius Products' investment in the Distributor.

(2) Represents adjustment to reflect $1 million in cash retained by Genius Products.

(3) Represents Genius Products' investment in the Distributor as of March 31, 2006. The Transaction represents a non-monetary exchange of a business controlled by Genius Products for a non-controlling interest in the Distributor. Accordingly, the amount to be initially recorded for Genius Products' investment in the Distributor will be partially based on Genius Products' fair value as determined by reference to the quoted market prices of Genius Products' shares for a reasonable time before and after the announcement of the Transaction and partially based on the historical basis of the net assets surrendered in the Transaction. Genius Products' investment in the Distributor as of March 31, 2006 was determined as follows:

| | | |
|---|---|---|
| Total shares outstanding as of 12/6/05 | 60,136,839 | |
| Volume weighted average share price | $ 2.24 | |
| | | |
| Equity market capitalization | $134,706,519 | |
| Less cash retained by Genius Products | $ (1,000,000) | |
| | | |
| Adjusted equity market capitalization | | $133,706,519 |
| Total stockholder's equity as of 3/31/06 | $ 50,746,563 | |
| Less cash retained by Genius Products | $ (1,000,000) | |
| | | |
| Adjusted carrying amount of net assets | | $ 49,746,563 |
| | | |
| Difference | | $ 83,959,956 |
| Ownership interest surrendered | | 70% |
| | | |
| Genius Products' partial gain before taxes | | $ 58,771,969 |
| Adjusted carrying amount of net assets | | $ 49,746,563 |
| | | |
| Genius Products' investment in the Distributor | | $108,518,532 |

Genius Products' equity market capitalization was computed using the volume weighted average share price for the five trading days prior to and five trading days following the announcement of the Transaction, including the day of the announcement, December 5, 2005.

(4) Represents the adjustment to deferred taxes related to the gain, assuming a combined federal and state tax rate of 40%.

(5) Represents the partial gain, net of taxes, recognized upon closing. The partial gain was determined as follows:

| | | |
|---|---|---|
| Total shares outstanding as of 12/6/05 | 60,136,839 | |
| Volume weighted average share price | $ 2.24 | |
| | | |
| Equity market capitalization | $134,706,519 | |
| Less cash retained by Genius Products | $ (1,000,000) | |
| | | |
| Adjusted equity market capitalization | | $133,706,519 |
| Total stockholder's equity as of 3/31/06 | $ 50,746,563 | |
| Less cash retained by Genius Products | $ (1,000,000) | |
| | | |
| Adjusted carrying amount of net assets | | $ 49,746,563 |
| | | |
| Difference | | $ 83,959,956 |
| Ownership interest surrendered | | 70% |
| | | |
| Genius Products' partial gain before taxes | | $ 58,771,969 |
| Taxes at 40% (federal and state) | | $ (23,508,788) |

Partial gain after taxes                                                          $ 35,263,182

(6) Represents the adjustments to transfer all results from operations from Genius Products to the Distributor and Genius Products' 30% share of the equity in net earnings (loss) from the Distributor for the year ended December 31, 2005 and the three months ended March 31, 2006.

(7) Represents Genius Products' 30% interest in the net loss of the Distributor for the year ended December 31, 2005 and the three months ended March 31, 2006. Because TWC was not fully operational during the respective periods, the accompanying pro forma statement of operations is based only on the individual statement of operations for Genius Products for the year ended December 31, 2005 and the three months ended March 31, 2006. For pro forma purposes, the historical results for Genius Products have been adjusted to reflect only its proportionate share of its net loss.

25

**Table of Contents**

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### SUPPLEMENTAL UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL INFORMATION

If and when TWC Holdings converts its Class W Units into 70% of the common stock of Genius Products, we expect to account for that transaction as a common control merger. Thereafter, the financial statements of Genius Products would reflect the full consolidation of the Distributor's financial statements that would have been reflected in the Distributor's financial statements. We have prepared supplemental pro forma financial statements adjusted to give effect to the proposed Transaction with TWC and assuming that TWC exercises its right to convert its interest in the Distributor into the common equity of Genius Products, Inc.

The unaudited supplemental pro forma balance sheet presents Genius Products, Inc. financial statements as if the Transaction and conversion by TWC had occurred at March 31, 2006. The supplemental unaudited statement of operations for the three months ended March 31, 2006 consolidates the Distributor and Genius Products, Inc. as if the Transaction and conversion by TWC had occurred as of January 1, 2006. The supplemental pro forma adjustments are described in the accompanying notes and are based upon available information and certain assumptions that management believes are reasonable including: (i) no intercompany balances at March 31, 2006 and; (ii) no additional specifically identifiable intangible assets. The supplemental pro forma financial information does not purport to represent what the results of operations or financial condition of Genius Products actually would have been had the Transaction occurred on such dates or to project its results of operations or financial condition for any future date or period.

26

Table of Contents

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**
**SUPPLEMENTAL UNAUDITED PRO FORMA BALANCE SHEET**
**AS OF MARCH 31, 2006**

| | Genius Products, Inc.(1) | Distributor(2) | Pro Forma Adjustments(3) | Pro Forma |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $    1,000,000 | $  17,402,355 | $          — | $  18,402,355 |
| Accounts receivable, net of allowance for doubtful accounts and sales returns of $6,908,789 and $8,366,779 | — | 42,038,129 | — | 42,038,129 |
| Inventories, net | — | 9,441,962 | — | 9,441,962 |
| Prepaid expenses | — | 565,460 | — | 565,460 |
| Notes receivable, related party | — | — | — | — |
| Total current assets | 1,000,000 | 69,447,906 | — | 70,447,906 |
| Restricted cash | — | 300,650 | — | 300,650 |
| Property and equipment, net | — | 620,489 | — | 620,489 |
| Production masters, net of accumulated amortization of $2,635,911 | — | 5,195,468 | — | 5,195,468 |
| Film library, net of accumulated amortization of $1,765,826 | — | 15,092,735 | — | 15,092,735 |
| Notes receivable, related party | — | 1,712,353 | — | 1,712,353 |
| Investment in Distributor | 108,518,532 | — | (108,518,532) | — |
| Goodwill | — | 98,447,873(4) | — | 98,447,873 |
| Deposits and other | — | 195,913 | — | 195,913 |
| Total assets | $109,518,532 | $191,013,387 | $(108,518,532) | $192,013,387 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $          — | $  13,542,394 | $          — | $  13,542,394 |
| Notes payable | — | 200,000 | — | 200,000 |
| Remittance to licensor | — | 17,730,485 | — | 17,730,485 |
| Accrued expenses | — | 6,410,420 | — | 6,410,420 |
| Deferred revenue | — | 16,262,426 | — | 16,262,426 |
| Customer deposits | — | 189,423 | — | 189,423 |
| Debentures payable | — | — | — | — |
| Redeemable common stock | — | 419,296 | — | 419,296 |
| Total current liabilities | — | 54,754,444 | — | 54,754,444 |
| Deferred gain, related party, net of current portion | — | 1,172,086 | — | 1,172,086 |
| Deferred tax liability | 23,508,788 | 1,380,338 | (23,508,788) | 1,380,338 |
| Total liabilities | 23,508,788 | 57,306,868 | (23,508,788) | 57,306,868 |
| Stockholders' equity | | | | |
| Preferred stock, $.0001 par value; 10,000,000 shares authorized; no shares outstanding | — | — | — | — |
| Class W preferred stock | — | — | — | — |
| Common stock, $.0001 par value; 100,000,000 shares authorized; 60,622,626 shares outstanding | 6,062 | — | 14,145 | 20,207 |
| Additional paid-in capital | 95,152,144 | — | 83,945,812 | 179,097,956 |

| | | | | |
|---|---|---|---|---|
| Members' equity | — | 133,706,519 | (133,706,519) | — |
| Accumulated deficit—beginning | (38,737,881) | — | — | (38,737,881) |
| Accumulated deficit—CY | 29,589,420 | — | (35,263,182) | (5,673,762) |
| Total stockholders' equity | 86,009,745 | 133,706,519 | (85,009,744) | 134,706,520 |
| Total liabilities and stockholders' equity | $109,518,532 | $191,013,387 | $(108,518,532) | $192,013,387 |

27

Table of Contents

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**SUPPLEMENTAL UNAUDITED PRO FORMA CONSOLIDATED STATEMENT OF OPERATIONS**

**THREE MONTHS ENDED MARCH 31, 2006**

| | Genius Products, Inc.(5) | Distributor(6) | Pro Forma Adjustments | Pro Forma |
|---|---|---|---|---|
| Revenues: | | | | |
| Video and DVD | $ — | $36,206,585 | $ — | $ 36,206,585 |
| Theatrical | — | 70,435 | — | 70,435 |
| Audio | — | 776,554 | — | 776,554 |
| Royalties, licensing and other | — | 373,061 | — | 373,061 |
| Gross revenues | — | 37,426,635 | — | 37,426,635 |
| Sales returns, discounts and allowances | — | (8,843,308) | — | (8,843,308) |
| Net revenues | — | 28,583,327 | — | 28,583,327 |
| Costs and expenses | | | | |
| Cost of revenues: | | | | |
| Video and DVD | — | 22,044,632 | — | 22,044,632 |
| Theatrical | — | 103,705 | — | 103,705 |
| Audio | — | 594,921 | — | 594,921 |
| Amortization of production masters and film library | — | 311,089 | — | 311,089 |
| Warehouse expense and other | — | 126,159 | — | 126,159 |
| Total cost of revenues | — | 23,180,506 | — | 23,180,506 |
| Gross profit (loss) | — | 5,402,821 | — | 5,402,821 |
| Operating expenses (income): | | | | |
| Product development | — | 746,877 | — | 746,877 |
| Sales and marketing | — | 5,522,719 | — | 5,522,719 |
| General and administrative | — | 4,895,095 | — | 4,895,095 |
| Severance | — | — | — | — |
| Gain on sale, related party | — | (40,267) | — | (40,267) |
| Total operating expenses | — | 11,124,424 | — | 11,124,424 |
| Loss from operations | — | (5,721,603) | — | (5,721,603) |
| Interest expense and other, net | — | 47,841 | — | 47,841 |
| Loss before provision for income tax | — | (5,673,762) | — | (5,673,762) |
| Provision for income tax | — | — | — | — |
| Loss before equity earnings from investee | — | (5,673,762) | — | (5,673,762) |
| Equity in net loss from investee | (1,702,129) | — | 1,702,129(7) | — |
| Net loss | $ (1,702,129) | $(5,673,762) | $ 1,702,129 | $ (5,673,762) |
| Basic and diluted net loss per share | $ (0.03) | N/A | N/A | $ (0.03) |
| Basic and diluted weighted average shares | 60,474,572 | — | 141,107,335(8) | 201,581,907 |

28

Table of Contents

**Notes to Supplemental Unaudited Pro Forma Consolidated Financial Information**

(1)   Represents the Genius Products, Inc. unaudited pro forma balance sheet as of March 31, 2006 giving effect to the Transaction as if it had occurred as of March 31, 2006.

(2)   Represents the Distributor unaudited pro forma balance sheet as of March 31, 2006 giving effect to the Transaction as if it had occurred as of March 31, 2006.

(3)   Represents the consolidation of Genius Products, Inc. and the Distributor as if TWC Holdings exercised its right to convert its direct and indirect interest into the common equity of Genius Products, Inc.

(4)   Represents the difference between the adjusted market capitalization of Genius Products, Inc. and the net tangible assets contributed by Genius Products, Inc. into the Distributor as of 3/31/2006.

| | | |
|---|---:|---:|
| Total shares outstanding as of 12/6/05 | 60,136,839 | |
| Volume weighted average share price | $        2.24 | |
| | | |
| Equity market capitalization | $134,706,519 | |
| Less cash retained by Genius Products | $   (1,000,000) | |
| | | |
| Adjusted equity market capitalization | | $133,706,519 |
| Genius net tangible assets as of 3/31/06 | $ 36,258,646 | |
| Less cash retained by Genius Products | $  (1,000,000) | |
| | | |
| Adjusted carrying amount of net tangible assets | | $ 35,258,646 |
| | | |
| Goodwill | | $ 98,447,873 |

Genius Products' equity market capitalization was computed using the volume weighted average share price for the five trading days prior to and five trading days following the announcement of the Transaction, including the day of the announcement, December 5, 2005.

(5)   Represents the Genius Products, Inc. unaudited pro forma statement of operations for the three months ended March 31, 2006 giving effect to the Transaction as if it had occurred on January 1, 2006.

(6)   Represents the Distributor unaudited pro forma statement of operations for the three months ended March 31, 2006 giving effect to the Transaction as if it had occurred on January 1, 2006.

(7)   Represents the adjustment to eliminate the Genius Products, Inc. 30% share of the equity in net earnings (loss) for the three months ended March 31, 2006.

(8)   Represents the additional shares issuable to TWC Holdings upon conversion of its direct and indirect interest in the Distributor into the common equity of Genius Products, Inc.

Table of Contents

## ACCOUNTING POLICIES RELATING TO THE TRANSACTION

At the closing of the Transaction, we will contribute to the Distributor all of our operating business, including substantially all of our assets, except for $1 million cash and certain liabilities, and receive a 30% equity interest in the Distributor. The Distributor will be treated as a partnership for U.S. federal income tax purposes. Accordingly, the book accounting for the Distributor will follow its tax status as a partnership. We intend to account for our investment in the Distributor on our financial statements using the equity method of accounting.

Under the equity method of accounting, only our investment in and amounts due to and from the equity investee will be included in our consolidated balance sheet. As a result, we will record an asset on our balance sheet related to our investment interest in the Distributor. The Transaction represents a non-monetary exchange of a business controlled by Genius Products for a non-controlling interest in the Distributor. Accordingly, the amount to be initially recorded for Genius Products' investment in the Distributor will be partially based on Genius Products' fair value as determined by reference to the quoted market prices of Genius Products' shares for a reasonable time before and after the announcement of the Transaction and partially based on the historical basis of the net assets surrendered in the Transaction. On our statement of operations, we will record our 30% share of the Distributor's profit or loss as equity in net earnings (losses) from investee. We expect to record a gain upon consummation of the Transaction and that this gain will be based on the difference between the fair market value of assets contributed and the net book value, reduced for the portion of the gain associated with the retained economic interest in the Distributor. The carrying amount of our investment in the Distributor will subsequently be adjusted to recognize our share of the earnings or losses of the Distributor after the Transaction. Pursuant to Accounting Principles Bulletin No. 18, we will be required to periodically assess whether a decrease in value of the investment has occurred which is other than temporary and which should be recognized immediately resulting in an impairment loss.

Commencing on December 5, 2005 through the closing date, we have been operating under an interim distribution agreement with TWC and are recording the results from titles we first released for TWC in March 2006 on our financial statements. After closing, substantially all of our revenue and expenses as well as the results from releasing TWC product will be reflected in the financial statements of the Distributor. Subsequent to this Transaction, we will include separate quarterly and audited annual financial statements of the Distributor in a note to our financial statements.

30

Table of Contents

# RISK FACTORS

*The business in which we are currently engaged, and in which we will be engaged following the Transaction, is rapidly changing and involves a high degree of risk. We urge you to consider carefully the following risks before deciding whether to approve the proposals to be voted upon by our stockholders at the Special Meeting. These factors should be considered in conjunction with the other information included in this Proxy Statement, including the risks discussed in under the caption "Risk Factors".*

**Risks Related to the Transaction**

*The issuance of Series W Preferred Stock in the Transaction will give TWC Holdings control over Genius Products. TWC Holdings may use its control to take actions that other stockholders believe are not in their best interests or the best interests of Genius Products.*

As a result of the Transaction and the related issuance of shares of Series W Preferred Stock in Genius Products, TWC Holdings will gain the ability to control Genius Products and to appoint a majority of our board of directors. The Series W Preferred Stock to be issued to TWC Holdings and its first-tier subsidiary, W-G Holding Corp., will provide TWC Holdings at least a majority of the total voting power of our outstanding stock until the interests of TWC and its affiliates in Genius Products or the Distributor falls below 20%. TWC Holdings may use its control over Genius Products to cause Genius Products to take actions that other stockholders believe are not in their best interests or the best interests of Genius Products. In addition, the LLC Agreement and the Registration Rights Agreement will provide TWC Holdings a right of first negotiation to acquire any additional securities we may wish to issue in a debt or equity financing after the closing, which could result in an increase of their effective control over us.

*The anticipated benefits of the Transaction will depend substantially on the success of TWC's theatrical releases.*

Our ability to realize the anticipated benefits of the Transaction will depend substantially on the performance of TWC's theatrical releases because the success of home video distribution is generally directly related to how well the applicable film performs at the box office. Neither we nor TWC can predict the box office performance of any of TWC's motion pictures because box office performance depends primarily upon the public's acceptance of the motion pictures, which cannot be accurately predicted. The economic performance of a motion picture also depends upon the public's acceptance of competing films, the availability of alternative forms of entertainment and leisure time activities, general economic conditions and other tangible and intangible factors, all of which can change and cannot be predicted with certainty.

In general, the economic performance of a motion picture is dependent on its domestic theatrical performance, which is a key factor in predicting revenue from other distribution channels, such as home video, and is determined by many factors, including TWC's ability to produce content and develop stories and characters that appeal to a broad audience, and the effective marketing of the motion picture. If TWC is unable to produce films that gain acceptance from a sufficiently broad audience or to effectively market such films, the commercial success of its films in home video release will be in doubt, which could result in the Distributor not recouping costs or not realizing anticipated profits, which could adversely affect our business, financial condition and results of operations. There are no assurances that TWC will be able to produce, or market effectively, films that will be commercially successful in home video release. Any of these events could have a material adverse effect on our business, financial condition and results of operations.

*Our net operating loss carryforwards may be substantially limited as a result of TWC's redemption rights or other transactions.*

Our net operating loss carryforwards through March 31, 2006 were approximately $40.0 million for U.S. federal income tax purposes. These losses are subject to substantial annual limitations on their utilization under the Internal Revenue Code. Moreover, the use of such net operating loss carryforwards would be subject to further

31

[Table of Contents](#)

substantial limitations if there were an "ownership change", as defined in Section 382 of the Internal Revenue Code, with respect to our stock. Under the limitation, we generally could only use in each taxable year an amount of our net operating losses realized prior to the ownership change equal to our fair market value immediately preceding the ownership change multiplied by the "long-term tax-exempt rate" generally in effect as of the date of the ownership change, with increases for "built-in gains" in assets recognized within five-years of the ownership change. The Internal Revenue Service publishes the long-term tax-exempt rate monthly; the long-term tax-exempt rate for ownership changes occurring in May 2006 is 4.30%. However, to the extent that the utilization of our loss carryforwards is already subject to an annual limitation under the Internal Revenue Code prior to the Transaction, the Transaction would not operate to increase the annual limitation on the utilization of such losses.

An ownership change results, in general, if the percentage of our stock owned by certain persons has increased by more than 50% during a prescribed period. For this purpose, determinations of the percentage of our stock held by any person are made on the basis of value. Pursuant to the LLC Agreement, TWC Holdings and its first-tier subsidiary, W-G Holding Corp., generally have the right (the "Rights") to have their Class W Units redeemed, which can be satisfied with our common stock. Under the Rights, TWC Holdings and its first-tier subsidiary, W-G Holding Corp., could acquire up to 70% of our common stock as of the closing of the Transaction. If the Rights were exercised in full and funded predominantly with our common stock, the resulting acquisition of our common stock by TWC Holdings and its first-tier subsidiary, W-G Holding Corp., would cause us to experience an ownership change under Section 382 of the Internal Revenue Code. For purposes of determining whether an ownership change has occurred, an option is treated as exercised on the date of issuance if a principal purpose of the issuance or structuring of the option is to avoid or ameliorate the impact of an ownership change and the holder of the option has an ownership interest in the corporation of more than 50%, determined as if the holder had exercised the option. The Internal Revenue Service may contend that a principal purpose of the issuance or structuring of the Rights was to avoid or ameliorate the impact of an ownership change and that an ownership change will therefore result from the issuance of the Rights. Even if the Internal Revenue Service does not contend that the issuance of the Rights results in an ownership change, our net operating losses are already subject to substantial limitation under Section 382 of the Internal Revenue Code and may be subject to further limitation as result of other transactions, such as future issuances of our stock.

*Our depreciation deductions for U.S. federal income tax purposes with respect to our assets will be limited as a result of the Transaction.*

The LLC Agreement provides that income and deductions of the Distributor, including depreciation deductions, will be allocated among the members of the Distributor using the "traditional" method prescribed by Treasury regulations. This method requires that when the Distributor has income, gain, loss, or deduction attributable to property contributed to the Distributor or the Distributor's existing properties revalued upon entry of new members, it must make appropriate allocations to the members to avoid shifting the U.S. federal income tax consequences of any built-in gain or loss in such properties from one member to another member. As a result, it is not likely that we will share in the depreciation or amortization deductions attributable to our assets (or the Distributor's home video distribution rights under the Distribution Agreement) following the Transaction, which will increase the taxable income (or reduce the loss) attributable to our assets as compared to what our income (or loss) would have been had we not engaged in the Transaction.

*There is a risk that Genius Products' share of the U.S. federal income tax liability of the Distributor will exceed our share of the cash flow from the Distributor.*

The U.S. federal income tax on a member's allocable share of the Distributor's taxable income may exceed the cash flow distributed to such member from the Distributor. Therefore, it is possible that we may have to use funds from sources other than the Distributor to pay our tax liability. In addition, the gain recognized on a sale of our LLC interest may exceed the cash proceeds from the sale. However, we are not permitted to transfer our LLC interest under the terms of the LLC Agreement.

32

Table of Contents

*There is a risk that income and losses of the Distributor could be reallocated.*

The Internal Revenue Service could challenge the allocation among the members of the Distributor of income, gains, losses, deductions and credits as lacking substantial economic effect or as not being allocated in accordance with the members' interests in the Distributor and, therefore, possibly allocate a different share of such items to the members. To the extent that such challenges to the allocation of various items were upheld, the tax treatment of Genius Products' investment in the Distributor could be adversely affected. In addition, such a reallocation during the life of the Distributor could result in the understatement of income for members which could result in the imposition of interest and penalties.

*There is a risk that the Distributor may be required to make disproportionate distributions to TWC Holdings and its first-tier subsidiary.*

In general, the Distributor must make distributions to members proportionate to their units. However, there is a risk that the Distributor will be audited resulting in additional taxes, penalties and interest payable by a member with respect to its units. In this event, the Distributor is required to make an additional distribution to such member (or former member following redemption of all of its units) equal to an amount intended to approximate such taxes, penalties and interest. Under this requirement, TWC Holdings and its first-tier subsidiary, W-G Holding Corp., could receive distributions from the Distributor that are disproportionate to their ownership of the Distributor at the time the distribution is made (although it would have been proportional to their ownership at the time the events giving rise to the tax liability occurred), and could require the Distributor to make payments to them following the redemption of all of their Class W Units. The Distributor generally must follow tax positions on its tax returns advocated by TWC.

*The Transaction, if completed, would make it difficult or impossible for another party to acquire Genius Products or otherwise effectuate a change of control without the consent of TWC.*

The significant control and financial rights that we intend to grant to TWC in connection with the Transaction would make it difficult or impossible for another party to acquire Genius Products or to otherwise effectuate a change of control without the consent of TWC. Accordingly, acquisitions and other change of control transactions that could increase the value of our stock or otherwise benefit our stockholders may not be possible following the closing of the Transaction for as long as TWC continues to hold its position in our company.

*There is a risk that the $60 million liquidation preference to be granted to TWC would eliminate or significantly reduce the proceeds available for distribution to our stockholders in the case of an acquisition or liquidation.*

TWC Holdings' direct and indirect ownership of the Class W Units will give TWC Holdings the right to receive the first $60 million in proceeds resulting from any liquidation of the Distributor, before Genius Products receives any of the proceeds. After payment of this liquidation preference to TWC Holdings, there may be little or no proceeds remaining for distribution to our stockholders in the case of an acquisition or liquidation involving Genius Products or the Distributor.

**Risks Related to Our Business Following the Transaction**

*Following the Transaction, our business, results of operations and financial condition will depend principally on the success of our relationship with TWC.*

We anticipate that, following the Transaction, a majority of our revenues will be derived from the distribution rights accorded the Distributor under the Distribution Agreement. Our business, results of operations and financial condition will therefore depend principally on the success of the relationship between TWC's personnel and those of the Distributor (which will consist primarily of our personnel following the closing). Any

33

Table of Contents

deterioration in or termination of that relationship would have a material adverse effect on our business, results of operations and financial condition. There can be no assurance that the Distributor will be successful in maintaining and developing its relationship with TWC following the closing.

**If the Distributor does not achieve target home video distribution rates for TWC's films or meet other performance criteria following the closing of the Transaction, TWC may terminate the Distribution Agreement, which would have a material adverse effect on our business, results of operations and financial condition.**

TWC has the right to terminate the Distribution Agreement if the Distributor does not achieve target home video distribution rates for TWC's films or meet other performance criteria following the closing of the Transaction. We cannot assure you that the Distributor will have the financial and other resources necessary to perform adequately. Accordingly, we are subject to the risk that TWC may terminate the Distribution Agreement, which would have a material adverse effect on our business, results of operations and financial condition.

**If we cannot ramp up our operations quickly to accommodate the new business from TWC following the closing of the Transaction, our business will suffer.**

The integration of the new titles that the Distributor will have the right to distribute under the Distribution Agreement will require significant management attention and expansion of our operations and employee base (which will be operated by the Distributor following the closing). Following the closing, the Distributor must maintain adequate operational, financial and management information systems, and motivate and effectively manage an increasing number of employees and base of operations. Our future success will also depend in part on the Distributor's ability to retain or hire qualified employees to operate its expanded businesses efficiently.

**There is a risk that our business may be adversely affected because we and the Distributor will be required to present content acquisition opportunities to TWC before we may pursue those opportunities.**

Subject to limited exceptions, if we or the Distributor are presented with a content acquisition opportunity, then we or the Distributor, as applicable, must present the content acquisition opportunity to TWC and the TWC parties will have the right to engage in the content acquisition opportunity. This requirement significantly restricts our future business opportunities and may have a material adverse effect on our business, results of operations and financial condition.

**If we cease to serve as the managing member of the LLC, then we could become subject to the Investment Company Act of 1940, which could have a material adverse effect on our business.**

The LLC Agreement provides that TWC or its designee will become the Managing Member of the Distributor, instead of Genius Products, if we become insolvent or bankrupt, if we violate the membership interest transfer restrictions in the LLC Agreement or a lender forecloses on a security interest granted with respect to our Class G Units in the Distributor. If we cease to serve as the managing member of the LLC, then we could become subject to the Investment Company Act of 1940 (the "1940 Act"), which could have a material adverse effect on our business.

Under the 1940 Act, a company may be deemed to be an investment company if it owns investment securities with a value exceeding 40% of its total assets, subject to certain exclusions. Investment companies are subject to registration under, and compliance with, the 1940 Act unless a particular exclusion or SEC safe harbor applies. If we ceased to serve as the managing member of the LLC and were deemed an investment company, we would become subject to the requirements of the 1940 Act. As a consequence, among other things, we would likely incur significant expenses and could be prohibited from engaging in our business or issuing our securities as we have in the past. We also might be subject to civil and criminal penalties for noncompliance.

34

Table of Contents

***The ownership interests of our current stockholders in our business will be significantly diluted as a result of the Transaction.***

As described above, the issuance to TWC Holdings and its first-tier subsidiary, W-G Holding Corp., of Series W Preferred Stock will give TWC Holdings, immediately following the closing, at least a majority of the total voting power of our outstanding stock. In addition, we will only have a 30% interest in the Distributor, in contrast to the 70% interest in the Distributor to be held directly and indirectly by TWC Holdings. Accordingly, the ownership interests of our current stockholders in our business will be significantly diluted as a result of the Transaction. Furthermore, if TWC Holdings and its first-tier subsidiary, W-G Holding Corp., redeemed its entire interest in the Distributor for shares of common stock of Genius Products, then they would own and have the right to vote at least 70% of our shares of common stock.

***TWC's success depends largely on Robert Weinstein and Harvey Weinstein.***

TWC is substantially dependent upon the services of Robert Weinstein and Harvey Weinstein, and, therefore, TWC's business, results of operations and financial condition could be adversely affected if TWC should lose the services of either of these individuals. TWC has entered into employment agreements with the Weinsteins. However, these agreements cannot assure TWC of the continued services of the Weinsteins. The loss of the services of either of the Weinsteins could have a material adverse effect on TWC's ability to produce and distribute motion pictures, which could have a material adverse effect on the business, operating results and financial condition of the Distributor and its ability to profit from the sale of home video products. This, in turn, would have a material adverse effect on our business, results of operations and financial condition.

***The motion picture industry is rapidly evolving, and recent trends have shown that audience response to both traditional and emerging distribution channels is volatile and difficult to predict. Neither we nor TWC can accurately predict the effect that changing audience demands, technological change or the availability of alternative forms of entertainment may have on our business or the motion picture industry***

The entertainment industry in general, and the motion picture industry in particular, continues to undergo significant changes, due both to shifting consumer tastes and to technological developments. Recently, some film distributors have experienced lower-than-expected box office revenues from their theatrical releases. While this is likely due to the combined effect of several independent factors, including a failure on the part of some studios adequately to adjust to the changing expectations of movie audiences, it is also likely that new technologies are also playing a role. These new technologies, such as video-on-demand and Internet distribution of films, have provided motion picture companies with new channels through which to distribute their films. However, accurately forecasting market demand within these new channels has proven challenging.

Our business model is impacted by both theatrical and non-theatrical distribution channels, and therefore could be affected by these recent trends. We cannot accurately predict the overall effect that shifting audience tastes, technological change or the availability of alternative forms of entertainment may have on our business. In addition to uncertainty regarding the growth of the DVD market, we similarly cannot be certain that other developing distribution channels and formats, such as video-on-demand, Internet distribution of films and high-definition, will attain expected levels of public acceptance or, if such channels or formats are accepted by the public, that we will be successful in exploiting the business opportunities they provide. Moreover, to the extent that these emerging distribution channels and formats gain popular acceptance, it is possible that demand for delivery through DVDs will decrease. Under the Distribution Agreement, we will not have the right to distribute films from TWC through these other distribution channels.

***Following the Transaction, the Distributor would assume the financial risk of customers' nonpayment or delay in payment under the Distribution Agreement, which could have a material adverse effect on our business, results of operations and financial condition.***

The Distribution Agreement provides that the Distributor will bear (and will not be entitled to recoup as distribution expenses) all bad debt expense and collection costs. If the bad debt expense and collection costs are

35

Table of Contents

significant, then they could have a material adverse effect on the Distributor's business, results of operations and financial condition, which, in turn, would have a material adverse effect on our business, results of operations and financial condition.

### *We have a history of significant losses, and we may never achieve or sustain profitability.*

We have incurred operating losses in every quarter since we commenced operations. As of March 31, 2006, we had an accumulated deficit of approximately $44.4 million. Our net loss for the quarter ended March 31, 2006 was approximately $5.7 million, our net loss for the year ended December 31, 2005 was approximately $17.2 million, our net loss for the year ended December 31, 2004 was approximately $6.0 million and our net loss for the year ended December 31, 2003 was approximately $2.7 million. We cannot provide assurances that we will achieve profitability in the future, even after the closing of the Transaction. Our continued operating losses may have a material adverse effect upon the value of our common stock and may jeopardize our ability to continue our operations.

### *The loss of any of our major customers could harm us.*

During the year ended December 31, 2005, one customer accounted for 10% or more of gross revenues. Wal-Mart accounted for 40% of net revenues for the year ended December 31, 2005. This customer is expected to continue to be a major customer of the Distributor following the closing as a result of the Transaction. The loss of any significant customers could have a material adverse effect upon the business of the Distributor and our business, results of operations and financial condition.

### *Our products are subject to returns.*

Major distributors to which we sell have in the past returned significant amounts of products to us if it has not sold in accordance with their expectations or if we have newer versions of the product available. We expect that they will continue to do so in the future and anticipate a certain level of returns, accounting for such when recognizing revenue based upon our historic return rates and estimates of returns based upon new product introduction. If product returns experienced by the Distributor are significantly greater than we anticipate, it will negatively impact our business, results of operations and financial condition and those of the Distributor.

### *There is a risk that the rate at which our inventory becomes obsolete will exceed our estimated allowances.*

Our estimated allowances for obsolete or unmarketable inventory are based upon management's understanding of market conditions and forecasts of future product demand, all of which are subject to change. If the actual amount of obsolete or unmarketable inventory significantly exceeds our estimated allowances, it could have a material adverse effect upon the business of the Distributor and our business, results of operations and financial condition.

### *Rapid technological change could render our current products obsolete.*

The market for cassettes, CDs, and DVD technology is subject to change. There can be no assurance that over time these technologies will not be affected by competition from another form of information storage and retrieval technology, such as on-line information services. A further strong advance in the technology surrounding cable and satellite that would give consumers access to information and entertainment may limit the expansion of the market for applications based on cassettes, CDs, and DVDs. We have the right to distribute TWC products utilizing DVD, UMD, CD-ROM and other similar hard carrier devices. However, we do not have the right to distribute TWC products utilizing other technologies such as cable and satellite and other future technologies. The replacement of our technology by another information storage and retrieval technology, or the replacement of existing technology by a new technology at a pace too rapid for production adjustments, may have a material adverse effect on our business, financial condition and results of operations.

36

**Table of Contents**

## CAUTIONARY STATEMENT CONCERNING FORWARD LOOKING INFORMATION

This Proxy Statement contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 relating to, among other things, our goals, plans and projections regarding our financial position, results of operations, market position, product development and business strategy. These statements may be identified by the use of words such as "will", "may", "estimate", "expect", "intend", "plan", "believe", "should", "would", "could" or the negative of these terms and other terms of similar meaning in connection with any discussion of future operating or financial performance. All forward-looking statements are based on our current views with respect to future events, are based on assumptions and involve inherent risks and uncertainties, including factors that could delay, divert or change any of them, and could cause action outcomes and results to differ materially from current expectations. Also, these forward-looking statements present our estimates and assumptions only as of the date of this Proxy Statement.

These factors include, among other things, our ability to complete the Transaction, the manner in which TWC exercises its control over Genius Products, the quality and financial performance of TWC's theatrical releases, the Distributor's ability to perform its obligations under the Distribution Agreement, whether TWC exercises its rights to terminate the Distribution Agreement in certain circumstances, the tax treatment of the Transaction, the effect of changing audience demands and technological change, and the availability of alternative forms of entertainment. Other such risks and uncertainties include our ability to grow our business, to obtain additional licenses and to meet anticipated release schedules, as well as other matters described in our filings with the SEC. For further details and a discussion of these and other risks and uncertainties, see "Risk Factors" above in this Proxy Statement and the risks discussed in our most recent Annual Report on Form 10-K under the caption "Risk Factors". Unless otherwise required by law, we undertake no obligation to publicly update any forward- looking statement, whether as a result of new information, future events or otherwise.

Table of Contents

## PROPOSAL 1
### APPROVAL OF THE CONTRIBUTION OF SUBSTANTIALLY ALL OF OUR ASSETS PURSUANT TO THE CONTRIBUTION AGREEMENT

### *The Transaction*

On December 5, 2005, Genius Products and TWC entered into the Master Contribution Agreement, and the parties amended the Master Contribution Agreement on March 15, April 26, May 30 and June 28, 2006. A copy of the Master Contribution Agreement, and the amendments thereto are attached as *Appendix A* to this Proxy Statement. Under the Contribution Agreement, we have agreed with TWC to form a new business venture (referred to as the "Distributor") that will operate all of the existing businesses of Genius Products and become the exclusive distributor of digital versatile discs ("DVDs") and other forms of home video for certain filmed entertainment products produced by TWC.

The Contribution Agreement provides that, on or prior to the closing, the following events will occur (referred to as the "Transaction"):

- TWC will enter into a Distribution Agreement with TWC Funding, which will become the Distributor. TWC Funding will transfer away substantially all of its assets and liabilities, so that at the closing, it will have no material assets or liabilities, other than with respect to or arising under the Distribution Agreement.

- The name of the Distributor will be changed to "Genius Products, LLC";

- We will contribute substantially all of our existing operations, assets (including cash) and certain of our liabilities to the Distributor in exchange for a 30% equity interest in the Distributor in the form of Class G Units;

- We will become the managing member of the Distributor, although TWC Holdings will have the ability to control us and appoint a majority of our board of directors (as described further below);

- The remaining 70% equity interest in the Distributor will be held directly (69%) and indirectly (1% through a first-tier subsidiary, W-G Holding Corp.) by TWC Holdings and will take the form of Class W Units in the Distributor. The holders of Class W Units will have the right to require that the Distributor redeem their Units for up to 70% of the outstanding common stock of Genius Products, Inc. (with such percentage subject to adjustment based on certain events) or, under certain circumstances, cash; and

- We will amend our Certificate of Incorporation to authorize Series W Preferred Stock and issue to TWC Holdings and its first-tier subsidiary (W-G Holding Corp.) 100 shares of our Series W Preferred Stock. These shares will have no material economic value but will immediately give TWC Holdings certain control rights over our company, including a 70% voting interest and the right to elect five out of seven directors on our Board of Directors (three of whom must be independent directors).

The following documents will be adopted or executed in connection with the closing of the Transaction:

- The Distributor will adopt an Amended and Restated Limited Liability Company Agreement in the form attached as *Appendix C* to this Proxy Statement (the "LLC Agreement");

- The Distributor will enter into the Distribution Agreement with TWC in the form attached as *Appendix D* to this Proxy Statement (the "Distribution Agreement");

- Genius Products will adopt an amended and restated certificate of incorporation in the form attached as *Appendix E* to this Proxy Statement; and

- We will enter into the other documents and agreements described below under Proposal 1 (beginning on page 96).

38

Table of Contents

Following the closing, the Distributor will carry on our existing business, and our primary asset will consist of our 30% equity interest in the Distributor, evidenced by our Class G Units in the Distributor. Since our business will be conducted by the Distributor, our current stockholders will only be entitled to benefit from 30% of the net profits, if any, that are generated by the Distributor, including net profits from our existing businesses that we are contributing to the Distributor and from the new business of distributing home video products for TWC's films.

Following the closing, Genius Products, Inc. will remain a publicly-traded company and our existing shares of common stock will remain outstanding and held by our public stockholders. Although TWC is not a public company, we do not intend that the Transaction will be part of any "going private" transaction or series of transactions by Genius Products. We will remain a separate company from TWC, and TWC's capital will not be available to us. We expect to finance the business of the Distributor after closing through its cash flow from operations and the cash contributed from Genius Products at closing.

We expect to finance the business of the Distributor after closing through its cash flow from operations and the cash contributed from Genius Products at closing. On December 6, 2005, we closed a $32 million private placement financing in which we issued 16,000,000 shares of our common stock at a purchase price of $2.00 per share and five-year warrants to purchase 4,800,000 shares of common stock with an exercise price of $2.40 per share. We completed this financing in order to be able to satisfy a condition to the closing of the Transaction that we have available for immediate use and contribution to the Distributor at least $25 million in cash. TWC has agreed to waive this condition provided that we have available cash of $12 million at closing. We intend that available cash, less certain amounts permitted to be retained under the Contribution Agreement, will be contributed to the Distributor at closing and be used to help finance the operations of the Distributor in the future. Our cash position was $18.6 million at March 31, 2006 and $45.6 million at May 31, 2006.

If the Transaction is consummated, it is expected that the principal executive offices of the Distributor will be located in Genius Products' offices in Santa Monica, California.

### The Companies

#### Genius Products, Inc.

Genius Products is an entertainment company that produces, publishes, licenses and distributes films, videos and music on digital versatile discs ("DVDs"), universal mini discs ("UMDs") and compact discs ("CDs"), under a variety of branded and non-branded names. Our products are sold at traditional, direct response, mail order and internet retailers nationwide and, to a lesser extent, internationally.

We sell our own proprietary content, license content from third parties and distribute content for third parties for a fee. On an interim basis, we currently have U.S. home video distribution rights to selected films and if the Transaction is completed will have the exclusive U.S. home video distribution rights to feature film and direct-to-video releases owned or controlled by The Weinstein Company LLC. We have released two TWC titles on DVD. On March 21, 2006, we released *Derailed*, starring Jennifer Aniston and Clive Owen, and on April 11, we released *Wolf Creek*, an Australian horror film. Upcoming TWC films planned for home video release include *Hoodwinked*, an updated retelling of the classic story of Red Riding Hood with the voices of Anne Hathaway, Glenn Close and Jim Belushi; *Mrs. Henderson Presents*, starring Judi Dench and Bob Hoskins; *Transamerica*, starring Felicity Huffman, winner of the Golden Globe Award for best actress; *The Matador*, starring Pierce Brosnan; and *Scary Movie 4*. Potential new releases by TWC include sequels to *Sin City*, *Kill Bill* and *Teenage Mutant Ninja Turtles*. We will also release content on DVD for Rainbow Media and the Independent Film Channel or IFC.

If the Transaction is completed, we will seek to leverage our increasing retail sales volumes from our new relationship with The Weinstein Company to improve the distribution and sale of our other owned and licensed content. We currently own or have the rights to publish DVDs and audio CDs under the trademarked brands described in the following table.* These brands include both proprietary and licensed brands. We work with a broad range of retail outlets including Wal-Mart, Best Buy, Target, Blockbuster, Movie Gallery, Netflix and

Definitive Proxy Statement (revised) for Genius Products, Inc.      Page 52 of 395
Case 2:15-ap-01241-BB    Doc 16-1    Filed 07/06/15    Entered 07/06/15 15:06:41    Desc
Exhibit AF1 - Part 1    Page 53 of 198

Table of Contents

Amazon.com to implement our specialized distribution strategy that consists of in-store displays that highlight our brands and promote our products that relate to these brands. We call this specialized distribution strategy our "Branded Distribution Network". We intend to continue to build our Branded Distribution Network by developing additional branded products through both internal development, acquisition and licenses from third parties. As part of this strategy, we acquired the Wellspring Media library with approximately 700 titles during 2005. Our brands and products are described below.

| Licensed Brands and Trademarks | Selected Owned or Licensed Content | Licensed Music Brands |
|---|---|---|
| AMC Monsterfest™ | Berliner Film Company | Ansel Adams |
| AMC TV for Movie People™ | J Horror Library (through Horizon | Baby Genius® * |
| AMC® Movies |   Entertainment and Pony Canyon Inc.) | Beatrix Potter™ |
| Bazooka® | Jillian Michaels | Curious George® |
| Genius Entertainment® | NBC News Presents | Guess How Much I Love You™ |
| Hollywood Classics™ | Wellspring Library | Jay Jay the Jet Plane® |
| IFILM® | **Selected Distributed Content** | Kid Genius® * |
| National Lampoon® | | My Little Pony® |
| Sundance Channel Home | Brandissimo! | Paddington Bear™ |
| Entertainment™ | Bauer Martinez Entertainment | Raggedy Ann and Andy™ |
| TV Guide® | IFC | Rainbow Fish™ |
| | Legend Films Library | Spot the Dog™ |
| | Liberation Entertainment Library | The Little Tikes® * |
| | Pacific Entertainment | The Snowman™ |
| | Porchlight Entertainment | Tonka® |
| | Shorts Play | Wee Worship™ * |
| | Shorts Play Extreme | |
| | The Weinstein Company** | |

\*    On December 31, 2005, we sold our rights in these lines of business to Klaus Moeller, our founder and former CEO. For more details, see "Business of Genius Products—Recent Developments" below.

\*\*    On an interim basis until closing of the Transaction.

     We were incorporated in the State of Nevada on January 8, 1996 under the name Salutations, Inc., or Salutations. In September 1997, Salutations acquired all of the outstanding shares of a company called International Trade and Manufacturing Corporation, or ITM, a Nevada corporation founded in 1992. Immediately after the acquisition, Salutations assumed all of the operations and businesses of ITM and changed its name to International Trading and Manufacturing Corporation, or ITMC. In October 1999, we changed our name from International Trading and Manufacturing Corporation to Genius Products, Inc. to reflect our primary business of producing, publishing and distributing audio and video products. On March 2, 2005, we changed our state of incorporation from the State of Nevada to the State of Delaware through a merger with a newly formed subsidiary in Delaware.

     Genius Products is a publicly traded corporation. Our principal executive offices are located at 2230 Broadway, Santa Monica, CA 90404, and our telephone number is (310) 829-4509. Our common stock trades on the Over-the-Counter Bulletin Board under the symbol, "GNPI.OB". For more information, please visit our website at www.geniusproducts.com; however, the information on our website is not a part of this Proxy Statement.

*The Weinstein Company LLC*

     The Weinstein Company LLC ("TWC") is a motion picture company founded by brothers Robert Weinstein and Harvey Weinstein (together, the ''Weinsteins''). From 1979 to March 2005, the Weinsteins were Co-Chairmen of Miramax Film Corp., a company they founded and, in 1993, sold to Walt Disney Pictures and

40

Table of Contents

Television ("Disney"). On March 29, 2005, the Weinsteins and Disney jointly announced the termination of the Weinsteins' employment contracts with Disney.

As part of the Disney separation, Disney, Miramax and an affiliate of TWC entered into an agreement which, among other things, gives the TWC affiliate the right to acquire from Miramax (i) Miramax's rights to more than 80 films and film projects, a number of which have been released, are complete and ready for release or are in post-production, and a majority of which are in development; (ii) the rights to produce, co-finance and co-distribute sequels to a number of established film franchises, including the *Scary Movie* (the next installment of which, *Scary Movie 4*, has been released), *Scream* and *Spy Kids* series; and (iii) Miramax's rights to 12 television projects in varying stages of development and production. The agreement also assigns to the TWC affiliate the Dimension Films name, under which at least 60 films have been theatrically released to date that have grossed, in aggregate, at least $2 billion at the domestic box office. The Miramax name and the Miramax Library (which includes both Miramax and Dimension titles) remain property of Disney. In addition, TWC has, to date, separately acquired rights to more than 25 additional projects from various parties, a number of which are completed or in post-production.

TWC will be the Weinsteins' primary film production vehicle. To that end, the Weinsteins have entered into employment agreements with TWC. The Weinsteins do, however, anticipate continuing to hold certain entertainment-related investments, including passive investments in several completed films, and continuing to be involved in non-film-related activities, at times actively, apart from TWC.

The principal executive offices of TWC are currently located at 375 Greenwich Street, New York, New York 10013, and their telephone number is (212) 941-3800.

### The Weinstein Company Holdings LLC

The Weinstein Company Holdings LLC ("TWC Holdings") is the ultimate parent company of TWC and The Weinstein Company Funding LLC ("TWC Funding"), and was formed in May, 2005. TWC Holdings currently owns, directly or indirectly, 100% of each of TWC and TWC Funding. After the closing of the Transaction, TWC Holdings will own directly 100% of TWC and 69% of TWC Funding, and will own indirectly 1% of TWC Funding through a first-tier subsidiary of TWC Holdings named W-G Holding Corp. After the closing, the remaining 30% of TWC Funding will be owned by Genius Products.

### The Weinstein Company Funding LLC

TWC Funding is currently a direct and indirect wholly-owned subsidiary of TWC Holdings. After the closing of the Transaction, TWC Funding will become the Distributor (defined below) and will carry on the business of Genius Products. Prior to the closing, the business activities of TWC Funding will have involved serving as the borrower under previous financing arrangements of TWC Holdings, and as a holding company of other rights and assets related to TWC's operations.

### Background of the Transaction

Over approximately the past two years, our current and former management and board of directors have sought to transform our company into a distributor of higher margin content by developing our branded distribution network, launching retail programs with major national retailers and obtaining libraries of high value content from third parties. In March 2005, we acquired the rights to the Wellspring Library, and in 2004 and 2005 we acquired the home video distribution rights to numerous additional film and video titles. In 2005, we also actively considered potential acquisitions of whole video and music libraries other than the Transaction.

In late March 2005, following our acquisition of the Wellspring Library from American Vantage Companies, Stephen K. Bannon, our current chairman, and Trevor Drinkwater, our president and chief executive officer, met with representatives of Goldman Sachs & Co. to explain the positioning of Genius as an independent distributor of home video. This meeting included a discussion of Genius Products as an alternative independent distributor for a company expected to be established by Robert and Harvey Weinstein.

41

Table of Contents

On March 29, 2005, the Weinsteins and Disney jointly announced the termination of their employment contracts with Disney and set October 1, 2005 as the expected launch date for their new company.

On April 29, 2005, Messrs. Bannon and Drinkwater met with a representative of TWC, and made a formal presentation proposing Genius Products as an independent distributor of TWC films and possible fee structures that might apply to such a relationship. Also on that date, Mr. Bannon met with representatives of Goldman Sachs & Co. to discuss the proposal.

From May through July 2005, Messrs. Bannon and Drinkwater held additional meetings with TWC's senior management regarding the proposed terms and structure of a potential distribution relationship between TWC and Genius Products. Also during this period, Messrs. Bannon and Drinkwater held discussions and briefings from time to time with other members of the board of directors of Genius Products regarding a possible distribution relationship with TWC.

On July 19, 2005, Messrs. Bannon and Drinkwater met with Robert Weinstein and discussed the details of a potential distribution relationship. Shortly after this meeting, we delivered a written proposal for Genius to act as a distributor of TWC's films. After this proposal was delivered to TWC, TWC informed our management that they were reviewing a number of alternative transactions, many of which consisted of significant monetary advances, and that TWC required a revised proposal from Genius Products which allowed TWC to obtain a controlling equity interest in our company. Our management learned that TWC was considering proposals from major and other independent distributors.

On August 12, 2005, our board of directors held a meeting at which members of management briefed the board regarding potential content acquisition opportunities. The board reviewed the status of ongoing discussions for the potential acquisition of another content library. The board also discussed the possibility of acquiring distribution rights to TWC's films, and determined to give that transaction a high priority.

In August 2005, we retained Jefferies & Company, Inc., or "Jefferies," to act as our exclusive financial advisor for a potential transaction with TWC and, if necessary, provide a fairness opinion regarding such transaction. In August 2005, our management, Jefferies and our corporate counsel, Morrison & Foerster LLP, worked to develop a revised term sheet for a potential transaction involving a substantial equity interest in Genius Products, which was delivered to TWC on or about August 15, 2005.

In mid-August 2005, we were notified by TWC that our proposal was under serious consideration by TWC. Our management informally informed our board of this fact and we began non-exclusive negotiations with TWC to sign a definitive letter of intent. TWC commenced preliminary due diligence of our company in August 2005, and we began due diligence of TWC's film library and future development plans, including its release schedule of films.

On September 7, 2005, our board of directors held a meeting at which Messrs. Bannon and Drinkwater made a presentation to the board regarding a potential transaction involving TWC in the form being negotiated with TWC. Messrs. Bannon and Drinkwater provided an overview of negotiations to date with TWC and representatives of Goldman Sachs. Messrs. Bannon and Drinkwater reviewed with the board the proposed terms of the transaction, as reflected in a draft letter of intent that had been prepared to document the parties' initial understandings. The Jefferies representatives discussed Jefferies' preliminary analysis of the potential transaction involving issuance of an equity interest to TWC. Members of the board asked various questions regarding the proposed terms, including the proposed respective ownership percentages of Genius Products and TWC, the proposed distribution fee and TWC's termination rights.

The Jefferies representatives then engaged in additional discussion with the board regarding their preliminary analysis of various components of the proposed transaction and made suggestions regarding changes to the proposed terms that would be beneficial to Genius Products. The Jefferies representatives also reviewed

42

Table of Contents

with the board a proposed timeline for the transaction. The members of the board asked numerous questions and made various comments regarding the proposed transaction with TWC. The board also discussed with Messrs. Bannon and Drinkwater potential alternatives to the transaction with TWC, including a proposed acquisition of another film library and a retail music business, both of which involved issuance of equity in Genius Products.

The board deferred any action relating to the proposed letter of intent, pending additional consideration of the proposed transaction and alternative transactions. Management indicated that additional information would be prepared and provided to the board to assist the board in its deliberations. In particular, the board asked for additional information comparing the proposed transaction with TWC and the other alternative transactions then under consideration. Mr. Bannon invited the other members of the board to contact the Jefferies representatives directly with any questions and requested that another board meeting be scheduled for September 8, 2005.

On September 8, 2005, our board of directors held a meeting at which the board engaged in additional discussions regarding the proposed transaction with TWC. Messrs. Bannon and Drinkwater presented a general overview of the transaction, a summary of which had been distributed to the members of the board prior to the meeting. Messrs. Bannon and Drinkwater discussed with the board the potential benefits to Genius Products from the transaction, including, among other things:

- Providing access to highly marketable content;

- Enhancing our position with retailers;

- Enhancing our ability to attract substantial distribution opportunities and content libraries; and

- Enhancing our ability to hire and retain qualified personnel.

The board discussed at length the effects of the proposed transaction and the proposed letter of intent on Genius Products and our stockholders, including various risks and uncertainties relating to the transaction. The board also discussed TWC's business and prospects.

The board then engaged in an extensive discussion regarding various alternative transactions then under consideration. Representatives of Cappello Capital Corporation joined the meeting by telephone and made a presentation to the board regarding a significant proposed merger transaction, which would be an alternative to the transaction with TWC. The board discussed the potential benefits and risks of this alternative transaction and certain other alternative transactions, comparing the benefits and risks to those associated with the TWC transaction.

The board discussed the ability to pursue the transaction with TWC and one or more alternative transactions concurrently. The board discussed the exclusive dealing provision in the letter of intent and whether it would restrict our ability to negotiate alternative transactions concurrently with the negotiation of the TWC transaction.

Following further discussion, our board of directors authorized our management to enter into the letter of intent, in substantially the form presented to the board. The board also directed management to continue to explore alternative transactions, subject to and to the extent permitted under the restrictions in the letter of intent.

On October 3, 2005, we retained Mark Bisgeier to assist us as special counsel with respect to the terms of a Distribution Agreement proposed to be entered with TWC under the letter of intent.

On September 19, 2005, we entered into the letter of intent with TWC. The letter of intent was non-binding, except for confidentiality obligations and provisions restricting our ability to participate in negotiations or solicit proposals or offers relating to alternative transactions. These provisions are subject to the board's fiduciary duties and our payment of a $1.5 million "break-up" fee to TWC to pursue an alternative transaction deemed to be more favorable to our stockholders from a financial point of view than the transaction with TWC. TWC was not bound to exclusively negotiate with us under the terms of the letter of intent.

Table of Contents

On September 26, 2005, our board of directors held a meeting. At this meeting, the board reviewed and discussed the letter of intent that had been signed. The board engaged in a detailed discussion regarding the terms and proposed structure of a transaction with TWC. The board also discussed the status of an alternative transaction that had been discussed at prior board meetings, in light of the restrictions contained in the letter of intent.

Following additional discussion, it was proposed that the board establish a special committee of independent directors to review draft agreements and other materials, deliberate and make recommendations to the full board of directors regarding the transaction with TWC. The board and counsel discussed the directors' fiduciary duties and those of the special committee relative to the transaction. Thereafter, the board established the special committee of independent directors, consisting of James Ellis and Michael Koss (the "Special Committee"). The members of the Special Committee did not receive any additional compensation for their service on the Special Committee.

Effective September 26, 2005, Charles Rivkin and Robert Graziano resigned from our board of directors in order to devote their full attention to positions that each of them had recently accepted with other companies.

Between September 23, 2005 and September 28, 2005, our counsel and counsel for TWC exchanged initial drafts of the proposed Contribution Agreement, Distribution Agreement and LLC Agreement. From these dates through December 5, 2005, our legal advisors and members of our management negotiated, through meetings and telephone calls, the provisions of these and other key agreements as well as the structure of a possible transaction with management of TWC and counsel and representatives of TWC. During the period of negotiation of these agreements, our management briefed individual members of our board from time to time concerning the progress and substance of the negotiations, and received feedback from the board members.

Beginning in late September 2005, representatives of TWC and representatives of Goldman Sachs & Co. conducted ongoing due diligence of our company and held numerous meetings with members of our management.

On October 19, 2005, the Special Committee held a meeting at which the members of the Special Committee discussed the status of the transaction with TWC with representatives of Morrison & Foerster LLP and Jefferies. The Jefferies representatives provided an updated overview of their analysis of the transaction, the current terms and potential revisions that would benefit Genius Products. The Special Committee also discussed the proposed structure of the transaction. The Special Committee also discussed that TWC's membership interests would be redeemable by TWC for common stock in Genius Products, and that TWC would be granted immediate majority voting control over Genius Products by the creation of a special series of preferred stock. The Special Committee also discussed the distribution rights that would be granted to the Distributor by TWC, and various conditions to the closing of the transaction.

On October 19, 2005, following the meeting of the Special Committee, the board of directors held a meeting at which the board reviewed the status of the transaction and the drafts of the transaction documents that were circulated to the board prior to the meeting.

On October 25, 2005, the board of directors held meetings at which Messrs. Bannon and Drinkwater updated the board regarding the status of negotiations with TWC and related matters.

On October 25, 2005, Herbert Hardt was appointed as a new independent member of our board of directors and was appointed chairman of our Audit Committee. Mr. Hardt was also appointed to serve on the Special Committee.

On November 7, 2005, our compensation committee held a meeting in Solana Beach at which the compensation committee discussed proposed modifications to executive employment arrangements in connection with the transaction with TWC. Additional meetings and briefings were held with members of the compensation committee regarding the terms of such modifications.

44

Table of Contents

On November 10, 2005, we engaged Roth Capital Partners to act as investment banker to raise new equity financing for Genius Products. The equity financing commitments were required to be received prior to execution of definitive transaction agreements with TWC, and the financing was required to close prior to completion of the transaction with TWC. In November 2005, our management made presentations to, and held meetings with, prospective investors.

On each of November 16 and November 23, 2005, the Special Committee held meetings at which the Special Committee received an update and discussed the status of negotiations and revised deal terms with management and representatives of Morrison & Foerster LLP. Representatives of Jefferies also participated in the November 23 meeting.

On November 25, 2005, our board held a meeting at which the board received an update and discussed the status of negotiations and revised deal terms.

On November 27, 2005, our board held a meeting at which the following occurred. Prior to the meeting, the directors were provided current drafts of the Contribution Agreement, LLC Agreement and Distribution Agreement and related materials.

- Our management and representatives of Morrison & Foerster LLP updated the board on the status of negotiations and revised deal terms, as well as the results of our due diligence review of TWC, including the reviews conducted by our advisors, and the board discussed the same;

- Our management reviewed with the board TWC's business, financial condition and prospects (including the findings of our advisors) and the potential risks and benefits of the potential transaction with TWC, and discussed various financial measures relating to the transaction and strategic alternatives to the transaction. The board also discussed the financial prospects and likelihood of success if Genius Products remained independent and did not conduct the transaction with TWC;

- Our management reviewed with the board the financing options available to us and the terms and conditions of the proposed private placement of common stock and warrants, to be closed following public announcement of our entry into the Contribution Agreement;

- Representatives of Morrison & Foerster LLP advised the board of its fiduciary obligations in connection with its consideration of the proposed TWC transaction;

- Representatives of Jefferies provided certain financial analyses relating to the transaction and delivered orally to the board its opinion described below under "Opinion of Genius Products' Financial Advisor to Our Board of Directors"; and

- Members of the Special Committee each indicated that they were in favor of the proposed TWC transaction.

On November 28 and November 30, 2005, our board held meetings at which the board received an update and discussed the status of negotiations and revised deal terms.

On November 28, 2005, The Weinstein Company Holdings LLC's board of representatives approved The Weinstein Company Holdings' and TWC's entry into the Contribution Agreement, LLC Agreement, Distribution Agreement and the other transaction documents to which either The Weinstein Company Holdings or TWC is a party, subject in the case of the LLC Agreement, the Distribution Agreement and the other transaction agreements, to the satisfaction of the conditions to closing described in the Contribution Agreement.

On December 1, 2005, our board approved the Transaction, our entry into the Contribution Agreement and the LLC Agreement, certain modifications to executive employment agreements in connection with the Transaction, and the other transaction documents to which Genius Products is a party. The board resolved to recommend that our stockholders approve the Transaction and related matters. All directors were present for the

45

Table of Contents

meeting and voted to approve these matters. Also at this meeting, our board approved the terms of a proposed equity financing transaction arranged by Roth Capital Partners, which involved a private placement of 16,000,000 shares of our common stock at $2.00 per share and five-year warrants to purchase 4,800,000 shares of our common stock at an exercise price of $2.40 per share. Following this meeting, we received binding purchase commitments from the participants in this financing.

On December 5, 2005, Jefferies rendered to our board its written opinion as investment bankers to the effect that, as of that date and based upon and subject to the various considerations and assumptions set forth therein, the consideration to be received by Genius Products pursuant to the draft Contribution Agreement delivered by Genius Products prior to 11:00 pm EST on December 4, 2005 was fair, from a financial point of view, to Genius Products.

On December 5, 2005, the Contribution Agreement was executed and delivered on behalf of Genius Products, TWC and The Weinstein Company Holdings LLC. In addition, the parties executed and delivered an interim distribution agreement and interim security agreement under which they will operate prior to the closing of the Transaction.

On December 5, 2005, the parties issued a joint press release announcing the execution of the Contribution Agreement, and on December 6, 2005 our management held a conference call to discuss the Transaction.

On December 6, 2005, we closed the private equity financing transaction arranged by Roth Capital Partners, in which we realized gross proceeds of $32 million before deducting commissions and other expenses. Also on such date, voting agreements and proxies were executed with the participants in the financing and certain other stockholders.

On March 15, 2006, the parties amended the Contribution Agreement to change the Outside Date (as defined in Section 7.1(b)(i) of the Contribution Agreement) from April 15, 2006 to May 31, 2006.

On April 26, 2006, the parties amended the Contribution Agreement to provide that The Weinstein Company Funding LLC shall become the "Distributor" from and after the closing of Transaction.

On May 30, 2006, the parties amended the Contribution Agreement to change the Outside Date from May 31, 2006 to June 30, 2006.

On June 28, 2006, Jefferies delivered to our board of directors and the Special Committee a letter confirming that (a) the consolidation assumption contained in its December 5, 2005 fairness opinion was not material to its analysis and (b) without such consolidation assumption, and with the understanding of how the Company intends to account for the operations of the Distributor following the closing of the Transaction as described in the letter, its December 5, 2005 fairness opinion would have otherwise remained unchanged.

On June 28, 2006, the parties amended the Contribution Agreement to change the Outside Date from June 30, 2006 to July 21, 2006.

### Regulatory Matters

Under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and the regulations promulgated thereunder, the Transaction may not be consummated unless certain filings have been submitted to the Antitrust Division of the U.S. Department of Justice (the "Antitrust Division") and the U.S. Federal Trade Commission ("FTC"), and certain waiting periods have expired or are otherwise earlier terminated by the Antitrust Division and the FTC.

The parties submitted the required filings to the Antitrust Division and the FTC. Prior to the scheduled expiration of the waiting period, the Antitrust Division and the FTC have the right to request additional

46

Table of Contents

information from Genius Products and TWC. Any such request would have the effect of extending the waiting period and could delay the closing of the transaction.

The Antitrust Division and the FTC frequently scrutinize the legality under the antitrust laws of transactions such as the Transaction. The Antitrust Division, the FTC, state antitrust authorities or a private person or entity could seek to enjoin the transactions contemplated by the Contribution Agreement under federal or state antitrust laws at any time before completion or to compel rescission or divestiture at any time subsequent to completion. We believe that the consummation of the Transaction will not violate the antitrust laws. There can be no assurance, however, that a challenge to the Transaction on antitrust grounds will not be made, or, if such a challenge is made, what the result will be.

On March 6, 2006, the parties received notification from the FTC that the U.S. Department of Justice and the FTC have granted early termination of the waiting period under the HSR Act with respect to the Transaction. This event satisfies one of the closing conditions under the Contribution Agreement.

### Reasons for the Transaction

Our board of directors believes that the Transaction has the potential to significantly enhance our position as distributor of high-quality content to the home video market. In deciding to approve the Transaction and our entry into the Contribution Agreement, LLC Agreement, Distribution Agreement and related agreements, our board of directors and the Special Committee consulted with senior members of our management team and advisors regarding the strategic and operational aspects of the Transaction and the results of due diligence efforts undertaken by management and our advisors. In addition, our board of directors and the Special Committee held numerous discussions with representatives of Jefferies and our other advisors regarding the Transaction. Our board of directors and the Special Committee also consulted with Jefferies as to the fairness, from a financial point of view to Genius Products, of the consideration to be received by Genius Products in the Transaction. Our board of directors and the Special Committee also consulted with representatives of Morrison & Foerster LLP regarding legal due diligence matters and the terms of the Contribution Agreement, LLC Agreement, Distribution Agreement and related agreements.

In reaching the decision to approve the Transaction and our entry into the Contribution Agreement, LLC Agreement and related agreements, our board of directors and the Special Committee considered a variety of factors, including:

- Current working capital constraints have hindered our progress in taking full advantage of our position in the retail market by impeding our ability to acquire high quality content;

- TWC currently has rights to over 80 projects in various stages of development resulting from the separation from Disney described above, many of which the Distributor will have the exclusive right to distribute in the United States;

- The Weinsteins have an established track record as film producers, demonstrated by their work with Miramax and Disney;

- TWC is well financed, having raised a total of approximately $1.2 billion to date, including $490 million in equity, a $500 million film securitization and approximately $200 million from other commercial relationships (although none of these funds will be available to the Distributor); and

- The distribution rights available from the Distributor present an opportunity to transform Genius Products' product offering and accelerate our revenue and earnings growth.

In addition, our board of directors and the Special Committee also identified and considered a variety of potentially negative factors in its deliberations concerning the Transaction, including:

- Following the Transaction, our business, results of operations and financial condition will depend substantially on the quality and box office performance of TWC's theatrical releases;

47

Table of Contents

- If we do not achieve target home video distribution rates for TWC's films or meet other performance criteria following the Transaction, TWC may terminate the Distribution Agreement, which would have a material adverse effect on our business, results of operations and financial condition;

- As a result of the Transaction and the related issuance to TWC of shares of Series W Preferred Stock in Genius Products, TWC Holdings will gain the ability to control Genius Products and to appoint a majority of our board of directors. The Series W Preferred Stock to be issued to TWC Holdings will provide TWC Holdings 70% of the total voting power of our outstanding stock;

- The ownership interests of Genius' current stockholders in our assets will be significantly diluted as a result of the Transaction;

- Under the Distribution Agreement, the Distributor would assume the financial risk of customers' nonpayment or delay in payment, which could have a material adverse effect on our business, results of operations and financial condition; and

- Various other risks associated with the Transaction and the businesses of Genius Products, TWC and the Distributor described in the section below entitled "Risk Factors".

Our board of directors and the Special Committee concluded, however, that these factors could potentially be managed or mitigated and that, overall, the negative factors associated with the Transaction were outweighed by the potential benefits of the Transaction.

We chose to structure the proposed Transaction in the manner described in this Proxy Statement, including operating our businesses after the closing through a limited liability company in which each party holds a participating interest, because we believe it is a tax efficient structure to conduct a joint enterprise. Because a limited liability company is taxed as a partnership, its earnings can be distributed to its members with only a single level of taxation. In addition, earnings that are reinvested by the parties in the business will result in an increase in tax basis in their respective membership interests, thus decreasing subsequent taxes if and when the interests are sold.

It was not practical to, and thus our board of directors and Special Committee did not, quantify, rank or otherwise assign relative weights to the wide variety of factors it considered in evaluating the Transaction, nor did the board or Special Committee determine that any one factor was of particular importance in deciding that the Transaction is in the best interests of Genius Products and our stockholders. This discussion of information and material factors considered by our board of directors and the Special Committee is intended to be a summary rather than an exhaustive list. In considering these factors, individual members of the board or Special Committee may have given different weight to different factors. The board and Special Committee conducted an overall analysis of the factors described above, and overall considered the factors to support its decision in favor of the Transaction. The decision of each member of our board of directors was based upon his own judgment, in light of all of the information presented, regarding the overall effect of the Transaction on our stockholders as compared to any potential alternative transactions or courses of action. After considering this information, all members of our board of directors unanimously approved the Transaction and recommended that our stockholders approve the Transaction.

### Recommendation of our Board of Directors

Following the unanimous recommendation of the Special Committee of independent directors that was formed in connection with our board of director's evaluation of the Transaction, our board of directors has determined that the Transaction is in the bests interests of Genius Products and our stockholders. Our board has unanimously approved the Transaction and the Contribution Agreement and unanimously recommends that our stockholders vote in favor of the proposal to approve the contribution of substantially all of our assets to the Distributor pursuant to the Contribution Agreement, and the other proposals contemplated by the Contribution Agreement and this Proxy Statement.

48

Table of Contents

### Opinion of Genius Products' Financial Advisor to Our Board of Directors

The Company engaged Jefferies & Company, Inc. on August 8, 2005 to serve as the Company's financial adviser, an engagement which subsequently included rendering an opinion to the board and the Special Committee of independent directors as to the fairness, from a financial point of view, to the Company of the consideration to be received by Genius pursuant to the Contribution Agreement. On November 27, 2005, Jefferies rendered to the board its oral opinion as investment bankers to the effect that, as of that date and based upon and subject to various considerations and assumptions described by Jefferies, the consideration to be received by the Company pursuant to the Contribution Agreement in its current form was fair, from a financial point of view, to the Company. On December 5, 2005, Jefferies rendered to the board its written opinion as investment bankers to the effect that, as of that date and based upon and subject to the various considerations and assumptions set forth therein, the consideration to be received by the Company pursuant to the draft Contribution Agreement delivered by the Company prior to 11:00 pm EST on December 4, 2005 was fair, from a financial point of view, to the Company. The two opinions are in substance the same except for the description of the deal structure and the date. The Company does not intend to request an updated opinion from Jefferies. On June 28, 2006, Jefferies delivered to our board of directors and the Special Committee a letter confirming that (a) the consolidation assumption contained in its December 5, 2005 fairness opinion was not material to its analysis and (b) without such consolidation assumption, and with the understanding of how the Company intends to account for the operations of the Distributor following the closing of the Transaction as described in the letter, its December 5, 2005 fairness opinion would have otherwise remained unchanged.

The full text of the Jefferies opinion, which sets forth the assumptions made, matters considered and limitations on the scope of review undertaken by Jefferies in rendering its opinion, as well as Jefferies' related side letter described below is attached to this Proxy Statement as *Appendix B*. The Company and the board encourage stockholders to read the Jefferies opinion as well as Jefferies' related side letter described below carefully and in their entirety. The summary of the Jefferies opinion in this Proxy Statement as well as Jefferies' related side letter described below is qualified in their entirety by reference to the full text of the Jefferies opinion and Jefferies' related side letter.

The Jefferies opinion and Jefferies' related side letter was provided to our board of directors and the Special Committee in connection with their consideration of the Transaction and addresses only the fairness, from a financial point of view and as of the date of the Jefferies opinion, of consideration to be received by the Company, and did not address any other aspect of the Transaction. The amount of the consideration to be received by Genius Products under the Contribution Agreement was determined through negotiations between the Company and TWC. The Jefferies opinion and Jefferies' related side letter do not constitute a recommendation as to how any stockholder should vote on the transaction or any matter relevant to the Contribution Agreement. No limitations were imposed by the board upon Jefferies with respect to the investigations made or procedures followed by it in rendering its opinion.

In connection with its opinion, Jefferies, among other things:

- reviewed drafts delivered to Jefferies prior to 11:00 pm EST on December 4 of (i) the Contribution Agreement, (ii) the LLC Agreement, (iii) the Distribution Agreement, (iv) a Security Agreement between the Company and TWC, (v) the Amended and Restated Certificate of Incorporation of Genius Products, Inc., (vi) the Registration Rights Agreement, (vii) an Interim Distribution Agreement between the Company and TWC, (viii) the Services Agreement, and (ix) the Securities Purchase Agreement, dated December 5, 2005, between the Company and the investors party thereto (collectively, the "Transaction Documents");

- considered certain financial and other information relating to the Company, TWC and the Distributor that was publicly available or furnished to Jefferies by the Company, including financial forecasts prepared by the Company in consultation with TWC;

- discussed with members of the Company's management the business, operations, historical financial results and future prospects of the Company and the Distributor;

49

Table of Contents

- discussed with certain members of TWC management the business plans, resources and prospects of TWC;

- considered certain financial and securities data of the Company and compared that data with similar data for other publicly-held companies in businesses Jefferies deemed reasonably similar to those of the Company; and

- performed certain discounted cash flow analyses, an accretion/(dilution) analysis, certain sensitivity analyses, an analysis of film library acquisition values and an analysis of certain comparable publicly-traded companies in businesses Jefferies deemed reasonably similar to those of the Company.

In addition, Jefferies conducted such other quantitative reviews, analyses and inquiries relating to the Company and TWC and considered such other information, financial studies, analyses, investigations, and financial, economic and market criteria as it deemed relevant and appropriate in rendering its opinion.

Jefferies' opinion was based on prevailing interest rates, dividend rates, market conditions, and other circumstances and conditions existing as of the date thereof, and its opinion did not represent Jefferies' view as to the price at which the Company's common stock would trade, or the value of the Class G Units, at any future date.

In its review and analysis and in rendering its opinion, Jefferies assumed and relied upon, but did not assume any responsibility to independently investigate or verify, the accuracy, completeness and fair presentation of all financial and other information that was provided to Jefferies by the Company or that was publicly available (including, without limitation, the information described in the bullet points above), or that was otherwise reviewed by Jefferies. Jefferies' opinion was expressly conditioned upon such information, whether written or oral, being complete, accurate and fair in all respects material to its analysis.

With respect to the financial forecasts provided to and examined by Jefferies, Jefferies noted that projecting future results of any company is inherently subject to uncertainty. The Company informed Jefferies, however, and Jefferies assumed, that such financial forecasts were reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the management of the Company as to the future performance of the Company, the Distributor and TWC, respectively. Jefferies expressed no opinion as to the Company's financial forecasts or the assumptions on which they were made, including without limitation, the effect, if any, that the restrictions on the conduct of the Distributor's business contained in the Transaction Documents would have on the Company's legacy businesses as conducted by the Distributor. In addition, in rendering its opinion Jefferies assumed that each of the Company, the Distributor and TWC would perform in accordance with such financial forecasts for all periods specified therein.

Jefferies assumed, with the consent of the Company's board, that the Transaction would be consummated in accordance with the terms described in the Transaction documents, without waiver, modification or amendment of any material term, condition or agreement and that, in the course of obtaining the necessary regulatory or third party approvals, consents and releases for the Transaction, no delay, limitation, restriction or condition would be imposed that would have an adverse effect on the Company or the Transaction. Representatives of the Company advised Jefferies, and Jefferies further assumed, that the final terms of the Transaction documents would not vary materially from those set forth in the drafts it reviewed.

In its review, Jefferies did not obtain any independent evaluation or appraisal of the assets or liabilities of, nor did it conduct a comprehensive physical inspection of any of the assets of, the Company, the Distributor or TWC, nor was Jefferies furnished with any such evaluations or appraisals or reports of such physical inspections, nor did Jefferies assume any responsibility to obtain any such evaluations, appraisals or inspections. Jefferies' opinion was based on economic, monetary, regulatory, market and other conditions existing and which could be evaluated as of the date thereof. Jefferies made no independent investigation of any legal or accounting matters affecting the Company, the Distributor or TWC, and Jefferies assumed the correctness in all respects material to

50

Table of Contents

its analysis of all legal and accounting advice given to the Company, and its board of directors, including, without limitation, advice as to the legal, accounting and tax consequences of the terms of the Transaction to the Company.

In rendering its opinion, Jefferies also assumed with the consent of the board of directors that the issuance of the Series W Preferred Stock and the Class G Units under the applicable Transaction Documents would not conflict in any manner with the certificate of incorporation or by-laws of the Company, as amended from time to time, the LLC Agreement and applicable Delaware law.

Jefferies' opinion did not address the fairness of the Transaction to any person or entity that became a stockholder of the Company after the date thereof as a result of the pre-closing equity financing required pursuant to the Contribution Agreement (the "Equity Financing").

Jefferies assumed that the common stock issued in the Equity Financing would be issued at the price Jefferies was informed would be specified in the related Stock Purchase Agreements.

Jefferies' opinion did not constitute a view regarding the solvency of the Company, TWC or the Distributor prior to or subsequent to the Transaction. Jefferies did not perform any procedures to determine the solvency of the Company, the Distributor or TWC. As such, its opinion did not constitute a solvency opinion, and should not be relied upon for such purposes.

Jefferies' opinion did not address, and should not be construed to address, either the underlying business decision to effect the Transaction or whether the consideration to be received by the Company in the Transaction represents the highest price obtainable. Jefferies expressed no view as to the federal, state or local tax consequences of the Transaction and assumed, based upon discussions with the Company's management, that the Transaction will not adversely affect the ability of the Company to utilize its accrued net operating losses.

Jefferies' opinion assumed that there would be no change of control of the Company or the Distributor during the term of the Distribution Agreement.

Jefferies' opinion assumed that the Distributor would be consolidated with the Company for accounting purposes. On June 28, 2006, Jefferies delivered to our board of directors and the Special Committee a letter confirming that (a) the consolidation assumption contained in its December 5, 2005 fairness opinion was not material to its analysis and (b) without such consolidation assumption, and with the understanding of how the Company intends to account for the operations of the Distributor following the closing of the Transaction as described in the letter, its December 5, 2005 fairness opinion would have otherwise remained unchanged.

Jefferies' opinion was effective as of the date thereof, and Jefferies has no obligation to update the opinion. Jefferies' analyses must be considered as a whole. Considering any portion of such analyses or the factors considered, without considering all analyses and factors, could create a misleading or incomplete view of the process underlying the conclusions expressed therein. Jefferies expressly disclaims any undertaking or obligation to advise any person of any change in any fact or matter affecting its opinion of which Jefferies becomes aware after the date thereof.

Jefferies' opinion was for the use and benefit of the board of directors of the Company in its consideration of the Transaction, and its opinion did not address the relative merits of the Transaction as compared to any alternative transactions that might be available to the Company. Jefferies' opinion did not constitute a recommendation as to how any holder of shares of the Company Common Stock should vote on any matter relevant to the Transaction. Jefferies expressed no opinion as to the price at which the Company's common stock would trade at any future time.

In preparing its opinion, Jefferies performed a variety of financial and comparative analyses. The preparation of a fairness opinion is a complex process involving various determinations as to the most

51

Table of Contents

appropriate and relevant quantitative and qualitative methods of financial analysis and the applications of those methods to the particular circumstances and, therefore, is not necessarily susceptible to partial analysis or summary description. Jefferies believes that its analyses must be considered as a whole. Considering any portion of its analyses and of the factors considered by it, without considering all analyses and factors, could create a misleading or incomplete view of the process underlying the conclusion expressed in its opinion. In addition, Jefferies may have given various analyses more or less weight than other analyses, and may have deemed various assumptions more or less probable than other assumptions, so that the range of valuation resulting from any particular analysis described below should not be taken to be Jefferies' view of the Company's actual value. Accordingly, the conclusions reached by Jefferies are based on all analyses and factors taken as a whole and also on the application of Jefferies' own experience and judgment.

In performing its analyses, Jefferies made numerous assumptions with respect to industry performance, general business and economic conditions and other matters, many of which are beyond the Company's and Jefferies' control. The analyses performed by Jefferies are not necessarily indicative of actual values or actual future results, which may be significantly more or less favorable than suggested by such analyses. In addition, analyses relating to the value of businesses or assets do not purport to be appraisals or to necessarily reflect the prices at which businesses or assets may actually be sold and are inherently subject to uncertainty. The analyses performed were prepared solely as part of Jefferies' analysis of the fairness to the Company, from a financial point of view, of the consideration to be received by the Company pursuant to the Contribution Agreement and were provided to the board in connection with the delivery of Jefferies' opinion.

The following is a summary of the material financial and comparative analyses performed by Jefferies that were presented to the board on December 5, 2005 in connection with the delivery of its opinion. The financial analyses summarized below include information presented in tabular format. In order to fully understand Jefferies' financial analyses, the tables must be read together with the text of each summary. The tables alone do not constitute a complete description of the financial analyses. Considering the data described below without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view of Jefferies' financial analyses.

*Historical Trading Analysis.* Jefferies reviewed the share price trading history of the Company's common stock for the two-year period ending December 2, 2005. Jefferies noted that over the indicated period the high and low prices for shares of Genius were:

- $2.90 and $1.15 for the last 24 month period

*Discounted Cash Flow Analysis.* Jefferies performed certain discounted cash flow analyses to estimate the present value of the free cash flows of the Company, the present value of the free cash flows projected to be received by the Distributor under the Distribution Agreement and the present value of the free cash flows of the projected incremental business that Genius expects to derive as a result of the Distribution Agreement.

In Jefferies' discounted cash flow analysis, Jefferies estimated the present value of the free cash flows of the Company through the fiscal year ending December 31, 2010 using Company management's financial projections. Jefferies also calculated the terminal value of the enterprise at December 31, 2010 by multiplying projected EBITDA in the fiscal year ending December 31, 2010 by multiples ranging from 5.0x to 7.0x. To discount the projected free cash flows and the terminal value to present value, Jefferies used discount rates ranging from 17.5% to 20.5%. To determine the implied total equity value for the Company, Jefferies subtracted debt and added cash to the implied enterprise value for the Company. After accounting for the vesting of in-the-money options, this analysis indicated a range of implied enterprise values for the Company of approximately $63.1 million to $83.7 million, and a range of implied values per share of the Company's fully-diluted common stock of approximately $1.22 to $1.62.

In the Distribution Agreement discounted cash flow analysis, Jefferies estimated the present value of the free cash flows of the Company's projections for home video distribution of product covered under the

**Table of Contents**

Distribution Agreement through the fiscal year ending December 31, 2014 using Company management's financial projections. Jefferies assumed that the term of the Distribution Agreement was 5 years at a 5% distribution fee. Jefferies also assumed that at the end of the 5th year, there was a 50% probability of renewal for three years and a 50% probability of termination, and factored these assumptions into its analysis. The perpetual right to distribute titles released during the distribution agreement term was valued at $125,000 per title. Due to the discrete term of the Distribution Agreement, Jefferies did not assume a terminal value for the enterprise. To discount the projected free cash flows and the perpetual distribution rights to present value, Jefferies used discount rates ranging from 12.5% to 17.5%. This analysis indicated a range of implied enterprise values for the Distribution Agreement of approximately $101.2 million to $112.3 million.

In the incremental business discounted cash flow analysis, Jefferies estimated the present value of the free cash flows of the Company's projections for incremental Genius Products business contingent on the Distribution Agreement through the fiscal year ending December 31, 2010 using Company management's financial projections. Jefferies also calculated the terminal value of the enterprise at December 31, 2010 by multiplying projected EBITDA in the fiscal year ending December 31, 2010 by multiples ranging from 4.0x to 7.0x. To discount the projected free cash flows and the terminal value to present value, Jefferies used discount rates ranging from 17.5% to 20.5%. This analysis indicated a range of implied enterprise values for the incremental business of approximately $54.1 million to $89.1 million.

*Relative Value Analysis.* Based on the Discounted Cash Flow Analyses described above, Jefferies performed the following analyses to determine the relative percentage contributions of each party to the Distributor:

*A. Range of Implied TWC Parties' Ownership Based on DCF Valuations.* In this analysis, TWC's contribution to the Distributor was calculated as the net present value of the Distribution Agreement and the net present value of the incremental business Genius Products expects to receive as a result of the Distribution Agreement. The analysis considered the TWC parties' implied ownership of the combined company at various exit multiples and discount rates and was calculated assuming that the incremental Genius business is valued at exit multiples from 4.0x to 7.0x EBITDA and the Distribution Agreement is discounted at a 15.0% discount rate. This resulted in an implied percentage ownership of Genius Products by the TWC parties after redemption of Class W Units of the Distributor from 66.6% to 74.6%.

*B. Range of Implied TWC Parties' Ownership Including Dilutive Effect of New Equity Raise Based on DCF Valuations.* In this analysis, TWC's contribution to the LLC was calculated as the net present value of the Distribution Agreement and the net present value of the incremental business Genius expects to receive as a result of the Distribution Agreement less the dilutive effect of the new $32 million equity raise to the entire capitalization structure. The analysis considered the TWC parties' implied ownership of Genius Products after redemption of Class W Units of the Distributor in exchange for Genius Common Stock at various exit multiples and discount rates and was calculated assuming that the incremental Genius business is valued at exit multiples from 4.0x to 7.0x EBITDA, the Distribution Agreement is discounted at a 15.0% discount rate, and incorporating the dilutive effect of a new $32 million equity raise. This resulted in an implied percentage ownership of Genius Products by the TWC parties after redemption of Class W Units of the Distributor from 59.1% to 66.1%.

*C. Range of Implied TWC Parties' Ownership Based on TWC DCF Valuation and Genius' Public Market Equity Value.* In this analysis, TWC's contribution to the LLC was calculated as the net present value of the Distribution Agreement and the net present value of the incremental business Genius expects to receive as a result of the Distribution Agreement. Genius' contribution to the LLC was calculated as its current equity market capitalization based on its December 2, 2005 closing price of $2.35, its 15-day average closing price of $2.09 and its 30-day average closing price of $1.87. The analysis considered the TWC parties' implied ownership of Genius Products after redemption of Class W Units of the Distributor in exchange for Genius Common Stock at various exit multiples and discount rates and was calculated assuming that the incremental Genius business is valued at exit multiples from 4.0x to 7.0x EBITDA and the Distribution Agreement is discounted at a 15.0% discount rate. With the current equity value of Genius based on the December 2, 2005 closing price, this resulted in an implied percentage ownership of Genius

53

Table of Contents

Products by the TWC parties after redemption of Class W Units of the Distributor ranging between 61.1% and 65.6%. With the current equity value of Genius based on the 15-day average closing price, this resulted in an implied percentage ownership of Genius Products by the TWC parties after redemption of Class W Units of the Distributor ranging between 63.9% and 68.3%. With the current equity value of Genius based on the 30-day average closing price, this resulted in an implied percentage ownership of Genius Products by the TWC parties after redemption of Class W Units of the Distributor ranging between 66.3% and 70.5%.

*D. Range of Implied TWC Parties' Ownership Based on TWC DCF Valuation and Genius' Public Market Equity Value Including Dilutive Effect of New Equity Raise.* In this analysis, TWC's contribution to the LLC was calculated as the net present value of the Distribution Agreement and the net present value of the incremental business Genius expects to receive as a result of the Distribution Agreement less the dilutive effect of the new $32 million equity raise to the entire capitalization structure. Genius' contribution to the LLC was calculated as its current equity market capitalization based on its December 2, 2005 closing price of $2.35, its 15-day average closing price of $2.09 and its 30-day average closing price of $1.87. The analysis considered the TWC parties' implied ownership of Genius Products after redemption of Class W Units of the Distributor in exchange for Genius Common Stock at various exit multiples and discount rates was calculated assuming that the incremental Genius business is valued at exit multiples from 4.0x to 7.0x EBITDA, the Distribution Agreement is valued at a 15.0% discount rate, and incorporating the dilutive effect of a new $32 million equity raise. With the current equity value of Genius based on the December 2, 2005 closing price, this resulted in an implied percentage ownership of Genius Products by the TWC parties after redemption of Class W Units of the Distributor ranging between 54.4% and 59.3%. With the current equity value of Genius based on the 15-day average closing price, this resulted in an implied percentage ownership of Genius Products by the TWC parties after redemption of Class W Units of the Distributor ranging between 56.7% and 61.4%. With the current equity value of Genius based on the 30-day average closing price, this resulted in an implied percentage ownership of Genius Products by the TWC parties after redemption of Class W Units of the Distributor ranging between 58.6% and 63.2%.

*E. Relative Value Analysis.* In this analysis, Jefferies compared the DCF valuation of Genius' standalone business to the implied value of a 22% interest in Genius Products after redemption of Class W Units of the Distributor, in exchange for Genius Common Stock which represented the implied ownership percentage of the existing Genius stockholders after adjusting for the $32 new equity raise and assuming all TWC share equivalents are converted to Genius shares. The DCF valuation of Genius' standalone business was between $63.1 and $83.7 at exit multiples of EBITDA between 5.0x and 7.0x and using a discount rate between 17.5% and 20.5%. The DCF valuation of a 22% interest in Genius Products after redemption of Class W Units of the Distributor was between $73.9 and $92.9 at exit multiples of EBITDA between 7.0x and 9.0x and using a discount rate between 16.0% and 18.0%.

*Pro Forma Accretion/(Dilution Analysis) to Genius Stockholders.* Accretion/(Dilution) Analysis was used to consider the pro forma earnings per share impact of the transaction to current Genius stockholders. The following table shows the calculated pro forma EPS accretion/(dilution) assuming the anticipated financial reporting structure:

| | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Basic Accretion/ (Dilution) Consolidated Case versus Standalone | (38.4)% | 12.0% | 11.5% | 8.1% | 20.1% |
| Fully-Diluted Accretion/ (Dilution) Consolidated Case versus Standalone | (35.9)% | 16.5% | 16.0% | 12.4% | 25.0% |

The following table shows the calculated pro forma EPS accretion/(dilution) assuming that TWC converts all of its units into Genius shares:

| | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| Basic Accretion/ (Dilution) Consolidated Case versus Standalone | (55.0)% | (7.3)% | (0.7)% | 0.8% | 13.3% |
| Fully-Diluted Accretion/ (Dilution) Consolidated Case versus Standalone | (53.2)% | (3.6)% | 3.3% | 4.9% | 17.9% |

54

**Table of Contents**

*Comparable Library Valuation Analysis*. Using publicly available information, Jefferies reviewed the historical prices paid for libraries of motion picture content. Jefferies reviewed 29 such acquisitions from August 2, 1985 to September 23, 2004. The mean and median implied price paid per title in each of the reviewed library acquisitions are $590,000 and $300,000, respectively.

Jefferies performed a discounted cash flow analysis to estimate the present value of the free cash flows to the Company as a result of the perpetual home video rights for product released during the term of the Distribution Agreement. Based on management's projections and assuming that the films released to the theater in any given year are released for home video distribution 50% in the current year and 50% in the following year and that no revenues are collected after 2020, the current value of the perpetual rights to home video sales at a 15% discount rate is estimated to be $17.1 million.

Using these two analyses, Jefferies estimated the present value of perpetual rights to be $20.3 million based on $125,000 per title released during the projected period.

*Comparable Company Analysis*. Using publicly available information and information provided by Company management, Jefferies analyzed the trading multiples of the Company's common stock and the corresponding trading multiples of the following companies, which were selected because they engage in distribution businesses that are reasonably similar to that of the Company. These companies included Handleman Company, Ingram Micro Incorporated, Navarre Corporation and Source Interlink Companies Incorporated.

Jefferies used the results of this analysis to determine the appropriate terminal EBITDA multiple for the Discounted Cash Flow Analysis of the standalone Genius business.

In its analysis, Jefferies derived and compared multiples for the Company and the selected companies, calculated as follows:

- the enterprise value divided by earnings before interest, taxes, depreciation and amortization, or "EBITDA," for the latest-twelve-month period, or "LTM," which is referred to as "Enterprise Value/LTM EBITDA,"

- the enterprise value divided by estimated EBITDA for calendar year 2005, which is referred to as "Enterprise Value/CY 2005E EBITDA,"

- the enterprise value divided by estimated EBITDA for calendar year 2006, which is referred to as "Enterprise Value/CY 2006E EBITDA," and

- the enterprise value divided by estimated EBITDA for calendar year 2007, which is referred to as "Enterprise Value/CY 2007E EBITDA."

This analysis indicated the following:

### Comparable Public Companies Multiples

|  | High | Low | Mean | Median | Genius |
|---|---|---|---|---|---|
| Enterprise Value/LTM EBITDA | 17.6x | 3.7x | 9.5x | 8.4x | NMx |
| Enterprise Value/CY 2005E EBITDA | 8.3x | 3.5x | 6.4x | 6.9x | NMx |
| Enterprise Value/CY 2006E EBITDA | 8.1x | 3.8x | 6.0x | 6.1x | 8.0x |
| Enterprise Value/CY 2007E EBITDA | 3.6x | 3.6x | 3.6x | 3.6x | 7.9x |

No company utilized in the comparable company analysis is identical to the Company. In evaluating the selected companies, Jefferies made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond the Company's and Jefferies' control. Mathematical analysis, such as determining the mean or median, is not in itself a meaningful method of using comparable company data.

Table of Contents

*Sensitivities Analysis.* Based on the Discounted Cash Flow Analysis described above, Jefferies performed certain discounted cash flow analyses to estimate the present value of the free cash flows of the Company based on reduced sales of 10% and 20%, and the present value of the free cash flows of the projected incremental business that Genius expects to derive as a result of the Distribution Agreement based on reduced sales of 10% and 20%.

The DCF valuation of Genius' standalone business based on reduced sales of 10% was between $57.5 and $76.2 at exit multiples of EBITDA between 5.0x and 7.0x and using a discount rate between 17.5% and 20.5%. The DCF valuation of Genius' standalone business based on reduced sales of 20% was between $52.0 and $68.6 at exit multiples of EBITDA between 5.0x and 7.0x and using a discount rate between 17.5% and 20.5%.

The range of implied TWC percentage ownership based on DCF valuations of the TWC business and the incremental business that Genius expects to derive as a result of the Distribution Agreement based on reduced sales of 10% and 20% are shown below. In this analysis, TWC's contribution to the LLC was calculated as the net present value of the Distribution Agreement and the net present value of the incremental business Genius expects to receive as a result of the Distribution Agreement.

The implied TWC parties' percentage ownership ranged between 57.5% and 61.0% including the $32 million equity raise, the incremental deal valued at an exit multiple of 5.0x and 10% reduced sales. The implied TWC parties' percentage ownership ranged between 54.2% and 57.6% including the $32 million equity raise, the incremental deal valued at an exit multiple of 5.0x and 20% reduced sales.

*Consideration of Selected Comparable Transactions Analysis.* While comparable transactions analysis is a commonly used valuation methodology, Jefferies did not employ such an analysis for the purposes of its opinion. Comparable transactions analysis is most appropriate for transactions that are materially similar in their nature and structure. Given the number of specific and unique characteristics of the Transaction, Jefferies considered a selected comparable transactions analysis inappropriate for valuing the consideration to be received by the Company pursuant to the Master Contribution Agreement.

*Consideration of Premiums Analysis.* While premiums analysis is a commonly used valuation methodology, Jefferies did not employ such an analysis for the purposes of its opinion. Premiums analysis is most appropriate for transactions that entail a discrete offer price in the form of cash or stock as consideration in exchange for a company's equity securities. Given the form of consideration in the Transaction, Jefferies did not consider a premiums analysis appropriate for providing a relative comparison of the consideration to be received by the Company pursuant to the Master Contribution Agreement.

Jefferies' opinion contains an assumption that "the Distributor will be consolidated with the Company for accounting purposes." However, following the closing of the Transaction, the Company will not consolidate the financial statements of the Distributor for accounting purposes, but rather intends to account for the financial statements of the Distributor using the equity method of accounting and to report the financial statements of the Distributor in a note to the Company's financial statements under generally accepted accounting principles. Accordingly, on June 28, 2006, Jefferies delivered to our board of directors and the Special Committee a letter confirming that (a) the consolidation assumption contained in its December 5, 2005 opinion was not material to its analysis and (b) without such consolidation assumption, and with the understanding of how the Company intends to account for the operations of the Distributor following the closing of the Transaction as described in the letter, its December 5, 2005 opinion would have otherwise remained unchanged.

Jefferies' opinion was one of many factors taken into consideration by the Genius Products board of directors in making its determination to approve the Transaction and should not be considered determinative of the views of the board or management with respect to the Transaction or the transaction consideration.

Jefferies was selected by the board based on Jefferies' qualifications, expertise and reputation. Jefferies is an internationally recognized investment banking and advisory firm. Jefferies, as part of its investment banking

56

Table of Contents

business, is regularly engaged in the valuation of businesses and securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements, financial restructurings and other financial services.

As noted in Jefferies' opinion, in February 2004 Jefferies advised Wellspring Media, Inc. ("Wellspring") on its sale to the American Vantage Companies, which included its film library (the "Wellspring Library"). Jefferies holds a secured negotiable promissory note made by Wellspring as part of Jefferies' fee in that transaction. Jefferies also represented American Vantage Companies in the sale of its subsidiary, American Vantage Media, to Genius Products. The Wellspring promissory note is now an obligation of Genius Products as a result of our acquisition of Wellspring from American Vantage Companies. The Wellspring promissory note matures on February 3, 2006.

Jefferies subsequently represented American Vantage Companies in the private placement to certain investors of 3,125,000 shares of Genius Products' stock received by American Vantage Companies in the sale of American Vantage Media and is currently engaged by American Vantage Companies to act as placement agent in connection with any other resale of shares of Genius Products' stock owned by American Vantage Companies.

Stephen K. Bannon, who is our chairman, served as a managing director and head of media and entertainment investment banking of Jefferies from July 2000 to April 2002.

Effective February 1, 2006, Genius Products hired John Mueller as its Chief Financial Officer and Executive Vice President. Mr. Mueller previously served as Senior Vice President of Media and Entertainment Investment Banking for Jefferies, and was actively involved in providing Jefferies' services to Genius Products in connection with the Transaction. Genius Products did not discuss any position with Mr. Mueller or determine to hire Mr. Mueller until after Jefferies rendered its fairness opinion to Genius.

In the ordinary course of business, Jefferies and its affiliates may trade or hold such securities of the Company for its own account and for the accounts of its customers and, accordingly, may at any time hold long or short positions in those securities.

Pursuant to an engagement letter between the Company and Jefferies dated August 8, 2005, as amended on December 3, 2005, the Company agreed to pay Jefferies a customary fee for its services in connection with the Transaction, a portion of which became payable to Jefferies upon delivery of its opinion, and the remainder of which shall be payable to Jefferies contingent upon consummation of the Transaction. Jefferies will also be reimbursed for reasonable expenses incurred, including the fees and disbursements of Jefferies' counsel. The Company has agreed to indemnify Jefferies against liabilities arising out of or in connection with the services rendered or to be rendered by it under its engagement.

### Interests of Directors, Executive Officers and Affiliates

In considering the recommendation of our board of directors to vote in favor of the contribution of substantially all of our assets in connection with the Transaction, stockholders should be aware that some of our executive officers and directors may have interests in the Transaction that may be different from, or in addition to, their interests as stockholders. Our board of directors was aware of these interests and considered them, among other things, in making its recommendations.

#### Employment Agreement Amendments Effective Upon Closing

Mr. Drinkwater, Rodney Satterwhite, Michael Radiloff and Mitch Budin are parties to employment agreement amendments under which they will receive rights to severance payments upon termination or other benefits. These employment agreement amendments only become effective upon the closing of the Transaction.

Table of Contents

Effective December 5, 2005, we entered into an amendment to the employment agreement with Mr. Drinkwater, pursuant to which the following changes were made to his employment agreement. The first two bullet points will only become effective upon closing of the Transaction:

- Three-year term, with up to two one-year extensions at our option;

- Base compensation of $425,000 in year one, $475,000 in year two, $525,000 in year three, $625,000 in year four (if applicable), and $675,000 in year five (if applicable), plus annual bonuses in each year of up to 50% of base salary based on performance factors to be determined by the Company's board of directors; and

- Additional stock options to acquire 1,000,000 shares, vesting in equal installments over five years.

Effective December 5, 2005, we entered into an amendment to the employment agreement with Mr. Satterwhite, pursuant to which the following changes were made to his employment agreement. The first bullet point will only become effective upon closing of the Transaction:

- Two-year term, with a one-year extension at our option; and

- Additional stock options to acquire 75,000 shares, vesting in equal installments over five years.

Effective December 5, 2005, we entered into an amendment to the employment agreement with Mr. Radiloff, pursuant to which the following changes were made to his employment agreement. The first bullet point will only become effective upon closing of the Transaction:

- Two-year term, with a one-year extension at our option; and

- Additional stock options to acquire 75,000 shares, vesting in equal installments over five years.

Effective December 5, 2005, we entered into an amendment to the employment agreement with Mr. Budin, pursuant to which the following changes were made to his employment agreement. The first bullet point will only become effective upon closing of the Transaction:

- Two-year term, with a one-year extension at our option; and

- Additional stock options to acquire 75,000 shares, vesting in equal installments over five years.

*Acceleration of Vesting of Stock Options Upon Closing*

In addition, the vesting of all unvested stock options outstanding at the time of the closing of the Transaction, including options held by our directors and executive officers, automatically will accelerate upon the closing of the Transaction. However, pursuant to their employment agreement amendments, each of Messrs. Budin, Satterwhite and Radiloff have agreed to waive the accelerated vesting of a portion of their existing stock options, and Mr. Drinkwater has agreed to restrictions on the sale or transfer of a portion of the shares of our common stock represented by his existing stock options.

### No Appraisal Rights

Under the applicable provisions of the Delaware General Corporation Law, our stockholders will have no right to seek appraisal of their shares of common stock in connection with the Transaction.

### Certain United States Federal Income Tax Consequences

The Transaction presents certain tax risks to us described under "Risk Factors—Risks Related to the Transaction" above.

EACH HOLDER OF OUR COMMON STOCK IS URGED TO CONSULT HIS OR HER OWN TAX ADVISOR AS TO THE FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTION, AND ALSO AS TO ANY STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES.

Table of Contents

## MATERIAL AGREEMENTS AND DOCUMENTS
## RELATING TO THE TRANSACTION

This section contains summaries of the principal terms and conditions of the material agreements and other material documents related to the Transaction listed below:

1. Article IV(B) of our proposed amended and restated certificate of incorporation, which authorizes the Series W Preferred Stock to be issued to TWC Holdings and a first-tier subsidiary in connection with the Transaction and establishes the rights, preferences and powers, and the qualifications, limitations and restrictions, of the Series W Preferred Stock;

2. The Contribution Agreement, as amended;

3. The LLC Agreement;

4. The Distribution Agreement; and

5. Additional agreements related to the Transaction, including the Voting Agreements, the Services Agreement and the Registration Rights Agreement.

We encourage you to read the appendices to this Proxy Statement in their entirety. These appendices include complete copies of our proposed Amended and Restated Certificate of Incorporation (*Appendix E*), the Contribution Agreement, as amended (*Appendix A*), the LLC Agreement (*Appendix C*) and the Distribution Agreement (*Appendix D*). The summaries below are qualified by the actual terms and conditions set forth in these appendices. While we believe that these summaries cover the material terms of the relevant documents, these summaries may not contain all of the information that you believe to be important. You should refer to the full text of the documents for details of the Transaction and the terms and conditions of the documents.

**1. *Series W Preferred Stock To Be Issued To TWC***

As a condition to the closing of the Transaction, we are required to issue 100 shares of Series W Preferred Stock to or as directed by TWC or an affiliate of TWC. Under Article IV(B) of our proposed amended and restated certificate of incorporation attached hereto as Appendix E, the Series W Preferred Stock will provide TWC significant rights, preferences and powers not available to our other stockholders.

***Voting.*** The holders of the Series W Preferred Stock will have the following voting rights:

- *General.* Except as required by our certificate of incorporation or applicable law, the holders of the shares of Series W Preferred Stock will be entitled to vote on all matters submitted to a vote of our stockholders, voting together with the holders of common stock (and of any other shares of our capital stock entitled to vote at a meeting of stockholders) as one class.

- *Voting Power When Threshold Amount Held.* So long as the "TWC Holders" (which means the members of the Distributor other than Genius Products) and their permitted transferees (i) own the shares of Series W Preferred Stock, and (ii) collectively beneficially own or have the right to beneficially own upon conversion, exchange, or redemption of Class W Units pursuant to the LLC Agreement at least 20% of our outstanding common stock (assuming conversion, exchange or redemption of the Class W Units and excluding shares of common stock issuable upon exercise of outstanding options, warrants or other convertible securities of Genius Products) (the "Threshold Amount"), the Series W Preferred Stock will have the following voting rights:

  - *Majority Voting Power.* Except as otherwise required in our certificate of incorporation or by applicable law, as of each record date for the determination of stockholders entitled to vote on any matter (a "Record Date"), the shares of Series W Preferred Stock will, in the aggregate, have voting rights and powers equal to the greatest of:

    - 100 votes;

59

Table of Contents

- the number of votes attributable to the number of shares of common stock that TWC Holders and their permitted transferees beneficially own, including without limitation those shares of common stock which they have the right to acquire, upon conversion, exchange or redemption of Class W Units pursuant to the LLC Agreement, less the number of votes attributable to the shares of common stock which TWC Holders and their permitted transferees may vote directly; and

- the number of votes that, together with all other votes entitled to be directly cast by the holders of the shares of Series W Preferred Stock on such Record Date, whether by virtue of beneficial ownership of our capital stock, proxies, voting trusts or otherwise, entitle the holders of the shares of Series W Preferred Stock to exercise one vote more than one-half of all votes entitled to be cast as of such Record Date by all holders of our capital stock.

Each holder of Series W Preferred Stock will be entitled to notice of any stockholders' meeting in accordance with our bylaws.

- *Board of Directors.* Our board of directors will consist of seven directors, and at any meeting for the election or removal of directors, however such meeting is called and regardless of whether such meeting is a special or annual meeting of stockholders, or at any adjournment thereof, or in connection with any written consent of stockholders, the holders of Series W Preferred Stock (voting separately as a single class) will be entitled to elect five (5) directors (the "Series W Directors"), three (3) of whom at the time of their election must be independent directors (under applicable listing standards), and to remove, without cause, from office any Series W Director and to fill any vacancy caused by the resignation, death or removal of any Series W Director. Vacancies on the board resulting from the death, resignation or removal of a Series W Director may be filled by the remaining Series W Directors, to hold office until a qualified successor is elected by the holders of Series W Preferred Stock at the next regular or special meeting of the stockholders. So long as TWC and each of its affiliates and permitted transferees owns or has a right to own the Threshold Amount, the holders of our common stock (voting separately as a single class) will be entitled to elect two (2) directors (the "At-Large Directors"), and to remove, without cause, from office any At-Large Director and, in the absence of any At-Large Directors, to fill any vacancy caused by the resignation, death or removal of any At-Large Director. Vacancies on the board resulting from the death, resignation or removal of an At-Large Director may be filled by the remaining At-Large Director, to hold office until a qualified successor is elected by the holders of common stock at the next regular or special meeting of the stockholders.

- *Protective Provisions.* In addition to the right of holders of shares of Series W Preferred Stock to vote together with the holders of common stock, the holders of shares of Series W Preferred Stock also have special rights under the protective provisions in the proposed amended and restated certificate of incorporation. These protective provisions provide that Genius Products will not without first obtaining the approval (by vote or written consent, as provided by law) of the holders of at least a majority of the then outstanding shares of Series W Preferred Stock voting as a separate class:

- take actions in contravention of or engage in activities inconsistent with the rights, duties and obligations of the Company under the LLC Agreement;

- cause the Distributor to take actions in contravention of or engage in activities inconsistent with the rights, duties and obligations of the Distributor under the Distribution Agreement (as amended, modified or supplemented from time to time);

- create or assume any indebtedness or liability, or provide any indirect financial assistance, or assume any mortgage, charge or other encumbrance on any property;

- sell, lease, exchange or dispose of, by any means, property or assets having a value in excess of $100,000;

60

Table of Contents

- enter into or effect any conversion, consolidation or merger;

- take any action to liquidate or dissolve Genius Products;

- enter into, amend or waive any contract with a member of the Distributor or with any party that is not arm's length;

- engage, remove or replace the independent auditors;

- guarantee the liabilities or debts of any person other than a subsidiary of Genius Products;

- declare or make any dividends or distributions, except dividends or distributions payable solely to holders of common stock;

- appoint or remove (i) the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, or any other executive level officer or employee or (ii) any other employee whose base compensation is in excess of $150,000 per year;

- change the size of our board of directors;

- approve the annual or quarterly budget for Genius Products or the Distributor, or vary more than 10% from the amount budgeted for any material line item therein;

- engage in any debt or equity financing, refinancing, recapitalization or other capital raising transaction;

- approve or enter into any contracts, agreements, understandings or arrangements outside the ordinary course or providing for payments by or to Genius Products or any of its subsidiaries of obligations in excess of $100,000 per year;

- commence or settle any litigation;

- license any item of product outside the ordinary course or on terms other than fair market value;

- approve or adopt any material employee compensation plan or arrangement;

- create any subsidiaries other than the Distributor;

- amend our amended and restated certificate of incorporation or bylaws, including in either case by way of consolidation or merger;

- authorize or issue any shares of capital stock or any instrument exercisable or convertible for shares of capital stock, other than issuances of common stock upon exercise or conversion of securities exercisable or convertible for common stock in existence on the date that the amended and restated certificate of incorporation is filed with the Delaware Secretary of State; or

- permit any of our subsidiaries, including, without limitation, the Distributor, to do any of the foregoing.

  Notwithstanding the foregoing, no such approval of holders of Series W Preferred Stock will be required for any action approved by the vote or consent of a committee of the board of directors composed only of At-Large Directors, or the holders of at least a majority of the outstanding shares of common stock, in each case in accordance with the common stock special voting provisions described in Sub-Proposal 2D below.

- *Vote Below Threshold Amount.* At such time as TWC Holders and their permitted transferees collectively beneficially no longer own or have the right to beneficially own, upon conversion, exchange or redemption of Class W Units pursuant to the LLC Agreement, the Threshold Amount, the voting rights of the holders of the Series W Preferred Stock described above will immediately terminate and each share of Series W Preferred Stock shall entitle the holder thereof to the number of votes represented by the number of shares of common stock into which all Class W Units held by TWC Holders and their permitted transferees would be converted, exchanged or redeemed pursuant to the LLC Agreement, divided by the number of shares of Series W Preferred Stock outstanding at the record date for such vote.

61

Table of Contents

- *Vote Required for Certificate of Incorporation or Bylaw Amendment.* Without the approval (by vote or written consent, as provided by law) of the holders of at least a majority of the then outstanding shares of Series W Preferred Stock voting as a separate class, we will not amend, alter or repeal any provision of our certificate of incorporation or bylaws (by merger or otherwise) so as to adversely affect the preferences, rights or powers of the Series W Preferred Stock.

*Dividend Provisions.* The holders of outstanding shares of Series W Preferred Stock will be entitled to receive dividends, when, as and if declared by the board of directors, out of our assets legally available therefor, as may be declared from time to time by our board of directors.

*Liquidation.* In the event of the liquidation, dissolution, winding up or sale or other disposition of all or substantially all of the assets of Genius Products, whether voluntary or involuntary ("Liquidation"), the holders of Series W Preferred Stock will be entitled to receive with respect to each shares of Series W Preferred Stock, after payment of or provision for payment of the debts and other liabilities of Genius Products, cash or any other assets of Genius Products in an amount (or having a fair market value) equal to $0.01 plus all accrued but unpaid dividends up to and including the date of Liquidation (the "Liquidation Preference"). The fair market value of any of our assets and the proportion of cash and other assets distributed by Genius Products to the holders of the Series W Preferred Stock will be reasonably determined in good faith by our board of directors.

*Conversion.* The Series W Preferred Stock will not be convertible into any other class of stock of the Corporation.

*Common Stock Provisions.* Article IV(C) of our proposed amended and restated certificate of incorporation attached hereto as *Appendix E* includes provisions that modify the rights, preferences and powers, and the qualifications, limitations and restrictions, of our common stock to include the right to elect two "At-Large Directors" and certain "Special Voting Provisions," consisting of matters which may only be approved by the At-Large Directors or by the vote of holders of a majority of our outstanding common stock. For a discussion of these common stock provisions see below under "Sub-Proposal 2D" beginning on page 108.

## 2. *The Contribution Agreement*

This section of the Proxy Statement describes selected portions of the Contribution Agreement, as amended.

### *Assets to be Contributed by Genius Products*

At the closing of the Transaction, Genius Products will contribute to the Distributor substantially all of its assets, except for the Excluded Assets described below. Pursuant to an amendment to the Contribution Agreement, the parties have agreed that The Weinstein Company Funding LLC shall be the Distributor.

### *Excluded Assets*

The following assets are excluded from the assets to be contributed by Genius Products in the Transaction:

- corporate seals, certificates of incorporation, minute books, stock transfer records or other records related to the corporate organization of Genius Products;

- certain claims, demands, rights or causes of action, and any cash, assets or other property recovered by Genius Products therefrom;

- any recovery of cash, assets or other property received by Genius Products that represents a return of or on any amounts or obligations previously paid or incurred by Genius Products in connection with the excluded liabilities described below under "Excluded Liabilities";

- benefit plans and contracts of insurance of Genius Products for employee group medical, dental and life insurance plans;

62

Table of Contents

- all insurance policies of Genius Products, to the extent that the parties mutually agree that any such items should not be transferred to the Distributor, and subject to the obligation of the Distributor to reimburse Genius Products for the costs thereof as provided in the Services Agreement described below under "Services Agreement", to the extent that the Distributor receives the benefits of these plans, contracts and policies; and

- all rights of Genius Products under the Contribution Agreement and the other agreements relating to the Transaction.

### Assumed Liabilities

At the closing of the Transaction, the Distributor will assume Genius Products' liabilities:

- to the extent reserved, reflected or accrued on Genius Products' balance sheet as of September 30, 2005 or as of the closing date;

- under the contributed assets that related to periods after the closing;

- arising after September 30, 2005 in the ordinary course of business in connection with activities permitted by the Contribution Agreement, except for liabilities and obligations arising out of legal violations and except for liabilities and obligations arising out of legal proceedings relating to any transactions, events or other circumstances occurring or existing on or prior to the closing; or

- arising under any contract, agreement or commitment which is being assigned to the Distributor under the Contribution Agreement other than liabilities relating to any breach of such contract, agreement or commitment occurring prior to the closing date.

### Excluded Liabilities

Notwithstanding the foregoing, the liabilities to be assumed by the Distributor do not include the following liabilities (collectively, the "Excluded Liabilities"), unless the terms of the Contribution Agreement specifically state that any such liability or obligation will transfer to or be the responsibility of the Distributor:

- all liabilities arising out of the ownership or operation of our business or the ownership, use, possession or condition of the transferred assets prior to the closing, other than (i) those which have been reserved, reflected or accrued on Genius Products' balance sheet as of September 30, 2005, (ii) those arising after September 30, 2005 in the ordinary course of business in connection with activities permitted by the Contribution Agreement, except for liabilities and obligations arising out of legal violations and except for liabilities and obligations arising out of legal proceedings relating to any transactions, events or other circumstances occurring or existing on or prior to the closing, and (iii) those arising under any contract, agreement or commitment which is being assigned to the Distributor under the Contribution Agreement other than liabilities relating to any breach of such contract, agreement or commitment occurring prior to the closing;

- all liabilities arising out of any violation or alleged violation by Genius Products of any legal requirement prior to, on or following the closing of the Transaction, whether or not reserved, reflected or accrued on Genius Products' balance sheet as of September 30, 2005, except for (i) such liabilities and obligations arising out of any violation or alleged violation by the Distributor or any of its subsidiaries on or following the closing, or (B) such liabilities and obligations of the Distributor or any of its subsidiaries arising out of the Transaction agreements or any of the transactions contemplated thereby;

- all liabilities arising out of any legal action or legal proceeding commenced against Genius Products or any subsidiary on or prior to the closing of the Transaction, and any legal action or legal proceeding commenced against Genius Products or any subsidiary following the closing of the Transaction to the extent relating to any transactions, events or other circumstances of Genius Products or any subsidiary occurring or existing on or prior to the closing, whether or not reserved, reflected or accrued on Genius Products' balance sheet as of September 30, 2005;

63

Table of Contents

- all liabilities and obligations of Genius Products or any subsidiary arising out of the excluded assets described above, other than prospective liabilities arising after the closing of the Transaction under Genius Products' employee benefit plans;

- with respect to contracts assignable to the Distributor as transferred assets but that are not assigned as of the Closing because of (i) a failure to receive any necessary consent, approval or waiver of a third party, (ii) because that assignment would violate the rights of any third party in such transferred asset, which violation would adversely affect the expected benefits or increase the expected costs or liabilities to the Distributor under the transferred asset, or (iii) otherwise affect adversely the rights of the Distributor in the Transferred Asset (together, the "Unassigned Contracts"), all amounts by which the aggregate value of the benefit that would otherwise be received by the Distributor under the Unassigned Contracts or any portion thereof, to the extent such amounts exceed the benefits received by the Distributor under alternate arrangements, exceeds $500,000, such aggregate value to be calculated based on the discounted future revenues reasonably expected to be received under such unassigned contracts as of the closing date;

- all liabilities and obligations under or arising in connection with our December 2005 private placement financing, including, without limitation, any liabilities, obligations, damages or interest relating to our failure to file or keep effective a registration statement with respect to, or to otherwise effect the registration of, registrable securities pursuant to any registration rights agreement, warrant or other agreement entered into in connection with the financing;

- the registration rights agreement described below under "Additional Agreements Related to the Transaction—Registration Rights Agreement"; and

- burdens, obligations or liabilities (i) of Genius Products or any subsidiary for taxes imposed with respect to all periods prior to the closing, and (ii) of Genius Products for taxes for all periods after the closing, other than taxes, if any, for which the Distributor is obligated to reimburse Genius Products pursuant to the Services Agreement described below under "Additional Agreements Related to the Transaction—Services Agreement".

### *Consideration*

We will receive Class G Units in the Distributor in exchange for the contribution of substantially all of our assets to the Distributor. The Class G Units that we receive will represent a 30% equity interest in the Distributor as of the closing of the Transaction. The Class G Units are described below in the section entitled, "The LLC Agreement—Classes of Units".

### *Closing Date*

The closing date will be determined by the parties, following satisfaction or waiver of the closing conditions described below under "Conditions to Closing". The Contribution Agreement may be terminated by either Genius Products or TWC if (i) the closing has not occurred on or prior to July 21, 2006 for any reason and (ii) the terminating party is not, on the date of termination, in material breach of any material provision of the Contribution Agreement. The Contribution Agreement may be terminated in additional situations, as described below in the section entitled, "Termination".

### *Assets and Liabilities of the Distributor*

Subject to the terms and conditions of the Contribution Agreement, at the closing (and prior to our contribution of assets to the Distributor), the Distributor is required to ensure that:

- the Distributor will hold no assets other than the home video distribution rights with respect to certain entertainment properties of TWC evidenced by the Distribution Agreement;

64

Table of Contents

- the Distributor will have or be subject to no liabilities other than arising under the Distribution Agreement or the Contribution Agreement, provided that to the extent assets or liabilities cannot be transferred, the Distributor may enter into alternate arrangements.

### Creation of New Distributor

At TWC's election prior to the closing, TWC may cause Genius Products to make the contributions described above to a newly formed Delaware limited liability company ("New Distributor"), TWC will contribute or cause to be contributed to the New Distributor the Distribution Agreement and the ownership of New Distributor will be as provided above with the contributor of the Distribution Agreement receiving the Class W Units described above, and such changes will be made to the Contribution Agreement as the context requires, and the parties will cooperate to take such actions as are necessary to implement those changes.

### Representations and Warranties

The Contribution Agreement contains representations and warranties by Genius Products relating to:

- our corporate organization and related matters;

- our capital structure;

- the authorization, execution, delivery, performance and enforceability of the Contribution Agreement and the other documents relating to the Transaction to which we are a party, and related matters;

- our reports and financial statements filed with the Securities and Exchange Commission;

- the absence of any undisclosed liabilities;

- the absence of undisclosed adverse changes in our business since September 30, 2005;

- the obtaining of the required governmental approvals and consents;

- the absence of conflicts, violations or breaches of law or agreements resulting from the execution, delivery and performance by us of the Contribution Agreement and the other documents relating to the Transaction to which we are a party;

- litigation involving us;

- our compliance with applicable law and regulations;

- our tax returns and other tax matters;

- our trademarks and intellectual property rights;

- our material contracts;

- finders' and brokers' fees payable by us in connection with the Transaction;

- our contracts relating to the licensing, distribution or exhibition of audio, video and/or audiovisual works in our product library;

- the contents of our product library and our related rights;

- our insurance policies, coverage and claims;

- our employee benefit plans and other employment matters;

- labor matters affecting us;

- title to our properties and other assets;

- the opinion of our financial advisor, Jefferies;

65

Table of Contents

- the absence of restrictions on our business activities;

- environmental matters affecting us, as well as our compliance with applicable environmental laws;

- our compliance with the Sarbanes-Oxley Act and related requirements;

- our compliance with listing requirements applicable to our common stock;

- the application to the Transaction of takeover protections;

- the accuracy of our disclosure to TWC;

- our receipt of binding commitments for equity and debt financing;

- affiliate contracts and affiliated transactions; and

- our compliance with the Foreign Corrupt Practices Act.

The Contribution Agreement also contains representations and warranties by TWC relating to:

- TWC's organization as a limited liability company and related matters;

- the authorization, execution, delivery, performance and enforceability of the Contribution Agreement and the other documents relating to the Transaction to which TWC is a party, and related matters;

- the obtaining of the required governmental approvals and consents;

- the absence of conflicts, violations or breaches of law or agreements resulting from the execution, delivery and performance by TWC of the Contribution Agreement and the other documents relating to the Transaction to which TWC is a party;

- litigation involving TWC;

- TWC's compliance with applicable law and regulations;

- finders' and brokers' fees payable by TWC in connection with the Transaction;

- the Distributor's organization as a limited liability company and related matters; and

- the accuracy of TWC's disclosure to us.

### Pre-Closing Covenants

During the period from the date of the Contribution Agreement until the closing of the Transaction, TWC has agreed not to:

- engage in any action or enter into any transaction or permit any action to be taken or transaction to be entered into that could reasonably be expected to materially adversely affect TWC's ability to deliver products covered by the Distribution Agreement or otherwise perform its material obligations under the Distribution Agreement;

- fail to comply in all material respects with applicable legal requirements where the failure to so comply could be reasonably expected to have, individually or in the aggregate, a material adverse effect on TWC;

- engage in any action or enter into any transaction or permit any action to be taken or transaction to be entered into that could reasonably be expected to delay the consummation of, or otherwise adversely affect any of the transactions contemplated under the Contribution Agreement;

- take any action that would, or could reasonably be expected to, result in any representations and warranties of TWC set forth in the Contribution Agreement to be untrue or any condition to the Transaction not to be satisfied; or

- announce an intention, enter into any formal or information agreement or arrangement, or otherwise make a commitment to do any of the foregoing.

66

Table of Contents

During the period from the date of the Contribution Agreement until the closing of the Transaction, unless TWC otherwise agrees in writing and except as specifically permitted, contemplated or required by the Contribution Agreement or other transaction documents, and except for those actions reasonably taken in furtherance of the Contribution Agreement or other transaction documents, we have agreed to conduct our business in the ordinary course consistent with past practice and not to:

- amend or otherwise change our certificate of incorporation or bylaws;

- with limited exceptions, issue, sell, pledge, dispose of, grant or encumber shares of our capital stock (or rights to acquire shares of our capital stock) or any material assets;

- declare or pay dividends or other distributions;

- reclassify, combine, split, subdivide or redeem or repurchase our capital stock;

- increase the compensation payable or to become payable or the benefits provided to our directors, officers or employees, or grant any severance or termination pay to, or enter into any employment or severance agreement with, any director, officer or other employee, or establish or amend any employee benefit, bonus or other plan or arrangement for the benefit of any director, officer or employee;

- take any action with respect to accounting policies or procedures;

- fail to maintain our books, account and records in the usual, regular and ordinary manner, in accordance with generally accepted accounting principles applied on a consistent basis;

- fail to comply in all material respects with applicable legal requirements where the failure to so comply could be reasonably expected to have, individually or in the aggregate, a material adverse effect on Genius Products;

- engage in any action or enter into any transaction or permit any action to be taken or transaction to be entered into that could reasonably be expected to materially delay the consummation of, or otherwise adversely affect any of the transactions contemplated under the Contribution Agreement, except as required by applicable law or delays to secure any required governmental approvals;

- take any action that would, or could reasonably be expected to, result in any representations and warranties of Genius Products set forth in the Contribution Agreement to be untrue or any condition to the Transaction not to be satisfied;

- take any action that could reasonably be expected to cause our shares of common stock to cease to be quoted on the OTCBB;

- issue any bonds, debentures, notes or other indebtedness, or refinance, replace or amend the terms of any such indebtedness;

- incur or guarantee any indebtedness for borrowed money;

- authorize any single capital expenditure or series of related capital expenditures in excess of $25,000 or capital expenditures which are, in the aggregate, reasonably likely to result in aggregate capital expenditures in excess of $250,000 for the period following the date of the Contribution Agreement and prior to the closing;

- whether or not in the ordinary course of business, make any expenditure of cash or case equivalents or commitment in excess of $75,000 individually or in the aggregate relating to the acquisition of library products, provided that we are required to promptly notify TWC of any expenditure or commitment for the acquisition of library products not exceeding $75,000 individually or in the aggregate;

- make any expenditure or investment of cash or cash equivalents in excess of $5,000 individually or $25,000 in the aggregate which is not otherwise contemplated by the Contribution Agreement and not made in the ordinary course of our business;

- settle or compromise any pending or threatened suit, action or claim, or commence any suit, action or claim involving a cash payment or compromise of a claim in excess of $25,000;

67

Table of Contents

- adopt a plan for complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization;

- with limited exceptions, pay, discharge or satisfy any material claims, liabilities or obligations;

- enter into, amend or otherwise modify a contract relating to various items specified in the Contribution Agreement;

- sell, transfer or license to any person or otherwise extend, amend or modify any intellectual property rights, or acquire such rights;

- except as may be required by law, make any material tax election, make or change any method of accounting with respect to taxes, file any amended tax returns or settle or compromise any material federal, state, local or foreign tax liability;

- sell, lease, license, encumber or otherwise dispose of any properties or assets;

- acquire any business or enter into any joint ventures, strategic partnerships or alliances;

- take any affirmative action, or fail to take any action, as a result of which any of various changes or events specified in the Contribution Agreement would be reasonably likely to occur; or

- announce an intention, enter into any formal or information agreement or arrangement, or otherwise make a commitment to do any of the foregoing.

In addition, we have agreed not to solicit, accept or furnish any information to any person in connection with any transaction proposal that would compete with the Transaction. However, in response to a bona fide unsolicited proposal with respect to a proposal for an alternative transaction, if our board of directors determines, in its good faith judgment, taking into account the advice of its financial advisor and outside counsel, that the proposal is for a transaction that constitutes or could reasonably be expected to constitute a proposal that is more favorable to our stockholders than the Transaction, then we are permitted to furnish information to the person making such alternative proposal and participate in discussions or negotiations with such person.

### Additional Agreements

The Contribution Agreement also provides that:

- We are required to call a stockholders' meeting in accordance with applicable law and our certificate of incorporation and bylaws as promptly as practicable for the purpose of voting upon the approval of the Transaction;

- We are required to use commercially reasonable efforts to take all lawful action necessary or advisable to solicit from our stockholders proxies in favor of the approval of the transactions contemplated by the Contribution Agreement and take all other reasonable action necessary or advisable to secure the requisite vote of stockholders in favor of such approval;

- Our board of directors is required to recommend that our stockholders vote in favor of the approval and adoption of the Contribution Agreement and the Transaction, and such recommendation must be included in this Proxy Statement; and

- TWC may elect prior to the closing to substitute a newly-formed Delaware limited liability company as the Distributor, in place of utilizing The Weinstein Company Holdings LLC or one of its existing affiliates as the Distributor.

### Contingent Dividend Right

The Contribution Agreement provides that, within 30 days following the closing of the Transaction or such later time as is practicable, we will issue to our stockholders of record on the date of the closing (to the extent

68

Table of Contents

practicable) an instrument (the "Contingent Dividend Right") entitling the holder to receive from Genius Products cash payments from time to time after the closing solely based on cash received by Genius Products from the exercise or conversion, after the closing of the Transaction, of options, warrants or other convertible securities that were issued and outstanding as of the closing date.

These cash payments will only be made when, as and if declared by the board of directors of Genius Products pursuant to a vote of a committee of the board consisting only of At-Large Directors (as such term is defined above under "Series W Preferred Stock To Be Issued To TWC—Voting"), but we will have no obligation to make or declare such payments. Furthermore, the issuance of Contingent Dividend Rights will be subject to any requirement that we may have to first register or qualify their issuance with the SEC and any state "blue-sky" securities authorities as applicable.

As of February 3, 2006, we had outstanding options, warrants and convertible securities to acquire a maximum of 32,993,175 shares with a gross exercise price of $62,226,596. However, the foregoing estimate of gross exercise price assumes that all outstanding instruments are exercised for cash, even though some instruments have "cashless exercise" features, so the actual gross exercise price will likely be less. Also we expect that our company will need to retain a portion of the gross exercise price received upon exercise of these instruments to pay for expenses not reimbursed by the Distributor pursuant to the Services Agreement. As a result, we cannot provide a reliable estimate of the future value or cash proceeds likely to be paid to holders of the Contingent Dividend Rights. We expect that the Contingent Dividend Rights will be registered under the Securities Exchange Act and may trade sporadically on the over the counter market. We do not intend to apply for listing of the Contingent Dividend Rights on any stock exchange or Nasdaq. There is no guarantee that a liquid market will develop for trading in the Contingent Dividend Rights.

### Conditions to Closing

Our obligations to consummate the Transaction are subject to the satisfaction, on or prior to the closing, of each of the following conditions, among others, any of which we may waive:

- The continued accuracy of all of TWC's representations and warranties in the Contribution Agreement;

- TWC's performance in all material respects of all covenants and obligations in the Contribution Agreement required to be performed by TWC on or prior to the closing date;

- No legal proceeding that, if determined adversely, could reasonably be expected to have a material adverse effect on TWC, will be pending against TWC, except as disclosed to us in writing prior to the date of the Contribution Agreement;

- Since the date of the Contribution Agreement, there shall not have occurred any events or changes (other than those contemplated under the Contribution Agreement) which (i) have had or could reasonably be expected to, individually or in the aggregate, have a material adverse effect on TWC, (ii) have materially adversely affected TWC's ability to produce or acquire motion pictures or perform any of its obligations under the Contribution Agreement or the Distribution Agreement, or (iii) have materially adversely affected TWC's film release schedule;

- TWC shall have executed and delivered the Distribution Agreement, and there shall have occurred no events or changes which have had or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on TWC's ability to deliver products under the Distribution Agreement or otherwise perform its material obligations under the Distribution Agreement;

- TWC shall have executed and delivered the LLC Agreement, which shall be the limited liability company agreement of the Distributor immediately following the closing; and

- The Distributor shall have executed and delivered the Services Agreement described below under "Additional Agreements Related to the Transaction".

69

Table of Contents

TWC's obligations to consummate the Transaction are subject to the satisfaction, on or prior to the closing, of each of the following conditions, among others, any of which we may waived:

- The continued accuracy of all of our representations and warranties in the Contribution Agreement;

- Our performance in all material respects of all covenants and obligations in the Contribution Agreement required to be performed by us on or prior to the closing date;

- No material legal proceeding, and no legal proceeding initiated by a stockholder of Genius Products relating to the complainant's rights as a stockholder of Genius Products, shall be pending against us, except as disclosed in any of our reports filed with the SEC during calendar year 2005 and prior to the date of the Contribution Agreement;

- Since the date of the Contribution Agreement, there shall not have occurred any events or changes (other than those contemplated under the Contribution Agreement or any of the other transaction agreements) which have had or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on us;

- We shall have issued 100 shares of Class W Preferred Stock to or as directed by TWC or an affiliate of TWC, as described above under "Series W Preferred Stock To Be Issued To TWC";

- We shall have executed and delivered the Registration Right Agreement described below under "Additional Agreements Related to the Transaction";

- We shall have executed and delivered the LLC Agreement, which shall be the limited liability company agreement of the Distributor immediately following the closing;

- The employment agreements of Trevor Drinkwater, Rodney Satterwhite, Michael Radiloff and certain other individuals agreed to by Genius Products and TWC, or the amendments thereto, shall be in full force and effect;

- The opinion of Jefferies & Company, Inc. shall not have been modified or withdrawn;

- The holders of a majority of our outstanding common stock shall have approved the Transaction and related matters;

- The amended and restated certificate of incorporation attached hereto as *Appendix E* shall have been duly filed with the Delaware Secretary of State;

- Our board of directors shall comprise seven members, five of whom shall have been designated by TWC or an affiliate of TWC in accordance with the amended and restated certificate of incorporation;

- Genius Products shall have received and have available to it not less than $25 million in cash from new equity financing, with the proceeds available for immediate use by and contributed to the Distributor, on terms and conditions not less favorable to Genius Products or the Distributor in any respect from those contained in the financing commitments previously delivered to TWC. In order to be able to satisfy this closing condition, on December 6, 2005, we completed a $32 million private placement financing in which we issued 16,000,000 shares of our common stock and five-year warrants to purchase 4,800,000 shares of common stock with an exercise price of $2.40 per share TWC has agreed to waive this condition provided that we have available cash of $12 million at closing. Our cash position was $18.6 million at March 31, 2006 and $45.6 million at May 31, 2006;

- Genius Products shall have received a binding director's and officer's liability policy of insurance on terms and conditions, and with applicable coverages and exclusions, in such amounts as have been previously agreed by Genius Products and TWC;

- All Excluded Liabilities of any of our subsidiaries shall have been transferred to, and assumed by, Genius Products, in a manner contemplated by the Contribution Agreement or the transaction agreements; and

- All consents, waivers or approvals required to be obtained in connection with the consummation of the transactions contemplated by the Contribution Agreement shall have been obtained, except where the failure to receive such consents, waivers or approvals would not have a material adverse effect on Genius Products or TWC.

70

Table of Contents

Each party's obligations to consummate the Transaction are subject to the satisfaction, on or prior to the closing, of each of the following conditions, among others, any of which we may waived:

- The Contribution Agreement and the transactions contemplated thereby, including the amended and restated certificate of incorporation in the form of *Appendix E* attached hereto, shall have been approved by the requisite vote of our stockholders;

- All waiting periods (and any extensions thereof) applicable to the Transaction under federal antitrust laws shall have expired or been terminated. This condition was satisfied on March 6, 2006 when we received notification from the FTC that the U.S. Department of Justice and the FTC have granted early termination of the waiting period under the HSR Act with respect to the Transaction;

- All consents, waivers or approvals required to be obtained in connection with the consummation of the transactions contemplated by the Contribution Agreement shall have been obtained, except where the failure to receive such consents, waivers or approvals would not have a material adverse effect on Genius Products or TWC; and

- There shall not be in effect any order issued by any governmental authority preventing the consummation of the transactions contemplated by the Contribution Agreement, nor shall any legal proceeding be pending that seeks any of the foregoing. There shall not be any legal requirement prohibiting the parties from consummating the transactions contemplated by the Contribution Agreement.

*Termination*

At any time prior to the closing, the Contribution Agreement may be terminated by the mutual written consent of Genius Products and TWC, or by Genius Products or TWC by delivery of written notice to the other explaining the reason for such termination (without prejudice to other remedies which may be available to the parties under this Agreement, at law or in equity):

- by either Genius Products or TWC if (i) the non-terminating party is in material breach of any material covenant contained in the Contribution Agreement and such breach shall not have been cured within fifteen (15) days of receipt by such party of written notice from the terminating party of such breach and (ii) the terminating party is not, on the date of termination, in material breach of any material covenant contained in the Contribution Agreement;

- by either Genius Products or TWC if (i) the closing has not occurred on or prior to July 21, 2006 for any reason and (ii) the terminating party is not, on the date of termination, in material breach of any material provision of the Contribution Agreement;

- by either Genius Products or TWC if, at our stockholders' meeting (or any adjournment or postponement thereof), the requisite vote of our stockholders do not approve the Contribution Agreement and the transactions contemplated hereby, including approving the amended and restated certificate of incorporation in the form attached hereto as *Appendix E*;

- by TWC if (i) our board of directors or a committee withdraws or modifies its approval of the Transaction or approves a competing transaction or letter of intent or other agreement relating to a competing transaction (each such item, an "Adverse Recommendation Change"), (ii) the board of directors of Genius Products or any committee thereof fails to recommend (or reconfirm its recommendation promptly upon request) to our stockholders that they give the required approvals, (iii) tender or exchange offer or other solicitation or proposal that would constitute an alternative competing transaction proposal is commenced on or after the date of the Contribution Agreement and our board of directors or any committee thereof fails to recommend against acceptance of such tender or exchange offer or other solicitation or proposal by our stockholders (including by means of taking no position with respect to the acceptance of such tender or exchange offer by our stockholders) within ten business days from the commencement thereof or (iv) our board of directors or any committee thereof resolves to take any of the foregoing actions;

- by TWC if Genius Products gives TWC a Termination Notice, as contemplated below;

71

Table of Contents

- by Genius Products if the board of TWC or its affiliates, or any committee thereof, whether or not permitted pursuant to the terms hereof, revokes, amends, modifies, withdraws or otherwise changes its approval or recommendation of advisability of the Contribution Agreement or the transactions contemplated hereby or resolves to take any such actions;

- by Genius Products if (i) our board of directors has received a superior proposal; (ii) in light of such superior proposal our board of directors shall have determined in good faith, after consultation with outside counsel, that it is necessary for our board of directors to withdraw or modify its approval or recommendation of the Contribution Agreement or transactions contemplated hereby in order to comply with its fiduciary duty to our stockholders under applicable legal requirements (any such determination, a "Superior Proposal Determination"); (iii) Genius Products has notified TWC in writing that it has made a Superior Proposal Determination (a "Termination Notice") and shall have provided to TWC in writing the final terms and conditions of, such Superior Genius Proposal; (iv) Genius Products is in compliance with the exclusive dealing requirements described above; (v) Genius Products has previously paid or concurrently pays the fees and expenses due as described below; and (vi) our board of directors concurrently approves, and Genius concurrently or promptly thereafter enters into, a definitive agreement providing for the implementation of such Superior Genius Proposal, provided that it has complied with all of the foregoing provisions, including the notice provision; or

- by TWC if (i) Genius Products announces its intention to disclose publicly any confidential, proprietary or other non-public information of, regarding or affecting TWC or any of its affiliates or any of their respective officers, directors, members or managers or (ii) any of such information is required to be disclosed pursuant to any legal requirement, which disclosure described in (i) or (ii), or the effects thereof, will be or could reasonably be likely to be, in the reasonable judgment of TWC, materially adverse to TWC or any of its affiliates or any of their respective officers, directors, members or managers.

### Termination Fees

Genius Products is required to pay to TWC or its designee a fee in the amount of $4,000,000 (the "Genius Termination Fee") which shall be inclusive of reasonable and customary out-of-pocket costs and expenses (including, without limitation, costs or expenses of lenders, legal counsel, investment bankers, consultants, accountants and other advisors) paid or incurred in connection with consummating the transactions contemplated by this Agreement ("TWC Expenses"), if:

- Genius Products terminates the Contribution Agreement based in our board's receipt of a superior proposal, as described above, or TWC terminates the Contribution Agreement based in our board's receipt of a superior proposal;

- TWC terminates the Contribution Agreement because of our uncured material breach (so long as the breach or failure to perform giving rise to such right of termination was a willful and knowing breach or failure to perform);

- TWC terminates the Contribution Agreement under the circumstance in which (i) our board of directors or a committee withdraws or modifies its approval of the Transaction or approves a competing transaction or letter of intent or other agreement relating to a competing transaction (each such item, an "Adverse Recommendation Change"), (ii) the board of directors of Genius Products or any committee thereof fails to recommend (or reconfirm its recommendation promptly upon request) to our stockholders that they give the required approvals, (iii) a tender or exchange offer or other solicitation or proposal that would constitute an alternative competing transaction proposal is commenced on or after the date of the Contribution Agreement and our board of directors or any committee thereof fails to recommend against acceptance of such tender or exchange offer or other solicitation or proposal by our stockholders (including by means of taking no position with respect to the acceptance of such tender or exchange offer by our stockholders) within ten business days from the commencement thereof or (iv) our board of directors or any committee thereof resolves to take any of the foregoing actions; or

72

Table of Contents

- Genius Products or TWC terminates the Contribution Agreement because the closing has not occurred on or prior to July 21, 2006, but only if (A) a competing transaction proposal shall have been publicly disclosed or disclosed to Genius prior to July 21, 2006 and (B) within 12 months after such termination Genius Products (or any of our subsidiaries) enters into a definitive agreement with respect to a superior proposal with the person or group (or any affiliate of such person or any member of such group) that made the competing transaction proposal referred to in clause (A) above, or consummates a transaction that constitutes a superior proposal with such person or group (or any affiliate of such person or any member of such group).

Genius Products will pay to TWC or its designee an amount necessary to reimburse TWC for its TWC Expenses, not to exceed $750,000, if Genius Products or TWC terminates the Contribution Agreement because (i) our stockholders do not approve the Transaction and our proposed amended and restated certificate of incorporation, or (ii) we announce our intention to disclose confidential information or such information is required to be disclosed, as described above.

Genius Products will pay to TWC or its designee the Genius Termination Fee less the amount of TWC Expenses paid as described above if Genius Products or TWC terminates the Contribution Agreement because our stockholders do not approve the Transaction and our proposed amended and restated certificate of incorporation, but only if (A) a competing transaction proposal shall have been publicly disclosed prior to the meeting of our stockholders to approve the Transaction, and (B) within 12 months after such termination Genius Products (or any of our subsidiaries) enters into a definitive agreement with respect to, or consummates, a competing transaction proposal.

### *Survival of Covenants, Representations and Warranties*

The covenants and agreements contained in the Contribution Agreement will survive until satisfied unless the Contribution Agreement explicitly provides for a specific termination date. All representations and warranties of the parties to the Contribution Agreement or any other agreement relating to the Transaction will survive the closing and terminate on the 18 month anniversary of the closing date (the "Survival Date"); *provided*, *that*:

- certain representations and warranties of the parties will survive until 90 days after all applicable statutes of limitations, including waivers and extensions, have expired, including representations and warranties relating to organization and qualification, subsidiaries, authority, capitalization, tax matters, the Foreign Corrupt Practices Act and no prior activities; and

- any claim for indemnification based upon a breach of any such representation or warranty and asserted prior to the Survival Date by written notice will survive until final resolution of such claim.

If an indemnification claim or claims are asserted prior to the expiration of the representation or warranty that is the basis for that claim or claims, then those claims will survive until their final resolution.

### *Indemnification by TWC*

Subject to the limitations described below, TWC is required to indemnify, defend and hold harmless the Distributor, Genius Products and its affiliates and their respective representatives (all such persons being referred to hereinafter as a "Genius Indemnified Person") from and against any and all damages, whether or not involving a third party claim, including attorneys' fees (collectively, "Genius Damages"), arising out of, relating to or resulting from:

- any breach of a representation or warranty of TWC contained in the Contribution Agreement or in any other agreement relating to the Transaction;

- any breach of or failure to perform a covenant of TWC contained in the Contribution Agreement or in any other agreement relating to the Transaction; and

73

Table of Contents

- any "Excluded Distributor Liability" as such term is defined in the Contribution Agreement, which includes certain liabilities of The Weinstein Company Funding LLC which may arise outside of the context of its business as the Distributor. Such indemnification for "Excluded Distributor Liabilities" will be eliminated if TWC elects prior to the closing to substitute a newly formed Delaware limited liability company as the Distributor in place of The Weinstein Company Funding LLC, as discussed above under "—Creation of New Distributor".

### Indemnification by Genius Products

Subject to the limitations described below, Genius Products is required to indemnify, defend and hold harmless the Distributor and TWC and its affiliates and their respective (all such persons being referred to hereinafter as a "TWC Indemnified Person"), from and against any and all damages, whether or not involving a third-party claim, including attorneys' fees (collectively, "TWC Damages"), arising out of, relating to or resulting from

- any breach of a representation or warranty of Genius Products contained in the Contribution Agreement or in any other agreement relating to the Transaction;

- any breach of or failure to perform a covenant of Genius Products contained in the Contribution Agreement or in any other agreement relating to the Transaction; and

- any Excluded Liability, paid, payable or asserted against the Distributor or any TWC Indemnified Person or to which the Distributor or any TWC Indemnified Person may become subject.

### Limitations on Indemnification

Notwithstanding anything herein to the contrary, TWC will not be obligated to indemnify any Genius Indemnified Person to the extent that the aggregate of all Genius Damages exceeds $15,000,000 (the "Indemnification Cap"). However, the Indemnification Cap will not apply to any TWC indemnification obligation arising out of, relating to or resulting from (i) fraud or intentional misrepresentation or breach of warranty by TWC or (ii) an Excluded Distributor Liability.

Genius Products shall not be obligated to indemnify any TWC Indemnified Person to the extent that the aggregate of all TWC Damages exceeds the Indemnification Cap. However, the Indemnification Cap will not apply to any indemnification obligation arising out of, relating to or resulting from (i) fraud or intentional misrepresentation or breach of warranty by Genius, (ii) with respect to breaches of particular representations and warranties specified in the Contribution Agreement or (iii) any Excluded Liabilities.

Genius Products will not be entitled to seek indemnification for Genius Damages unless and until the aggregate amount of all Genius Damages exceeds $200,000 (the "Threshold Amount"), at which point TWC will be liable for all Genius Damages in excess of the Threshold Amount, subject to the other provisions of the Contribution Agreement. However, the Threshold Amount will not apply (i) with respect to breaches of particular representations and warranties specified in the Contribution Agreement, (ii) in cases of fraud or intentional misrepresentation, or (iii) any Excluded Distributor Liability, as described under "—Indemnification by TWC".

The Distributor or TWC will not be entitled to seek indemnification for TWC Damages arising out of breaches of representations and warranties unless and until the aggregate amount of all TWC Damages exceeds the Threshold Amount, at which point Genius Products will be liable for all TWC Damages in excess of the threshold amount, subject to the other provisions of the Contribution Agreement. However, the Threshold Amount will not apply (i) with respect to breaches of particular representations and warranties specified in the Contribution Agreement, (ii) in cases of fraud or intentional misrepresentation and (iii) with respect to any Excluded Liabilities.

74

Table of Contents

If, following the closing of the Transaction, (i) Genius Products conducts a debt or equity financing in order to raise funds to satisfy an indemnification obligation of Genius Products under the Contribution Agreement, then the ratio setting forth the number of shares of our common stock into which Class W Units may be converted or exchanged at any time will be adjusted, as provided in the LLC Agreement or (ii) the Distributor satisfies directly any liability for which it is entitled to indemnification by Genius Products under the Contribution Agreement, then additional Class W Units will be issuable by the LLC Agreement, as provided in the LLC Agreement.

### Expenses

Subject to the termination fee provisions describe above, whether or not the Transaction is consummated, each party is required to pay it own costs and expenses in connection with the Contribution Agreement and the related agreements, including without limitation the fees and expenses of its advisers, accountants and legal counsel. However, the parties will share equally all fees and expenses incurred in connection with any filings under federal antitrust laws. If the closing occurs, all costs and expenses of Genius Products and TWC incurred in connection with the Contribution Agreement and the other related agreements will be paid or reimbursed by the Distributor.

### 3. The LLC Agreement

This section of the Proxy Statement describes selected portions of the LLC Agreement. References below to "members" of the Distributor refer to persons admitted to the Distributor as members in accordance with the Delaware Limited Liability Company Act. The LLC Agreement provides that the initial members of the Distributor will be Genius Products, TWC Holdings and its first-tier subsidiary, W-G Holding Corp..

References below to the "managing member" of the Distributor refer to the member responsible for managing the Distributor. The initial managing member will be Genius Products. TWC Holdings or its designee will become the managing member of the Distributor, instead of Genius Products, if we become insolvent or bankrupt, if we violate the membership interest transfer restrictions in the LLC Agreement or a lender forecloses on a security interest granted with respect to our Class G Units in the Distributor. See below under the section entitled, "Transfer of Interests".

### Purposes of the Distributor

The purpose of the Distributor will be to:

- distribute certain home video products of TWC and perform marketing, promotion and advertising services in connection with that distribution, pursuant to the terms of the Distribution Agreement;

- engage in the business currently conducted by Genius Products; and

- conduct such other lawful acts, businesses or activities as the managing member and the holders of a majority of the outstanding Class W Units may agree in their sole discretion.

The Distributor will have the power to do any and all acts necessary or advisable for the furtherance of its business and activities.

### Term

The term of the Distributor will be perpetual, unless earlier terminated following the occurrence of any event identified in the provisions of the LLC Agreement relating to the dissolution and winding up of the Distributor. Upon such event, the Distributor will be dissolved and its affairs wound up in accordance with such provisions.

75

Table of Contents

### Remuneration to Members

No member will receive any interest, salary, compensation, draw or reimbursement with respect to its capital contributions or its capital account. A member may receive compensation or reimbursement for services rendered or expenses incurred on behalf of the Distributor or otherwise in its capacity as a member, as provided in or contemplated by the LLC Agreement or as may otherwise be authorized by the managing member subject to Class W Prior Approval, as defined below under "Limitations on the Authority of the Managing Member". Genius Products will not be entitled to any compensation for services rendered to the Distributor solely in its capacity as managing member, except for reimbursement for reasonable expenses actually incurred by it on behalf of the Distributor.

### Voting Rights

Except as provided in the LLC Agreement or the certificate of formation, members will have no voting, approval or consent rights with respect to any matter, act, decision or document involving the Distributor or its business.

### Admission of Additional Members

No new or substitute members may be admitted to the Distributor, except in accordance with the approval requirements and transfer restrictions set forth in the LLC Agreement, as described below. Unless so admitted to the Distributor as a member, no person will be, or will be considered, a member. The Distributor may elect to deal only with persons so admitted as members (including their duly authorized representatives).

### Withdrawals or Resignations

No Member may withdraw or resign from the Company except pursuant to the provisions of the LLC Agreement relating to transfers of interests, as described below.

### Members' Meetings; Quorum; Votes

The managing member, any member holding thirty percent (30%) or more of the outstanding units of the Distributor or the holders of a majority of outstanding Class W Units, may call for a meeting of the members from time to time by written notice to the other members; provided, however, that meetings of the members will not otherwise be required. At any members' meeting, the managing member will appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting will prepare minutes of the meeting, which will be placed in the minute books of the Company. The members may act without a meeting if the action to be taken is reduced to writing and approved and signed in advance by members holding units sufficient to authorize or take such action at a meeting of the members. The presence in person or by proxy of members holding a majority of the outstanding units, including members holding a majority of the outstanding Class W Units, will constitute a quorum for any meeting of members. Unless otherwise provided herein or under applicable law, each member will be entitled to cast one vote for each unit it holds. Except as otherwise provided in the LLC Agreement, the affirmative vote of a majority of the outstanding units will be effective to take any action by the members.

### Devotion of Time; Company Opportunities; Other Activities

Genius Products is required to devote all of its time and business efforts to (the "Genius Permitted Activities"):

- promoting the business and interests of the LLC, including serving as the managing member under the LLC Agreement, conducting financing activities in furtherance of the business of the Distributor and performing its obligations under the LLC Agreement and under the Contribution Agreement;

76

**Table of Contents**

- holding the Class G Units and enforcing, fulfilling and managing Genius Products' rights, duties, liabilities and obligations as a member holding Class G Units;

- maintaining the status of Genius Products as a public reporting company with publicly traded securities;

- prosecuting, enforcing, exploiting, defending, settling, fulfilling and managing our rights, duties, liabilities and obligations arising in, under or from any of (i) the Excluded Assets, Excluded Liabilities or Contingent Dividend Rights, as described above under "—The Contribution Agreement," (ii) such other assets, liabilities and agreements that Genius may acquire or become subject to, and (iii) such securities as Genius Products may issue;

- conducting Genius Capital Transactions solely to fund activities of Genius Products that are not provided for or reimbursed by the Distributor, provided that such activities constitute Genius Permitted Activities other than under this paragraph (collectively, "Genius Exclusive Capital Transactions");

- complying with all legal requirements (as such term is defined in the Contribution Agreement) that Genius Products is or may become subject to; and

- doing everything necessary, suitable, convenient or proper for, or in connection with, or incident to, the accomplishment of any of the foregoing activities.

Except for Genius Permitted Activities, Genius Products is not permitted to engage in any other business or conduct any other activities.

TWC Holdings, its affiliates and their respective officers, directors, members, managers, employees, partners and agents (the "TWC Persons"), will devote whatever time, effort and skill as they deem appropriate for the operation of the Distributor. Notwithstanding any duty (contractual, fiduciary or otherwise) existing at law or in equity, the TWC Persons are free to own interests in other businesses and undertakings and to pursue and engage other businesses, investments, activities and opportunities (collectively, "Other Interests"). The Distributor and the managing member are fully aware that the TWC Persons are engaged, and in the future will be engaged, in and conduct Other Interests which are, directly or indirectly, in competition with the Distributor or with each other, including as contemplated below under "Content Acquisition Opportunities".

Other than as expressly set forth in the Distribution Agreement, notwithstanding any duty (contractual, fiduciary or otherwise) existing at law or in equity, neither TWC Holdings nor any TWC Person will have any obligation to offer the Distributor, the managing member or any other member or their respective affiliates any Other Interests or the right to participate therein.

None of the Distributor, the managing member nor their respective affiliates will have any rights in any Other Interests in which TWC Holdings or any TWC Person engages outside of the Distributor by virtue of TWC Holdings' or any TWC Person's relationship to the Distributor or otherwise. Notwithstanding any duty (contractual, fiduciary or otherwise) existing at law or in equity, TWC Holdings and the TWC Persons will not be required to disclose to the Distributor, the managing member or any other member the existence or nature of any such Other Interests. The Distributor, the managing member and each member will waive any conflict of interest related to such Other Interests, and the Distributor, the managing member and each member will agree that it will have no claim under fiduciary duty or any other principles to such Other Interests.

### *Content Acquisition Opportunities*

The Distributor and the managing member agree that it is intended that the Distributor will not engage in Content Acquisition Opportunities (as defined below), other than as described below and as provided in the LLC Agreement. The term "Content Acquisition Opportunity" means the acquisition of any distribution or other rights in any audio, visual and/or audiovisual works of any kind or character, including, without limitation, motion pictures.

77

Table of Contents

If the managing member or the Distributor is presented with a Content Acquisition Opportunity, the Distributor or the managing member, as applicable, will promptly present such Content Acquisition Opportunity to TWC Holdings and TWC Holdings or any of the TWC Persons designated by TWC Holdings will have the right to engage in the Content Acquisition Opportunity as provided herein.

If TWC Holdings or any such TWC Person determines to engage in the Content Acquisition Opportunity, then, notwithstanding any duty (contractual, fiduciary or otherwise) existing at law or in equity, it may do so on whatever terms it deems appropriate without any further obligation to the Company (other than under the Distribution Agreement) or the managing member, and the Distributor and the managing member will be prohibited from engaging in such Content Acquisition Opportunity.

If TWC Holdings notifies the Distributor that it or the designated TWC Persons do not desire to engage in such Content Acquisition Opportunity, or if TWC or the designated TWC Person does not respond within the required time period, then the Distributor (but not the managing member) will be free to engage in such Content Acquisition Opportunity for its own account without any further obligation to TWC Holdings, subject to any applicable required approvals described below under "Limitations on the Authority of the Managing Member".

However, if the terms or elements of the Content Acquisition Opportunity are modified so as to differ from the terms presented to TWC Holdings in any material respect that is more favorable to the Distributor, the Distributor and the managing member will be required to again present the Content Acquisition Opportunity to TWC in accordance with these provisions. Neither TWC Holdings nor any TWC Person will have any obligation to present any Content Acquisition Opportunity to the Distributor or Genius Products.

For the avoidance of doubt, notwithstanding any duty (contractual, fiduciary or otherwise) existing at law or in equity, neither TWC Holdings nor any TWC Person will have any obligation to present any Content Acquisition Opportunity to the Distributor or the managing member.

Notwithstanding the foregoing, Genius Products and the managing member will not be required to offer any Content Acquisition Opportunity that both:

- is consistent with the business currently conducted by Genius Products; and

- requires aggregate fixed payments (*e.g.*, advances, fixed purchase price, etc.) of less than $75,000 for any individual acquisition or series of related acquisitions. However, in no event will all fixed payments related to such qualifying Content Acquisition Opportunities in any year exceed the lesser of (a) $2,000,000 in the aggregate or (b) the amount budgeted for acquisitions as set forth in the Distributor's annual budget.

Notwithstanding the business currently conducted by Genius Products, the Distributor is not permitted to enter into any Content Acquisition Opportunity that is competitive with TWC Holdings' business (*e.g.,* feature films) and is not permitted to enter into any such Content Acquisition Opportunity without specific prior written approval from TWC Holdings and without first presenting such Content Acquisition Opportunity to TWC Holdings as described above.

Any Content Acquisition Opportunity entered into by the Distributor is required to be on customary industry terms (*e.g.*, customary royalties or distribution fees) and the Distributor will not structure any Content Acquisition Opportunity so as to avoid or circumvent its obligation to offer such Content Acquisition Opportunity to TWC Holdings or the TWC Persons or otherwise in a manner that frustrates the intent of the requirements of the LLC Agreement, including but not limited to offering terms that are not consistent with industry standards. By way of example, the Distributor is not permitted to achieve an advance within the $75,000 and $2 million limits set forth above by offering non-standard terms in other areas, such as higher than customary royalties or lower than customary distribution fees.

The provisions described above under this section entitled "Content Acquisition Opportunities" will terminate upon the termination or expiration of the Distribution Agreement (or any successor or replacement agreement with TWC Holdings).

78

**Table of Contents**

### Classes of Units

The total number of Class G Units initially issued to Genius Products will represent 30% of the total units of the Distributor. Additional Class G Units will be granted to such persons, at such times and in such amounts, in accordance with the LLC Agreement and as the managing member may determine with Class W Prior Approval in accordance with the requirements described below under "Limitations on the Authority of the Managing Member".

The total number of Class W Units initially held by TWC Holdings, directly and indirectly through W-G Holding Corp., will represent an aggregate of 70% of the total units of the Distributor. Additional Class W Units will be granted to such persons, at such times and in such amounts, as the managing member may determine with Class W Prior Approval in accordance with the requirements described below under "Limitations on the Authority of the Managing Member".

If the Distributor pays, discharges or otherwise satisfies or assumes any liability or obligation for which it is entitled to indemnification from Genius Products pursuant to the Contribution Agreement, the Distributor will redeem from Genius Products (without any further payment to Genius Products) a number of Class G Units, and issue to the holders of Class W Units (without any further payment by such holders) a number of additional Class W Units, in an amount equal to the following formula:

$$U = (L * P) / V$$

where:

| | | |
|---|---|---|
| U | = | the number of Class G Units to be redeemed from Genius Products and Class W Units to be issued to the holders of Class W Units as described above; |
| L | = | the amount paid, discharged or otherwise satisfied or assumed by the Distributor in satisfaction of such liability or obligation; |
| P | = | the percentage interest of the holders of Class W Units immediately prior to the redemption of Genius Products' Class G Units and the issuance of additional Class W Units as described above; and |
| V | = | the lesser of the volume weighted 30-day trailing average or the market price of Genius Products' common stock as of the date of the Distributor's satisfaction, payment, discharge or assumption of such liability or obligation (whichever occurs first). |

If TWC Holdings or any TWC Person pays, discharges or otherwise satisfies or assumes any liability or obligation for which it is entitled to indemnification from Genius Products pursuant to the Contribution Agreement, the Distributor will redeem from Genius Products (without any further payment to Genius Products) a number of Class G Units, and issue to the holders of Class W Units (without any further payment by such holders) a number of additional Class W Units, in an amount equal to the following formula:

$$U = L / V$$

where:

| | | |
|---|---|---|
| U | = | the number of Class G Units to be redeemed from Genius Products and Class W Units to be issued to the holders of Class W Units as described above; |
| L | = | the amount paid, discharged or otherwise satisfied or assumed by TWC Holdings or any TWC party in satisfaction of such liability or obligation; and |
| V | = | the lesser of the volume weighted 30-day trailing average or the market price of Genius Products' common stock as of the date of TWC Holdings' or any TWC Person's satisfaction, payment discharge or assumption of such liability or obligation (whichever occurs first). |

Examples illustrating how these formulas operate are included in Exhibit 4.1 to the LLC Agreement, a copy of which is attached as *Appendix C*.

Table of Contents

### *Capital Accounts*

A separate capital account will be maintained for each member in accordance with Exhibit D attached to the LLC Agreement. No member will be personally liable for or be required to restore any deficit capital account balance.

### *Initial Contributions by Genius Products*

Concurrently with the execution of the LLC Agreement, Genius will, pursuant to the Contribution Agreement, contribute to the Distributor all of the assets, rights and properties required to be contributed by Genius Products therein, whether tangible or intangible, including its right, title and interest in and to any real property.

### *Additional Capital Contributions*

Genius Products will contribute to the Distributor as an additional capital contribution the net proceeds (including, without limitation, cash, securities, assets or other property) received from any of the following transactions (a "Genius Capital Transaction"):

- any private placement, public offering or other sale or disposition of our common stock, or securities convertible into or exchangeable for our common stock, or upon the exercise, conversion or exchange of a convertible security; or

- the sale of property, incurrence of indebtedness, recapitalization or refinancing, or from any other capital raising transaction.

However, the consideration received by Genius Products after the closing from the exercise of options, warrants or other convertible securities that are issued and outstanding as of the closing date (or any property acquired solely with such consideration) will not be required to be contributed to the Distributor. In addition, if the Genius Capital Transaction is the issuance of indebtedness, such indebtedness will not be contributed as capital but instead should be loaned to the Distributor on terms agreed upon by the members.

Not later than three (3) business days following the consummation of any Genius Capital Transaction, Genius Products is required to transfer the net proceeds to the Distributor. Except to the extent that such Genius Capital Transaction constituted an Indemnification Issuance (as defined below) or a Genius Exclusive Capital Transaction or the payment of the exercise price from the exercise, conversion or exchange of a convertible security outstanding on the closing of the Transaction, following receipt of the net proceeds or assets or other value received from a Genius Capital Transaction, the managing member will promptly cause the Distributor to issue to Genius Products a number of additional Class G Units equal to the number of shares of our common stock actually issued in the Genius Capital Transaction covered by the first bullet point under the above definition.

However, if Genius has issued a convertible security in the Genius Capital Transaction, the Distributor will instead provide Genius Products with the contingent right to be issued a number of additional Class G Units only upon the exercise or conversion of such convertible security and contribute to the Distributor the net proceeds received therefrom (the amount of such Class G Units so issuable equal to the number of shares of our common stock actually issued upon such exercise or conversion)

For purposes of calculating the number of additional Class G Units issuable to Genius Products pursuant to this provision, there will be disregarded any (1) declaration or payment of a dividend on our outstanding common stock in our common stock or distribution to holders of our outstanding common stock in shares of our common stock, (2) split or subdivision of our outstanding common stock or (3) reverse stock split or other combination of our common stock into a smaller number of shares of our common stock, that may have occurred after the closing of the Transaction. For example, if there occurs a 2-for-1 stock split of our common stock after the

80

Table of Contents

closing of the Transaction and Genius Products thereafter issues 100 new shares in a Genius Capital Transaction, the Distributor would only issue 50 Class G Units in connection with the contribution of net proceeds from that Genius Capital Transaction.

For purposes of clarification, in no event will any Class G Units be issued to Genius Products in connection with an Indemnification Issuance or Genius Exclusive Capital Transaction, whether or not Genius Products contributes the proceeds therefrom to the Distributor. The term "Indemnification Issuance" means our issuance of shares of common stock in connection with the satisfaction of an indemnification obligation to the Distributor or any TWC Person pursuant to the Contribution Agreement.

No member will be required to lend any funds to the Distributor or to make any additional contribution of capital to the Distributor, except as otherwise required by applicable law, any binding agreement entered into after the closing of the Transaction or by the provisions described above in this section entitled, "Additional Capital Contributions". Any member or affiliate of a member may, with the consent of the managing member and subject to the provisions of the LLC Agreement and any other senior loan, credit or financing agreement of the Distributor, lend or advance money to the Distributor or a subsidiary, make loans to the Distributor or a subsidiary or guaranty any loans made to the Distributor or a subsidiary by a third party lender or any affiliate of any member that is a commercial lending institution, and any such loan or guaranty by a member or an affiliate of a member will not be considered to be a capital contribution unless otherwise provided in the agreement relating to such loan or guaranty or as otherwise determined by the managing member. It is contemplated that the Distributor may engage in borrowing in connection with the operations of its business, *provided*, *however*, that Genius Products will not be entitled to create any pledge, lien, encumbrance or restriction of any kind upon its rights or interests under the Distribution Agreement without TWC Holdings' prior written consent in its sole discretion.

### *Withdrawal of Capital Contributions*

Except as otherwise provided in or contemplated by the LLC Agreement, no member will demand or receive a return of any capital contributions or otherwise withdraw from the Distributor without the consent of all members. Under circumstances requiring a return of any capital contributions, no member will have the right to receive property other than cash except as may be specifically provided herein.

### *Repurchase of Class W Units*

*Company Repurchase Right.* At any time prior to December 31, 2009, if either:

- TWC terminates the Distribution Agreement in accordance with the terms described below beginning on page 94 under "—The Distribution Agreement" because the "Annual Video Ratio" is less than 60% or the "Semi-Annual Video Ratio" is less than 60% and the Video Ratio or Semi-Annual Video Ratio, as applicable, giving rise to such termination is more than 50%, (as calculated pursuant to the terms of the Distribution Agreement); or

- TWC enters bankruptcy and does not (i) continue to substantially perform its obligations under the Distribution Agreement, or (ii) provide for TWC's obligations being assumed under the Distribution Agreement by or through a successor, affiliate or other person;

then, in either such case, the Distributor may repurchase from TWC Holdings and its first-tier subsidiary, W-G Holding Corp., (proportionally in accordance with their respective percentage interests) a portion of the Class W Units owned by them on the closing of the Transaction as provided below (the "Company Repurchase Right").

The purchase price to be paid to TWC Holdings and its first-tier subsidiary, W-G Holding Corp., for the repurchase of Class W Units upon the exercise of the Company Repurchase Right will be an amount equal to 75% of the cash amount that TWC Holdings and its first-tier subsidiary, W-G Holding Corp., would receive upon a redemption of tendered units as described below under "Redemption of Holder of Class W Units", where the number of tendered units will be deemed to equal the number of Class W Units to be repurchased.

81

**Table of Contents**

The portion of the Class W Units subject to the Company Repurchase Right during any calendar year will be determined as follows:

| Year of Term | Portion of Units Subject to Repurchase |
|---|---|
| 1/1/06 – 12/31/06 | 60% |
| 1/1/07 – 12/31/07 | 30% |
| 1/1/08 – 12/31/08 | 20% |
| 1/1/09 – 12/31/09 | 10% |

*No Company Repurchase Right.* For purposes of clarification, if at any time prior to December 31, 2009, TWC terminates the Distribution Agreement for the reasons described above and at the Annual Video Ratio or Semi-Annual Video Ratio, as applicable, giving rise to such termination is less than 50% (as calculated pursuant to the terms of the Distribution Agreement), then the Distributor will have no Company Repurchase Right to repurchase any portion of the Class W Units then held by TWC Holdings and its first-tier subsidiary, W-G Holding Corp.

*Repurchase Procedure.* The managing member will determine in its discretion whether the Distributor will exercise the Company Repurchase Right by the majority vote of Genius Products' independent board members. Promptly following any termination of the Distribution Agreement giving rise to the Company Repurchase Right, but in any event within fifteen (15) business days thereafter (the "Repurchase Right Expiration Date"), the Distributor will send a written notice (the "Repurchase Notice") to TWC Holdings and its first-tier subsidiary, W-G Holding Corp., setting forth: (i) whether the Distributor is exercising its Company Repurchase Right, (ii) the portion of TWC Holdings and its first-tier subsidiary's, W-G Holding Corp.'s, Class W Units then subject to the Company Repurchase Right that the Distributor wishes to repurchase and (iii) the managing member's calculation of the higher of the volume weighted 30-day trailing average or the market price for the Class W Units that it is offering to repurchase, and its methodology in arriving at such calculation. Following receipt of the Repurchase Notice, TWC Holdings will confirm the managing member's calculation of the higher of the volume weighted 30-day trailing average or the market price to be paid for the Class W Units then being repurchased, and TWC Holdings and the managing member will in good faith agree upon the date of the closing for such repurchase, such closing to occur not later than sixty (60) days after the Repurchase Right Expiration Date.

At the closing of the Distributor's repurchase of TWC Holdings' and its first-tier subsidiary's, W-G Holding Corp.'s, Class W Units, the Distributor will deliver the repurchase price to be paid for the Class W Units being repurchased to or as directed by TWC Holdings in immediately available funds by wire transfer or certified check. The Company Repurchase Right will terminate and be of no further force or effect if the Distributor has not exercised that right on or before the Repurchase Right Expiration Date, and any Class W Units for which the Distributor does not exercise its Company Repurchase Right as indicated in a Repurchase Notice will no longer be subject to a Company Repurchase Right and will be held by TWC Holdings and its first-tier subsidiary, W-G Holding Corp., free and clear of any claims or rights in favor of the Distributor arising under the repurchase provisions described above.

*Disputes Regarding Termination.* Any disputes regarding a termination of the Distributor's rights to distribute covered product under the Distribution Agreement will be resolved pursuant to the terms of the Distribution Agreement and not under the LLC Agreement. Unless grounds exist to exercise the Company Repurchase Right other than termination of the Distribution Agreement (*i.e.,* a repurchase triggered by the circumstance described in the second bullet point above under "Company Repurchase Right"), until the final resolution of any such dispute, the Distributor may not exercise its Company Repurchase Right with respect to any portion of TWC Holdings' and its first-tier subsidiary's, W-G Holding Corp.'s, Class W Units as otherwise provided above, and they will retain full title and ownership of all Class W Units then held by them, free and clear of any liens, claims, encumbrances or rights of set off of any kind, and will be entitled to exercise all of its

82

**Table of Contents**

rights and receive all of the benefits as a holder of all of its Class W Units hereunder (including, without limitation, the right to receive distributions or to decide upon a Class W Prior Approval). The repurchase procedures upon exercise of a Company Repurchase Right (other than the running of the period for the managing member's determination of whether to exercise the Company Repurchase Right that ends on the Repurchase Right Expiration Date) will be stayed until the final resolution of any suit properly filed by the Distributor or TWC in good faith pursuant to the terms of the Distribution Agreement and thereafter actively prosecuted that disputes or seeks declaratory relief regarding TWC Holdings' right to terminate the Distribution Agreement. Notwithstanding any dispute regarding a termination of the Distribution Agreement that may have occurred or be ongoing, the valuation date for the determination of the cash amount payable upon exercise of a Company Repurchase Right will be the date of the event giving rise to the Company Repurchase Right.

### Redemption Rights of Holder of Class W Units

Each holder of Class W Units will have the right (subject to the terms and conditions set forth herein) to require the Distributor to redeem all or a portion of the Class W Units held by such Tendering Party (as defined below) and not subject to a Company Repurchase Right under the provisions described above (such Class W Units being hereafter "Tendered Units") in exchange (a "Redemption") for a number of shares of our common stock calculated as determined below.

Any Redemption will be exercised pursuant to a Notice of Redemption (as defined below) delivered to the Distributor and the managing member by TWC Holdings when TWC Holdings exercises the Redemption right on behalf of itself, as a holder of Class W Units, or on behalf of another holder of Class W Units (such party, the "Tendering Party"). The Tendering Party shall submit such information, certification or affidavit as the managing member may reasonably require in connection with the restrictions and limitations of our certificate of incorporation to any such acquisition.

On the Specified Redemption Date (as defined below) the Tendering Party will transfer such number of the Tendered Units to the Distributor in exchange for a number of shares of our common stock (and rights, if applicable) equal to the Genius Common Stock Amount on the Specified Redemption Date.

As used in the LLC Agreement:

- the term "Notice of Redemption" means any notice given from time to time to the Distributor by a holder of Class W Units that such holder elects to exercise its right (subject to the terms and conditions set forth herein) to require the Distributor to redeem the number of Class W Units held by such holder as specified in such notice. However, no Notice of Redemption may be given prior to the one-year anniversary of the closing of the Transaction.

- the term "Specified Redemption Date" means the later of (i) the tenth business day after the receipt by the managing member of a Notice of Redemption or (ii) in the case the managing member elects (with the Tendering Party's consent as provided below) to conduct an Offering Funding (as defined below), the business day following the date of the closing of the Offering Funding. However, the Specified Redemption Date, as well as the closing of a Redemption, or an acquisition of Tendered Units by the Distributor with cash as described below, on any Specified Redemption Date, may be deferred, in the managing member's sole and absolute discretion, for up to 60 days in the aggregate as may reasonably be required to effect, as applicable, compliance with federal securities laws or other applicable laws.

- the term "Genius Common Stock Amount" means a number of shares of our common stock equal to the product of (i) the number of Tendered Units and (ii) the Adjustment Factor (as defined below). The Genius Common Stock Amount is subject to appropriate adjustment if we issue to holders of our common stock certain rights, options, warrants or convertible or exchangeable securities, or other securities or property.

- the term "Adjustment Factor" means 1.0, subject to appropriate adjustment for dividends, stock splits, reverse stock splits, distributions, Indemnification Issuances, certain stock issuances and other items

83

Table of Contents

specified in the definition contained in the LLC Agreement. For illustrative purposes, examples of adjustments to the Adjustment Factor are set forth on Exhibit C attached to the LLC Agreement. A copy of the LLC Agreement (including Exhibit C attached to the LLC Agreement) is attached to this Proxy Statement as *Appendix C*.

Genius Products unconditionally agrees to deliver to the Distributor such number of shares of our common stock (and rights, if applicable) sufficient to enable the Distributor to meet its obligation under these provisions. The Genius Common Stock Amount will be delivered to the Distributor and issued in the name of the Tendering Party on the Specified Redemption Date. The shares of our common stock issued pursuant to these provisions will bear registration rights under the Registration Rights Agreement described below in the section entitled, "Additional Agreements Related to the Transaction—Registration Rights Agreement".

Notwithstanding anything to the contrary contained above, if a Tendering Party receives shares of our common stock as provided above, and after the receipt of such shares, Genius Products takes actions that would have caused an adjustment to the Adjustment Factor if such actions had occurred prior to the issuance of the shares to the Tendering Party, then the managing member will cause additional shares to be issued to the Tendering Party to the same extent as if the Adjustment Factor had been so adjusted at the time of the original issuance.

Notwithstanding the foregoing, at the request of the Distributor and with the consent of the Tendering Party, which may be withheld in the Tendering Party's sole discretion:

- The Distributor may deliver to the Tendering Party an amount equal to the Cash Amount (as defined below) in lieu of the Genius Common Stock Amount payable on the Specified Redemption Date; or

- the managing member on behalf of the Distributor may elect to raise funds for the payment of the Cash Amount either (i) by contribution by Genius Products of funds from the proceeds of a private placement or registered public offering (each, an "Offering Funding") by Genius Products of a number of shares of our common stock ("Offering Funding Shares") or (ii) from any other sources (including, but not limited to, the sale of any property and the incurrence of additional debt) available to Genius Products or the Distributor.

As used in the LLC Agreement, the term "Cash Amount" means an amount of cash equal to the product of (i) the greater of the volume weighted 30-day trailing average or market price of a share of our common stock and (b) the Genius Common Stock Amount, determined as of the applicable Valuation Date.

Promptly upon the Distributor's receipt of the Notice of Redemption, the managing member will give notice (a "Single Funding Notice") to all holders of Class W Units and having Redemption rights pursuant to the provisions described above and request that TWC Holdings elect whether or not to effect a Redemption of any such holders' Class W Units to be funded through an Offering Funding (if an Offering Funding has been requested by the Distributor) or otherwise.

If TWC Holdings elects to effect such a Redemption on behalf of any such holder of Class W Units (including itself), it will give notice thereof and of the number of Class W Units to be made subject thereto in writing to the managing member within 10 business days after receipt of the Single Funding Notice, and such holder of Class W Units will be treated as a Tendering Party for all purposes of the provisions described above.

A Tendering Party will have no right to receive distributions with respect to any Tendered Units (other than the Cash Amount) paid after delivery of the Notice of Redemption, whether or not the Distributor's record date for such distribution precedes or coincides with such delivery of the Notice of Redemption. However, if the Distributor elects to fund the Cash Amount with the proceeds of an Offering Funding as described above, and TWC Holdings has consented to an Offering Funding, then the Tendering Party's right to receive distributions will not be suspended as provided above and such Tendering Party will have the right to receive distributions actually made hereunder prior to the date of the closing of the Offering Funding whose proceeds are used to pay the Cash Amount.

84

Table of Contents

Notwithstanding anything herein to the contrary, with respect to any Redemption pursuant to the provisions described above in this section entitled, "Redemption Rights of Holder of Class W Units":

- To the extent Genius Products provides shares of our common stock or funding to pay the Cash Amount, each Class W Unit acquired by the Distributor as described above will be transferred to Genius Products and be converted into and deemed to be a Class G Unit.

- No Tendering Party may effect a Redemption for less than 500 Class W Units or, if such Tendering Party holds (as a member or, economically, as an assignee) less than 500 Class W Units, all of the Class W Units held by such Tendering Party.

- The consummation of such Redemption will be subject to the expiration or termination of the applicable waiting period, if any, under federal antitrust laws.

- The Tendering Party will continue to own all Class W Units subject to any Redemption, and be treated as a member or an assignee, as applicable, with respect to such Class W Units for all purposes of the LLC Agreement, until such Class W Units are either paid for by the Distributor or transferred to the managing member and paid for, by the issuance of shares of our common stock, on the Specified Redemption Date, except to the extent that the Tendering Party otherwise obtains indicia of ownership of our common stock.

### Redemptions

Except with respect to the Class W Units as provided above, without the Class W Prior Approval, the Distributor is prohibited from acquiring, by purchase, redemption or otherwise, any units of any class or type of any member or holder without offering to purchase, on the same terms and conditions, a proportionate share of the units of such class or type of all other applicable members or holders.

### Management through the Managing Member

The management of the Distributor is vested in the managing member (which will initially be Genius Products), which has the power and authority to manage and direct the business and affairs of the Distributor under the terms and conditions of the LLC Agreement. Except as otherwise expressly provided in the LLC Agreement, the members will not participate in the control of the Distributor and will have no right, power or authority to act for or on behalf of or otherwise bind, the Distributor. Except as expressly provided in the LLC Agreement or required by any non-waiveable provisions of applicable law, members will have no right to vote on or consent to any other matter, act, decision or document involving the Distributor or its business. The managing member will be deemed to owe the same fiduciary duties to the members that directors of Delaware corporations owe to that corporation's stockholders under Delaware law.

### Limitations on the Authority of the Managing Member

The managing member's authority to run the business and affairs of the Distributor is subject only to the limitations described in this section. For so long as TWC Holdings and its first-tier subsidiary, W-G Holding Corp., and their transferees beneficially own units comprising at least 20% of the outstanding units of the Distributor, the managing member is not permitted to take any actions on behalf of the Distributor (directly or through a subsidiary) without the prior approval of TWC Holdings with respect to any of the following matters (a "Class W Prior Approval"):

- taking or purporting to take actions in contravention of or engaging in activities inconsistent with the LLC Agreement or the Distribution Agreement;

- creating or assuming any indebtedness or liability, or providing any indirect financial assistance, or assuming any mortgage, charge or other encumbrance on any property of the Distributor;

- selling, leasing, exchanging or disposing of, by any means, property or assets of the Distributor having a value in excess of $100,000;

Table of Contents

- entering into or effecting any conversion, consolidation or merger involving the Distributor;

- to the fullest extent permitted by law, taking any action to liquidate or dissolve the Distributor;

- entering into, amending or waiving any contract with a member or with any party that is not at arm's length, including amending any provision of, or making any election under, the Services Agreement described below;

- engaging, removing or replacing the Distributor's independent auditors;

- guaranteeing the liabilities or debts of any other person than a subsidiary of the Distributor;

- requiring any guarantee from any member;

- declaring or making any distribution, including any distribution in-kind of securities or other non-cash assets;

- issuing or granting any Class G Units, Class W Units or any other units, membership interests or economic interests in the Distributor (other than as provided in the LLC Agreement);

- utilizing subdistributors, or licensees, or outsourcing any functions relating to the Distributor's performance under the Distribution Agreement;

- appointing or removing (A) the Distributor's Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, or any other executive level officer or employee and (B) any other employee whose compensation is in excess of $150,000 per year;

- approving the annual or quarterly budget for the Distributor, or varying more than 10% from the amount budgeted for any particular line item therein;

- engaging in any debt or equity financing, refinancing, recapitalization or other capital raising transaction;

- approving or entering into any contracts, agreements, understandings or arrangements outside the ordinary course or providing for payments by or to the Distributor or obligations in excess of $100,000 per year;

- commencing or settling any litigation;

- licensing any item of product outside the ordinary course or on terms other than fair market value;

- approving or adopting any material employee compensation plan or arrangement; and

- creating any subsidiary or taking any of the actions described above with respect to any subsidiary.

In addition, the Distributor generally must follow tax positions on its tax returns advocated by TWC Holdings.

### Officers

The day-to-day management of the Distributor will be vested in the officers of the Distributor under the supervision of the managing member. The initial president and chief executive officer of the Distributor will be Trevor Drinkwater, subject to the terms of any employment agreement between the Distributor and Mr. Drinkwater in effect as of the closing of the Transaction.

### Right of First Negotiation for Genius Products Financings

Notwithstanding anything to the contrary herein, if Genius Products decides to raise additional capital, whether by conducting a private placement, public offering or other sale or disposition of equity or debt securities, from any other incurrence of additional indebtedness or from the sale of any property, Genius Products is required first to deliver a written notice thereof to TWC Holdings. The notice must set forth in reasonable

86

Table of Contents

detail all material terms and conditions of the proposed capital raising transaction. TWC Holdings will then have the option of negotiating with Genius to acquire the securities or property to be issued or sold in such capital raising transaction. If TWC Holdings elects to negotiate with Genius Products, Genius Products and TWC Holdings will negotiate in good faith to reach an agreement for the sale of the proposed properties or securities to TWC Holdings for a 60 day period following notification. If, by the last day of the sixty (60) day period, Genius Products and TWC Holdings have not reached an agreement or a non-binding term sheet or letter of intent for the sale of Genius Products' properties or securities to TWC Holdings, Genius Products will be free to conduct such capital raising transaction with such other parties as it desires on the same terms and conditions in all material respects that were presented to TWC Holdings, provided, that Genius Products is required to re-offer any transaction or financing to TWC Holdings as provided above if the terms at which such financing or transaction are proposed to be accomplished are materially less favorable to Genius Products in any respect than the terms of the transaction or financing initially presented to TWC Holdings.

### Distributions

Subject to tax distributions described below, available cash will be distributed to the members and applicable holders pro rata to each holder of units in accordance with its respective percentage interest, at such times as the managing member determines in its sole discretion, subject to Class W Prior Approval in accordance with the provisions described above under, "Limitations on the Authority of the Managing Member".

### Tax Distributions

During each fiscal year or within 45 days after the end thereof, the Distributor is required to make distributions to each member from available cash pro rata in accordance with their respective percentage interests in an aggregate amount equal to the minimum amount which, if distributed to the members in accordance with their respective percentage interests, would provide each member with an amount at least equal to (A) the product of (i) the sum of the amount of net capital gain and the net amount of all items taxable at ordinary income rates (or deductible from ordinary income) allocable to such member on such member's Schedule K-1 to the Distributor's Form 1065 for such fiscal year, and (ii) the highest combined effective federal, state and local tax rate applicable to an individual resident in New York City, over (B) the aggregate amount of distributions received by such member during such fiscal year.

If, as a result of an audit adjustment, amended return, or other cause that affects amount of income, gain, loss or deduction previously reported or that should have been reported on a member's or former member's Schedule K-1 to the Distributor's Form 1065 with respect to a prior fiscal year, additional taxes, interest or penalties (collectively, "Back Taxes") are imposed on such member or former member with respect to such prior fiscal year, the annual target tax distributions of each member for such prior fiscal year will be recalculated by including such member's back taxes and each member or former member will receive a distribution equal to the additional tax distribution it would have received for such prior fiscal year based on the recalculated annual target distributions.

### Allocations of Net Income and Net Losses

All allocations of net income, net losses and any other items of income, gain, loss, deductions and credit of the Distributor are to be made in accordance with the provisions of Exhibit D attached to the LLC Agreement. Exhibit D provides generally that, except as otherwise provided in the LLC Agreement, the net income or net losses of the Distributor for each fiscal year or other period for which allocations are made hereunder, and, if appropriate, items thereof, will be allocated among the members as required so that the closing balance in each member's adjusted capital account as of the end of such fiscal year (or shorter period for which allocations are being made hereunder), is, as nearly as possible, equal to the amount that would be distributed to such member if the Distributor were dissolved, its affairs wound up and its assets sold for cash in an amount equal to their respective gross asset values, all of the Distributor's liabilities were satisfied (limited with respect to each

87

Table of Contents

nonrecourse liability to the fair market value of the asset securing such liability), and the net assets of the Distributor were distributed to the members in the order of priority described below in the section entitled, "Payment of Liabilities and Liquidating Distributions Upon Dissolution".

### Distributions in Kind

The Distributor may, in the sole discretion of the managing member and subject to TWC Holdings' rights described above in the section entitled, "Limitations on the Authority of the Managing Member", make distributions of securities or other non-cash assets.

### Liability for Amounts Distributed

The members agree that, except as otherwise expressly provided herein or required by applicable law, no member will have an obligation to return money or other property paid or distributed to such member, whether or not such distribution was in violation of the Delaware Limited Liability Company Act. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of the LLC Agreement, any member is obligated to make any such return, such obligation will be the obligation of such member and not of any other person.

### Performance of Duties; Liability of Members

Except as provided in the LLC Agreement, the members will not be liable to the Distributor or to any other member or any other person bound by the LLC Agreement for any loss or damage sustained by the Distributor or a member, unless the loss or damage shall have been the result of actually proven fraud, deceit, gross negligence, reckless or intentional misconduct or a knowing violation of law by such member. The managing member is required to perform its managerial duties in good faith, in a manner that it reasonably believes to be in the best interests of the Distributor and its members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

### Exculpation and Indemnification

To the fullest extent permitted by applicable law, the Distributor is required to defend, indemnify, protect and hold harmless any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that such person:

- is or was a member, managing member, officer, director, employee, consultant or other agent or affiliate of the Distributor or that, being or having been such a member, managing member, officer, employee or agent or affiliate of such parties, such person is or was serving at the request of the Distributor as a manager, director, officer, employee, consultant or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise; or

- is or was an officer, director, member, employee, consultant or other agent or affiliate of a member, managing member or any of their respective affiliates (all such persons being referred to hereinafter as a "Covered Person");

Nevertheless, any such Covered Person will not be entitled to indemnification if the loss or damage was the result of fraud, deceit, gross negligence, reckless or intentional misconduct or a knowing violation of law by such Covered Person.

The managing member will be authorized, on behalf of the Distributor, to enter into indemnity agreements from time to time with any Covered Person entitled to be indemnified by the Distributor hereunder, upon such terms and conditions as the managing member deems appropriate in its business judgment. The indemnification rights set forth herein will be in addition to, and will not be exclusive of, any other rights to which such Covered Person may be entitled by contract or otherwise under applicable law.

Table of Contents

### Insurance

The Distributor will have the power to purchase and maintain insurance on behalf of any person who is or was a Covered Person against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as a Covered Person, whether or not the Distributor would have the power to indemnify such person against such liability under the LLC Agreement or under applicable law.

The Distributor is required to obtain and maintain such insurance policies covering the members, managing member and officers of the Distributor as are, in the good faith determination of the managing member, consistent with its exculpation and indemnification obligations set forth herein. The coverage amounts and other terms of each of the insurance policies will be determined and/or changed by the managing member from time to time, provided, that the members, managing member and officers of the Distributor will be listed as named insureds.

### Transfer of Interests

Subject to the restrictions on transfer described below, each of TWC Holdings and its first-tier subsidiary, W-G Holding Corp., may transfer all or any portion of their respective units, membership interest or economic interest to any other party in its sole discretion. However, through December 31, 2009, TWC Holdings and its first-tier subsidiary, W-G Holding Corp., are not permitted to transfer that portion of its Class W Units that remain subject to the Company Repurchase Right described above under "Repurchase of Class W Units—Company Repurchase Right", other than to a permitted transferee.

Except with the written approval of TWC Holdings, which it may withhold in its sole discretion, to the fullest extent permitted by law, Genius Products may not transfer all or any portion of its units to any person, by operation of law or otherwise. Upon any transfer by Genius Products in violation of the LLC Agreement, TWC Holdings or its designee will become the managing member.

Subject to certain conditions, a member or holder will be entitled to pledge its membership interest, economic interest or units as security for a loan or other financing. TWC Holdings or its designee will become the managing member immediately upon any foreclosure of any security interest granted with respect to Class G Units.

### Restrictions on Transfer

Notwithstanding any other provision of the LLC Agreement:

- no member is permitted to transfer any unit, or any interest therein; and

- neither the Distributor nor any member shall enter into any financial instrument or contract the value of which is determined in whole or in part by reference to the Distributor and which would be treated as an "interest in a partnership" for purposes of Treasury Regulation Section 1.7704-1;

if the effect of such Transfer, or of such financial instrument or contract, would be to cause, or create a material risk of causing, (A) the Distributor to be classified as a publicly traded partnership, or (B) the Distributor to terminate for federal income tax purposes. In furtherance of the foregoing, unless otherwise consented to by TWC and the managing member in writing in their sole discretion, any transfer of a unit or interest therein must satisfy one or more safe harbor provisions of Treasury Regulations Section 1.7704-1 including Sections 1.7704-1(e), (f), (g), (h) and (j), relating to "publicly traded partnerships". To the fullest extent permitted by law, any transfer made in violation of this restriction will be null and void and will not be recognized by the Distributor.

### Dissolution and Winding Up

The Distributor will be dissolved, its assets will be disposed of, and its affairs wound up upon the first to occur of the following:

- the entry of a decree of judicial dissolution pursuant to the Delaware Limited Liability Company Act;

Table of Contents

- the approval of the managing member with Class W Prior Approval;

- the sale of all or substantially all of the assets of the Distributor or any similar transaction with similar effect;

- the happening of any other event that makes it unlawful or impossible to carry on the business of the Distributor; or

- at any time there are no members of the Distributor, unless the Distributor is continued in accordance with the Delaware Limited Liability Company Act.

Upon the occurrence of any dissolution event, the Distributor will continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.

After satisfaction of the liabilities of the Distributor to creditors (whether by payment or the making of reasonable provision for payment thereof), including debts and liabilities to members who are creditors of the Distributor and expenses of liquidation, the remaining assets will be distributed to the members as follows:

- *First*, to the holders of Class W Units in an aggregate amount equal to the product of the Floor Amount per Class W Unit and the number of Class W Units then outstanding, pro-rata in accordance with their percentage interests (the "Class W Liquidating Distribution Preference"). The term "Floor Amount" means an amount per Class W Unit equal to $60 million divided by the number of Class W Units issued as of the closing.

- *Second*, to the holders of Class G Units pro-rata in accordance with their percentage interests until the holders of Class G Units have received aggregate distributions equal to the product of (x) their aggregate percentage interest (based on all outstanding units of the Distributor) and (y) the aggregate amount of the Class W Liquidating Distribution Preference and the amount distributed to the holders of Class G Units under this provision.

- *Thereafter*, pro-rata to the holders of all units in accordance with their respective percentage interests.

### Accounting, Records and Reporting by Members

The Distributor will engage a reputable third party public accounting firm chosen by the managing member subject to Class W Prior Approval to conduct an audit of the financial statements of the Distributor on an annual basis, unless the managing member elects to do so on a more frequent basis.

The managing member will cause to be delivered to each member

- a monthly financial statement of the Distributor (within ten (10) days following the end of each month);

- a quarterly financial statement of the Distributor (within twenty (20) days following the end of each quarter); and

- annual audited financial statements of the Distributor (within seventy (70) days following the end of each fiscal year).

Such other reports as determined by the managing member to be necessary will be prepared by the managing member or authorized officers of the Distributor, and will contain such information and cover such matters as determined by the managing member and will be distributed to the members at such times as determined by the managing member.

### Amendments

All amendments to the LLC Agreement are required to be in writing and will not be effective unless approved by Genius Products and TWC Holdings; provided, however, that any such amendment which

90

Table of Contents

disproportionately disadvantages one member relative to another member will not be effective without the written concurrence of such disadvantaged member. However, the managing member is permitted to make certain specific amendments without the consent of or execution by the members, such as amendments to Exhibit A to the LLC Agreement (which lists members and their membership interests) following any issuance, redemption, repurchase, reallocation or transfer of units in accordance with the LLC Agreement.

### Costs

The Distributor is responsible for and is required to reimburse each of Genius Products and TWC for all of their respective expenses, including, without limitation, expenses of lenders, legal counsel, investment bankers, consultants, accountants and other advisors, incurred at any time in connection with pursuing or consummating the transactions contemplated by the LLC Agreement, the Distribution Agreement and the Contribution Agreement.

### 4. The Distribution Agreement

This section of the Proxy Statement describes selected portions of the Distribution Agreement. As described in more detail below, the Distributor will earn a fee of between 3% and 6% on net sales of home video products from TWC, depending on the level of sales compared to theatrical box office revenues for the films released on home video. The Distributor will collect the proceeds which it receives from sales of home video products, and will remit these proceeds to TWC, minus the Distributor's distribution fee of 3% to 6%, cost of goods sold (including manufacturing expenses) and certain marketing expenses.

### Grant of Rights

Subject to the limitations described below, to the extent that TWC or any TWC Controlled Affiliate controls such rights, TWC will, during the Output Term, grant to the Distributor the right, during the License Term in the United States (and its territories and possessions including Puerto Rico, U.S. Virgin Islands and Guam), to design, manufacture (subject to the terms described below under "Manufacturing"), distribute, advertise, publicize, promote and market Videograms of the Covered Product in English, Spanish and such other languages as may be approved by TWC in writing on a product-by-product basis.

### Certain Important Defined Terms

The Distribution Agreement contains several significant defined terms that are material in understanding the terms of the Distribution Agreement. Following is a summary of the respective definitions of many of the significant defined terms used in the Distribution Agreement, which are presented in alphabetical order for ease of reference. For the exact definitions, please refer to the actual text of the Distribution Agreement, which is attached as Appendix D.

- the term "Adjusted Net Contribution" means the amount calculated on each Measurement Date on a Measured Film by Measured Film basis equal to (i) with respect to a Measured Film whose Initial Home Video Release Date occurred less than six months prior to the end of the applicable Measurement Period, the Net Contribution (determined as described below under the section entitled "Application of Gross Receipts") for such Measured Film divided by .85; (ii) with respect to a Measured Film whose initial home video release date occurred at least six months but less than ten months prior to the end of the applicable Measurement Period, the Net Contribution for such Measured Film divided by .90; and (iii) with respect to a Measured Film whose initial home video release date occurred at least ten months prior to the end of the applicable Measurement Period, 100% of the Net Contribution for such Measured Film. Notwithstanding that the Adjusted Net Contribution will be calculated after the end of each Measurement Period, the Adjusted Net Contribution with respect to any Measured Film shall include the Net Contribution for such Measured Film (adjusted as provided above) and any Distributor Credit for such Measured Film earned by TWC, in each case, through the earlier of (a) the date that is 12 months after the initial home video release date of the applicable Measured Film and (b) the end of the applicable Measurement Period. For purposes of clarification, the Distributor Credit is used here solely

91

Table of Contents

for the purpose of calculating the Annual Video Ratio and no portion of any Distributor Credit shall be payable to Distributor;

- the term "Annual Measurement Period" means, with respect to each calendar year of the Output Term, the period commencing on January 1 of such calendar year and continuing through and including December 31 of such year;

- the term "Annual Video Ratio" means, for the applicable Annual Measurement Period, the ratio (expressed as a percentage) of (a) the aggregate Adjusted Net Contribution for all applicable Measured Films to (b) the aggregate of domestic theatrical box office revenues for all such Measured Films (as reported by Nielsen EDI), such box office revenues calculated for each such Measured Film through the date that is 12 months after the date of such Measured Film's initial theatrical release in the Territory;

- the term "Covered Product" means all Motion Pictures, excluding Excluded Product, for which (i) TWC or a TWC Controlled Affiliate owns or controls the right to distribute Videograms embodying such Motion Pictures in the Territory; and (ii) TWC or any TWC Controlled Affiliate elects, in its sole discretion, to release during the Output Term for distribution by means of Videograms in the Territory, in each case subject to any and all existing restrictions and agreements and any restrictions and agreements existing at the time such Motion Picture is licensed to or acquired by Licensor or any TWC Controlled Affiliate;

- the term "Distributor Credit" means, with respect to TWC's exercise of its rights to engage a duplicator and/or replicator in connection with the manufacture of Videograms, the payments actually received by TWC and not returnable from such duplicator and/or replicator which are directly attributable to the volume of Videograms of Covered Product duplicated and/or replicated. For purposes of clarification, the Distributor Credit is used herein solely for the purpose of calculating the Annual Video Ratio and no portion of any Distributor Credit will be payable to the Distributor;

- the term "Excluded Product" means (i) any motion picture for which TWC or an affiliate does not own or control, at the time of initial theatrical release of such motion picture in the United States, the right to distribute Videograms in the United States, including without limitation because of co-finance arrangements, split-rights arrangements or for any other reason or (ii) any motion picture acquired by TWC or any TWC Controlled Affiliate as part of a library or slate of motion pictures in a transaction or series of transactions where the purchase price for such library or slate of motion pictures is in excess of $100,000,000;

- the term "License Term" means, with respect to each Covered Product licensed to Distributor during the Output Term on a product-by-product basis, the shorter of (i) perpetuity, or (ii) the full term of rights to distribute such Covered Product by means of Videograms in the Territory owned or controlled by TWC or any TWC Controlled Affiliate, subject only to early termination of the Distribution Agreement and TWC's buy back rights, as described below;

- the term "Output Term" means the period commencing on the effective date of the Distribution Agreement and continuing through and including (a) December 31, 2010 if TWC does not extend the Output Term no more than three months before December 31, 2010, or (b) December 31, 2013 if TWC does so extend the Output Term;

- the term "Semi-Annual Adjusted Net Contribution" means the amount calculated on each Semi-Annual Measurement Date on a Semi-Annual Measured Film by Semi-Annual Measured Film basis and shall mean the Net Contribution for such Semi-Annual Measured Film divided by .85. Notwithstanding that the Semi-Annual Adjusted Net Contribution will be calculated after the end of each Semi-Annual Measurement Period, the Semi-Annual Adjusted Net Contribution with respect to any Semi-Annual Measured Film will include the Semi-Annual Net Contribution for such Semi-Annual Measured Film (adjusted as provided above) and any Distributor Credit for such Semi-Annual Measured Film earned by TWC, in each case, through the earlier of (a) the date that is six (6) months after the initial home video release date of the applicable Semi-Annual Measured Film and (b) the end of the applicable Semi-

92

Table of Contents

Annual Measurement Period. For purposes of clarification, the Distributor Credit is used here solely for the purpose of calculating the Semi-Annual Video Ratio and no portion of any Distributor Credit shall be payable to the Distributor.

- the term "Semi-Annual Measured Films" shall mean, (i) with respect to each Semi-Annual Measurement Period commencing on January 1, all Covered Product that has (a) had its initial home video release date on or after October 1 of the calendar year preceding the applicable Semi-Annual Measurement Period but before April 1 of the calendar year of the applicable Semi-Annual Measurement Period and (b) been theatrically released after November 1, 2005; and (ii) with respect to each Semi-Annual Measurement Period commencing on July 1, all Covered Product that has (a) had its initial home video release date on or after April 1 of the calendar year of the applicable Semi-Annual Measurement Period but before October 1 of such calendar year and (b) been theatrically released after November 1, 2005. By way of example, with respect to the Semi-Annual Measurement Period commencing on January 1, 2008 and ending on June 30, 2008, the Semi-Annual Measured Films shall be all Covered Product which have been theatrically released after November 1, 2005 and which have had their respective initial home video release dates on or after October 1, 2007 but before April 1, 2008. By way of further example, with respect to the Semi-Annual Measurement Period commencing on July 1, 2009 and ending on December 31, 2009, the Semi-Annual Measured Films will be all Covered Product which have been theatrically released after November 1, 2005 and which have had their respective initial home video release dates on or after April 1, 2009 but before October 1, 2009;

- the term "Semi-Annual Measurement Period" means, with respect to each calendar year of the Output Term beginning with calendar year 2007, each six month period commencing on either January 1 or July 1 of such calendar year, as applicable;

- the term "Semi-Annual Video Ratio" means, for the applicable Semi-Annual Measurement Period, the ratio (expressed as a percentage) of (a) the aggregate Semi-Annual Adjusted Net Contribution for all applicable Semi-Annual Measured Films to (b) the aggregate of domestic theatrical box office revenues for all such Semi-Annual Measured Films (as reported by Nielsen EDI), such box office revenues calculated for each such Semi-Annual Measured Film through the date that is six months after the date of such Semi-Annual Measured Film's initial theatrical release in the Territory;

- the term "Territory" means the United States and its territories and possessions, including Puerto Rico, the U.S. Virgin Islands and Guam;

- the term "TWC Controlled Affiliate" means any affiliate of TWC existing as of the date of the Distribution Agreement or any entity in which TWC thereafter creates, establishes or acquires a controlling interest, directly or indirectly, for a purchase price of less than $100,000,000; and

- the term "Videograms" means videocassettes, videodiscs, videotape, DVD, Universal Media Disc ("UMD"), CD-ROM or other similar hard carrier devices now known or hereafter devised and designed to be used in conjunction with a personal reproduction apparatus which causes a visual image (whether or not synchronized with sound) to be seen on the screen of a television receiver, computer screen, hand-held device or any similar device now known or hereafter devised.

### Exclusivity

With respect to the distribution by means of Videograms of the Covered Product, the Distributor's rights in the United States will be exclusive to the Distributor.

### Manufacturing

TWC reserves the right to directly engage a duplicator and/or replicator in connection with the manufacture of Videograms embodying the Covered Product. Until such time, if ever, as TWC exercises such right, the Distributor will engage duplicators and/or replicators for the manufacture of Videograms in accordance with the Distribution Agreement.

93

[Table of Contents](#)

If TWC elects to exercise its right to so directly engage a duplicator and/or replicator for Videograms of Covered Products, the Distributor will advance and recoup, in accordance with the provisions described below under "Applications of Gross Receipts", all amounts required to be paid by TWC to its duplicator and/or replicator with respect to Videograms of Covered Products pursuant to the terms of the Distribution Agreement.

With respect to Covered Product, except during the periods that TWC elects to exercise its rights with respect to Videogram duplication/replication as described above, the Distributor will arrange for the manufacture, packaging and delivery of the finished goods to the Distributor's distribution centers. However, all matters relating to the Distributor's manufacture and distribution of the Covered Product in the United States will be subject to meaningful, good faith consultation with, and reasonable approval by, TWC. The Distributor will advance and recoup, in accordance with the provisions described below under "Applications of Gross Receipts", all costs and expenses incurred in connection with the manufacturing, packaging and delivery of such store-ready finished goods to the Distributor's warehouse facilities and fulfillment/distribution centers.

### Marketing and Advertising

Subject to meaningful, good faith consultation with the Distributor, TWC will designate the initial release date in the United States for each Covered Product and the Distributor will initially release Videograms of such Covered Product on such date, subject to TWC's timely delivery of the related materials and TWC's timely approval, pursuant to the terms of the Distribution Agreement, of any and all materials and plans required for the distribution by the Distributor.

The budget for (i) the development and implementation of the marketing strategy of each Covered Product, (ii) the creation, placement and distribution of all marketing, advertising and promotional materials for each Covered Product; (iii) the marketing expense budget for the initial release of each Covered Product in the United States; and (iv) all other matters relating to the advertising, marketing and promotion of the Covered Product (including without limitation, media spends, media buys and rebates) will be subject to TWC's and the Distributor's mutual prior written approval and, in the event of any disagreement, TWC's decision will control.

Without limiting the foregoing, the Distributor will be responsible for the advertisement, promotion, and merchandising efforts in respect of Videograms of Covered Product, including the preparation of artwork and design layouts of all types, the furnishing of merchandising posters and displays for distribution by the Distributor, and the furnishing of reasonably sufficient quantities of demonstration samples to the Distributor's sales staff, subject in all respects to TWC's approval rights.

The Distributor will have the right to market, promote and advertise in the United States its distribution of Videograms of the Covered Product with respect to each Covered Product in any and all media. Distributor will advance and recoup, in accordance with the provisions described below under "Application of Gross Receipts", all costs and expenses incurred in connection with the reproduction, delivery and shipment of any advertising materials.

### Distribution

As between the Distributor and TWC, TWC will be solely responsible for, and will pay or cause to be paid all costs, expenses and charges incurred in connection with:

- The acquisition, development, financing and production of Covered Product, including all creative and artistic aspects and paying any and all related costs, expenses or charges; and

- The procurement of all necessary rights, licenses, consents, authorizations and clearances necessary for the Distributor to distribute Videograms of the Covered Product as and to the extent contemplated by the Distribution Agreement; and the payment of all royalties, fees, costs and other sums payable to any person in connection therewith.

The Distributor is required to perform in a conscientious and first-class manner to the fullest extent of its ability and on a "label blind" and non-discriminatory basis, all services customary, necessary and appropriate in

94

Table of Contents

connection with the manufacture, distribution, sale and other exploitation of Covered Product under the Distribution Agreement.

The Distributor is required to keep TWC fully informed on a regular basis regarding the Distributor's manner of distribution, sales methods and policies, including without limitation the Distributor's distribution pattern and wholesale and retail distribution channels and outlets. The Distributor is required to consider in good faith TWC's suggested improvements or changes to such manner of distribution, sales methods and policies.

### Approvals and Controls; Restrictions

The Distributor's exercise of the rights is subject to, and required to be exercised in accordance with, the following:

- *General.* All marketing materials, media spends, media buys, returns policies and rebates, refunds, credits and discounts provided to the Distributor's customers with respect to the Covered Product will be subject to TWC's prior written approval.

- *Subdistribution/Outsourcing.* Other than as permitted under the Distribution Agreement (*e.g.,* for manufacturing, physical packaging, etc.) the Distributor will not be entitled to outsource any functions or engage any subdistributors to distribute, sell or otherwise exploit the Covered Product or to sublicense any of its rights under the Distribution Agreement in the United States, or any portion thereof, without TWC's express prior written approval.

- *Manufacturing Levels.* Subject to consultation with the Distributor, TWC will have the right on an ongoing and continuous basis to designate the number of Videogram units manufactured and to be shipped.

- *Suggested Retail List Price.* Subject to consultation with the Distributor TWC will designate the suggested retail list price for each Covered Product on an ongoing and continuous basis and will provide the Distributor with notice of any changes to such suggested retail list prices thereafter.

- *Sales Efforts.* Subject to TWC's control over manufacturing levels as described above and, if applicable, TWC's control over the manufacturing of Videograms as described above, the Distributor is required to commence in good faith to manufacture, distribute and sell Covered Product in order to effectuate the marketing plan no later than the initial release date designated by TWC for each such Covered Product and will continue thereafter to diligently and continuously so manufacture, distribute and sell Covered Product as necessary, in the Distributor's good faith business judgment, to meet consumer demand. The Distributor, in exercising the rights and licenses granted hereunder, is required to use all commercially reasonable efforts in its good faith business judgment to promote and maximize the sale of the Videograms of Covered Product throughout the United States.

- *Reserve for Returns/Bad Debt.* The Distributor will be entitled to establish and maintain a reserve for returns for each Covered Product in an amount equal to seventeen and one-half percent (17 $^1$/2%) of net receipts attributable to such Covered Product, *provided* that all such reserves not constituting actual returns will be liquidated within five (5) months of establishment. TWC and the Distributor will review and discuss the reserve for returns annually for possible adjustments based on a review of the Distributor's prior 12 months' returns and forecasts of future returns, provided that any failure of the parties to reach an agreement with respect to such adjustments will not be a breach of the Distribution Agreement nor will it give rise to any right or remedy of either party; provided further that no such adjustments will be made (and the 17 $^1$/2% reserve will continue to apply) unless agreed to in writing by both parties. No reserve for returns will be taken on or established with respect to any non-returnable Videograms distributed, sold or otherwise exploited by the Distributor hereunder. The Distributor will bear (and will not be entitled to recoup as distribution expenses) all bad debt expense and collection costs. TWC will have approval rights over the Distributor's returns policy.

- *Cutting and Editing.* The Distributor generally is prohibited from cutting, editing, adding to, altering or deleting Covered Product or related packaging or advertising material.

95

[Table of Contents](#)

- *Security; Copy Protection.* The Distributor is required to institute and employ "state-of-the-art" security systems, measures and procedures at least equal to such systems, measures and procedures of other first-class providers of services of the type provided hereunder to prevent loss, damage, theft, pirating, unauthorized exhibition, copying or duplication of any of Covered Product or materials delivered by TWC.

- *No Approval Over Content.* The Distributor will not have any control or approval rights relating to the content or rating of any Covered Product delivered to the Distributor under the Distribution Agreement.

- *Payment of Additional Expenses.* Except as expressly provided in the Distribution Agreement, the Distributor will be solely responsible for any and all costs and expenses arising in connection with the exercise of the rights granted to the Distributor under the Distribution Agreement.

- *Dedicated Staff.* The Distributor is required to create and maintain a dedicated sales, marketing and operational unit of a commercially reasonable size for the sales, marketing and distribution of Covered Product in the United States giving regard to a target cumulative Video Ratio of 70%. The size, level and personnel of such dedicated unit will be subject to TWC's prior written approval and the Distributor agrees to consider in good faith candidates proposed by TWC for all such positions, provided that the Distributor will determine in its sole discretion all salary levels and other compensation with respect such candidates. The cost of such dedicated staff will be borne exclusively by the Distributor (in accordance with and subject to its general overhead budget) and no costs or expenses related to such staff will be charged to TWC as a distribution expense or otherwise. Without limiting the generality of the foregoing, TWC will have the right to designate one senior level executive of Distributor who will be subject to Distributor's approval (not to be unreasonably withheld or delayed) and who will be Distributor's primary contact with TWC. This senior executive will be responsible for keeping TWC fully informed on an ongoing and continuous basis regarding all matters of Distributor's distribution of Videograms of Covered Product hereunder and is required to be reasonably available to TWC to facilitate the same.

- *Standard of Care.* The Distributor is required to distribute Videograms of the Covered Product with no less than the same degree of effort, quality of service and standard of care that U.S. major motion picture studios apply to their distribution of Videograms of their own comparable motion pictures or programs. Without limiting the generality of the foregoing, the percentage of the Distributor's aggregate annual sales attributable to direct sales to retailers (as opposed to sales to wholesale distributors) is required to be not less than that of U.S. major motion picture studios. Any and all bonuses (excluding annual corporate bonuses not tied to sales targets), incentive plans and sales commission structures for the Distributor's employees and all other persons and entities involved in distributing Videograms of Covered Product are required to be designed and implemented (i) so as not to have an unfair or adverse discriminatory impact on Covered Product and (ii) to provide no less than an "equal incentive" to all bonus plan participants to sell the Covered Product as compared to other motion pictures distributed by means of Videograms by the Distributor. Compliance with the foregoing obligations is of the essence, entitling TWC to terminate the Distributor's right to distribute the Covered Product in the event of any material breach of such obligations.

- *Content Acquisition Opportunities.* If the Distributor is presented with a content acquisition opportunity, the Distributor is required to promptly present such content acquisition opportunity to TWC and TWC or any TWC Controlled Affiliate will have the right to engage in the content acquisition opportunity in accordance with the terms and conditions of the Distribution Agreement. If TWC or any TWC Controlled Affiliate determines to engage in the content acquisition opportunity, it may do so on whatever terms it deems appropriate without any further obligation to the Distributor (other than under the Distribution Agreement) and the Distributor will be prohibited from engaging in such content acquisition opportunity. Neither TWC nor any TWC Controlled Affiliate will have an obligation to present any content acquisition opportunity to the Distributor. Notwithstanding the foregoing, the Distributor will not be required to offer any content acquisition opportunity that both (i) is consistent with Distributor's current business and is not competitive with TWC's business, *and* (ii) requires

96

Table of Contents

aggregate fixed payments (e.g., advances, fixed purchase price, etc.) of less than $75,000 for any individual acquisition or series of related acquisitions. However, in no event may all fixed payments related to such qualifying content acquisition opportunities in any year exceed $2,000,000 in the aggregate. The Distributor does not intend to enter into any content acquisition opportunity that is competitive with TWC's business (e.g., feature films) and is not permitted to enter into any such content acquisition opportunity without specific prior written approval from TWC and without first presenting such content acquisition opportunity to TWC. Any content acquisition opportunity entered into by the Distributor is required to be on customary industry terms and the Distributor is prohibited from structuring any content acquisition opportunity so as to avoid or circumvent its obligation to offer such content acquisition opportunity to TWC as required under the Distribution Agreement, including but not limited to offering terms that are not consistent with industry standards. By way of example, the Distributor is not permitted to achieve an advance within the $75,000 and $2 million limits set forth above by offering non-standard terms in other areas, such as non-customary royalties or distribution fees.

### Delivery of Materials

For each Covered Product, TWC will deliver to such location in the United States as the Distributor may at any time designate the materials (including video masters and related print and sound elements) necessary for the Distributor to create first class Videograms embodying such Covered Product. If the delivery materials are not technically acceptable to the Distributor in the Distributor's reasonable good faith business judgment based on the Distributor's then-current standards applied on a non-discriminatory basis for motion pictures with similar characteristics (e.g., age, gauge, etc.), then the Distributor is required to notify TWC in writing within 21 days of the Distributor's receipt of such delivery materials of any such defects in said delivery materials and, if TWC agrees such defect exists and needs to be remedied in order for the Distributor to exploit the rights granted hereunder, TWC will promptly replace the defective delivery materials at TWC's sole cost and expense. Otherwise, the Distributor is required to create Videograms of the Covered Product based on the delivery materials delivered by TWC.

### Expenses

The provisions in the Distribution Agreement governing expenses include the following:

- *Distribution Expenses.* The Distributor will advance all distribution expenses relating to the distribution of Covered Product. Recoupable distribution expenses (including all costs of manufacturing Videogram units) will be recouped by the Distributor on a Covered Product-by-Covered Product basis only as units are sold and will be limited to only direct, auditable, out-of-pocket, customary and reasonable costs and expenses actually paid by the Distributor to third parties in arm's length transactions (and not directly or indirectly reimbursed or credited to Distributor, including by way of rebates, credits and/or discounts) in connection with units sold and not returned. Distribution expenses will include, without limitation, necessary DVD mastering costs (including authoring, compression and copyright encryption) and film-to-tape transfer costs (if applicable). Distribution expenses will not include, and the Distributor will solely bear out of its distribution fee, all costs and expenses of sales, creative services (other than creative services outsourced to third parties at the written direction of TWC), inventory and category management in connection with the distribution of Covered Product, and all costs associated with unsold units.

- *Marketing Expenses.* All marketing expenses will be advanced and recouped by the Distributor on a Covered Product-by-Covered Product basis as units are sold. Recoupable marketing expenses will be limited to only those direct, auditable, out-of-pocket, customary and reasonable costs and expenses actually paid by the Distributor to third parties in arm's length transactions (and not directly or indirectly reimbursed or credited to Distributor, including by way of rebates, credits and/or discounts) in accordance with the marketing budget. Notwithstanding the foregoing, the out-of-pocket costs and

Table of Contents

expenses actually paid by the Distributor to third parties in connection with any outsourced marketing or other services will not constitute recoupable expenses unless such outsourcing is approved in writing by TWC in advance. The Distributor will bear (and will not be entitled to recoup as marketing expenses or distribution expenses or otherwise) all costs and expenses incurred by the Distributor in excess of the amounts set forth in the marketing budget, unless TWC requests or approves in writing such cost increases in accordance with the terms of the Distribution Agreement.

• *No Cross-Collateralization.* Gross receipts and expenses relating to the Distributor's exploitation of each Covered Product will not be cross-collateralized with the gross receipts or expenses of any other Covered Product or any other motion pictures, programs or other products. As the sole and limited exception to the preceding sentence, if and to the extent the Distributor does not recoup all expenses in connection with an item of direct-to-video Covered Product because TWC requires the Distributor to increase the marketing budget or manufacturing level for such item of Covered Product above that prepared or otherwise approved by the Distributor in its reasonable good faith business judgment (taking into account customary marketing expenditure and manufacturing levels for comparable motion pictures in the entertainment industry during the 12 month period immediately preceding such Covered Products' anticipated initial home video release date), then the Distributor will be entitled to recoup from net contribution otherwise payable to TWC under the LLC Agreement in connection with other Covered Product the amount of marketing and/or manufacturing expenses in connection with such Covered Product designated by TWC in excess of the amount so approved by the Distributor in its reasonable good faith business judgment. By way of example, if the Distributor approves $100,000 in marketing expenses in its reasonable good faith business judgment in connection with a direct-to-video Covered Product and TWC directs the expenditure of $150,000 in marketing expenses, and if the Distributor does not recoup all expenses in connection with such Covered Product, then the Distributor will be entitled to recoup the unrecouped expenses up to a cap of $50,000 from net contribution otherwise payable to TWC under the Distribution Agreement.

### Application of Gross Receipts

The gross receipts of every kind and nature from any and all sources actually received by or credited to the Distributor or any affiliate or subsidiary from the distribution of the Covered Products on a Covered Product-by-Covered Product basis, less all related refunds, credits (other than credits for cooperative advertising) and discounts, are referred to as "Net Receipts". Net Receipts are to be applied on an ongoing and continuous basis in the following order:

• First, the Distributor will deduct and retain an amount sufficient to maintain a reserve for returns equal to (and not in excess of) 17.5% of Net Receipts, as such percentage may be adjusted as described above under the section entitled, "Reserve for Returns/Bad Debt";

• Second, from the remaining Net Receipts, the Distributor will deduct and retain for itself a distribution fee of 5% of such remaining net receipts, provided that upon liquidating the reserve for returns as described above under the section entitled "Reserve for Returns/Bad Debt", the Distributor will deduct and retain for itself from such liquidated reserve (*i.e.,* the Net Receipts constituting such reserve and deducted as described above which have not been returned or credited to customers within the applicable return reserve period and are therefore part of Net Receipts) a distribution fee of 5% of such liquidated reserve;

• Third, from the remaining Net Receipts the Distributor will deduct and retain for itself all expenses in connection with such Covered Product that the Distributor has the right to recoup as described above under the section entitled, "Expenses";

• Fourth, from the remaining Net Receipts the Distributor will deduct and retain for itself amounts equal to any Licensor True-Up Payments (as defined below) then payable to the Distributor; and

• Fifth, the Distributor will remit to TWC all remaining Net Receipts. The amount thus remitted to TWC is referred to as the "Net Contribution".

98

Table of Contents

### Deemed Distribution Fee

Within ninety (90) days after the end of each full calendar year, the Distributor will calculate the Deemed Distribution Fee Percentage and the Deemed Distribution Fee Amounts for the period commencing on the effective date of the Distribution Agreement and continuing through and including December 31st of the calendar year in question (the "Measurement Period").

The "Deemed Distribution Fee Percentage" will be equal to, with respect to the Net Receipts of all Covered Product during the applicable Measurement Period, (a) 3% if the cumulative Video Ratio is less than or equal to 50.00% for the applicable Measurement Period, (b) 4% if the cumulative Video Ratio is greater than 50.00% and less than or equal to 60.00% for the applicable Measurement Period, (c) 5% if the cumulative Video Ratio is greater than 60.00% and less than or equal to 75.00% for the applicable Measurement Period, and (d) 6% if the cumulative Video Ratio is greater than 75.00% for the applicable Measurement Period. The "Deemed Distribution Fee Amounts" will equal the product of the Deemed Distribution Fee Percentage multiplied by the cumulative Net Receipts for the applicable Measurement Period.

TWC and the Distributor will from time to time review and discuss in good faith possible adjustment to the cumulative Video Ratio levels based on then-customary industry standards for Video Ratios, manufacturing levels and suggested retail prices for Videogram units, provided that any failure of the parties to reach an agreement with respect to such adjustment will not constitute a breach of the Distribution Agreement or give rise to any right or remedy of the parties; provided further that no such adjustment will be made unless agreed to in writing by both parties.

### True-Up Payments

If the Deemed Distribution Fee Amounts for the applicable Measurement Period exceed the actual distribution fee amounts for the applicable Measurement Period, then the Distributor will be entitled to deduct such excess (a "Licensor True-Up Payment") from Net Contribution otherwise payable to TWC on a prospective basis. If the actual distribution fee amounts for the applicable Measurement Period exceed the Deemed Distribution Fee Amounts for the applicable Measurement Period, then the Distributor will pay the amount of such excess (a "Distributor True-Up Payment") to TWC ratably in six (6) monthly installments commencing 30 days after the Measurement Date for the applicable Measurement Period.

### Returned Units

Notwithstanding anything to the contrary contained in the Distribution Agreement, no distribution fees will be payable on any Videogram which is sold and returned, and to the extent any distribution fees are charged on units that are ultimately returned, the Distributor agrees to disgorge any distribution fee charged with respect to such Videogram in the accounting period in which the Videogram is so returned.

### Subdistributor/Sublicensee Fees

Unless otherwise agreed by the parties in writing, distribution fees payable to the Distributor will be inclusive of any fees paid or payable to any affiliates and any subdistributors and sublicensees.

### Excessive Sales to Wholesalers

The Distributor has advised TWC that the Distributor intends to distribute Videograms of the Covered Product throughout the United States directly to retailers (*i.e.*, Net Receipts will be calculated as 100% of amounts paid by retailers (less all related refunds, credits and discounts) without the deduction of any agents' or other third party fees). If more than fifteen percent (15%) of the Net Receipts in any consecutive six month period are Net Receipts from wholesalers (as opposed to Net Receipts directly from retailers) then the Distributor

99

Table of Contents

will not be entitled to a distribution fee with respect to such Net Receipts in excess of such 15% and the Distributor is required to immediately rebate to TWC any such distribution fee then previously deducted by the Distributor.

### Security Interest

The Distributor will grant to TWC a security interest to secure amounts owing to TWC under the Distribution Agreement.

### Accounting and Payment

The Distributor will render or cause to be rendered to TWC monthly accounting statements within 45 days after the last day of the applicable calendar month. The statements are required to indicate (on an aggregate and Covered Product-by-Covered Product basis) the number of Videograms sold and returned, gross receipts, Net Receipts, distribution expenses, marketing expenses, applicable distribution fees, and Net Contribution. The statements shall also be required to include (i) a breakdown by the Distributor's top 15 accounts, (ii) a breakdown of the Distributor's calculation of the reserve for returns, including any liquidation thereof and (iii) a breakdown of the Distributor's calculation of the percentage of the Distributor's sales attributable to direct sales to retailers and the Distributor's sales to wholesale distributors.

All monies due and payable to TWC pursuant to the Distribution Agreement and shown to be due on each monthly statement are required be paid to TWC at the time the next monthly accounting statement is due to TWC. If the Distributor fails to pay any amount due and payable in accordance with the preceding sentence and does not cure such failure within five business days thereafter, then, without waiving any of TWC's other rights or remedies under the Distribution Agreement, the Distributor will be obligated to pay interest on such unpaid amounts at an annual rate equal to the prime rate announced from time to time by TWC's senior lender plus two percent from the date such amount was due and payable until the date such payment actually is made by the Distributor.

### No Minimum Sales Warranty

Neither TWC nor the Distributor makes any representation or warranty of any kind or nature with respect to the quantities of Covered Product that may be sold or returned, or the gross receipts or Net Contribution that will or may be derived by the Distributor or TWC pursuant to the Distribution Agreement. The extent of sales and returns of Videograms under the Distribution Agreement, and the amount of gross receipts that may be derived, is speculative.

### Proprietary Rights

The Covered Product and related proprietary materials and all copyrights, trademarks and other proprietary rights in and to the Covered Product and related proprietary materials are and will remain owned exclusively by TWC. In addition, TWC will own the copyrights, trademarks and other proprietary rights in any and all artwork and designs created or used by the Distributor in connection with the distribution of Covered Product, which incorporate or otherwise include any elements of any of the Covered Product or the related proprietary material.

The Distributor is required to promptly take all reasonable legal steps necessary (subject to TWC's prior written approval with respect to the institution of any legal proceeding), to protect the interests of TWC and the Distributor in the Videogram distribution of Covered Product in the United States, and to obtain redress and restrain any third party from any unauthorized reproduction, exhibition, distribution or other use of the Covered Product in the United States or from the duplication of any prints or the doing of any act which infringes upon any of TWC's or the Distributor's rights in the Covered Product in the United States or any materials manufactured or delivered under the Distribution Agreement. All direct, auditable, out-of-pocket expenses

100

Table of Contents

incurred by the Distributor in connection with this provision will be deemed recoupable distribution expenses attributable to the applicable Covered Product.

### Representations and Warranties

The Distribution Agreement contains customary representations and warrants from TWC and the Distributor, including representations relating to due organization, authorization and no conflicts or legal violations. In addition, TWC is required to make representations relating to, among other things, TWC's rights to the Covered Products, and the Distributor is required to make representations relating to the Distributor's compliance with law and non-infringement of third party rights in connection with the performance of the Distribution Agreement.

### Indemnity

Each party agrees to defend, indemnify and hold harmless the other party (and its affiliates, and its and their respective successors, assigns, licensees, officers, directors, employees and representatives) against and from any and all claims, liabilities, damages, costs and expenses (including reasonable attorneys' fees and court costs) arising from or related to any breach by the indemnifying party of any of its undertakings, representations, warranties, covenants or agreements under the Distribution Agreement, and/or arising from or related to any and all third party claims which, if proven, would constitute a breach.

TWC further agrees to indemnify and hold harmless the Distributor (and its affiliates, and its and their respective successors, assigns, licensees, officers, directors, employees and representatives) against and from any and all claims, liabilities, damages, costs and expenses (including reasonable attorneys' fees and court costs) arising from or related to the acquisition, development, financing, production, distribution, exhibition, marketing and/or any other exploitation of any and all Covered Products, excepting only claims arising solely out of a breach of any of the Distributor's representations, warranties or agreements under the Distribution Agreement or any other matter for which the Distributor is obligated to indemnify TWC under the Distribution Agreement.

The Distributor further agrees to defend, indemnify and hold harmless TWC (and its affiliates, and its and their respective successors, assigns, licensees, officers, directors, employees and representatives) against and from any and all claims, liabilities, damages, costs and expenses (including reasonable attorneys' fees and court costs) arising from or related to (i) the Distributor's distribution of such Covered Products under the Distribution Agreement, excepting only claims arising solely out of a breach of any of TWC's representations, warranties or agreements under the Distribution Agreement, and (ii) any unauthorized use by Distributor of the advertising materials.

### Early Termination

Subject to the notice and cure provisions described below, TWC will have the right to terminate the Distribution Agreement and all of the Distributor's rights in and to the Covered Product without prejudice to any rights which TWC may have, whether pursuant to the provisions of the Distribution Agreement or otherwise in law, or in equity, or otherwise, upon the occurrence of any one or more of the following events:

- If the Distributor is in material breach of any of its covenants, obligations, warranties or representations under the Distribution Agreement or under any of the security documents;

- If the Distributor is unable to pay its debts when due, makes any assignment for the benefit of creditors, or files any petition under the bankruptcy or insolvency laws of any jurisdiction, county or place, or has or suffers a receiver or trustee to be appointed for its business or property, or is adjudicated a bankrupt or an insolvent;

- If the Annual Video Ratio is less than 60% (as calculated on any Measurement Date). However, if TWC does not exercise its termination right with respect to this provision within 90 days after receipt of the

101

Table of Contents

Distributor's calculation of the Annual Video Ratio which will be provided to TWC no later than the applicable Measurement Date, then the termination right with respect to such calendar year will be deemed waived;

- If the Semi-Annual Video Ratio is less than 60% (as calculated for any Semi-Annual Measurement Period). However, if TWC does not exercise its termination right with respect to this provision within 90 days after receipt of Distributor's calculation of the Semi-Annual Video Ratio (which shall be provided to TWC no later than the applicable Semi-Annual Measurement Date), then such termination right with respect to such Semi-Annual Measurement Period will be deemed waived. Notwithstanding the preceding sentence, the threshold of 60% set forth in the preceding sentence may be reduced to 57.5% for one and only one Semi-Annual Measurement Period during the Output Term designated by the Distributor (it being understood and agreed that this sentence will apply to the Semi-Annual Video Ratio only and not the Annual Video Ratio). The Semi-Annual Video Ratio will be calculated within 15 days after June 30 and December 31 of each calendar year of the Output Term beginning with calendar year 2007 with respect to the preceding six month period commencing on either January 1 or July 1 of such calendar year, as applicable;

- If the Distributor fails to fully comply with the liquidity and coverage ratios set forth on Schedule B attached to the Distribution Agreement;

- If the Distributor incurs any indebtedness for borrowed money outside of the ordinary course or for an amount in excess of $10 million in year 2006 or, in any year thereafter, the amount of the Distributor's cash flow for the then-preceding calendar year (and in any event for an amount in excess of $10 million) without prior written approval of TWC;

- If the Distributor intentionally or repeatedly distributes, sells or otherwise exploits (or authorizes any third party to sell or otherwise exploit) Videograms embodying the Covered Product outside the United States;

- If either the Distributor or Genius Products experiences a change of control event; or

- if a change of control of the Distributor occurs that is not the direct result of TWC selling all or substantially all of its ownership interest in the Distributor to any person or group of persons.

Upon the occurrence of any of the events described above, TWC will give notice of termination (if TWC elects to terminate) in writing to the Distributor; *provided*, that TWC will not be required to give notice with respect to any event under the second, eighth or ninth bullet point above to the extent prohibited or restricted by applicable law. The Distributor will have 15 days from the date of receiving notice to correct any default which is curable with the payment of money and 30 days as to any other default which is capable of cure. However; the Distributor will have no right to cure with respect to any event listed above, except under the first bullet point above. Failing a timely cure by the Distributor as described above, the Distribution Agreement will immediately terminate.

Upon the occurrence of a change of control of TWC or a change of control of Distributor that is a direct result of TWC selling all of substantially all of its ownership interest in Distributor, TWC will have the right to terminate the Output Term. However, any such termination will not become effective prior to January 1, 2009. TWC will irrevocably elect to exercise its rights to terminate the Output Term by delivering written notice to the Distributor within 90 days of the consummation of the TWC change of control event, which notice shall specify a termination date (the "TWC Change of Control Termination Date").

If TWC terminates the Output Term pursuant to this provision, then TWC will pay to the Distributor the net present value of the Termination Penalty (such net present value to be calculated by allocating the Termination Penalty in equal monthly installments over the number of whole months remaining between the TWC Change of Control Termination Date and the expiration of the Output Term, and then discounting such installments back to the TWC Change of Control Termination Date using a discount rate equal to TWC's weighted average cost of

Table of Contents

capital at the time of the TWC Change of Control Termination Date). The term "Termination Penalty" means the product of (i) the average annual Net Receipts (such average to be calculated after adjustment for actual returns and by reference to all calendar years ending before the TWC Change of Control Termination Date), multiplied by (ii) .025, multiplied by (iii) .7, multiplied by (iv) a fraction, the numerator of which shall be the number of whole months remaining between the TWC Change of Control Termination Date and the expiration of the Output Term and the denominator of which shall be 24. In addition, TWC will have the right (but not the obligation) to exercise its buy-back rights pursuant to and in accordance with the provisions described below under "Buy-Back Right".

From and after the early termination of the term of the Distribution Agreement as described above, all rights granted to the Distributor under the Distribution Agreement will revert to TWC and neither the Distributor nor its successors or permitted assigns will have any right whatsoever after the termination date to manufacture, sell, ship, market, distribute or otherwise use any of the Videograms embodying the Covered Product or the related proprietary materials.

### Buy-Back Right

At any time after the expiration or earlier termination of the Output Term, upon 30 days written notice to the Distributor, TWC will have the right to buy back from the Distributor all distribution and other rights granted under the Distribution Agreement with respect to any or all Covered Products. The amount payable by TWC for such rights will be an amount equal to 2.5% of the Projected Net Receipts for such Covered Product. "Projected Net Receipts" will equal the net present value of the future Net Receipts (after the deduction of the higher of (i) a $17\frac{1}{2}$% reserve for returns (as such percentage may be adjusted as described above) or (ii) the actual projected percentage of returns) projected by the Distributor ("Distributor Projections") with respect to the applicable Covered Product. The discount rate used to calculate the Projected Net Receipts will be the Distributor's weighted average cost of capital at the time of the buy-back.

If the parties cannot agree as to the Projected Net Receipts, each party will hire its own independent third-party appraiser to provide an appraisal with respect to the Projected Net Receipts. If the higher of the two appraisals is within 10% of the lower appraisal, the average of the two appraisals will be the amount used as the Projected Net Receipts to determine the buy-back purchase price. If the higher of the two appraisals is not within 10% of the lower appraisal, then the two appraisers will mutually appoint a third independent appraiser to provide a third appraisal (the "Final Appraisal") with respect to the Projected Net Receipts. The Final Appraisal will be averaged with the one of two prior appraisals which is closest to the Final Appraisal and such averaged amount will be used as the Projected Net Receipts to determine the buyback purchase price.

If TWC exercises its buy-back rights, then the early termination provisions described above will apply, except that TWC will be obligated to purchase from the Distributor any non-obsolete inventory of Videograms not in excess of the manufacturing levels previously approved by TWC.

### Most Favored Nations

If at any time following the effective date of the Distribution Agreement the Distributor enters into a home video distribution agreement with a third party which grants more favorable terms regarding the net cost of distribution (taking into account distribution fee, fee structure, advances, etc.) and/or grants more favorable terms with respect to operating controls and/or approvals, the Distributor agrees to grant to TWC the benefit of the more favorable terms.

The Distributor will have its third-party agreements audited by the Distributor's outside auditor at the end of each year in order to verify compliance with this provision, and the auditor will issue a statement to TWC that either Distributor is in compliance (*i.e.,* no more favorable third-party agreements) or is not, in which case the auditor will provide details of the applicable more favorable provisions of third-party agreements that must be

103

**Table of Contents**

granted to TWC, as well as a calculation of any amounts that may be due to TWC under such more favorable provisions; but the auditor need not disclose to TWC any of Distributor's confidential information.

## 5. *Additional Agreements Related To The Transaction*

### *Voting Agreements*

In connection with the execution of the Contribution Agreement, TWC received executed Voting Agreements and proxies from certain stockholders of Genius Products pursuant to which these stockholders agreed to vote their shares in favor of the transactions contemplated by the Contribution Agreement, certain changes to our Certificate of Incorporation to accommodate these transactions and an increase of six million shares in our 2004 Stock Incentive Plan. TWC received executed Voting Agreements and proxies from stockholders holding approximately 32.2% of our outstanding shares as of the date of the Contribution Agreement.

In connection with the Voting Agreements, each of the relevant stockholders also delivered to TWC an irrevocable proxy coupled with an interest and appointed Lawrence Madden and Irwin Reiter, executive officers of TWC, as attorneys-in-fact to vote all the shares beneficially owned by such stockholders in accordance with the provisions of the Voting Agreements. Each such stockholder also agreed not to transfer any of his or her respective shares in Genius Products except (i) to a relative, (ii) where required by law or (iii) the sale by such stockholder of up to 25% of his or her respective shares subject to the Voting Agreement, provided that such stockholder must obtain from the transferee an agreement to be bound by the applicable Voting Agreement, other than with respect to sales of shares conducted on our primary public trading market or exchange.

### *Services Agreement*

At the Closing, Genius Products and the Distributor will enter into a Services Agreement pursuant to which the Distributor will agree to render certain services to us or on our behalf. The Distributor will provide to Genius Products such services as shall be reasonably necessary or appropriate to enable us to:

- serve as the managing member of the Distributor and perform our obligations as managing member under and in the manner contemplated in the Contribution Agreement, LLC Agreement and Registration Rights Agreement;

- continue as a public reporting company following the closing; and

- comply with all other legal, regulatory and contractual obligations and requirements applicable to us in connection with the foregoing.

The Services Agreement provides examples of services that will be performed by the Distributor pursuant to the Services Agreement. In addition, to the extent that any of the services are not provided to us as contemplated in the Services Agreement, we will have the right to obtain any of the services ourselves and obtain reimbursement from the Distributor for the reasonable costs thereof.

### *Registration Rights Agreement*

At the Closing, Genius Products and TWC Holdings will also enter into a Registration Rights Agreement pursuant to which we will agree to register for resale at our own expense the shares of our common stock issuable upon redemption of TWC Holdings' and its first-tier subsidiary's, W-G Holding Corp.'s, Class W Units in the Distributor.

Under the Registration Rights Agreement, we will grant to the holders of such shares:

- five demand registration rights;

104

**Table of Contents**

- unlimited "piggyback" registration rights (*i.e.,* the right to have shares registered if we decide to file a registration statement for other shares, subject to customary limitations); and
- unlimited Form S-3 registration rights.

The Registration Rights Agreement also provides that, without the prior written consent of the holders of at least a majority of the registrable securities then outstanding, we are not permitted to enter into any agreement with any holder or prospective holder of any of our securities that would grant to such holder or prospective holder registration rights superior to or on parity with those granted under the Registration Rights Agreement.

The registration rights under the Registration Rights Agreement terminate for each holder after such time at which all registrable securities held by such holder can be sold without restriction (including volume and manner-of-sale restrictions) on a single day without registration in compliance with Rule 144 under the Securities Act and such holder has received, upon such holder's request, an opinion of counsel to Genius Products to that effect.

Under the Registration Rights Agreement, subject to certain limitations, we also grant to TWC Holdings (on behalf of itself and the other holders of registrable securities) a right of first offer with respect to future sales by Genius Products or any of its subsidiaries of any shares of, or securities convertible into or exercisable for any shares of, any class of our or any of our subsidiaries' capital stock to any person or entity.

*Required Vote*

To be approved, Proposal 1 must receive a "For" vote from the majority of our outstanding shares of common stock, voting either in person or by proxy.

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" PROPOSAL 1.**

105

**Table of Contents**

**PROPOSAL 2, INCLUDING SUB-PROPOSALS 2A – 2F**
**APPROVAL OF THE AMENDMENT AND RESTATEMENT**
**OF OUR CERTIFICATE OF INCORPORATION**

In connection with the Transaction, we agreed with TWC that, subject to the approval of our stockholders, we would amend and restate our certificate of incorporation to implement a number of changes, as described below. At the special meeting you will be asked to consider and vote to approve our amended and restated certificate of incorporation.

In order to comply with applicable rules of the SEC relating to proxy statements, we are also presenting Sub-Proposals 2A through 2F to our stockholders as separate proposals for approval. As a matter of state law, only the approval of the amended and restated certificate of incorporation, as a whole, is required. **However, because we are required to present the sub-proposals separately and because all of the revisions to our existing certificate of incorporation that are reflected in the amended and restated certificate of incorporation are considered by Genius Products and TWC to be integral parts of the Transaction, the approval of Proposal 2 and each of the Sub-Proposals 2A through 2F is a condition to completion of the Transaction. Accordingly, a vote against Proposal 2 or any of the related Sub-Proposals 2A through 2F is effectively a vote against the Transaction.**

*SUB-PROPOSAL 2A—A proposal to approve a provision restricting the acts or activities in which the Company may engage to certain limitations arising under the Transaction documents.*

Article III of our proposed amended and restated certificate of incorporation attached as *Appendix E* includes provisions that restrict the acts or activities in which the Company may engage to certain limitations arising under the Transaction documents. In particular, Article III states that the Company's purpose is to engage in any lawful act or activity for which corporations may be organized under Delaware law, subject to:

- the limitation on business and activities of the Company contained in the LLC Agreement, as described above beginning on page 75 under the caption, "Proposal 1—The LLC Agreement—Devotion of Time; Company Opportunities; Other Activities"; and

- receipt of prior approval for certain activities of the Company from the holders of Series W Preferred Stock to the extent required under the amended and restated certificate of incorporation, as described above beginning on page 59 under the caption, "Proposal 1—Series W Preferred Stock to be Issued to TWC".

*SUB-PROPOSAL 2B—A proposal to approve the increase of the number of authorized shares of common stock from 100,000,000 to 300,000,000 shares and the increase of the number of authorized shares of all classes of stock from 110,000,000 to 310,000,000 shares.*

Article IV, Section (A) of our proposed amended and restated certificate of incorporation attached as *Appendix E* includes provisions that increase the authorized number of shares of our common stock from 100,000,000 shares to 300,000,000 and increase the number of authorized shares of all classes of stock from 110,000,000 to 310,000,000.

Our certificate of incorporation currently authorizes us to issue 100,000,000 shares of common stock, $0.0001 par value per share. The certificate of incorporation also authorizes us to issue 10,000,000 shares of preferred stock, but the proposed amended and restated certificate of incorporation would not affect this authorization. The primary reason for the proposed increase in our authorized shares is to accommodate the shares issuable to the TWC parties should they exercise their right to require Genius Products to redeem all or a portion of its Class W Units in the Distributor for shares of our common stock. Such right is discussed further above under "Proposal 1—LLC Agreement—Redemption Rights of Holder of Class W Units."

As of the record date, 60,972,626 shares of our common stock were outstanding, 20,126,268 shares of common stock were reserved for issuance upon the exercise of outstanding stock options or other equity

106

Table of Contents

compensation awards (including options issued under our 2004 Stock Incentive Plan) and 12,866,907 shares of common stock were reserved for issuance upon the exercise of outstanding warrants. In addition, if TWC exercises its right in full to require Genius Products to redeem all of its Class W Units in the Distributor for shares of our common stock as of the closing date, unless we pay cash in connection with this redemption we would be required to issue to TWC 141,022,359 shares of our common stock, subject to adjustment as provided in the LLC Agreement, based upon the number of shares of our common stock outstanding as of the Record Date.

The primary reason for the proposed increase in our authorized shares is to accommodate the shares issuable to the TWC parties should they exercise their right to require Genius Products to redeem all or a portion of their Class W Units in the Distributor for shares of our common stock. In addition, our board of directors believes that it is desirable to increase the number of authorized shares of common stock to ensure that there is a sufficient number available to provide our company with adequate flexibility to issue common stock for other corporate purposes that may be identified in the future. The additional shares could be used, among other things, for the declaration of stock splits or stock dividends, for acquisitions of other companies, for public or private financings to raise additional capital, for the issuance of stock under options granted or to be granted under various stock incentive plans or other benefit plans for our employees and non-employee directors, and the issuance of stock under warrants granted or to be granted in the future. There are currently no commitments or agreements for the issuance of additional shares of common stock, except as described in this Proxy Statement.

If the proposed amended and restated certificate of incorporation is adopted, the newly authorized shares would be unreserved and available for issuance without further stockholder action, except as required by applicable laws and regulations. All of the additional shares resulting from the proposed increase in our authorized common stock would be of the same class if and when they are issued, and holders would have the same rights and privileges as holders of shares of common stock presently issued and outstanding, including the same dividend, voting and liquidation rights.

The holders of our common stock do not have preemptive rights to subscribe to additional securities that may be issued by our company, which means that current stockholders do not have a prior right to purchase any additional shares in connection with a new issuance of capital stock of our company in order to maintain their proportionate ownership of our common stock. Accordingly, if our board of directors elects to issue additional shares of common stock, such issuance could have a dilutive effect on the earnings per share, voting power and equity ownership of current stockholders.

The proposed increase in the authorized number of shares of common stock could have an anti-takeover effect. The availability for issuance of additional shares of common stock could discourage, or make more difficult, efforts to obtain control of our company because such shares could be issued to dilute the voting power of a person seeking control. For example, it may be possible for our board of directors to delay or impede a merger, tender offer, or proxy contest that it determines is not in the best interests of our company and stockholders by causing such additional authorized shares to be issued to holders who might side with the board in opposing such a takeover or change in control. By potentially discouraging unsolicited takeover attempts, the proposed amended and restated certificate of incorporation may limit the opportunity for our stockholders to dispose of their shares at the higher price generally available in takeover attempts or under a merger proposal and may also have the effect of permitting our current management, including the current board of directors, to retain its position and resist changes that stockholders may wish to make if they are dissatisfied with the conduct of our business.

It should be noted that the issuance of additional shares of common stock could have a detrimental effect upon existing holders of our common stock since such issuance may, among other things, have a dilutive effect on the earnings per share of common stock and the voting rights of holders of the common stock. Although authorization of additional shares of common stock is recommended by the board of directors for the reasons stated herein, and not because of any possible anti-takeover effect, such additional authorization of shares of common stock could be used by incumbent management to make more difficult, and thereby discourage, an attempt to acquire control of the Company, even though our stockholders may deem such an acquisition

107

Table of Contents

desirable. For example, the shares could be privately placed with purchasers who might support the board of directors in opposing a hostile takeover bid. The issuance of new shares could also be used to dilute the stock ownership and voting power of a third party seeking to remove the directors, replace incumbent directors, accomplish certain business combinations or alter, amend or repeal portions of our certificate of incorporation.

**SUB-PROPOSAL 2C—A proposal to approve a provision authorizing Series W Preferred Stock and establishing the rights, preferences and powers, and the qualifications, limitations and restrictions, of Series W Preferred Stock.**

Article IV, Section (B) of our proposed amended and restated certificate of incorporation attached hereto as *Appendix E* includes provisions that authorize Series W Preferred Stock and establish the rights, preference and powers, and the qualifications, limitations and restrictions, of Series W Preferred Stock.

As explained above in Proposal 1, as a condition to the closing of the Transaction, we are required to issue to TWC 100 shares of Series W Preferred Stock. The terms of the Series W Preferred Stock include the rights, preferences and powers described above in the section entitled, "Proposal 1—Series W Preferred Stock to be Issued to TWC."

Under our existing certificate of incorporation, our board of directors is authorized to create or provide for any series of Preferred Stock, and to fix the designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof. Accordingly, even if our stockholders do not approve this Proposal 3, our board of directors would be permitted to create the Series W Preferred Stock and determine the rights, preferences and powers of the Series W Preferred Stock.

Nevertheless, we wish to solicit the approval of our stockholders with respect to the authorization of the Series W Preferred Stock because the shares of Series W Preferred Stock that we plan to issue to TWC in connection with the Transaction will give TWC significant rights, preferences and powers not held by our other stockholders, as described above in the section entitled, "Proposal 1—Series W Preferred Stock to be Issued to TWC."

**SUB-PROPOSAL 2D—A proposal to modify the rights, preferences and powers, and the qualifications, limitations and restrictions, of Common Stock.**

Article IV(C) of our proposed amended and restated certificate of incorporation attached hereto as *Appendix E* includes provisions that modify the rights, preferences and powers, and the qualifications, limitations and restrictions, of our common stock to include the right to elect two "At-Large Directors" and certain "Special Voting Provisions," consisting of matters which may be approved by the At-Large Directors or by the vote of holders of a majority of our outstanding common stock, without giving effect to any of the voting rights granted to holders of shares Series W Preferred Stock.

Article IV(C) provides that, so long as the TWC parties and their permitted transferees collectively beneficially own or have the right to beneficially own upon conversion, exchange, or redemption of Class W Units pursuant to the LLC Agreement, at least the Threshold Amount (as defined above on page 59), the holders of common stock (voting separately as a single class) will be entitled to elect two directors of Genius Products, referred to as the "At-Large Directors," and to remove, without cause, from office any At-Large Director and, in the absence of any At-Large Directors, to fill any vacancy caused by the resignation, death or removal of any At-Large Director. Vacancies on the board resulting from the death, resignation or removal of an At-Large Director may be filled by the remaining At-Large Director, to hold office until a qualified successor is elected by the holders of common stock at the next regular or special meeting of the stockholders.

Article IV(C) also provides that, so long as the TWC parties and their permitted transferees collectively beneficially own or have the right to beneficially own upon conversion, exchange, or redemption of Class W Units pursuant to the LLC Agreement, at least the Threshold Amount, the following matters may be approved by

108

Definitive Proxy Statement (revised) for Genius Products, Inc.     Page 121 of 395
Case 2:15-ap-01241-BB   Doc 16-1   Filed 07/06/15   Entered 07/06/15 15:06:41   Desc
Exhibit AF1 - Part 1   Page 122 of 198

Table of Contents

the vote or consent of a committee of the board of directors composed only of At-Large Directors, or the holders of at least a majority of the outstanding shares of Common Stock, without giving effect to any of the voting rights granted to holders of shares Series W Preferred Stock:

- defending, settling, fulfilling or otherwise managing any of our liabilities, duties or obligations arising in, under or from any of the Excluded Liabilities (defined above on page 63 under "—Excluded Liabilities" and in the Contribution Agreement);

- prosecuting and managing our interest, rights or remedies arising in, under or from any of the Excluded Assets (defined above on page 62 under "—Assets" and in the Contribution Agreement);

- declaring or making dividends or distributions payable solely to holders of our common stock;

- making payments to the holders of the Contingent Dividend Right under the terms thereof; and

- undertaking a Genius Capital Transaction (defined above on page 80 under "LLC Agreement—Additional Capital Contributions" and in the LLC Agreement); and

- solely to fund our activities not provided for or reimbursed by the Distributor, provided that such activities are permitted to be taken by us under the LLC Agreement following the closing of the Transaction.

***SUB-PROPOSAL 2E—A proposal to approve a provision by which the Company elects out of the Delaware law restricting business combinations with interested stockholders.***

Article IX of our proposed amended and restated certificate of incorporation attached hereto as *Appendix E* includes provisions that provide that, to the fullest extent permitted by law, the Company elects not to be governed by Section 203 of the Delaware General Corporation Law.

Section 203 restricts our ability to engage, directly or indirectly, in a business combination transaction with an "interested stockholder". An interested stockholder is one that holds 15% or more of our voting stock. Specifically, under Section 203, we cannot engage in a business combination with any interested stockholder for three years after the interested stockholder became an interested stockholder, unless:

- Prior to such time, the board of directors approved the business combination or the transaction that resulted in the interested stockholder becoming an interested stockholder;

- Upon consummation of the transaction that resulted in the interested stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of our outstanding voting stock, excluding shares owned by our directors who are also officers and shares held in employee stock plans in which participants do not have the confidential right to determine whether their plan shares will be tendered in a tender or exchange offer; or

- The board approves the business combination, and stockholders holding at least two-thirds of our voting stock authorize it at an annual or special meeting.

Section 203 permits corporations to elect not to be governed by Section 203, provided that the stockholders approve such election.

If Section 203 does not govern us, we may more easily enter into business combinations with persons or entities that hold substantial percentages of our capital stock, including TWC or its affiliates.

***SUB-PROPOSAL 2F—A proposal to approve a provision by which the Company renounces the Company's interest or expectancy in, or in being offered the opportunity to participate in, corporate opportunities engaged in by TWC (including its affiliates and related persons).***

Article V of our proposed amended and restated certificate of incorporation attached hereto as *Appendix E* includes provisions by which the Company renounces the Company's interest or expectancy in, or in being offered the opportunity to participate in, corporate opportunities engaged in by TWC (including its affiliates and related persons).

Definitive Proxy Statement (revised) for Genius Products, Inc.      Page 122 of 395
Case 2:15-ap-01241-BB    Doc 16-1    Filed 07/06/15    Entered 07/06/15 15:06:41    Desc
Exhibit AF1 - Part 1    Page 123 of 198

Table of Contents

We believe that the waiver of fiduciary duties reflected in this Sub-Proposal 2F is appropriate and reasonable, because otherwise our issuance of Series W Preferred Stock to TWC in connection with the Transaction and the appointment of directors to our board of directors by TWC may restrict the activities of TWC and/or these directors, and expose them to liability for their other activities after the consummation of the Transaction. It is not our intent to cause TWC or its director nominees to be subject to liability for activities conducted by TWC that are competitive with Genius Products following the Transaction. Accordingly, our board of directors believes that it is in the best interests of Genius Products and its stockholders to waive such fiduciary duties in order to facilitate the consummation of the Transaction, in recognition of the fact that TWC currently engages in, and may in the future engage in, the same or similar lines of business and have interests in the same areas or types of corporate opportunities, and in recognition of the benefits to be derived by Genius Products and the Distributor through their respective continued contractual, corporate and business relations with TWC.

The proposed amendment to our certificate of incorporation reflected in this Sub-Proposal 2F provides, among other things, that:

- Genius Products renounces any interest or expectancy in, or in being offered the opportunity to participate in, any corporate opportunity which may be engaged in by Authorized Persons, their affiliates or their respective directors, officers and employees or to which such persons may have access to the fullest extent permitted by the Delaware General Corporation Law.

- "Authorized Person" is defined to include TWC, any successor by operation of law (including by merger) of an Authorized Person, any person or entity which acquires all or substantially all of the assets of an Authorized Person in a single transaction or series of related transactions and any subsidiary of any person or entity describe above.

- To the fullest extent permitted by applicable law, no director, officer, employee, or stockholder of Genius Products, in such capacity, that is an Authorized Person, an affiliate of an Authorized Person or any of their respective directors, officers, or employees, acting in his or her capacity as such, will have any obligation to Genius Products to refrain from competing with Genius Products, making investments in competing businesses or otherwise engaging in any commercial activity that competes with Genius Products.

- To the fullest extent permitted by applicable law, Genius Products will not have any right, interest or expectancy with respect to any such particular investments or activities undertaken by any Authorized Person, any affiliate of an Authorized Person or any of their respective directors, officers or employees and such investments or activities will not be deemed wrongful or improper, and no such person will be obligated to communicate, offer or present any potential transaction, matter or opportunity to Genius Products, even if such potential transaction, matter or opportunity is of a character that, if presented to Genius Products, could be taken by Genius Products.

- If an Authorized Person, any affiliate of an Authorized Person or any of their respective directors, officers or employees acquires knowledge of a potential transaction or matter which may be a corporate opportunity for both the Authorized Person and Genius Products, the Authorized Person, affiliate of an Authorized Person and their respective directors, officers and employees, will have no duty to communicate or offer such corporate opportunity to Genius Products and will not be liable to Genius Products or its stockholders for breach of any fiduciary duty by reason of the fact that an Authorized Person or any director, officer, or employee of an Authorized Person, acting in his or her capacity as such, pursues or acquires such corporate opportunity for itself, directs such corporate opportunity to another person, or does not communicate information regarding such corporate opportunity to Genius Products, and Genius Products renounces any interest or expectancy in such corporate opportunity.

- Nothing in the amendment will limit or otherwise prejudice any contractual rights Genius Products may have or obtain against any Authorized Person, any affiliate of an Authorized Person or any of their respective directors, officers, or employees.

110

Table of Contents

- Notwithstanding anything contained in our certificate of incorporation to the contrary, in addition to any other vote of stockholders required by law or our certificate of incorporation, the affirmative vote of the holders of at least 80 percent of the outstanding shares of the Series W Preferred Stock, voting together as a single class, will be required to amend, repeal or adopt any provision inconsistent with the foregoing.

### REQUIRED VOTE

To be approved, Proposal 2, including Sub-Proposals 2A – 2F, must receive a "For" vote from the majority of our outstanding shares of common stock, voting either in person or by proxy. The approval of Proposal 2, including Sub-Proposals 2A – 2F, is a condition to completion of the Transaction, and thus a vote against Proposal 2, or any of Sub-Proposals 2A through 2F, effectively will be a vote against the Transaction.

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" PROPOSAL 2, INCLUDING EACH OF SUB-PROPOSALS 2A – 2F.**

111

Table of Contents

PROPOSAL 3

**APPROVAL OF AN AMENDMENT AND RESTATEMENT OF OUR 2004 STOCK INCENTIVE PLAN TO (I)
INCREASE THE NUMBER OF SHARES OF COMMON STOCK AVAILABLE FOR ISSUANCE UNDER THE
PLAN FROM 7,500,000 SHARES TO 13,500,000 SHARES, PROVIDED THE PROPOSED TRANSACTION
WITH THE WEINSTEIN COMPANY IS CONSUMMATED, AND (II) PROHIBIT OPTION REPRICINGS
UNDER THE PLAN WITHOUT STOCKHOLDER APPROVAL OF SUCH REPRICINGS**

*Background*

Subject to stockholder approval, our board of directors has adopted an amendment and restatement of our 2004 Stock
Incentive Plan (the "2004 Plan") to increase the number of shares reserved for issuance under the 2004 Plan by 6,000,000
shares from 7,500,000 shares to 13,500,000 shares, subject to adjustment in the event of a stock split, stock or other
extraordinary dividend, or other similar change in our common stock or capital structure. This amendment will be
contingent on the consummation of the proposed Transaction with The Weinstein Company discussed in Proposal 1
above. If the proposed Transaction does not close, we will not adopt the proposed increase in the number of shares
reserved for issuance under the 2004 Plan.

In addition, we are proposing to adopt the following new paragraph as Section 7(d) of the 2004 Plan. This proposed
new paragraph would prohibit the "Administrator" of the 2004 Plan (as that term is defined in the 2004 Plan) from
approving a repricing of a stock option or other right or benefit awarded under the 2004 Plan, without approval of our
stockholders. The proposed new paragraph is below, and the full text of the 2004 Plan is attached to this Proxy Statement
as *Appendix F*:

"7(d) *Award Repricing*. The Board shall not approve a program providing for either (a) the cancellation of
outstanding Options or other rights or benefits and the grant in substitution therefor of new Options, rights or benefits
having a lower exercise price or (b) the amendment of outstanding Options to reduce the exercise price thereof,
except upon the condition that any such program be subject to approval by the stockholders of the Company before it
may become effective. Such stockholder approval shall be obtained in the degree and manner required under
Applicable Laws. This paragraph shall not be construed to apply to "issuing or assuming a stock option in a
transaction to which section 424(a) applies," within the meaning of Section 424 of the Code."

The 2004 Plan is intended to enable us to attract and retain the best available personnel for positions with the
Company, to provide additional incentive to employees, directors and consultants and to promote the success of our
business. Our board of directors believes that the Company's long-term success is dependent upon our ability to attract
and retain superior individuals who, by virtue of their ability and qualifications, make important contributions to our
business.

The 2004 Plan provides for the grant of:

- incentive stock options to our employees, including officers and employee directors;

- non-qualified stock options to our employees, directors and consultants; and

- restricted stock awards.

A general description of the principal terms of the 2004 Plan as proposed to be amended and restated is set forth
below. This description is qualified in its entirety by the terms of the 2004 Plan, as amended and restated, a copy of which
is attached to this Proxy Statement as *Appendix F* and is incorporated herein by reference.

In addition, the vesting of all unvested stock options outstanding at the time of the closing of the Transaction,
including options held by our directors and executive officers, automatically will accelerate upon the closing of the
Transaction. However, pursuant to their employment agreement amendments, each of Messrs. Budin, Satterwhite and
Radiloff have agreed to waive the accelerated vesting of a portion of their existing stock

112

Table of Contents

options, and Mr. Drinkwater has agreed to restrictions on the sale or transfer of a portion of the shares of our common stock represented by his existing stock options.

### General Description

*Shares Reserved for Issuance under the 2004 Plan.* As of December 31, 2005, options to purchase 7,297,500 shares had been granted under the 2004 Plan of which options to purchase 6,530,000 shares were outstanding. No shares of restricted stock had been granted under the 2004 Plan. As of December 31, 2005, the number of officers, employees, consultants and directors of Genius Products and related entities that were eligible to receive grants under the 2004 Plan was approximately 42 persons. The maximum number of shares with respect to which options may be granted to a participant during a calendar year is 1,000,000 shares. In addition, in connection with a participant's commencement of continuous service, a participant may be granted options for up to an additional 1,000,000 shares which will not count against the limit set forth in the previous sentence. For awards of restricted stock that are intended to be performance-based compensation under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), the maximum number of shares subject to such awards that may be granted to a participant during a calendar year is 1,000,000 shares. All share numbers described in this paragraph are subject to adjustment in the event of a stock split, stock dividend, or other similar change in our common stock or capital structure.

*Administration.* The 2004 Plan is administered, with respect to grants to employees, directors, officers, and consultants, by the plan administrator, defined as the Board or one or more committees designated by the Board. Generally, the 2004 Plan will be administered by the Compensation Committee. With respect to grants to officers and directors, the committee will be constituted in such a manner as to satisfy applicable laws, including Rule 16b-3 promulgated under the Securities Exchange Act of 1934, as amended, and Section 162(m) of Code.

*Terms and Conditions of Awards.* Stock options granted under the 2004 Plan may be either incentive stock options under the provisions of Section 422 of the Internal Revenue Code, or nonqualified stock options. Incentive stock options may be granted only to employees. Non-qualified stock options and awards of restricted stock may be granted to employees, directors and consultants. Subject to applicable laws, the plan administrator has the authority, in its discretion, to select employees, directors and consultants to whom awards may be granted from time to time, to determine whether and to what extent awards are granted, to determine the number of shares of our common stock or the amount of other consideration to be covered by each award, to approve award agreements for use under the 2004 Plan, to determine the terms and conditions of any award, to construe and interpret the terms of the 2004 Plan and awards granted, to establish additional terms, conditions, rules or procedures to accommodate the rules or laws of applicable non-U.S. jurisdictions and to take such other action not inconsistent with the terms of the 2004 Plan as the plan administrator deems appropriate.

The 2004 Plan includes the following performance criteria that may be considered by the plan administrator when granting performance-based awards: (i) increase in share price, (ii) earnings per share, (iii) total stockholder return, (iv) operating margin, (v) gross margin, (vi) return on equity, (vii) return on assets, (viii) return on investment, (ix) operating income, (x) net operating income, (xi) pre-tax profit, (xii) cash flow, (xiii) revenue, (xiv) expenses, (xv) earnings before interest, taxes and depreciation, (xvi) economic value added and (xvii) market share.

The term of awards granted under the 2004 Plan may not be for more than ten years (or five years in the case of incentive stock options granted to any participant who owns stock representing more than 10% of the combined voting power of us or any parent or subsidiary of ours), excluding any period for which the participant has elected to defer the receipt of the shares or cash issuable pursuant to the award.

*Termination of Service.* An award may not be exercised after the termination date of such award as set forth in the award agreement. In the event a participant in the 2004 Plan terminates continuous service with us for any reason other than death or disability, the vested portion of an award may be exercised within a period of three-

Table of Contents

months following the termination (or such longer or shorter period as determined by the plan administrator). In the event a participant in the 2004 Plan terminates continuous service with us as a result of death or disability, the vested portion of an award may be exercised within a period of twelve-months following the termination (or such longer or shorter period as determined by the plan administrator). The award will terminate to the extent not exercised on the last day of the specified period or the last day of the original term of the award, whichever comes first. Any award designated as an incentive stock option, to the extent not exercised within the time permitted by law for the exercise of incentive stock options following the termination of employment, will convert automatically to a nonqualified stock option and thereafter will be exercisable as such to the extent exercisable by its terms for the period specified in the award agreement.

*Change in Capitalization.* Subject to any required action by our stockholders, the number of shares of common stock covered by outstanding awards, the number of shares of common stock that have been authorized for issuance under the 2004 Plan, the exercise or purchase price of each outstanding award, the maximum number of shares of common stock that may be granted subject to awards to any participant in a calendar year, and the like, will be proportionally adjusted by the plan administrator in the event of (i) any increase or decrease in the number of issued shares of common stock resulting from a stock split, stock dividend, combination or reclassification or similar event affecting our common stock, (ii) any other increase or decrease in the number of issued shares of common stock effected without receipt of consideration by us or (iii) as the plan administrator may determine in its discretion, any other transaction with respect to common stock including a corporate merger, consolidation, acquisition of property or stock, separation (including a spin-off or other distribution of stock or property), reorganization, liquidation (whether partial or complete) or any similar transaction; provided, however, that conversion of any of our convertible securities will not be deemed to have been "effected without receipt of consideration". Such adjustment will be made by the plan administrator and its determination will be final, binding and conclusive.

*Corporate Transaction and Change in Control.* Effective upon the consummation of a corporate transaction (as defined in the 2004 Plan), all outstanding awards will terminate. However, all such awards will not terminate to the extent the contractual obligations represented by the award are assumed by the successor entity. Further, the award will automatically become fully vested and exercisable for all of the shares at the time represented by the award, immediately prior to the specified effective date of such corporate transaction. In the event of a change in control (as defined in the 2004 Plan), an award will automatically become fully vested and exercisable for all of the shares represented by the award at the time of such change in control.

*Amendment, Suspension or Termination of the 2004 Plan.* The Board may at any time amend, suspend or terminate the 2004 Plan. The 2004 Plan will terminate on September 30, 2014, unless terminated earlier by the Board. To the extent necessary to comply with applicable provisions of federal securities laws, state corporate and securities laws, the Internal Revenue Code, the rules of any applicable stock exchange or national market system, and the rules of any non-U.S. jurisdiction applicable to awards granted to residents therein, we will obtain stockholder approval of any such amendment to the 2004 Plan in such a manner and to such a degree as required.

### Certain U.S. Federal Tax Consequences Relating to 2004 Stock Incentive Plan

The following summary of the U.S. federal income tax consequences of 2004 Plan transactions is based upon federal income tax laws in effect on the date of this Proxy Statement. This summary does not purport to be complete, and does not discuss non-U.S., state or local tax consequences or guidance that may be issued by the Treasury Department under Section 409A of the Internal Revenue Code.

*Nonqualified Stock Options.* The grant of a nonqualified stock option under the 2004 Plan will not result in any federal income tax consequences to the participant or to us. Upon exercise of a nonqualified stock option, the participant is subject to income taxes at the rate applicable to ordinary compensation income on the difference between the option exercise price and the fair market value of the shares on the date of exercise. This income is

114

Definitive Proxy Statement (revised) for Genius Products, Inc.     Page 127 of 395
Case 2:15-ap-01241-BB   Doc 16-1   Filed 07/06/15   Entered 07/06/15 15:06:41   Desc
Exhibit AF1 - Part 1   Page 128 of 198

Table of Contents

subject to withholding for federal income and employment tax purposes. We are entitled to an income tax deduction in the amount of the income recognized by the participant, subject to possible limitations imposed by Section 162(m) of the Code and so long as we withhold the appropriate taxes with respect to such income (if required) and the participant's total compensation is deemed reasonable in amount. Any gain or loss on the participant's subsequent disposition of the shares of common stock will receive long or short-term capital gain or loss treatment, depending on whether the shares are held for more than one year following exercise. We do not receive a tax deduction for any such gain.

In the event a nonqualified stock option is amended or has an exercise price less than the fair value of the stock on the date of grant, such option may be considered deferred compensation and subject to the rules of new Section 409A of the Code, which provide rules regarding the timing of payment of deferred compensation. An option subject to Section 409A of the Code which fails to comply with the rules of Section 409A, can result in an additional 20% tax obligation, plus penalties and interest. Currently how the additional tax and penalties and interest will be applied is unclear.

*Incentive Stock Options.* The grant of an incentive stock option under the 2004 Plan will not result in any federal income tax consequences to the participant or to us. A participant recognizes no federal taxable income upon exercising an incentive stock option (subject to the alternative minimum tax rules discussed below), and we receive no deduction at the time of exercise. In the event of a disposition of stock acquired upon exercise of an incentive stock option, the tax consequences depend upon how long the participant has held the shares of common stock. If the participant does not dispose of the shares within two years after the incentive stock option was granted, nor within one year after the incentive stock option was exercised, the participant will recognize a long-term capital gain (or loss) equal to the difference between the sale price of the shares and the exercise price. We are not entitled to any deduction under these circumstances.

If the participant fails to satisfy either of the foregoing holding periods, he or she must recognize ordinary income in the year of the disposition (referred to as a "disqualifying disposition"). The amount of such ordinary income generally is the lesser of (i) the difference between the amount realized on the disposition and the exercise price or (ii) the difference between the fair market value of the stock on the exercise date and the exercise price. Any gain in excess of the amount taxed as ordinary income will be treated as a long or short-term capital gain, depending on whether the stock was held for more than one year. In the year of the disqualifying disposition, we are entitled to a deduction equal to the amount of ordinary income recognized by the participant, subject to possible limitations imposed by Section 162(m) of the Code and so long as the participant's total compensation is deemed reasonable in amount.

The "spread" under an incentive stock option—i.e., the difference between the fair market value of the shares at exercise and the exercise price—is classified as an item of adjustment in the year of exercise for purposes of the alternative minimum tax. If a participant's alternative minimum tax liability exceeds such participant's regular income tax liability, the participant will owe the larger amount of taxes. In order to avoid the application of alternative minimum tax with respect to incentive stock options, the participant must sell the shares within the same calendar year in which the incentive stock options are exercised. However, such a sale of shares within the same year of exercise will constitute a disqualifying disposition, as described above.

In the event an incentive stock option is amended or has an exercise price less than the fair market value of the stock on the date of grant, such option may be considered deferred compensation and subject to the rules of new Section 409A of the Code, which provide rules regarding the timing of payment of deferred compensation. An option subject to Section 409A of the Code which fails to comply with the rules of Section 409A, can result in an additional 20% tax obligation, plus penalties and interest. Currently how the additional tax and penalties and interest will be applied is unclear. In addition, the amendment of an incentive stock option may convert the option from an incentive stock option to a nonqualified stock option.

*Restricted Stock.* The grant of restricted stock will subject the recipient to ordinary compensation income on the difference between the amount paid for such stock and the fair market value of the shares on the date that the

115

Table of Contents

restrictions lapse. This income is subject to withholding for federal income and employment tax purposes. We are entitled to an income tax deduction in the amount of the ordinary income recognized by the recipient, subject to possible limitations imposed by Section 162(m) of the Code and so long as we withhold the appropriate taxes with respect to such income (if required) and the participant's total compensation is deemed reasonable in amount. Any gain or loss on the recipient's subsequent disposition of the shares will receive long or short-term capital gain or loss treatment depending on how long the stock has been held since the restrictions lapsed. We do not receive a tax deduction for any such gain.

Recipients of restricted stock may make an election under Section 83(b) of the Code ("Section 83(b) Election") to recognize as ordinary compensation income in the year that such restricted stock is granted, the amount equal to the spread between the amount paid for such stock and the fair market value on the date of the issuance of the stock. If such an election is made, the recipient recognizes no further amounts of compensation income upon the lapse of any restrictions and any gain or loss on subsequent disposition will be long or short-term capital gain to the recipient. The Section 83(b) Election must be made within thirty days from the time the restricted stock is issued.

### Amended Plan Benefits

Because the administrator of the 2004 Plan will make future awards at its discretion, we cannot determine the number of options and other awards that may be awarded in the future to eligible participants if the amendment and restatement of the 2004 Plan is approved by our stockholders. We also cannot determine the number of options and other awards that would have been received by eligible participants in 2005 if the amendments to the 2004 Plan had been in effect during 2005.

### Equity Compensation Plan Information

The following table provides information concerning our equity compensation plans as of December 31, 2005.

| Plan Category | Number of Securities To Be Issued upon Exercise of Outstanding Options, Warrants and Rights | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance under Equity Compensation Plans (Excluding Securities Reflected in the Second Column) |
|---|---|---|---|
| Equity Compensation Plans Approved by Stockholders | 37,713,336 | $ 1.96 | 0 |
| Equity Compensation Plans Not Approved by Stockholders | — | — | — |

### Required Vote

To be approved, Proposal 3 must receive a "For" vote from the majority of our outstanding shares of common stock, voting either in person or by proxy.

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" PROPOSAL 3.**

116

**Table of Contents**

**PROPOSAL 4**
**APPROVAL OF ADJOURNMENTS OF THE SPECIAL MEETING, IF NECESSARY, TO PERMIT FURTHER SOLICITATION OF PROXIES IF THERE ARE NOT SUFFICIENT VOTES AT THE TIME OF THE MEETING TO APPROVE ONE OR MORE OF THE PROPOSALS DESCRIBED ABOVE**

If we fail to receive a sufficient number of votes to approve one or more of the proposals described above, we may propose to adjourn the Special Meeting, if a quorum is present, for a period of not more than 30 days for the purpose of soliciting additional proxies. We currently do not intend to propose adjournment at the Special Meeting if there are sufficient votes to approve the proposals described above.

*Required Vote*

If approval of the proposal to adjourn the Special Meeting for the purpose of soliciting additional proxies is submitted to our stockholders for approval, Proposal 4 must receive a "For" vote from the majority of our outstanding shares of common stock, voting either in person or by proxy.

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" PROPOSAL 4.**

117

Table of Contents

## BUSINESS OF GENIUS PRODUCTS

### Overview

Genius Products is an entertainment company that produces, publishes, licenses and distributes films, videos and music on digital versatile discs, or DVDs, universal mini discs, or UMDs, and compact discs, or CDs, under a variety of branded and non-branded names. Our products are sold at traditional, direct response, mail order and internet retailers nationwide and, to a lesser extent, internationally.

We sell our own proprietary content, license content from third parties and distribute content for third parties for a fee. On an interim basis, we currently have U.S. home video distribution rights to selected films and if the Transaction is completed will have the exclusive U.S. home video distribution rights to feature film and direct-to-video releases owned or controlled by The Weinstein Company LLC. We have released two TWC titles on DVD. On March 21, 2006, we released *Derailed*, starring Jennifer Aniston and Clive Owen, and on April 11, we released *Wolf Creek*, an Australian horror film. Upcoming TWC films planned for home video release include *Hoodwinked*, an updated retelling of the classic story of Red Riding Hood with the voices of Anne Hathaway, Glenn Close and Jim Belushi; *Mrs. Henderson Presents*, starring Judi Dench and Bob Hoskins; *Transamerica*, starring Felicity Huffman, winner of the Golden Globe Award for best actress; *The Matador*, starring Pierce Brosnan; and *Scary Movie 4*. Potential new releases by TWC include sequels to *Sin City*, *Kill Bill* and *Teenage Mutant Ninja Turtles*. We will also release content on DVD for Rainbow Media and the Independent Film Channel or IFC.

If the Transaction is completed, we will seek to leverage our increasing retail sales volumes from our new relationship with The Weinstein Company to improve the distribution and sale of our other owned and licensed content. We currently own or have the rights to publish DVDs and audio CDs under the trademarked brands described in the following table.* These brands include both proprietary and licensed brands. We work with a broad range of retail outlets including Wal-Mart, Best Buy, Target, Blockbuster, Movie Gallery, Netflix and Amazon.com to implement our specialized distribution strategy that consists of in-store displays that highlight our brands and promote our products that relate to these brands. We call this specialized distribution strategy our "Branded Distribution Network". We intend to continue to build our Branded Distribution Network by developing additional branded products through both internal development, acquisition and licenses from third parties. As part of this strategy, we acquired the Wellspring Media library with approximately 700 titles during 2005. Our brands and products are described below.

| Licensed Brands and Trademarks | Selected Owned or Licensed Content | Licensed Music Brands |
|---|---|---|
| AMC Monsterfest™ | Berliner Film Company | Ansel Adams |
| AMC TV for Movie People™ | J Horror Library (through Horizon | Baby Genius® * |
| AMC® Movies | Entertainment and Pony Canyon Inc.) | Beatrix Potter™ |
| Bazooka® | Jillian Michaels | Curious George® |
| Genius Entertainment® | NBC News Presents | Guess How Much I Love You™ |
| Hollywood Classics™ | Wellspring Library | Jay Jay the Jet Plane® |
| IFILM® | **Selected Distributed Content** | Kid Genius® * |
| National Lampoon® | Brandissimo! | My Little Pony® |
| Sundance Channel Home | Bauer Martinez Entertainment | Paddington Bear™ |
| Entertainment™ | IFC | Raggedy Ann and Andy™ |
| TV Guide® | Legend Films Library | Rainbow Fish™ |
| | Liberation Entertainment Library | Spot the Dog™ |
| | Pacific Entertainment | The Little Tikes® * |
| | Porchlight Entertainment | The Snowman™ |
| | Shorts Play | Tonka® |
| | Shorts Play Extreme | Wee Worship™ * |
| | The Weinstein Company** | |

---

\*      See Recent Developments below.
\*\*    On an interim basis until closing of the Transaction.

Definitive Proxy Statement (revised) for Genius Products, Inc. Page 131 of 395
Case 2:15-ap-01241-BB Doc 16-1 Filed 07/06/15 Entered 07/06/15 15:06:41 Desc
Exhibit AF1 - Part 1 Page 132 of 198

Table of Contents

On March 21, 2005, we completed the acquisition of American Vantage Media Corporation, or AVMC, a subsidiary of American Vantage Companies, or AVC. The acquisition was completed through an agreement and plan of merger which provided for the issuance to AVC of (i) 7,000,000 shares of our common stock and (ii) warrants to purchase 1,400,000 shares of our common stock, half at an exercise price of $2.56 per share and half at an exercise price of $2.78 per share, plus our assumption of approximately $6.3 million in debt of AVMC. A subsidiary of AVMC is Wellspring Media, Inc., which owns the rights to a substantial film library, as discussed further below. The Wellspring film library has approximately 700 titles of independent and art-related films, documentaries and holistic living programs that we plan to expand through acquisition and distribution agreements with content providers.

**Sale of Baby Genius**

On December 31, 2005, we sold to Klaus Moeller, our founder and former Chief Executive Officer, all of our right, title and interest in and to our "Baby Genius", "Kid Genius", "Little Tikes" and "Wee Worship" lines of business. We sold to Mr. Moeller all our audio and audiovisual works under those brands, and all related intellectual property, agreements, documents and instruments. Subject to limited exceptions, Mr. Moeller took over our obligations for royalties, advances, reporting requirements, and other obligations relating to talent agreements, producer agreements, and other agreements relating to these properties. The purchase price for this sale was $3 million. On January 5, 2006, Mr. Moeller assigned the rights to these assets and related obligations over to Pacific Entertainment Corporation, a company controlled by Mr. Moeller, Larry Balaban and Michael Meader.

In connection with this sale, we entered into a distribution agreement with Pacific Entertainment pursuant to which we were appointed the exclusive distributor of sound or video recordings owned or controlled by Pacific Entertainment during the term of the distribution agreement. As part of the distribution agreement, Genius Products will continue to distribute Baby Genius, Little Tikes and Wee Worship DVDs and music CDs and all new products under these brands. The territory of our distribution rights is the United States for audiovisual recordings and the United States and Canada for audio-only recordings, including their respective territories and possessions. The term of the distribution agreement is five years, subject to earlier termination when the deferred portion of the purchase price for the underlying assets is fully paid to us. Under the distribution agreement, we will receive a distribution fee and recoup all of our expenses.

**Corporate Structure**

We were incorporated in the State of Nevada on January 8, 1996 under the name Salutations, Inc., or Salutations. In September 1997, Salutations acquired all of the outstanding shares of a company called International Trade and Manufacturing Corporation, or ITM, a Nevada corporation founded in 1992. Immediately after the acquisition, Salutations assumed all of the operations and businesses of ITM and changed its name to International Trading and Manufacturing Corporation, or ITMC. In October 1999, we changed our name from International Trading and Manufacturing Corporation to Genius Products, Inc. to reflect our primary

Table of Contents

business of producing, publishing, licensing and distributing audio and video products. On March 2, 2005, we changed our state of incorporation from the State of Nevada to the State of Delaware through a merger with a newly formed subsidiary in Delaware.

## DVD Products

We sell and license our own proprietary content, license content from third parties and distribute content for third parties for a fee. Upon closing of the Transaction, we will have the exclusive U.S. home video distribution rights to feature film and direct-to-video releases owned or controlled by TWC. However, we are currently distributing home video for TWC under an interim agreement until the Transaction closes. We will seek to leverage our increasing retail sales volumes from our new relationship with TWC to improve the distribution and sale of our owned and licensed content as well as secure rights to additional content. We sell our owned and licensed products in retail outlets nationwide under well-known brands, including AMC, TV Guide, Sundance Channel Home Entertainment, Bazooka, National Lampoon, Baby Genius and Wellspring. We use a specialized distribution strategy called our Branded Distribution Network. Our Branded Distribution Network strategy employs the use of in-store displays that highlight our brands and promote our products among a broad range of retail outlets. We customize our displays and promotions based upon the buying patterns, habits and demographics of the consumers. As we add more content to our libraries, we intend to acquire, license, develop or distribute products with credible value and brand them for relevance to the consumer. We attempt to limit financial exposure through: (i) detailed return on investment, or ROI, analysis on potential acquisitions of new content, and (ii) our newly implemented vendor managed inventory system that provides us a scalable infrastructure and cost effective technology to manage the supply chain process.

To support our Branded Distribution Network, we intend to continue to acquire rights to film and television libraries and/or enter into distribution agreements with new content suppliers. Our acquisition of AVMC and its Wellspring library gives us a substantial library of high quality content consisting of approximately 700 feature films and documentaries. We believe this acquisition will drive value in our independent film genre categories. Additionally, we licensed the rights to distribute DVDs for the Legend and Liberation Entertainment film libraries. Each of these content suppliers have prolific film and TV libraries that include family classics, horror & cult classics, musical performances and television series. We believe these segments are integral to a well-balanced content portfolio that can generate revenue in several distribution channels.

We primarily sell and distribute entertainment products in the following categories:

1. Theatrical new releases (The Weinstein Company titles)

2. Independent Films, both theatrical and direct-to-video (Wellspring)

3. Classic content (TV Guide / Movie Classics / Legend Films)

4. Family oriented content (Brandissimo!)

5. Genre content, primarily horror, comedies, action, special interest, and health and wellness (Liberation Entertainment)

## CD and Other Products

### Music CDs

We distribute a line of musical CDs under recognizable brand names which come in three series: Classical, Instrumental and Vocal. We currently distribute 23 titles from the Baby Genius music catalog. The CDs are sold individually, in 2-packs and in 3-packs. In 2003, we introduced the first two Kid Genius titles. While Baby Genius products are developed for children up to the age of three, Kid Genius music is targeted for children ages three to seven. In 2003, we also introduced the Wee Worship branded line of Christian music for children. We have eight titles in this line. As disclosed above under "Recent Developments," we recently sold the "Baby

120

Table of Contents

Genius" and "Kid Genius" lines of business. We intend to continue to distribute these products pursuant to the terms of our distribution agreement with Pacific Entertainment.

### Licensed Children's Music

We have focused on developing, producing and acquiring the music rights to quality children's entertainment and toy brands. In addition to developing our own Genius brand-name products, we obtained licenses for the audio and/or video rights for established third-party properties. Since 2003, we have introduced many licensed music properties, including My Little Pony, Tonka, Jay Jay the Jetplane, Guess How Much I Love You, Rainbow Fish, Curious George, Paddington Bear, Raggedy Ann and Andy, The Snowman and Spot.

## Distribution

We utilize third-party distribution facilities located throughout the United States. We sell our products directly to retailers and through key select wholesale distribution companies including Alliance Entertainment Corp., Ingram and Baker & Taylor. We have excellent relationships with retailers nationwide and are a direct supplier to nearly every major retailer or major distributor that carries video and/or music products. We have distribution in approximately 25,000 retail locations. Our products can be found at retail outlets nationwide, such as mass retail stores including Target, Wal-Mart, Kmart, Meijers, ShopKo, Costco and Sam's Club; children's toy stores including Toys R Us and Babies R Us; electronics stores including Best Buy, Fry's and Circuit City; bookstores including Borders and Barnes & Noble; music retailers including Trans World Entertainment, Musicland, and Virgin; internet retailers including Amazon.com and Netflix; rental outlets including Blockbuster, Movie Gallery, and Hollywood Video, direct marketing companies including QVC and Columbia House and other non-traditional outlets.

We have entered into distribution agreements with companies located in the United States, Canada, the Philippines, Singapore and Hong Kong. In each of these instances, we receive licensing fees for the licensed products that are produced and sold by the licensees. These products include proprietary music and video products in certain countries and products developed by the licensees for sale that utilize our brand names and trademarks. We have also engaged licensing agents to assist us in licensing broadcast rights for our proprietary music and video products. While we hope to enter into relationships with other domestic and international distributors, there can be no assurance that we will do so or, if we do enter into any such relationships, that they will be profitable.

## Marketing and Sales

Our marketing and sales strategies are designed to support the sale of products for the retail, Internet and licensing components of our business. For our proprietary content, we use relatively low-cost marketing techniques, including public relations, promotional programs, in-store advertising and merchandising programs and cross-marketing with our strategic partners which are useful for marketing purposes but do not generate revenues directly. We continue to exhibit our products at select industry trade shows. For The Weinstein Company content, we will use marketing programs and strategies consistent with those used by other major film studios, including advertising on television, radio, magazines and newspapers and special promotions with retailers and consumer packaged goods companies.

For the year ended December 31, 2005, one customer accounted for 10% or more of net revenues. Wal-Mart accounted for 40% of net revenues in 2005. Our two largest customers in 2004, Target Corporation and Dollar Tree Stores, Inc., accounted for 27% and 26% of our net revenues, respectively. Dollar Tree Stores, Inc. is one of our primary retailers for our low priced value product that consists primarily of public domain content. Consistent with our strategy to shift our business from the lower margin, value product to higher priced and higher margin proprietary product, Dollar Tree Stores' share of our total net revenue declined from 26% in 2004 to 4.4% in 2005. Value product net revenue declined from $11.1 million in 2004 to $3.7 million in 2005, or 67%.

121

Table of Contents

Excluding value product revenue, net revenue increased $13.1 million from $5.5 million in 2004 compared to $18.6 million in 2005 or 238%. Our two largest customers in 2003, Anderson Merchandising and Target Corporation, accounted for 36% and 18% of our net revenues, respectively.

## Trademarks and Licenses

### Trademarks

We use multiple trademarks to distinguish our products, including Genius Entertainment and Movie and TV Classics, TV Guide, AMC, Sundance Channel, Hollywood Classics, National Lampoon and NBC News. In addition, our recently acquired subsidiaries American Vantage Media and Wellspring Media have a portfolio of trademarks that they use to distinguish and protect their films and related products. These and other trademarks are the subject of registrations and pending applications filed by us for use with a variety of products and other content, and we have an active program to expand our usage and registration of trademarks. We regard our rights in and to our trademarks and materials as valuable assets in the marketing of our products and vigorously seek to protect them against infringement and denigration by third parties.

### Third-Party Licenses

A portion of our business is dependent upon licenses that we obtain from third parties relating primarily to entertainment content, such as film, video and music. We also license the right to use well-known brands that we associate with our products, such as TV Guide, AMC and Hollywood Classics. In addition, the Wellspring film library that we recently acquired includes a large number of third-party licenses to films and documentaries in the library.

In September 2003, we executed a license agreement for the exclusive right to distribute worldwide a majority of Falcon Picture Group's audio and video products under the AMC and TV Guide brand names in the United States and Canada. This license agreement calls for a royalty to be paid on the sales of the video and audio products. We currently are involved in litigation with Falcon Picture Group. See "Legal Proceedings" below.

We license our classical music from Naxos of America, Inc. The various license agreements we have with Naxos terminate upon the expiration of the copyright of the music that is held by Naxos, or upon our discontinuation of the product line. We also pay royalties to other parties for selected songs that were chosen for inclusion in our products.

Also as discussed above, we have entered into licensing agreements to develop, manufacture and distribute music CDs in association with the licenses: Rainbow Fish, Curious George, Paddington Bear, Raggedy Ann and Andy, The Snowman, Spot, Beatrix Potter, My Little Pony and Tonka. These license agreements call for a royalty to be paid on all related music sales. Ownership of the music we create for these products becomes the property of the licensor.

## Suppliers and Compliance with Environmental Laws

We are able to obtain our CDs, videos and DVDs from a variety of suppliers. These items are readily available, and we would not expect our production to be seriously affected by the failure of any one supplier. We are not aware of any environmental laws that affect our business.

## Internet Business

Consumers who visit our retail website at www.geniusproducts.com can learn about us and our products. We are also creating a business-to-business section that will allow smaller independent retailers to order our products for resale in their stores. We believe that a continued Internet presence is desirable because it aids in consumer sales, business-to-business sales and name recognition and, in doing so, assists our retail business.

122

Table of Contents

## Competition

The retail and Internet markets for entertainment products, including cassettes, CDs, videos and DVDs, are highly competitive. We face significant competition with respect to the number of products currently available, pricing and in securing distribution at retail outlets. The costs of entry into the retail and Internet markets for competitive products are low, and there are no significant barriers to entry. There are many companies who could introduce directly competitive products in the short term that have established brand names, are better funded, have established distribution channels and have greater resources than us.

These established companies include Disney, Fox, Paramount, Sony, Time-Warner, Lionsgate and more. Within the category of children's music, established competitors include Disney, Kid Rhino, Madacy, Music for Little People, St. Clair, Direct Source, Twin Sisters, Great American Audio, Razor & Tie and more. Within the category of videos for children, established competitors include the Baby Einstein and Winnie-the-Pooh series by Disney Home Video, Barney series by HIT Entertainment, Dr. Seuss series by Fox Home Entertainment, Little Bear series by Paramount Home Video, Paddington Bear series by Time-Life, Sesame Street series by Sony Wonder, Teletubbies and Boohbah series by PBS Home Video/Paramount, Madeleine, The Jungle Book, The Little Mermaid, Fisher Price, Leapfrog, Brainy Baby and So Smart.

We believe the Transaction will improve our competitive position by providing us with a high volume of major studio quality, theatrically released feature films and direct-to-videos to distribute that will increase our market share with retailers.

## Employees

As of March 31, 2006, we had 91 full time employees and two part time employees. We expect to add employees as driven by our Distribution Agreement with The Weinstein Company. None of our employees are represented by an organized labor union. We believe our relationship with our employees is good, and we have never experienced an employee-related work stoppage. We will need to hire and retain highly-qualified management personnel in order to execute our business plan. No assurance can be given that we will be able to locate and hire such personnel or that, if hired, we will continue to be able to pay the higher salaries necessary to retain such skilled employees.

## Facilities

On March 15, 2006, we entered into a lease agreement for a 17,400 square foot facility located in Santa Monica, California, which we intend to use as our principal executive offices. This lease is for a five-year term which commenced in March 2006. Our monthly rent for this space is as follows:

| MONTH OF TERM | AMOUNT |
|---|---|
| 1-12 | $54,810 |
| 13-24 | $56,454 |
| 25-36 | $58,148 |
| 37-48 | $59,892 |
| 49-60 | $61,689 |

In November 2003, we entered into a sublease agreement for a 5,603 square foot facility located in Solana Beach, California, which we currently still use as our principal executive offices. This sublease is for a five-year term which commenced in January 2004. Our monthly rent for this space is as follows:

| MONTH OF TERM | AMOUNT |
|---|---|
| 1-12 | $ 11,206 |
| 13-24 | $ 11,598 |
| 25-36 | $ 12,001 |
| 37-48 | $ 12,421 |
| 49-60 | $ 12,856 |

123

Table of Contents

In addition to the monthly rent, we will pay for increases in common area expenses over the base year of 2004. We also have the option to extend the lease for an additional five-year period, although we intend to sublease this office until the end of the term.

On December 31, 2003, we entered into a sublease arrangement with the Meader Family Limited Trust, a related party, under which we rent a portion of a warehouse facility (approximately 8,000 square feet) in Atlantic, Iowa, for a monthly rent of $2,900. This centrally located facility is used to distribute our products to certain customers. The lease expires in December 2007, although we intend to sublease this warehouse until the end of the term.

Also on December 31, 2003, we entered into a sublease arrangement with Ekelund Properties, LLC, a related party, under which we rent sales offices (approximately 1,300 square feet) in Excelsior, Minnesota, for a monthly rent of $1,200. This lease has subsequently been terminated.

On October 15, 2004, we entered into a sublease agreement for a 1,670 square foot facility located in Bentonville, Arkansas. This sublease has a term of 5 years and expires in October 2009. The monthly rent for this facility is $1,879 with an annual increase of 3 percent.

On March 22, 2005 as part of the acquisition of AVMC and Wellspring, we assumed office space in New York and Santa Monica on a month-to-month basis. The monthly rent for the New York facility is $17,792 and the monthly rent for the Santa Monica facility is $18,490. We recently gave written notice to our landlord that we will move out of our current Santa Monica location on April 30, 2006.

We believe that these facilities are adequate for the immediate future.

## Legal Proceedings

Except as described below, we are not a party to any legal or administrative proceedings, other than routine litigation incidental to our business that we do not believe, individually or in the aggregate, would be likely to have a material adverse effect on our financial condition or results of operations.

### Wellspring

On March 21, 2005, we completed our acquisition of American Vantage Media Corporation and its subsidiary, Wellspring Media, Inc. On or about March 14, 2005, a complaint was filed in U.S. Bankruptcy Court for the District of Delaware against Wellspring requesting a judgment in excess of $3,000,000. The complaint was filed by the Chapter 7 Trustee of the Winstar Communications, Inc. Estate. The details of this matter are discussed below.

In September 2001 (prior to the acquisition of Wellspring by AVMC), Winstar (or its predecessor) sold a subsidiary, Winstar TV & Video, to Wellspring in exchange for $2,000,000 in cash and a promissory note in the amount of $3,000,000. The merger agreement provided that in the event the working capital of Winstar TV & Video was determined to be less than $3,000,000 at the closing of the merger, the sole remedy of Wellspring was a reduction in the principal amount of the promissory note by the difference between $3,000,000 and the actual amount of the working capital. The accountants for Wellspring determined that at the time of the closing of the merger, Winstar TV & Video had a working capital deficit. Based upon this determination and the provisions of the merger agreement, Wellspring determined that the amount due under the promissory note should be reduced to zero, and as a result no payment was made. On November 30, 2001, Wellspring informed Winstar of its determination regarding the working capital deficit, and Winstar subsequently advised Wellspring that it disputed the determination. Since 2001, Wellspring and Winstar have engaged in discussions in an effort to settle the dispute over the working capital calculation, but no settlement has been reached.

**Table of Contents**

We believe that, if an adverse judgment against Wellspring occurs or an adverse settlement is reached, our subsidiaries Wellspring and AVMC will be entitled to full indemnification against any such losses by the initial owners of Wellspring (prior to AVMC), and we will be entitled to indemnification by American Vantage Companies. However, if the outcome of this litigation is adverse to us and we are required to pay significant monetary damages that are not indemnified by others, our financial condition and results of operations will likely be materially and adversely affected.

**Falcon Picture Group**

In October, 2005, we commenced litigation against Falcon Picture Group, LLC ("Falcon") in the Superior Court of San Diego County, Case No. GIN047884 seeking damages of $975,000 arising out of Falcon's breach of the license agreement. In October, 2005, Falcon commenced litigation against Genius in the Circuit Court of Cook County, Illinois, Case No. 05H16850 (the "Illinois Proceeding"), based upon allegations, among other things, that Genius breached the terms of a license agreement by refusing to pay certain royalties to which Falcon supposedly was entitled. Falcon seeks a damages award of approximately $83,332 subject to proof at trial. Falcon further alleges that as a result of Genius' purported default under the license agreement, Falcon is entitled to a judgment declaring the license agreement to have been lawfully terminated. Genius plans to vigorously defend against the allegations thereof.

125

**Table of Contents**

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis of our financial condition and results of operations should be read in conjunction with the financial statements and the related notes. This discussion contains forward-looking statements based upon current expectations that involve risks and uncertainties, such as our plans, objectives, expectations and intentions. Our actual results and the timing of certain events could differ materially from those anticipated in these forward-looking statements as a result of certain factors, including those set forth under "Risk Factors" and elsewhere in this Proxy Statement. See "Cautionary Statement Concerning Forward Looking Statements."

### General

We are an entertainment company that produces, publishes, licenses and distributes films, videos and music on digital versatile discs, or DVDs, universal mini discs, or UMDs, and compact discs, or CDs under a variety of branded and non-branded names. Our products are sold at traditional, direct response, mail order and Internet retailers nationwide and, to a lesser extent, internationally. Our current business includes revenues from three major sources, as follows:

- Sales of videos and DVDs (76.8% and 82.6% of gross revenues for 2005 and 2004, respectively);

- Sales of audio CDs and cassettes (18.6% and 15.2% of gross revenues for 2005 and 2004, respectively); and

- Sales of theatrical and other (4.6% and 2.2% of gross revenues for 2005 and 2004, respectively).

Consistent with other retail product distributors, we experience some degree of sales seasonality. Our second quarter (period ending June 30) is typically the lowest sales period and our fourth quarter the highest. However we have grown significantly over the past few quarters, and therefore our changes in revenues may not track industry seasonality norms. In addition, we are placing a higher focus on our branded and proprietary business and less of a focus on value-priced products. This transition may affect future quarterly results.

We do not report our different products as segments because we do not allocate our resources among products nor do we measure performance by product. Finally, we do not maintain discrete financial information regarding product lines. Due to our size and limited resources, our sales, marketing and product development efforts are performed by the same personnel who support all products. Our warehousing costs also reflect support of all products and cannot be distinguished among product lines. In addition, we do not report our retail operations, representing sales over the Internet, as a separate segment as they are immaterial, representing less than 1% of revenues. Our Internet presence is maintained primarily for advertising and brand recognition purposes.

*Financing Transactions*

On March 2, 2005, we entered into a securities purchase agreement with certain institutional investors related to the private placement of 6,518,987 shares of our common stock, par value $0.0001 per share, and five-year warrants to purchase 1,303,797 shares of common stock, half at an exercise price of $2.56 per share and half at an exercise price of $2.78 per share. The transaction closed on March 3, 2005 and we realized gross proceeds of $10.3 million from the financing, before deducting commissions and other expenses. We agreed to register for resale the shares of common stock issued in the private placement and shares issuable upon exercise of warrants. Such registration statement became effective on May 11, 2005.

In May 2005, we entered into a securities purchase agreement with certain institutional investors related to the private placement of 3,000,000 shares of our common stock, par value $0.0001 per share, and five-year warrants to purchase 270,000 shares of our common stock at an exercise price of $2.56 per share. The transaction closed on May 20, 2005, and we realized gross proceeds of $5.25 million from the financing before deducting commissions and other expenses.

126

[Table of Contents](#)

On October 4, 2005, Genius entered into a Note and Warrant Purchase Agreement with a group of investors (collectively, the "Investors"). Under the Purchase Agreement, the Investors loaned a total of $4.0 million to Genius in exchange for (i) promissory notes in favor of the Investors (the "Notes") with a total principal balance of $4.0 million and (ii) five-year warrants to purchase a total of 280,000 shares of our common stock, par value $0.0001 per share, with an exercise price per share equal to $1.88 (the last reported sales price of our common stock, as reported by the Over the Counter Bulletin Board, on the initial closing date of October 5, 2005). On December 5, 2005, we repaid $2.5 million of the October 4, 2005 Notes with proceeds from our December 2005 private equity financing.

On December 5, 2005, we entered into a securities purchase agreement with certain institutional investors related to the private placement of 16,000,000 shares of our common stock, par value $0.0001 per share, and five-year warrants to purchase 4,800,000 shares of our common stock with an exercise price of $2.40 per share. The transaction closed on December 6, 2005 and we realized gross proceeds of $32 million from the financing, before deducting commissions and other expenses. The proceeds from the offering will provide working capital to fund new ventures as well as content acquisitions.

*Recent Severance*

During the quarter ended September 30, 2005, we executed a plan for the purpose of reorganizing our executive management team and terminating an exclusive agreement with our financial advisor. As a result, severance charges of approximately $2.7 million were recognized as operating expense during the quarter ended September 30, 2005, of which, $1.4 million was related to non-cash compensation expense resulting from the grant of additional vested stock options and the acceleration of certain unvested stock options. At December 31, 2005, the remaining severance obligation was $0.3 million.

*Sale of Baby Genius*

On December 31, 2005, we entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") with Klaus Moeller, who was our founder and formerly our CEO. Under the Asset Purchase Agreement, we agreed to sell to Mr. Moeller all of our right, title and interest in and to the following assets (the "Assets"), subject to the terms, conditions and limitations set forth in the Asset Purchase Agreement:

- Audio and audiovisual works entitled "Baby Genius";

- Audio and audiovisual works entitled "Kid Genius";

- Audio and audiovisual works entitled "Little Tikes";

- Audio works entitled "Wee Worship"; and

- Related intellectual property, agreements, documents and instruments.

Subject to limited exceptions, Mr. Moeller agreed to assume any and all obligations for royalties, advances, reporting requirements, and all other obligations of any kind arising out of or in connection with all talent agreements, producer agreements, and any and all other agreements relating to the Assets and due after the signing of the Asset Purchase Agreement.

The purchase price for the Assets was $3 million, payable as follows:

- $250,000 in cash on signing;

- $750,000 by means of a secured promissory note due and payable in full, together with all accrued interest, on January 30, 2006, bearing interest at the rate of 4.5% per annum; and

- $2 million by means of a secured promissory note due and payable in full, together with all accrued interest, on the fifth anniversary of the closing date, bearing interest at the rate of 4.5% per annum.

[Table of Contents](#)

We will continue to distribute Baby Genius, Little Tikes and Wee Worship DVDs and music CDs and all new products under these brands. Under the distribution agreement, we will receive a distribution fee and recoup all of our expenses. The $3 million purchase price was determined by negotiations between the parties and our assessment of the reasonable value of the Assets and the distribution arrangement.

**Critical Accounting Policies**

*Allowance for sales returns and doubtful accounts.* The allowance for doubtful accounts and provision for sales returns includes management's estimate of the amount expected to be lost or returned on specific accounts and for losses or returns on other as yet unidentified accounts included in accounts receivable. In estimating the allowance component for unidentified losses and returns, management relies on historical experience and takes into account current information obtained from retailers including retail sell-through data and retail inventory data as available. The amounts we will ultimately realize could differ materially in the near term from the amounts assumed in arriving at the allowance for doubtful accounts and provision for sales returns in the accompanying financial statements.

*Inventories.* Inventories consist of raw materials and finished goods and are valued at the lower of cost or market. Cost is determined on a first-in-first-out method of valuation. We regularly monitor inventory for excess or obsolete items and make any valuation corrections when such adjustments are needed.

*Long-lived assets.*

*Property and Equipment:* Property and equipment purchases are recorded at cost and are depreciated and amortized over the estimated useful lives of the assets (three to seven years generally) using the straight-line method.

*Production Masters:* Music production masters are stated at cost net of accumulated amortization. Costs incurred for music production masters, including licenses to use certain classical compositions, royalties, and recording and design costs, are capitalized and amortized over a three or seven year period using the straight-line method from the time a title is initially released. All exploitation costs, including print and advertising (P&A) costs associated with our theatrical department, are expensed as incurred.

*Film Library:* We capitalize the costs of production and acquisition of film libraries. Costs of production include costs of film and tape conversion to DLT master format, menu design, authoring and compression. These costs are amortized to direct operating expenses in accordance with Statement of Position ("SOP") 00-2, "Accounting by Producers or Distributors of Films", using the individual film forecast method over a period of ten years. Costs are stated at the lower of unamortized film costs or estimated fair value. For acquired film libraries, ultimate revenue includes estimates over a period not to exceed ten years. Management regularly reviews and revises when necessary its ultimate revenue and cost estimates, which may result in a change in the rate of amortization of film costs and/or a write-down of all or a portion of the unamortized costs of the library to its estimated fair value. No assurances can be given that unfavorable changes to revenue and cost estimates will not occur, which may result in significant write-downs affecting our results of operations and financial condition.

*Goodwill:* We evaluate the carrying value of goodwill as of December 31 of each year and between annual evaluations if events occur or circumstances change that would more likely than not reduce the fair value of the reporting unit below its carrying amount. Such circumstances could include, but are not limited to: (1) a significant adverse change in legal factors or in business climate, (2) unanticipated competition, or (3) an adverse action or assessment by a regulator. When performing the impairment review, we determine the carrying amount of each reporting unit by assigning assets and liabilities, including the existing goodwill, to those reporting units. A reporting unit is defined as an operating segment or one level below an operating segment (referred to as a component). A component of an operating segment is deemed a reporting unit if the component constitutes a business for which discrete financial information is available, and segment management regularly reviews the operating results of that component.

128

Table of Contents

To evaluate whether goodwill is impaired, we compare the fair value of the reporting unit to which the goodwill is assigned to the reporting unit's carrying amount, including goodwill. We determine the fair value of each reporting unit using the present value of expected future cash flows for that reporting unit. If the carrying amount of a reporting unit exceeds its fair value, the amount of the impairment loss must be measured. The impairment loss would be calculated by comparing the implied fair value of reporting unit goodwill to its carrying amount. In calculating the implied fair value of the reporting unit goodwill, the fair value of the reporting unit is allocated to all of the other assets and liabilities of that unit based on their fair values. The excess of the fair value of a reporting unit over the amount assigned to its other assets and liabilities is the implied fair value of goodwill. An impairment loss would be recognized when the carrying amount of goodwill exceeds its implied fair value.

Long-lived assets are reviewed annually for impairment and whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Impairment is necessary when the undiscounted cash flows estimated to be generated by the asset are less than the carrying amount of the asset.

*Revenue recognition.* Revenues are recorded upon the shipment of goods. Costs of sales and an allowance for returns are also recorded at the time of shipment. The allowance for returns calculation is based upon an analysis of historical customer and product returns performance as well as current customer inventory data as available. Updates to the returns calculation is performed quarterly. Revenues from theatrical release of films are recognized at the time of exhibition based on our participation with box office receipts. Revenues from royalties are recognized when received. Revenues from licensing are recognized when the title is available to the licensee.

*Income taxes.* Deferred taxes are accounted for using an asset and liability approach, whereby deferred tax assets are recognized for deductible temporary differences and operating loss carry-forwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

## Results of Operations—Three Months Ended March 31, 2006 and 2005

*Revenues:*

Video and DVD revenues for the first quarter ended March 31, 2006 were composed of sales of The Weinstein Company ("TWC") title, *Derailed,* sales of branded and proprietary products including branded classic movies and television shows on DVD as well as non-branded classic movies and television shows on DVD, and Wellspring titles from AVMC. Video revenues increased $34.8 million during the first quarter ended March 31, 2006 to $36.2 million, as compared to $1.4 million during the comparable prior year period. This increase from 2005 was primarily due to the addition of revenues from the video release of TWC's *Derailed.*

Theatrical revenues were composed of sales generated from film rentals by our theatrical division. Theatrical revenues increased to $0.1 million for the first quarter ended March 31, 2006, compared to zero for the comparable prior year period. This primarily related to the release of *Unknown White Male* during the quarter ended March 31, 2006. In February 2006, we announced we will no longer release films theatrically.

Audio revenues for the first quarter ended March 31, 2006 were composed of Baby Genius, Kid Genius, licensed music CDs, interactive music programs, non-branded, and value music products sold at an entry level price point at retail. Audio revenues decreased $0.5 million during the first quarter ended March 31, 2006 to $0.8 million, as compared to $1.3 million during the comparable prior year period. The decrease was attributable to lower sales of the Baby Genius music, licensed music product, value music products and Lifestyles Music Program.

[Table of Contents](#)

Royalties, licensing and other revenues were composed of royalties from licensing fees from Wellspring Media, Inc. and the license of our Baby Genius brand name. Royalties, licensing and other revenues increased $0.3 million during the first quarter ended March 31, 2006 to $0.4 million, as compared to $25,118 during the comparable prior year period. The changes resulted from an increase in licensing revenues from our acquisition of AVMC on March 22, 2005.

As a result of the foregoing, total gross revenues increased $34.6 million during the first quarter ended March 31, 2006, to $37.4 million as compared to $2.8 million during the comparable prior year period, due primarily to increased sales of video products as discussed above.

Sales returns, discounts and allowances increased $8.6 million during the first quarter ended March 31, 2006 to $8.8 million, as compared to $0.2 million during the comparable prior year period. The increase primarily resulted from the increase in sales from the video release of TWC's *Derailed*. Additionally, there has been an industry trend towards an increasing percentage of returns for the sale of DVD's. The provision for sales returns and allowances is calculated in accordance with historical averages and industry changes, but may vary in the future based on customer and product mix.

Net revenues increased $26.0 million during the first quarter ended March 31, 2006 to $28.6 million as compared to $2.6 million during the comparable prior year period, primarily due to the increase in sales of DVDs from the release of *Derailed*.

***Costs and expense:***

*Cost of Sales:*

Cost of sales consists primarily of the cost of products sold to customers, packaging and shipping costs, amortization of production masters, and royalties paid on sales of licensed products. For analytical purposes we review amortization of production masters as a stand-alone cost element and discuss the aggregate cost of producing, packaging, and shipping of the audio, DVD, and royalty, licensing and other products. Generally, cost of sales increased as a result of the increased sales. We include remittances to TWC in cost of sales. Under our interim distribution agreement with TWC, we record remittances to TWC based upon net revenues we receive from sales of TWC titles released on DVD (net of reserves and allowances), deduct our distribution fee, deduct cost of goods sold (including manufacturing expenses), deduct certain marketing expenses, and record the remaining balance as a remittance to licensor under cost of goods sold.

Video and DVD cost of sales increased $20.4 million during the first quarter ended March 31, 2006 to $22.0 million, as compared to $1.6 million during the comparable prior period. The increase resulted from an increase in video and DVD sales, primarily due to the video release of TWC's *Derailed* during the first quarter ended March 31, 2006. Cost of sales related to *Derailed* include the remittance to The Weinstein Company and the related product cost of sales.

Theatrical cost of sales, composed primarily of print and advertising costs related to sales generated from film rental by our theatrical division, were $0.1 million during the quarter ended March 31, 2006 primarily from the theatrical release of *Unknown White Male*, as compared to zero for the quarter ended March 31, 2005. Our theatrical division was discontinued in February 2006.

Audio cost of sales decreased $0.2 million during the first quarter ended March 31, 2006 to $0.6 million, as compared to $0.8 million during the comparable prior period. The decrease in cost of sales was due to the lower audio sales during the first quarter ended March 31, 2006.

Amortization of production masters and film library increased $0.1 million during the first quarter ended March 31, 2006 to $0.3 million, as compared to $0.2 during the comparable prior period. The increase in

130

Table of Contents

amortization of production masters and film library is primarily the result of the acquisition of AVMC, as well as an increase in amortization of the production masters due to the development of our library.

*Operating Expense:*

Product development expenses increased $0.5 million during the first quarter ended March 31, 2006 to $0.7 million, as compared to $0.2 million during the comparable prior period. The increase was attributed to the addition of new titles into our libraries.

Sales and marketing expenses increased $5.1 million during the first quarter ended March 31, 2006 to $5.5 million as compared to $0.4 million for the comparable prior period. The increase in sales and marketing is primarily attributable to the video release of TWC's *Derailed* which was released on March 21, 2006.

General and administrative expenses increased by $3.5 million during the first quarter ended March 31, 2006 to $4.9 million, as compared to $1.4 million during the comparable prior period. These increases were primarily due to increased payroll, rent, and utilities as a result of the acquisition of AVMC, increased payroll and overhead to support the increased sales volume anticipated as part of the new relationship with The Weinstein Company, increased transaction costs including investment banking, audit and legal fees of $0.6 million related to the transaction announced with The Weinstein Company, severance costs associated with employees and outside consultants of $0.7 million and warrants and options expense associated with compensation to certain employees and outside consultants of $1.0 million. General and administrative expenses were 17.1% of net revenues for the quarter ended March 31, 2006 compared to 56.4% for the quarter ended March 31, 2005.

On December 31, 2005, we sold to Klaus Moeller, our founder and former Chief Executive Officer, all of our right, title and interest in and to our "Baby Genius", "Kid Genius", "Little Tikes" and "Wee Worship" lines of business for a total purchase price of $3 million.

The purchase price was payable as follows:

- $250,000 in cash on signing;

- $750,000 by means of secured promissory note due and payable in full, together with all accrued interest, on January 30, 2006, bearing interest at the rate of 4.5% per annum; and

- $2 million by means of a secured promissory note due and payable in full, together with all accrued interest, on the fifth anniversary of the closing date, bearing interest at a rate of 4.5% per annum.

In conjunction with this transaction we recorded a gain on sale in the amount of $1,351,710 and recorded a note receivable in the amount of $1,712,353 representing the present value of a $2 million secured promissory note that we received in this transaction and a deferred gain of $1,212,353. We have subsequently received payment in full of the secured promissory note, due on January 30, 2006, in the amount of $750,000, plus interest. We will recognize the deferred gain based upon the relative percentage of revenue we generate in each period relative to the total revenue expected to be generated over the term of the distribution agreement. For the quarter ended March 31, 2006, we recognized a gain of $40,267 relating to the deferred gain of $1.2 million at December 31, 2005.

We had interest income of $47,841 during the first quarter ended March 31, 2006 as compared to $5,840 of interest expense for the comparable prior period. The change resulted from the repayment of notes payable during the first quarter of 2006, offset by an increase in interest income related to the higher average cash balance for the quarter ended at March 31, 2006.

As result of the foregoing, the net loss increased $3.5 million during the first quarter ended March 31, 2006, to $5.7 million as compared to $2.2 million during the comparable prior period.

131

Definitive Proxy Statement (revised) for Genius Products, Inc.     Page 144 of 395
Case 2:15-ap-01241-BB   Doc 16-1   Filed 07/06/15   Entered 07/06/15 15:06:41   Desc
Exhibit AF1 - Part 1   Page 145 of 198

**Table of Contents**

**Results of Operations—2005 Compared to 2004**

*Revenues:*

    Video and DVD revenues for the year ended December 31, 2005 were composed of sales of branded and proprietary products including branded classic movies and television shows on DVD as well as non-branded classic movies and television shows on DVD and Wellspring titles from the completion of the acquisition of AVMC on March 22, 2005. Video gross revenues increased $8.8 million or 55.3% during the year ended December 31, 2005 to $24.8 million compared to $16.0 million for the same period ended December 31, 2004. These increases were due to the acquisition of AVMC on March 22, 2005 and increased revenues from our branded products during 2005. The increase in revenue was offset by a decline in value priced products as a result of our decision to discontinue this product line. Value product net revenue declined from $11.1 million in 2004 to $3.7 million in 2005, or 67%. Excluding value product revenue, gross revenue increased $13.1 million from $5.5 million in 2004 compared to $18.6 million in 2005 or 238%.

    Theatrical revenues were composed of sales generated from film rental by our theatrical subsidiary, Wellspring Media, Inc., that we acquired from AVMC on March 22, 2005. Theatrical revenues were $0.8 million for the year ended December 31, 2005, as compared to zero for the comparable prior year. On February 20, 2006 we announced a corporate realignment of this subsidiary (See subsequent event, Note 14).

    Audio revenues for the year ended December 31, 2005 were composed of Baby Genius, Kid Genius, licensed music CDs, interactive music programs, and non-branded, value music products sold at an entry level price point at retail. Audio revenues increased $3.1 million, or 103.4%, during the year ended December 31, 2005 to $6.0 million, as compared to $2.9 million during the comparable prior year. The increase was attributable to higher sales of the Baby Genius and licensed music product and continued sales of the non-branded, value music products and Lifestyles Music Program that we introduced in the fourth quarter of 2004.

    Royalties, licensing and other revenues were composed of royalties from licensing fees from Wellspring Media, Inc, and the license of our Baby Genius brand name. Royalties, licensing and other revenues increased $0.3 million, or 77.3%, for the year ended December 31, 2005 to $0.7 million, as compared to $0.4 million during the comparable prior year. The changes resulted from a decrease in royalties related to the licensing of our Baby Genius brand name, offset by an increase in licensing revenues from our acquisition of AVMC on March 22, 2005.

    As a result of the foregoing, total gross revenues increased $13.0 million, or 67.0%, during the year ended December 31, 2005, to $32.3 million as compared to $19.3 million during the comparable prior year, due primarily to increased sales of video and audio products as discussed above.

    Sales returns, discounts and allowances increased $7.3 million, or 268.5%, during the year ended December 31, 2005 to $10.0 million, as compared to $2.7 million during the year ended December 31, 2004. Overall, there has been an industry trend towards an increasing percentage of returns for the sale of DVDs. The increase resulted primarily from additional markdowns, higher returns from increased sales year over year, and higher than expected returns during the quarter ended December 31, 2005 due to lower than expected performance by a retail promotion with one of our major retailers. The provision for sales returns and allowances is calculated in accordance with historical averages and industry changes, but may vary in the future based on customer and product mix.

    Net revenues increased $5.7 million, or 34.3%, for the year ended December 31, 2005 to $22.3 million as compared to $16.6 million for the comparable prior year, due to the increase in sales of DVDs and the acquisition of AVMC, offset in part by an increase in sales returns and allowances as described above.

132

[Table of Contents](#)

*Costs and expense:*

*Cost of Sales:*

Cost of sales consists primarily of the cost of products sold to customers, packaging and shipping costs, amortization of production masters and library and royalties paid on sales of licensed products. For analytical purposes we review amortization of production masters and library as a stand-alone cost element and discuss the aggregate cost of producing, packaging, and shipping of the audio, DVD, and royalty, licensing and other products. Generally, cost of sales increased as a result of increased sales.

Video and DVD cost of sales increased $2.2 million, or 19.4%, during the year ended December 31, 2005 to $13.7 million as compared to $11.4 million during the comparable prior year. The increase resulted from an increase in Video and DVD sales, partially due to the addition of AVMC into our Video and DVD product mix for 2005 and a reserve recorded for obsolete products determined by management to be of limited or no value. Video and DVD cost of sales in 2005 were 55.1% of DVD and VHS revenues, as compared to 71.7% for 2004. The decrease in Video and DVD costs for the year ended December 31, 2005, as compared to the year ended December 31, 2004, was the result of an increase of higher margin products in our sales mix during 2005. The improvement in the cost of sales and the reserve for obsolescence are due in part to our decision to decrease our sales of value priced, lower margin content and increase the sale of our proprietary content.

Theatrical cost of sales, composed primarily of releasing costs associated with film prints and advertising related to the exhibition and promotion of films in theaters by our subsidiary, Wellspring Media Inc., were $2.1 million for the year ended December 31, 2005 as compared to zero during 2004. During 2005, theatrical releasing costs included significant expenditures on the theatrical release of titles including *Palindromes, Kings & Queens, Wild Side,* and *The Beat My Heart Skipped.* Theatrical releasing expenditures can vary from period to period, often in advance of a theatrical release and the associated film rental revenues that are generated from exhibiting the film (See subsequent event, Note 14).

Audio cost of sales increased $2.6 million, or 221.9%, during the year ended December 31, 2005 to $3.8 million, as compared to $1.2 million for the year ended December 31, 2004. The increase in cost of sales was due to higher audio sales for 2005 compared to 2004. Audio cost of sales in 2005 were 63.7% of audio revenues, as compared to 40.2% in 2004. This increase was due primarily to the reserve of inventory during the second and fourth quarters of 2005.

Amortization of production masters and film library increased $2.3 million, or 336.3%, for the year ended December 31, 2005 to $3.0 million, as compared to $0.7 million during the comparable prior year. The increase in amortization of production masters and film library is primarily the result of an increase in sales for 2005 as compared to 2004 and the acquisition of AVMC.

Warehouse expenses and other decreased by $0.3 million, or 48.3%, to $0.3 million in 2005 as compared to $0.6 million in 2004 due to the classification of royalties, licensing and other expense of $0.3 million in 2004. Excluding the royalties, licensing and other expense of $0.3 million in 2004, warehouse expense increased slightly to $0.3 million in 2005 as increased sales and inventory levels resulted in higher freight-in and warehouse operations. However, warehouse expenses as a percentage of gross sales decreased from 3.0% in 2004 to 0.9% in 2005.

*Gross Profit:*

Gross profit decreased $3.3 million to a gross loss of $0.6 million in 2005 as compared to a gross profit of $2.7 million in 2004 due primarily to a reserve recorded for obsolete products determined by management to be of limited or no value and higher amortization of production master and film library.

133

Table of Contents

*Operating Expense:*

Product development expenses increased $0.2 million, or 17.9%, during the year ended December 31, 2005 to $1.1 million, as compared to $1.0 million for 2004. The increase was attributed to the addition of new titles into our libraries. However, product development expense as a percentage of net revenues decreased from 5.8% in 2004 to 5.0% in 2005.

Sales and marketing expenses increased $0.4 million, or 19.2%, to $2.6 million during the year ended December 31, 2005 as compared to $2.2 million for the comparable prior year. Prior to its acquisition by us, AVMC significantly reduced its sales and marketing expense, and although the acquisition of AVMC resulted in higher sales to us, the current rate at which we are incurring sales and marketing expenses for AVMC is significantly below the prior year, due in part, to the lack of resources dedicated to sales and marketing by AVMC. The Company intends to increase sales and marketing expense in 2006 to support revenue increases.

General and administrative expenses increased by $5.9 million, or 116.1% during the year ended December 31, 2005 to $11.0 million, as compared to $5.1 million during 2004. These increases were primarily due to increased payroll, rent, and utilities as a result of the acquisition of AVMC, increased payroll and overhead to support the increased sales volume anticipated as part of the new relationship with The Weinstein Company from which revenue will not be generated until 2006, increased transaction costs including investment banking, audit and legal fees related to the transaction announced with The Weinstein Company, severance costs associated with employees and outside consultants and warrants and options expense associated with compensation to certain employees and outside consultants. Additional expenses include increased insurance, accounting and legal costs associated with the larger combined entity. General and administrative expense as a percentage of net revenues increased from 30.7% in 2004 to 49.4% in 2005. Excluding expenses of $2.4 million associated with TWC transaction fees and TWC-related overhead and other charges, general and administrative expenses would have been $8.6 million in 2005, or 38.6% of net revenue, as compared to $5.1 million, or 30.7% in 2004.

We reorganized our executive management team and terminating an exclusive agreement with our financial advisor during the third quarter ended September 30, 2005. As a result, severance related charges of approximately $2.7 million were recognized, of which, $1.4 million was related to non-cash compensation expense resulting from the grant of additional vested stock options and the acceleration of certain unvested stock options. As of December 31, 2005, the remaining severance obligation was $0.3 million.

On December 31, 2005, we sold to Klaus Moeller, our founder and former Chief Executive Officer, all of our right, title and interest in and to our "Baby Genius", "Kid Genius", "Little Tikes" and "Wee Worship" lines of business for a total purchase price of $3 million.

The purchase price was payable as follows:

- $250,000 in cash on signing;

- $750,000 by means of secured promissory note due and payable in full, together with all accrued interest, on January 30, 2006, bearing interest at the rate of 4.5% per annum; and

- $2 million by means of a secured promissory note due and payable in full, together with all accrued interest, on the fifth anniversary of the closing date, bearing interest at a rate of 4.5% per annum.

In conjunction with this transaction we recorded a gain on sale in the amount of $1,351,710 and recorded a note receivable in the amount of $1,712,353 representing the present value of a $2 million secured promissory note that we received in this transaction. We have subsequently received payment in full of the secured promissory note, due on January 30, 2006, in the amount of $750,000, plus interest.

Interest expense and other, net decreased by $0.1 million, or 15.6% for the year ended December 31, 2005 to $0.5 million, as compared to $0.6 million for the comparable prior year. The decrease resulted from the

Table of Contents

repayment of notes payable in the fourth quarter of 2004 and an increase in interest income in 2005 as a result of an increase in cash, partially offset by an increase in interest expense related to the $4.0 million notes payable assumed as part of the AVMC transaction and the $4.0 million notes payable issued in October 2005.

As result of the foregoing, the net loss increased by $11.1 million for the year ended December 31, 2005, to $17.1 million, as compared to $6.0 million for 2004.

**Results of Operations—2004 Compared to 2003**

DVD and VHS revenues for our fiscal year ended December 31, 2004 were composed primarily of sales of our non-branded movies and television shows distributed on DVD and to a lessor extent AMC, TV GUIDE and Hollywood Classic branded classic movies and television shows. DVD and VHS revenues were $15,967,711 during 2004, as compared to $876,285 during 2003. This large increase of 1722% was due primarily to our launch during 2004 of non-branded classic movie and television shows on DVD and VHS, which accounted for $11,096,371 of the increase in 2004 revenues. The remaining increase of $3,995,055 was attributable primarily to sales of branded content on DVD and VHS during 2004.

Audio revenues for fiscal 2004 were composed of Baby Genius, Kid Genius, licensed music CDs, Interactive music programs and a Value music product sold at an entry level price point at retail. Audio revenues increased $797,141, or 37%, in 2004 to $2,946,237, compared to $2,149,096 in 2003. The increase in audio revenues was the result of increased sales of licensed music products and the introduction of the Interactive and Value audio products in 2004. The increases were slightly offset by a decline in sales of Baby Genius and Kid Genius audio products.

Royalties, licensing and other revenues are composed of royalties from our prior agreement with Warner Home Video, licensing fees from the license of our Baby Genius brand name, Zoo Babies and other plush gift products. Royalties, licensing and other revenues were $420,299 in 2004 compared to $456,110 in 2003, a decrease of $35,811, or 8%, primarily due to reductions in royalties and licensing revenue.

Total gross revenues increased $15,852,756, or 455%, during 2004 to $19,334,247, as compared to $3,481,491 in 2003 due primarily to increased sales of the new DVD products as discussed above. During 2004, two customers each accounted for more than 10% of sales during the period, and in total represented 53% of gross revenues for the year.

Sales returns, discounts and allowances increased $2,291,330, or 555%, to $2,704,315, or 14% of gross revenues, in 2004, as compared to $412,985, or 12% of gross revenues, in 2003. The provision for sales returns, discounts and allowances in the 2004 period were affected by a change in product mix, customer mix, and the significant increase in sales volume.

Net revenues increased by $13,561,426, or 442%, to $16,629,932 for 2004, from $3,068,506 for 2003, due primarily to the increase in sales of our new DVD products as discussed above.

Cost of sales consists primarily of the cost of products sold to customers, packaging and shipping costs, amortization of production masters, and royalties paid on sales of licensed products. For analytical purposes, we review amortization of production masters as a stand-alone cost element and discuss the aggregate cost of producing, packaging, and shipping of the audio, DVD, and royalty, licensing and other products.

Audio cost of sales in 2004 was 40% of audio revenues, as compared to 50% in 2003. This improvement was due to increased sales of higher margin licensed music, and a shift of sales from third-party distribution to our direct sales force. DVD and VHS cost of sales in 2004 was 71.7% of DVD and VHS revenues, as compared to 53.2% for 2003. 2004 DVD product mix was heavily skewed towards our lower margin, value-priced DVDs, as compared to 2003. Costs of revenues were 77.4% for royalty, licensing and other revenues in 2004 as

135

Table of Contents

compared to 56.9% in 2003. This increase is due to a change in product mix, as high margin licensing revenues decreased as compared to 2003.

Amortization of production masters increased $476,911, or 233%, to $681,404 for 2004 as compared to $204,493 for 2003. We currently anticipate that product development amortization expenses will continue to increase as capitalized product development costs are amortized at the same ratio as expected DVD library revenues.

We took a $474,358 charge to cost of sales in the fourth quarter of 2004 to establish an inventory reserve for obsolete product. This was deemed necessary as the product strategy for fiscal year 2005 will evolve given the acquisition of the Wellspring library. See Note 14 to the financial statements.

Warehouse expenses increased by $115,843, or 84%, to $253,864 in 2004 as compared to $138,021 in 2003, as increased sales and inventory levels resulted in higher freight-in and warehouse operations costs. However, warehouse expenses as a percentage of gross sales decreased from 4.0% in 2003 to 1.3% in 2004.

Sales and marketing expenses increased by $1,145,925, or 112%, to $2,166,785 in 2004 as compared to $1,020,860 in 2003. This increase was due primarily to increased personnel costs and variable commissions payable to an outside sales representative. Sales and marketing expense as a percentage of net revenues decreased from 33.3% in 2003 to 13.0% in 2004.

Product development expenses increased by $528,056, or 123%, to $956,521 in 2004 as compared to $428,465 in 2003. The increase is attributed to increased personnel and consulting costs as related to the new product releases in 2004. Product development expense as a percentage of net revenues decreased from 14% in 2003 to 5.7% in 2004.

General and administrative expenses increased by $3,025,896, or 145%, to $5,107,547 in 2004 as compared to $2,081,651 in 2003. The increase was primarily due to bonuses paid to executives and staff in the first quarter of 2004, hiring of additional executive and clerical personnel, the costs of stock options and warrants granted to non-employees, professional fees and outside services. The cost of warrants granted to non-employees was $1,339,412 in 2004, as compared to $430,655 recorded in 2003. This increase was the result of the recognition of $872,154 of consulting services for one party in 2004. General and administrative expense as a percentage of net revenues decreased from 67.8% in 2003 to 30.7% in 2004.

Interest expense for 2004 was $542,451, compared to $144,021 for 2003, due to interest and amortization of the discount on notes issued in the fourth quarter of 2003. The notes had a maturity date of December 2004 and have been repaid.

The net loss for 2004 of $6,046,168 was $3,303,492 greater than the net loss of $2,742,676 for 2003 primarily as the result of investments in personnel, DVD content and other infrastructure which added cost to our operations as discussed above.

**Liquidity and Capital Resources**

Net cash used in operations during the three months ended March 31, 2006 was $6.8 million, primarily due to the net loss of $5.7 million, increases in accounts receivable and inventories, offset by increases in accounts payable, deferred revenue, remittance to licensor, and allowance for doubtful accounts and provision for returns. These changes are primarily related to the release of two TWC titles, *Derailed* and *Wolf Creek*. The increase in accounts receivable relates primarily to sales of *Derailed* and the shipment of *Wolf Creek* during the quarter ended March 31, 2006. The increase in accounts payable and inventories primarily relate to invoices received but not paid for the production of inventory and sales and marketing expenses for *Derailed* and *Wolf Creek*. The increase in deferred revenue related primarily to invoices for shipments of *Wolf Creek,* which had a street date on

136

Table of Contents

April 11. The invoices for *Wolf Creek* were recorded as deferred revenue since the street date for Wolf Creek occurred after March 31, 2006. The remittance to licensor primarily represents the amount owed to TWC after deducting the related cost of sales, marketing costs, and our distribution fee from net sales of *Derailed* during the first quarter. Under the terms of the interim distribution agreement, we are required to pay TWC after collection of receipts, which as of March 31, 2006 had not been collected. Allowance for doubtful accounts and provision for returns increased primarily as a result of reserves for returns related to the release of *Derailed*. For the three months ended March 31, 2005, net cash used in operations was $5.1 million, driven primarily by the net loss of $2.2 million and the decrease in accounts payable, offset by a decrease in accounts receivable.

Net cash used in investing activities for the three months ended March 31, 2006, was $0.3 million, primarily attributed to the purchase of property and equipment. For the three months ended March 31, 2005, net cash used in investing activities was $0.2 million, which was primarily due to the payment of obligations relating to the acquisition of AVMC.

Cash used in financing activities for the three months ended March 31, 2006 was $5.1 million, resulting from the repayment of $3.8 million of the $4.0 million notes payable assumed as part of the acquisition of AVMC on March 31, 2005 and the repayment of $1.5 million of notes issued in October 2005, offset by proceeds from the exercise of options and warrants.

At March 31, 2006, we had cash balances of $18,402,355 and net accounts receivable of $42,038,129. We feel that we have sufficient liquidity to fund our operations through the remainder of 2006. However, we will consider additional issuance of equity and debt financing to fund future growth opportunities. Although we believe that our expanded product line offers us the opportunity for significantly improved operating results in future quarters, no assurance can be given that we will operate on a profitable basis in 2006, or ever, as such performance is subject to numerous variables and uncertainties, many of which are out of our control.

The table below summarizes information as of March 31, 2006 regarding certain future minimum contractual obligations and commitments for the next five years:

|  | Remainder of 2006 | 2007 | 2008 | 2009 | 2010 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Lease obligations | $ 804,465 | $1,092,459 | $976,302 | $728,507 | $734,880 | $185,068 | $4,521,681 |
| Employment agreements | 1,148,659 | 961,250 | — | — | — | — | 2,109,909 |
| Consulting agreements | 160,000 | — | — | — | — | — | 160,000 |
| Royalty advances | 231,386 | — | — | — | — | — | 231,386 |
| Total | $2,344,510 | $2,053,709 | $976,302 | $728,507 | $734,880 | $185,068 | $7,022,976 |

At December 31, 2005, we had cash balances of $30,597,164 and net accounts receivable of $2,406,658 compared to cash balances of $1,223,881 and net accounts receivable of $3,615,073 at December 31, 2004. Our working capital increased $21,381,080 from $60,177 at December 31, 2004 to $21,441,257 at December 31, 2005 primarily as a result of an increase in cash and cash equivalents. Long-lived assets, comprised of production masters and film library, were $19,727,179 at December 31, 2005 compared to $3,867,546 at December 31, 2004. The increase in long-lived assets is the result of additions to our film library and the acquisition of AVMC on March 22, 2005, offset by amortization expense during 2005.

Net cash used in operations during the year ended December 31, 2005 was $16.3 million, primarily due to the net loss of $17.2 million, certain transition costs related to AVMC, decreases in accounts payable, and increases in accounts receivable. In addition, cash used in operations for 2005 increased as a result of the development of our film library.

137

Definitive Proxy Statement (revised) for Genius Products, Inc.  Page 150 of 395
Case 2:15-ap-01241-BB Doc 16-1 Filed 07/06/15 Entered 07/06/15 15:06:41 Desc
Exhibit AF1 - Part 1 Page 151 of 198

Table of Contents

Net cash provided by investing activities for the year ended December 31, 2005, was $0.6 million, primarily attributed to net cash received from the AVMC acquisition and cash received as part of the sale of Baby Genius assets to Pacific Entertainment on December 31, 2005 offset by the purchase of property and equipment.

Cash provided by financing activities for the year ended December 31, 2005 was $45.1 million, primarily resulting from the sale of our common stock in private equity placements in March, May and December of 2005, proceeds from notes payable, and cash received from the exercise of stock options and warrants. Cash received was partially offset by payments on short term debt and offering costs. For the year ended December 31, 2004, cash provided by financing activities was $5.5 million, primarily driven by a private equity placement.

On October 4, 2005, we entered into a Note and Warrant Purchase Agreement with a group of investors (collectively, the "Investors"). Under the Purchase Agreement, the Investors loaned a total of $4.0 million to us in exchange for (i) promissory notes in favor of the Investors (the "Notes") with a total principal balance of $4.0 million and (ii) five-year warrants to purchase a total of 280,000 shares of our common stock, par value $0.0001 per share, with an exercise price per share equal to $1.88 (the last reported sales price of our common stock, as reported by the Over the Counter Bulletin Board, on the initial closing date of October 5, 2005).

The Notes do not bear any interest, and all outstanding principal was due and payable in full on March 3, 2006 (the first business day that is 150 days after the initial closing date).

On December 5, 2005, we repaid $2.5 million of the October 4, 2005 Notes with proceeds from our December 2005 private equity financing.

On December 5, 2005, we entered into a securities purchase agreement with certain institutional investors related to the private placement of 16,000,000 shares of our common stock, par value $0.0001 per share, and five-year warrants to purchase 4,800,000 shares of common stock with an exercise price of $2.40 per share. The transaction closed on December 6, 2005 and we realized gross proceeds of $32 million from the financing, before deducting commissions and other expenses. The proceeds from the offering will provide working capital to fund new ventures including the recent transaction announced with TWC and other content acquisitions.

Subsequent to year end, in February of 2006, we repaid $3.8 million of the Notes assumed as part of the AVMC transaction. In March 2006, we repaid the remaining $1.5 million of the October 2005 Notes. We feel that we have sufficient liquidity to fund our operations through the remainder of 2006; however we will consider additional issuance of equity and debt financing to fund future growth opportunities. Although we believe that our expanded product line offers us the opportunity for significantly improved operating results in future quarters, no assurance can be given that we will operate on a profitable basis in 2006, or ever, as such performance is subject to numerous variables and uncertainties, many of which are out of our control (See subsequent event, Note 17).

**Quantitative and Qualitative Disclosures About Market Risk**

As of March 31, 2006, our cash and cash equivalents were invested with financial institutions with investment grade credit ratings. Due to the short duration of our investment portfolio and the high quality of our investments, an immediate 10% change in interest rates would not have a material effect on the fair market value of our portfolio. Therefore, we would not expect our operating results or cash flows to be affected to any significant degree by the effect of a sudden change in market interest rates on our investment portfolio.

We do not enter into hedging or derivative instrument arrangements.

138

Definitive Proxy Statement (revised) for Genius Products, Inc.   Page 151 of 395

Case 2:15-ap-01241-BB  Doc 16-1  Filed 07/06/15  Entered 07/06/15 15:06:41  Desc

Exhibit AF1 - Part 1  Page 152 of 198

Table of Contents

## EXECUTIVE COMPENSATION

  The following table sets forth summary information regarding the compensation earned by our chief executive officer and each of our other most highly compensated executive officers employed by us as of December 31, 2005 whose salary and bonus for the fiscal year ended December 31, 2005 was in excess of $100,000 for their services rendered in all capacities to us. In addition, the table includes two additional individuals for whom disclosure would be required to be provided but for the fact that the individual was not serving as an executive officer of Genius Products at December 31, 2005. The listed individuals are hereinafter referred to as the "Named Executive Officers".

### SUMMARY COMPENSATION TABLE

| | | | | | Long-Term Compensation | | | |
| | | Annual Compensation | | | Awards | | Payouts | |
| Name and Position | Year | Salary $ | Bonus $ | Other Annual Compensation $ | Restricted Stock Awards $ | Securities Underlying Option/SARs and Warrants | LTIP Payouts $ | All Other Compensation $ (Car Allowance) |
|---|---|---|---|---|---|---|---|---|
| Trevor Drinkwater | 2005 | 228,125 | 0 | 0 | 0 | 2,600,000 | 0 | 4,000 |
| CEO | 2004 | 175,000 | 0 | 0 | 0 | 500,000 | 0 | 0 |
| | 2003 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Klaus Moeller | 2005 | 316,709(1) | 0 | 9,733(1) | 0 | 261,000 | 0 | 3,000 |
| Former CEO and | 2004 | 225,000 | 125,000 | 0 | 0 | 750,000 | 0 | 9,000 |
| Interim CFO | 2003 | 150,000(1) | 45,000 | 0 | 28,572(1) | 626,257(1) | 0 | 9,000 |
| Shawn Howie | 2005 | 117,692 | 0 | 0 | 0 | 1,200,000 | 0 | 0 |
| CFO | 2004 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2003 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| David Snyder | 2005 | 149,358 | 0 | 0 | 0 | 200,000 | 0 | 0 |
| Executive Vice | 2004 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| President of | 2003 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Content | | | | | | | | |
| Rodney Satterwhite | 2005 | 163,540 | 0 | 0 | 0 | 450,000 | 0 | 1,600 |
| Chief Operating | 2004 | 125,000 | 0 | 0 | 0 | 30,000 | 0 | 0 |
| Officer | 2003 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michael Meader | 2005 | 281,293 | 0 | 24,495 | 0 | 209,000 | 0 | 3,000 |
| Former President | 2004 | 197,500 | 85,000 | 0 | 0 | 575,000 | 0 | 9,000 |
| | 2003 | 150,000(2) | 15,000 | 0 | 28,572(2) | 496,572(2) | 0 | 9,000 |
| Mark Miller | 2005 | 173,750 | 0 | 0 | 0 | 0 | 0 | 3,000 |
| Former Chief | 2004 | 173,000 | 20,000 | 0 | 0 | 0 | 0 | 0 |
| Operating Officer | 2003 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

(1) Mr. Moeller resigned as our Chief Executive Officer in February 2005. During 2003, in response to our Company's limited cash flow, Mr. Moeller accepted $20,000 of his 2003 salary in the form of 28,572 shares of common stock valued at $0.70 per share and a five-year warrant to purchase 28,572 shares of common stock at an exercise price of $1.40. These issuances were made as of June 2, 2003, at the same price as a private placement at that time. Mr. Moeller resigned his employment on July 28, 2005, and will continue to receive salary compensation for twelve months under the terms of a Settlement Agreement dated July 28, 2005. Mr. Moeller also received a consulting fee of $9,733 for the period of July 28, 2005, to September 1, 2005.

(2) Mr. Meader resigned as our President in July 2005. During 2003, in response to our Company's limited cash flow, Mr. Meader accepted $20,000 of his 2003 salary in the form of 28,572 shares of common stock valued at $0.70 per share and a five-year warrant to purchase 28,572 shares of common stock at an exercise price of $1.40. These issuances were made as of June 2, 2003, at the same price of a private placement at that time. Mr. Meader will

continue to receive salary compensation for twelve months under the terms of a Settlement Agreement dated July 28, 2005. Mr. Moeller received a $24,495 commission payment based on two percent (2%) of sales of music during the third quarter of 2005.

139

Table of Contents

The following table sets forth the options granted, if any, to the Named Executive Officers during the fiscal year ended December 31, 2005.

### OPTION/SAR GRANTS IN LAST FISCAL YEAR
### INDIVIDUAL GRANTS

| Name | Number of Securities Underlying Options/ SARs Granted (#) | Percent of Total Options/ SARs Granted to Employees in Fiscal Year (%) | Exercise or Base Price ($/SH) | Expiration Date |
|---|---|---|---|---|
| Trevor Drinkwater | 1,200,000 | 17% | $ 1.65 | July 26, 2015 |
| | 1,000,000 | 14% | $ 1.88 | November 7, 2015 |
| | 400,000 | 6% | $ 2.31 | November 28, 2015 |
| Klaus Moeller | 261,000 | 4% | $ 1.55 | July 28, 2010 |
| Shawn Howie | 900,000 | 13% | $ 1.65 | July 26, 2015 |
| | 100,000 | 3% | $ 1.88 | November 7, 2015 |
| | 200,000 | 1% | $ 2.31 | November 28, 2015 |
| David Snyder | 200,000 | 3% | $ 2.10 | June 14, 2015 |
| Michael Meader | 209,000 | 3% | $ 1.55 | July 28, 2010 |
| Rodney Satterwhite | 120,000 | 2% | $ 2.10 | June 14, 2015 |
| | 30,000 | 0% | $ 1.63 | October 19, 2015 |
| | 225,000 | 3% | $ 1.88 | November 7, 2015 |
| | 75,000 | 1% | $ 2.31 | November 28, 2015 |
| Mark Miller | 0 | 0 | 0 | |

The following table sets forth information concerning the exercise of stock options by the Named Executive Officers during our fiscal year ended December 31, 2005, and the value of all exercisable and unexercisable options at December 31, 2005. This table does not include warrants.

### AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR-END OPTION VALUES

| Name | Number of Securities Underlying Unexercised Options at FY-End (#) | | Value of Unexercised In-The-Money Options at FY-End ($) [1] | |
|---|---|---|---|---|
| | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Trevor Drinkwater | 1,012,500 | 2,087,500 | $1,640,000 | $2,790,000 |
| Klaus Moeller | 2,058,685 | 0 | $2,334,578 | 0 |
| Shawn Howie | 500,000 | 700,000 | $ 825,000 | $ 848,000 |
| David Snyder | 0 | 200,000 | 0 | 0 |
| Michael Meader | 1,702,000 | 0 | $1,884,450 | 0 |
| Rodney Satterwhite | 105,000 | 225,000 | $ 201,000 | $ 330,900 |
| Mark Miller | 487,500 | 0 | $ 450,000 | 0 |

(1) Based on the closing price for our common stock at the close of market on December 31, 2005. On December 31, 2005, the price of our common stock was $2.02 per share. The lowest exercise price of any outstanding option at December 31, 2005 was $1.37 per share.

**Table of Contents**

**Employment Contracts, Termination of Employment and Change-in-Control Arrangements with Named Executive Officers**

*Trevor Drinkwater*

On August 3, 2005, we entered into an employment agreement with Trevor Drinkwater pursuant to which Mr. Drinkwater agreed to serve as Chief Executive Officer of the Company.

Under the agreement, Mr. Drinkwater is employed by the Company at-will and his employment may be terminated by the Company at any time. Mr. Drinkwater's annual salary during his employment is $275,000. Mr. Drinkwater will be provided an $800 monthly auto allowance and three weeks annual paid vacation. Mr. Drinkwater was granted options to purchase 1,200,000 shares of the Company's common stock priced at fair market value of the common stock on the date of grant. The options shall vest over a three-year period, with 600,000 vesting upon the date of grant and the remaining 600,000 vesting in equal installments on each of the second and third anniversaries of the date of grant. The agreement also calls for the Company to pay to Mr. Drinkwater, at its sole discretion, an incentive bonus based upon achievement of certain operating profit results as defined in his agreement. Mr. Drinkwater will also receive accelerated vesting of stock options if the targeted operating profit results are achieved. If the Company terminates Mr. Drinkwater without cause (as defined in the agreement), Mr. Drinkwater is entitled to receive a severance payment equal to his compensation for a twelve month period plus all accrued but unpaid salary and vacation time.

Effective December 5, 2005, we entered into an amendment to the employment agreement with Trevor Drinkwater, pursuant to which the following changes were made to his employment agreement. The first two bullet points will only become effective upon closing of the Transaction with TWC:

- Three-year term, with up to two one-year extensions at the option of the Company;

- Base compensation of $425,000 in year one, $475,000 in year two, $525,000 in year three, $625,000 in year four (if applicable), and $675,000 in year five (if applicable), plus annual bonuses in each year of up to 50% of base salary based on performance factors to be determined by the Company's Board of Directors; and

- Additional stock options to acquire 1,000,000 shares, vesting in equal installments over five years.

*Shawn Howie*

On June 23, 2005, we entered into an employment agreement with Shawn Howie pursuant to which Mr. Howie agreed to serve as an Executive Vice President and the Chief Financial Officer of the Company. Mr. Howie is employed at-will and his employment may be terminated by the Company at any time. Mr. Howie's annual salary during his employment is $225,000. In addition, Mr. Howie was granted options to purchase 900,000 shares of the Company's common stock with an exercise price of $1.95 per share. The options will vest in equal annual installments of 180,000 shares beginning on the first anniversary of Mr. Howie's hire date. The Agreement also calls for the Company to pay to Mr. Howie, at its sole discretion, a year-end performance bonus consistent with the bonus plan of the Company's Chief Executive Officer. If the Company terminates Mr. Howie without cause (as defined in the agreement), Mr. Howie is entitled to receive a severance payment equal to his compensation for a six-month period plus all accrued but unpaid salary and vacation time.

In addition, on February 7, 2006, we entered into a Settlement Agreement and Release of Claims with Shawn Howie relating to Mr. Howie's resignation as an officer of our Company.

*Rodney Satterwhite*

Effective December 2, 2005, we entered into an employment agreement with Rodney Satterwhite pursuant to which Mr. Satterwhite agreed to serve as Executive Vice President and Chief Operating Officer.

141

Table of Contents

Under the agreement, Mr. Satterwhite is employed by the Company at-will and his employment may be terminated by the Company at any time. Mr. Satterwhite's annual salary during his employment will be $200,000, and he will be provided an additional $800 monthly auto allowance. In addition, Mr. Satterwhite was granted an option to purchase 225,000 shares of the Company's common stock vesting over a three-year period. Mr. Satterwhite will be provided three weeks annual paid vacation. If the Company terminates Mr. Satterwhite without cause (as defined in the agreement), he will be entitled to receive a severance payment equal to his compensation for a six-month period plus all accrued but unpaid salary and vacation time.

Effective December 5, 2005, the Company entered into an amendment to the employment agreement with Mr. Satterwhite, pursuant to which the following changes were made to his employment agreement. The first bullet point will only become effective upon closing of the Transaction:

- Two-year term, with a one-year extension at the option of the Company; and

- Additional stock options to acquire 75,000 shares, vesting in equal installments over five years.

*Klaus Moeller and Michael Meader*

Effective January 3, 2002, we entered into three-year employment agreements with Klaus Moeller and Michael Meader. Under each employment agreement, the executive is entitled to an annual salary of $150,000 and was granted an option to purchase 450,000 shares of common stock which vest one-third each year beginning on December 31, 2002. The options granted are exercisable for a period of 10 years from the date of grant at an exercise price of $0.63 per share, the market price on the date of grant. Under these employment agreements, if the senior executive died or was terminated without cause (as defined in the employment agreement) during the first year of the employment agreement, the senior executive would have received 24 months of salary as severance pay. If the senior executive died or was terminated without cause during the second year of the employment agreement, the senior executive would have received 18 months of salary as severance pay. If the senior executive dies or is terminated without cause during the third year of the employment agreement, the senior executive will receive 12 months of salary as severance pay. Severance pay under these employment agreements is due and payable in full immediately upon death or termination of the senior executive.

Effective October 31, 2003, the above employment agreements were amended to (i) extend the expiration date until January 2, 2006, (ii) to increase annual salaries according to the table below, and (iii) to grant to each senior executive a ten-year stock option to purchase 250,000 shares of our common stock at an exercise price of $1.50 per share, of which 50,000 shares will vest on December 31, 2004, and 200,000 shares will vest on December 31, 2005.

| | 2004 Salary | 2005 Salary |
|---|---|---|
| Klaus Moeller | $222,500 | $244,750 |
| Mike Meader | $197,500 | $217,250 |

On July 27, 2005, we announced a reorganization of our management team and announced that Michael Meader would resign as our president and become a consultant to the Company and Klaus Moeller would resign as an executive of the Company, but would remain a director and consult for the Company. On July 29, 2005, we entered into severance and consulting arrangements with Messrs. Meader and Moeller, upon the terms described below. Mr. Moeller subsequently resigned as a director, effective September 9, 2005.

Under the terms of a Confidential Settlement Agreement and Mutual Release of Claims with Mr. Meader (the "Meader Severance Agreement"), we agreed to the following:

- Mr. Meader resigned effective July 28, 2005 (the "Meader Resignation Date");

- The Company agreed to pay Mr. Meader severance for 12 months totaling $217,250, subject to standard payroll deductions and withholdings and payable in accordance with the regular company payroll practice;

142

Table of Contents

- The Company agreed to issue to Mr. Meader 209,000 additional vested stock options at fair market value on the date of grant, pursuant to our 2004 Stock Incentive Plan, exercisable over a period of 5 years;

- Mr. Meader retains any award of stock options previously vested and unvested as of the Meader Resignation Date. Unvested options vested as of the Meader Resignation Date;

- The Company agreed to pay Mr. Meader's health insurance premiums for 12 months beginning at the conclusion of the Separation and Retention Agreement (the "Meader Consulting Agreement");

- The Company agreed to reimburse Mr. Meader for reasonable legal expenses in connection with the negotiation and execution of the Meader Severance Agreement in an amount not to exceed $3,000; and

- The parties agreed to release each other of all claims.

Under the Meader Consulting Agreement, Mr. Meader agreed to provide retention services to us as an employee in matters related only to our music and/or catalog business for a period of 60 days starting on July 28, 2005 (the "Retention Period"), which has since expired. During the Retention Period, we could terminate the Retention Period early for "cause" as defined in the Meader Consulting Agreement. Under the terms of the agreement, we agreed to pay Mr. Meader $18,104.16 per month in consulting fees for work performed during the Retention Period, payable in accordance with our regular payroll practice. In addition, we agreed to pay Mr. Meader as additional compensation, a commission of 2% of all sales of music by us during the third quarter of 2005.

Under the terms of a Confidential Settlement Agreement and Mutual Release of Claims with Mr. Moeller (the "Moeller Severance Agreement"), we agreed to the following:

- Mr. Moeller resigned effective July 28, 2005 (the "Moeller Resignation Date");

- The Company agreed to pay Mr. Moeller severance for 12 months totaling $244,750, subject to standard payroll deductions and withholdings and payable in accordance with the regular company payroll practice;

- The Company agreed to issue to Mr. Moeller 261,000 additional vested stock options at fair market value on date of grant, pursuant to our 2004 Stock Incentive Plan, exercisable over a period of 5 years;

- Mr. Moeller retains any award of stock options previously vested and unvested as of the Moeller Resignation Date. Unvested options vested as of the Moeller Resignation Date;

- The Company agreed to pay Mr. Moeller's health insurance premiums for 12 months beginning at the conclusion of the Separation and Retention Agreement (the "Moeller Consulting Agreement");

- The Company agreed to reimburse Mr. Moeller for reasonable legal expenses in connection with the negotiation and execution of the Moeller Severance Agreement in an amount not to exceed $3,000; and

- The parties agreed to release each other of all claims.

Under the Moeller Consulting Agreement, Mr. Moeller agreed to provide consulting services to us, as an independent contractor, in any area for which he is qualified by virtue of his education, experience and training upon request by a duly authorized officer. The consulting relationship began on July 29, 2005, and was to continue for a minimum of four months, and thereafter terminable by either party on 60 days written notice (the "Consulting Period"). Our obligation to pay Mr. Moeller any further consulting fees was to cease upon termination of the Consulting Period.

During the Consulting Period, Mr. Moeller was to receive $8,500 per month in consulting fees, which will be paid every six months. In addition, Mr. Moeller was to receive a fully vested stock option grant for 150,000 shares at fair market value on date of grant, pursuant to our 2004 Stock Incentive Plan.

On September 1, 2005, the Company and Mr. Moeller mutually agreed to terminate the Moeller Consulting Agreement and the Company paid Mr. Moeller for services performed under the Moeller Consulting Agreement through September 1, 2005.

**Table of Contents**

For a description of agreements with persons who currently serve as executive officers but are not included above as Named Executive Officers, see above under "Proposal 1—The Transaction—Interests of Directors, Executive Officers and Affiliates". Such information is also contained under "Related Party Transactions" in the definitive proxy statement that we filed with the Securities and Exchange Commission on December 12, 2005 relating to our 2005 Annual Meeting of Stockholders.

144

Table of Contents

## SECURITY OWNERSHIP OF BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information known to us with respect to the beneficial ownership of common stock as of March 31, 2006, by (i) each person who is known by us to own beneficially more than 5% of our common stock, (ii) each of our directors and Named Executive Officers and (iii) all of our executive officers and directors as a group. Except as otherwise listed below, the address of each person is c/o Genius Products, Inc., 2230 Broadway, Santa Monica, CA 90404. As of March 31, 2006, there were outstanding 60,622,626 shares of our common stock.

| Name of Owner | Shares Beneficially Owned [1] | |
| --- | --- | --- |
| | Number | Percent |
| Stephen K. Bannon | 355,104(2) | * |
| Trevor Drinkwater | 1,212,500(3) | 2% |
| James G. Ellis | 167,036(4) | * |
| Herbert Hardt | 251,637(5) | * |
| Klaus Moeller | 2,646,044(6) | 4.36% |
| Michael Meader | 2,372,733(7) | 3.91% |
| Mark Miller | 487,500(8) | * |
| Shawn Howie | 500,000(9) | * |
| Rodney Satterwhite | 275,000(10) | * |
| David Snyder | 0(11) | 0% |
| All directors and officers as a group (8 persons) | 7,462,263(12) | 12.31% |
| Bonanza Master Fund, Ltd. | 4,065,474(13) | 6.71% |
| Janus Capital Management | 6,272,070(14) | 10.35% |
| Magnetar Capital Partners LLC | 5,706,400(15) | 9.41% |
| Magnetar Financial LLC | 3,463,494(15) | 5.71% |
| Wellington Management Company LLP | 8,486,730(16) | 14.00% |

\*    Represents less than 1% of our common stock.

(1)  Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of common stock subject to options and warrants currently exercisable or convertible, or exercisable or convertible within 60 days of March 31, 2006, are deemed outstanding for computing the percentage of the person holding such option or warrant but are not deemed outstanding for computing the percentage of any other person. Except as pursuant to applicable community property laws, the persons named in the table have sole voting and investment power with respect to all shares of common stock beneficially owned.

(2)  Includes outstanding options to purchase 355,104 shares exercisable within 60 days of March 31, 2006. Excludes outstanding options to purchase 1,474,416 shares exercisable after that period.

(3)  Includes outstanding options to purchase 1,212,500 shares exercisable within 60 days of March 31, 2006. Excludes outstanding options to purchase 1,887,500 shares exercisable after that period.

(4)  Includes outstanding options to purchase 167,036 shares exercisable within 60 days of March 31, 2006. Excludes outstanding options to purchase 262,484 shares exercisable after that period.

(5)  Includes 180,050 shares held directly by Mr. Hardt. Also includes outstanding options to purchase 71,587 shares exercisable within 60 days of March 31, 2006. Excludes outstanding options to purchase 71,587 shares exercisable after that period.

(6)  Includes 543,787 shares held by or for the benefit of family members of Mr. Moeller, as to which Mr. Moeller disclaims all beneficial interest, and 75,000 shares held by Mr. Moeller as guardian of two minor children. Also includes (i) outstanding options to purchase 1,998,685 shares exercisable within 60 days of March 31, 2006 and (ii) warrants to purchase 28,572 shares exercisable within 60 days of March 31, 2006.

145

Table of Contents

(7)  Includes 100,000 shares held by family member of Mr. Meader and 542,161 shares held directly by Mr. Meader. Includes outstanding options to purchase 1,702,000 shares exercisable within 60 days of March 31, 2006. Also includes a warrant to purchase 28,572 shares exercisable within 60 days of March 31, 2006.

(8)  Includes outstanding options to purchase 487,500 shares exercisable within 60 days of March 31, 2006.

(9)  Includes outstanding options to purchase 500,000 shares exercisable within 60 days of March 31, 2006.

(10) Includes outstanding options to purchase 275,000 shares exercisable within 60 days of March 31, 2006. Excludes options to purchase 205,000 shares exercisable after that period.

(11) Excludes outstanding options to purchase 200,000 shares exercisable after that period.

(12) Includes outstanding options to purchase 2,356,227 shares exercisable within 60 days of March 31, 2006. Excludes options to purchase 5,106,036 shares exercisable after that period.

(13) Bonanza Master Fund, Ltd. is managed by Bonanza Capital, Ltd., which is managed by Bonanza Fund Management, Inc. The number of shares indicated includes warrants to purchase 783,829 shares of common stock. The mailing address for Bonanza Master Fund, Ltd. is 300 Crescent Court, Suite 1740, Dallas, Texas 75201.

(14) The securities reported herein are held by Janus Investment Fund, on behalf of its Series Janus Venture Fund, which is managed by Janus Capital Management. The number of shares includes (i) 4,850,070 shares held directly by Janus Capital and (ii) a warrant to purchase 1,425,000 shares of common stock. However, the warrant provides that the number of shares that may be acquired upon exercise of the warrant is limited to the extent necessary to insure that the total number of shares of common stock then beneficially owned by the warrant holder and its affiliates and any other persons whose beneficial ownership of common stock would be aggregated with the warrant holder's for purposes of Section 13(d) of the Securities Exchange Act of 1934, as amended, does not exceed 9.999% of the total number of issued and outstanding shares of common stock (including for such purpose the shares of common stock issuable upon exercise). The mailing address for Janus Investment Fund is c/o Janus Capital Management, 151 Detroit St., Denver, CO 80206.

(15) The securities reported herein are held by accounts of Magnetar Capital Master Fund Ltd., a Cayman Islands exempted Company ("Magnetar Capital Master Fund") and certain managed accounts ("Managed Accounts"). Magnetar Capital Partners serves as the sole member and parent holding company of Magnetar Financial, and Magnetar Investment LLC. Each of Magnetar Financial and Magnetar Investment Management are registered investment advisors under Section 203 of the Investment Advisors Act of 1940, as amended. Magnetar Financial serves as investment advisor to the Managed Accounts. In such capacity, Magnetar Investment Management exercises voting and investment power over the Shares held for the accounts of the Managed Accounts. Supernova Management is the controlling member of Magnetar Capital Partners. The Manager of Supernova Management is Mr. Litowitz. The principal business address of each of Magnetar Financial, Magnetar Capital Partners, and Supernova Management is 1603 Orrington Avenue, 13th Floor, Evanston, Illinois 60210. Each of Magnetar Capital Partners, Supernova Management and Mr. Litowitz may be deemed to be the beneficial owners of : (a) 3,050,994 shares held for the account of Magnetar Capital Master fund; (b) 412,500 shares issuable under the conversion of certain warrants held for the account of Magnetar Capital Master Fund; and (c) 2,242,906 shares held for the accounts of Managed Accounts. Magnetar Financial may be deemed to be the beneficial owner of 3,464,494 shares including (a) 3,050,994 shares held for the account of Magnetar Capital Master Fund; and (b) 412,500 shares issuable upon the conversion of certain warrants held for the account of Magnetar Capital Master Fund.

(16) Wellington Management LLP, in its capacity as investment adviser, may be deemed to beneficially own 8,486,730 shares which are held of record by clients of Wellington Management. The principal business address for Wellington Management is 75 State Street, Boston, MA 02109.

Table of Contents

## MARKET PRICE AND DIVIDEND DATA

Our common stock trades on the Over-the-Counter Bulletin Board, or OTCBB, under the symbol "GNPI.OB". The market represented by the OTCBB is extremely limited and the price for our common stock quoted on the OTCBB is not necessarily a reliable indication of the value of our common stock. The following table sets forth the high and low bid prices for shares of our common stock for the periods noted, as reported on the OTCBB. Quotations reflect inter-dealer prices, without retail mark-up, mark-down or commission and may not represent actual transactions. The last reported sales price per share of our common stock, as reported by the OTCBB on June 20, 2006 was $1.70.

| Year | Period | High | Low |
| --- | --- | --- | --- |
| Fiscal Year 2004 | First Quarter | $2.95 | $1.95 |
| | Second Quarter | $2.40 | $1.45 |
| | Third Quarter | $2.00 | $1.15 |
| | Fourth Quarter | $1.94 | $1.34 |
| Fiscal Year 2005 | First Quarter | $2.45 | $1.45 |
| | Second Quarter | $2.55 | $1.71 |
| | Third Quarter | $2.10 | $1.41 |
| | Fourth Quarter | $2.61 | $1.37 |
| Fiscal Year 2006 | First Quarter | $2.25 | $1.62 |

Our common stock is subject to Rule 15g-1 through 15g-9 under the Securities Exchange Act of 1934, as amended, which imposes certain sales practice requirements on broker-dealers who sell our common stock to persons other than established customers and "accredited investors" (generally, individuals with a net worth in excess of $1,000,000 or annual income exceeding $200,000 or $300,000 together with their spouses). For transactions covered by this rule, a broker-dealer must make a special suitability determination for the purchaser and have received the purchaser's written consent to the transaction prior to the sale.

Our board of directors determines any payment of dividends. We have never declared or paid cash dividends on our common stock. We do not expect to authorize the payment of cash dividends on our shares of common stock in the foreseeable future, except the possible contingent dividend right described above under Proposal 1. Any future decision with respect to dividends will depend on future earnings, operations, capital requirements and availability, restrictions in future financing agreements and other business and financial considerations.

## STOCKHOLDER PROPOSALS FOR THE 2006 ANNUAL MEETING

Stockholder proposals that are intended to be presented at our 2006 Annual Meeting must be received no later than August 14, 2006, in order that they may be included in the proxy statement and form of proxy relating to that meeting, and must meet all the other requirements as specified in the Bylaws. In addition, the proxy solicited by the board of directors for the 2006 Annual Meeting will confer discretionary authority to vote on any stockholder proposal presented at that meeting, unless we receive notice of such proposal not later than October 28, 2006. However, these deadlines are subject to change if our 2006 Annual Meeting is held more than 30 days from December 29, which is the day on which our 2005 Annual Meeting was held.

147

Table of Contents

## EXPERTS

Our audited financial statements as of December 31, 2005 and 2004 included in this Proxy Statement have been audited by Singer Lewak Greenbaum and Goldstein, LLP, and the 2003 financial statements have been audited by Cacciamatta Accountancy Corporation, as set forth on their respective reports thereon, and are included in reliance upon such reports given upon the authority of such firms as experts in accounting and auditing.

## OTHER MATTERS

The directors of the Company know of no other matters to be brought before the meeting. If any other matters properly come before the meeting, including any adjournment or adjournments thereof, it is intended that proxies received in response to this solicitation will be voted on such matters in the discretion of the person or persons named in the accompanying proxy form.

## WHERE YOU CAN FIND MORE INFORMATION

Genius Products files annual, quarterly and current reports, proxy statements, and other information with the Securities and Exchange Commission. Anything that Genius Products files with the SEC may be read and copied at the Securities and Exchange Commission's public reference rooms in Washington, D.C., New York, New York and Chicago, Illinois. Please call the SEC at 1-800-732-0330 for further information on the public reference rooms. Our SEC filings should also be available to the public from commercial document retrieval services and at the web site that the SEC maintains at http://www.sec.gov.

You may obtain copies of documents that we file with the SEC from us without charge, excluding all exhibits, by requesting them in writing or by telephone at the following address:

GENIUS PRODUCTS, INC.

2230 Broadway

Santa Monica, CA 90404

(310) 829-4509

We have provided all information contained in this Proxy Statement with respect to Genius Products. TWC provided certain information contained in this Proxy Statement regarding TWC under the captions "Summary of the Transaction—The Companies" and "Proposal 1—The Transaction—The Companies". No party assumes any responsibility for the accuracy or completeness of the information provided by any other party. You should rely only on the information contained in this Proxy Statement (including any supplement hereto) to vote on the matters described herein. We have not authorized anyone to provide you with information that is different from what is contained in this Proxy Statement. You should not assume that the information contained in this Proxy Statement is accurate as of any date other than the date of this Proxy Statement. Neither the mailing of this Proxy Statement to stockholders nor the completion of the Transaction will create any implication to the contrary.

**STOCKHOLDERS ARE URGED TO COMPLETE, SIGN AND RETURN PROMPTLY THE ACCOMPANYING PROXY IN THE ENCLOSED ENVELOPE**

By Order of the Board of Directors

Santa Monica, California
June 29, 2006

**Trevor Drinkwater**
*President and Chief Executive Officer*

148

**Table of Contents**

## INDEX TO FINANCIAL STATEMENTS OF GENIUS PRODUCTS

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | FS-2 |
| Report of Independent Registered Public Accounting Firm | FS-3 |
| Consolidated Balance Sheets at December 31, 2004 and 2005 | FS-4 |
| Consolidated Statements of Operations for the Years Ended December 31, 2003, 2004 and 2005 | FS-5 |
| Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2003, 2004 and 2005 | FS-6 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2003, 2004 and 2005 | FS-7 |
| Supplemental Disclosure of Non-Cash Investing and Financing Activity | FS-8 |
| Supplemental Disclosure of Cash Flow Information | FS-9 |
| Notes to Consolidated Financial Statements | FS-10 |
| Schedule II – Valuation and Qualifying Accounts | FS-30 |
| Notes to Consolidated Financial Statements (Unaudited) | FS-34 |

FS-1

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
Genius Products, Inc.

We have audited the accompanying consolidated statements of operations, stockholders' equity and cash flows of Genius Products, Inc. and Subsidiary (the "Company") as of December 31, 2003. These financial statements are the responsibility of the Company management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the results of operations, changes in stockholders' equity, and cash flows of the Company for the year ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America.

/s/ CACCIAMATTA ACCOUNTANCY CORPORATION

Irvine, California
March 19, 2004

FS-2

Table of Contents

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors
Genius Products, Inc.
Santa Monica, California

We have audited the consolidated balance sheets of Genius Products, Inc. and subsidiaries (collectively, the "Company") as of December 31, 2005 and December 31, 2004, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the two years in the period ended December 31, 2005. Our audits also included the financial statement schedules of the Company, listed in Item 15(a). These financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provided a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements, taken as a whole, present fairly in all material respects the information set forth therein.

/s/ SINGER LEWAK GREENBAUM & GOLDSTEIN LLP

Los Angeles, California
April 13, 2006

FS-3

Table of Contents

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEET**

|  | December 31, | |
|---|---|---|
|  | 2004 | 2005 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,223,881 | $ 30,597,164 |
| Accounts receivable, net of allowance for doubtful accounts and sales returns of $1,542,805 and $6,908,789 | 3,615,073 | 2,406,658 |
| Inventories, net | 3,473,483 | 5,567,953 |
| Prepaid expenses | 312,046 | 703,875 |
| Notes receivable, related party | — | 750,000 |
| Total current assets | 8,624,483 | 40,025,650 |
| Property and equipment, net | 264,989 | 396,358 |
| Production masters, net of accumulated amortization of $1,054,005 and $2,510,307 | 3,867,546 | 4,573,191 |
| Film library, net of accumulated amortization of $1,517,001 | — | 15,153,988 |
| Notes receivable, related party, net or current portion | — | 1,712,353 |
| Goodwill | — | 14,487,917 |
| Deposits and other | 239,148 | 15,545 |
| Total assets | $ 12,996,166 | $ 76,365,002 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 7,329,218 | $ 9,242,560 |
| Notes payable | — | 5,379,296 |
| Accrued expenses | 789,166 | 3,307,893 |
| Customer deposits | — | 189,423 |
| Debentures payable | 50,750 | 50,750 |
| Redeemable common stock | 395,172 | 414,471 |
| Total current liabilities | 8,564,306 | 18,584,393 |
| Deferred gain, related party | — | 1,212,353 |
| Deferred taxes | — | 1,380,338 |
| Total liabilities | 8,564,306 | 21,177,084 |
| Stockholders' equity | | |
| Preferred stock, $.0001 par value; 10,000,000 shares authorized; no shares outstanding | — | — |
| Common stock, $.0001 par value; 100,000,000 shares authorized; 25,208,512 and 60,438,154 shares outstanding | 2,521 | 6,044 |
| Additional paid-in capital | 26,006,700 | 93,919,755 |
| Accumulated deficit | (21,577,361) | (38,737,881) |
| Total stockholders' equity | 4,431,860 | 55,187,918 |
| Total liabilities and stockholders' equity | $ 12,996,166 | $ 76,365,002 |

The accompanying notes are an integral part of these
consolidated financial statements.

FS-4

Table of Contents

### GENIUS PRODUCTS, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF OPERATIONS

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2003 | 2004 | 2005 |
| Revenues: | | | |
| Video and DVD | $    876,285 | $15,967,711 | $ 24,804,906 |
| Theatrical | — | — | 750,883 |
| Audio | 2,149,096 | 2,946,237 | 5,992,065 |
| Royalties, licensing and other | 456,110 | 420,299 | 745,054 |
| Gross revenues | 3,481,491 | 19,334,247 | 32,292,908 |
| Sales returns, discounts and allowances | (412,985) | (2,704,315) | (9,965,179) |
| Net revenues | 3,068,506 | 16,629,932 | 22,327,729 |
| Costs and expenses | | | |
| Cost of revenues: | | | |
| Video and DVD | 466,384 | 11,447,806 | 13,664,813 |
| Theatrical | — | — | 2,130,182 |
| Audio | 1,081,149 | 1,185,112 | 3,814,478 |
| Amortization of production masters and film library | 204,493 | 681,404 | 2,973,303 |
| Warehouse expense and other | 397,484 | 579,112 | 299,532 |
| Total cost of revenues | 2,149,510 | 13,893,434 | 22,882,308 |
| Gross profit (loss) | 918,996 | 2,736,498 | (554,579) |
| Operating expenses (income): | | | |
| Product development | 428,465 | 956,521 | 1,127,481 |
| Sales and marketing | 1,020,860 | 2,166,785 | 2,582,527 |
| General and administrative | 2,081,651 | 5,107,547 | 11,036,118 |
| Severance | — | — | 2,745,422 |
| Gain on sale, related party | — | — | (1,351,710) |
| Total operating expenses | 3,530,976 | 8,230,853 | 16,139,838 |
| Loss from operations | (2,611,980) | (5,494,355) | (16,694,417) |
| Interest expense and other, net | (129,896) | (551,013) | (465,303) |
| Loss before provision for income tax | (2,741,876) | (6,045,368) | (17,159,720) |
| Provision for income tax | 800 | 800 | 800 |
| Net loss | $ (2,742,676) | $ (6,046,168) | $(17,160,520) |
| Basic and diluted net loss per share | $      (0.16) | $      (0.25) | $      (0.42) |
| Basic and diluted weighted average shares | 17,574,405 | 23,826,584 | 40,400,112 |

The accompanying notes are an integral part of these
consolidated financial statements.

FS-5

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### FOR THE YEARS ENDED DECEMBER 31, 2003, 2004 AND 2005

| | Common Stock | | Additional Paid-in Capital | Stock Subscription Receivable | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance, December 31, 2002 | 15,870,680 | $ 1,587 | $16,486,148 | $ (2,645,858) | $ (12,788,517) | $ 1,053,360 |
| Shares issued in private placement, net of offering costs | 3,836,786 | 384 | 2,618,396 | — | — | 2,618,780 |
| Debt conversion | 10,000 | 1 | 9,999 | — | — | 10,000 |
| Shares issued for compensation | 142,860 | 14 | 99,986 | — | — | 100,000 |
| Shares issued for services | 217,847 | 22 | 174,478 | — | — | 174,500 |
| Exercise of stock options | 159,330 | 16 | 121,362 | — | — | 121,378 |
| Stock option costs | — | — | 430,655 | — | — | 430,655 |
| Shares issued for payment of DVD remastering costs | 350,000 | 35 | 349,965 | — | — | 350,000 |
| Shares issued for option to acquire the Falcon Picture Group | 70,922 | 7 | 99,993 | — | — | 100,000 |
| Interest on subscriptions receivable | — | — | 150,384 | (150,384) | — | — |
| Warrants issued with notes payable | — | — | 506,557 | — | — | 506,557 |
| Net loss | — | — | — | — | (2,742,676) | (2,742,676) |
| Balance, December 31, 2003 | 20,658,425 | $ 2,066 | $21,047,923 | $ (2,796,242) | $ (15,531,193) | $ 2,722,554 |
| Shares issued in private placement, net of offering costs | 5,000,000 | 500 | 6,419,468 | — | — | 6,419,968 |
| Exercise of warrants for cash | 217,500 | 22 | 137,004 | — | — | 137,026 |
| Cashless exercise of warrants | 478,716 | 51 | (51) | — | — | — |
| Issue of warrants for services rendered or to be rendered | — | — | 1,339,412 | — | — | 1,339,412 |
| Shares issued for services rendered | 57,994 | 3 | 62,797 | — | — | 62,800 |
| Exercise of options | 169,400 | 17 | 172,003 | — | — | 172,020 |
| Cancel shares issued for payment of DVD remastering costs | (350,000) | (35) | (349,965) | — | — | (350,000) |
| Shares canceled/rescinded | (12,226) | (1) | 1 | — | — | — |
| Other adjustment | (1,943) | — | — | — | — | — |
| Payoff subscriptions receivable | (1,009,354) | (101) | (2,821,893) | 2,796,242 | — | (25,752) |
| Net loss | — | — | — | — | (6,046,168) | (6,046,168) |
| Balance, December 31, 2004 | 25,208,512 | $ 2,522 | $26,006,699 | $ — | $ (21,577,361) | $ 4,431,860 |
| Shares issued in private placement, net of offering costs | 25,681,024 | 2,568 | 44,453,870 | — | — | 44,456,438 |
| Shares and warrants issued for the acquisition of AVM | 7,550,301 | 755 | 18,806,754 | — | — | 18,807,509 |
| Exercise of warrants for cash | 1,255,315 | 125 | 1,277,039 | — | — | 1,277,164 |
| Exercise of options for cash | 157,600 | 16 | 191,564 | — | — | 191,580 |
| Issuance of options/warrants for services rendered or to be rendered | — | — | 440,085 | — | — | 440,085 |
| Shares issued for services rendered | 585,402 | 58 | 988,192 | — | — | 988,250 |
| Severance | — | — | 1,418,375 | — | — | 1,418,375 |
| Warrants issued as debt discount | — | — | 321,878 | — | — | 321,878 |
| Other adjustment | — | — | 15,299 | — | — | 15,299 |
| Net loss | — | — | — | — | (17,160,520) | (17,160,520) |
| Balance, December 31, 2005 | 60,438,154 | $ 6,044 | $93,919,755 | $ — | $ (38,737,881) | $ 55,187,918 |

The accompanying notes are an integral part of these consolidated financial statements.

FS-6

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2003 | 2004 | 2005 |
| **Cash flows from operating activities** | | | |
| Net loss | $(2,742,676) | $(6,046,168) | $(17,160,520) |
| Adjustments to reconcile net loss to net cash used by operating activities: | | | |
| Depreciation and amortization | 300,283 | 762,299 | 3,154,718 |
| Change in allowance for doubtful accounts and provision for returns | 112,597 | 1,360,208 | 5,544,765 |
| Change in provision for obsolete inventory | — | 474,358 | 1,827,077 |
| Common stock issued for services rendered | 274,500 | 62,800 | 988,250 |
| Amortization of warrants issued for services | 430,655 | 1,339,412 | 440,085 |
| Options issued for severance | — | — | 1,418,375 |
| Shares issued for payment of DVD remastering costs | 350,000 | — | — |
| Gain on sale of assets to Pacific Entertainment | — | — | (1,351,710) |
| Interest expense on redeemable common stock | 25,155 | 21,602 | 19,299 |
| Amortization of discounts on notes payable | 86,634 | 419,923 | 216,476 |
| Changes in assets and liabilities: | | | |
| (Increase) decrease in Accounts receivable | (1,147,870) | (3,653,284) | (1,493,023) |
| (Increase) decrease in Inventories | (570,025) | (3,117,557) | (3,524,738) |
| (Increase) decrease in Prepaid expenses | (480,898) | 195,055 | (395,052) |
| (Increase) decrease in Film library | — | — | (1,291,732) |
| (Increase) decrease in Development of production masters | (1,154,582) | (2,986,659) | (2,161,947) |
| (Increase) decrease in Deposits and other | — | — | 314,084 |
| Increase (decrease) in Accounts payable | 849,542 | 5,897,604 | (4,218,235) |
| Increase (decrease) in Accrued expenses and other | 28,131 | 289,965 | 1,453,135 |
| Increase (decrease) in Customer deposits | — | — | (41,386) |
| Net cash used in operating activities | (3,638,554) | (4,980,442) | (16,262,582) |
| **Cash flows from investing activities** | | | |
| Payments for Patents and trademarks | (32,424) | (3,380) | (9,800) |
| Acquisition of AVMC | — | — | 598,594 |
| Proceeds from sale of assets to Pacific Entertainment | — | — | 250,000 |
| Purchase of property and equipment | (23,841) | (195,280) | (272,174) |
| Net cash (used in) provided by investing activities | (56,265) | (198,660) | 566,620 |
| **Cash flows from financing activities:** | | | |
| Proceeds from notes payable | 1,150,000 | — | 4,000,000 |
| Payments on notes payable | — | (1,150,000) | (4,855,934) |
| Payments of offering costs | — | — | (3,443,562) |
| Purchase of redeemable common stock | — | (117,362) | — |
| Proceeds from exercise of options | 121,378 | — | 191,580 |
| Proceeds from exercise of warrants | — | 309,045 | 1,277,161 |
| Proceeds from issuance of common stock | 2,618,780 | 6,419,968 | 47,900,000 |
| Net cash provided by financing activities | 3,890,158 | 5,461,651 | 45,069,245 |
| Net increase (decrease) in cash and equivalents | 195,339 | 282,549 | 29,373,283 |
| Cash and cash equivalents at beginning of period | 745,993 | 941,332 | 1,223,881 |
| Cash and cash equivalents at end of period | $  941,332 | $ 1,223,881 | $ 30,597,164 |

FS-7

**Table of Contents**

### SUPPLEMENTAL DISCLOSURE OF NON-CASH INVESTING AND FINANCING ACTIVITY

During the years ended December 31, 2005, 2004, and 2003 the Company completed non-cash transactions as follows:

|  | 2003 | 2004 | 2005 |
|---|---|---|---|
| Shares issued for notes receivable, including interest | $150,384 | $ — | $ — |
| Issuance of common stock for an option to acquire Falcon Picture Group | 100,000 | — | — |
| Conversion of debenture to common stock | 10,000 | — | — |
| Repayment of officer loans by return of common stock | — | 25,752 | — |
| Repayment of notes receivable by return of common stock | — | 2,796,676 | — |
| Equity consideration for acquisition of AVMC | $ — | $ — | $18,807,590 |

The accompanying notes are an integral part of these
consolidated financial statements.

FS-8

**Table of Contents**

### SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION

| | Year Ended December 31 | | |
|---|---|---|---|
| | **2003** | **2004** | **2005** |
| Cash paid for: | | | |
| Interest | $373 | $151,532 | $234,202 |
| Income taxes | 800 | 800 | 900 |

The accompanying notes are an integral part of these
consolidated financial statements.

FS-9

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 1. NATURE OF BUSINESS.

We were incorporated in the State of Nevada on January 8, 1996 under the name Salutations, Inc. ("Salutations"). In September 1997, Salutations acquired all of the outstanding shares of a company called International Trade and Manufacturing Corporation ("ITM"), a Nevada corporation founded in 1992. Immediately after the acquisition, Salutations assumed all of the operations and businesses of ITM and changed its name to International Trading and Manufacturing Corporation ("ITMC"). In October 1999, we changed our name from International Trading and Manufacturing Corporation to Genius Products, Inc. to reflect our primary business of producing, publishing and distributing audio and video products. On March 2, 2005, Genius Products, Inc. changed its state of incorporation from the State of Nevada to the State of Delaware through a merger with a newly formed subsidiary in Delaware. We are engaged primarily in producing, publishing and distributing digital versatile discs or DVDs, universal mini discs or UMDs, and compact discs or CDs. Our products are marketed under both proprietary and licensed brands. We sell directly to major retailers and to third party distributors. We also sell our products through various websites on the Internet.

THE WEINSTEIN COMPANY TRANSACTION. On December 5, 2005, we entered into a Master Contribution Agreement in connection with the formation of a new venture to exploit the exclusive U.S. home video distribution rights to feature film and direct-to-video releases owned or controlled by The Weinstein Company (see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Recent Strategic Transactions). Under the terms of the Agreement, at the closing of the Transaction ("Closing") we will contribute to the Distributor substantially all of our assets, employees and existing businesses and certain liabilities, and the Distributor will hold a distribution agreement from TWC entitling it to distribute in the United States, and receive a distribution fee on, all filmed entertainment for which TWC owns or controls U.S. home video distribution rights. The Distributor will initially be 70% owned by TWC or its owners and 30% owned by us. The Company's interest in the Distributor will consist of Class G Units representing a 30% membership interest in the Distributor, and the interest of TWC or its owners will consist of Class W Units representing a 70% membership interest in the Distributor. The 70% interest in the Distributor held by TWC or its owners will be redeemable, at their option at any time from one year after the Closing, for up to 70% of the outstanding common stock of Genius Products, or with their approval, cash. We expect to file a proxy to obtain shareholder approval for this transaction in April or May 2006. We intend to account for this new venture using the equity method of accounting and report the financial results of the venture in a note to our financial statements, rather than consolidating it. We are currently distributing titles on DVD for The Weinstein Company under an interim distribution agreement until this transaction closes. After Closing, substantially all of our revenue and expenses as well as the results from releasing TWC product will be reflected in the financial statements of the Distributor.

### BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

PRINCIPLES OF CONSOLIDATION. The consolidated financial statements include the accounts of Genius Products, Inc., our wholly owned subsidiary American Vantage Media Corporation, also referred to herein as AVMC (and its wholly owned subsidiary Wellspring Media, Inc.) which was acquired on March 21, 2005, as well as Sanuk Corporation (which is inactive). All significant inter-company transactions and accounts have been eliminated in consolidation.

USE OF ESTIMATES. The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

FS-10

**Table of Contents**

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

CASH AND CASH EQUIVALENTS. For purposes of the statement of cash flows, cash equivalents include time deposits, certificates of deposit and all highly liquid debt instruments with original maturities of three months or less.

ACCOUNTS RECEIVABLE. The allowance for doubtful accounts and provision for sales returns includes management's estimate of the amount expected to be lost or returned on specific accounts and for losses or returns on other as yet unidentified accounts included in accounts receivable. In estimating the allowance component for unidentified losses and returns, management relies on historical experience and takes into account current information obtained from retailers including retail sell-through data and retail inventory data as available. The amounts we will ultimately realize could differ materially in the near term from the amounts assumed in arriving at the allowance for doubtful accounts and provision for sales returns in the accompanying financial statements.

CONCENTRATIONS OF CREDIT RISK. In 2005, one customer accounted for 40% of net revenue. At December 31, 2005 this customer comprised 12.5% of the accounts receivable before allowances. In 2004, two customers accounted for 27% and 26% of net revenue, respectively. At December 31, 2004, these two customers comprised 28% and 29%, respectively, of accounts receivable before allowances. In 2003, two customers accounted for 36% and 18% of net revenues. At December 31, 2003, these two customers comprised 52% and 9% of the accounts receivable before allowances.

Financial instruments that potentially subject us to concentration of credit risk consist primarily of temporary cash investments and trade receivables. The Company restricts investment of temporary cash investments to financial institutions with investment grade credit ratings. We provide credit in the normal course of business to customers located throughout the United States. We perform ongoing credit evaluations of our customers, generally do not require collateral and maintain allowances for potential credit losses which, when realized, have been within the range of management's expectations.

We maintain cash and cash equivalents at several financial institutions. From time to time the balances for these accounts exceed the Federal Deposit Insurance Corporation's ("FDICs") insured amount.

INVENTORIES. Inventories consist of raw materials and finished goods and are valued at the lower of cost or market. Cost is determined on a first-in-first-out method of valuation. Shipping and handling costs are recorded as expenses in the period in which they are incurred. The Company regularly monitors inventory for excess or obsolete items and makes any valuation corrections when such adjustments are needed.

**LONG-LIVED ASSETS.**

*Property and Equipment:* Property and equipment purchases are recorded at cost and are depreciated and amortized over the estimated useful lives of the assets (three to seven years generally) using the straight-line method.

*Production Masters:* Music production masters are stated at cost net of accumulated amortization. Costs incurred for music production masters, including licenses to use certain classical compositions, royalties, and recording and design costs, are capitalized and amortized over a three or seven year period using the straight-line method from the time a title is initially released. All exploitation costs, including print and advertising (P&A) costs associated with our theatrical department, are expensed as incurred.

*Film Library:* We capitalize the costs of production and acquisition of film libraries. Costs of production include costs of film and tape conversion to DLT master format, menu design, authoring and compression. These

FS-11

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

costs are amortized to direct operating expenses in accordance with Statement of Position ("SOP") 00-2, "Accounting by Producers or Distributors of Films", using the individual film forecast method over a period of ten years. Costs are stated at the lower of unamortized film costs or estimated fair value. For acquired film libraries, ultimate revenue includes estimates over a period not to exceed ten years. Management regularly reviews and revises when necessary its ultimate revenue and cost estimates, which may result in a change in the rate of amortization of film costs and/or a write-down of all or a portion of the unamortized costs of the library to its estimated fair value. No assurances can be given that unfavorable changes to revenue and cost estimates will not occur, which may result in significant write-downs affecting our results of operations and financial condition.

*Goodwill*: We record the excess purchase price of net tangible and intangible assets acquired over their estimated fair value as goodwill. We have adopted the provisions of SFAS 142, Goodwill and Intangible Assets. Under the SFAS 142, we are required to test goodwill for impairment at least annually. We evaluate the carrying value of goodwill as of December 31 of each year and between annual evaluations if events occur or circumstances change that would more likely than not reduce the fair value of the reporting unit below its carrying amount. Such circumstances could include, but are not limited to: (1) a significant adverse change in legal factors or in business climate, (2) unanticipated competition, or (3) an adverse action or assessment by a regulator. In performing the impairment review, we determine the carrying amount of each reporting unit by assigning assets and liabilities, including the existing goodwill, to those reporting units. A reporting unit is defined as an operating segment or one level below an operating segment (referred to as a component). A component of an operating segment is deemed a reporting unit if the component constitutes a business for which discrete financial information is available and segment management regularly reviews the operating results of that component. Our reporting unit is Genius Products, Inc. and its consolidated subsidiaries. To evaluate whether goodwill is impaired, we compare the fair value of the reporting unit to the reporting unit's net book value. We determine the fair value of our reporting unit using the present value of its expected future cash flows. If the net book value plus the value of debt outstanding of the reporting unit exceeds its fair value, then the amount of the impairment loss must be measured. The impairment loss would be calculated by comparing the implied fair value of reporting unit to its net book value plus the value of debt outstanding. In calculating the implied fair value of the reporting unit's goodwill, the fair value of the reporting unit is allocated to all of the other assets and liabilities of that unit based on their fair values. The excess of the fair value of a reporting unit over the amount assigned to its other assets and liabilities is the implied fair value of goodwill. An impairment loss would be recognized when the carrying amount of goodwill exceeds its implied fair value. We conducted an impairment review as of December 31, 2005. Based on the analysis performed we determined that our reporting unit's goodwill fair value exceeded its carrying amount, and therefore concluded that there was no indication of an impairment loss.

FAIR VALUE OF FINANCIAL INSTRUMENTS. The carrying amounts of cash and cash equivalents, accounts receivable, prepaid expenses, accounts payable and accrued expenses approximate fair value.

STOCK-BASED COMPENSATION. The Company has elected to adopt only the disclosure provisions of Statement of Financial Accounting Standards ("SFAS") 123, "Accounting for Stock-based Compensation" as amended by SFAS No. 148, "Accounting for Stock Based Compensation Transition and Disclosure - an amendment of FASB Statement No. 123", and continues to measure compensation cost related to stock and stock options issued to employees using the intrinsic method of accounting prescribed by Accounting Principles Board Opinion No. 25 ("APB 25"), "Accounting for Stock Issued to Employees", and related interpretations.

FS-12

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Had compensation cost for our stock option plan been determined based on the fair value at the grant dates for awards under this plan consistent with the method of SFAS 123, as amended by SFAS No. 148, our net loss and loss per common share would have been increased to the pro forma amounts indicated below:

|  | Year Ended December 31, | | |
|  | 2003 | 2004 | 2005 |
|---|---|---|---|
| Net loss as reported | $(2,742,676) | $(6,046,168) | $(17,160,520) |
| Compensation cost at fair value | (332,764) | (1,808,011) | (1,007,795) |
| Pro forma net loss | $(3,075,440) | $(7,854,179) | $(18,168,315) |
| Basic and diluted net loss per share |  |  |  |
| As reported | $ (0.16) | $ (0.25) | $ (0.42) |
| Pro forma | $ (0.18) | $ (0.33) | $ (0.45) |

The pro forma compensation cost recognized for the grant date fair value of the stock options granted during the years ended December 31, 2003, 2004 and 2005 was estimated using the Black-Scholes model with the following weighted-average assumptions:

|  | Year Ended December 31, | | |
|  | 2003 | 2004 | 2005 |
|---|---|---|---|
| Risk free interest rate | 4.0% | 2.7% | 3.6% |
| Expected dividend yield | — | — | — |
| Expected volatility | 50% | 20% | 50% |
| Expected life (in years) | 5.0 | 4.2 | 3.5 |

RECLASSIFICATIONS. Certain prior period amounts have been reclassified to conform to the current period presentation.

REVENUE RECOGNITION. Revenues are recorded upon the shipment of goods. Costs of sales and an allowance for returns are also recorded at the time of shipment. The allowance for returns calculation is based upon an analysis of historical customer and product returns performance as well as current customer inventory data as available. Updates to the returns calculation are performed quarterly. Revenues from the theatrical release of feature films are recognized at the time of exhibition based on our participation with box office receipts. Revenues from royalties are recognized when received. Revenues from licensing are recognized when the title is available to the licensee.

ADVERTISING COSTS. Advertising costs, including the costs of placement of our products with retailers, are expensed in the period in which the cost is incurred. Advertising costs were $179,041, $155,521, and $195,811 for the years ended December 31, 2005, 2004, and 2003 respectively.

INCOME TAXES. Deferred taxes are accounted for using an asset and liability approach, whereby deferred tax assets are recognized for deductible temporary differences and operating loss carry-forwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

FS-13

**Table of Contents**

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

LOSS PER SHARE. Basic EPS is calculated using income available to common stockholders divided by the weighted average of common shares outstanding during the year. Diluted EPS is similar to Basic EPS except that the weighted average of common shares outstanding is increased to include the number of additional common shares that would have been outstanding if the dilutive potential common shares, such as options, had been issued. The treasury stock method is used to calculate dilutive shares which reduces the gross number of dilutive shares by the number of shares purchasable from the proceeds of the options assumed to be exercised.

BASIC AND DILUTED INCOME (LOSS) PER COMMON SHARE. The effect of the potentially dilutive securities listed below (options and warrants that are outstanding) were not included in the computation of diluted loss per share, since to do so would have been dilutive.

|  | 2005 | 2004 | 2003 |
|---|---|---|---|
| Stock options and warrants | 37,713,336 | 23,051,748 | 14,971,165 |

### RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

In March 2005, the FASB issued FASB Interpretation (FIN) No. 47, "Accounting for Conditional Asset Retirement Obligations" (FIN 47), which clarifies the meaning of the term conditional asset retirement obligation as used in SFAS 143, "Accounting for Asset Retirement Obligations" (SFAS 143) and clarifies when an entity would have sufficient information to reasonably estimate the fair value of an asset retirement obligation. This interpretation is effective no later than the end of fiscal years ending after December 15, 2005 (December 31, 2005 for calendar-year companies). Retrospective application of interim financial information is permitted but is not required. Management does not expect adoption of FIN 47 to have a material impact on the Company's financial statements.

In May 2005, the FASB issued Statement of Financial Accounting Standards ("SFAS") No. 154, "Accounting Changes and Error Corrections" ("SFAS No. 154"), an amendment to Accounting Principles Bulletin Opinion No. 20, "Accounting Changes" ("APB No. 20"), and SFAS No. 3, "Reporting Accounting Changes in Interim Financial Statements". Though SFAS No. 154 carries forward the guidance in APB No. 20 and SFAS No. 3 with respect to accounting for changes in estimates, changes in reporting entity, and the correction of errors, SFAS No. 154 establishes new standards on accounting for changes in accounting principles, whereby all such changes must be accounted for by retrospective application to the financial statements of prior periods unless it is impracticable to do so. SFAS No. 154 is effective for accounting changes and error corrections made in fiscal years beginning after December 15, 2005, with early adoption permitted for changes and corrections made in years beginning after May 2005. We will implement SFAS No. 154 in our fiscal year beginning January 1, 2006. We are currently evaluating the impact of this new standard but believe that it will not have a material impact on our financial position, results of operations, or cash flows.

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments", which amends SFAS No. 133, "Accounting for Derivatives Instruments and Hedging Activities" and SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities". SFAS No. 155 amends SFAS No. 133 to narrow the scope exception for interest-only and principal-only strips on debt instruments to include only such strips representing rights to receive a specified portion of the contractual interest or principle cash flows. SFAS No. 155 also amends SFAS No. 140 to allow qualifying special-purpose entities to hold a passive derivative financial instrument pertaining to beneficial interests that itself is a derivative instrument. We are currently evaluating the impact this new Standard but believe that it will not have a material impact on our financial position, results of operations, or cash flows.

In December 2004, the FASB issued SFAS 123R, "Share Based Payments." SFAS 123R requires companies to expense the value of stock options and similar awards. This statement is a revision of SFAS 123, "Accounting

Table of Contents

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

for Stock-Based Compensation" and supersedes APB Opinion No. 25, "Accounting for Stock Issued to Employees," and its related implementation guidance. SFAS 123R requires a public entity to measure the cost of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award (with limited exceptions). That cost will be recognized over the period during which an employee is required to provide service in exchange for the award — the requisite service period (usually the vesting period). No compensation cost is recognized for equity instruments for which employees do not render the requisite service. In March 2005, the SEC issued Staff Accounting Bulletin No. 107 ("SAB 107") regarding the SEC's interpretation of SFAS 123R and the valuation of share-based payments for public companies. SFAS 123R, and its related implementation guidance, will significantly change existing accounting practice and will have a material effect on our reported earnings. The pro forma disclosures previously permitted under SFAS 123 will no longer be an alternative to financial statement recognition.

We are required to adopt SFAS 123R in the first quarter of fiscal 2006, beginning January 1, 2006. Under SFAS 123R, we must determine the appropriate fair value model to be used for valuing share-based payments, the amortization method for compensation cost and the transition method to be used at the date of adoption. The transition methods include modified-prospective and modified-retrospective adoption options. Under the modified-retrospective option, prior periods may be restated either as of the beginning of the year of adoption or for all periods presented. The modified-prospective method requires that compensation expense be recorded for all unvested stock options and restricted stock at the beginning of the first quarter of adoption of SFAS 123R, while the modified-retrospective method would record compensation expense for all unvested stock options and restricted stock beginning with the first period of adoption.

We plan to apply the modified prospective transition method, which requires that compensation expense be recorded for all unvested stock options and restricted stock beginning the first quarter of 2006. We have chosen the Black-Scholes valuation model to value stock-based compensation utilizing an expected volatility estimated using the historical method. Unamortized compensation expense related to outstanding unvested options, as determined in accordance with FAS 123R, that we expect to record during 2006 is approximately $3 million before income taxes. This estimate excludes the effect of additional expense related to new awards that may be granted during 2006.

In March 2006, the FASB issued SFAS No. 156, "Accounting for Servicing of Financial Assets" ("SFAS NO. 156"), which provides an approach to simplify efforts to obtain hedge-like (offset) accounting. This Statement amends FASB Statement No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities", with respect to the accounting for separately recognized servicing assets and servicing liabilities. The Statement (1) requires an entity to recognize a servicing asset or servicing liability each time it undertakes an obligation to service a financial asset by entering into a servicing contract in certain situations; (2) requires that a separately recognized servicing asset or servicing liability be initially measured at fair value, if practicable; (3) permits an entity to choose either the amortization method or the fair value method for subsequent measurement for each class of separately recognized servicing assets or servicing liabilities; (4) permits at initial adoption a one-time reclassification of available-for-sale securities to trading securities by an entity with recognized servicing rights, provided the securities reclassified offset the entity's exposure to changes in the fair value of the servicing assets or liabilities; and (5) requires separate presentation of servicing assets and servicing liabilities subsequently measured at fair value in the balance sheet and additional disclosures for all separately recognized servicing assets and servicing liabilities. SFAS No. 156 is effective for all separately recognized servicing assets and liabilities as of the beginning of an entity's fiscal year that begins after September 15, 2006, with earlier adoption permitted in certain circumstances. The Statement also describes the manner in which it should be initially applied. We do not believe that SFAS No. 156 will have a material impact on our financial position, results of operations or cash flows.

FS-15

Table of Contents

GENIUS PRODUCTS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

## NOTE 2. INVENTORY

| | December 31, | |
|---|---|---|
| | 2004 | 2005 |
| Raw materials | $ 349,231 | $ 71,085 |
| Finished goods | 3,598,610 | 7,798,303 |
| | 3,947,841 | 7,869,388 |
| Allowance for obsolescence | (474,358) | (2,301,435) |
| Inventories, net | $3,473,483 | $ 5,567,953 |

## NOTE 3. PROPERTY AND EQUIPMENT

| | December 31, | | |
|---|---|---|---|
| | 2004 | 2005 | Useful lives |
| Computers and equipment | $ 424,071 | $ 711,646 | 3-5 years |
| Furniture and fixtures | 33,746 | 35,445 | 3-7 years |
| Leasehold improvements | 22,365 | 22,365 | Lesser of lease term or useful life |
| | 480,182 | 769,456 | |
| Accumulated depreciation and amortization | (215,193) | (373,098) | |
| Property and equipment, net | $ 264,989 | $ 396,358 | |

Depreciation expense for the years ended December 31, 2005, 2004 and 2003 was $181,388, $71,253 and $52,842, respectively.

## NOTE 4. INVESTMENT IN FILMS AND VIDEO

Effective in 2004, we adopted SOP 00-2 to account for the amortization of costs associated with the acquisition of film libraries. As such, the costs of production and library acquisition are amortized consistent with the recognition of revenue generated by the library over a period of ten years. The ultimate revenue and timing of the revenue stream for the film library are estimated and are the basis for the amortization of costs. Prior to this time, we amortized the costs associated with film libraries over a seven year period using straight-line depreciation. An analysis by management of the past film library amortization expense determined that there was no material change in the cumulative amortization expense incurred through the date of the change given the change in accounting principle. As such, there is no cumulative charge associated with the change in accounting principle.

| | December 31, | |
|---|---|---|
| | 2004 | 2005 |
| Titles released, net of accumulated amortization | $3,867,546 | $ 4,573,191 |
| Acquired library, net of accumulated amortization | — | 14,551,096 |
| Titles acquired and not released | — | 602,892 |
| | $3,867,546 | $19,727,179 |

The Company expects approximately 46.1% of titles released, net of accumulated amortization and excluding acquired library, will be amortized during the three year period ended December 31, 2008. The Company expects approximately 80% of titles released, net of accumulated amortization and excluding acquired

FS-16

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

library, will be amortized during the seven year period ended December 31, 2012 as the library is comprised primarily of mature titles which provide a longer, steadier stream of revenue. The acquired library, including titles acquired and not released, of $15.1 million, net of accumulated amortization at December 31, 2005 is the Wellspring library that was acquired as part of the acquisition of AVMC and Wellspring Media, Inc. on March 22, 2005. The Wellspring library is amortized over its expected revenue stream for period of ten years from the acquisition date. The remaining amortization period on the library as of December 31, 2005 is approximately nine years on unamortized costs of $15.1 million. We estimate amortization expense for 2006 to be $3.0 million.

We expect that we will pay accrued participation liabilities of $1.9 million during the twelve month period ending December 31, 2006.

## NOTE 5. ACQUISITION OF AVMC

On March 21, 2005, we completed our acquisition of American Vantage Media Corporation ("AVMC"), a subsidiary of American Vantage Companies ("AVC"). The acquisition was completed through an Agreement and Plan of Merger ("Merger Agreement") which provided for the issuance to AVC of (i) 7,000,000 shares of our common stock valued at $2.27 per share and (ii) warrants to purchase 1,400,000 shares of our common stock, half at an exercise price of $2.56 per share and half at an exercise price of $2.78 per share, plus our assumption of approximately $15.2 million in debt of AVMC. The fair value of these warrants was estimated as $1,596,482 using the Black-Scholes model with the following weighted average assumptions: expected volatility of 60%, risk free interest of 4.2%, an expected life of five years and no expected dividends. The purchase price is approximated by using the average closing market price of our common stock over the two-day period before and after the sale was announced. $1,559,911 in direct costs incurred for the acquisition include $238,886 for legal and professional services related to the valuation of the Wellspring library, as well as a transaction fee of $1,249,183 paid in the form of 550,301 shares issued at a value of $2.27 per share, and 63,000 warrants, half at an exercise price of $2.56 and half at an exercise price of $2.78, for $71,842. The value of the warrants was estimated using the Black-Scholes model with the following weighted average assumptions: expected volatility of 60%, risk free interest of 4.2%, an expected life of five years and no dividends. The fair value of the warrants were classified as equity in 2005 in accordance with Emerging Issues Task Force Issue No. 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock."

The total purchase price of the Wellspring acquisition was allocated to the estimated fair value of assets acquired and liabilities assumed as set forth in the following table:

| | |
|---|---:|
| Current assets | $ 4,073,887 |
| Property and equipment | 31,414 |
| Wellspring library | 15,379,258 |
| Other assets | 238,167 |
| Liabilities assumed | (13,783,912) |
| Deferred tax liability | (1,380,338) |
| Goodwill | 14,487,917 |
| Total Consideration | $ 19,046,393 |

After the acquisition of AVMC, we consider the Company as one operating segment and reporting unit. Goodwill from the acquisition is accounted for in accordance with SFAS 142 "Goodwill and Intangible Assets". The Wellspring library acquired in the transaction will be accounted for in accordance with SOP 00-2 as discussed further in Note 1. None of the goodwill is expected to be deductible for tax purposes.

FS-17

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following unaudited pro forma information represents our consolidated results of operations as if the acquisition of AVMC had occurred on January 1, 2004. Such pro forma information does not purport to be indicative of the results that would have been obtained had these events actually occurred at the beginning of the periods presented, nor does it intend to be a projection of future results.

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2005 | 2004 |
| Pro forma net revenue | $ 24,037,510 | $34,854,518 |
| Pro forma net loss | $(18,643,478) | $ (7,845,429) |
| Pro forma net loss per share | | |
| Basic and diluted | $        (0.46) | $        (0.33) |

## NOTE 6. ACCRUED EXPENSES

The components of accrued expenses at December 31, 2004 and 2005 were:

| | December 31, | |
| --- | --- | --- |
| | 2004 | 2005 |
| Accrued payroll and related items | $259,366 | $    483,697 |
| Accrued commissions | 74,934 | $    373,510 |
| Unearned revenue | — | $    262,742 |
| Accrued severance | — | $    308,591 |
| Tax payable | — | 74,637 |
| Other accrued expense | 454,866 | 1,804,716 |
| Total accrued expenses | $789,166 | $3,307,893 |

## NOTE 7. NOTES PAYABLE AND CONVERTIBLE DEBENTURES

On March 22, 2005, we completed our acquisition of American Vantage Media ("AVMC") (see Note 5). As part of this acquisition, Genius assumed notes payable to certain individuals and entities with a total principal balance of $4.0 million, bearing interest at 7%, payable quarterly, and a maturity date of February 3, 2006. Genius repaid $3.8 million of these notes on February 7, 2006 and withheld payment on the balance as part of our contractual right to reserve for certain potential liabilities associated with the acquisition.

On October 4, 2005, we entered into a Note and Warrant Purchase agreement with a group of investors (collectively, the "Investors"). Under the Purchase Agreement, the Investors loaned a total of $4.0 million to us in exchange for (i) promissory notes in favor of the Investors (the "Notes") with a total principal balance of $4.0 million and (ii) five-year warrants to purchase a total of 280,000 shares of our common stock, par value $0.0001 per share, with an exercise price per share equal to $1.88 (the last reported sales price of our common stock, as reported by the Over the Counter Bulletin Board, on the initial closing date of October 5, 2005). The discount allocated to the warrants was $0.3 million, calculated using the Black-Scholes Model, with the following weighted average assumptions: expected volatility 60%; risk-free interest rate of 4.2%; expected life of five years and no dividends payable. The fair value of the warrants were classified as equity in 2005 in accordance with Emerging Issues Task Force Issue No. 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock." The discount is amortized over the life of the Note. As of December 31, 2005 the amortized discount was $0.2 million. On December 5, 2005, we repaid $2.5 million of the October 4, 2005 Notes with proceeds from our December 2005 private equity financing, and on March 6, 2006 we repaid the remaining $1.5 million.

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

In the fourth quarter of 2003, we issued notes payable totaling $1,150,000 to private lenders. The notes bore interest at 10.5% and were due December 31, 2004. Interest was payable quarterly, beginning March 31, 2004. For the years ended December 31, 2004 and 2003, interest expense on the notes was $97,278 and $22,238, respectively. Each lender was also granted one warrant at $1.00 per share and one warrant at $3.00 per share for our common stock for each dollar loaned. The discount allocated to the warrants was $506,557, calculated using the Black-Scholes Model, with weighted average assumptions: expected volatility 50%, risk free interest of 4.4%, expected life of two years and no dividends paid. The discount was amortized over the life of the notes. The notes were paid in full as of December 31, 2004.

In 2001, we issued a convertible debenture for $50,750 to a shareholder in place of redeemable common stock. The debenture bears interest at 8%, was due March 31, 2002, and was convertible into common shares at $.50 per share; however, the conversion feature of this debenture has expired. Interest on the debenture was accrued through December 31, 2005. There was no beneficial conversion interest related to this debenture. We repaid the balance of debenture in February 2006.

### NOTE 8. COMMON STOCK

On March 2, 2005, we changed our state of incorporation from the state of Nevada to the state of Delaware and changed the par value of our common stock from $0.001 per share to $0.0001 per share. All transactions have been restated to reflect this change.

On March 19, 2004, we completed a private placement offering of 100 units aggregating $7 million pursuant to the exemption from registration under Rule 506 of Regulation D of the Securities Act. Proceeds net of cash commissions totaled approximately $6.4 million. Sands Brothers International Limited served as the selected dealer for the transaction. The private placement was priced at $70,000 per unit. Each unit consists of 50,000 shares of common stock and warrants to purchase 10,000 shares of common stock. The warrants have an exercise price of $3.00 per share and a five-year term. The fair value of the warrants at the time of issuance was $403,220 using the Black-Scholes valuation method with weighted average assumptions of expected volatility of 20%, risk free interest of 2.65%, expected life of five years and no expected dividends. Pursuant to the sales of the units we issued 5,000,000 new unregistered shares of common stock and warrants to purchase up to 1,650,000 shares of common stock (including those warrants issued as compensation to the selected dealer). In accordance with the terms of the Registration Rights Agreement we entered into with the investors and the selected dealer in connection with this financing, we have filed a resale registration statement for the resale of the common stock and the common stock underlying the warrants. The fair value of the warrants were classified as equity in 2005 in accordance with Emerging Issues Task Force Issue No. 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock."

On March 2, 2005, we entered into a securities purchase agreement with certain institutional investors related to the private placement of 6,518,987 shares of our common stock, par value $0.0001 per share, and five-year warrants to purchase 1,303,797 shares of Common Stock, half at an exercise price of $2.56 per share and half at an exercise price of $2.78 per share. The transaction closed on March 3, 2005 and we realized gross proceeds of $10.3 million from the financing, before deducting commissions and other expenses. We agreed to register for resale the shares of Common Stock issued in the private placement and shares issuable upon exercise of warrants. Such registration statement became effective on May 11, 2005. The fair value of the warrants were classified as equity in 2005 in accordance with Emerging Issues Task Force Issue No. 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock"

In May 2005, we entered into a securities purchase agreement with certain institutional investors related to the private placement of 3,000,000 shares of our common stock and five-year warrants to purchase 270,000

FS-19

Table of Contents

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

shares of our common stock at an exercise price of $2.56 per share. The transaction closed on May 20, 2005, and we realized gross proceeds of $5.25 million from the financing before deducting commissions and other expenses. The fair value of the warrants were classified as equity in 2005 in accordance with Emerging Issues Task Force Issue No. 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock."

On December 5, 2005, we entered into a securities purchase agreement with certain institutional investors related to the private placement of 16,000,000 shares of our common stock, par value $0.0001 per share, and five-year warrants to purchase 4,800,000 shares of common stock with an exercise price of $2.40 per share. The transaction closed on December 6, 2005 and we realized gross proceeds of $32 million from the financing, before deducting commissions and other expenses. The proceeds from the offering will provide working capital to fund new ventures as well as content acquisitions. The fair value of the warrants were classified as equity in 2005 in accordance with Emerging Issues Task Force Issue No. 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock."

OTHER STOCK ISSUANCES. During 2005, we issued 585,402 shares to third-party consultants and service providers for a total of $905,750. During 2004, we issued 57,994 shares to third-party consultants and service providers for a total of $102,800. During 2003, we issued 217,847 shares to third-party consultants and service providers for a total of $174,500, 350,000 shares of common stock as a prepayment against the development of re-mastered DVDs (which were subsequently returned in January 2004) and 70,922 shares of common stock for an option to acquire Falcon Picture Group. Also during this time period, a debenture of $10,000 was converted through the issuance of 10,000 shares. Additionally, we issued shares to certain officers in payment of salaries. Five officers, collectively, accepted 142,860 shares and 142,860 warrants as payment of $100,000 of 2003 salary.

REDEEMABLE COMMON STOCK. During 1999, we reviewed certain aspects of our issuances of common stock and determined that during 1997, 1998 and through September 1999, we sold common stock in private placement transactions that may be subject to redemption. In 2002, 1,250 shares were redeemed and in 2001, 8,750 shares were exchanged for a convertible debenture of $50,750 bearing interest at 8%. The total number of shares subject to redemption at December 31, 2005 was 49,300. Accordingly, additional paid in capital has been reduced by $362,322 to reflect the cumulative amounts subject to redemption. In addition, accrued interest of $148,899, calculated at an annual rate of 8% on the unredeemed shares, is included in the total of $414,471 shown in the caption "redeemable common stock" in the accompanying balance sheet. Rescission offers were made for some of the redeemable common stock.

OPTION AND WARRANT EXERCISES. In 2005 157,600 options were exercised at prices of $0.80-$1.50 per share resulting in proceeds of $191,580, and 1,255,315 warrants were exercised at a price of $1.00-$1.40, resulting in proceeds of $1,277,161. In 2004, 169,400 options were exercised at prices of $0.80-$1.53 per share, resulting in proceeds of $172,020, and, 217,500 warrants were exercised at a price of $0.63 per share, resulting in proceeds of $137,026. 478,716 shares of stock were issued in exchange for 1,436,148 warrants in a cashless exercise during the year. In 2003, 159,330 options were exercised at prices of $0.63 - $1.02, resulting in proceeds of $121,378.

**NOTE 9. STOCK OPTIONS AND WARRANTS**

EMPLOYEES. The 2004 Stock Option Plan provides a total of 7,500,000 shares to be granted as either incentive stock options or nonqualified stock options to our employees, directors and consultants. The term of the awards may not be for more than ten years (or five years in the case of incentive stock options granted to any participant who owns stock representing more than 10% of the combined voting power of us or any parent or

FS-20

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

subsidiary of ours). During 2005, we granted options to our employees and directors to purchase a total of 6,561,253 stock options under the 2004 Stock Option Plan and 3,270,000 stand alone stock options outside any plan, at an exercise price of $1.45-$2.31 and $1.55-$2.31, respectively. During 2004, we granted options to our employees and directors to purchase a total of 5,775,080 shares of our common stock at exercise prices of $1.40 to $4.00 per share, which equaled or exceeded fair market value at the time the options were granted. During 2003, we granted options to our employees and directors to purchase a total of 2,652,617 shares of our common stock at exercise prices of $.78 to $1.98 per share, which also equaled or exceeded fair market value at the time the options were granted.

NON-EMPLOYEES. In 2005, we granted warrants to purchase a total of 8,905,750 shares of our common stock at exercise prices from $1.58 to $2.78 per share to individuals for services to be rendered and in relation to a private placement, resulting in the recognition of $440,085 of expense. During 2005, warrants for 1,255,315 shares were exercised for cash. In 2004, we granted warrants to purchase a total of 4,667,432 shares of our common stock at exercise prices from $1.20 to $3.00 per share to individuals for services to be rendered and in relation to a private placement, resulting in the recognition of $1,339,412 of expense. During 2004, warrants for 217,500 shares were exercised for cash and 478,716 shares of stock were issued in exchange for 1,436,148 warrants in a cashless exercise. In accordance with Emerging Issues Task Force (EITF) Issue No. 96-18, "Accounting for Equity Instruments That are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services," and EITF Issue No. 00-18, "Accounting Recognition for Certain Transactions Involving Equity Instruments Granted to Other Than Employees," the stock based compensation expense recorded in our Statement of Operations for the year ended December 31, 2004, in the amount of $1,339,412, reflected the portion of the aggregate option value corresponding to the aggregate number of shares vested on the options through that date.

A summary of stock option and warrant activity follows:

|  | Options and Warrants Outstanding | Weighted Average Exercise Price |
|---|---|---|
| December 31, 2002 | 5,794,542 | $ 1.03 |
| Granted | 9,369,088 | $ 1.53 |
| Exercised | (159,330) | $ 0.76 |
| Canceled | (33,135) | $ 2.10 |
| December 31, 2003 | 14,971,165 | $ 1.35 |
| Granted | 9,805,080 | $ 2.52 |
| Exercised | (398,150) | $ 0.80 |
| Canceled | (1,326,347) | $ 1.05 |
| December 31, 2004 | 23,051,748 | $ 1.83 |
| Granted | 18,737,003 | $ 2.08 |
| Exercised | (1,412,915) | $ 1.04 |
| Canceled | (2,662,500) | $ 2.24 |
| December 31, 2005 | 37,713,336 | $ 1.96 |
| Options and warrants exerciseable, December 31, 2005 | 27,474,333 | $ 1.95 |

FS-21

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following information applies to all options and warrants outstanding at December 31, 2005:

| | Options/ warrants outstanding | Average remaining life | Weighted average exercise price options and warrants outstanding | Options and warrants exercisable | Weighted average exercise price options and warrants exercisable |
|---|---|---|---|---|---|
| Under $1.50 | 6,808,412 | 2.76 | $ 0.94 | 6,788,412 | $ 0.94 |
| $1.50 - $1.99 | 13,385,715 | 8.72 | 1.68 | 5,759,629 | 1.60 |
| $2.00 - $2.99 | 14,103,209 | 6.68 | 2.35 | 12,191,542 | 2.36 |
| $3.00 - $3.99 | 2,475,000 | 3.25 | 3.00 | 2,475,000 | 3.00 |
| $4.00 + over | 941,000 | 6.02 | 4.60 | 259,750 | 6.19 |
| | 37,713,336 | 4.80 | $ 1.96 | 27,474,333 | $ 1.94 |

## NOTE 10. SEVERANCE

We reorganized our executive management team and terminated an exclusive agreement with our financial advisor during the third quarter ended September 30, 2005. As a result, severance related charges of approximately $2.7 million were recognized, of which, $1.4 million was related to non-cash compensation expense resulting from the grant of additional vested stock options and the acceleration of certain unvested stock options. As of December 31, 2005, the remaining severance obligation was $0.3 million.

## NOTE 11. INCOME TAXES

Significant components of the provision for income taxes for the years ended December 31, 2005, 2004, and 2003 are as follows:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| CURRENT PROVISION | | | |
| Federal | 0 | 0 | 0 |
| California | $800 | $800 | $800 |
| DEFERRED PROVISION: | | | |
| Federal | 0 | 0 | 0 |
| California | 0 | 0 | 0 |
| Provision for Income Taxes | $800 | $800 | $800 |

A reconciliation of the expected income tax (benefit) computed using the federal statutory income tax rate to our effective income tax rate is as follows for the years ended December 31, 2005, 2004, and 2003:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Income tax computed at federal statutory tax rate | 34.00% | 34.00% | 34.00% |
| State taxes, net of federal benefit | 5.82% | 5.81% | 5.81% |
| Valuation allowance | -39.46% | -39.49% | -39.66% |
| Other | -0.36% | -0.32% | -0.15% |
| | 0.00% | 0.00% | 0.00% |

FS-22

Table of Contents

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Significant components of our deferred tax assets (liabilities) at December 31, 2005 and 2004 consisted of the following:

|  | 2005 | 2004 |
|---|---|---|
| NOL carry-forwards | $ 13,886,000 | $ 5,137,000 |
| Allowance accounts | 404,000 | 11,000 |
| State deferreds | (401,000) | 0 |
| Other reserves | 4,559,000 | 1,078,000 |
| Accrued vacation | 60,000 | 46,000 |
| Deferred compensation cost | 1,067,000 | 990,000 |
| Depreciation | 25,000 | 58,000 |
| Wellspring deferred tax liability | (1,380,000) | 0 |
| Net deferred tax assets | 18,220,000 | 7,320,000 |
| Less valuation allowance | ($19,600,000) | ($7,320,000) |
| Net deferred tax asset (liability) | ($ 1,380,000) | — |

As of December 31, 2005, we had total net operating loss carry-forwards for federal and state income tax purposes of $34,333,000 and $25,029,000 respectively which start expiring in 2011 through 2025. Included in our total net operating loss carryover, is approximately $12,900,000 of net operating losses we inherited as a result of AVMC acquisition pertaining to the Wellspring division. The utilization of net operating loss carry-forwards may be limited due to the ownership change under the provisions of Internal Revenue Code Section 382 and similar state provisions.

The net change in our valuation allowance increased $12.3 million in 2005, $2.6 million in 2004 and $1.0 million in 2003. The entire deferred income tax assets have been offset by a valuation allowance since management does not believe the recoverability of the deferred income tax assets during the next year is more likely than not. Accordingly, a deferred income tax benefit for the year ended December 31, 2005 has not been recognized in these financial statements. Included as part of deferred tax liabilities, that are not offset against the deferred tax assets in the determination of the required increase in the valuation allowance is step up in certain identifiable assets as a result of the AVMC acquisition that created recognition of approximately $1.5 million of deferred tax liability.

**NOTE 12. SUBSCRIPTIONS RECEIVABLE**

On January 22, 2004, the officers' notes receivable held by Genius Products as subscriptions receivable were paid by tendering shares of Genius Products common stock pursuant to the terms of the notes. Klaus Moeller tendered 168,052 shares and Michael Meader tendered 168,052 shares to retire their loans. Larry Balaban and Howard Balaban tendered 170,405 shares and 174,883 shares, respectively, to retire their loans and other advances. The remaining subscriptions receivable were paid off with 327,962 shares tendered.

**NOTE 13. COMMITMENTS AND CONTINGENCIES**

OPERATING LEASES. The Company leases certain facilities and computer equipment under non-cancelable operating leases. Rental expense for 2005, 2004, and 2003 was $484,763, $150,208, and $149,865, respectively.

As of December 31, 2005, the future minimum annual rental commitments required under existing non-cancelable operating leases are as follow:

|  | 2006 | 2007 | 2008 | 2009 | 2010 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Lease obligations | $939,249 | $1,092,459 | $976,302 | $728,507 | $734,880 | $185,068 | $4,656,465 |

FS-23

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Except as described below, we are not a party to any legal or administrative proceedings, other than routine litigation incidental to our business that we do not believe, individually or in the aggregate, would be likely to have a material adverse effect on our financial condition or results of operations.

### WELLSPRING MATTER

On March 21, 2005, we completed our acquisition of American Vantage Media Corporation and its subsidiary, Wellspring Media, Inc. ("Wellspring"). On or about March 14, 2005, a complaint was filed in U.S. Bankruptcy Court for the District of Delaware against Wellspring requesting a judgment in excess of $3,000,000. The complaint was filed by the Chapter 7 Trustee of the Winstar Communications, Inc. Estate ("Winstar"). The details of this matter are discussed below.

In September 2001 (prior to the acquisition of Wellspring by American Vantage Media), Winstar (or its predecessor) sold a subsidiary, Winstar TV & Video ("TV & Video"), to Wellspring in exchange for $2,000,000 in cash and a promissory note in the amount of $3,000,000. The merger agreement provided that in the event the working capital of TV & Video was determined to be less than $3,000,000 at the closing of the merger, the sole remedy of Wellspring was a reduction in the principal amount of the promissory note by the difference between $3,000,000 and the actual amount of the working capital. The accountants for Wellspring determined that at the time of the closing of the merger, TV & Video had a working capital deficit. Based upon this determination and the provisions of the merger agreement, Wellspring determined that the amount due under the promissory note should be reduced to zero, and as a result no payment was made. On November 30, 2001, Wellspring informed Winstar of its determination regarding the working capital deficit, and Winstar subsequently advised Wellspring that it disputed the determination. Since 2001, Wellspring and Winstar have engaged in discussions in an effort to settle the dispute over the working capital calculation, but no settlement has been reached.

We believe that, if an adverse judgment against Wellspring occurs or an adverse settlement is reached, our subsidiaries, Wellspring and American Vantage Media, will be entitled to full indemnification against any such losses by the initial owners of Wellspring (prior to American Vantage Media), and we will be entitled to indemnification by American Vantage Companies. However, if the outcome of this litigation is adverse to us, and we are required to pay significant monetary damages that are not indemnified by others, our financial condition and results of operations will likely be materially and adversely affected.

### FALCON PICTURE GROUP MATTER

In October 2005, we commenced litigation against Falcon Picture Group, LLC ("Falcon") in the Superior Court of San Diego County, Case No. GIN047884 seeking damages of $975,000 arising out of Falcon's breach of the license agreement. In October 2005, Falcon commenced litigation against Genius in the Circuit Court of Cook County, Illinois, Case No. 05H16850 (the "Illinois Proceeding"), based upon allegations, among other things, that Genius breached the terms of a license agreement by refusing to pay certain royalties to which Falcon supposedly was entitled. Falcon seeks damages award of approximately $83,332 subject to proof at trial. Falcon further alleges that as a result of Genius' purported default under the license agreement, Falcon is entitled to judgment declaring the license agreement to have been lawfully terminated. Although Genius has not yet responded to the complaint in the Illinois proceeding, Genius plans to vigorously defend against the allegations thereof.

EXECUTIVE EMPLOYMENT AGREEMENTS. In 2002, we entered into employment agreements with six of our executive officers and key employees. The agreements are for three-year terms and provide for stock options, employee benefits and severance pay for termination without cause of between 12 and 24 months' salary. In 2003, these agreements were amended to extend the term for an additional year, and to provide for

FS-24

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

salary increases and additional stock option awards. In 2004 we entered into an employment agreement with three new executive officers that provide for stock options, employee benefits and severance pay for termination without cause. In 2005 one of these agreements were amended to provide for salary increases and additional stock option awards. Additionally, in 2005 we entered into an employment agreement with six new executive officers that provide for stock options, employee benefits and severance pay for termination without cause. The 2002, 2004, and 2005 agreements allow for the assignment of contract benefits to the employee's heirs in the event of an employee death within the contract term.

### NOTE 14. RELATED-PARTY TRANSACTIONS

SALE OF BABY GENIUS. On December 31, 2005, we entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") with Klaus Moeller who was our founder and formerly our CEO and a Director. Under the Asset Purchase Agreement, we agreed to sell to Mr. Moeller all of our right, title and interest in and to the following assets (the "Assets"), subject to the terms, conditions and limitations set forth in the Asset Purchase Agreement:

- the audio and audiovisual works entitled "Baby Genius";

- the audio and audiovisual works entitled "Kid Genius";

- the audio and audiovisual works entitled "Little Tikes";

- the audio works entitled "Wee Worship"; and

- related intellectual property, agreements, documents and instruments.

Subject to limited exceptions, Mr. Moeller agreed to assume any and all obligations for royalties, advances, reporting requirements, and all other obligations of any kind arising out of or in connection with all talent agreements, producer agreements, and any and all other agreements relating to the Assets and due after the signing of the Asset Purchase Agreement. As part of the agreement, we will continue to distribute Baby Genius, Little Tikes and Wee Worship DVDs and music CDs and all new products under these brands. Under the distribution agreement, we will receive a distribution fee and recoup all of our expenses.

The purchase price for the Assets was $3 million, payable as follows:

- $250,000 in cash on signing;

- $750,000 by means of a secured promissory note due and payable in full, together with all accrued interest, on January 30, 2006, bearing interest at the rate of 4.5% per annum; and

- $2 million by means of a secured promissory note due and payable in full, together with all accrued interest, on the fifth anniversary of the closing date, bearing interest at the rate of 4.5% per annum.

The $3 million purchase price was determined by negotiations between the parties and our assessment of the reasonable value of the Assets and the distribution arrangement described above.

In conjunction with this transaction we recorded a gain on sale in the amount of $1,351,710, a note receivable in the amount of $1,712,353 representing the present value of a $2 million secured promissory note that we received in this transaction and a deferred gain of $1,212,353. We will recognize the deferred gain based upon the relative percentage of revenue we generate in each period relative to the total revenue expected to be generated over the term of the distribution agreement. We have subsequently received payment in full of the secured promissory note, due on January 30, 2006, in the amount of $750,000, plus interest.

FS-25

Table of Contents

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

FALCON PICTURE GROUP, LLC. On September 8, 2003, we executed a license agreement with Falcon Picture Group, LLC ("Falcon") for the exclusive rights to distribute a majority of its audio and video products worldwide, with AMC and TV Guide branded DVD movie and television collections and Twilight Zone branded audio collections in the U.S. and Canada. Carl Amari, a former member of our board of directors, is the CEO of Falcon. This agreement expires on July 1, 2006, with an automatic renewal for an additional three years if both parties are fulfilling their obligations under the agreement and calls for a royalty to be paid on the sales of the video and audio products. We have committed to pay a minimum annual royalty of $240,000 for brands including AMC and Twilight Zone, and a royalty of $325,000 for TV Guide over a three and one-half year term that commenced on December 22, 2003. In addition, the agreement calls for a minimum content purchase of $300,000 annually.

The agreement also provides a three-year option to acquire Falcon's assets for $3,600,000 (payable in cash or stock or a combination of cash and stock). As consideration for the right to purchase Falcon, we issued 70,922 shares of common stock with a market value of approximately $100,000. The stock value of $1.40 is based on the average of the closing market price of the common shares as of September 8, 2003, the date of issuance of such shares and the execution of the agreement, and July 1, 2003, the effective date of the agreement. The specific assets and liabilities of Falcon that would be acquired under this right will be negotiated by the parties at the time the acquisition is considered. We do not anticipate that we will exercise our right and have recorded a reserve in the amount of $100,000 for the value of the right that has been included in other assets.

FACILITY LEASES. We lease a warehouse facility in Iowa from The Meader Family Limited Partnership which is affiliated with Michael Meader, formerly our president. Lease payments were $34,800, $34,800, $20,400 in 2005, 2004 and 2003, respectively. The term of this lease is through 2007 although it is likely that we will sublease this warehouse until the end of the term. The Company also leased sales offices in Minnesota from Ekelund Properties, which is affiliated with Julie Ekelund, Executive Vice President. Lease payments in 2004 were $14,400 and $7,200 in 2003 under this agreement. This lease expired in January 2005.

BRANDISSIMO!. On November 1, 2005, we entered into an agreement with Brandissimo! Inc., a company which was co-owned by Mr. Trevor Drinkwater, our CEO, and is currently co-owned by David Snyder our Executive Vice President of Content. Under this agreement, we have an exclusive "first look" at all Brandissimo owned or controlled children's projects to be produced for videogram distribution. We will serve as exclusive videogram distributor for all Brandissimo-owned or controlled children's projects produced or otherwise presented to us during the one-year term of the agreement. Brandissimo will render production services for any and all children's projects which we finance and produce during the term of the agreement. Over the course of the term, we will pay to Brandissimo a $100,000 non-refundable, non-recoupable overhead fee. Under the agreement, we are entitled to receive a distribution fee equal to 12% to 20% of gross receipts, depending on the products being distributed.

SHARES ISSUED FOR COMPENSATION. In 2003, five officers, collectively, accepted 142,860 shares and 142,860 warrants of our common stock as payment of $100,000 of 2003 salary. The warrants have an exercise price of $1.40 and have a five year term.

INVESTMENT BANKING AND FINANCIAL ADVISORY SERVICES. Alexander L. Cappello is Chairman and CEO of Cappello Capital Corp., investment bankers. Bruce Pompan is Managing Director of Cappello Capital Corp. Both were our Directors. We retained Cappello Capital Corp. to perform corporate finance advisory services for a two-year period commencing in March 2004. After the first 12 month term the agreement can be terminated with 30 days' advance notice. Cappello Capital Corporation has been granted 2,000,000 warrants with an exercise price of $2.50 and a term of ten years. On July 21, 2005, We and Cappello Capital Corp. ("Cappello") entered into (i) a letter agreement (the "First Amendment") amending certain portions

FS-26

**Table of Contents**

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

of our original engagement agreement, dated March 24, 2004 (the "Engagement Agreement"), under which we retained Cappello as exclusive financial advisor; and (ii) a Resale Agreement (the "Resale Agreement") providing restrictions on open market sales of certain shares of common stock issued to Cappello. Alex Cappello and Bruce Pompan, were our directors, are each managing directors of Cappello Capital Corp., and Alex Cappello is the sole shareholder of Cappello Capital Corp.

Under the First Amendment, we and Cappello agreed to the following:

- The Engagement Agreement and the exclusive engagement of Cappello as our financial advisor are terminated effective as of June 3, 2005;

- The term "Covered Party" for purposes of the tail period under the Engagement Agreement is limited to two parties identified in the Amendment and any party providing financing to complete a proposed transaction identified in the Amendment. The fees payable by us for potential transactions with these two parties are modified from the amounts otherwise payable under the Engagement Agreement;

- Bruce L. Pompan will submit his resignation as our director, effective immediately;

- The Company will issue to Cappello 175,000 shares of common stock and reduce the exercise price on 2.0 million warrants to purchase common stock currently held by Cappello from $2.50 per share to $2.20 per share;

- The Company will increase the monthly retainer payable to Cappello from $10,000 per month to $25,000 per month for services commencing as of June 3, 2005 until the occurrence of certain events specified in the Amendment; and

- The Company will pay to Cappello a fee for the private placement transaction which closed on May 20, 2005 in the amount of $105,000 (2% of the transaction) and 171,675 warrants to purchase our common stock exercisable at $1.75 per share.

**NOTE 15. SELECTED QUARTERLY FINANCIAL DATA**

Selected unaudited quarterly financial data for the years ended December 31, 2004 and 2005 are summarized below.

| | 2004 | | | |
| --- | --- | --- | --- | --- |
| | **First Quarter** | **Second Quarter** | **Third Quarter** | **Fourth Quarter** |
| Net sales | $ 3,131,389 | $ 2,057,557 | $ 5,017,456 | $ 6,423,530 |
| Gross profit (loss) | $ (650,750) | $ 398,754 | $ 1,081,333 | $ 1,907,161 |
| Loss before income taxes | $ (797,752) | $ (1,246,687) | $ (917,377) | $ (3,083,552) |
| Net loss | $ (798,552) | $ (1,246,687) | $ (917,377) | $ (3,083,552) |
| Basic earnings per share | $ (0.04) | $ (0.05) | $ (0.04) | $ (0.12) |
| Weighted average shares outstanding | 20,697,233 | 24,442,271 | 25,080,003 | 25,397,825 |

| | 2005 | | | |
| --- | --- | --- | --- | --- |
| | **First Quarter** | **Second Quarter** | **Third Quarter** | **Fourth Quarter** |
| | | **As Restated** | **As Restated** | |
| Net sales | $ 2,555,886 | $ 3,912,450 | $ 8,154,040 | $ 7,705,352 |
| Gross profit (loss) | $ (110,914) | (1,731,034) | 2,367,825 | (1,080,457) |
| Loss before income taxes | $ (2,231,523) | (5,288,177) | (3,846,623) | (5,793,397) |
| Net loss | $ (2,232,323) | (5,296,352) | (3,854,798) | (5,777,047) |
| Basic earnings per share | $ (0.08) | $ (0.13) | $ (0.09) | $ (0.12) |
| Weighted average shares outstanding | 28,000,009 | 41,754,657 | 43,348,990 | 48,211,947 |

Table of Contents

### GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Restatement of Prior Quarters Ended June 30, 2005 and September 30, 2005**

The Company revised theatrical revenue to decrease the amount recognized due to an accrual for film rental earned but not billed that was not reversed in the subsequent period, revised royalty revenue to recognize unearned revenue from a prior period that became earned revenue and revised royalty expense and production cost amortization expense to increase the amounts recognized because the Company had recorded these amounts as assets rather than expenses.

The effects of the restatement on net revenues, cost of revenues, gross profit, net loss, basic and diluted loss per common share, production masters, film library, accrued expenses, and stockholders' equity as of and for the quarter ended June 30, 2005 are as follows:

|  | As Originally Reported | Restatement Adjustments | As Restated |
|---|---|---|---|
| Net revenues | $ 3,822,450 | $  90,000 | $ 3,912,450 |
| Cost of revenues | 5,163,789 | 479,695 | 5,643,484 |
| Gross profit | (1,341,339) | (389,695) | (1,731,034) |
| Net loss | $(4,906,657) | $(389,695) | $(5,296,352) |
| Loss per common share: |  |  |  |
| Basic and diluted | $      (0.12) | $      (0.01) | $      (0.13) |
| Production masters | $ 3,456,267 | $  (63,547) | $ 3,392,720 |
| Film library | 16,095,700 | (416,148) | 15,679,552 |
| Accrued expenses | 1,595,815 | (90,000) | 1,505,815 |
| Stockholders' equity | $31,725,719 | $(389,695) | $31,336,024 |

The effects of the restatement on net revenues, cost of revenues, gross profit, net loss, basic and diluted loss per common share, production masters, film library, accrued expenses, and stockholders' equity as of and for the quarter ended September 30, 2005 are as follows:

|  | As Originally Reported | Restatement Adjustments | As Restated |
|---|---|---|---|
| Net revenues | $ 8,405,643 | $(251,603) | $ 8,154,040 |
| Cost of revenues | 5,670,430 | 115,785 | 5,786,215 |
| Gross profit | 2,735,213 | (367,388) | 2,367,825 |
| Net loss | $(3,487,410) | $(367,388) | $(3,854,798) |
| Loss per common share: |  |  |  |
| Basic and diluted | $      (0.08) | $      (0.01) | $      (0.09) |
| Accounts receivable | $ 5,649,464 | $(251,603) | $ 5,397,861 |
| Production masters | 3,615,641 | (105,021) | 3,510,620 |
| Film library | 16,270,146 | (490,459) | 15,779,687 |
| Accrued expenses | 3,235,852 | (90,000) | 3,145,852 |
| Stockholders' equity | $30,210,223 | $(757,083) | $29,453,140 |

### NOTE 16. TERMINATION OF DISTRIBUTION AGREEMENT WITH WARNER HOME VIDEO

On March 5, 2004, We and Warner Home Video mutually agreed to terminate the Baby Genius distribution agreement. The Company subsequently began self-distribution of the Baby Genius line of DVDs. Under the termination agreement, we also regained the distribution rights for our planned line of Kid Genius DVDs. The termination agreement calls for a $300,000 payment to Warner made by means of a royalty arrangement based on net sales of the Baby Genius DVDs. As an additional element of the settlement, we agreed to purchase approximately $192,000 in outstanding Baby Genius inventory held at various Warner locations.

FS-28

Table of Contents

## GENIUS PRODUCTS, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**NOTE 17. SUBSEQUENT EVENTS**

NEW CFO. On February 7, 2006, we announced the hiring of John Mueller as Chief Financial Officer. Mr. Mueller joined us from Jefferies & Company, Inc., where he served as Senior Vice President of Media and Entertainment Investment Banking in New York. He succeeded Shawn Howie.

REPAYMENT OF NOTES. On February 3, 2006, we repaid $3.8 million of the $4.0 million notes assumed as part of the acquisition of AVMC on March 22, 2005. Additionally, on March 6, 2006, we repaid the remaining $1.5 million of the short-term notes issued on October 4, 2005.

SANTA MONICA LEASE. On February 17, 2006, we entered into a lease agreement for 17,400 square foot office facility in Santa Monica, California. This lease expires on March 16, 2011. The monthly rent for this facility is $54,810.

CORPORATE REALIGNMENT. On February 20, 2006, we announced a corporate realignment of the Wellspring Media division ("Wellspring") which is currently based in New York, New York. The Company announced that the Wellspring home entertainment distribution division will transfer to our facility located in Santa Monica, California and that the Wellspring theatrical distribution arm will be closed. The primary goal of this corporate realignment is to improve our operating efficiencies. The Company estimates that it will incur costs of an aggregate total of approximately $490,000 in connection with this action. These costs consist primarily of employee severance arrangements and other related expenses. We expect to pay these costs and substantially complete the reorganization by May 2006.

FS-29

**Table of Contents**

### GENIUS PRODUCTS, INC AND SUBSIDIARIES

### SCHEDULE II – Valuation and Qualifying Accounts
### Years Ended December 31, 2003, 2004 and 2005

Allowances are deducted from the assets to which they apply, except for sales returns and allowances.

| | Balance at Beginning of Period | Charged to costs and expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| **Year ended December 31, 2003** | | | | | |
| **Allowance for:** | | | | | |
| Uncollectible accounts | $ 15,000 | $ 11,000 | $ — | $ — | $ 26,000 |
| Reserve for potential product obsolescence | — | — | — | — | — |
| Reserve for sales returns and allowances | 55,000 | 101,597 | — | — | 156,597 |
| Deferred Tax Assets | 3,714,000 | 957,000 | — | — | 4,671,000 |
| | $3,784,000 | $ 1,069,597 | $ — | $ — | $ 4,853,597 |
| **Year ended December 31, 2004** | | | | | |
| **Allowance for:** | | | | | |
| Uncollectible accounts | $ 26,000 | $ 21,000 | $ — | $ (5,121) | $ 41,879 |
| Reserve for potential product obsolescence | — | 474,358 | — | — | 474,358 |
| Reserve for sales returns and allowances | 156,597 | 1,339,208 | — | (173,658) | 1,322,147 |
| Deferred Tax Assets | 4,671,000 | 2,649,000 | — | — | 7,320,000 |
| | $4,853,597 | $ 4,483,566 | $ — | $ (178,779) | $ 9,158,384 |
| **Year ended December 31, 2005** | | | | | |
| **Allowance for:** | | | | | |
| Uncollectible accounts | $ 41,879 | $ 361,222 | $1,310,275 (a) | $ (757,730) | $ 955,646 |
| Reserve for potential product obsolescence | 474,358 | 1,827,077 | — | — | 2,301,435 |
| Reserve for sales returns and allowances | 1,322,147 | 5,183,543 | 217,057 (a) | (769,604) | 5,953,143 |
| Deferred Tax Assets | 7,320,000 | 12,280,000 | — | — | 19,600,000 |
| | $9,158,384 | $19,651,842 | $ 1,527,332 | $(1,527,334) | $28,810,224 |

(a)   AVMC acquired reserve

[Table of Contents](#)

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2005 | March 31, 2006 |
|---|---|---|
| | | (unaudited) |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 30,597,164 | $ 18,402,355 |
| Accounts receivable, net of allowance for doubtful accounts and sales returns of $6,908,789 and $8,366,779 | 2,406,658 | 42,038,129 |
| Inventories, net | 5,567,953 | 9,441,962 |
| Prepaid expenses | 703,875 | 565,460 |
| Notes receivable, related party | 750,000 | — |
| Total current assets | 40,025,650 | 70,447,906 |
| Restricted cash | — | 300,650 |
| Property and equipment, net | 396,358 | 620,489 |
| Production masters, net of accumulated amortization of $2,510,307 and $2,635,911 | 4,573,191 | 5,195,468 |
| Film library, net of accumulated amortization of $1,517,001 and $1,765,826 | 15,153,988 | 15,092,735 |
| Notes receivable, related party | 1,712,353 | 1,712,353 |
| Goodwill | 14,487,917 | 14,487,917 |
| Deposits and other | 15,545 | 195,913 |
| Total assets | $ 76,365,002 | $108,053,431 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $  9,242,560 | $  13,542,394 |
| Notes payable | 5,379,296 | 200,000 |
| Remittance to licensor | — | 17,730,485 |
| Accrued expenses | 3,307,893 | 6,410,420 |
| Deferred revenue | — | 16,262,426 |
| Customer deposits | 189,423 | 189,423 |
| Debentures payable | 50,750 | — |
| Redeemable common stock | 414,471 | 419,296 |
| Total current liabilities | 18,584,393 | 54,754,444 |
| Deferred tax liability | 1,380,338 | 1,380,338 |
| Deferred gain, related party | 1,212,353 | 1,172,086 |
| Total liabilities | 21,177,084 | 57,306,868 |
| Commitments and contingencies | | |
| Stockholders' equity | | |
| Preferred stock, $.0001 par value; 10,000,000 shares authorized; no shares outstanding | — | — |
| Common stock, $.0001 par value; 100,000,000 shares authorized; 60,438,154 and 60,622,626 shares outstanding | 6,044 | 6,062 |
| Additional paid-in capital | 93,919,755 | 95,152,144 |
| Accumulated deficit | (38,737,881) | (44,411,643) |
| Total stockholders' equity | 55,187,918 | 50,104,653 |
| Total liabilities and stockholders' equity | $ 76,365,002 | $108,053,431 |

See accompanying notes to unaudited interim financial statements

FS-31

Table of Contents

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(UNAUDITED)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2005 | 2006 |
| Revenues: | | |
| Video and DVD | $ 1,419,262 | $36,206,585 |
| Theatrical | — | 70,435 |
| Audio | 1,320,810 | 776,554 |
| Royalties, licensing and other | 25,118 | 373,061 |
| Gross revenues | 2,765,190 | 37,426,635 |
| Sales returns, discounts and allowances | (209,304) | (8,843,308) |
| Net revenues | 2,555,886 | 28,583,327 |
| Costs and expenses | | |
| Cost of revenues: | | |
| Video and DVD | 1,632,163 | 22,044,632 |
| Theatrical | — | 103,705 |
| Audio | 790,800 | 594,921 |
| Amortization of production masters and film library | 172,670 | 311,089 |
| Warehouse expense and other | 71,168 | 126,159 |
| Total cost of revenues | 2,666,801 | 23,180,506 |
| Gross profit (loss) | (110,915) | 5,402,821 |
| Operating expenses (income): | | |
| Product development | 227,314 | 746,877 |
| Sales and marketing | 446,491 | 5,522,719 |
| General and administrative | 1,440,964 | 4,895,095 |
| Gain on sale, related party | — | (40,267) |
| Total operating expenses | 2,114,769 | 11,124,424 |
| Loss from operations | (2,225,684) | (5,721,603) |
| Interest and other income (expense) | (5,840) | 47,841 |
| Loss before provision for income taxes | (2,231,524) | (5,673,762) |
| Provision for income taxes | 800 | — |
| Net loss | $(2,232,324) | $(5,673,762) |
| Basic and diluted net loss per share | $ (0.08) | $ (0.09) |
| Basic and diluted weighted average shares | 28,000,009 | 60,474,572 |

See accompanying notes to unaudited interim financial statements

FS-32

Table of Contents

**GENIUS PRODUCTS, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2005 | 2006 |
| Cash flows from operating activities: | | |
| Net loss | $ (2,232,323) | $ (5,673,762) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 35,922 | 48,185 |
| Amortization of production masters and film library | — | 311,089 |
| Change in allowance for doubtful accounts and provision for returns | (837,217) | 9,146,531 |
| Change in provision for obsolete inventory | — | (178,041) |
| Common stock issued for services | 58,579 | 19,100 |
| Stock compensation expense | — | 1,028,456 |
| Debt discounts | — | 120,704 |
| Interest expense on redeemable common stock | 4,825 | 4,825 |
| *Changes in assets and liabilities:* | | |
| (Increase) decrease in Accounts receivable | 2,687,842 | (48,778,002) |
| (Increase) decrease in Inventories | 646,738 | (3,695,968) |
| (Increase) decrease in Prepaid expenses, notes receivable and deposits | 16,799 | 708,047 |
| (Increase) decrease in Restricted cash | — | (300,650) |
| (Increase) decrease in Development of production masters and film library | (878,189) | (872,113) |
| Increase (decrease) in Accounts payable | (4,723,799) | 4,299,834 |
| Increase (decrease) in Accrued expenses and other | 137,912 | 3,102,526 |
| Increase (decrease) in Deferred revenue | — | 16,262,426 |
| Increase (decrease) in Remittance to licensor | — | 17,730,485 |
| Increase (decrease) in Debentures payable | — | (50,750) |
| Increase (decrease) in Deferred gain, related party | — | (40,267) |
| Net cash used in operating activities | (5,082,911) | (6,807,345) |
| Cash flows from investing activities: | | |
| AVM cash, net of expenses paid in cash | (188,886) | — |
| Purchase of property and equipment | (36,857) | (272,316) |
| Net cash used in investing activities | (225,743) | (272,316) |
| Cash flows from financing activities: | | |
| Payments on notes payable | — | (5,300,000) |
| Payments on short-term debt | (2,349,219) | — |
| Payments of offering costs | (718,589) | — |
| Proceeds from exercise of options | 83,580 | 138,551 |
| Proceeds from exercise of warrants | 557,560 | 46,301 |
| Proceeds from issuance of common stock | 10,300,000 | — |
| Net cash (used in) provided by financing activities | 7,873,332 | (5,115,148) |
| Net increase (decrease) in cash and equivalents | 2,564,678 | (12,194,809) |
| Cash at beginning of period | 1,223,880 | 30,597,164 |
| Cash at end of period | $ 3,788,558 | $ 18,402,355 |
| | | |
| Supplemental disclosure of cash flow information | | |
| Warrants issued for offering costs | $ 1,014,986 | $ — |
| Issuance of common stock for offering costs | $ 350,000 | $ — |