1          UNITED STATES BANKRUPTCY COURT

2       CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

3                    --oOo--

4    In Re:                    )   Case No. 2:11-bk-62283-RN
                               )
5    GENIUS PRODUCTS, LLC,     )   Chapter 7
                               )
6    Debtor.                   )   Los Angeles, California
                               )   Thursday, 2:00 P.M.
7    --------------------------)   September 17, 2015
     ALFRED H. SIEGEL, *Chapter* 7 )
8    *Trustee*,                )
                               )
9              Plaintiff,      )
                               )   Adv. No. 2:15-ap-01241-RN
10             v.              )
                               )
11   THE WEINSTEIN COMPANY, LLC, )
     *et al.*,                 )
12                             )
               Defendants.     )
13   --------------------------X
                                   CONTINUED MOTION FOR
14                                 APPROVAL OF POST-PETITION
                                   FINANCING PURSUANT TO 11
15                                 U.S.C. SECTION 364(c)

16                                 MOTION TO DISMISS THE
                                   ADVERSARY PROCEEDING
17
                  TRANSCRIPT OF PROCEEDINGS
18           BEFORE THE HONORABLE RICHARD NEITER
               UNITED STATES BANKRUPTCY JUDGE
19
     APPEARANCES:
20
     For Plaintiff:            JAMES P. MENTON, JR., ESQ.
21                             DAVID B. SHEMANO, ESQ.
                               Robins, Kaplan, Miller &
22                               Ciresi, LLP
                               2049 Century Park East
23                             Suite #3400
                               Los Angeles, California 90067
24
     Proceedings produced by electronic sound recording;
25   transcript produced by transcription service.



```
 1                                ANTHONY A. FRIEDMAN, ESQ.
                                  Levene, Neale, Bender, Yoo &
 2                                   Brill, LLP
                                  1020 Constellation Boulevard
 3                                Suite #1700
                                  Los Angeles, California 90067
 4
     For Defendants:             METTE H. KURTH, ESQ.
 5                               ALAN R. FRIEDMAN, ESQ.
                                 Fox Rothschild, LLP
 6                               1800 Century Park East
                                 Suite #300
 7                               Los Angeles, California 90067

 8   Court Recorder:             Shafari Tatum
                                 U.S. Bankruptcy Court
 9                               Central District of California
                                 Edward R. Roybal Federal Building
10                                 and Courthouse
                                 255 East Temple Street, Room #940
11                               Los Angeles, California  90012
                                 (855) 460-9641
12
     Court Transcriptionist:     Ruth Ann Hager, C.E.T.**D-641
13                               Ben Hyatt Certified Deposition
                                    Reporters
14                               17835 Ventura Boulevard, Suite 310
                                 Encino, California  91316
15

16

17

18

19

20

21

22

23

24

25
```



Page                                                                    3

1       LOS ANGELES, CALIFORNIA, THURSDAY, SEPTEMBER 17, 2015,

2                            2:06 P.M.

3                            --oOo--

4          THE COURT:  The first matter is set for hearing

5   is that of a continued motion for approval of post-petition

6   financing.  Debtor's counsel, do you want to tell me where

7   you are in that matter?

8          MR. ANTHONY FRIEDMAN:  Good afternoon, Your

9   Honor.  Anthony Friedman, Levene, Neale, Bender, Yoo &

10  Brill, on behalf of Al Siegel, the Chapter 7 Trustee.

11         THE COURT:  Thank you.

12         MR. ANTHONY FRIEDMAN:  Your Honor, we were able

13  to have a conference call this morning and we were able to

14  discuss revisions to the litigation funding agreement.

15  What we have come up with and we have not been able to --

16  one of the funding parties was not able to participate on

17  the phone call, though we understand that they are in

18  agreement with this.  However, we just need some

19  documentation or some sort of writing from them confirming

20  that they are in agreement.

21         What it would provide is that the funding

22  agreement is revised so that the funding parties would

23  receive their $250,000 back and that what they would then

24  receive is, instead of the 85 percent of the additional

25  funds above as the return, that they would receive the

Page                                                                4

1   first $500,000 only from the return and that would be

2   disbursed amongst their client, which benefits the estate

3   because it reduces those creditors' claims by the funds

4   that they receive, but that would be the extent of the

5   return on top of their $250,000 and not the 85 percent as

6   originally proposed.

7            THE COURT:  You've lost me because you went from

8   250 to five.  They're putting up 250 new money and --

9            MR. ANTHONY FRIEDMAN:  They're putting up

10  $250,000 as new money for the funding.

11           THE COURT:  Yes.  Okay.

12           MR. ANTHONY FRIEDMAN:  The return would be the

13  250,000 that they're putting up --

14           THE COURT:  Yes.

15           MR. ANTHONY FRIEDMAN:  -- plus they would then

16  receive $500,000 on top of that as the return.  That would

17  go against their claims.  Then after that they would

18  participate as though they were every other creditor in the

19  estate.

20           THE COURT:  Okay.  Thank you.  I appreciate that

21  and when I see that in writing I'll certainly act upon it.

22           MR. ANTHONY FRIEDMAN:  Okay.  Your Honor, I think

23  what we would do is I would propose that ...

24           THE COURT:  I'm prepared to approved of it if

25  that's your concern that when I see it in writing if it

Page                                                                    5

1   conforms to what you've just described.

2           MR. ANTHONY FRIEDMAN:  Well, that's fine then.

3   Your Honor, then I think that's -- right.  I think what we

4   would propose is we'd do a supplemental declaration and

5   lodge an order with the new information in there and the

6   new agreement and then lodge the order.

7           THE COURT:  Okay.  Thank you.

8           MR. ANTHONY FRIEDMAN:  Thank you, Your Honor.

9           THE COURT:  All right.  Let's take up

10  number #2.00, also Genius Products, which is 11-62283, and

11  this is an adversary proceeding, 15-01241, which is

12  Siegel v. The Weinstein Company, *et al.*

13          MS. KURTH:  Good afternoon, Your Honor, Mette

14  Kurth with Fox Rothschild, LLP, and here with me is my

15  partner Alan Friedman as well, and we are appearing on

16  behalf of The Weinstein Company and Weinstein Company

17  Holdings.

18          THE COURT:  Ms. Kurth, thank you.

19          And Alan Friedman, is that your name?

20          MR. ALAN FRIEDMAN:  Yes, Your Honor.

21          THE COURT:  Thank you.

22          MR. SHEMANO:  Good afternoon, Your Honor, David

23  Shemano with James Menton of Robins Kaplan, LLP, special

24  litigation counsel to the Chapter 7 Trustee.

25          THE COURT:  Thank you.  Okay.  The name of your

Page                                                                                  6

1  colleague?

2          MR. SHEMANO:  James Menton, M-E-N-T-O-N.

3          THE COURT:  Okay.  Well, the -- how do I start

4  this.  The motion to dismiss the adversary proceeding is

5  certainly complex.  The transactions are complex.  And

6  having read the documents I still need some explanation and

7  so I don't know which one of you would like to start first

8  and sort of give me an overlay to make sure that my thought

9  process is correct.

10         MR. ALAN FRIEDMAN:  I'd be happy to, Your Honor.

11         THE COURT:  Thank you.

12         MR. ALAN FRIEDMAN:  Thank you.  So just as a sort

13  of procedural matter, Your Honor, I'm going to give you the

14  overlay, which was how I would start presenting the motion

15  to dismiss to the Court.  There are --

16         MR. ALAN FRIEDMAN:  You don't have to repeat

17  what's really on the pleadings, but I would like an overlay

18  of those pleadings.

19         MR. ALAN FRIEDMAN:  Fair enough.  So what has

20  occurred in this case is that the Trustee has brought

21  claims against The Weinstein Company and The Weinstein

22  Company Holdings that are based upon agreements that were

23  entered into beginning in 2005 and ending in 2009.  At the

24  outset Genius Products, Inc. and The Weinstein Company

25  began to have conversations.  That happened in 2005.

Page                                                                    7

1    That's not disputed.  That's admitted in the opposition

2    papers.  In 2005 The Weinstein Company, which is run by Bob

3    Weinstein and Harvey Weinstein, who used to run Miramax

4    Film Company, was formed and it was an opportunity for

5    the -- for The Weinstein Company to go out and replicate

6    what occurred from Miramax Films, but it was also an

7    opportunity for a company like Genius Products, Inc., that

8    ran a distribution business for DVDs to try to do a deal so

9    that they could distribute The Weinstein Company product in

10   the hope that what The Weinstein Company would be able to

11   release would be something along the lines of what they

12   were able to do at Miramax Films; so it was an exciting

13   opportunity.

14          The staying within -- Your Honor, I'm going to

15   stay within the pleadings as I'm sure the Court would want

16   me to.

17          THE COURT:  Yes.  Thank you.

18          MR. ALAN FRIEDMAN:  Not to mention the Trustee's

19   counsel.

20          THE COURT:  I think that's a good parameter for

21   everybody to respect.  Okay.

22          MR. ALAN FRIEDMAN:  So what -- what is though

23   stated in the Trustee counsel's opposition that in 2005 and

24   2006 Genius Products, Inc. never alleged to be a company

25   that is anything other than independent from the

Page                                                            8

1   defendants.  It's an independent company.  It -- excuse me,

2   it was a public company and the -- and The Weinstein

3   Company had entered into negotiations that culminated, in

4   the words of the Trustee again, in a joint venture in July

5   2006.  What that joint venture was, was set out in the

6   agreement that we have offered to the Court as incorporated

7   by reference, the master contribution agreement, which

8   included two exhibits, one a distribution agreement and the

9   other the operating agreement.  And what the deal was that

10  The Weinstein Company and Genius Products, Inc. agreed to

11  as independent companies was those fully negotiated

12  agreements, negotiated fully in two thou -- in 2005 when

13  they were independent companies, would be the distribution

14  agreement and the operating agreement in the event that the

15  joint venture actually did culminate, which it did in July

16  2006 when the profit -- when the shareholders of Genius

17  Products, Inc. approved the transactions.  So that's how it

18  all got going; negotiated by independent companies in 2005.

19        So as Your Honor will have seen in our papers

20  where the Trustee says these were not -- the two -- the

21  2006 distribution agreement was not an arm's-length

22  agreement and, in fact, The Weinstein Company was on both

23  sides of it because an executive of The Weinstein Company

24  signed for both parties, what we have said is no, because

25  that was pre-ordained in the contribution agreement that

Page                                                                          9

1   was negotiated by the independent parties.  So all that was

2   happening there is rather than be in breach of what those

3   parties agreed to that distribution agreement signed as

4   those independent parties had anticipated and required was

5   signed and became part of the joint venture.

6          THE COURT:  Okay.  So the two parties would you

7   say negotiated at arm's length and were separate from one

8   another, had what -- the same person for each entity sign

9   the agreement?

10         MR. ALAN FRIEDMAN:  No, because -- Your Honor,

11  I'm sorry, no.  I was unclear.  The contribu -- the master

12  contribution agreement, that's the one that was signed in

13  December 2005 and that's the one that called for the -- its

14  exhibits to be signed once the shareholders of Genius

15  Product, Inc. approved the deal, if they did.  That master

16  contribution agreement was signed by different people.  It

17  was signed by an executive of Genius Products, Inc. on the

18  one hand and an executive of The Weinstein Company on the

19  other hand.  Entirely different.

20         THE COURT:  Well, then what did you mean when you

21  said the same person signed the agreements?

22         MR. ALAN FRIEDMAN:  In 2000 -- what that joint

23  venture that was negotiated in 2005 called for, was once

24  the Genius Products, Inc. shareholders approved the deal,

25  if they approved the deal, then the agreements that were

Page                                                              10

1   negotiated and attached to the 2005 agreement would need to

2   be signed.  So that -- those agreements were negotiated by

3   Genius Products on the one hand and The Weinstein Company

4   on the other.  They were signed by those executives from

5   either company and they had exhibits that would need to be

6   signed when and if the deal was approved in -- by the

7   shareholders.

8            When that deal was approved pursuant to what was

9   required in the contribution agreement enter -- you know,

10  negotiated and signed by the independent parties was that

11  The Weinstein Company would contribute the distribution

12  agreement to the joint venture.  It's that -- and so at the

13  very same moment that The Weinstein Company signed that

14  agreement on behalf of The Weinstein Company and the name

15  of the company that is now -- has come to be the debtor, at

16  that very same moment that's when Genius Products, Inc., at

17  the very same moment contributed all of its distribution

18  business and that's when the parties agreed to have 30

19  percent for Genius Products, Inc. of that joint venture and

20  The Weinstein Company Holdings to have 70 percent.  So up

21  until the time that those deals closed all parties --

22           THE COURT:  Well, what did The Weinstein

23  Companies contribute to get their 70 percent of the joint

24  venture?

