UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| IN RE: | . | Case No. 2:11-bk-62283-BB |
| | . | Chapter 7 |
| GENIUS PRODUCTS LLC, | . | |
| | . | Los Angeles, California |
| Debtor. | . | Tuesday, April 26, 2016 |
| . . . . . . . . . . . . | . | 2:08 p.m. |
| SIEGEL, CHAPTER 7 | . | |
| TRUSTEE, | . | |
| | . | |
| Plaintiff, | . | Adv. No. 2:15-ap-01241-BB |
| v. | . | |
| THE WEINSTEIN COMPANY | . | |
| LLC, et al., | . | |
| | . | |
| Defendants. | . | |
| . . . . . . . . . . . . | . | |

STATUS CONFERENCE
BEFORE THE HONORABLE SHERI BLUEBOND
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

APPEARANCES:

For The Weinstein Company          Fox Rothschild LLP
LLC:                               By:  ALAN R. FRIEDMAN, ESQ.
                                        METTE H. KURTH, ESQ.
                                   1800 Century Park East, Suite 300
                                   Los Angeles, CA  90067
                                   (212) 878-1426

                                   Fox Rothschild LLP
                                   By:  WILLIAM H. STASSEN, ESQ.
                                   2000 Market Street, 20th Floor
                                   Philadelphia, PA  19103
                                   (215) 299-2000
                                   (Telephonic appearance)

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311      Fax No. (609) 609)587-3599**

APPEARANCES (Cont'd):

For Alfred H. Siegel                    Robins, Kaplan, Miller & Ciresi,
Chapter 7 Trustee:                           LLP
                                        By:  DAVID B. SHEMANO, ESQ.
                                             JAMES P. MENTON, ESQ.
                                        2049 Century Park East, Ste. 3400
                                        Los Angeles, CA 90067
                                        (310) 552-0130

                                        A. Siegel & Associates
                                        By:  ALFRED H. SIEGEL, ESQ.
                                        21650 Oxnard Street, Suite 500
                                        Woodland Hills, CA  91367

Court Recorder:                         Sonia Cheek
                                        U.S. Bankruptcy Court
                                        255 East Temple Street, Room 940
                                        Los Angeles, CA 90012
                                        (855) 460-9641

- - -

1          THE COURT:  Okay, 202 is Genius Products LLC, Siegel

2   versus Drinkwater.  That matter has been continued to June 28

3   at 2 p.m. and is off calendar.  And I've got 203 Genius

4   Products LLC, Siegel versus The Weinstein Company, a status

5   conference.  Appearances please.

6          MR. FRIEDMAN:  Hello, Your Honor.  Alan Friedman,

7   attorney for the defendants, The Weinstein Company, the

8   Weinstein Company Holdings.

9          THE COURT:  All right, thank you.

10         MS. KURTH:  Good afternoon, Your Honor.  With him as

11  well, Mette Kurth of Fox Rothschild and we also have William

12  Stassen dialed in telephonically.

13         THE COURT:  On the phone.  All right, thank you.

14         MR. SHEMANO:  Good afternoon, Your Honor.  David

15  Shemano and James Menton of Robins, Kaplan on behalf of the

16  Chapter 7 Trustee.

17         THE COURT:  All right, thank you.  All right, so

18  what's the status of this matter?  Oh, this was a Judge Neiter

19  matter, correct?

20         MS. KURTH:  Correct.

21         UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

22         THE COURT:  Okay, all right, so he issued an order a

23  while back that set dates way out into the future which is --

24         MR. FRIEDMAN:  Your Honor, I'm sorry.  Is Mr. Stassen

25  on the telephone?

4

1          THE COURT:  Oh, yes, Mr. Stassen, are you there?

2          MR. STASSEN:  Yes, I am, Your Honor.  I know Ms.

3    Mette introduced me but -- Ms. Kurth did.

4          THE COURT:  Okay.

5          MR. STASSEN:  But I am on the phone, yes, thank you,

6    Your Honor.

7          THE COURT:  Is there anyone else on the phone as long

8    as we're asking?  No?  Okay.  On this matter.  All right, so

9    Judge Neiter set a scheduling order way back when that set a

10   whole slew of dates and I don't usually do that.  I kind of set

11   one date at a time.  I mean I may set a discovery cutoff but I

12   don't generally set trial dates and whatnot.  So the question I

13   asked in the tentative, are the parties on track?  Because you

14   did have a discovery deadline for fact discovery of August 31,

15   2016.  So the question is are we on track to do that?  Can we

16   leave that one in place?

