UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| IN RE: | . | Case No. 2:11-bk-62283-BB |
| | . | Chapter 7 |
| GENIUS PRODUCTS LLC, | . | |
| | . | Los Angeles, California |
| Debtor. | . | Tuesday, November 1, 2016 |
| . . . . . . . . . . . . | . | 2:27 p.m. |
| ALFRED H. SIEGEL, | . | |
| CHAPTER 7 TRUSTEE, | . | |
| | . | |
| Plaintiff, | . | Adv. No. 2:15-ap-01241-BB |
| v. | . | |
| THE WEINSTEIN COMPANY | . | |
| LLC, et al., | . | |
| | . | |
| Defendants. | . | |
| . . . . . . . . . . . . | . | |

TRANSCRIPT OF MOTION HEARINGS and STATUS CONFERENCE
BEFORE THE HONORABLE SHERI BLUEBOND
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

APPEARANCES:

| | |
|---|---|
| For The Weinstein Company LLC: | Fox Rothschild LLP<br>By:  ALAN R. FRIEDMAN, ESQ.<br>1800 Century Park East, Suite 300<br>Los Angeles, CA  90067<br>(212) 878-1426 |
| | Fox Rothschild LLP<br>By:  WILLIAM H. STASSEN, ESQ.<br>2000 Market Street, 20th Floor<br>Philadelphia, PA  19103<br>(215) 299-2000 |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311        Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

For Alfred H. Siegel              Robins, Kaplan, Miller & Ciresi,
Chapter 7 Trustee:                  LLP
                                  By:  DAVID B. SHEMANO, ESQ.
                                       JAMES P. MENTON, ESQ.
                                  2049 Century Park East, Ste. 3400
                                  Los Angeles, CA 90067
                                  (310) 552-0130


For Trevor Drinkwater:            Loeb & Loeb, LLP
                                  By:  BENJAMIN KING, ESQ.
                                  10100 Santa Monica Boulevard
                                  Suite 2200
                                  Los Angeles, CA 90067
                                  (310) 282-2000


Court Recorder:                   Earnestine Walker
                                  U.S. Bankruptcy Court
                                  255 East Temple Street, Room 940
                                  Los Angeles, CA 90012
                                  (855) 460-9641

- - -

1          THE COURT:  Okay, so I don't think I have anybody

2  left except for the Genius Product folks, correct?  Okay.

3  So let me just call all that at the same time.

4          And I've got 209 Genius Products LLC, Siegel versus

5  Drinkwater, plaintiff's motion for leave to file amended

6  complaint.  And then I've got 210 Siegel versus Drinkwater, a

7  motion to consolidate Adversary 15-01241 with Adversary Number

8  14-01287.  Then I've got 211 which is Siegel versus Drinkwater

9  14-01287, the status conference.  And then I've got 212 Siegel

10 versus Weinstein which is a motion to consolidate Siegel versus

11 Weinstein with the other adversary I mentioned a minute ago.

12 And then I've got 213 Siegel versus Weinstein, defendant's

13 motion for judgment on the pleadings.  And then I've got 214

14 Siegel versus Weinstein, a status conference.  I think that's

15 it.

16         So why don't we take appearances.  If you feel the

17 need to tell me you're appearing on only certain of these

18 matters go for it.  Otherwise I'll assume if you make a general

19 appearance you're appearing on all of them.

20         MR. KING:  Good afternoon, Your Honor, Benjamin King,

21 Loeb and Loeb appearing for defendant Trevor Drinkwater in

22 matters 209 through 211.

23         THE COURT:  All right.  Thank you.

24         MR. SHEMANO:  Good afternoon, Your Honor, Jim Menton

25 and David Shemano of Robins, Kaplan, LLP appearing on behalf of

4

1    Al Siegel Chapter 7 Trustee on all matters.

2              THE COURT:  All right.  Thank you.

3              MR. STASSEN:  Good afternoon, Your Honor, William

4    Stassen from Fox Rothschild appearing on behalf of the

5    Weinstein companies.

6              THE COURT:  All right.

7              MR. STASSEN:  I think, Your Honor, probably only with

8    regard to the motions relating to the Weinstein companies

9    unless the Court would like to entertain our thoughts on any

10   other issues.

11             THE COURT:  You wouldn't happen to know which numbers

12   those are, would you?  212, 213?  Yes, I think it's 212, 213,

13   214.  Okay.

14             MR. STASSEN:  Thank you, Your Honor.

15             THE COURT:  All right.  Is that everybody?

16             MR. FRIEDMAN:  Well --

17             THE COURT:  Yes, no?

18             MR. FRIEDMAN:  Alan Friedman also on behalf of The

19   Weinstein Companies for the same matters as Mr. Stassen.

20             THE COURT:  All right, fair enough.  Okay.  So let's

21   just kind of plug our way through these.  I think frankly the

22   motion for leave to file an amended complaint might make sense

23   to do it first because that affects how I feel about the

24   motions to consolidate.  So let me give you my tentative ruling

25   on that.

5

1          You know, the black letter rule of law or whatever is

2     that an amended complaint will relate back to the date of the

3     filing of the original complaint and therefore not -- you

4     wouldn't have a statute of limitations problem if the first

5     complaint had been timely.  If the later complaint arises out

6     of the same set of facts and occurrences.  And it's just, you

7     know, a different theory arising out of that.  Well, it does in

8     this case but only because the first amended complaint -- I

9     didn't look at the original I looked at the first amended one

10    -- only because the first amended complaint is so generic that

11    it's just, you know, improper transfers, transfers to insiders

12    that well, gosh, any transfer you could come up with would

13    probably fall within the scope of that.  So I don't think it's

14    supposed to work that way.

15          And I agree with the defendant that simply saying I

16    reserve the right to amend later when I discover something that

17    can't broaden the scope of what relates back.  Because then,

18    you know, everybody would say that and everything would always

19    relate back.

20          And I don't think the dollar amount or the magnitude

21    of it is the issue here because we do have -- there is an

22    exhibit -- the defendant was talking about there being $80,000

23    and he thought that was all that was at stake -- or $802,000,

24    something like that.  There is a list of transfers attached to

25    the first amended complaint.  I don't think that's the case

1 because we do -- I think that larger number was thrown around

2 in the body of the complaint.  But nevertheless it did seem to

3 me that it was -- there's no meat in this original complaint

4 about the specifics of it.

5      And yet when you talk about the complaint against

6 Weinstein -- let me say it differently.  The first amended

7 complaint it really sounds like there's money being transferred

8 away and, you know, here's our attachment of these particular

9 transfers.  Whereas when you start talking about the Weinstein

10 complaint it's talking about entering into these whole

11 transactions and entering into contracts pursuant to which the

12 amounts that are being paid under these contracts are not being

13 -- in exchange for reasonably equivalent value.  And I don't

14 want to get ahead of ourselves to the motion for judgment on

15 the pleadings.  But it isn't just that the dollar amount is

16 being transferred away.  It's the whole context in which those

17 -- the obligation to make those payments arose by virtue of

18 entering into these agreements and the way they were

19 structured.  So I do think it's different in character.

20      So that's my tentative.  And before I hear from the

21 trustee why don't I give the Weinstein companies an opportunity

22 to say what I just said perhaps better or more thoroughly so

23 that you could then respond to both what I've said and whatever

24 they've said at the same time.  Did you want to elaborate on

25 what I said or correct me since I've been mistaken so many

1 times today?

2      MR. KING:  No, Your Honor.  I think you summarized it

3 pretty well.  I just wanted to say that, you know, in terms of

4 the inclusion of the number that was put in there, there are

5 other provisions of the first amended complaint that actually

6 tend to misdirect someone from ever making the connection that

7 this was related to the Weinstein transactions whatsoever.  I

8 did particularly mention the time frame being something that

9 picked up at a different time frame than when these agreements

10 were entered into.  So allowing the amendment would actually

11 open us up to an earlier year in the time period which would of

12 course not cause someone who's presented with that complaint to

13 believe they were being sued or could be sued based upon the

14 Weinstein transactions because it wasn't even included in the

15 time frame as set forth.

16      THE COURT:  Well, okay, but let me make sure I

17 understand what you're saying.  The initial -- the entry into

18 the agreements was beyond the four year statute of limitation

19 and that's part of what your basis for your motion to dismiss

20 is.  But there were transfers made under those agreements or

21 pursuant to those agreements during the four year reach back.

22 So are you saying the first amended complaint is in even

23 smaller time frame than that four year period?

24      MR. KING:  No.  The first amended complaint covers

25 the four years prior to the petition date.  So that's time in

1  which -- it goes to about mid-2007.  But the key --

2       THE COURT:  Okay.  That is the same time period as

3  the facts under the Weinstein theory.

4       MR. KING:  Yes, and no.

5       THE COURT:  It's just -- well, the transfers that

6  they're seeking to recover it is.  You're arguing that the

7  contracts were entered into before that four year period.  But

8  they're not trying to recover amounts that were paid before the

9  four year period.

10       MR. KING:  Your Honor, as I stand here today I don't

11 know when the first payments were made under the distribution

12 agreements.  We're talking about but they were in place for a

13 year before that time period picks up.  I don't know if there

14 were payments during that year.  I presume there would have

15 been because the arrangement was --

16       THE COURT:  Okay.  But that's not what they're

17 seeking to recover in the second amended complaint.  They're

18 not trying to go back more than four years.

19       MR. KING:  Well, they're actually challenging the

20 entry into those transactions themselves as fraudulent

21 conveyances which means they are saying that in June, 2006

22 wrongdoing occurred by virtue of entering into those

23 transactions which was not within the scope of the original

24 first amended complaint which picks up sometime around the

25 middle of 2006.

1          THE COURT:  Well, is that true or are you just trying

2   to recover transfers that were made under that agreement?

3          MR. KING:  Well, if you read their first second

4   amended complaint, their proposed second amended complaint it's

5   very clear that they are alleging the entry into those

6   agreements as themselves being a fraudulent conveyance and

7   engaged in with fraudulent intent.

8          THE COURT:  Okay.  But they're not trying to recover

9   transfers made under that agreement more than four years before

10  the bankruptcy, are they?