25           MR. ALAN FRIEDMAN:  They contributed in ex -- the

Page                                                                11

1   exclusive right to the debtor to distribute on DVDs and

2   videos the movies that The Weinstein Company released going

3   forward until the term expired, which I believe, Your

4   Honor, was in the end of 2008.

5          THE COURT:  Okay.  And that was limited to home

6   con -- home videos?

7          MR. ALAN FRIEDMAN:  Yeah.  And really D -- by

8   that time I think the real part of that marketplace, Your

9   Honor, was DVDs.

10         THE COURT:  Okay.  All right.

11         MR. ALAN FRIEDMAN:  And that was, you know --

12         THE COURT:  So, okay.  So that's 2006.

13         MR. ALAN FRIEDMAN:  Correct.

14         THE COURT:  And we've got the -- this joint

15   venture.

16         MR. ALAN FRIEDMAN:  But then now there's an

17   important -- if I may, there's an important thing before we

18   continue into 2006 because also in December 2005, Genius

19   Products, Inc. on the one hand and The Weinstein Company on

20   the other hand, independent companies, signed what the

21   parties have called the interim distribution agreement.  So

22   that indisputably was done by independent people in

23   December 2005.  That agreement, the Trustee admits in his

24   complaint, had substantially similar terms.  That's their

25   words, Your Honor.  We agree with it but that's their

Page                                                                    12

1    admission.  Had substantially similar terms to the

2    distribution agreement that they challenge in this case

3    that was dated July 2006.

4            THE COURT:  Okay.

5            MR. ALAN FRIEDMAN:  So just to, you know, sort of

6    make the point that we -- we're making in our pleading on

7    that, the Trustee has said in his complaint -- and we have

8    said it's not plausible and I -- Your Honor, I -- I'm

9    certainly prepared to talk about the standards of that, but

10   let me just get to this point.  The Trustee has said that

11   the distribution agreement in 2006 was not entered into at

12   arm's length, was -- had onerous and one-sided terms not in

13   favor of the debtor and had -- was a distribution agreement

14   that no independent DVD distributor would enter into.

15   That's what they say.

16           However, in December 2005 they admit that an

17   entirely independent distribution company, Genius Products,

18   Inc., entered into the exact -- the -- an distribution

19   agreement within their words "substantially similar terms."

20   So it's just not right.  I mean, it's --

21           THE COURT:  Well, wait a minute.  If they -- all

22   that you're saying that the Trustee acknowledges or admits

23   is that the 2005 distribution agreement contains

24   substantially similar terms to the 2006 agreement.

25           MR. ALAN FRIEDMAN:  Yes.



Page                                                                    13

1          THE COURT:  That the Trustee challenges the

2    arm's-length nature of the 2006 agreement, but you didn't

3    say that the 2005 agreement is not being challenged or is

4    be -- or it is being challenged.

5          MR. ALAN FRIEDMAN:  No, it is not, Your Honor.

6    It is absolutely not part of their complaint.

7          THE COURT:  And do you know why?  I'll ask them

8    and see.

9          MR. ALAN FRIEDMAN:  Yeah.  I would tell you the

10   reason why is because they know that it was negotiated at

11   arm's length and it represents what each side thought was a

12   deal that they -- that made sense to that side, so it was

13   not challenged.  I mean, that -- there is no question that

14   it -- that that was done between -- and by the way, Your

15   Honor, that -- here's another reason why.  The interim

16   distribution agreement, Your Honor, done in 2000 --

17   December of 2005 that would -- they -- Genius Products,

18   Inc., committed to that with its substantially similar

19   terms through December 2008.  So they would -- even if the

20   deal never closed, even if The Weinstein Company and Genius

21   Products, Inc. never closed on that joint venture, Genius

22   Products, Inc. in December 2005 liked those terms

23   sufficiently to commit to sign to the interim distribution

24   agreement as an independent distributor, totally

25   independent from The Weinstein Company, with a term that

Page                                                                    14

1   would run as far -- you know, The Weinstein Company might

2   have had the ability to end that term earlier but from

3   Genius Products, Inc., it was a term that ran through

4   December 2008.  So --

5            THE COURT:  Okay.  Its term was, but it was

6   replaced by the two -- the later 2006 contribution

7   agreement.

8            MR. ALAN FRIEDMAN:  That is correct, Your Honor,

9   and the --

10           THE COURT:  Okay.  So they weren't -- they

11  weren't performing after mid-2006 under the interim

12  agreement?

13           MR. ALAN FRIEDMAN:  That is correct.  And, Your

14  Honor --

15           THE COURT:  Okay.

16           MR. ALAN FRIEDMAN:  -- the reason why the -- if I

17  may, the reason why we bring up the interim distribution

18  agreement is for a very important point.  That very

19  important point is they can't -- they should not -- it's

20  not plausible, in the words of the cases, for them to have

21  it both ways.  They shouldn't be able to say no independent

22  distributor would enter into this and it's onerous and one-

23  sided when, in fact, that's exactly what happened in the

24  2000 -- December of 2005.  And, Your Honor, if I may -- I

25  don't want to interrupt.

Page                                                                          15

1          THE COURT:  You're not interrupting.

2          MR. ALAN FRIEDMAN:  Okay.

3          THE COURT:  I'm just taking notes.

4          MR. ALAN FRIEDMAN:  And so -- so the fact, Your

5    Honor, that then the joint venture was approved as

6    negotiated between these totally independent parties and

7    reflected in the master contribution agreement, also

8    December of 2005, all that means is that the parties again

9    they -- the deal that they had crafted as independent

10   parties they both wanted to complete.  They wanted to work

11   pursuant to it.

12          So what -- what we have said with re -- if I may,

13   with respect to the overlay with regard to the agreements

14   entered into in 2006 that are challenged, and those are the

15   2006 distribution agreement and the operating agreement,

16   what we've said there is it's not plausible for them to say

17   these were onerous and one-sided and not arm's length

18   dictated by The Weinstein Company because, Your Honor,

19   these terms of those agreements were actually -- and nobody

20   can challenge this because it's clear in the documents --

21   these documents -- these agreements were negotiated by

22   independent parties, Genius Products, Inc., on the one

23   hand.

24          THE COURT:  I mean, you've said that a -- this is

25   I think your third time.  So you don't have to --

Page                                                                16

1           MR. ALAN FRIEDMAN:  Well, I'm sorry for --

2           THE COURT:  -- repeat it.

3           MR. ALAN FRIEDMAN:  I'm sorry then, Your Honor.

4           THE COURT:  I can follow you.

5           MR. ALAN FRIEDMAN:  I am.

6           THE COURT:  Okay.

7           MR. ALAN FRIEDMAN:  But the point is they then --

8 they make the argument that, you know, that's -- that -- so

9 this was all from the start, the Weinsteins --

10          THE COURT:  Okay.  They make the argument that

11 this agreement was onerous and, therefore, they ought to be

12 entitled to some relief as a result of that and you're

13 saying it doesn't make sense because they didn't have any

14 problems with the 2005 agreement which contains

15 substantially similar terms.

16          MR. ALAN FRIEDMAN:  That is correct.  And just to

17 go even a step farther there's no question that they could

18 have walked away from this agreement with its terms at any

19 point prior to the signing.

20          THE COURT:  This agreement which was -- which is

21 "this agreement"?

22          MR. ALAN FRIEDMAN:  What, the --

23          THE COURT:  This 2005?

24          MR. ALAN FRIEDMAN:  They could have -- the

25 agreements that they signed in 2005 that ordained what was

Page                                                                    17

1  going to happen.  They also could have walked away and not

2  signed the 2006 agreement subject to us -- a breakup fee

3  that was negotiated at arm's length in December of 2005.

4  So this was the definition of "arm's length" in the sense

5  that nobody had a bear hug over the other.

6           THE COURT:  Okay.  I'm not sure --

7           MR. ALAN FRIEDMAN:  Either side could have walked

8  away.

9           THE COURT:  We haven't gotten into what is the

10  causes of action yet in your historic overlay.  So let's --

11  take me from this.  In December of 2006 -- in the middle of

12  2006 this master contribution and master operating

13  agreement -- well, or at least the master agreement was

14  signed --

15           MR. ALAN FRIEDMAN:  And that's what --

16           THE COURT:  -- in 2006.

17           MR. ALAN FRIEDMAN:  I'm sorry, Your Honor, two --

18  December 2005 was when that one was signed.

19           THE COURT:  Okay.  But didn't that lead to the --

20  what I'll call it the joint venture agreement of 2006?  And

21  is the joint venture agreement that contained substantially

22  similar terms or is it the 2000 and -- December 2005

23  distribution agreement?

24           MR. ALAN FRIEDMAN:  It's -- if I may, the -- this

25  is the --

Page                                                                    18

1          THE COURT:  You may.  I'm asking you.

2          MR. ALAN FRIEDMAN:  Yes.  In 2005 the master

3     contribution agreement was signed.  Two exhibits to that

4     agreement were a distribution agreement and an operating

5     agreement.

6          THE COURT:  Um-hum.

7          MR. ALAN FRIEDMAN:  And what the parties agreed

8     in the master contribution agreement was when and if the

9     Genius Product, Inc. shareholders approved the deal those

10    exhibits in substantially the same form would be signed.

11    So I'd submit to you, Your Honor, that the terms that are

12    an issue here were fully negotiated in exhibits in 2005 but

13    it's only because it was a public company they wanted to

14    disclose the deal and have the shareholders vote on the

15    deal that those agreements ended up getting signed in July

16    of 2006 because they needed shareholder approval.  All of

17    their terms were negotiated by the independent parties

18    prior to signing the contribution agreement in 2005.

19         And then at the risk of, you know, just giving

20    you the one other agreement, Your Honor, the interim

21    distribution agreement was there as well in December 2005.

22    But the point of that agreement with -- that's the one,

23    Your Honor, that has substantially similar terms to the one

24    that they're challenging and to -- and substantially

25    similar terms to one of the exhibits to the master

Page                                                                          19

1  contribution agreement.  But the difference with the

2  interim distribution agreement was that that one would have

3  continued even if the Genius shareholders did not approve

4  the deal.  So that's how much Genius Products, Inc. wanted

5  to do a distribution deal as an independent company based

6  on substantially the same terms that the Trustee is

7  challenging here.  They wanted to do it so badly that even

8  if their shareholders did not approve the deal they wanted

9  to have a -- they -- us -- they not only wanted to, they

10 signed an agreement that would obligate them to those terms

11 through December 2008, whether or not they -- the joint

12 venture ever happened.

13         THE COURT:  Okay.

14         MR. ALAN FRIEDMAN:  Their --

15         THE COURT:  Go ahead.

16         MR. ALAN FRIEDMAN:  It -- if it -- we were to

17 continue -- if you'd like me to continue chronologically

18 there, there are --

19         THE COURT:  No.  I just wanted an overlay.  And

20 so you're doing it historically instead of responding to

21 their causes of action.  That's okay.

22         MR. ALAN FRIEDMAN:  What -- whatever Your Honor

23 would prefer is how I -- I want to do it the way that would

24 work best for you.

25         THE COURT:  The background is helpful.

Page                                                          20

1          MR. ALAN FRIEDMAN:  Pardon me?

2          THE COURT:  The background is helpful.

3          MR. ALAN FRIEDMAN:  Okay.  Thank you.

4          THE COURT:  Okay.  You want to just finish up the

5    historical part?

6          MR. ALAN FRIEDMAN:  Yes.

7          THE COURT:  And then let's talk about the causes

8    of action asserted in your defenses and that was cause --

9    to those causes of action.

10         MR. ALAN FRIEDMAN:  Thank you.  So after 2006 --

11   July 2006, you know, the distribution and the operation of

12   the debtor, which was at the time named Genius Products,

13   LLC, that was also part of the change that was pre-

14   ordained.  It was -- they would call it Genius Products,

15   LLC.  They continued to operate.  Somewhere in it looks

16   like 2008 there was a desire to change, amend and modify

17   the arrangements.  And what happened there, Your Honor,

18   that leads us to the next two agreements that they referred

19   to in their complaint.  So one of them is the purchase sale

20   agreement and the other, what we have called -- you know,

21   the Trustee and defendants have called, the amended

22   distribution agreement.  And they are dated I believe as of

23   December 31, 2008.

24         So the purchase sale agreement -- first off, just

25   to link it to the amended distribution agreement, Your

Page                                                                    21

1   Honor, had -- it provided that a fully negotiated copy of

2   the amended distribution agreement would be attached as an

3   exhibit.  So there's no question that when the parties

4   signed the purchase sale agreement they were committing to

5   exactly what has become and what is the amended

6   distribution agreement.  And the reason why that's

7   important to know, Your Honor, is what happened with the

8   purchase sale agreement -- and they -- again, their theory

9   is that The Weinstein Company was able to dictate terms and

10  to make the terms of the purchase sale agreement and the

11  amended distribution agreement conform with what the

12  Weinstein Company wanted because they say once the

13  Weinstein Company was in control.

14          So again, they have the same statements that the

15  amended distribution agreement contained onerous and one-

16  sided terms and that no independent distributed --

17  distribution company would enter into such an agreement.