17         MR. MENTON:  We're not on track for that, Your Honor.

18         THE COURT:  Okay, what's going on?

19         MR. MENTON:  What's going on?  We've done initial

20   disclosures.  We have done -- we are now in the early document

21   stage so the other side, Weinstein, has propounded discovery.

22   We have produced -- well, there's different aspects.  There's

23   hard copy documents and electronic documents.  In terms of the

24   hard copy documents, the debtor had about 900 boxes that we

25   were able to obtain, a little bit more than that.  We've gone

1  through those and come up with 200 boxes that have responsive

2  documents to discovery propounded by the Weinsteins.  And so

3  we've gone through that.

4         We have produced -- and we're doing rolling

5  productions and so we have produced 8,000, approximately 8,200

6  documents to date, 20,000 pages.  We have another production

7  that's coming up.  The bottom line is we anticipate in the

8  first part of May getting through the hard copy documents which

9  is about, a total of about 76,000 documents that we will have

10 reviewed and working through that.

11        One of the complications not only in processing all

12 of that is that we are coming across a number of agreements,

13 many agreements, thousands of agreements that have

14 confidentiality provisions that deal with third parties.  As

15 the Court may know, the debtor was involved in the distribution

16 business and so had lots of relationships with other parties

17 that have confidentiality provisions within them and so we are

18 having to go through those confidentiality provisions to see if

19 they are still in place, whether they're relevant, whether

20 they've been terminated.

21        And those that are still relevant for our purposes we

22 need -- the process would be to send -- the proposal would be

23 that we would send letters to those to ask them if they have

24 some questions, concerns and give them an opportunity to come

25 before Your Honor if they do not want that information

1  disclosed.  If they don't have an issue with that, then we've

2  been working with opposing counsel on coming up with a

3  stipulated protective order.  We'd probably still mark them as

4  confidential potentially.

5          THE COURT:  Don't most of the confidentiality

6  provisions say something like, you know, unless the Court --

7  could you please turn off your phones and devices?  Somebody is

8  squeaking out there.  Don't they probably say something about

9  if you're ordered or compelled to turn them over by a subpoena

10 or something along those lines?

11         MR. MENTON:  Some do.

12         THE COURT:  All right.

13         MR. MENTON:  And some I don't think do and some don't

14 have that kind of provision so we want to be sure and go

15 through all of those.

16         THE COURT:  Okay, all right.

17         MR. MENTON:  That's part of in the mix and that's

18 just the hard copy documents.

19         In terms of the electronic documents, Your Honor,

20 there's 313 gigabytes of documentation we've provided to the

21 other side.  We're working on a call back -- a call back

22 provision in terms of potential privileged stuff.  We're

23 working through that.  And then we have another 156 gigabytes

24 of information, of electronic information that we are working

25 with opposing counsel on.

1          We've come up with some search terms.  We've provided

2   them with that and working through getting -- issues with

3   respect to that and then also there are some cost issues that

4   we're going through.  The estate does not have a lot of money

5   and so there's some proportionality issues and we're working

6   with the other side to try to see how that all plays out.  But

7   that's documentation to be produced at some point as well.

8          The other -- we have -- the trustee has propounded

9   discovery on the other side and we got responses back and they

10  can provide an update on the documents to be produced but it

11  may be extensive and we haven't received anything yet so that's

12  in play.  Defendants have also propounded discovery on Quadrant

13  (phonetic), two third parties so far.  So the bottom line is

14  there's a lot that we've done and a lot more to do and so I

15  don't think that the August time frame in terms of getting fact

16  discovery done makes sense at this point.

17          THE COURT:  Okay, is everybody playing nice so far?

18          MR. MENTON:  Yes, Your Honor.

19          THE COURT:  Yes?  Everybody seems to be getting along

20  okay?  Yes?  The other side agrees?