11         MR. KING:  Well, they have -- what they have said is

12  over the entire life of the relationship there was $130 million

13  transfer or some number around there.  I don't have a schedule

14  of the payments.  So again I'm not in a position to say whether

15  any of those were in that year before that.  But I think

16  they're saying all transfers that were made between the time,

17  you know, pursuant to those agreements, and I don't think

18  they've carved out that those -- that the earliest was not made

19  until the 2007 time frame.

20         But the key I'm going back to is that in the -- when

21  you look at the first amended complaint throughout it there are

22  statements that suggest, you know, again transfers as a defined

23  term throughout the first amended complaint.  And it's

24  literally defined as the transfers identified on that Exhibit A

25  to the first amended complaint which is the $802,000 amount.

1  When you look at their -- and I'm specifically looking at

2  Paragraph 25 of the -- of this first amended complaint which

3  they cite in their reply as something that shows that they

4  already alleged --

5          THE COURT:  I'm sorry, which paragraph number?

6          MR. KING:  Paragraph 25.  It's one of the paragraphs

7  that they suggest is incorporated by reference into the breach

8  of fiduciary duty cause of action and that somehow, you know,

9  because it uses the terms the transfers were made for their own

10 personal use it goes to the motive argument.  If you see there

11 they say that it was for his own personal use.  How could funds

12 that were transferred to the Weinsteins be for the defendant's

13 personal use?  He's transferred them away.  That's --

14         THE COURT:  Well, unless Drinkwater owns an interest

15 in the entity to which he's transferring it, or would otherwise

16 derive some benefit from pleasing the Weinstein companies.

17         MR. KING:  But they have no -- well, his own personal

18 use is different than his own personal benefit.  So that is a

19 phrase that would lead one to believe those are funds he

20 received that he could use.  So it's not just that the terms

21 are vague here it's that there are terms in here that would

22 lead one to conclude they're talking about a different claim

23 than what they're saying here.  The time periods are different,

24 some of the language keys off of that.

25         If you look at the breach of fiduciary duty claim in

1  the original complaint it says it incorporates by reference the

2  rest of the first amended complaint and it actually uses -- and

3  let me direct you to that paragraph.  In Paragraph 48 which is

4  the breach of fiduciary duty cause of action it says here that

5  defendant breached his fiduciary duties to the debtor and its

6  creditors, as described in detail herein.  There's no detail at

7  all regarding the actual Weinstein transfers or transfers to

8  insiders, but the complaint is filled with detail about those,

9  capital T, transfers that are listed in that schedule.

10        So it is -- it is not even close to something that

11  would put Trevor Drinkwater on notice that he is being sued for

12  the entry of -- into fraudulent distribution agreements in June

13  of 2006 or that he's being sued for the proceeds that were paid

14  pursuant to those agreements and the detail that is included in

15  the proposed second amended complaint is a testament to that.

16  That's why if you look at it they're two totally different

17  complaints.  They're complex transactions, their theories are

18  complex for why this is fraudulent transfer or I think it's now

19  they're pitching it solely as breach of fiduciary duty, but the

20  facts are quite elaborate.

21        And the idea that they couldn't have put that in this

22  first amended complaint because they didn't know enough

23  information just doesn't hold up when you look at what they

24  actually had access to much earlier than today.  They had

25  copies of these agreements which are basically the 90 percent

1  of the allegations that the agreements themselves were so

2  onerous and burdensome that they couldn't have possibly, you

3  know, been entered into with any intent other than a fraudulent

4  intent.  So that's the essence of it.  I'll leave to address

5  it, but we agree with Your Honor's tentative and we believe

6  that the relation back doctrine is the key to this.

7        Certainly there are liberal standards on amendment

8  but when you're talking about relation back you're talking

9  about depriving someone of their substantive right to assert

10 the statute of limitations in connection with the claims.  And

11 in this case, this case was filed on -- in 2011, I believe, and

12 the trustee had a couple of years to location information and

13 allege claims including locating these agreements which were

14 referenced in public filings.  They weren't mysterious

15 agreements that were held secret.  They could have obtained

16 copies of those agreements from numerous sources.

17        So I think when you consider the argument that they

18 say well, you know, we had to do an investigation, we had to

19 find out additional facts you're going to find that if you

20 really look at it the grand total of their efforts to get

21 documents from my client were three letters that my client

22 didn't receive because he had quit the company's employment a

23 year before the bankruptcy was even filed.  He had moved on and

24 he had designated someone else to receive the mail for the

25 company.  He didn't receive the letters and so he didn't turn

1 over documents immediately.

2       But there are more ways to get documents than to send

3 a letter.  Go to a court, you get an order for a turnover of

4 the documents, you serve a subpoena on the individual for the

5 documents.  None of that happened.  So I think when you look at

6 this they had ample opportunity to do an investigation leading

7 up to the actual expiration of the statute date.  They didn't

8 do it and now what they're trying to do is go back and

9 prejudice my client two years after the fact by reaching back

10 on a vague complaint and saying well it really alleges these

11 Weinstein company claims.  Thank you.

12       THE COURT:  Okay.  Thank you.  Whichever one of you

13 would like to argue.

14       MR. MENTON:  Your Honor, what Mr. King was doing was

15 rearguing a motion that had already been heard before this

16 Court a year ago.  To go back -- and specifically he's talking

17 about the motion to modify and the motion to compel.  All of

18 those arguments were made back at the time.  But let's step

19 back.  Mr. Drinkwater -- Mr. King alluded to three letters that

20 were sent and made reference to Mr. Drinkwater never having

21 received them.  They were sent not only to his business but to

22 his home.  And in declarations before this --

23       THE COURT:  Okay.  Let me stop you for a second.

24 This wasn't all about tolling.  I didn't really see like an

25 equitable tolling argument, I mean, because you could try to

1 move for leave to amend now.  Say we know it doesn't relate

2 back, but we shouldn't be required to have it relate back

3 because it should be told.  Did I just not read that or was

4 that not in here?

5      MR. MENTON:  It wasn't expressed, Your Honor, but

6 through the whole motion itself we talk about why the trustee

7 was in the position he was in.

8      THE COURT:  Well, you do.  But you didn't analyze it

9 that or the authorities that way and I didn't analyze it that

10 way.  I looked at it as what this was all about was whether it

11 relates back.  That was really the way I looked at it.  Because

12 to me it is a different analysis to say tolling and even then

13 there's an absolute outside and it's a different analysis.  So

14 I know that you blame him a fair amount in here, but to me that

15 was like color, you know, just trying to get me sufficiently

16 annoyed to say it's okay.  I didn't analyze it in terms of a

17 tolling analysis.  I didn't see either side citing authorities

18 about it.  Were there any authorities that I missed in here --

19      MR. MENTON:  I didn't cite them --

20      THE COURT:  -- about tolling?

21      MR. MENTON:  -- in the brief, Your Honor.  And to be

22 honest it wasn't meant to just provide color.  It was to

23 provide an explanation about where we've been and how we got to

24 where we are.  And so the point in all of that was not to

25 rehash the past, but to demonstrate or to show the Court that

1 the trustee was in an untenable situation.  There was limited

2 amount of information in the public domain.  He had limited

3 amount of information available to him in light of Mr.

4 Drinkwater who did not provide information or cooperate prior

5 to the filing of the complaint.  And the complaint itself

6 didn't cause Mr. Drinkwater -- the complaint itself as you well

7 know has 11 claims for relief.

8         And those claims include breach of fiduciary duty for

9 failing to turnover books and records, for having -- for

10 failing to cooperate.  And even that in May of 2014 didn't

11 cause Mr. Drinkwater to tell the trustee do -- I've got five

12 storage units of books and records that you've been trying to

13 get but I didn't turn them over.  But now that I've been sued

14 maybe it's a good time for me to try to cooperate.  And none of

15 that happened.  And Mr. Drinkwater didn't advise the trustee.

16 So at the time of the complaint there was very limited

17 information.

18         THE COURT:  Okay, but when did you get the

19 information that you -- that finally led you to say we should

20 file a motion for leave to file the second amended complaint?

21         MR. MENTON:  Yes.  That was a long process, Your

22 Honor, and how that happened, just to go back --

23         THE COURT:  Well, let's not go back.  Let's just tell

24 me when you actually got it.  Did you then promptly bring this

25 motion for leave to file a second amended complaint, or did

1 that take another couple of years?

2       MR. MENTON:  We started to get books and records from

3 Mr. Drinkwater -- no, we actually got them on our own in August

4 of 2015.  There were over 900 boxes of documents.  And we only

5 got those after years -- over three and a half years Mr.

6 Drinkwater had those boxes.  So we had to go through over 900.

7 And I went to those storage units myself.  There was no

8 organization to those boxes and we had to get those boxes and

9 then through my law firm we had to go through those boxes and

10 do an investigation and scan those documents and start

11 reviewing those documents.

12       In addition, we didn't get -- after Mr. Drinkwater

13 was compelled by Mr. -- by Judge Neiter to turn over books and

14 records that he had we ended up getting a hard drive finally

15 from Mr. Drinkwater.  That only was in the fall of 2015 and

16 there was some glitches and we got a forensic image of that in

17 February of --

18       THE COURT:  Well, here's what I'm confused about

19 Siegel versus The Weinstein Company, the other adversary

20 proceeding that we're here on today, 214 is the status

21 conference, that was filed in May 8th, 2015.  So before that

22 probably at least a month before that because it had taken you

23 some time to draft you knew that you thought these -- there was

24 a problem with these distribution agreements and that they

25 were, you know, fraudulent transfers vis-á-vis the debtor.  And

1  you knew Drinkwater was the guy who was in charge at the time

2  this happened.  So certainly by April of 2015 you knew about

3  all these causes of action.  You knew enough then.  But this

4  motion go brought -- I mean this motion to amend your complaint

5  got filed on what?  This one got filed in -- what's the date on

6  this thing -- October of 2016 like a year and a half later,

7  right?

8          MR. MENTON:  Yes, Your Honor, the timing is right,

9  but we were going -- we knew that information.  We didn't have

10  other information that became available through the books and

11  records that we reviewed.  So for instance payroll records in

12  other words, there was $800,000 that was from bank records.