18  However, they got -- they have an enormous problem, Your

19  Honor, that makes that again entirely implausible under the

20  case law.  And the reason why that is, Your Honor, an

21  entirely different company called Quadrant Management --

22  and we've referred to Quadrant Management in our papers.

23          THE COURT:  Yes, I read it.

24          MR. ALAN FRIEDMAN:  Quadrant Management, entirely

25  independent, became as they admit in the complaint the

Page                                                                    22

1   majority owner of Genius Products, LLC, the debtor,

2   pursuant to the purchase sale agreement.  Genius

3   Products -- excuse me, Your Honor -- Quadrant Management

4   also through its affiliate paid 20 million dollars in

5   connection with the common -- the majority owner of the

6   debtor.  And how do -- why -- how did they become the

7   majority owner?  They became the majority because pursuant

8   to the purchase sale agreement they obtained the interest

9   that The Weinstein Company Holdings had had in the debtor.

10  That's what happened.

11          So again, with the purchase sale agreement when

12  they're saying The Weinstein Company dictated terms and no

13  independent distributor would have entered into that

14  agreement, the reality is Quadrant never alleged to have

15  any relationship.  Utterly independent.  It entered into

16  it.  It could have walked away if it didn't like the terms.

17  Instead, it chose to become the majority owner and to make

18  a 20 million-dollar payment in connection with this

19  company.  It is -- it's -- it is --

20          THE COURT:  Okay.  But that freed them from the

21  control of The Weinstein Companies, didn't it?  Because

22  they bought The Weinstein Companies' interests.

23          MR. ALAN FRIEDMAN:  Well, that -- but when you

24  say -- if you don't mind, Your Honor, when you say "that

25  freed them," what I'm -- what I -- I'm -- want to make

Page                                                                     23

1    clear is what it did is it enabled an independent

2    company -- not the debtor, an independent company --

3    Quadrant, to become the owner of that.  So it didn't free

4    Quadrant.  Excuse me, it didn't free Quadrant of The

5    Weinstein Company Holdings' control because Quadrant had no

6    involvement.

7            THE COURT:  I know.  Quadrant paid 20 million

8    dollars to The Weinstein Companies, right?

9            MR. ALAN FRIEDMAN:  Yes.  That --

10           THE COURT:  Okay.  And it --

11           MR. ALAN FRIEDMAN:  You know, there --

12           THE COURT:  -- got it something for that.

13           MR. ALAN FRIEDMAN:  There was more complexity to

14   it, Your Honor --

15           THE COURT:  Yeah, I know.

16           MR. ALAN FRIEDMAN:  -- but that's fair.

17           THE COURT:  That's why we're having this

18   conversation.  You're trying to help me sort through this.

19   So to start to understand the complexities of it, The

20   Weinstein Companies get 20 million dollars from Quadrant in

21   2008 for The Weinstein Companies' interest in the LLC, the

22   debtor.

23           MR. ALAN FRIEDMAN:  Not really, Your Honor.

24           THE COURT:  Okay.

25           MR. ALAN FRIEDMAN:  And here's why.  What

1   happened in the purchase sale agreement -- and again, this

2   isn't disputed.  This is part of their complaint and it's

3   in the purchase sale agreement, which they have no

4   objection to.  When that occurred Genius Products, LLC owed

5   The Weinstein Company substantial amounts of money.  I

6   believe it's something like 77 million dollars.  There's

7   a -- there's a schedule to the purchase sale agreement, so

8   the exact number is there for everybody to see if my memory

9   is wrong.  And what the deal in the purchase sale agreement

10  was, was to work out an arrangement that made sense to

11  Quadrant, the debtor, The Weinstein Company, so that they

12  could move forward in a different fashion.  So what -- that

13  20 million went to reduce what was already owed to The

14  Weinstein Company under the distribution agreement.  And,

15  in fact, Your Honor, what happened --

16          THE COURT:  So the L -- I'm sorry.  Let me

17  just --

18          MR. ALAN FRIEDMAN:  Sure.  I'm sorry.

19          THE COURT:  -- follow you before you get too far

20  ahead of me.

21          MR. ALAN FRIEDMAN:  I'm sorry.

22          THE COURT:  The LLC owed at that time and "that

23  time" is mid -- sometime in 2008, right?

24          MR. ALAN FRIEDMAN:  I think that that amount --

25  the deal -- that agreement is dated I believe

Page                                                                      25

1  December 2008.  That amount I think was due as of the end

2  of August 2008.  And then they made some -- well, that's

3  what I've -- that is what my memory is.

4          THE COURT:  Okay.  But -- so in August of 2008,

5  which is the time that parties are dis -- Quadrant is

6  discussing this acquisition with The Weinstein Companies,

7  the Weinstein Companies were owed 70 million dollars

8  roughly by the debtor, the joint -- or by the joint venture

9  or the debtor?

10         MR. ALAN FRIEDMAN:  Well, the debtor.

11         THE COURT:  Okay.  And of that 70 million

12 dollars, 20 million is paid in cash --

13         MR. ALAN FRIEDMAN:  Yes, Your Honor.

14         THE COURT:  -- and the other is to be --

15         MR. ALAN FRIEDMAN:  Twenty million at closing,

16 correct.

17         THE COURT:  Twenty -- well, and it's paid in cash

18 at closing.  When was the closing?

19         MR. ALAN FRIEDMAN:  Again, I believe it was

20 December 31 or January 1, 2009.  It was right in that time

21 period.

22         THE COURT:  Okay.  I'll just say on or about

23 December 2008.  Okay.  There -- so there's 20 million paid

24 and an agreement to work out -- some satisfaction to work

25 out how to satisfy the remaining 50 million dollars that

Page                                                              26

1   was owed?

2          MR. ALAN FRIEDMAN:  Yeah.  I actually have the

3   exact numbers.  I don't know if you -- Your Honor wants

4   them, but it -- where I said 77 it's 78.9 million.

5          THE COURT:  Um-hum.

6          MR. ALAN FRIEDMAN:  And, yes, the purchase sale

7   agreement then set forth how that amount was to be paid off

8   and, you know, just --

9          THE COURT:  "That amount" meaning the balance --

10  the difference between the 20 million cash and the 78.9

11  million, is that it?

12         MR. ALAN FRIEDMAN:  Yes.  Yes.  They were all

13  part of -- yes, that's fair to say.

14         MR. SHEMANO:  Actually, Your Honor --

15         MR. ALAN FRIEDMAN:  They were --

16         MR. SHEMANO:  I'm sorry.  This is David Shemano.

17  I don't think that's correct.  Just factually, I don't

18  think the payment of 20 million dollars from Quadrant to

19  the debtor reduced the debtor's overall obligation.  There

20  was a 20 million-dollar note created out of the purchase

21  and sale agreement which the debtor promised to pay the

22  Weinsteins.  I think that 20 million is part of the 79

23  million dollars.  Quadrant purchased that note from the

24  Weinsteins, so there still remained 79 million dollars

25  outstanding.  It's just that 20 million dollars was now

Page                                                                            27

1    owed to Quadrant as opposed to the Weinsteins.

2              THE COURT:  Well --

3              MR. ALAN FRIEDMAN:  So I assume -- but, Your

4    Honor, that's actually not what the purchase sale agreement

5    says.  I'm looking at Schedule 2.1 to that agreement and

6    that is one of the exhibits.  I think it's Exhibit 2 to the

7    Stephen Scibelli declaration, Your Honor.  So I don't -- I

8    can tell you what it says.  I can show this page to --

9    well, you probably have it, Mr. Shemano.

10             THE COURT:  Well, why don't you describe it in

11   your words?

12             MR. ALAN FRIEDMAN:  Okay.

13             THE COURT:  Again, as an overlay.

14             MR. ALAN FRIEDMAN:  Well, here, I'm looking at

15   Schedule 2.1 to the purchase sale agreement right here.

16   Last page to -- and what it says -- let me get Mr. Shemano

17   an extra copy if that's okay.

18             THE COURT:  Sure.

19             MR. SHEMANO:  I don't know.  There's no exhibit

20   numbers.

21             MR. ALAN FRIEDMAN:  Take the -- I'm sorry, Your

22   Honor.  Let me just show --

23             THE COURT:  I understand.

24             MR. ALAN FRIEDMAN:  Show how this is attached.

25             Would you like a copy, Your Honor?

Page                                                                    28

1               THE COURT:  Sure.

2               MR. ALAN FRIEDMAN:  May I approach?

3               THE COURT:  No, please give it to my courtroom

4     deputy.

5               MR. ALAN FRIEDMAN:  I'll just put in a different

6     page that I'm going to refer to if that's okay.

7               THE COURT:  Um-hum.  Yes, let's go ahead.

8               MR. ALAN FRIEDMAN:  So we're looking at

9     Schedule 2.1.  So is -- that shows the balance due is 78.9

10    million right at the top.  And if you go down to about six

11    lines from the bottom of the page there -- you'll see the

12    payment at closing --

13              THE COURT:  Yes.

14              MR. ALAN FRIEDMAN:  -- and 20 million.  So

15    Mr. Shemano is right.  This was the complexity that I

16    didn't -- I said it was complex but didn't get into.  He is

17    correct that the purchase sale agreement did two things at

18    the same time.  So it's in the same contemporaneous

19    agreement.  One, it provided for Genius Products, LLC, to

20    provide a 20 million-dollar promissory note to the

21    Weinstein Companies -- or I actually don't remember who it

22    was issued to right now, Your Honor, whether it was The

23    Weinstein Company or not.  I just don't recall.  But then

24    it provided in that same document for the affiliate of

25    Quadrant to pay The Weinstein Company 20 million, so now

Page                                                                        29

1  the affiliate of Quadrant would hold that note and be

2  entitled to payment back from the debtor.  And it -- but

3  that's the 20 million.  So it did reduce --

4           THE COURT:  So Wein -- so, okay.

5           MR. ALAN FRIEDMAN:  It did reduce the 78.9.

6           THE COURT:  But what did the debtor obtain for

7  issuing a 20 million-dollar note?

8           MR. ALAN FRIEDMAN:  The debtor -- well, the

9  debtor owed 78.9 million dollars.

10           THE COURT:  Okay.

11           MR. ALAN FRIEDMAN:  This was part of the way in

12  which the debtor was paying this back.  And --

13           THE COURT:  Okay.

14           MR. ALAN FRIEDMAN:  And there's two things I

15  would like to make on that score, if I may, Your Honor.

16  One is what The Weinstein Company agreed to do was accept a

17  drawn-out, risky way to get paid back the money that it was

18  owed and this was -- this -- this was negotiated with

19  Quadrant, an independent company who signed this agreement

20  committing to this at the same time it became the majority

21  shareholder, so it was independent.  And what you'll also

22  see at the end of this is the -- among other things, The

23  Weinstein Company also released the bottom number, 10.77

24  million.  That number, remaining unpaid obligation, that

25  was written off, so the debtor actually got quite a good

Page                                                                        30

1   deal having this.

2            THE COURT:  Well, let me understand what the

3   debtor got.  So the debtor owes Weinstein Companies I'll

4   call it 79 million dollars.  The debtor makes some

5   payments, 2.3 million dollars, a million eight, seven

6   million dollars.  So that's, what, 12 million dollars

7   roughly of the debtor paying its cash in October and

8   November of 2008 to The Weinstein Companies.  So it's

9   reducing its obligation, is that right what the schedule

10  says?

11           MR. ALAN FRIEDMAN:  Yes, Your Honor.

12           THE COURT:  Okay.  And various other credits are

13  given that I don't think are particularly essential at this

14  point, to be more specific, are given to the debtor to

15  reduce its balance by August 2000 -- well, in -- it's 46

16  million dollars.  I don't -- that doesn't make sense, I

17  think.

18           MR. ALAN FRIEDMAN:  Well, no.  It probably --

19  that --

20           THE COURT:  Because there were payments in

21  October and November of that same year.

22           MR. ALAN FRIEDMAN:  So is it --

23           THE COURT:  Now you tell me.  I need some help to

24  get through this.  This is still confusing because this

25  shows reducing the 79 million-dollar balance per an August

1  2008 accounting statement, but it shows deductions taken

2  before you get to the August balance deductions for

3  payments made in various transactions that were after

4  August of 2008.

5       MR. ALAN FRIEDMAN:  What they were trying to do

6  here, Your Honor, was the amount due was 78 million.