21          MR. FRIEDMAN:  Yes, Your Honor.

22          THE COURT:  Yes?  Good.  That's good to hear.

23          MR. STASSEN:  Yes, Your Honor.

24          MR. FRIEDMAN:  And honestly, Mr. Stassen has been

25  more involved in that --

1          THE COURT:  Okay.

2          MR. FRIEDMAN:  -- so he should really speak more so
3     than I.

4          THE COURT:  Okay, all right, so it sounds like you
5     don't really need me to do much of anything at the moment.
6     You're just doing what needs to be done and slogging through
7     what seems like a whole lot of stuff to slog through, right?

8          MR. MENTON:  Yes, Your Honor.

9          THE COURT:  Okay, well, where are we at now?  This is
10    April.  I mean I could extend the August date, I could vacate
11    the August date, I could do nothing and have you come back
12    before the August date and figure out what the new date ought
13    to be when you come back before the August date.  What's your
14    preference, Mr. Menton?

15         MR. MENTON:  Well, in terms of coming back, we could
16    come back on the June 28th date.  We anticipate being here on
17    the Drinkwater matter.  There's a status conference in that
18    case.  I think Mr. Stassen and I had contemplated if the Court
19    wanted to schedule a time, to have that discovery go into March
20    of next year.  If the Court were inclined to -- need to set a
21    deadline, I'm not opposed to the Court vacating it and kind of
22    -- just kind of seeing where we are come June or some time
23    thereafter.

24         THE COURT:  I probably wouldn't normally make you
25    come back as early as June because this is already May

1  basically.  But you talked about the Drinkwater matter.  I

2  guess it would be a good idea to have you on the same schedule,

3  is that the idea to keep the two together?  Are they --

4            MR. MENTON:  Yes, Your Honor, and the reason for that

5  is that what's potentially in play is the trustee may decide to

6  proceed with Mr. Drinkwater and may seek to not only

7  consolidate the Drinkwater matter with this matter, but also

8  potentially amend the complaint.  And so I think my

9  understanding is the Court previously had potentially wanted

10 both of the parties -- everybody to be here because of that

11 Drinkwater aspect of things.

12           THE COURT:  Right, okay, well, why don't I set it

13 over to then and maybe in the meantime maybe we just vacate all

14 the dates and then we can talk about what a new date ought to

15 be in June?  Does that make some sense?  Does that work?

16           MR. MENTON:  That's fine from my perspective, Your

17 Honor.

18           THE COURT:  I see Mr. Friedman nodding too so that

19 works for you as well?

20           MR. FRIEDMAN:  Yes.  There's a point that I wanted to

21 make --

22           THE COURT:  Okay, go ahead.

23           MR. FRIEDMAN:  -- before we have closure on that.

24 Thank you.  So this is something that -- this case is huge for

25 everybody.  You've heard from Mr. Menton how much electronic

1 discovery he has spoken about.  I don't have the numbers to

2 tell Your Honor right now but we have quite a lot as well.  The

3 costs are going to be enormous and well, you know, we're not

4 the trustee, we're also not, you know, a large company.  We

5 have about 130 employees.  You know, this is an extraordinarily

6 taxing case for us as well.

7          THE COURT:  And how much is in controversy?

8          MR. FRIEDMAN:  The trustee is suing for $130 million

9 --

10          THE COURT:  Okay.

11          MR. FRIEDMAN:  -- which is, you know, the theory

12 behind that, as I understand it, is the trustee is going back

13 four years from the petition date.  What Genius did was it was

14 a DVD distributer and it distributed, among other things, all

15 of The Weinstein Company product pursuant to distribution

16 agreements and The Weinstein Company was by far the biggest of

17 the entities for whom it distributed product.  And what the 130

18 million represents is over the four years that they're entitled

19 to sue for under their complaint, they have asked for all the

20 money back on the theory that the agreements that were entered

21 into are ones that are subject to challenge.

22          Now, normally what happens and what they've even said

23 in their complaint is the distributer gets a distribution fee.

24 And under our agreements, you know, they got anywhere depending

25 on the agreement from five percent to eight percent.  That's a

1 distribution fee that they get to keep.

2      They have alleged that the normal distribution fee is

3 something like 15 percent.  So they haven't sued for the

4 difference between what they're saying is that distribution fee

5 and the five or the eight percent.  They have sued for

6 everything.  So, in other words, what they're suing for is 100

7 percent of all revenue from the DVDs.  But the amount that

8 they're, therefore, suing for is $130 million.