13  But that wasn't all the monies that Mr. Drinkwater got during

14  this period of time.  And only through books and records were

15  we able to determine that more monies were given to him.

16          THE COURT:  Okay.  But the 130,000 million new claim

17  about entering into these agreements with the Weinstein Company

18  that isn't more money that you found that went to Mr.

19  Drinkwater.  That's money that went to Weinstein that you knew

20  about in April of 2016 when you brought the adversary

21  proceeding against the Weinstein Company.  Is there something

22  you didn't know at the time you brought the adversary against

23  the Weinstein Company that you only learned later?  I mean I

24  guess what I'm trying to say is why wasn't this motion at least

25  -- if you're trying to say that I should look at, even though

1  it's not briefed as such, any kind of estoppel claim and that I

2  shouldn't look at this as being -- that you didn't unreasonably

3  delay why was this motion brought in October of 2016 instead of

4  April or May of 2015?  I don't see anything that you needed to

5  learn other than what you knew at the time you sued Weinstein

6  in order to want to bring this complaint, right?

7          MR. MENTON:  Excuse me, Your Honor.

8          THE COURT:  I'm not sure it makes a difference

9  because I think we'd be having the same discussion in May of

10 2015.

11         MR. MENTON:  There was a number of information.  We

12 were able to look at the books and records, we were able to

13 look at internal documents to discern what Mr. Drinkwater was

14 saying and doing that period of time.  We also wanted to take

15 his 2004 examination which we put in front of Judge Neiter in

16 order to gain information based on that 2004 Exam.  So you get

17 Mr. Drinkwater under oath to provide information concerning

18 assets and liabilities and it obviously went into the Weinstein

19 case.  And that did not happen until 2000 -- August of 2016.

20 And there were stipulations that I worked with Mr. King on over

21 time.  And the notion was that Mr. King did not want to have

22 that 2004 Examination go forward until the trustee had had an

23 adequate time, in his view, to review the books and records so

24 that Mr. Drinkwater would not have to come back.  And so that's

25 all part of the process over a long period of time in order to

1  look at the books and records and to take his exam -- and to

2  look at those books and records and gather information and to

3  take his 2004 Exam which is what we did.

4          And then after that we entered into a stipulation

5  that the Court approved to allow additional time to resolve the

6  matter and it didn't resolve it unfortunately at this time and

7  so we ended up bringing the motion.  But it was all predicated

8  on a notion of figuring out and looking at what role did Mr.

9  Drinkwater play other than what may be in a public domain.

10  Because in a public domain it didn't go into chapter and verse

11  about what Mr. Drinkwater's role was internally.

12          And through his 2004 Examination we in our view got a

13  much clearer picture in terms of his talking about negotiating

14  a deal and how one signed it on his birthday and all of this

15  stuff.  And all of that is informed by -- all of that went into

16  -- and looking at issues about, you know, for instance looking

17  at the internal information with respect to projections that

18  were done at the outset or looking at time periods and

19  financial distress that the company was facing.

20          THE COURT:  Well, you were already claiming there

21  were fraudulent transfers because you had already sued the

22  Weinstein Company by May of 2015.  Okay.  And now what was Mr.

23  Drinkwater's job title, or what was his role?

24          MR. MENTON:  He was the CEO of the company.

25          THE COURT:  Okay.  So you needed to know more to know

1 his involvement?  I mean, you knew that the transactions you

2 were alleging already that the transactions entering into the

3 transactions on behalf of the company was a fraudulent

4 transfer.  And, I think, I have to double check, I think you're

5 alleging actual fraud as well.  And you knew Drinkwater was the

6 CEO.  I guess I'm not really -- I don't really know that the

7 additional -- that you didn't already have enough information

8 in April or May of 2015 to have sought leave to amend then.

9 But putting that aside why don't we move on to the other

10 question.  Why don't you address the does it relate back, the

11 thing that was really the bulk of what the motion seemed to be

12 talking about.

13          What is it that -- well, to reiterate what I said

14 before I think notwithstanding what Mr. King said I do think

15 that you have allegations that are broad enough in your first

16 amended complaint that you could shoehorn this in.  So, for

17 example, 49, I mean you say for example in the first amended

18 complaint Paragraph 49 plaintiff has informed and believes that

19 defendant either alone or in concert with other directors or

20 officers breached this fiduciary duty to the debtor and their

21 creditors by causing the debtor to issue payments of debtor

22 funds to insiders including officers, directors, and members of

23 the debtor in an effort to avoid paying creditors to the

24 debtor.

25          Well, if I understand correctly at the time the

1 Weinstein Companies were insiders and there were payments that

2 were made to the Weinstein Company that you're challenging.  So

3 technically I think you -- it's within this, but if it's within

4 this so is every dollar they ever paid to anybody who is an

5 insider under any theory and I don't think this is specific

6 enough that you can say oh well it's the same set of facts and

7 occurrences because you really haven't given me any specific

8 facts and occurrences.  So why don't you address that.

9             MR. MENTON:  Certainly.  So Paragraph 49 makes that

10 -- it helps out in that regard.  Paragraph 52.  So the

11 defendant used his position, control and power as a director

12 and officer of a debtor to issue payments of debtor fund to

13 insiders.  Again, including officers, directors, members of the

14 debtor in an effort to avoid paying creditors of the debtor and

15 in so doing breached his fiduciary duty to the debtor and its

16 creditors.

17             And then we get to Paragraph 53.  Plaintiff is

18 informed and believed that defendant either alone or in concert

19 with other directors or officers of the debtor authorized

20 payments in excess of $130 million to insiders including

21 officers, directors and members of the debtor in an effort to

22 avoid paying creditors of the debtor and thereby breaching his

23 fiduciary duties by reducing the assets available to pay the

24 debtors, creditors in said amount.

25             So those are some of the paragraphs.  We have $130

1  million insider Weinstein in the opposition -- and in

2  connection with this they didn't file a motion to dismiss, they

3  didn't file a motion for a more definitive statement.  They

4  actually answered the complaint and denied the allegation

5  specifically.  So they had some awareness of this.  And in

6  addition they ended up propounding discovery that asked not

7  only for what are the facts that support 53, but they also ask

8  --

9         THE COURT:  Well, at any point did you respond to

10 those discovery requests to say payments made under the

11 distributions agreement with the Weinstein Co.?  And if so,

12 when?

13        MR. MENTON:  What we did, Your Honor, was we entered

14 a propounding discovery to deal with that issue.  And what we

15 did in those discovery responses we indicated, because this

16 after Judge Neiter had entered his order and what we said was

17 are --

18        THE COURT:  Which order?

19        MR. MENTON:  There's two orders.  He issued -- in

20 September of 2015 he entered two orders.  One was a motion to

21 compel that required Mr. Drinkwater as the debtor's

22 representative to file schedules which hasn't happened yet to

23 appear for a 2004 exam and to turn over all the books and

24 records that he had.

25        The second was the motion to modify which vacated all

1  of the dates in this case.  And the predicate for that was that

2  we needed time to do our investigation.  And the concept was to

3  do the investigation as a result of which the trustee would

4  then be able to, in his view, make a determination about what

5  we were going to do with this action.  Whether we were going to

6  dismiss it outright based on what that investigation showed or

7  whether we would do something else.  Whether we would try to

8  amend the complaint for consideration by the court or try to

9  resolve the matter.  We've attempted to resolve the matter it

10  hasn't happened it.  Okay.  Fine.  He decided that based on

11  that investigation that took place overtime to try to seek

12  amendment.  And that's what we've done.

13         So in other words, in those discovery responses we

14  made clear that we wanted that process to go through.

15         THE COURT:  Okay.  I thought your point was you were

16  telling me that in discovery responses when they asked you what

17  53 was based on that you had been telling them that it was

18  based on things like this Weinstein agreement -- the

19  distribution agreement that you're challenging in this --

20         MR. MENTON:  What I'm attempting to suggest, Your

21  Honor, is the comment that they've made that they had no notice

22  at all about how could this deal with the Weinstein matter at

23  all?  And what I'm suggesting is that they certainly were aware

24  that the $130 million dealt with Weinstein.  And why do we know

25  that?  Because they asked for document demands -- a document

1  demand saying if you have a claim against Drinkwater that's

2  related to Weinstein provide all the documents in that regard.

3  And in response to that we had said our investigation is

4  ongoing and let us conduct the investigation.

5         THE COURT:  So you said maybe yes, maybe no.  They

6  asked whether this had anything to do with Weinstein and your

7  response was maybe yes, maybe no?

8         MR. MENTON:  What I said is we are going to continue

9  our investigation.

10        THE COURT:  Okay.  Well, I'm not really sure what

11 this really proves.  This is September of 2015 that you're

12 telling me about.  You're saying because of the way they formed

13 their question that that meant they must have been on notice

14 because they were asking about something involving Weinstein?

15        MR. MENTON:  Yes, Your Honor.

16        THE COURT:  Okay.  I see a head shaking over here.

17 You're trying to say that you did not --

18        MR. KING:  No, Your Honor.

19        THE COURT:  -- make such a discovery request?

20        MR. KING:  Our request said state all facts on which

21 you base your allegation in Paragraph 53 that, quote.  And we

22 quoted language from the first amended complaint that said $130

23 million.  We never said it had anything to do with Weinstein.

24 At that point we knew they were -- they had already told us in

25 a Rule 26(f) conference that they were planning to possibly

1  seek leave to amend to allege the actions against the

2  Weinsteins, but they had already -- that the same allegations

3  they had alleged against the Weinsteins against Trevor they

4  made that clear by that point.  So this discovery was not

5  illuminating in that regard.  But our point was we simply asked

6  them for the facts behind that paragraph and they objected.

7  They didn't provide a response.  It was all objections based on

8  the fact that they were undergoing this process.

9          THE COURT:  Well, in any event in May of 2015 there

10 had been a separate lawsuit filed against Weinstein and I think

11 that $130 million number showed up.  So presumably they could

12 put two and two together by that point that maybe that's where

13 that number comes from.  But that to me doesn't mean when this

14 complaint was filed a year earlier that this is specific enough

15 to cause that to relate back.  The fact that later facts and

16 circumstances might have caused him to think oh, I wonder if

17 they're ever going to come after me for this amount, that's a

18 different question than whether the first amended complaint is

19 based on the same set of facts and occurrences -- let me say it

20 differently.  Whether the second amended complaint is seeking

21 to add a claim that arises out of the same set of facts and

22 occurrences that were actually pleaded in the first amended

23 complaint.  So you got anything else for me on that one?