7       THE COURT:  Um-hum.

8       MR. ALAN FRIEDMAN:  The -- you know, there's a --

9  there -- what they were also trying to do in the middle of

10  the page was do an estimate of what would become due

11  because Genius was -- Genius Products, LLC was continuing

12  to distribute DVDs so they were trying to make an estimate

13  of what would become due based on what occurred in

14  September, October and November and December.

15       THE COURT:  So where it says "payment" it's not

16  literally a payment of cash for that amount; it's an

17  estimate of what that would be paid in those days.

18       MR. ALAN FRIEDMAN:  Well, it's an estimate of

19  their obligation, yeah, of what was due.  Correct, Your

20  Honor.

21       THE COURT:  Because they had banged down that

22  obligation, right?  They --

23       MR. ALAN FRIEDMAN:  Well, the --

24       THE COURT:  "They" being the debtor.

25       MR. ALAN FRIEDMAN:  Well, this would actually --

Page                                                                         32

1   but now this is actually an increase because they -- you

2   know, the -- because now they're -- the -- this top number

3   is through August.  These numbers in the middle for

4   September, October, November, December, now that's adding

5   what they anticipate to be the obligation --

6           THE COURT:  Okay.  Fine.

7           MR. ALAN FRIEDMAN:  -- going forward.  But if

8   I -- we can -- I don't want to move off this if the Court

9   does not want to, but if I could --

10          THE COURT:  I think we're stuck on something and

11  I'd like to move off of it, but you were telling me why

12  Quadrant's acquisition of The Weinstein Company's interest

13  in the debtor demonstrated that that was a fair arm's-

14  length transaction.

15          MR. ALAN FRIEDMAN:  Sure.  And so it --

16          THE COURT:  And so far you have not clarified it

17  for me.  So I --

18          MR. ALAN FRIEDMAN:  Okay.  That --

19          THE COURT:  I still need your help.

20          MR. ALAN FRIEDMAN:  Thank you, Your Honor.  In

21  this purchase agreement this is -- this is the -- what I

22  think is an important point.  Quadrant comes in from, you

23  know, nowhere.  It's an independent company but it's

24  interested in becoming involved in the debtor.  And what it

25  agrees to do is sign an agreement that's going to give it

Page                                                              33

1  majority ownership and take out The Weinstein Company which

2  will no longer have majority ownership.  And without

3  Quadrant --

4           THE COURT:  Okay.

5           MR. ALAN FRIEDMAN:  -- this deal doesn't happen

6  because it's the one that comes up with the way to pay the

7  20 million dollars and it's the -- it's -- we have -- you

8  know, this is a document for which we requested that the

9  Court take judicial notice.  It's a Form 8-K that we

10 attached to my declaration, Your Honor, and that includes

11 with it a press release that shows that Quadrant is a --

12          THE COURT:  Well, the press release and SEC

13 filings are hearsay, so what am I supposed to do about

14 that?  What are you supposed to do about it?

15          MR. ALAN FRIEDMAN:  Well --

16          THE COURT:  I can't base a decision based on non-

17 evidence.

18          MR. ALAN FRIEDMAN:  I want -- I bel -- well,

19 here.  I believe under the cases that we've cited it can be

20 considered by the Court for whether or not their claim is

21 plausible, but if Your Honor would prefer me not to mention

22 it then I won't mention it.  But --

23          THE COURT:  No.  If you -- look, I've read that

24 part of your brief.

25          MR. ALAN FRIEDMAN:  Well, okay.  So -- and the

Page                                                                          34

1   only part is -- and I believe, Your Honor, that you can

2   take judicial notice of it, in which case it's not im --

3   respectfully, maybe --

4           THE COURT:  Well, I don't think --

5           MR. ALAN FRIEDMAN:  Maybe I'm wrong but maybe --

6           THE COURT:  I think --

7           MR. ALAN FRIEDMAN:  Maybe I'm wrong but if it is

8   a judicially noticeable item then it's not subject to a

9   hearsay issue.  If I'm wrong, Your Honor, you know, I'm not

10  saying, you know, take me to the Supreme Court on that

11  because I -- but that is my understanding of how it works.

12          THE COURT:  If it's offered to prove the truth of

13  the assertion --

14          MR. ALAN FRIEDMAN:  Yes.

15          THE COURT: -- if this payment was made -- these

16  payments were made, then it's hearsay.

17          MR. ALAN FRIEDMAN:  Well --

18          THE COURT:  If it's offered for -- to show that

19  this was disclosed in the newspapers and, therefore,

20  somebody had some information and made it a knowing

21  investment --

22          MR. ALAN FRIEDMAN:  So then I would say, Your

23  Honor, that the -- just in the context here the fact that

24  Quadrant because it is disclosed out there -- it is a

25  disclosure out there that The Weinstein Company and The

Page                                                                 35

1   Weinstein Company Holdings would be aware of, it says that

2   Quadrant is a three billion-dollar sophisticated

3   restructuring company and this is what it does for a

4   living.

5           So whether or not that's true, Your Honor, that

6   would certainly be -- and it's also something that the

7   debtor would have seen.  So whether or not it's true it

8   would inform the context of the deal as to why the debtor

9   would be interested in having Quadrant come in and be its

10  majority owner and help it deal with payments that it owes

11  but is -- has not been able to pay on a -- you know, to The

12  Weinstein Company --

13          THE COURT:  Well, Mr. Friedman, let me just

14  interrupt politely.  We're getting at far afield of trying

15  to have an understanding of an overlay before we get into

16  your motion to dismiss.  And I think it's sufficient to say

17  that in December of 2008 Quadrant comes in and takes out

18  The Weinstein Company's 70 percent interest in the debtor.

19  Is that right?

20          MR. ALAN FRIEDMAN:  The Weinstein Company kept a

21  ten percent -- what's a word -- warrant interest.  But --

22  so they took all the Weinstein Company's interest in the

23  debtor.  But I -- just in terms of, you know, having you

24  have the full thing.  They gave up -- yeah, that's what

25  they were left with, not more.  That's what they were left

Page                                                                36

1    with.

2            (Pause)

3            THE COURT:  I made a note and tell me if I'm

4    correct.

5            "Schedule 2.1 shows the payment and credits taken

6        by TWC by Quadrant in order to acquire TWC's 60-

7        percent interest in the joint venture.  It's TWC

8        retaining a ten percent warrant interest."

9    And that's shorthand slang.  Is that accurate summation of

10   what you told me?

11           MR. ALAN FRIEDMAN:  I think that the -- in this

12   regard I think it is not and I'm pausing because I'm really

13   trying to orient my memory, Your Honor.  The Weinstein

14   Company no longer had a membership interest in the debtor

15   after this deal and that was provided for in this deal.

16   What they did -- what was envisioned, Your Honor, in this

17   purchase and sale agreement was that every -- The Weinstein

18   Company and Quadrant, or its affiliate really because that

19   was the one who was obtaining majority ownership of the

20   debtor, they would exchange their interest in the debtor,

21   that's the LLC, for stock in Genius Products, Inc., which

22   was the public company and that happened.  So I'm -- just

23   because Your Honor is wanting me --

24           THE COURT:  Wait.  Go back and repeat that

25   sentence if you would.

Page                                                                      37

1              MR. ALAN FRIEDMAN:  Okay.  And so this is one of

2    the complexities that Your Honor referred to.  The purchase

3    sale agreement contemplated that, one, the seller was going

4    to acquire majority ownership by buying what The Weinstein

5    Company had; but, two, The Weinstein Company was going to

6    keep warrant interest.  And the way that was going to

7    happen, Your Honor, is the purchase sale agreement in

8    paragraph 1.6 also contemplated that there would be an

9    exchange so that the interest of -- so that Genius

10   Products, Inc. would become the 100 percent owner of the

11   debtor, which happened and that's -- so that's why I had to

12   hesitate and not say it was correct to say that The

13   Weinstein Company ended up with a ten percent -- Weinstein

14   Company Holdings, Your Honor, ended up with a ten percent

15   membership interest in the debtor because really what have

16   ended up happening is it -- it obtained warrants that were

17   --

18             THE COURT:  Okay.

19             MR. ALAN FRIEDMAN:  -- and going to be for the

20   Genius Products, Inc. stock.

21             THE COURT:  But Genius Products, Inc. -- or

22   Genius, Inc., became a 100-percent owner of the

23   distribution entities what you're telling me, what I think

24   you said.

25             MR. ALAN FRIEDMAN:  That is correct, Your Honor.

Page                                                                    38

1          THE COURT:  What happened to the 30 percent that

2    the LLC owned?

3          MR. ALAN FRIEDMAN:  No, no.  Your Honor, I'm

4    sorry I was not clear earlier.  The 30 percent of the

5    debtor was owned by Genius Products, Inc.; 70 percent was

6    owned by The Weinstein Company Holdings.

7          THE COURT:  Right.

8          MR. ALAN FRIEDMAN:  So --

9          THE COURT:  But along --

10         MR. ALAN FRIEDMAN:  -- Genius Products, Inc. --

11         THE COURT:  -- comes Quadrant.

12         MR. ALAN FRIEDMAN:  -- went from holding 30

13   percent to holding 100 percent of the debtor.

14         THE COURT:  Genius Product, Inc. was owned by the

15   Weinstein Companies?

16         MR. ALAN FRIEDMAN:  No.

17         THE COURT:  That was owned 30/70?

18         MR. ALAN FRIEDMAN:  No.  The Weinstein, I'm sorry

19   to say -- I'm sor --

20         THE COURT:  Well, I thought the debtor was an LLC

21   so that's why you're confusing me.

22         MR. ALAN FRIEDMAN:  The Weinstein Company had a

23   70 percent interest in the LLC and Genius Products, Inc.

24   had a 30 percent interest in the --

25         THE COURT:  Okay.

Page                                                                39

1           MR. ALAN FRIEDMAN:  -- LLC.

2           THE COURT:  That's what I thought --

3           MR. ALAN FRIEDMAN:  Pardon me?

4           THE COURT:  -- was the case for the last hour.

5           MR. ALAN FRIEDMAN:  Pardon me?

6           THE COURT:  That's what I thought was what you

7    explained to me for the last hour.

8           MR. ALAN FRIEDMAN:  Okay.

9           THE COURT:  All of a sudden you talked about

10   Genius Products, Inc., having 100 percent interest in the

11   debtor.

12          MR. ALAN FRIEDMAN:  Well, that's what ended up

13   happening under the contemplation of the purchase sale

14   agreement.  What they decided to do then -- this was -- you

15   know, this was something that -- when The Weinstein

16   Company, you know -- as we discussed, The Weinstein Company

17   no longer was the majority owner of the debtor through this

18   purchase sale agreement.  Instead --

19          THE COURT:  That's the 70 percent.

20          MR. ALAN FRIEDMAN:  -- Quadrant was.  But then

21   what they did in this agreement is they said, "And we're

22   going to exchange whatever interest anybody has in the

23   debtor for shares in Genius Product, Inc."

24          THE COURT:  Who said --

25          MR. ALAN FRIEDMAN:  So that means --



Page                                                                40

1           THE COURT:  Who is "they"?  Is that Quadrant or

2   is that --

3           MR. ALAN FRIEDMAN:  Well, that's what's provided

4   for in the purchase sale agreement that was signed by

5   Quadrant, The Weinstein Company Holdings and the debtor,

6   among others.  What -- so what happened is Genius Products,

7   Inc. owned 100 percent of the debtor.  Quadrant now owned

8   a -- I don't know what the size of its interest of Genius

9   Products, Inc. was.  What I do know is that The Weinstein

10  Company had a -- warrants at that point in Genius Products,

11  Inc. of ten percent.

12          THE COURT:  All right.  I wish you had cleared it

13  up for me.  You haven't.  I understand.