9      THE COURT:  Okay.

10      MR. FRIEDMAN:  What we have raised with Mr. Menton

11 and really Mr. Stassen had the conversation but what was

12 reported back to me was that trustee's counsel wasn't too

13 excited about this idea but we said that we would raise it.  So

14 what started as, you know, a multiple claim complaint is really

15 down to a constructive fraudulent conveyance claim here.  And

16 what we have raised with them is the idea of bifurcating

17 discovery to focus on whether or not there was reasonably

18 equivalent value for the contracts that they have challenged in

19 the complaint.  All of the transfers of the $130 million they

20 acknowledge came from these agreements.  So what we thought

21 might be a way to help both sides deal with these costs is to

22 bifurcate, focus on that.  I don't think the Court wants to

23 hear it and I'm not planning to walk you through why we think

24 that that is an element that we think will be ripe for summary

25 judgment but that is what we think.  I could walk you through

1  it but I don't know if you want that.

2           THE COURT:  Yes, not today.  Well, another thought

3  though when you talked to me about the astronomical amount of

4  the discovery and from what I'm hearing, you're saying 130

5  million is 100 percent and they're really at best entitled to

6  15 percent minus the five percent that they already got or some

7  significantly lower number.

8           But in any event, it would seem as though this would

9  be a horrific enough exercise that perhaps mediation might be a

10  good idea.  Of course the real question for me is, is it too

11  soon to suggest that or order you to that because you don't yet

12  know enough from your fact discovery to be able to have a

13  meaningful discussion or, conversely, is the fact discovery so

14  thoroughly unpleasant that people would rather, even if they

15  have limited information, toss around numbers and try to work a

16  thing out to avoid the excruciating task of having to go

17  through the discovery.  What's your sense of timing on it?

18  Pretty much I order everybody to mediation so you will go.  The

19  question is does it need to be later or should it be sooner?

20  What's your sense of that?

21           MR. FRIEDMAN:  So top of my head this is what I think

22  would be sensible.  There are really two sets of agreements.

23  There were agreements that were entered into in 2006 although

24  they were truly negotiated in exhibits to a 2005

25  agreement, a December 2005 agreement.  I think it would make

1  sense to have limited discovery of the negotiations of those

2  agreements including, you know, because they were done by

3  parties that had no relationship to each other.  And then

4  there's another set of agreements that were entered into at the

5  end of 2008, December 31, I think, 2008, and that was one in

6  which there was also an entity that was an essential party to

7  the agreements, Quadrant.  It's the one that Mr. Menton

8  referenced that we have subpoenaed, that The Weinstein Company

9  has subpoenaed.

10        And I think that we should also have limited

11  discovery of Quadrant.  I think at that point we would probably

12  be -- so what I mean by that is some amount of document

13  discovery and some limited number of depositions and I think at

14  that point for mediation purposes, not for summary judgment

15  purposes, we might be in a spot where, you know, it might be

16  meaningful to have a mediator really evaluate what the

17  reasonably equivalent value plan looks like.  That's all I got.

18        THE COURT:  I'm trying to process that.  Now, you're

19  talking about -- the claim was constructive fraud.  It's not

20  actual intent to hinder.

21        MR. FRIEDMAN:  Correct.

22        THE COURT:  So are you thinking that this discovery

23  -- it almost sounded to me like you thought this discovery

24  would reflect that it was an arm's length kind of a transaction

25  and, therefore, that I would conclude there was reasonably

1 | equivalent value when it could be arm's length and it could

2 | still be constructive fraud because it was less than reasonably

3 | equivalent value.  So you're not suggesting that the regularity

4 | of it is what's going to -- well, you also said this was not

5 | discovery that you needed for summary judgment.  This was just

6 | enough to do the mediation so I'm a little confused as to why

7 | these chunks are what you need for the mediation as opposed to

8 | some other chunks but then I know exceedingly little about the

9 | issues in this lawsuit.

10 |        MR. FRIEDMAN:  Well, as I said, Your Honor, reacting

11 | to the question about what is the right time for mediation --

12 |        THE COURT:  Right.