24         MR. MENTON:  The point was -- the purpose of the

25 second amended complaint was to provide the Court with context

1  to provide details concerning $130 million that is specifically

2  referenced in the complaint.  There is reference in the

3  complaint to mismanagement.  There is reference in the

4  complaint to -- the mismanagement having caused the company to

5  go out of business, to cease operations earlier on in

6  Paragraphs 12, 18, and 25.  Those are incorporated by

7  reference.  There is talk about Mr. Drinkwater using his

8  position, power and control to transfer monies to insiders.

9         And it specifically identifies 130 million.  What we

10 are attempting to do in the amended complaint was to provide

11 some additional information and detail and clarification on

12 that.  I understand where the Court seems to be coming out on

13 this.  And so if the Court's not inclined to grant the motion

14 that's fine.  What we will do is we will just go back.  We've

15 got 11 causes of action, we have breach of fiduciary duty

16 claims and we have fraudulent transfer claims.  And we will go

17 forward and we will reengage onto the discovery front and do

18 supplemental discovery.  And we may have some disputes with the

19 discovery they've done, and move forward.

20        THE COURT:  All right.  Okay.  We'll, I'm going to

21 deny Number 209.  And let me get an order to follow from Mr.

22 Drinkwater's lawyer?

23        MR. KING:  Yes, Your Honor.

24        THE COURT:  Okay.  From Drinkwater.  All right.

25 Okay.  So then in light of that we don't have the exact sort of

1  overlap that we would have if we had a second amended

2  complaint.  So I think it makes sense to deny the motions to

3  consolidate.  However, I'm a big fan of efficiencies and I have

4  no problem with trying to keep everything kind of moving on the

5  same sort of general time frame.  I think it makes sense to not

6  to try -- to try if possible to -- if there's somebody you want

7  to depose to do it once and to cover, you know, both

8  adversaries at the same time if you can.

9         And then when it comes to -- if we're ready for trial

10 I don't know what -- I haven't looked at whether everybody's

11 consented or whether there's issues about whether I can enter a

12 final order or can't enter a final order, whether there's jury

13 trials or not.  I haven't even looked at any of that.  But when

14 we get to a pretrial conference we can certainly talk about

15 what's going to get tried where and when and whether this

16 should be combined or that shouldn't be combined or if there's

17 certain issues we should try together or not try together.  We

18 can figure that out as we do.

19        So with that I'd be inclined to deny the motions to

20 consolidate.  Unless anyone wants to be heard on those?  No?

21        MR. KING:  No, Your Honor, we would submit on that.

22        THE COURT:  All right.

23        MR. MENTON:  That's fine, Your Honor.

24        THE COURT:  Okay.  So I'll deny that.  I'll deny both

25 of those.  So that's 210 and 212.  And who wants to get me

1 orders on those?  You'll do that, too?

2          MR. KING:  We'll do that as well.

3          THE COURT:  All right.  Okay.  Order to follow from

4 Drinkwater.  All right.  That's very gentlemanly of you.  Thank

5 you.  All right.  Then we've got status conference, 211.  So

6 let's come back to that one in a minute.  I guess we're going

7 to try to consolidate -- coordinate it with the other matter

8 anyway.  And then I've got 213.  All right.  So 213, that's the

9 motion for judgment on the pleading.  And I know there was some

10 argument about whether or not we're -- you're just trying to

11 reargue whatever Judge Neiter did before.  Is it law of the

12 case or not law of the case?  I don't intend to be bound by law

13 of the case per se.

14          I mean if there is an order that he entered that's

15 binding somebody would have to move to reconsider it.  But he

16 didn't really reach this.  He sort of left it -- he kind of

17 left open the question of whether this was or wasn't something

18 that might be done by the -- barred by the statute of

19 limitations.  And now I'm looking for the page that I could

20 swore was folded over, but it doesn't seem to be folded over

21 now.

22          Anyway, all right.  I'm sure it's here someplace.  So

23 my tentative on this one -- let me see if I can articulate

24 this.  Okay.  So the contention that's being made is that

25 because the contract was entered into the distribution

1    agreements between Genius Products and the Weinstein Company

2    because it was entered into outside the applicable statute of

3    limitations period that therefore the obligations created by

4    that agreement can't be avoided.  And because the obligations

5    created by that agreement can't be avoided then if you later

6    make a payment that was required under that contract then it's

7    -- since the satisfaction of an antecedent obligation is

8    reasonably -- or its value, not necessarily reasonably

9    equivalent, but its value for fraudulent transfer analysis then

10   you can't possibly have a fraudulent transfer claim when it's

11   simply paying an amount that fell due under a contract that can

12   no longer be avoided as a fraudulent transfer under statute of

13   limitations problem theory.

14         That sounds good, but I'm not prepared to get there

15   yet, because I think it can potentially be much more

16   complicated than that.  I think you can have a fact intensive

17   analysis under sort of a variety of circumstances.  This is a

18   distribution agreement and it may -- and I have to tell you I

19   haven't pulled out the specifics of the agreement to read it,

20   but it isn't going to tell us the actual dollar amounts that

21   are due.  It's going to give us formulas and things like that.

22   So subsequent events are going to determine how much you

23   actually have to pay and when under that contract.

24         So although when we think, we bankruptcy types think

25   about when a claim arises for the purpose of, you know, whether

1  it falls within the scope of a discharge or whether you have to

2  file a proof of claim we have this notion that, you know, once

3  the contract's signed that anything arises under it relates

4  back.  I don't think that's the same exact analysis under

5  fraudulent transfer analysis.  And it may well be when you have

6  a contract that sort of governs the parties -- the way they're

7  going to relate to each other but the actual duty to pay a

8  particular amount doesn't arise until later I'm not sure but

9  that you can't say you ought to look at -- when you're applying

10 the statute of limitations that you only have to look back at

11 the point in time at which the obligation arose and not

12 necessarily when the contract that caused that obligation to

13 arise was done.  So that's a, you know, that's a slightly more

14 complex analysis.

15        And I've cited a couple of cases in the tentative,

16 none of which is binding on me, because they're from elsewhere,

17 but I think they're analogous and perhaps instructive.  And

18 I've cited In Re Omega Door, 399 B.R. 295 which is a Ninth

19 Circuit -- (6th Cir. B.A.P. 2009).  And Advanced

20 Telecommunications Network, 490 F.3d, 1325 (11th Cir. 2007).  I

21 think those cases were actually talking about payments due

22 under a prom note and a series of payments.  And they were even

23 willing to say well you don't necessarily have to go back to

24 the date the prom note was executed, that you could actually

25 look at the due date of a particular payment and ask whether

1  that payment could be a fraudulent transfer.  That's a

2  different fact pattern.  These aren't binding on me anyway.

3        But my point is I actually would want to look at that

4  pretty closely to see well when did the obligation actually

5  arise?  And I think it may well be the case that you can say at

6  that point what were they getting in exchange for making that

7  payment especially in light of the fact that at the time they

8  were making that payment the obligation -- the entry into that

9  distribution agreement was still avoidable potentially as a

10 fraudulent transfer.  It hadn't ripened into being unavoidable

11 because the statute hadn't run yet.

12        So if the agreement -- even if what you say about,

13 you know, you can't avoid -- you're satisfying an antecedent

14 obligation because it relates back to the date of the contract

15 if the contract's made in 2006 or whatever year it's made in if

16 you're making a payment in 2009 at a time when you still could

17 have avoided the payment as a fraudulent -- the contract as a

18 fraudulent transfer maybe that's okay, too.  So I just wasn't

19 so ready to decide on that.  Not to say you shouldn't, you

20 know, come back with me with that argument if we get to trial

21 and maybe by then I will feel differently about it.

22        But at this juncture I'm not so ready to say, you

23 know, slam dunk obviously no way they could come back at you

24 for anything.  Because the way I read the complaint they are

25 alleging that the entry of the -- into the distribution

1 agreement was itself a fraudulent transfer.  But my

2 understanding was they were only seeking to recover amounts

3 paid under that agreement during the statutory period.  And is

4 that a fair characterization, Mr. Menton?

5          MR. MENTON:  Yes, Your Honor.

6          THE COURT:  Yes.  Okay.  So that's my tentative.  And

7 I guess before I hear from Weinstein Company maybe the trustee

8 wants to -- is there anything you want to correct or elaborate

9 or --

10          MR. SHEMANO:  Your Honor, I think you've got it

11 exactly right.  And I would point out that they do not cite a

12 single case or authority for their position.  The cases that

13 the Court -- we cited and the Court picked up on are to the

14 contrary.  And I think the Court is correct.  And we're only

15 trying to avoid and recover the transfers made within a four

16 year period.  And we're ready to go to trial on that issue.

17 And their statute of limitations just fails.  They do not have

18 any authority for it.

19          THE COURT:  Okay.  All right.  Who wants to take that

20 one?

21          MR. STASSEN:  Thank you, Your Honor.  For the record

22 William Stassen for the Weinstein Companies.  I'm not sure what

23 order to take this in, but let me start with what was just

24 said.  And that's with regard to what the complaint seeks.  I

25 read the complaint differently.  So if you look at the

1  complaint, I don't know if Your Honor has it there with you.

2           THE COURT:  I do.  If I can just lay my hands on it.

3  I've got -- this is -- the status conference here is 214 so it

4  should be in this stack.  And am I looking for just one or is

5  there a first amended or --

6           MR. STASSEN:  It is -- I don't think there's a first

7  amended, Your Honor.  The date -- the file date is May 8th,

8  2015.

9           THE COURT:  I got your answer.  Let's see, I thought

10  I had the complaint.  Well, it should be in your motion, too.

11  Is it not in your motion or no?  Maybe not.

12           MR. STASSEN:  It is probably attached to that.  If

13  not, Your Honor, I can share my copy and go by memory which is

14  fine.