14          MR. ALAN FRIEDMAN:  Can I take another try, Your

15  Honor?

16          THE COURT:  I'm sure --

17          MR. ALAN FRIEDMAN:  I mean, I'm not sure which

18  part on --

19          THE COURT:  When you went from the debtor holding

20  a 30 percent interest in the joint venture to the debtor --

21          MR. ALAN FRIEDMAN:  No.  No, no, no.  The joint

22  venture, which was the word that was used in their

23  opposition and maybe in their complaint but certainly in

24  their opposition, that's -- I used the word -- as I said, I

25  was using the words that they said.  The LLC is the debtor

Page                                                                    41

1    and what the agreement was from the master contribution

2    agreement back in 2005 was that the debtor would be owned

3    30 percent by Genius Products, Inc. and 70 percent by The

4    Weinstein Company Holdings.  So that was always --

5             THE COURT:  Okay.  The debtor --

6             MR. ALAN FRIEDMAN:  -- the plan.

7             THE COURT:  -- is the LLC?

8             MR. ALAN FRIEDMAN:  Correct, Your Honor.

9             THE COURT:  Okay.  Would be owned by --

10            MR. ALAN FRIEDMAN:  Thirty percent by Genius

11   Products, Inc. and 70 percent by The Weinstein Company

12   Holdings.

13            THE COURT:  I follow that.  Okay.

14            MR. ALAN FRIEDMAN:  So then what happened in the

15   purchase sale agreement -- I think we're making --

16   respectfully, maybe this is more complicated than

17   necessary.  What happened -- Your Honor is correct.  I

18   mean, what -- the purchase sale agreement provided in

19   effect for Quadrant's affiliate to purchase 60 percent of

20   The Weinstein Company and 60 percent -- excuse me, 60

21   percent of the debtor.  In other words, leaving The

22   Weinstein Company with ten percent but -- and I don't

23   really remember this so fully, but what instead was then

24   there was going to be a warrant issued to The Weinstein

25   Company Holding for the remaining ten percent and that's in

Page                                                                42

1  the purchase sale agreement in -- well, I see it right here

2  in the "whereas" clause on the first page.

3         And then -- but in terms of the more large

4  picture, Your Honor, it's at that point that The Weinstein

5  Company and whether -- whatever we characterized that

6  security as -- has at most ten percent and Quadrant has,

7  you know, the admitted majority ownership and, you know,

8  they're committing.  They're putting in money, et cetera.

9         THE COURT:  Is that a majority ownership 70

10 percent?  If it is you're only accounting for a ten percent

11 warrant, 60 percent for Quadrant's acquisition of the 70

12 percent owned by TWC.  The 30 percent which was owned by

13 GPI, what happened to that?

14        MR. ALAN FRIEDMAN:  They still own it.  They -- I

15 would -- it would be convenient to draw it out but I won't

16 do that.  That doesn't make sense here.  GPI always owns 30

17 percent of the debtor.  From the moment that, you know,

18 the --

19        THE COURT:  Even after the quarrant -- Quadrant

20 deal?

21        MR. ALAN FRIEDMAN:  After the Qua -- no.  No.  Up

22 until the Quadrant deal.  At the time --

23        THE COURT:  Okay.

24        MR. ALAN FRIEDMAN:  -- of the Quadrant deal there

25 was a decision that's reflected in the purchase sale

Page                                                                    43

1   agreement which clearly would apply to the interests of

2   Quadrant and the debtor because The Weinstein Company at

3   this point is only a ten percent interest holder.  And that

4   -- and what they wanted to do was have Genius Products,

5   Inc. go from owning 30 percent to owning 100 percent and

6   give to Quadrant a large number of shares in Genius

7   Products, Inc. to reflect that it now has the interest that

8   is commensurate with what it has given up and give to The

9   Weinstein Company a smaller interest.

10          So at the end of the day -- I've not done this

11  analysis but the way I imagine it worked, Your Honor, was

12  Genius Products, Inc. owns 100 percent.  Whoever of

13  Genius -- whoever were the Genius Products shareholders

14  they now got diluted because Quadrant came in and got a 60

15  percent interest of Genius Products, Inc., and The

16  Weinstein Company got their warrants.

17          THE COURT:  Why would that dilute anything if The

18  Weinstein Companies before the Quadrant deal had 70 percent

19  and after the -- Quadrant came in and Quadrant had 60

20  percent and The Weinstein Companies had ten percent more in

21  interest?

22          MR. ALAN FRIEDMAN:  There were --

23          THE COURT:  And 30 percent is still remains --

24          MR. ALAN FRIEDMAN:  There were shareholders of

25  Genius Products, Inc. before this exchange occurred and

1   those shareholders of Genius Products, Inc. had 30 percent.

2   Then Quadrant comes in and has its interest in the

3   debtor -- its LLC membership interest in the debtor

4   exchanged for Genius Products, Inc. shares.  That's where

5   the change.  So now where there once was a group of

6   shareholders of Genius Products, Inc. that owned, you know,

7   the outstanding shares, now there was a new shareholder:

8   Quadrant.  And Quadrant got issued shares that I would

9   imagine were equal to 60 per -- you know, equal to -- so

10  they -- it would have at least a 60-percent interest of

11  Genius Products, Inc.

12          It's not a question, Your Hon -- to be honest,

13  Your Honor, it's not a question that I think really comes

14  up in the analysis of these claims because in a different

15  level what is clear is that under the purchase sale

16  agreement Genius Products -- excuse me, under the purchase

17  sale agreement Quadrant Management became the majority

18  owner of the company that the debtor is claiming The

19  Weinstein Company Holdings control.

20          THE COURT:  So except for the ten percent more in

21  interest Quadrant be -- takes out -- Quadrant replaces the

22  Weinstein Companies under this purchase agreement.

23          MR. ALAN FRIEDMAN:  I think that's -- I think

24  that's probably fair to say.  That's all that The Weinstein

25  Company has left.

Page                                                                            45

1          THE COURT:  And the 30 percent of shares owned by

2    others remained owned by others?

3          MR. ALAN FRIEDMAN:  Yes.

4          THE COURT:  Okay.  That's in GPI.  And then the

5    debtor, which is the LLC, who owned 30 percent ...

6          MR. ALAN FRIEDMAN:  Your Honor, if I may.

7          THE COURT:  Um-hum.

8          MR. ALAN FRIEDMAN:  No, the debtor didn't own 30

9    percent.  The debtor -- that that 30 percent number keeps

10   coming up.  That 30 percent is the amount of the debtor

11   that GPI owned prior to the purchase sale agreement, prior

12   to, you know, Quadrant coming in.  That 30 percent is what

13   the debtor -- excuse me, Your Honor -- that 30 percent of

14   the debtor's, which Genius Products, Inc. received,

15   pursuant to what was negotiated in 2005 and that same

16   negotiation is the one that resulted in The Weinstein

17   Company Holdings getting the other 70 percent of the

18   debtor.

19         So the debtor's got -- what the debtor is getting

20   is the exclusive distribution agreement from The Weinstein

21   Company, plus the debtor is getting the other distribution

22   business that Genius Products, Inc. previously was

23   operating under Genius Products, Inc., which Genius

24   Products, Inc. became was basically a non-operating company

25   that depended upon the results of the debtor and its 30

Page                                                                    46

1   percent interest in the debtor going forward.

2           THE COURT:  After the Quadrant deal?

3           MR. ALAN FRIEDMAN:  That was the -- no, that the

4   deal --

5           THE COURT:  Okay.

6           MR. ALAN FRIEDMAN:  -- that was done in 2006.

7   The only thing that change -- that -- that's -- I'm trying

8   to respond to when Your -- the Court said that the debtor

9   owned 30 percent.  That's not what happened.  What happened

10  is the debtor was receiving from both The Weinstein Company

11  and from Genius Products, Inc. distribution assets.  From

12  Genius Products, Inc. you got whatever Genius Products,

13  Inc. was distributing up until that point in time.  This is

14  back in July 2006 when the shareholders approved it.  And

15  what the -- what they got from The Weinstein Company, as we

16  were discussing, was the exclusive rights to The Weinstein

17  Company DVD distribution deal through the end of December

18  2008.  So that -- that's -- that was -- those were the

19  things that the distributor received.

20          And what we point out in our papers, Your Honor,

21  with respect to that transaction was that the board of

22  Genius Products, Inc. said to their shareholders that they

23  believed that owning 30 percent of the distribution

24  business with The Weinstein Company contract was better

25  than owning 100 percent of their distribution business

Page                                                                47

1   without it.  That was what they believed.

2          So I -- there's one more -- I don't know if

3   there's a point that you would like me to address before I

4   go beyond the purchase sale agreement and the amended

5   distribution agreement, but there's another agreement.

6   Should I turn to that one?

7          THE COURT:  Not yet because you totally lost me

8   in the last five or ten minutes of your explanation.  So I

9   apologize to you, but I don't find that it was lucid enough

10  for me to understand it.  It may be absolutely correct, but

11  I apologize to you if I was unable to understand it.

12          MR. SHEMANO:  Your Honor, can I have a shot?

13          THE COURT:  I'm trying to figure out how to go

14  from here to some end in sight today, which will be in an

15  hour.

16          It's possible that this I call it overlay which I

17  thought was quickly going to get us into the claims for

18  relief that had been asserted by the debtor against The

19  Weinstein Companies and its defenses to those claims for

20  relief so I could rule on the motion to dismiss.  Now we're

21  far away from my being able to make a decision on that and

22  I candidly do not think I will make a decision without

23  taking this matter under submission and trying to sort it

24  out myself.

25          So what is -- what would be most helpful is to

Page                                                                48

1    try to understand what it is that the debtor is complaining

2    it lost in these transactions and what it is entitled to

3    recover in these transactions because that's what's set

4    forth in its complaint.  I can read the complaint and I can

5    read the answer.  I've read the complaint.  I've read the

6    answer and I've read the motion to dismiss and the

7    responses and it's still -- well, it's still too

8    complicated to be able to rule on without getting a clearer

9    explanation from you and from Mr. Shemano.

10           Maybe we ought to just take a five-minute break.

11   And I don't know if you can go back -- I mean, there's a

12   clear point where you start losing me and that's the

13   introduction of Quadrant, what it got and what remained and

14   whether or not that transaction in any way affected the

15   debtor and it might conceivably give rise to a cause of

16   action in favor of the debtor.

17           MR. SHEMANO:  Your Honor, I think what would be

18   helpful is if I could take five minutes of the Court's time

19   and hopefully simplify this very point.  And I'm not saying

20   that counsel is going to agree with me on the

21   simplification, but I think it will be helpful to the Court

22   to at least understand the overlay, the issue with respect

23   to how Quadrant very tangentially fits into this complaint

24   in his cause of action.  We're spending a lot of time on

25   something that truly is tangential and I think I can

1  explain to the Court why and I think it will help simplify

2  and help the Court get back on track what --

3          THE COURT:  You don't mind the interruption,

4  Mr. Friedman?

5          MR. ALAN FRIEDMAN:  Well, Your Honor has been

6  patient with me, as has Mr. Shemano.  I -- just from his

7  preface I do not believe that I'm going to agree because I

8  think Quadrant's at the core and not a tangent, but I

9  certainly think it's fair to give Mr. Shemano five minutes.

10         THE COURT:  Thank you.

11         MR. SHEMANO:  Thank you.  And I --

12         MR. ALAN FRIEDMAN:  Thank you, Your Honor.

13         THE COURT:  And I certainly appreciate the

14  Court's difficulty with the complexity of these

15  transactions.  They're documented in a very complex way and

16  unfortunately that complexity does more to obfuscate rather

17  than to elucidate.  The -- and I will get to the Qua -- I'm

18  going to get to exactly the Quadrant issue so to really

19  help the Court.

20         The key for the Court to understand is that you

21  have to distinguish GPI from the debtor.  The Weinsteins

22  and GPI agreed to go into business together.  They decided

23  to go into business together through a new entity that

24  originally was wholly controlled by the Weinsteins and

25  essentially GPI contributed its business to the debtor,

Page                                                                    50

1  this distribution business.  Weinstein agreed to

2  exclusively license its titles to the debtor and in

3  exchange Weinstein kept 70 percent and GPI got 30 percent

4  of the equity of the membership interest.  And that's when

5  the debtor started.

6           And we represent the Trustee of the debtor.  We

7  do not represent the Trustee of GPI.  Whatever transactions

8  GPI entered into with Weinstein are not our concern.  We do

9  not concede that they were fair; we do not concede they

10 were unfair.  They're simply not relevant to our task on

11 behalf of the Trustee of the debtor who entered into a

12 distribution agreement with the Weinsteins in 2006.  The

13 history of that distribution agreement, Your Honor, I'm

14 sure will be very interesting at trial and why the parties

15 did what they did.  But the only thing that really matters

16 for purposes of the complaint and the motion to dismiss is

17 that the debtor, which started business in 2006 and did not

18 conduct any business prior to 2006, entered into a

19 distribution agreement with the Weinsteins.  And the heart

20 of the complaint, Your Honor, when we -- when we get --

21 break through the clouds and confusion and obfuscation and

22 the complexity, the heart of the complaint is that the

23 terms of the distribution agreement were not market.

24 Essentially, Weinstein said to the debtor, "This is what

25 we're going to do, A, B, C, D, E, F and G.  This is what's

Page                                                              51

1  going to work for us," and the debtor said, "Yes, sir,

2  we'll do whatever you want."  And because they agreed to

3  those terms the debtor immediately started losing money and

4  was insolvent.

5         And this relationship continued for several

6  years.  And as the old jokes goes, you know, they lost

7  every mon -- they lost a dollar in every transaction but

8  they tried to make it up on the volume.  Every time the

9  Weinsteins called up the debtor and said, "You must

10 distribute a title pursuant to our agreement," the debtor

11 had no choice because the Weinsteins controlled the debtor.