13 |        MR. FRIEDMAN:  -- and trying to avoid some of the

14 | massive discovery and the costs associated with it, I think

15 | that that discovery would enlighten -- provide the mediator,

16 | provide the parties with the ability to see not only the

17 | regularity.  These were enormously experienced, sophisticated

18 | parties.  There was -- you know, if I was to -- again, I don't

19 | want to bring in -- you're sort of inviting it but I could

20 | bring in some of what was said, what I expect this discovery is

21 | going to show.  Here --

22 |        THE COURT:  But in general terms.  I mean, you don't

23 | have to --

24 |        MR. FRIEDMAN:  We'll just do very briefly.  So this

25 | -- the first set of agreements was done with a public entity on

1  the other side and they had to -- not only did they, you know,

2  have outside counsel, special counsel, on the distribution

3  agreement which is the heart of what the claim is with respect

4  to these early agreements, they also had, you know, a fairness

5  opinion for the deal and they also had their shareholders

6  approve the deal.

7         And some of what they said about this deal, what was

8  unique for this opportunity is The Weinstein Company is by far

9  the biggest content owner that they would be able to

10  potentially distribute DVDs for.  And what the board said in

11  their proxy statement, SEC proxy statement, was, you know, that

12  this provided an opportunity to improve our competitive

13  position, that the distribution agreement, the same one that's

14  being challenged is what they said in the proxy statement is a

15  valuable and highly sought after right and when combined with

16  our employees' management team and existing distribution

17  business will help transform the distributor into a large and

18  well-recognized entertainment distributor.

19         So we actually think that there is going to be quite

20  a lot that can be discovered from the people who negotiated

21  these deals from, you know, Jefferies and Company.  That's the

22  other subpoena that Mr. Menton referred to that was -- who

23  issued the fairness opinion and from Quadrant that was involved

24  in the 2008 agreement to give, you know, certainly for

25  mediation purposes, you know, a reason to -- for everybody to

1  get a good handle upon, you know, the strength or weakness of

2  whether or not there was reasonably equivalent value.

3          THE COURT:  Okay, so it sounds like you don't need a

4  lot of documents to be able to be in a position to go to

5  meditation.  You're just imagining what Mr. Menton ought to see

6  before he had to go to mediation, am I correct?

7          MR. FRIEDMAN:  Well, we don't have access to most of

8  those -- the documents that I referred to.  We don't have

9  access to whatever the trustee has, we don't have access to

10 what Quadrant has, we don't have access to what Jefferies has

11 or, you know --

12         THE COURT:  But you have access to something because

13 you're --

14         MR. FRIEDMAN:  Well, we have The Weinstein Company

15 documents.

16         THE COURT:  Okay.

17         MR. FRIEDMAN:  But even there, you know, there's

18 still going to be a lot of electronic discovery.  It's easy to

19 say and we could take depositions and get people on the record

20 but without having first done the document review, you know, we

21 run the risk.  Then we would need to get them on the record a

22 second time which, you know, nobody is very fond of, certainly

23 these third parties like Quadrant or Jefferies.

24         THE COURT:  Of course, then if you bifurcate too, if

25 you only do a piece of it, then -- and don't do all of it, then

1  you may end up getting the same people back again the second

2  time to do the rest of it if you need --

3          MR. FRIEDMAN:  That is a possibility but probably

4  more limited and maybe more -- I mean, you know, former

5  employees of Genius.  But yes, that is a possibility but, you

6  know, in weighing, avoiding the cost of plunging into that

7  discovery and involving, you know, the insolvency experts who,

8  you know, do a lot of work and charge a lot of money for that

9  work, that would be the idea of maybe if we had considerable

10 savings by bifurcating, possibly.  They don't work out, but on

11 a, you know, when we try to sort of have our expectations of

12 what will in the long run be less expensive in our calculation,

13 maybe they disagree entirely, bifurcating would make sense.

14         THE COURT:  All right.  Great.  Anything else you

15 want to get off your chest?

16         MR. FRIEDMAN:  Not about this case.

17         THE COURT:  Not about this case?

18         MR. FRIEDMAN:  Thank you.

19         THE COURT:  Okay, so did one of you want to react to

20 what he just said?  And mainly my question is, you know, when

21 is the right time for mediation?  Should I be urging you to do

22 that sooner rather than later in the hope that it will spare

23 Mr. Menton or his minions from having to do some of this

24 hideous discovery.

25         MR. SIEGEL:  I'm so glad I have Mr. Menton to do all

1  this hideous discovery.