15           THE COURT:  Well, hang on.  It should be here.  I can

16  also call it up online.  So is there a particular part you want

17  me to look at?

18           MR. FRIEDMAN:  Your Honor, I have an extra copy.

19           THE COURT:  You have an extra copy?

20           MR. FRIEDMAN:  It might be Exhibit 2.  I'm not sure.

21           THE COURT:  To the motion?  I know I saw it

22  somewhere.  It's got to be here.

23           MR. FRIEDMAN:  What I have here is Exhibit 2.  And

24  it's Document Number 66.

25           THE COURT:  I can't find anything today.  I'll call

1  it up.  Document 66.  I'll get it online.

2           MR. MENTON:  Or is it Document Number 120?

3           THE COURT:  120.

4           MR. MENTON:  Filed on 5/8.

5           THE COURT:  Why don't you bring it up.

6           MR. FRIEDMAN:  I may have underlined something,  I

7  don't think you'll be --

8           THE COURT:  I'll ignore your underline.

9           MR. FRIEDMAN:  All right.

10          THE COURT:  I won't tell anybody what you underlined.

11 Thank you.

12          MR. STASSEN:  So first let me say when --

13          THE COURT:  Just a second.  I'm looking around -- oh,

14 there it is.  Thank you.  I knew it was here someplace.  Okay,

15 I'm ready.  Where am I supposed to look?

16          MR. STASSEN:  Well, first let me say, Your Honor,

17 earlier in the hearing it related to Mr. Drinkwater I think

18 Your Honor very appropriately described the complaint and

19 claims.  And that is that they are based on the nature of the

20 transactions, the underlying transactions and how onerous they

21 are, et cetera, et cetera.  And so if Your Honor would turn to

22 Paragraph 49, and this is within the specific claim for

23 constructive fraud.

24          THE COURT:  Okay.  Circled and underlined.  Sorry.

25 Oh, wait, I said I wasn't going to say that.  Okay.  Yes.

1              MR. STASSEN:  Of course we'll ignore that.

2              THE COURT:  Yes.  Strike that.

3              MR. STASSEN:  Paragraph 49 says that -- specifically

4    says that the debtor did not receive reasonably equivalent

5    value in exchange for the distribution agreement.  So it's

6    focused on the agreement itself.

7              THE COURT:  Well, that's the allegation.  But the

8    prayer --

9              MR. STASSEN:  Yes, I understand --

10             THE COURT:  -- is a different question.

11             MR. STASSEN:  Your Honor.

12             THE COURT:  Okay.

13             MR. STASSEN:  And then if Your Honor would turn to

14   Paragraph 56 which is the final paragraph of their claim it

15   says by reason of the foregoing, and then I'll drop down to the

16   Section B of that it says they're seeking to avoid, quote, all

17   obligations incurred under the distribution agreement.  So A is

18   the transfers and B is the actual agreement which they are

19   trying to avoid.  At least that's how we read the complaint,

20   Your Honor.

21             So I think one of the things that's going on is this

22   concept that in this particular case, and we see this in a

23   number of the cases that have been cited to the Court in the

24   various papers.  There is often a disconnect or not a clear

25   connection made between the underlying agreement and the

1  individual transfers that maybe the trustee or someone is

2  seeking to avoid.  We don't have that in this case.  This case

3  is -- it's very, very different, because there is absolutely no

4  disconnect between what the trustee is trying to seek here, the

5  transfers, and the obligations under the agreement.  The

6  complaint is crystal clear about that all the way through.

7         And so when you look at -- and I can take this in a

8  couple different orders and I'm happy to talk about Omega.

9         THE COURT:  It's crystal clear that what, that

10  they're seeking to do both?

11         MR. STASSEN:  Yes.  And that the transfers, the

12  specific transfers they're seeking to --

13         THE COURT:  It's a defined term.  Where do we see the

14  definition of that defined term, transfers?

15         MR. STASSEN:  That's a good question.

16         UNIDENTIFIED ATTORNEY:  Paragraph 37.

17         MR. STASSEN:  Thank you, counsel.

18         THE COURT:  Paragraph 37.  From and after December

19  27th, 2007 the debtor transferred 130, et cetera to TWC.

20  December 27th, 2007 is -- what happened on that date?  Is that

21  four years before the filing?  Or what is that date?

22         MR. STASSEN:  I believe that would be the four year

23  --

24         THE COURT:  Or is that the date of the --

25         MR. STASSEN:  -- look back date.

1          MR. SHEMANO:  The voluntary petition date was --

2          THE COURT:  That's four years before the voluntary

3 petition date.

4          MR. SHEMANO:  Right.

5          THE COURT:  Okay.  So from and after September 27th

6 debtor transferred 130 million to TWC on account of obligations

7 under the distribution agreement, the purchase agreement, the

8 TWC note, the amended distribution agreement and/or the

9 restructure agreement, paren, quote, the transfers.  So the

10 transfers when we say in Paragraph 56 that you referred me to,

11 yes, so the debtor may avoid each of the transfers, with a

12 capital T.  That one is within -- just within the four year

13 period.

14          Now then he's got B which is all obligations occurred

15 under the distribution agreement, the purchase agreement, et

16 cetera, et cetera which I agree with you would go farther than

17 that.  It would go both future in time and beyond that.  But A

18 is limited in time by virtue of the use of the word transfers.

19          MR. STASSEN:  I agree with that, Your Honor.  One of

20 the things that is important to consider in relation to the

21 motion is a lot of the cases talk about -- some of the courts

22 in the cases which have been cited the underlying court ruled

23 that if the obligation occurred outside the statute of

24 limitations all transfers made pursuant to that obligation are

25 also time barred as a result of the original obligation being

1  beyond the statute of limitations.

2         THE COURT:  Before we get to that argument, just a

3  second.  Hold that thought.  Before we get to that the other

4  thing I'm looking for if you actually look at prayer, because

5  even 56 is just reciting, you know, sort of how they get there.

6  Look at the actual prayer, wherefore trustee praise for

7  judgment as follows.  In the first and second claim for relief

8  for avoidance of the transfers and obligations.  So what is --

9  now, obligations has got a capital O there.  So where is that

10 definition?  Is that also somewhere on 37 or --

11        MR. STASSEN:  When Your Honor is referring to the

12 prayer could you direct me to where you're -- which --

13        THE COURT:  The prayer?

14        MR. STASSEN:  Yes.

15        THE COURT:  I'm looking at Page -- it was the very

16 first paragraph of the prayer.  Page 18 --

17        MR. STASSEN:  I see.

18        THE COURT:  -- Line 18 and 19.

19        MR. SHEMANO:  Paragraph 59.

20        THE COURT:  Paragraph 59.  Okay.  So on 59 we define

21 what that term is where we say all obligations incurred under

22 the distribution agreement, the purchase agreement, the amended

23 distribution agreement, the TWC note, and the restructure

24 agreement obligations, okay, are avoidable pursuant to 5 44.

25 Okay.  So transfers with a capital T is limited to the four

1   years.  Obligations, just avoiding the duty to pay them if you

2   will, that you're going back to, you know, before all

3   obligations, period, correct?

4          MR. SHEMANO:  Yes, except practically no.  All the

5   obligations that were incurred beyond four years were satisfied

6   by the transfers so there may be obligations pursuant to one or

7   more of these documents that were incurred after 2007 that may

8   still be outstanding, but I agree with the parties.  The way

9   the complaint is defined there is no limitation on the time

10  limit.

11         THE COURT:  And as a practical matter all you're

12  trying to get is the money back that was paid under the

13  transfers.

14         MR. SHEMANO:  Correct.

15         THE COURT:  I understand what you're saying.  Okay.

16  So I interrupted your other point.  So you're reiterating the

17  argument which I understand the argument which is if the

18  obligation is too old to avoid then you can't avoid the

19  transfer and payment of it because you're saying is what you're

20  doing is satisfying an antecedent debt.  I get the argument.  I

21  just think -- I don't know that it's that simple as to when

22  exactly the obligation arose, when it's something that arose

23  over time under the agreement.  And I also don't know whether

24  if at the time the transfer was made the obligation was

25  avoidable.  That changes that result.  But you may persuade me

1  by the time of trial, I don't know.  I'm not saying it isn't

2  that way.  I'm just not there yet.

3        MR. STASSEN:  Fair enough, Your Honor.  I think that

4  there's a couple of things.  First of all in the complaint, and

5  we talked about Paragraph 37, also Paragraphs 54, 56, within

6  their argument itself they submit to the Court in response to

7  this motion they -- let me back up.  This concept that maybe as

8  occurs in some of the cases where there's a dispute about

9  whether the transfer itself is tied directly, dollar for dollar

10  or whatever way to the underlying obligation, that exists in

11  some cases.  In some of the cases they cite to the complaint

12  asked for things beyond what the agreement or the underlying

13  obligations would seek.

14        And what I want to make sure that we're all clear on

15  is there is a straight line between the underlying obligation

16  and that 2006 distribution agreement and transfers that were

17  made pursuant to that agreement.

18        THE COURT:  That is precisely the factual question

19  that I'm not prepared to summarily adjudicate.  So, for

20  example, if the distribution agreement just defines sort of how

21  the parties are going to do business, but then it's not until

22  during the statutory period the debtor actually performs a

23  bunch of services or Weinstein performs -- I don't even know

24  who's doing services for whom.  One party does their part and

25  the debtor's supposed to pay for it, but the amount of the

1  services the debtor is getting in exchange for what it's due

2  and what it's paying are not reasonably equivalent.

3        And the obligation of the debtor didn't arise to

4  actually pay it until the Weinstein Companies did whatever they

5  were supposed to do even though the formula was created by this

6  earlier agreement.  It may well be that you can avoid that as a

7  fraudulent transfer.  Because all you're really doing is

8  setting into place the formula under which you're supposed to

9  operate.  But then when the time -- this isn't something where

10 it was just -- let me contrast this from a loan.  It was a

11 promissory note where they, you know, a lump sum.