12 The Weinsteins said, "You will do this and these are the

13 terms you're going to do it."  And every time the

14 Weinsteins did that the debtor lost more money.

15        And that went on for several years until, like

16 all money-losing operations, you eventually lose other

17 people's money and you can't -- so you have to stop.  And

18 at that point we get to the Quadrant transaction, Your

19 Honor.

20        After several years of this, the Weinsteins

21 decided they needed to get out of this transaction or at

22 least they needed to try and get out of the transaction.

23 So what they did -- and again, Your Honor, all we have at

24 this point of the proceeding are the descriptions of the

25 documents and the documents in the SEC filings.  We've --

Page                                                                52

1   there's been no discovery, no depositions.  We don't know

2   exactly why people did what they did or what actually

3   happened.  All we know is what the documents say.  We can

4   find -- we can read them publicly -- is that -- and is that

5   -- and very simply, Your Honor, is that Weinstein sold its

6   70 percent interest -- or 60 percent interest.  They

7   retained a ten percent interest.  There's con -- there was

8   confusion.  They basically sold their majority interest to

9   Quadrant and they were no longer a member of the debtor but

10  they continued to be the licensor.  And that's what's

11  important, Your Honor, because ultimately what this lawsuit

12  is about is that the debtor paid 130 million dollars to The

13  Weinstein Companies within four years of the petition date.

14  And what's important about that 130 million is that each of

15  those dollars was based upon some consideration -- some

16  alleged consideration.

17          THE COURT:  I'm going to --

18          MR. SHEMANO:  It --

19          THE COURT:  I'm going to stop you for a minute.

20          MR. SHEMANO:  Yes.

21          THE COURT:  The Weinstein Companies retained

22  after the sale to Quadrant the right to dictate to the

23  debtor?

24          MR. SHEMANO:  After -- that --

25          THE COURT:  What it was to distribute?



Page                                                                    53

1          MR. SHEMANO:  There's two different periods.

2    When the -- when in two -- starting in 2006 when the debtor

3    started operations and entered into the distribution

4    agreement with the Weinsteins, under both the operating

5    agreement in which Weinstein was the managing member -- or

6    I shouldn't say the man -- the controlling member and under

7    the distribution itself, what the complaint alleges and

8    what the Court must accept as true, and I don't think

9    there's really much -- they don't even dispute this really,

10   is that the Weinsteins had total operational control over

11   the debtor.  They could dictate every single material

12   decision that the debtor could make or couldn't make.  The

13   Weinsteins had absolutely control.  They had no different

14   control than if the debtor was simply an operating division

15   of Weinstein, which really goes to the heart of our

16   complaint.  They -- there was no independence of the debtor

17   from Weinstein throughout this relationship.  It's very

18   important for the Court to understand that because it goes

19   to really the heart of the complaint.

20          In 2008 this whole Quadrant transaction, after

21   two years of this and when the debtor had been depleted of

22   all resources and when the debtor at minimum owed, you

23   know, 80 million dollars or 75 million dollars, whatever it

24   was, whatever the number may be, after two years of this

25   relationship it wasn't making money again.  It was losing

Page                                                                54

1   money constantly.  The Weinsteins said they get a

2   transaction which they removed themselves as the member and

3   so it's very im -- so if I could put words in counsel's

4   mouth, they rely upon that because they say as of

5   December 31, 2008 Weinstein no longer controlled the

6   debtor.  That's their argument.  But even if that were

7   true, and we don't concede that, your Honor, because we

8   really have -- there's been no discovery.  We have no

9   evidence of what actually occurred.  All we know is what

10  publicly filed documents say what's supposed to happen.

11  But even if -- even if in December 31, 2008 Weinstein was

12  no longer the controlling member, they were still the

13  licensor under the amended distribution agreement and what

14  we alleged under the complaint is that under the amended

15  distribution agreement they retained absolute control over

16  the debtor's material decision making with respect to the

17  distribution agreement.  And again, the debt -- the debtor

18  had no flexibility or discretion.  They had to do exactly

19  what Weinstein told them to do.  They -- whether -- whether

20  it was, "You have to distribute this title.  You have to

21  distribute this title now.  You have to distribute this

22  title instead of another title."  Whatever it was,

23  Weinstein dictated the terms.  And again, this is really

24  not disputed in their motion, Your Honor, the control under

25  the distribution agreement and that distribution agreement

1   continued until this debtor ceased operations months later.

2            THE COURT:  Give me a date.

3            MR. SHEMANO:  Well, we don't know, Your Honor.

4   All we know is sometime after September 2009.  You know,

5   nine months after the Quadrant transaction was documented

6   the debtor ceased operations.  And the reason we don't know

7   more, Your Honor, again -- is again because we haven't

8   taken any discovery.  We're totally reliant upon the public

9   reporting of Genius Products, Inc.  Genius Products, Inc.

10  was a publicly-traded company.  Everything we know is

11  because Genius Products, Inc. would do public filings.

12  Those public filings stopped in 2009.  So it's apparent

13  from those lack of filings and whatever press reports we

14  could find is that the debtor ceased the operations

15  sometime in 2009 shortly after the Quadrant transaction was

16  engaged in.  And the principals of the debtor who were also

17  the former principals of Genius Products, Inc., you know,

18  went off and started a new business.  You know,

19  Mr. Drinkwater went off and started a new business

20  presumably similar to what the debtor did, which is all

21  fine and good, but the debtor was a defunct entity, an

22  insolvent, defunct entity shortly after the Quadrant

23  transaction at the point in which the -- which Weinstein

24  dispossessed itself of its majority interest.

25           From our perspective, Your Honor, we -- the

Page                                                                56

1   reason I say it's all tangential is because all we're

2   concerned about is the payment of 130 million dollars and

3   why it was paid.

4          THE COURT:  Well, wasn't that a payment of the

5   obligations to -- for having distributed --

6          MR. SHEMANO:  Exactly --

7          THE COURT:  -- The Weinstein Company's films?

8          MR. SHEMANO:  -- Your Honor.  And so our -- what

9   our -- what happened with -- the reason the Quadrant

10  transaction is disclosed in the complaint is because money

11  was owed under the distribution agreement.  Call it 79

12  million dollars as of August 2008.  And it was re-

13  documented under the purchase and sale agreement and the

14  restructuring agreement and all those other agreements

15  post-2008.  But all those documents which basically re-

16  characterize the debt are all rooted in the original

17  distribution agreement.  So if there's 79 million dollars

18  owed as of August 2008 and under the purchase and sale

19  agreement the parties decide to say, "Okay, how are we

20  going to document that 79 million dollars; you're going to

21  do a new 20-million-dollar note and you're going to pay ten

22  million dollars here and you're going to pay five million

23  dollars here," our only point of the complaint, Your Honor,

24  is that the consideration for those payments is not those

25  promissory notes and those obligations under the 2008

Page                                                                                     57

1    purchase and sale agreement.  The true consideration is the

2    obligations under the 2006 distribution agreement.

3              THE COURT:  Okay.

4              MR. SHEMANO:  And that's -- and that's why we

5    say -- and that's why it's important.  Whether a payment

6    was made to Weinstein prior to December 31, 2008 or after

7    December 31, 2008, it's all rooted in an obligation under

8    the distribution agreement and our complaint rises --

9              THE COURT:  Your complaint is that the debtor was

10   paying too much for what it got.

11             MR. SHEMANO:  Exactly.

12             THE COURT:  Okay.

13             MR. SHEMANO:  That's the complaint.  That's the

14   complaint.  The debtor paid too much.  If the debt -- if

15   this -- if this contract had been negotiated fairly and at

16   arm's length and had reflected more -- most importantly

17   market terms and industry norms, if it had done that, 130

18   million dollars would not have been paid to the Weinsteins.

19   A significantly lesser amount would have been paid and that

20   difference is a fraudulent transfer, Your Honor, and that's

21   the heart of the complaint.  And that's -- and that's why

22   this motion to dismiss, Your Honor, is so strange for us

23   because, you know, we hear -- there -- they want to argue

24   to you, well, it had to be fair because, you know, the

25   terms were originally negotiated between Genius Products,

Page                                                                          58

1    Inc. and Weinstein in 2005.

2            THE COURT:  Now let me test this, Mr. Shemano --

3            MR. SHEMANO:  Yeah.

4            THE COURT:  -- with you.  Supposing you have

5    two -- two grocery stores a block apart.

6            MR. SHEMANO:  Yes.

7            THE COURT:  And you go to buy a dozen tomatoes.

8            MR. SHEMANO:  Yes.

9            THE COURT:  And for Market A you pay a dollar a

10   tomato so it costs you $10.  Then at Market B you've got to

11   pay a dollar and a half so it costs you $15.

12           MR. SHEMANO:  Right.

13           THE COURT:  And although the tomatoes were washed

14   and looked nicer in Market B there's still the same tomato.

15           MR. SHEMANO:  Correct.

16           THE COURT:  So you argue that I paid too much for

17   the second tomatoes.

18           MR. SHEMANO:  Well, it's a little more in our

19   case, Your Honor.

20           THE COURT:  Okay.  But that's your argument.

21           MR. SHEMANO:  Well, yes, except I want to

22   emphasize that when the debtor entered into the

23   distribution agreement in 2006 the Weinsteins, who were the

24   distributor, also controlled the debtor as licensee.  So

25   the Wein -- this was an entirely insider transaction.  This

Page                                                                    59

1   is not a situation where you have a contract -- your

2   grocery store buys vegetables.

3            THE COURT:  Well, I own both.  I own both grocery

4   stores.  So now does it matter?

5            MR. SHEMANO:  I'm sorry.  Your -- repeat your

6   question, Your Honor.

7            THE COURT:  I own both grocery stores.  And one

8   grocery store sold the tomatoes for a buck a tomato and the

9   second grocery store it's a dollar and a half.  Do you

10  contend that whoever you are --

11           MR. SHEMANO:  Yeah.

12           THE COURT:  -- a creditor of the owner, I guess

13  is who you are, that to the extent he paid fif -- a dollar

14  and a half a tomato you have made a fraudulent transfer and

15  you can recover five -- fifty cents back?

16           MR. SHEMANO:  No, Your -- not -- not in --

17           THE COURT:  Then how does that differ from this?

18           MR. SHEMANO:  In this situation, Your Honor, the

19  debtor incurred obligations under the distribution

20  agreement.  It incurred obligations.  It agreed to spend

21  money on behalf of Weinstein.  It agreed to pay money to

22  Weinstein.  In ex -- it got so that in exchange for that it

23  got the right to make some type of royalty.  All right.

24  That's the distribution agreement.  And what we say is

25  objectively the terms that were agreed to at its inception

Page                                                                60

1   were so far beyond industry -- it's not some vari --

2   some -- it's not a fifty-cent variation, Your Honor.  We're

3   saying this was so extreme that it not only render the

4   debtor insolvent at the time, it made it impossible for the

5   debtor to make any money and it ultimately caused the

6   debtor to be insolvent to the prejudice of creditors.  And

7   that is a fraudulent transfer because the consideration --

8   the consideration that they received, the debtor received,

9   in exchange for incurring those obligations was not

10  reasonably equivalent.

11          So the answer to your question, Your Honor, is

12  just because somebody charges more than somebody else by

13  itself -- by itself, Your Honor -- by itself is not

14  sufficient to demonstrate fraudulent transfer.  But under

15  the facts of this case where the variation between market

16  terms and what was agreed to are so vast and -- and you

17  cannot evade -- I wish they would.  They are trying so hard

18  to evade -- is that Weinstein was not the customer, Your

19  Honor.  Weinstein in your -- in your analogy is the

20  supplier.  They supply tomatoes to Grocery Store 1 for a

21  dollar and they supply tomatoes to Grocery Store 2 at a

22  buck fifty, but imagine they own Grocery Store 2 and their

23  whole business model is, "Well, what we'll do is we'll skim

24  the profits of the company through overcharging for the

25  tomatoes and at the end of the day all the third parties

Page                                                                 61

1   who sold lettuce and cucumbers they'll get stiffed at the

2   end, but in the meantime we're going to make a lot of money

3   skimming off the tomatoes."  That's what happened here,

4   Your Honor.  And that's why this case is an insider

5   transaction and has to be reviewed as an insider

6   transaction and we're entitled at trial to show to you --

7   we're not asking you to agree with us today.  It's

8   obviously a disputed fact.  We're going to show you at

9   trial just how bad this contract really was and how the

10  Weinsteins basically obtained a wish list that they never

11  could have agreed -- they never could have achieved in any

12  other circumstance.