2            THE COURT:  That's right.

3            MR. SIEGEL:  I did want to make one -- it's always

4  interesting to hear the other side's kind of view of the case.

5  It's always very informative.  A couple of things.  Regarding

6  this bifurcation and the issue of insolvency, what's alleged in

7  the complaint is that -- so the Court can sense the structure

8  here -- there was an independent entity called Genius Products

9  Inc. which negotiated this -- these pre-agreements with

10 Weinstein.  And as a result of those agreements, a wholly owned

11 subsidiary of Weinstein was turned into Genius Products LLC,

12 our debtor, and the Inc. contributed the business to the LLC

13 and became a 30 percent member of the LLC and Weinstein was the

14 70 percent member of the LLC.

15           So it's important for the Court to understand,

16 because I noticed it wasn't mentioned, that at all times we're

17 talking about these transactions and the transfers at issue,

18 Weinstein is the controlling member of the debtor and in

19 control of its operations.  So Weinstein, our view of the case,

20 was on both sides of the transaction at all relevant times.

21 And, in fact, if you look at the distribution agreement, not

22 that the pre-agreement entered into between Inc. and Weinstein

23 but the one that the LLC entered into which is the one that's

24 at issue in the case.  Weinstein's CFO actually signed it in

25 both capacities as the licensor and the licensee so it's a

1  Weinstein agreement and Weinstein negotiated term.

2         So Inc., this is important, Inc. remained a public

3  company and did public reporting and what we know from the

4  public reporting from the SEC filings --

5         THE COURT:  Okay, but wait.  Inc. is the one that did

6  the pre-negotiations and contributed its rights to the LLC --

7         MR. SIEGEL:  Its business.

8         THE COURT:  -- and it retained 30 percent of the LLC.

9         MR. SIEGEL:  A 30 percent interest, correct.

10        THE COURT:  But Inc. remained publicly traded?

11        MR. SIEGEL:  Correct.

12        THE COURT:  Okay.

13        MR. SIEGEL:  And so he did public filings.

14        THE COURT:  Okay.

15        MR. SIEGEL:  And so with respect to insolvency,

16 what's alleged in the complaint, and really all we need to rely

17 upon as a matter of law, is that Inc. in its SEC filings was

18 publicly reporting that the LLC was losing money right off the

19 bat and was insolvent on a balance sheet basis and what we know

20 is by the end of 2008, less than two years after two years

21 after the agreement was entered into, the company was

22 insolvent.

23        And so what we -- we're actually the reverse of

24 bifurcation, Your Honor.  We think really the correct way to

25 stipulate to save costs is for Weinstein to simply acknowledge

1  what their own entity was reporting at the time -- and by the

2  way, Weinstein was also a member of the Inc. as part of the

3  deal.  They became a member of the Inc. as well -- just concede

4  and acknowledge what was publicly reported which is that the

5  debtor was insolvent.  And if you do that, that'll certainly

6  narrow the issues.  And if you're not going to acknowledge it,

7  tell us why.  Tell us what exactly are the factual issues

8  regarding insolvency that we need to take extensive discovery

9  about and presumably employ experts to come and basically say

10 that the SEC filings were accurate or not.  That's the correct

11 way to simply costs regarding the insolvency issue.

12      Regarding the mediation issue, Your Honor, again,

13 we've produced -- it was a laborious process getting documents.

14 They were under -- the Court is coming late to the process.

15 The documents had been in the possession of Mr. Drinkwater for

16 several years during the bankruptcy and he never told anybody

17 about it until it just kind of popped up last year.  Is it last

18 year, two years?  I can't remember now.

19      And we got all the boxes after going to Judge Neiter

20 and actually getting an order compelling the turnover of the

21 boxes and getting an order from Judge Neiter directing that Mr.

22 Drinkwater serve as the debtor, as the debtor's representative

23 for all purposes of this case so we can at least take a 2004

24 examination of him as the debtor.  But we have gone through a

25 great expensive process of collecting those documents,

1  reviewing them and producing them to the other side.  We don't

2  know what they have.  They have not given us any documents yet.

3  We've gone through the process of giving lots of documents.  We

4  don't have any documents back.  Again, we don't know what

5  they're going to say.