12       Now I realize the cases don't even make this

13 distinction.  They'd say even these are avoidable the ones --

14 the cases I cited.  But let's assume we had a fact pattern

15 where the transferee, the creditor loaned money outside the

16 statutory period and all the debtor is doing is repaying that

17 in installments.  I think that is a better case for your

18 argument than one where you've got an agreement pre-bankruptcy

19 that explains -- or excuse me pre the statutory period that

20 kind of explains the formulas and the way the parties are going

21 to relate to each other and who's going to do what.  And then

22 later during the statutory period the creditor does whatever

23 it's supposed to do and then creating an obligation on the part

24 of the debtor to pay for that at a rate that is far in excess

25 of the reasonably equivalent value for that.  I don't know that

1    that's even what we're dealing with.

2          But there were ongoing performances as opposed to

3    before the statutory period some amount set in stone that

4    wasn't affected by what the parties did later.  Unless I'm

5    confused.  I mean, is it -- weren't they doing things for each

6    other and paying each other at rates?  You know, it's a

7    distribution agreement, right, so the distribution hadn't all

8    previously happened, right?

9          MR. STASSEN:  It's a put agreement.  So TWC is

10   required any movie that has distribution rights have to go to

11   Genius to distribute.  That's required.  Whatever output they

12   have goes to Genius.  The agreement itself, unlike what was

13   said in the response, the agreement it defines covered product

14   and it also states what Genius has to do.  And Genius shall, it

15   says in the agreement, do the following things in relation to

16   the things the movie that's going to distribute.  So there's no

17   issue about that.

18         And there's no issue about the percentage.  They get

19   to take their cost off the front -- top and they get to keep

20   five percent on top of their cost for their profit.  And the

21   primary focus of the trustee's complaint is that the five

22   percent was wrong, it should have been a higher percentage.

23   That that percentage was too low and it was onerous.  But

24   really --

25         THE COURT:  But every time a movie is put to them

1  they have to perform services that have a value far in excess

2  of what they were going to get paid for it.  I mean, maybe.

3  That's the argument.

4          MR. STASSEN:  But here --

5          MR. FRIEDMAN:  Your Honor, may I -- I'm sorry to

6  interrupt.  I'm not a bankruptcy lawyer but I do -- I am a

7  lawyer in the film business.  May I just say something?

8          THE COURT:  Sure.  Okay.

9          MR. FRIEDMAN:  So what Your Honor is positing, I

10 think, would make sense if this was not an output agreement.

11 As Mr. Stassen says an output agreement it's decided on day one

12 when signatures are signed, the Weinsteins come in, they had no

13 choice, they had to live with the terms of that agreement until

14 2010 unless by its terms it ended earlier.  So four years.  If

15 somebody else came along and said we'll do it for three percent

16 TWC had no choice.  They had to leave it with them.  If TWC had

17 delivered fantastic picture after fantastic picture after

18 fantastic picture and everybody was knocking down their door

19 saying you've got the worse deal going given your track record

20 TWC was stuck.  Everything was defined on day one.

21          If it was an at will agreement TWC would have said

22 you guys are getting away with murder because of our track

23 record --

24          THE COURT:  Well, you may have a defense that you

25 provided a reasonably equivalent value.  That isn't what I'm

1  talking about.

2         MR. FRIEDMAN:  Then I'm not being clear.  But what

3  I'm saying is if you were to look, you know, in 2007 when a new

4  movie comes up there was an obligation by TWC to give it to

5  them and there was an obligation by them created in 2006 to

6  release it under the terms that are agreed to at the point in

7  time where they negotiated with whatever were the

8  circumstances.

9         But if Your Honor was to then say but, you know, when

10 they give that picture in the end of 2007 let's look at the

11 circumstances in 2007 and see whether or not the terms make

12 sense.  In 2007 that would be going in hindsight.  Because they

13 didn't know in 2006 when they one hundred obligated themselves

14 that they had to be joined at the hip through 2010.  That's

15 when they made their decision.  If you say I'm not going to

16 focus on what you had in your mind now because I'm going to

17 look at 2007 when you delivered the picture.  That would only

18 make sense -- with due respect, Your Honor, I'm sorry to say it

19 that way, but that would make sense from everybody's viewpoint

20 if it was an at will, as opposed to an output.

21        THE COURT:  But don't forget there's the whole other

22 discussion which is if it was fraudulent at the inception and

23 nobody ever would have done that deal if it wasn't a sweetheart

24 deal to the Weinstein Company at its inception and then every

25 time it came on that a movie was put to them and they had to

1  perform under it such as they were then paying the price of

2  having made that fraudulent transfer then we get into that same

3  argument well, if at the time they were doing that deal or

4  actually performing under that deal you could still have

5  avoided the original obligations of fraudulent transfer, does

6  that change the analysis?

7          MR. FRIEDMAN:  Well, I'm going to let Mr. Stassen

8  continue.  But thank you for letting me speak.

9          THE COURT:  You're welcome.  And I understand what

10  you're saying.  And I'm not saying I won't ultimately agree

11  with you.  I don't know.  I'm just not there yet.

12          MR. FRIEDMAN:  I haven't answered it, what Your Honor

13  said, but I'm sure Mr. Stassen does, as well.

14          MR. STASSEN:  The thing that I want to address, Your

15  Honor, is Your Honor's presented a hypothetical.  You know,

16  what if in the performance of the agreement later on, you know,

17  extra services were provided and suddenly it's not reasonably

18  equivalent value and there's all these fact intensive issues

19  relating into performance?  To me it's an interesting

20  hypothetical but it's not what's in the pleadings.  And with a

21  motion for judgment on the pleadings we're looking at what the

22  trustee alleged in this complaint.

23          THE COURT:  What he's alleging here is it was a

24  fraudulent transfer the time it was made and therefore there

25  was no reasonably equivalent value when they performed it.

1          MR. STASSEN:  I agree that that's their allegation.

2    But I think it should be undisputed that at the time they filed

3    their complaint, in fact, at the time the bankruptcy petition

4    was filed all of the obligations under that original

5    distribution agreement became unavoidable as a result of the

6    statute of limitations running.  This is why, for example, Your

7    Honor, I mean, the same arguments that we're having in relation

8    to this agreement -- by the way, you know, we have no doubt

9    that when we get to a trial we're going to show this was

10   reasonably equivalent value.

11          But we only filed this motion as to the first

12   agreement.  The same arguments relating to performance and

13   everything are going to apply to the later agreements.  But we

14   only focused on the 2006 because that's the one agreement that

15   is unavoidable.  And I think that the trustee understood when

16   preparing this complaint that there was going to be an issue, a

17   potential issue with whether or not reasonably equivalent value

18   was provided in that an antecedent debt was satisfied with each

19   payment.

20          That's why the trustee in the complaint attacks,

21   repeatedly, the underlying agreements all the way along the

22   way.  They're not focused on just the transfers.  They know

23   they have to undermine the obligations in the agreement because

24   otherwise they're going to have to have a trouble -- they're

25   going to have a problem with each transfer satisfying an

1 antecedent debt in every one of the agreements.

2          What's right before the Court now in this motion is

3 we know one agreement, the 2006 distribution agreement is

4 unavoidable as we stand here today.  And it's unavoidable as of

5 the date the bankruptcy petition was filed.  They can't avoid

6 it under state law or any law.  They have no ability to

7 challenge the obligations under that agreement.  And in

8 contrast to the hypothetical the Court has offered the

9 complaint is very clear and throughout.  In Paragraph 37 that

10 we read just a few moments ago, Your Honor, it says that all of

11 the transfers were made, quote, on account of the obligations.

12 Again in Paragraph 54 it says each of the transfers was made on

13 account of the debtor's obligations under the distribution

14 agreement.

15          They're not alleging in this complaint that there was

16 any payment made to TWC outside of some obligation that existed

17 in the distribution agreement.  There's no allegation in the

18 complaint.  They're not saying they did extra services, they're

19 not saying, you know, they took on extra work, they're not

20 saying TWC required them to do additional things they didn't

21 agree to in the agreement.  They are alleging in the complaint

22 every single transfer was a result of a specific obligation in

23 what is an unavoidable agreement.

24          And with regard to, you know, even like <u>Omega Door</u>.

25 So <u>Omega Door</u>, the problem with <u>Omega Door</u> the Bankruptcy Court

1  said based on the statute of limitations we're wiping

2  everything out.  But Omega Door and it said the Bankruptcy

3  Court still needs to make a determination whether there was

4  reasonably equivalent value.  Whether the payments satisfied an

5  antecedent debt.  And so it remanded.

6          The same is true with the other case that Your Honor

7  cited.  So in that case the Bankruptcy Court dismissed all the

8  claims, the underlying obligation and the transfers that

9  occurred within the statute of limitations.  It says all.  And

10 the court itself highlighted the word all.  But then it went

11 and looked at reasonably equivalent value and found that no

12 value was provided with respect to those transfers.

13         So it's a two part analysis.  One is the statute of

14 limitations, and the second is antecedent value, you know, was

15 reasonably equivalent value given to satisfy an antecedent

16 debt?  And our suggestion, Your Honor, is in this complaint

17 there's a straight line.  They say we satisfied an obligation

18 under the 2006 distribution agreement.  And we suggest, Your

19 Honor, that that agreement is unavoidable.  And if it's

20 unavoidable every single payment made in satisfaction of that

21 agreement is per se under fitness holding reasonably equivalent

22 value.

23         THE COURT:  I don't know how you can distinguish this

24 from Omega Door in the sense that the Bankruptcy Court

25 essentially granted the motion you're asking me to grant.  And

1   the B.A.P. said, no, you got to -- you shouldn't decide it as a

2   matter of law you ought to remand it and actually look at

3   whether there was value given in exchange for each of those

4   transfers.

5          So you're asking me to decide it summarily and <u>Omega</u>

6   <u>Door</u> said yeah, it's kind of fact intensive you kind of have to

7   look at the facts of it.  And, you know, I don't get reversed

8   on appeal for not granting summary adjudication on the issue,

9   right?  I only get reversed on appeal for deciding it.  I'd

10  rather decide it and whichever way I'm going to decide it

11  having heard the facts and considered it than decided summarily

12  and find that it really was a factual issue that I really

13  should have considered factually, right?