13          And I want to point -- I want to emphasize this,

14  Your Honor.  They spent a lot of time in their motion that

15  we keep on talking about no independent party ever would

16  have agreed to these terms.  But look, look, Genius

17  Products, Inc. agreed to those terms.  That's true, Your

18  Honor.  Again, we're not -- we are not the trustee for

19  Genius Products, Inc.  We take no position on whether a

20  trustee for Genius Products, Inc.'s creditors could go sue

21  other parties for fraudulent transfers and breach of

22  fiduciary duty.  Not our issue.  But what we do know is

23  that the transaction negotiated between Genius Products,

24  Inc. and Weinstein was not a transaction in which Genius

25  Products, Inc. said, "We're going to continue to be an

Page                                                                    62

1    independent entity."  The entire heart of the Genius

2    Products, Inc./Weinstein transaction is we agree.  We are

3    going to be subsumed by Weinstein.  We're going to become a

4    working division of Weinstein.  We're not going to be an

5    independent entity.  That's what that deal was.  And that

6    deal, Your Honor, we think the facts will prove, were a

7    very good deal for the officers of Genius Products, Inc.

8    They got great jobs.  They got great salaries.  They got

9    bonuses.  Those are all paid.  They got the reputation of

10   being the distributors for the Weinsteins.  That's all

11   great, but objectively was that a great agreement for an

12   independent distributor?  Absolutely not.  And that's

13   again, Your Honor, something we will prove at trial.

14   There's no way you can -- anybody can make that type of

15   judgment on these pleadings.  But if we can prove it at

16   trial we're entitled to judgment because that will be a

17   fraudulent transfer.

18         THE COURT:  So, therefore, the hour and a quarter

19   or so of Mr. Friedman's explanation was interesting.

20   Interesting from start background, but really doesn't go to

21   the heart of your complaint.

22         MR. SHEMANO:  It doesn't go to our heart.  The

23   only reason we even mention the Quadrant --

24         THE COURT:  Whether Quadrant or not was involved

25   in this it doesn't matter.

Page                                                                63

1            MR. SHEMANO:  It makes no -- right.

2            THE COURT:  But all that really matters -- and to

3    put it in perhaps better legal terms, all that would be

4    relevant is whether the debtor in paying Weinstein -- the

5    Weinstein Companies for its share of the royalties paid

6    unfair consideration.

7            MR. SHEMANO:  That's correct, Your Honor.  That's

8    it.  That's the complaint.  It's very -- it's not a

9    complicated complaint.  It's -- it all comes down to

10   whether the terms of the contract were fair and the debtor

11   received reasonably equivalent value.  And that's something

12   obviously this Court has done in its career lots of times.

13   And that's all it is.  It's not -- it's not -- you know,

14   it's a lot of -- lot of -- there were complications,

15   transactions and documents and it's a publicly-traded

16   company here at that certain point, but at the end of the

17   day that's all it is, Your Honor.  Were those terms fair,

18   objectively fair based upon the evidence?  And that's why

19   this motion to dismiss, Your Honor, you should find it easy

20   to deny.

21           In fact, Your Honor, I think we're -- you know,

22   we're not going to even get to the summary judgment.  We're

23   going to get into a battle experts on regarding those terms

24   and you, the Court, will decide at that point regard --

25   regarding whether these terms are objectively fair for this

Page                                                                    64

1   insider transaction.

2            THE COURT:  Thank you.

3            MR. SHEMANO:  Thank you, Your Honor.

4            THE COURT:  Mr. Friedman, before you stand up

5   we're going to take a ten-minute break.  Come back in ten

6   minutes.

7            MR. MENTON:  Your Honor, if I may, can I be

8   excused and then Mr. Shemano can fill me in?

9            THE COURT:  Sure.

10           MR. MENTON:  Thank you, Your Honor.

11           THE COURT:  Thank you.

12           (Off the record.)

13           THE CLERK:  Please remain seated and come to

14   order.  This United States Bankruptcy Court is again in

15   session.

16           THE COURT:  Mr. Friedman, why don't you take 15

17   minutes, and I'm going to be firm on the time limit, and

18   tell me what you want to tell me that think you -- if

19   anything needs to be added to your explanation so I can

20   rule on the motion to dismiss.

21           MR. ALAN FRIEDMAN:  Thank you, Your Honor.  Your

22   Honor, I'm going to pick up with where Mr. Shemano started.

23   He said that the -- part of the complaint is that the terms

24   of the district agree -- distribution agreement in 2006

25   were not market.  He said what The Weinstein Company did is

Page                                                                    65

1    they dictated and the debtor said, "Yes, sir, we will do

2    whatever you want," and that's how those terms came to be.

3    That's what Mr. Shemano said.

4              But, Your Honor, that is just factually not the

5    case.  What is the case is that those terms were negotiated

6    between independent parties.  Either -- both of them could

7    have walked if they decided that they didn't like those

8    terms.  That's what they could have done.

9              Your Honor, this case -- we -- so this case

10   asserts a claim that under *Eclectic Properties* in the Ninth

11   Circuit and *Twombly* and *Iqbal* in the Supreme Court simply

12   is not plausible.  In *Eclectic,* which is a case that

13   involved a plaintiff alleging that properties that it

14   purchased from the defendants had been listed an inflated

15   price because the defendants had entered into sale lease-

16   back transactions in which they charged higher rents than

17   market value and as a result made the properties appear to

18   be worth more than they were because they were attracting

19   allegedly higher rents than they should have gotten and

20   sued saying that he was defrauded and that there were RICO

21   violations.  And what the con -- what the Court in the

22   Ninth Circuit said was:

23         "When companies engage in sale lease-back

24           transactions that are facially legitimate, pay rent

25           and operate legitimate businesses for years thereafter

Page                                                                66

1          and otherwise act as routine participants in American

2          commerce, a significant level of fact specificity is

3          required to allow a court to reasonably infer that

4          such conduct is part of a fraudulent scheme."

5          And the Court found that under *Twombly* they had

6    not satisfied their pleading burden.  And the Court, as we

7    requested the Court do here, recognized that it was

8    premature in that case to subject anybody to expensive

9    discovery and continued litigation under that kind of a

10   scenario.

11          What the cases tell us, Your Honor, and this is

12   clear, is if there are -- the Trustee has come up with --

13   here's the Trustee's version of what occurred.  In this

14   agreement that was negotiated between Genius Products, Inc.

15   and The Weinstein Company that had the terms under which

16   the distribution proceeded and which both sides could have

17   walked away and both sides were represented by counsel --

18   there was investment bankers involved -- what the Trustee

19   would have Your Honor believe is that these independent

20   parties with all those professionals agreed to onerous

21   terms that no truly independent distributor ever would have

22   agreed to.

23          Under *Eclectic* and under *Twombly* and *Iqbal* what

24   the Court is told that it needs to do is consider obvious

25   alternative explanations.  So, Your Honor, in here in a

Page                                                                    67

1   business that involves the entertainment business what the

2   obvious alter -- alternate explanation, Your Honor, is, is

3   that these independent companies thought that they could

4   make a successful go on the basis of the terms that they

5   had and that's what they tried to do and ultimately it

6   turned out that it didn't work.  And everybody knows that

7   there is risk in any business, certainly in the

8   entertainment business.

9            Your Honor made a reference to the grocery store

10  example.  And what this is more like, the way the parties

11  approached it at the time, was that the opportunity to

12  distribute The Weinstein Company product was like they were

13  an anchor tenant and if you can get in that anchor tenant

14  you will attract more business.  That's what the Genius

15  Products people thought.  That's what they said in the

16  proxy statement.  That's -- that supports the plausible

17  explanation that these independent parties didn't simply

18  come together and make a bad deal that it was going to not

19  make money for anybody.  It's really, Your Honor, very

20  illusory what Mr. Shemano said because the only way that

21  GPI can make money is if the distributor makes money.

22  GPI's only interest is 30 percent of the distributor.  So

23  it's illusory to say that when they negotiated that arm's-

24  length deal that they didn't have an interest in getting

25  for the debtor something of value.  Your Honor, I think if

Page                                                                                    68

1   you apply the standard of *Eclectic* and *Iqbal* and *Twombly*

2   you will agree that it is implausible for these claims to

3   proceed.  And if they can replead, which we don't think

4   they can, that might be one thing, but as stated they

5   haven't put forth facts.  And the Trustee continues to

6   disregard the fact as to how this agreement actually was

7   negotiated.

8          I'm going to turn because beyond to -- to

9   different arguments, Your Honor, that we make and I will

10  rely on our brief in part in light of the time constraint.

11  We have cited cases that show that the way in which they

12  plead actual fraudulent transfers are based on conclusory

13  allegations, not fact allegations, and we've cited -- you

14  know, we cited the *SEI Real Estate* case that they just

15  ignored.  That's out of this Bankruptcy Court, Central

16  District, California Bankruptcy Court.  They simply didn't

17  put -- they've said things and they continue to say things

18  today, but there's no factual basis for them.  They're

19  conclusory allegations that are not entitled to be true.

20  Perhaps they can come up with something.  Again, we don't

21  think they ha -- can but they haven't done so yet.

22         And, you know, we call Your Honor's attention to

23  the case we cited, *Allstate Insurance v. Countrywide*.  That

24  was a case in which similar types of allegations which we

25  said, well, the -- there was not adequate consideration

Page                                                                  69

1   provided.  The price that was challenged was depressed

2   relative to fair value.  That's all we're saying here is we

3   don't think it was market.  There needs to be facts that

4   support that.  Just like the case that the claims were

5   dismissed in the *SEI Real Estate* and there are other cases

6   that we cite in our brief, they have just fallen short of

7   what they need to allege here.

8           The same is true with the constructive fraudulent

9   transfer claim where -- and I reiterate, the notion that

10  they have come up with a plausible basis for saying that

11  there was not reasonable equivalent value when all of the

12  terms -- you know, there -- Mr. Shemano complains that the

13  way in which The Weinstein Company DVDs were distributed

14  were -- you know, The Weinstein Company had under the

15  agreement the ability to make decisions with respect to

16  their distribution.  That's what was negotiated by

17  independent parties.  Nobody can ever say that that didn't

18  happen because that's exactly what happened.  To say that

19  that like they do the -- The Weinstein Company's on both

20  sides of the transaction is simply and honestly, we would

21  say, improper to put in a pleading because they know that

22  the only way that contract came about was between an arm's-

23  length negotiation between utterly independent parties who

24  could have walked away at any time.

25          They had alleged -- the one agreement that I

Page                                                                    70

1  didn't get to, Your Honor, is an agreement that was entered

2  into in 2009 and that was the restructuring agreement in

3  September 2009, so that was many months after The Weinstein

4  Company ceased to have an ownership interest in the

5  Trustee -- in the debtor.  Even so, Your Honor, they say

6  that that agreement was entered into on onerous and one-

7  sided terms, even though there was -- they don't give you

8  any of the terms.  They don't give you any of the basis for

9  that and there is no basis.  There was no opportunity.

10 Even if they wanted to, to come up with onerous and one-

11 sided terms they didn't have the leverage.

12         As we show in our papers part of that agreement

13 included a settlement agreement from September 2009 and the

14 only objection that was made to that, Your Honor, was

15 mistakenly the Trustee said no.  The settlement agree --

16 the restructuring agreement they said was from December

17 2008 and the settlement agreement you're talking about is

18 from September 2009 so they cannot be one in the same

19 agreement.

20         However, the complaint itself says that the

21 restructuring agreement was September 2009 and that's what

22 the settlement agreement says and the documents themselves

23 refer to each other as being part and parcel of the same

24 agreement.  In the settlement agreement, September 2009,

25 there is a complete release.  We've quoted that release in

Page                                                                    71

1    the papers, Your Honor, and nobody has ever suggested that

2    that complete release is not sufficiently broad so that it

3    doesn't cover their fiduciary duty claims, their claims

4    under Delaware statute 18607 for illegal distributions and

5    their alter ego claim.  The only basis upon which they make

6    their fiduciary duty claim and their alter ego claim, Your

7    Honor, is that allegedly The Weinstein Company Holdings was

8    the "controlling member" -- that's what they say

9    "controlling member" -- of the debtor.  It's -- there's no

10   basis.  It's -- there's no good-faith basis to say that

11   based on the agreements that are before the Court and

12   properly incorporated in the complaint.  They bring five of

13   their seven causes of action, Your Honor, on the

14   restructuring agreement and because that settlement

15   agreement is indivisible and part of that, it applies.

16   That release applies.  So all those claims, Your Honor,

17   should be dismissed under the release.

18          They make arguments in their opposition that we

19   have responded to.  I think that their cases are not on

20   point and the release which the Trustee stands into the

21   shoes of -- stands into the shoes of the debtor on clearly

22   applies.  The one thing that they say that we didn't have

23   the opportunity to say in our brief, they cite out of

24   California, out of, you know, this District's -- this

25   Circuit cases saying that fiduciary duty claims should not

Page                                                                    72

1  be subject to release.  However, Your Honor, it -- if you

2  have the opportunity to read those cases, in all of those

3  cases the release under consideration was while the

4  fiduciary duty existed.