6         With respect to mediation, Your Honor, with this case

7  I believe it's ultimately going to come out if we ever get to a

8  trial, there's going to be expert testimony because the

9  distribution agreement has terms which are alleged in the

10  complaint to be extremely onerous and outside, beyond any

11  reasonable market terms.  Even if they were negotiated arm's

12  length --

13         THE COURT:  Upon the debtor?

14         MR. SIEGEL:  With the debtor, correct.  Even if they

15  were negotiated at arm's length which we don't agree with but

16  even if they were, the terms themselves objectively were far

17  beyond anything reasonable that the market could produce.  This

18  was a truly insider transaction that was gone into not because

19  Inc. was trying to make money, they thought it was going to be

20  a profitable enterprise because that's what the market told

21  them no, that's not what this was about at all.

22         And we will demonstrate through expert testimony what

23  the market was and what the Weinsteins could have achieved if

24  they had actually entered into an arm's length transaction with

25  a real distributor.  And the Court will then conclude whether

1    or not these terms were reasonable -- reasonably equivalent

2    value was exchanged for these obligations.  So --

3              THE COURT:  Wait, actually, I want to ask one or two

4    quick questions in there.

5              MR. SIEGEL:  Yes.

6              THE COURT:  Okay, but you're not suing on an actual

7    fraud theory?  It's just a constructive fraud or --

8              MR. SIEGEL:  Well, we sued --

9              THE COURT:  And that was dismissed?

10             MR. SIEGEL:  -- and Judge Neiter dismissed that claim

11   with prejudice.

12             THE COURT:  Okay.

13             MR. SIEGEL:  I mean I'm not going to take an

14   interlocutory appeal.

15             THE COURT:  Okay.

16             MR. SIEGEL:  That's the status of the case.

17             THE COURT:  Okay.  And then second question, it

18   sounds like we aren't going to have accounting issues

19   particularly here.  It's not so much a question of how much

20   money.  I mean we may need to figure out how much was actually

21   paid but that's not likely to be the subject of material

22   dispute here.  It's more about yes, they were supposed to get X

23   dollars, they got X dollars but is that reasonably equivalent

24   value?  Am I correct in that impression?

25             MR. SIEGEL:  From our perspective it is.

1                    THE COURT:  Okay.

2                    MR. SIEGEL:  And we were able to identify -- before

3    we got the books and records -- so the Court must understand

4    that the complaint, the original complaint, was filed right

5    before the statute of limitations expired with no books and

6    records.  The only thing retained were bank records, and they

7    showed $130 million transferred to the Weinsteins.  If the

8    Weinsteins for any reason thought that number was inaccurate,

9    it was erroneous in some way, tell us.  But we've always

10   assumed that that's not going to be a disputed factual issue.

11                   It will be undisputed that the money was transferred.

12   It was transferred on account of obligations owing under the

13   distribution agreement and then various variations of the

14   distribution agreement subsequently and that's not really going

15   to be a disputed issue.  The issue is going to ultimately be

16   whether this was a -- that Genius Products LLC which had other

17   creditors and did not pay other creditors because it was paying

18   Weinstein, whether those obligations were reasonably equivalent

19   value or not.  And we think that is ultimately going to be a

20   matter of expert testimony.

21                   And, you know, we're prepared to go to mediation

22   whenever the Court thinks mediation is going to be appropriate.

23   Again, most of what -- from our perspective, most of the

24   discovery that we are going to be engaging is is simply going

25   to be confirmatory evidence on what our experts are going to

1  testify.  They're going to say -- we're going to get testimony

2  on what are all the distribution agreements that Genius entered

3  into.  We are going to get testimony on the other agreements

4  that Weinstein has entered into and we're going to compare and

5  contrast them with this distribution agreement.

6        And we're pretty convinced that at the end of the day

7  when the trier of fact hears this, the Court is going to see a

8  pretty dramatic disparity between what was entered into with

9  Genius Products LLC when Weinstein controlled both sides of the

10  transaction and what actual market terms were.  And all the

11  evidence that we're gaining -- we hope to gain from Weinstein

12  is basically to understand, understand why these terms were

13  entered into when they were so egregious and just confirmatory

14  evidence regarding what the market terms were.  So we

15  understand discovery process and we understand there's a lot of

16  documents and the parties are going to ask for everything and

17  that's just the way the process works, but that's where we're

18  going to open it up.