14         And I think -- I mean, doesn't the -- Vance

15  (phonetic) say its value as opposed to reasonably equivalent

16  value?  And I don't know if that makes a difference here.  But

17  I mean, the standard is whether it's reasonably equivalent

18  value, right?

19         MR. STASSEN:  That's correct.

20         THE COURT:  Yes.  And 548 says I think that what is

21  it (e) or (f) or (d) or something says satisfaction of an

22  antecedent obligation is value.  It doesn't say reasonably

23  equivalent value.  Yes, value means property or satisfaction of

24  securing of the present or antecedent debt, et cetera.  So it's

25  value but was it reasonably equivalent value?  And does -- I

1  mean, I don't know.  I've never really thought that through.

2  Does that mean yes, they got value by satisfying this

3  obligation?  But if the obligation itself was a fraudulent

4  transfer to begin with maybe that means if that wasn't

5  reasonably equivalent value then satisfying the obligation is

6  just -- for example, let's say you sign an agreement that says

7  I'm going to pay you $100 every time you do X.  And so the

8  obligation to pay the $100, okay that was -- you're providing

9  value because you're satisfying that obligation.  But it

10  doesn't say reasonably equivalent value for the amount due

11  under that obligation.  So maybe I do need to say well, what is

12  doing X worth?  And although you've given value of $100 and

13  satisfying that obligation was that reasonably equivalent value

14  since when you incurred that obligation it really wasn't worth

15  what it was you were agreeing to pay?  I don't know.

16          MR. STASSEN:  I guess, Your Honor, my response is

17  that when the Ninth Circuit says in <u>Fitness Holdings</u> that value

18  is defined to include satisfaction of an antecedent debt, and

19  when <u>Fitness Holding</u> says that payment of a preexisting debt is

20  value and if the payment is dollar for dollar full value is

21  given, and when the Ninth Circuit in <u>Fitness Holding</u> says to

22  the extent a transfer constitutes payment of the debtor's

23  antecedent or present debt the transfer is not constructively

24  fraudulent.  So whether or not you enter into --

25          THE COURT:  Yes, but when does the debt arise since

51

1  the contract describes the formulas in the way you're supposed

2  to relate to each other?  But they didn't owe the money until,

3  you know, you put the thing to them and they were supposed to

4  do whatever they were supposed to do.  I mean, you gave them

5  the film and they were supposed to do it.  So the obligation to

6  actually perform didn't really arise until the movie was put to

7  them for them to do their thing, right?

8          So I have a different question of when does the

9  obligation arise since the -- again, it's not -- the contract

10 isn't resolving, you know, it's a percentage that they're

11 supposed to pay not a flat dollar amount that was determined

12 before the four year statutory period.  It's a percentage that

13 doesn't arise until we do the math and figure out what that is,

14 right?

15         MR. FRIEDMAN:  Your Honor, I think this is sort of an

16 addendum to what I was talking about earlier.

17         THE COURT:  Yes.

18         MR. FRIEDMAN:  Actually the contract liquidates

19 what's due.  Yes, you have to figure it out.  But there's one

20 answer that is correct based on the math of how much was

21 distributed, how much was returned?  There's one answer, but --

22         THE COURT:  But there's no obligation to pay it as of

23 2006 because the facts hadn't occurred yet that gave rise to

24 what the real numbers are.  The formula arose.

25         MR. FRIEDMAN:  But you could say the same thing.

1  It's not a perfect -- the analogy that Your Honor's given is

2  not exactly apples to apples, but you could say the same thing.

3  If a promissory note says you have to make a payment, you know,

4  every -- the end of every quarter for the next three years well

5  your payment isn't due for the second quarter of the next year

6  until that comes around.  Just like no payment is due on a film

7  that is released in 2007 when you sign the agreement in 2006.

8  But everything is known and determined and baked into what the

9  terms are in 2006 so that when it comes around to 2007 and the

10 film is put out and they have to take it because that was what

11 the deal is then you have one mathematical answer.

12         The same with the promissory note, nothing is due

13 until the second quarter of 2007 and --

14         THE COURT:  The amount that has to be paid is a

15 percentage of a number that isn't known yet, isn't that true?

16         MR. FRIEDMAN:  This is a liquidated amount in the

17 sense that the numbers are all going to be known and there is

18 one answer.  Yes, it is true that the distribution fee is a

19 percentage.

20         THE COURT:  Of a number that isn't known yet at the

21 time you signed the contract, right?

22         MR. FRIEDMAN:  But what is known is that what they

23 have to -- that TWC has to give them the film and they have to

24 put it out and whatever happens happens.  But there's nothing

25 left to chance.

53

1          THE COURT:  Okay.  But there's no -- except how much

2     they're going to make and what the costs and I mean, no, there

3     are things left to chance.  The number isn't known at the time

4     you entered into that distribution agreement unlike the

5     promissory note scenario where you know exactly what you're

6     going to pay.  You don't know what the number is that they're

7     going to have to pay until the film comes and they do whatever

8     they do and they get whatever they get and then they have to

9     pay the percentage.

10          So anyway, we're going round in circles.  I

11    understand the argument and like I said I'm not saying you're

12    wrong.  You haven't persuaded me you're right yet.

13          MR. STASSEN:  Can I just have two little pieces, Your

14    Honor?

15          THE COURT:  Yes.

16          MR. STASSEN:  I would humbly suggest or ask the Court

17    to look at footnote 9 in one of the cases submitted by the

18    trustee.  And that's <u>In Re Trinsum Group</u>.  It's 460 B.R. 379.

19    And that footnote 9 it sort of walks its way through the case

20    that deals with this very issue.

21          And then the only other point I would make with

22    regard to the discussion that we just had the same --

23          THE COURT:  You want to tell me what footnote 9 says

24    so I don't have to call it up?

25          MR. STASSEN:  Yes, of course.  Absolutely, Your

54

1   Honor.

2              MR. SHEMANO:  Which case did we say?

3              MR. STASSEN:  It's <u>Trinsum</u>.  That's also --

4              MR. FRIEDMAN:  If you want to see the underlining I

5   can give you a case.

6              THE COURT:  Well, I don't know how long is footnote

7   9.  Can you just read it to me?

8              MR. FRIEDMAN:  It's all of this, Your Honor.

9              THE COURT:  Okay.  All right.  Give me --

10             MR. FRIEDMAN:  Is that all right?

11             THE COURT:  Sure.  Yes.  Go ahead.

12             MR. FRIEDMAN:  This is what I -- this is my --

13             MR. SHEMANO:  Mark it all up, tell her how to rule.

14             MR. MENTON:  That case was actually not cited.

15             MR. STASSEN:  I think it was.

16             THE COURT:  But in any event it's <u>Trinsum Group, Inc.</u>

17   460 B.R. 379 a Bankruptcy Court case from Southern District of

18   New York in 2011.  And footnote 9, some courts have held when

19   seeking to avoid transfers under Section 5:44(b) -- what do you

20   mean, no, that's not the right one?

21             MR. FRIEDMAN:  Yes.

22             THE COURT:  Okay.

23             MR. STASSEN:  I apologize.  I misspoke, Your Honor.

24             UNIDENTIFIED ATTORNEY:  Totally different topic.

25             THE COURT:  Okay.  A promissory note and the

 1 transfers made on account of that note can be separated for the

 2 purposes of the statute of limitations questions because the

 3 provisions and applicable state laws specifically list

 4 obligations incurred in transfers separately.

 5         Yes, I don't think that's so great.  I mean, like I

 6 said, I see the promissory note case as being different from

 7 our case actually.

 8         In particular the courts in the above cases noted the

 9 notes were executed outside the statute of limitations period

10 the transfer may be still viewed as paying off an antecedent

11 debt and would therefore be unavoidable.  Additionally, it's

12 relevant to note the cases allowing separation of notes from

13 transfers involve state laws that follow UFTA as opposed to the

14 UFCA.

15         In addition, it's relevant to note that cases

16 allowing separation of notes from transfers involves state laws

17 that follow the UFTA while the New York case involved state law

18 that followed the UFCA.  And frankly the 5 48 is closer to the

19 UFTA.  But anyway, statutory language of the UFTA has been

20 interpreted to technically allow the separation as there are

21 different definitions for conveyances and transfers.

22 Nonetheless the concept of antecedent debt prevails in

23 situations where the transfer was made on account of an

24 unavoidable obligation.

25         Okay, I've read it.  It doesn't allow -- that doesn't

1  help me at all.  I have the same issues.  Moreover, as I said

2  this is not the same exact pattern as a promissory note.

3  Moreover, they're making a distinction based on the UFTA versus

4  the UFCA doesn't really help me because I'm sort of neither,

5  but I'm kind of more like the UFTA.  So I think if anything I'm

6  more confused than I was before.  But anyway I don't think this

7  changes the result.

8          Mr. Friedman, do you need your case back?  Why not?

9  You can take it back.  But thank you.  Okay.  That was one

10  point.  What was the other point you wanted to make?

11          MR. STASSEN:  The other point was with regard to

12  knowing the precise amount that would be due.  A mortgage with

13  a variable rate would be the same situation.  You enter into

14  the note, you enter into your mortgage for your home.  It's a

15  variable rate.  You have no idea in a year or two years or

16  three years.

17          THE COURT:  I don't see that as the same.

18          MR. STASSEN:  Okay.  That's fine.  Your Honor --

19          THE COURT:  It's closer.  I'll grant you it's closer,

20  but I don't see it as the same.

21          MR. STASSEN:  Well, I appreciate that and I certainly

22  appreciate the Court's time.

23          THE COURT:  No problem.  Okay.  So I'm going to deny

24  that motion, order to follow from the trustee?

25          MR. SHEMANO:  Yes, Your Honor.

1           THE COURT:  And I've denied certainly without

2 prejudice to your ability to raise it at trial or on the

3 merits, I just -- I don't want another motion that looks just

4 like this one.  That's what I don't want.

5           MR. STASSEN:  Understood.  Understood.

6           THE COURT:  I guess -- I don't know whether you want

7 to call that with prejudice/without prejudice.  Again, I'm not

8 denying it on the merits of the argument I'm just not going to

9 grant you summary adjudication on it.  Okay.