5          This September 2009 agreement was long after The

6  Weinstein Company Holdings was a "controlling member"

7  because that's what they plead in their complaint.  They're

8  trying to change things now but that's what they say in

9  their complaint and, respectfully, Your Honor, you should

10 not permit that to occur.

11         The fiduciary duty claims fail separately.

12 They're not just released.  They also fail because they're

13 time barred.  And I'm just going to go to the relation back

14 point, Your Honor, even though we've made other arguments

15 in our briefs.  The fiduciary duty claims do not relate

16 back, Your Honor.  They don't relate back because, you

17 know, there's no dispute under Rule 15(c) of the Federal

18 Rules that you need to have to claim a rise out of the same

19 conduct, transactions or occurrences as in the initial

20 complaint and, you know, where is the case?  Here, there's

21 a separate party.  There's a second requirement, which is

22 that that second party, The Weinstein Company Holdings,

23 because it was not included in the initial complaint, The

24 Weinstein Company Holdings has to have had some notice

25 that, you know, the reason it wasn't included was because

Page                                                                 73

1   of mistaken identity.

2           Your Honor, they failed both of those and it's

3   not even close.  Again, they ignore *Williams v. Boeing*, the

4   Ninth Circuit 2008 case that we cite.  And what that case

5   said is that claims arise out of the same -- I'm quoting:

6           "The claims arise out of the same conduct,

7       transaction or occurrence if they share a common core

8       of operative facts such that the plaintiff will rely

9       on the same evidence to prove each claim."

10          Now they say, you know, you should apply this

11  liberally and don't be troubled by this.  That's really

12  their answer to everything.  We didn't really plead

13  plausible claims but let us go by this motion.  But as I

14  said earlier, that's not what the Supreme Court or the

15  Ninth Circuit says is appropriate.  Plead plausible claims.

16  Don't just punt.  Don't make expensive discovery occur.

17  That's what they -- we cite the case.  That's what it says.

18          In this case -- in this Ninth Circuit case the

19  original complaint asserted claims against Boeing for

20  hostile work environment and race discrimination.  The

21  plaintiffs -- a class of plaintiffs later wanted to add a

22  wage compensation discrimination claim.  And even though

23  they had those hostile work environment claims, those race

24  discrimination claims and even though in the first

25  complaint they had said the terms and conditions were not

Page                                                                 74

1    the same for the plaintiffs as for, you know, the ones that
2    they were saying they were being discriminated by not being
3    treated as well as, the Court said, no, this doesn't --
4    this is not arising out of the same conduct, transaction or
5    occurrence.  That's the Ninth Circuit speaking and they
6    said there's no fair notice that you would have had -- been
7    subjected to a wage compensation claim.
8         Well, here there was no fiduciary duty claim in
9    the first complaint.  There was no mention of The Weinstein
10   Company Holdings.  The only thing that they were
11   challenging were payments made to The Weinstein Company and
12   that's a different -- and so there was no reason for The
13   Weinstein Company Holdings to think that there might be a
14   fiduciary duty claim alleged based on what was in the
15   initial complaint.
16        Under the Ninth Circuit it's not even close and
17   what I neglected to say, Your Honor, as *Boeing* -- as the
18   *Boeing* case says, it's only the same if the defen -- if the
19   plaintiff is going to rely on the same evidence.  If Your
20   Honor will look at their fiduciary duty claim they assert
21   things like The Weinstein Company Holdings allegedly
22   prevented the debtor from undertaking profitable business
23   ventures.  There's nothing like that in the original
24   complaint.  They also say The Weinstein Company Holdings
25   allegedly required the debtor to engage in unprofitable

Page                                                                          75

1    business opportunities.  It's first totally conclusory.  No

2    fact to support that.  Should not be taken as true.  But

3    again, look in the initial complaint and look at the --

4    this complaint.  Nothing -- there's no reason to -- the

5    evidence to prove those things is unique to this -- the

6    current complaint and not something from the first

7    complaint.

8           Further, to the extent that they could get

9    damages, those damages have nothing to do with what

10   transfers were made.  Those damage will have something to

11   do with whether there really were profitable business

12   opportunities or there were unprofitable ones that were

13   required.  So utterly different evidence.  It is crystal

14   clear under the Ninth Circuit cases that that cannot relate

15   back under that circumstance.  There's just no basis for

16   doing so.

17          The second basis on 15(c), Your Honor, is the one

18   what -- should The Weinstein Company have known or should

19   have known that but for a mistake, you know, it would have

20   been included in the first action.  Well, they cite this

21   case *Krupski v. Costa Crociere*, a Supreme Court case.  But

22   what happened there is night and day from what happened

23   here.  What happened there is there was a cruise ship and a

24   passenger was injured and brought a personal injury claim.

25   And the passenger ended up suing in an affiliate of the

Page                                                                        76

1   operator of the cruise.  Sued a land marketing company -- a

2   marketing -- a company that was involved in marketing.  And

3   the -- they should have sued a different company because

4   that's the one that is liable for injuries on cruises that

5   are run.

6           And the Court found that it's the exact same

7   claim and, you know, both companies knew about this claim

8   so, yeah, you can assert the exact same claim you asserted

9   the first time against this second company because, you

10  know, they should have known that there was a mistake

11  because they're the only one in that corporate family that

12  can be sued for personal injuries on cruises.

13          Here, there was no reason to think that the

14  Trustee made a mistake by not including a fiduciary claim

15  against The Weinstein Company Holding.  Unlike in this case

16  they rely on there wasn't a fiduciary duty claim in the

17  first complaint.  Further, the only claim in the first

18  complaint was that payments were made to The Weinstein

19  Company and that was true.  That -- and they allege it and

20  that was what happened.  So again, why would TWC Holdings

21  think that if they're challenging payments to The Weinstein

22  Company and sued The Weinstein Company they meant to sue

23  The Weinstein Company Holdings who did not receive those

24  payments.

25          Then next, the basis of that first --

Page                                                                      77

1           THE COURT:  Mr. Friedman, time is up.

2           MR. ALAN FRIEDMAN:  Can I complete a few more

3    points or no?  No.

4           THE COURT:  No.  I really do have to leave when I

5    mentioned, so if we have to come back we'll come back.

6           MR. ALAN FRIEDMAN:  Thank you.

7           THE COURT:  You're welcome.

8           Mr. Shemano, you get your 15 minutes.

9           MR. SHEMANO:  Very brief, Your Honor.  Regarding

10   the specificity of the complaint I ask the Court please

11   look at paragraph 26 of the complaint.  In paragraph 26 we

12   identify 13 specific provisions of the distribution

13   agreement that we allege were onerous and not market.

14   There's no way you can imagine a more specific allegation

15   of constructive fraudulent transfer, an actual fraudulent

16   transfer than to identify 13 different provisions that are

17   the evidence for the lack of reasonably equivalent value.

18   This is not a bare-bones complaint.

19           And regarding insolvency, I ask the Court to look

20   at paragraph 32 of the complaint.  We don't simply allege

21   insolvency and nothing more.  We take exact quotes from the

22   public filings on Genius Products, Inc., which they

23   publicly reported the massive losses and the massive

24   balance sheet and balance of this company during the

25   operating period.  So there is absolutely the detail

1    required beyond any stretch of the imagination for

2    fraudulent transfer.

3              Regarding the release, Your Honor, again I ask

4    you, we briefed that issue.  We identified a number of

5    cases for the Court.  The notion that an insider can grant

6    itself a release from fraudulent transfer and breach of

7    fiduciary duty on a lawful dividend that they -- you can do

8    it simply by granting yourself a release is absurd, Your

9    Honor.  And every case that has dealt with it said these

10   are insider transactions, you have to evaluate them as

11   insider transactions and they're probably -- you have to

12   value them as fraudulent transfers themselves, and that

13   includes, Your Honor, even under if you -- again we're on a

14   motion dismiss.  We're not even on a summary judgment

15   hearing where we even know the facts of what Weinstein

16   controlled and what Weinstein didn't control in 2009.  But

17   even if you assumed that they were not the controlling

18   member in September 2009 and when the final release was

19   entered, again that release to the extent it granted a

20   release of these claims with no consideration or fraudulent

21   transfers and we allege they're fraudulent transfers.  So

22   there's no way in a motion to dismiss you can say that

23   these releases require dismissal of this complaint.

24             And finally with the relation-back issue, Your

25   Honor, again let's -- the Court is -- the Court has become

Page                                                                    79

1   quite informed about the course of this case.  When these

2   complaints were filed the debtor's books and records were

3   in a storage facility maintained by Trevor Drinkwater who

4   did not tell the debtor he had the books and records.  The

5   Trustee was scrambling to meet a statute of limitations

6   based upon very little information and did his very best

7   that he could to meet that statute of limitations and file

8   the complaint.  And that complaint will -- identifies the

9   130 million dollars of transfers.  It identifies the

10  debtor's mismanagement and transfers to insiders as the

11  cause and the root of the issue.

12          And with respect to whether TWC Holdings should

13  not have been aware that but for a mistake it would have

14  been a defendant, one of the cause of action that's alleged

15  in the original complaint is unlawful distribution.  Now,

16  an unlawful distribution claim can only be alleged against

17  the shareholder, against the member.  But at the time, and

18  this is repeated repeatedly in the complaint, the Trustee

19  alleges he's not aware of any contract between the parties.

20  So he didn't even know -- he didn't even know at that time,

21  had actual knowledge of the underlying agreements but he

22  was able to allege an unlawful distribution.

23          So TWC Holdings, which doesn't deny that it was

24  aware of the complaint -- it can't deny it -- it had to

25  know that once the debt -- the Trustee became aware that

Page                                                                80

1   TWC Holdings was the member, that TWC Holdings would be the

2   proper defendant.  So it was all there at its rudiment

3   basis in the original complaint and all that's been done,

4   Your Honor, in the subsequent complaint is that once we

5   were able to identify the SEC filings and go through them

6   in detail and understand better why these 130 million

7   dollars of transfers were made to the Weinsteins, we were

8   able to put that detail in the complaint.  And for the

9   defendant to now use that against us, the fact that we now

10  know the underlying reasons these transfers were made and

11  put it into an amended complaint as cause to dismiss the

12  claims that are -- that are referred to and, you know, in

13  the embryo of those claims in the original complaint is

14  really unfair.  The original complaint, Your Honor, would

15  survive a motion to dismiss on these claims.

16          So I think, Your Honor, the correct answer is to

17  deny this motion, let us engage and start reviewing the

18  documents we now have access to; let's start getting into

19  why, that the who and the where and the why of these

20  transactions get even more detail and we'll come back at

21  trial, Your Honor, and we'll prove to you our claims and

22  why judgment should be entered and relief granted.

23          THE COURT:  Thank you.

24          I thank you both.  I know I cut you off before

25  you finished, Mr. Friedman, but I think you had an hour and

1  a half or so today to tell me what you wanted to tell me.

2  And unless you think there's something so in -- significant

3  that it has to be said I'd like to take the matters under

4  submission now and not have further argument.

5           MR. ALAN FRIEDMAN:  But --

6           THE COURT:  You can respond to that and comment.

7           MR. ALAN FRIEDMAN:  Your Honor, I -- you were

8  very patient with me and I appreciate that.  I'll say one

9  minute, I'm watching your clock, and then I will sit down

10  and I do appreciate it.

11          The only thing that I wanted to get to is the

12  18607 point.  We have it in our brief so I won't even make

13  the arguments that we had there.  But in terms of the

14  relation-back point that Mr. Shemano just made, there would

15  be no reason to think even there that it would relate back

16  because there were no payment.  The payments were not made

17  as distributions to The Weinstein Company Holdings.  And

18  when you see our papers you'll see you can't make a

19  constructive dividend point, which they cited a District of

20  Maine case for but the Delaware Chancery Court has

21  expressly disagreed with it.

22          And with that, Your Honor, I will thank you

23  again.  I appreciate the time you've provided.

24          THE COURT:  Thank you all.  Court is adjourned.

25  The matter is under submission.

Page                                                                          82

1          MR. ALAN FRIEDMAN:  Thank you, Your Honor.

2          MR. SHEMANO:  Thank you.

3          MS. KURTH:  Thank you very much, Your Honor.

4          (End of proceedings.)

5                      * * * * * * *

6      I certify that the foregoing is a correct

7  transcript from the electronic sound recording of the

8  proceedings in the above-entitled matter.

9

10  _____        Date:  10/1/2015

11  RUTH ANN HAGER, C.E.T.**D-641

12

13

14

15

16

17

18

19

20

21

22

23

24

25