19        THE COURT:  Okay, well, here's what I'm going to do.

20  For now I just want to continue this to the same date as the

21  Drinkwater matter so that you're here at the same time and

22  vacate the existing dates.  I'll just vacate them all.  And

23  then I do want you to start thinking about who a mediator might

24  be because it seems to me that even if you're not prepared to

25  have a mediation on the merits, in light of the December 2015

1  amendments to the Federal Rules of Civil Procedure which would

2  require me to get more involved in the discovery process and to

3  look at proportionality and intelligent ways to do this, I

4  think it might be a useful exercise for you to mediate about

5  how to proceed with this case and should you bifurcate issues,

6  should you try to tee up something as a matter of partial

7  summary adjudication?

8         Is there a more effective -- cost effective way to do

9  it rather than having you spend, you know tons and tons of

10  money on administrative expenses here and, you know, what if,

11  you know, they turn out to be right and then, you know, you

12  spent all of this money and for what?  So it might be -- and

13  I'm by no means trying to pre-judge that that's the case but it

14  is a little frightening to get out there, you know, hundreds

15  and hundreds of thousands of dollars into the discovery process

16  in a case where, you know, you just don't really know how it's

17  going to play out.

18         So all right, so I'm not going to do anything now by

19  way of ordering it but start talking about it because I am

20  likely in the June status conference time frame to order you to

21  do this.  And I may just order you to mediate about whatever

22  you may need to mediate about, whether it be the merits or

23  failing that, then how to get from Point A to Point B.  All

24  right, so you referred to a June date.  Does anybody know when

25  that June date is?

1            MR. MENTON:  It's June 28th, Your Honor.

2            THE COURT:  Okay, all right.  There it is, Siegel

3    versus Drinkwater.  Okay, so I'm going to continue the status

4    conference to June 28 at 2 p.m.  I'm going to waive the

5    requirement of a status report for that particular status

6    conference because it won't be that long and then -- between

7    now and then -- and then I would like the plaintiff to lodge a

8    scheduling order -- plaintiff to lodge scheduling order

9    vacating the dates set by the -- I know it may feel like you're

10   moving backwards but it doesn't feel like that to me, November

11   -- in the November 19 scheduling order.

12           Let me just double check whether there's anything in

13   there that I do want to preserve.  The fact discovery is going

14   to drive the expert discovery so we don't want to have dates

15   for that.  I'm not going to set a deadline for pretrial motions

16   at this point or a pretrial order or pretrial conference.  We

17   had the June 2nd status conference at 9:30.  Let's make sure

18   that isn't on my calendar.  Yes, that's not on my calendar.

19   Nobody ever calendared for me anyway so this would certainly be

20   -- our June 28th status conference will be in lieu of that June

21   21st one.  So yes, there's nothing about these dates that I

22   would want to preserve.  So let's just continue it to June 28

23   at two.

24           I'm waiving the requirement of a status conference.

25   I'm telling the parties, to all parties to think about a

1   mediator.  You can go on our program -- on our panel, you can

2   go off our panel if you want.  But if you go off the panel,

3   they're going to want to be paid.  But what I think would be

4   nice here, I think you're going to want somebody who's going to

5   be available on an as needed basis throughout the course of

6   this because you may want to meet with them now to talk about

7   how best to proceed with discovery and can you bifurcate or

8   not.  And then you might later once you've done some more

9   discovery, you might want to talk to them about the merits.  It

10  might be nice to pay somebody and have them available as

11  opposed to just trying to get you one day for free from

12  somebody off the panel.  Not to say that the person you pay

13  couldn't be on the panel too.  So I leave it open to you and

14  you don't need to necessarily resolve it but it might be nice

15  to kind of think about it.  Think about how that might work.

16  And other than that then, I will see you on June 28th at 2 p.m.

17          UNIDENTIFIED ATTORNEY:  Thank you.

18          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

19          THE COURT:  Thank you very much.

20                          *  *  *  *  *

21

22

23

24

25

## C E R T I F I C A T I O N

        I, MARY POLITO, court approved transcriber, certify
that the foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the
above-entitled matter, and to the best of my ability.


/s/ Mary Polito_____

MARY POLITO

J&J COURT TRANSCRIBERS, INC.        DATE:  June 2, 2016