10           MR. STASSEN:  Fine, Your Honor.

11           THE COURT:  All right.  So then we've got the status

12 conferences.  And where are we?  I know there was one matter

13 where I had vacated some of the dates and I don't remember if

14 that's this -- I don't know.  Did I vacate all of the Neiter

15 trial related dates or are we -- I mean, are we otherwise ready

16 for trial?

17           MR. STASSEN:  Yes, Your Honor.

18           THE COURT:  Where are -- we're ready for trial though

19 in this case or what?

20           UNIDENTIFIED ATTORNEY:  Not quite, Your Honor.

21           THE COURT:  Okay.

22           UNIDENTIFIED ATTORNEY:  have vacated dates in both

23 cases, both the Drinkwater case and the Weinstein case.

24           THE COURT:  Right.  Okay.  But are we done with

25 discovery?

 1             UNIDENTIFIED ATTORNEY:  No, we're not.  We're far

 2  from that, Your Honor.  The trustee has produced documents.  We

 3  don't need to get into details here.  The Weinsteins have not

 4  produced any documents to date.

 5             THE COURT:  Okay.  Is there a discovery cutoff now or

 6  did they vacate it?

 7             UNIDENTIFIED ATTORNEY:  There are no dates for

 8  deadlines in this case.

 9             THE COURT:  No dates.  Okay.

10             UNIDENTIFIED ATTORNEY:  We're all okay on that.

11             THE COURT:  Okay.  Well, except maybe I'm not okay

12  with that.  Maybe I should set a date.  Maybe I should set a

13  discovery cutoff.  I don't know.  I mean, how -- what are we

14  thinking if we were going to have a discovery cutoff, or we

15  don't know?  I should just ask you to come back in three months

16  and not worry about any of the dates or where are we?

17             UNIDENTIFIED ATTORNEY:  Your Honor, I would suggest

18  that that would make sense from my perspective, set a status

19  conference in 90 days.  The reason for that is because

20  certainly in the Drinkwater -- if you're going to coordinate

21  things in the Drinkwater case we've got to start discovery over

22  again.  With respect to the Weinstein case as I said there are

23  discovery disputes that may -- and this is another issue that

24  we have to deal with today.  They haven't produced any

25  documents to date.  It's been over a year since we did initial

1  disclosures, and six months since they did their discovery

2  responses.

3         So we've been dealing with (indiscernible) issues and

4  there are a whole host of other issues that may need to get

5  resolved with the help of this Court or -- and so at this point

6  I don't think it's -- I think it's premature to start setting

7  discovery deadlines or other deadlines in this case and let us

8  proceed -- I would suggest proceed as we are and hopefully we

9  can make some progress in terms of whether we need to bring

10 motions before this Court on discovery, whether we can resolve

11 them and start producing documents, whether the trustee has

12 produced documents, will be producing more documents.  There's

13 also subpoenas out there on a variety of things going on.  So I

14 would suggest 90 days would make sense in terms of a status

15 conference.  At that point I would think we'd be in a better

16 position to set some deadlines.

17         THE COURT:  Okay.  Before we -- before I rule on that

18 or decide on that have we -- have the parties gone to mediation

19 and should I be ordering you to mediation and if so should I be

20 ordering you to mediation now, should I be waiting until

21 there's more discovery to order you to mediation?  If you

22 haven't already gone to mediation, and maybe even if you have I

23 will order you to mediation at some point.  The real question

24 is whether I ought to do that now in the hope of making

25 everybody's lives more enjoyable, in the hope that it would

1  settle, or we can't do it yet because we haven't done

2  meaningful enough discovery yet.  I don't know.

3       UNIDENTIFIED ATTORNEY:  If I may address that, Your

4  Honor.

5       THE COURT:  Yes.

6       UNIDENTIFIED ATTORNEY:  So the parties have gotten

7  together and decided on David Stern who doesn't have any

8  conflicts.  So he's willing and prepared to be the mediator in

9  this case.  But we want to raise for the Court's consideration

10 last time the Court had suggested perhaps the mediator would

11 act in an ongoing capacity in a role potentially dealing with

12 some discovery matters if there were issues that arose as

13 opposed to just a merits mediator.  I wanted to get the Court's

14 perspective on that.  I think the trustee would prefer -- Mr.

15 Stern has agreed to provide eight hours of free work.  Perhaps

16 use him as the merits mediator, if you will, and not

17 necessarily use him for potential discovery disputes that we

18 may have.  But we will do what the Court wants.  And we were

19 unclear, at least the trustee was unclear as to what the Court

20 was thinking about, if there are motions to compel and things

21 that need to be brought --

22      THE COURT:  But I didn't order anything.

23      MR. FRIEDMAN:  No.

24      THE COURT:  I was just grousing at how difficult this

25 was and I thought this would be something that might be a good

1  idea.

2          UNIDENTIFIED ATTORNEY:  Yes, you had suggested

3  potentially dealing with that on a, you know, a mediator being

4  available to deal with writer issues that arise as they come.

5  One of the concerns raised by Mr. Stassen and I do believe it's

6  a good one, to what extent if Mr. Stern, for instance, were

7  involved in ongoing kinds of things whether that might taint,

8  if you will, or impact how people may feel when he actually

9  conducts a mediation later depending on what he decided kind of

10 along the way.  But we would follow --

11         THE COURT:  Well, he can't decide anything as a

12 mediator.

13         UNIDENTIFIED ATTORNEY:  No, that's correct.  But in

14 terms of

15 --

16         THE COURT:  And people, he will form impressions

17 about you folks as he goes through it.  He might perhaps also

18 develop a relationship and a rapport with you during the

19 process.  Or as I did in one case I was the discovery mediator

20 and the discovery disputes were so attractive well, I just

21 settled the case because it was easier.  So I'm not sure you

22 want to make a hard and fast distinction the one between the

23 two, but if you both agree that you think that would be a bad

24 idea I don't really -- I don't feel that way.  But I'd like you

25 to consult a mediator as needed and if that means you want two

1  separate ones, I'm okay with that.  And if you're already

2  talking about it then I'm not inclined to order you to do it

3  now.  And by the time I am inclined to say order you to

4  mediation maybe you will have already done it and I'll say oh,

5  okay, well, then I don't need to order you because you've

6  already done your mediation.

7         So I don't -- I'm flexible on that. I  really don't

8  care.  My thought was it would be one and the same, but it

9  certainly doesn't have to be if you really think that would be

10  problematic.

11        UNIDENTIFIED ATTORNEY:  Okay, I'll let Mr. Stassen

12  speak to that.  The other procedural issue I know the Court has

13  particular forms with respect to the mediation program.  Would

14  we need to do that in this case with respect to Mr. Stern?

15        THE COURT:  If you're going to just use him for eight

16  hours for free like he's appointed off the panel then there is

17  the court form for appointing a mediator.  I'd use that.  If on

18  the other hand, you're going to like have him do something more

19  creative or you're planning to have him do eight hours free but

20  then you may want more and you want to be able to pay him after

21  that and maybe you want him to do discovery or you don't want

22  him to -- feel free to use a stipulation if you want to instead

23  of that.  That might actually put you outside the mediation

24  program.  But you could certainly stipulate that you're going

25  to be bound by whatever our general order is concerning

63

1   mediation.  I want it to work for you guys.

2          So again, if you just want to use him off the panel

3   the way you'd normally do it under a mediation program then

4   just use the standard form order.  If you want to do something

5   different or more creative or offer to pay him or someone else

6   do a stipulation.

7          UNIDENTIFIED ATTORNEY:  Okay.

8          MR. STASSEN:  Your Honor, there's been no discussion

9   of Mr. Stern being appointed in the Drinkwater matter.  But I

10  have informally been engaging with talks with the trustee to

11  try to discuss that on a fairly frequent basis.  We're not

12  there by any means, but those discussions are ongoing.  So

13  probably at this time for that matter it's appropriate to just

14  continue that process.  And maybe when we come back to the

15  status conference in three months if there's a need to appoint

16  a mediator we can --

17         THE COURT:  Well, let me ask a question that I

18  haven't a clue about but maybe you will.  Sometimes there are

19  matters that are not, you know, consolidated, maybe not even

20  coordinated, but they really aren't going to settle unless they

21  all settle at the same time.  I don't know whether there's any

22  kind of linkage like that on either side of the Drinkwater and

23  the Weinstein matters.  I mean, from the trustee's perspective,

24  you know, maybe one pot of money you don't care where it comes

25  from, I don't know.  But does anyone think that if we did go to

1    a mediation that we really ought to go at the same because it

2    can't settle unless everybody settles?

3                UNIDENTIFIED ATTORNEY:  I don't see that, Your Honor.

4                THE COURT:  You don't see that?  Okay.  Do -- no, you

5    don't feel that way?  Does the trustee think that?

6                MR. SHEMANO:  Not at this time, Your Honor.  I want

7    to make a point in terms of going back to the Weinsteins and

8    mediation with Mr. Stern.  Our view now is that unless and

9    until we get discovery a mediation would not be productive and

10   so we don't see that appropriate at this time or in the near

11   future until we can get down the road here.

12               THE COURT:  Okay.  Unless you need him for a

13   mediation -- to mediate discovery disputes I suppose.

14               MR. SHEMANO:  Correct, Your Honor.

15               THE COURT:  Okay.  All right, well, I'm just going to

16   continue these for about 90 days and then we'll -- by which

17   point I will have forgotten everything we discussed today and

18   we can start fresh.  All right, one, two, three.  All right.

19   How about February 7th at 2:00 p.m.?  And that would make your

20   joint status reports due January 24.  February 7 at 2:00 p.m.,

21   joint status report due January 24.  All right.

22               THE COURT:  See you then.  Thank you very much.

23               THE ATTORNEYS:  Thank you, Your Honor.

24               THE COURT:  Thank you.  That concludes the matter on

25   calendar for whatever date this is, Tuesday, November 1st.

1                              * * * * *

2                   **C E R T I F I C A T I O N**

3              I, KIMBERLY UPSHUR, court approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter, and to the best of my ability.

7

8    /s/ Kimberly Upshur

9    KIMBERLY UPSHUR

10   J&J COURT TRANSCRIBERS, INC.       DATE:  November 29, 2016

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25