ROBINS KAPLAN LLP
David B. Shemano (State Bar No. 176020)
*dshemano@robinskaplan.com*
James P. Menton, Jr. (State Bar No. 159032)
*jmenton@robinskaplan.com*
2049 Century Park East, Suite 3400
Los Angeles, CA  90067
Telephone: 310-552-0130
Facsimile: 310-229-5800

Special Litigation Counsel for Alfred H. Siegel,
Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>GENIUS PRODUCTS, LLC,<br><br>          Debtor.<br><hr><br>ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE FOR THE ESTATE OF GENIUS PRODUCTS, LLC,<br><br>          Plaintiff,<br><br>    v.<br><br>THE WEINSTEIN COMPANY, LLC; and THE WEINSTEIN COMPANY HOLDINGS, LLC,<br><br>          Defendants. | Case No.  2:11-bk-62283-BB<br><br>Chapter 7<br><br><br>Adv. No. 2:15-ap-1241-BB<br><br>**APPLICATION OF CHAPTER 7 TRUSTEE FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>[Declarations of Trevor Drinkwater, Anthony Friedman, James P. Menton, Jr., David B. Shemano, and Howard Kaplan In Support Filed Concurrently Herewith]<br><br>Date:     TBD[1]<br>Time:     TBD<br>Place:    Courtroom 1539<br>           255 East Temple Street<br>           Los Angeles, CA  90012 |

---

[1] Concurrently herewith, the Trustee has filed his *Application to Shorten Time* that proposes a hearing date of November 15, 2017 at 10:00 a.m.

61386053.9

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................. 1

II. JURISDICTION AND VENUE ........................................................................ 3

III. STATEMENT OF FACTS .............................................................................. 3

    A. The Relationship Between The Debtor And Weinstein ............................ 3

    B. The Weinstein Transaction Renders Genius Insolvent............................ 5

    C. The Genius Bankruptcy .......................................................................... 5

    D. The Pending Fraudulent Transfer Litigation .......................................... 6

        1. The Bankruptcy Court Denies Weinstein's Two Motions To Dismiss..... 6

        2. Current State Of The Litigation .................................................... 7

IV. THE DISTRIBUTION AGREEMENT WAS A FRAUDULENT TRANSFER ................... 7

    A. Trevor Drinkwater Confirms The Allegations In The Complaint ................ 7

    B. The Press Reports The Deal Was Negotiated Favorably For Weinstein.......... 8

V. THE DEBTOR'S TRANSFERS TO TWC WHILE INSOLVENT .................................. 10

VI. WEINSTEIN IS IMPLODING ....................................................................... 11

VII. THE COURT SHOULD ENJOIN ANY DISSIPATION OF WEINSTEIN'S
ASSETS ...................................................................................................... 11

    A. The Debtor Will Likely Succeed On The Merits ........................................ 13

        1. The Debtor Made Transfers To Weinstein.................................... 13

        2. The Debtor Had A Creditor Whose Claim Arose Before The Transfers Were
Made .......................................................................................... 13

        3. The Debtor Did Not Receive Reasonably Equivalent Value In Exchange For
The Transfers ............................................................................. 14

        4. The Debtor Made the Transfers While Insolvent.......................... 15

    B. The Debtor Is Likely To Suffer Irreparable Harm In The Absence Of An
Injunction .................................................................................................. 15

    C. The Balance Of The Equities Is In The Trustee's Favor. ............................. 17

    D. Relief Is In The Public Interest .................................................................. 17

    E. The Court Should Not Require A Bond ....................................................... 17

VIII. CONCLUSION ............................................................................................ 18

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Flynt Distributing Co. v. Harvey*,
   734 F.2d 1389 (9th Cir. 1984)............................................................................12

*In re Fashion World, Inc.*,
   44 B.R. 754 (Bankr. Mass. 1984)......................................................................14

*In re Key3Media Group, Inc.*,
   336 B.R. 87 (Bankr. D. Del. 2005) ...................................................................14

*In re Koubourlies*,
   869 F.2d 1319 (9th Cir. 1989)...........................................................................15

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009)...........................................................12, 15, 17

*Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*,
   887 F. Supp. 1320 (N.D. Cal. 1995) ................................................................12

*Oiye v. Fox*,
   211 Cal.App.4th 1036 (Cal. App. 6 Dist., 2012) .............................................12

*Repub. Of the Phil. v. Marcos*,
   862 F.2d 1355 (9th Cir. 1988)..........................................................................13

*Rubin v. Pringle (In re Focus Media Inc.)*,
   387 F.3d 1077 (9th Cir. 2004).........................................................2, 12, 13, 15

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009)..........................................................................17

*Takiguchi v. MRI Int'l, Inc.*,
   611 F. App'x 919 (9th Cir. 2015) .....................................................................12

*Wimbledon Fund, SPC (Class TT) v. Graybox, LLC*,
   2015 U.S. Dist. LEXIS 134966 (C.D. Cal. September 29, 2017)......................2

*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .............................................................................................16

**Statutes**

11 U.S.C. § 101(54) ..............................................................................................13

11 U.S.C. §§ 101-1532...........................................................................................3

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

11 U.S.C. § 105(a) ..............................................................................................................3

11 U.S.C. § 548(a)(1)(B) ..................................................................................................14

28 U.S.C. § 157 ...................................................................................................................3

28 U.S.C. § 157(b) ..............................................................................................................3

28 U.S.C. § 1334 .................................................................................................................3

28 U.S.C. § 1408 .................................................................................................................3

28 U.S.C. § 1409 .................................................................................................................3

Cal. Civ. Code § 3439.01 ..................................................................................................13

Cal. Civ. Code § 3439.01(c) .............................................................................................12

Cal. Civ. Code § 3439.02 ..................................................................................................14

Cal. Civ. Code § 3439.02(a) .............................................................................................14

Cal. Civ. Code § 3439.05 ............................................................................................13, 14

Cal. Civ. Code § 3439.07(a)(3) ..........................................................................1, 11, 12, 17

Cal. Civ. Code § 3439.07(a)(3)(A) ....................................................................................3

**Rules**

Fed. R. Bankr. P. 7065 .............................................................................................1, 3, 12

Fed. R. Civ. P. 65 ..............................................................................................................12

Fed. R. Civ. P. 7065 ..........................................................................................................17

Local Bankruptcy Rule 7065-1 .......................................................................................1, 3

1    Plaintiff Alfred H. Siegel (the "Trustee"), chapter 7 trustee for the estate of Genius

2    Products, LLC (the "Debtor" or "Genius"), hereby moves the Court (the "Application") for an

3    order to show cause why a preliminary injunction should not issue and for a temporary restraining

4    order ("TRO"), substantially in the form attached hereto as Exhibit A (the "Proposed Order"),

5    pursuant to section 3439.07(a)(3) of the California Civil Code, section 7065 of the Federal Rules

6    of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Bankruptcy Rule 7065-1: (1)

7    enjoining defendants The Weinstein Company's ("TWC") and The Weinstein Company

8    Holdings, LLC ("TWC Holdings" and together with TWC, "Weinstein"), and their respective

9    agents, employees and representatives from using, transferring, encumbering, or otherwise

10   disposing of Weinstein's respective assets, debt, or equity interests outside the ordinary course of

11   business without the Trustee's consent or further Order of this Court.

12   In support of this Application, the Trustee is filing concurrently the Declarations of Trevor

13   Drinkwater, Anthony A. Friedman, James P. Menton, Jr., David B. Shemano and Howard J.

14   Kaplan.[2]

## I.

## INTRODUCTION

17   The Trustee commenced this action to avoid and recover millions of dollars fraudulently

18   transferred to TWC in connection with Weinstein's ownership of the Debtor, a defunct home

19   video distributor.  During the four years prior to the commencement of this case, TWC received

20   over $130 million from the Debtor.  A successful outcome of this fraudulent transfer action,

21   including the collection on any judgment, is the only hope the Debtors' creditors have that that

22   they will recover anything on account of their significant claims.

23   As widely reported by prominent media outlets, Weinstein is now imploding. In October

24   2017, TWC fired its co-chairman, Harvey Weinstein ("HW"), following reports in *The New York*

25   *Times* and *The New Yorker* detailing numerous sexual harassment and sexual assault allegations

26   against HW. HW's importance to TWC cannot be understated.  HW co-founded TWC, was its

27

28   [2] Concurrently herewith, the Trustee filed a motion for authority to file the Declaration of Howard J. Kaplan and
certain exhibits attached to the Declaration of Trevor Drinkwater and Anthony A. Friedman under seal.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    co-chairman, and played an essential role in its ongoing operations. In fact, Weinstein has

2    admitted to the Trustee that the circumstances facing TWC, including reports that TWC's very

3    survival is in question, "have been well reported in newspapers and other media outlets across the

4    country," and that the "unprecedented" and "crisis" situation that now exists raises "existential

5    issues."

6    It is highly doubtful that TWC can survive as a going concern.  In the aftermath of HW's

7    firing and the diminution of the Weinstein brand following the sexual assault allegations, only

8    two realistic outcomes likely remain for TWC: (1) a fire sale of TWC's assets to a third party; or

9    (2) a bankruptcy filing.  These outcomes are reinforced by TWC's own press release announcing

10   an interim financing deal with Colony Capital ("Colony") to "stabilize" TWC and entry into a

11   negotiating period with Colony for a potential sale of TWC's assets, and, following the reported

12   collapse of its dealings with Colony, a recent *New York Times* report that a bankruptcy filing is

13   likely.

14   This action is not based on a breach of contract.  It is based upon fraudulent transfer,

15   which means that TWC was the recipient of significant assets that rightfully and equitably belong

16   to the Debtor.  The Debtor is almost certainly the largest unsecured creditor of TWC, and in view

17   of the extraordinary circumstances now occurring, the Trustee is extremely concerned that the

18   very assets that should be returned to the Debtor will be dissipated in the coming weeks as

19   Weinstein tries to stay afloat.

20   Accordingly, the Trustee seeks an injunction preserving the *status quo* enjoining

21   Weinstein from transferring using, transferring, encumbering, or otherwise disposing of

22   Weinstein's respective assets, debt, or equity interests outside the ordinary course of business

23   without the Trustee's consent or further Order of this Court.  Such relief is necessary to prevent

24   the imminent dissipation of Weinstein's assets, which assets are necessary for the Trustee to

25   satisfy his fraudulent transfer claims against Weinstein.  *See generally, Rubin v. Pringle (In re*

26   *Focus Media Inc.),* 387 F.3d 1077 (9th Cir. 2004); *Wimbledon Fund, SPC (Class TT) v. Graybox,*

27   *LLC,* 2015 U.S. Dist. LEXIS 134966 (C.D. Cal. September 29, 2017).  Weinstein will not be

28   harmed in the slightest by the injunction sought as it will only make its business transactions

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   transparent and prevent an inchoate fire sale while the Trustee will be irreparably injured should

2   the order sought not issue.

3                                              **II.**

4                              **JURISDICTION AND VENUE**

5          This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This

6   matter relates to the administration of the Debtor's bankruptcy estate (the "Estate") and is,

7   accordingly, a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this Court

8   pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein

9   are sections 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy

10  Code"), Rule 7065 of the Federal Rules of Bankruptcy Procedure, Local Bankruptcy Rule 7065-

11  1, and section 3439.07(a)(3)(A) of the California Civil Code.

12                                             **III.**

13                              **STATEMENT OF FACTS**

14  **A.      The Relationship Between The Debtor And Weinstein**

15         Genius Products, Inc., ("GPI") was formed in 1996 and went public in 2000.  GPI was an

16  independent distributor of home videos.  Revenues in 1999 were approximately $2.3 million

17  derived primarily from the distribution of videos for children.  By 2004, revenues had grown to

18  approximately $19 million, primarily through the distribution of value-priced videos (*i.e.*, dollar

19  bin) to discount retailers such as Target and Dollar Stores.

20         In 2005, Bob and Harvey Weinstein left Disney and formed Weinstein.  As an

21  independent film studio, Weinstein was reliant on separate entities to distribute their films

22  theatrically and to the home video market.  Home video distribution is performed by both the

23  major studios and independent distributors, which compete with each other for the right to

24  distribute content.

25         In 2004, GPI was acquired by an investment group led by Stephen Bannon.[3]  In 2005, the

26  new management of GPI saw Weinstein as a unique opportunity to grow the GPI business from

27

28  [3] Mr. Bannon recently served as President Trump's Chief Strategist.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  its low margin dollar video business to a major player in the home video market that distributed

2  higher quality content.  Therefore, GPI aggressively pursued the right to be the distributor of

3  Weinstein's home video.

4      GPI's efforts in pursuing Weinstein were successful.  In 2005, Weinstein and GPI

5  formally entered into an agreement to form a new venture.  The new venture was consummated in

6  July 2006.  Pursuant to the transaction, GPI contributed its business and assets to a Weinstein

7  wholly-owned subsidiary, renamed Genius Products, LLC ("Genius" or the "Debtor"), and GPI

8  received in exchange a 30% interest in Genius.  Contemporaneously, Weinstein granted Genius

9  exclusive U.S. home video distribution rights to feature film and direct-to-video releases owned

10  or controlled by Weinstein, and Weinstein retained in exchange a 70% interest in Genius.

11  Declaration of Trevor Drinkwater (the "Drinkwater Declaration"), Ex. A.

12      As part of the transaction, Weinstein and Genius (now owned 70% by Weinstein) entered

13  into a distribution agreement (the "TWC Distribution Agreement").  Under the agreement, Genius

14  was responsible for manufacturing, merchandising, marketing, and distributing Weinstein's video

15  products, as well as for billing and collection.  In exchange, Genius received a 5% distribution fee

16  plus reimbursement of certain expenses, and all remaining distribution proceeds were to be paid

17  to Weinstein. Drinkwater Decl., Ex. B.

18      Weinstein was on both sides of the transaction when it entered into the TWC Distribution

19  Agreement.  While the terms of the TWC Distribution Agreement were previously negotiated

20  between Weinstein and GPI, the TWC Distribution Agreement was entered into when Weinstein

21  owned 70% of Genius.  Larry Madden, Weinstein's CFO at the time, signed the TWC

22  Distribution Agreement on behalf of both Weinstein and Genius. Drinkwater Decl., Ex. B, at page

23  46.

24      In addition to Weinstein content, Genius also distributed products for third-party licensors

25  such as ESPN, World Wrestling Entertainment, Sesame Workshop, Discovery Kid, Animal

26  Planet and The Learning Channel.  Genius primarily sold product to major national retailers

27  including Wal-Mart, Blockbuster Entertainment, Best Buy, Circuit City, Kmart, Target, NetFlix,

28  Costco, Sam's Club, Amazon, Borders, Toys R Us and Columbia House.  Drinkwater Decl., Ex.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

G, at page 77.

**B.    The Weinstein Transaction Renders Genius Insolvent**

The venture was a disaster for Genius, because the terms of the TWC Distribution Agreement were so onerous and one-sided in favor of Weinstein it was impossible for Genius to operate profitably.  While Genius grew rapidly and its revenues skyrocketed to over $300 million in 2007, so did its expenses.  GPI's SEC disclosures reported that Genius had a net loss of $19.7 million for the year ended December 31, 2006, a net loss of $18.8 million for the year ended December 31, 2007, and a net loss of $89.8 million for the nine months ended September 30, 2008. As of September 30, 2008, Genius's publicly reported total assets were disclosed to be worth approximately $113 million (exclusive of purported goodwill estimated at $68 million), while current liabilities were in the amount of $195 million. Drinkwater Decl., Ex. G at page 25; Ex. H, at page 23.

In an apparent belated attempt to stem the losses, Genius and Weinstein entered into an amended distribution agreement as of December 31, 2008 (the "Amended Distribution Agreement") that modified certain of the most onerous provisions in the TWC Distribution Agreement.  Drinkwater Decl., Ex. C.  At the same time, among other things, (1) Weinstein divested itself of a majority ownership of Genius to a restructuring investment firm called Quadrant pursuant to the terms of a purchase and sale agreement (the "Purchase Agreement") and (2) Genius issued to TWC a promissory note in the original principal amount of $20 million (the "TWC Note"). Drinkwater Decl., Exs. D and E.

In 2009, Genius and Weinstein entered into a restructuring agreement (the "Restructuring Agreement") pursuant to which the Amended Distribution Agreement was terminated. The parties entered into a new service agreement pursuant to which Genius continued to distribute Weinstein products. Drinkwater Decl., Ex. F.

In September 2009, Vivendi acquired the operations and distribution rights held by Genius, and Genius subsequently ceased operations.  In 2009, GPI ceased SEC filings.

**C.    The Genius Bankruptcy**

On December 27, 2011, an involuntary bankruptcy petition was filed against Genius by

1   (1) World Wrestling Entertainment, Inc. ("WWE"), the holder of judgment in the approximate

2   amount of $6,000,000, (b) Thought Equity Motion, Inc., the holder of an arbitration award in the

3   approximate amount of $463,000, and (3) LD Entertainment, the holder of a default judgment in

4   the approximate amount of $2,100,000. [Case Dkt. No. 1.]

5       The petition was unopposed and an order for relief was entered on May 4, 2012. [Case

6   Dkt. No. 14.]  The Trustee was appointed as the chapter 7 trustee.

7       **D.    The Pending Fraudulent Transfer Litigation**

8       On May 8, 2015, the Trustee commenced this action by filing a very detailed complaint

9   (the "Complaint") against Weinstein alleging fraudulent transfer, recovery of improper dividends,

10  and breach of fiduciary duty. [Dkt. No. 1.]  The Trustee seeks to avoid and recover in excess of

11  $130 million paid to Weinstein in the four years prior to the bankruptcy filing.  The gravamen of

12  the complaint is that the terms of the Distribution Agreement were so onerous and one-sided that

13  Genius was rendered insolvent by the transaction.

14      **1.    The Bankruptcy Court Denies Weinstein's Two Motions To Dismiss**

15      On July 6, 2015, Weinstein filed a motion to dismiss the complaint for failure to state a

16  claim. [Dkt. No. 14.]  In summary, Weinstein argued that every dollar it received from Genius

17  was on account of Genius's contractual obligations under the TWC Distribution Agreement, so

18  "value" was received by Genius.  Further, Weinstein argued that because the terms of the TWC

19  Distribution Agreement were previously negotiated by GPI while GPI was independent, the 2006

20  agreement was an arm's-length transaction that provided fair terms.

21      On October 23, 2015, the Bankruptcy Court issued its order regarding the motion. [Dkt.

22  No 40.]  While the Court dismissed certain ancillary claims as time-barred or released, the Court

23  refused to dismiss the key fraudulent transfer claim, holding:

24          While Defendants may have a defense that each transfer resulted in
            the reduction of Debtor's contractual liability to the Defendants in
25          support of a finding of "reasonably equivalent value," the
            Complaint, as pled, demonstrates that the terms of the agreements
26          may have resulted in the Debtor receiving less than "reasonably
            equivalent value" for the transfers made.
27

28      On October 11, 2016, Weinstein filed a motion for judgment on the pleadings. [Dkt. No.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

68.]  In summary, Weinstein argued that the Trustee is time-barred from avoiding the obligations

incurred by Genius under the 2006 Distribution Agreement because the applicable four-year

statute of limitations expired prior to December 27, 2011, the date the Debtor's bankruptcy

petition was filed, and all of the payments were made in satisfaction of debts arising from the

2006 agreement.

On November 9, 2016, the Bankruptcy Court denied the motion without prejudice to be

reargued at trial, agreeing with the Trustee that at the pleading stage the fraudulent transfer claims

are not time-barred if: (1) Genius's obligations arose under the TWC Distribution Agreement not

in 2006, but subsequently when each film was distributed pursuant to the terms of the TWC

Distribution Agreement, and (2) the transfers made within four years of the bankruptcy filing

were avoidable as fraudulent transfers when made.  [Dkt. No. 95.]

**2.    Current State Of The Litigation**

The parties have served first requests for production of documents and documents have

been produced pursuant thereto.  In connection with this discovery, TWC has produced to the

Trustee a limited number of distribution or similar agreements with third parties.  Declaration of

James P. Menton, Jr. (the "Menton Declaration"), ¶ 2.

On October 27, 2017, Weinstein's counsel referenced the "unprecedented" circumstances

now existing and reported in the newspapers and other media outlets to delay providing

supplemental written responses to the Trustee's discovery. Menton Decl., ¶ 3, Ex. K.

The current deadline for completing fact discovery is June 29, 2018.  No depositions have

been taken nor scheduled and no trial date has been set.  There is a status conference scheduled

for January 30, 2018.   Menton Decl., ¶ 4.

**IV.**

**THE DISTRIBUTION AGREEMENT WAS A FRAUDULENT TRANSFER**

**A.    Trevor Drinkwater Confirms The Allegations In The Complaint**

Trevor Drinkwater was affiliated with GPI commencing in 2004 and directly involved

with the negotiations with Weinstein. He was appointed as the President and CEO of Genius in

2006 and continued in that role through 2010.  In addition, Drinkwater signed GPI's SEC filings

1 during the same period. Drinkwater is the most knowledgeable person concerning Genius's

2 assets, liabilities and operations during the period of the TWC Distribution Agreement.

3   On August 12, 2016, pursuant to the Order of the Bankruptcy Court [Case Dkt. No. 141],

4 Drinkwater was examined by the Trustee in Drinkwater's capacity as an officer of Genius.  In his

5 examination, Drinkwater described the Weinstein transaction as "a little bit of a moon shot."

6 Menton Decl., Ex. L, 2004 Examination Transcript (the "Transcript"), at 30:6. Drinkwater

7 testified that at the time of the negotiations, there was significant competition for Weinstein's

8 business, and there were several times during the negotiations that GPI thought it had lost the

9 deal.  Transcript, 32:13-18, 35:2 to 36:16.  Drinkwater testified that Weinstein told GPI that

10 competitors, including major studios, were offering Weinstein a significant advance, which GPI

11 could not do, so GPI had to be flexible on the distribution fee and other deal terms to get the

12 Weinstein business.  Transcript, 46:6-13.

13   When asked to identify any term in the Distribution Agreement that reflected a negotiation

14 in which GPI successfully rejected a Weinstein demand and Weinstein agreed to GPI's demand,

15 the only term Drinkwater could recall was that Weinstein had originally proposed a 2%

16 distribution fee, while the negotiated deal term was 5%. Transcript, 192:1 to 196:17.

17   **B. The Press Reports The Deal Was Negotiated Favorably For Weinstein**

18   The one-sided nature of the transaction was not only common knowledge in the industry

19 at the time, it was openly bragged about in the press.  An article about the transaction was

20 published in *Fortune* on November 26, 2007.  While Stephen Bannon, GPI's Chairman at the

21 time who put the deal together for GPI, is not directly quoted, he was interviewed for the article

22 and the obvious source for most of the details.  The article includes the following reporting:

23    Bannon, a one-time Goldman Sachs media banker, bought a small
   film library and then caught wind that the Wall Street powerhouse

24    was raising $1.2 billion for the Weinstein startup in 2005. He and
   Drinkwater pitched his old firm and the Weinsteins to enlist Genius

25    as their home video distributor rather than one of the majors.

26    ***Bannon cut them the industry's best deal -- a 5% royalty paid to***
   ***Genius versus a typical rate of more than double that.***  (emphasis

27    added).

28 Declaration of David B. Shemano (the "Shemano Declaration"), Ex. M.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Bannon, or whoever else was the source for the "industry's best deal" quote, was being

modest.  The terms of the Distribution Agreement were onerous, one-sided, unprecedented, and

inexplicable from the perspective of Genius if Genius's purpose was to make any money and stay

in business.

Howard J. Kaplan, an expert for the Trustee, whose prior experience includes full-time

employment as the Chief Financial Officer of Morgan Creek Productions, Inc. and Morgan Creek

International, Inc. (collectively, "Morgan Creek"), and Chief Operating Officer of Morgan Creek

International, Inc., during which time his duties and responsibilities at Morgan Creek included

overseeing all matters involving the business and legal side of acquiring, producing and

distributing films, has prepared an initial expert report (the "Expert Report"), wherein he opines

that the TWC Distribution Agreement did not reflect market terms at the time of its execution.

This initial Expert Report is attached as Exhibit 1 to Mr. Kaplan's declaration (the "Kaplan

Declaration") filed concurrently herewith. Mr. Kaplan's opinions include:

- The TWC Distribution Agreement contained numerous below market terms at the time of its execution.  The amount of identifiable loss resulting from the below market terms compared to market terms approached $50 million.

- The fee set forth in the TWC Distribution Agreement is meaningfully and substantially below market.  The fee was a discount of 50% or more compared to Genius's distribution agreements with its other significant customers. The loss resulting from the below market distribution fee is at least $31 million.

- The arm's-length distribution fees set forth in output agreements entered into by TWC and other Weinstein-controlled (including Miramax and Dimension Films) entities with distributors other than Genius are materially in excess of the fee set forth in the TWC Distribution Agreement.

- The arbitrage between what TWC paid a third party producer for an acquired product and what Genius charged TWC for the same feature film product, was in excess of 100% and, more often than not, a multiple of the TWC Distribution Agreement fee.  In other words, TWC simply agreed to distribute the particular film, and then sub-distributed the product through its agreement with Genius placing the distribution burden and risk on Genius.

- The TWC Distribution Agreement permitted TWC to include or exclude items that would be covered by the agreement, which is not a market term.  This provision permitted TWC to exclude *Inglourious Basterds*, its most successful theatrical release of the period.  The damages resulting from lost distribution fee income on this film was at least $8 million.

- Market distribution agreements typically provide for the cross collateralization of titles.  The TWC Distribution Agreement prohibits cross collateralization. The loss

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

resulting from this prohibition is at least $2.1 million.

- Numerous terms of the TWC Distribution Agreement were used to defer payments of expenses from TWC to Genius. The loss resulting from Genius having to carry these costs is at least $5 million.

- Additional terms that were not market include (a) the failure to have Harvey Weinstein ("HW") listed as a Key Man to the TWC Distribution Agreement; (b) excess losses resulting from TWC's ability to force Genius to include a substantial amount of non-theatrical product through its distribution system; (c) the failure to include new technology rights; (d) the inclusion of an excessive amount of dedicated staff; (e) the loss on the disposal or distribution of inventory at the conclusion of the TWC deal; and (f) a below market return reserve.

Kaplan Decl., ¶¶ 5-13, Exhibit 1.

Thus, Weinstein utilized the TWC Distribution Agreement to transfer to Weinstein, as a result of Weinstein's ownership of Genius, Genius's cash by charging Genius above-market rates in the TWC Distribution Agreement instead of the net revenues that could be obtained if the TWC Distribution Agreement reflected market terms and industry norms.

As a practical matter, Genius, owned 70% by Weinstein, was treated as an operating division of Weinstein. If Genius had been legally structured as an operating division of Weinstein, then the terms of the TWC Distribution Agreement between Weinstein and its division would be of no consequence. However, third-party licensors and creditors did business with and extended credit to Genius, and were left holding the bag when Genius ceased operations.

## V.

## THE DEBTOR'S TRANSFERS TO TWC WHILE INSOLVENT

From and after December 27, 2007, the Debtor transferred at least $130 million to TWC on account of obligations under the TWC Distribution Agreement, the Purchase Agreement, the TWC Note, the Amended Distribution Agreement and/or the Restructuring Agreement (the "Transfers"). The Transfers were made from accounts maintained by the Debtor at Citibank, N.A. Declaration of Anthony A. Friedman (the "Friedman Declaration"), ¶¶ 2-3, Exs. I and J. A list of the Transfers identifying specific dates and amounts is attached as Exhibit D to the Complaint.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

## VI.

## WEINSTEIN IS IMPLODING

In October 2017, several prominent media publications, including *The New York Times* and *The New Yorker*, reported that more than a dozen women accused HW of sexually harassing, assaulting, or raping them.  Shemano Decl., Exs. N and O.

As a result of the accusations, TWC fired HW.  Since HW's firing, numerous media outlets have reported that TWC has been desperately seeking outside funding to continue operations.  On October 16, 2017, TWC issued a press release announcing that TWC and Colony reached an agreement for Colony to provide "an immediate capital infusion" into TWC and for a negotiation period for the potential sale of all or a significant portion of TWC assets to Colony. Shemano Decl., Ex. P.  By October 25, 2017, Colony had decided not to provide a capital infusion and Colony's chairman, Tom Barrack, described TWC as "a patient that's dying on the table." Shemano Decl., Ex Q.  There are now reports that TWC expect to close an expedited sale for substantially all of its assets by the end of November. Shemano Decl., Ex R.

More recently, on October 27, 2017, Weinstein's counsel sent an email to the Trustee's counsel admitting that the circumstances facing TWC "have been well reported in newspapers and other media outlets across the country" and that the "unprecedented" and "crisis" situation that now exists raises "existential issues." As noted above, Weinstein's counsel referenced the newspapers and other media and the circumstances they have reported, which include that the company's very survival is threatened, to support claimed inability to provide supplemental discovery responses to the Trustee. Menton Decl., Ex. K.

## VII.

## THE COURT SHOULD ENJOIN ANY DISSIPATION OF WEINSTEIN'S ASSETS

The Trustee requests the Court enter a temporary restraining order and order to show cause why a preliminary injunction should not issue to enjoin any dissipation of Weinstein's assets.  As demonstrated below, the Debtor, almost certainly the largest unsecured creditor of TWC, satisfies the requisite standard and the order should issue.

California Civil Code section 3439.07(a)(3) provides that in an action for relief against a

transfer or obligation under the voidable transfer statute, a creditor may obtain:

> (A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or other property of the transferee.
>
> (B)  Appointment of a receiver to take charge of the asset transferred or other property of the transferee.
>
> (C)  Any other relief the circumstances may require.

The Trustee is a "creditor" for purposes of relief under section 3439.07(a)(3).  Section 3439.01(c) defines a "creditor" as a person who has a "claim," and "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *See generally*, *Oiye v. Fox*, 211 Cal.App.4th 1036, 1059 (Cal. App. 6 Dist., 2012) (affirming injunction even though claimant had not reduced her claim to judgment.).

In addition, pursuant to Federal Rule of Civil Procedure 65, made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7065, where a plaintiff seeks to avoid a fraudulent transfer, a court may issue a preliminary injunction enjoining the transfer of assets to preserve the status quo pending trial.  *In re Focus Media Inc.*, 387 F.3d 1077 (9th Cir. 2004).

"A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).  To determine whether a preliminary injunction should issue to enjoin a transfer of assets, "a court balances the plaintiff's likelihood of success against the relative hardship to the parties. To receive a preliminary injunction, [a plaintiff is] required to show either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represent extremes of a single continuum, rather than two separate tests." *In re Focus Media Inc.*, 387 F.3d at 1085.[4]

In ruling on a motion for a preliminary injunction, a court has the discretion to hold an

---

[4] The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction.  *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  evidentiary hearing and permit discovery. *Takiguchi v. MRI Int'l, Inc.,* 611 F. App'x 919, 920

2  (9th Cir. 2015).  The court also has discretion to consider and weigh oral testimony and evidence

3  that would otherwise be inadmissible at trial. *Flynt Distributing Co. v. Harvey,* 734 F.2d 1389,

4  1394 (9th Cir. 1984).

5      **A.    The Debtor Will Likely Succeed On The Merits**

6      To prevail on the first element, the Trustee has the burden to show "a fair chance of

7  success." *In re Focus Media Inc*., 387 F.3d at 1086. The Trustee does not have to prove absolute

8  certainty of the outcome of the litigation.  The Trustee need only prove that there are "serious

9  questions" that cannot be resolved at the preliminary injunction hearing, justifying a preservation

10  of the status quo. *Repub. Of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

11      As set forth above, the Bankruptcy Court has denied two motions to dismiss.  The factual

12  record demonstrates a substantial likelihood of success.  At a minimum, the Trustee raises serious

13  questions going to the merits of those claims.

14      **1.    The Debtor Made Transfers To Weinstein**

15      Pursuant to Bankruptcy Code section 101(54) and California Civil Code section 3439.01,

16  a "transfer" is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary,

17  of disposing of or parting with any asset or an interest in any asset, and includes payment of

18  money, release, lease and creation of a lien or other encumbrances."

19      From and after December 27, 2007, the Debtor transferred at least $130 million to TWC.

20  Friedman Decl., Exs. I and J.  A detailed list of the Transfers is attached as Exhibit D to the

21  Complaint.  The Transfers satisfy the definition of a "transfer" under Bankruptcy Code section

22  101(54) and California Civil Code section 3439.01 because each Transfer is a disposition of

23  property of the Debtor to the TWC.  Accordingly, the Trustee is substantially likely to succeed in

24  demonstrating that the Transfers were made to TWC.

25      **2.    The Debtor Had A Creditor Whose Claim Arose Before The Transfers**

26          **Were Made**

27      For a transfer to be fraudulent under California Civil Code section 3439.05, the debtor

28  must have had a creditor whose claim arose before the allegedly fraudulent transfer was made.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Here, WWE is an unsecured creditor of the Debtor existing before the Transfers were made who

2    has an allowed unsecured claim against the Debtor's Estate as of the petition date.  Drinkwater

3    Decl, ¶ 12; WWE Proof of Claim No. 6.  Thus, this element is satisfied.

4    **3.    The Debtor Did Not Receive Reasonably Equivalent Value In Exchange**

5    **For The Transfers**

6    The Trustee has raised serious questions as to whether the Debtor received less than

7    reasonably equivalent value in exchange for the Transfers.  Under Bankruptcy Code section

8    548(a)(1)(B) and California Civil Code section 3439.05, a transfer is fraudulent as to a creditor

9    whose claim arose before the transfer was made if the transfer is made without receiving a

10   reasonably equivalent value in exchange for the transfer or obligation, and the debtor was

11   insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.  *Id.*

12   A debtor is insolvent, if at fair valuations, the sum of the debtor's debts is greater than the sum of

13   the debtor's assets.  Cal. Civ. Code § 3439.02(a).  A debtor who is generally not paying his or her

14   debts as they become due is presumed to be insolvent.  *Id.*

15   The determination of "reasonably equivalent value" is based on the totality of the

16   circumstances.  Courts consider a variety of factors, including: (1) the fair market value of the

17   service received compared to the price paid; (2) the arm's-length nature of the transaction; and (3)

18   the good faith of the transferee.  *In re Key3Media Group, Inc.,* 336 B.R. 87, 94 (Bankr. D. Del.

19   2005).  Courts have held that transfers of property pursuant to below-market agreements may be

20   avoided as fraudulent transfers.  *See, e.g., In re Fashion World, Inc.*, 44 B.R. 754, 756 (Bankr.

21   Mass. 1984) (below-market lease agreement was avoidable as a fraudulent conveyance).

22   As set forth above and in greater detail in the Kaplan Expert Report, the Debtor did not

23   receive reasonably equivalent value in exchange for the Transfers.  Accordingly, the Trustee has

24   established a likelihood of success that he will establish that the Debtor did not receive reasonably

25   equivalent value in exchange for the Transfers.  At the very least, the Trustee has raised serious

26   questions regarding whether the Debtor received reasonably equivalent value in exchange for the

27   Transfers.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**4.      The Debtor Made the Transfers While Insolvent**

The Trustee is likely to establish that the Debtor was insolvent when it made the Transfers to TWC.  California Civil Code section 3439.02 governs insolvency.  Subsection (a) provides that a debtor is insolvent if, at fair valuations, the sum of the debtor's debt is greater than the sum of the debtor's assets.  Subsection (b) provides that a debtor that is generally not paying its debts as they become due is presumed insolvent.  Subsection (c) provides that assets under section 3439.02 do not include property that has been transferred, concealed, or removed with intent to hinder, delay or defraud creditors or that has been transferred in a manner making the transfer voidable under the chapter.  *In re Koubourlies*, 869 F.2d 1319, 1321 (9th Cir. 1989).

At the time of the Transfers, the Debtor was insolvent.  As set forth above, GPI's publicly filed disclosures with the SEC reported that the Debtor had significant operating losses starting in 2006 that continued through the cessation of its operations, and was balance sheet insolvent no later than 2008.  Drinkwater Declaration, Ex. G at page 25; Ex. H at page 23.

In sum, the Trustee has demonstrated a substantial likelihood of success in its fraudulent transfer claims against Weinstein.  At a minimum, the Trustee raises serious questions going to the merits of those claims.

**B.      The Debtor Is Likely To Suffer Irreparable Harm In The Absence Of An Injunction**

An injunction is necessary to prevent the Debtor from suffering irreparable injury, namely the inability to recover the fraudulent funds that TWC received through the TWC Distribution Agreement.  Irreparable injury results when there is "a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson*, 572 F.3d at 1085.  To determine whether that likelihood exists, courts specifically consider the non-moving party's prior conduct.  *See, Johnson*, 572 F.3d at 1085.  An asset freeze is appropriate if that conduct demonstrates that the non-moving party is capable of placing assets beyond the reach of a judgment.  *In re Focus Media, Inc.*, 387 F.3d at 1086.  The Debtor will suffer irreparable harm in the absence of an injunction.  Weinstein's current crisis evidences a real risk of dissipation:

- Recent press reports have suggested a potential sale of all or a significant portion

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

of TWC's assets may occur in a matter of weeks.  Such an expedited asset sale will almost certainly be detrimental to TWC's unsecured creditors, including the Debtor. This type of sale is unusual in the entertainment industry and what appears contemplated is a fire sale that will result in a write off of goodwill and going concern values.

- TWC is probably in material default under one or more of its lender agreements. It is standard for loan and security documents in the entertainment industry to contain numerous debt covenants.  In the case of TWC, these covenants would include that HW, as a Key Man, remain materially active in TWC's trade/business. HW was terminated by TWC, so it is safe to assume that TWC is in violation of this debt covenant.  Weinstein is also likely in breach of financial threshold covenants relating to (a) security under its credit facilities, (b) financial performance, and (c) liquidity.  Therefore, there is a risk that Weinstein will quickly consummate transactions to satisfy the demand of its lenders as opposed to what is in the best interests of the enterprise.

- In summary, (a) TWC is in possession of at least $45 million of assets that rightfully belong to Genius; (b) those assets were employed in TWC's business enterprise and were placed at risk; (c) the risk increased as a result of HW's wrongdoing; (d) the sale of assets under the circumstances described in the press is not being conducted in a manner typical of library/ business entity sales in the entertainment industry and will likely wipe out a meaningful amount of TWC equity and reduce the value of TWC's assets to a level that makes recovery of Genius's funds highly improbable; and (e) the prevention of an asset fire sale is unlikely to harm secured creditors while it will provide needed protection to TWC's unsecured creditors by preventing the corporate financial drain associated with a fire sale.

Kaplan Decl., ¶¶ 17-21, Exhibit 1.

Accordingly, in order to prevent the imminent dissipation of TWC's assets and to ensure that the Trustee will be able to satisfy his claims, the proposed injunction should be granted.

Moreover, the proposed injunctive relief should be granted because Weinstein's prior conduct enhances the possibility that it will dissipate assets.  As evidenced by the facts of this very litigation, Weinstein has a history of structuring its transactions to make recovery by creditors very difficult.  Weinstein's prior conduct with the Debtor shows the need for injunctive relief to ensure that Weinstein does not dissipate its assets at the expense of the Debtor's creditors.

Should Weinstein disagree with the Trustee's position regarding its financial health, Weinstein should segregate cash or other assets that will be designated for the benefit of the Trustee if and when a judgment is entered.  While Weinstein received over $130 million in transfers, the Trustee recognizes that Weinstein may be able to offset that amount to the extent

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  Weinstein provided value to the Debtor.  Therefore, the Trustee suggests assets worth at least $45

2  million should be segregated.

3  **C.     The Balance Of The Equities Is In The Trustee's Favor.**

4  To determine whether an injunction is appropriate, the Court must evaluate the interim

5  harm the defendant is likely to sustain if the injunction is granted, and compare it with the harm

6  the plaintiff is likely to suffer if injunctive relief is denied.  *Winter v. Nat'l Res. Def. Council,*

7  *Inc.*, 555 U.S. 7, 22 (2008).  Here, the balancing of the equities heavily favors entry of an

8  injunction.  Without relief, it is likely that Weinstein's assets will be dissipated and the Trustee's

9  chance of collecting any judgment accordingly diminished.

10  Weinstein, on the other hand, will suffer no cognizable injury if the Court preserves the

11  *status quo* by issuing the injunction.  As a practical matter, Weinstein is no longer a viable going

12  concern business.  The injunction will ensure that Weinstein's effective liquidation will be

13  transparent and realize fair market value, and not fire sale value, for its assets.  Consequently, the

14  balance of the equities favor the Trustee.

15  **D.     Relief Is In The Public Interest**

16  The public interest is not a significant factor unless the requested injunction would impact

17  non-parties.  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009) ("When the reach

18  of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the

19  public interest will be 'at most a neutral factor in the analysis rather than one that favor[s]

20  [granting or] denying the preliminary injunction.").  As Weinstein is effectively in liquidation

21  mode, the public interest is in ensuring a transparent process that avoids the dissipation of assets

22  that only benefits insiders.  Accordingly, this factor supports issuance of the proposed injunctive

23  relief.

24  **E.     The Court Should Not Require A Bond**

25  California Civil Code section 3439.07(a)(3) does not require a bond as a condition to

26  relief. The Court may dispense with the bond requirement of Federal Rule of Bankruptcy

27  Procedure 7065 if "there is no realistic likelihood of harm to the defendant from enjoining his or

28  her conduct."  *Johnson*, 572 F.3d at 1086.  Following the ruination of the Weinstein brand

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   following the sexual harassment allegations and HW's firing, it is evident that TWC must

2   liquidate.  Accordingly, the temporary restraining order preserving the status quo will not cause it

3   to suffer any harm.

4                                                **VIII.**

5                                          **<u>CONCLUSION</u>**

6          **WHEREFORE**, the Debtor respectfully requests that this Court issue the TRO, enter an

7   Order to Show Cause why a preliminary junction should not issue, and provide such other and

8   further relief as the Court deems just and proper.

9

10  DATED:  November 2, 2017                   **ROBINS KAPLAN LLP**

11

12                                            By:  /s/ David B. Shemano
                                                  David B. Shemano
13                                                James P. Menton, Jr.
                                                  Kevin D. Meek

14                                            Special Litigation Counsel for Alfred H. Siegel,
15                                            Chapter 7 Trustee

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit A**

**Proposed Order**

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
David B. Shemano (State Bar No. 176020)
*dshemano@robinskaplan.com*
James P. Menton, Jr. (State Bar No. 159032)
*jmenton@robinskaplan.com*
2049 Century Park East, Suite 3400
Los Angeles, CA  90067
Telephone: 310-552-0130
Facsimile: 310-229-5800

Special Litigation Counsel for Alfred H. Siegel,
Chapter 7 Trustee

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>GENIUS PRODUCTS, LLC,<br><br>          Debtor. | Case No.  2:11-bk-62283-BB<br><br>Chapter 7 |
| ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE FOR THE ESTATE OF GENIUS PRODUCTS, LLC,<br><br>          Plaintiff,<br><br>    v.<br><br>THE WEINSTEIN COMPANY, LLC; and THE WEINSTEIN COMPANY HOLDINGS, LLC,<br><br>          Defendants. | Adv. No. 2:15-ap-1241-BB<br><br>**TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>**Hearing:**<br>Date:<br>Time:<br>Place:    Courtroom 1539<br>          255 East Temple Street<br>          Los Angeles, CA  90012 |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Upon the *Application For A Temporary Restraining Order And Order To Show Cause Why A Preliminary Injunction Should Not Issue* (the "Application"), filed by Plaintiff Alfred H. Siegel, as chapter 7 trustee (the "Trustee") for the estate of Genius Products, LLC (the "Debtor"); and upon consideration of the Application, the Declarations of Howard J. Kaplan, Trevor Drinkwater, James P. Menton Jr., Anthony A. Friedman, and David B. Shemano filed concurrently therewith and the record of this bankruptcy case (the "Case"); and it appearing that the Court has jurisdiction to consider the Application pursuant to 28 U.S.C. §§ 1334 and 157, and it appearing that the Application is a core matter pursuant to 28 U.S.C. § 157(b)(2), and that the Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of the Case and of the Application is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that notice was reasonable and adequate in the circumstance; and it appearing that the relief requested in the Application is in the best interests of the Debtor's estate, its creditors, and other parties in interest;

**THE COURT FINDS AND CONCLUDES**:

1.      The Trustee has demonstrated a substantial likelihood of success on the merits.

2.      The Trustee has demonstrated that: (i) the relief requested in the Application is necessary to prevent the imminent dissipation of Weinstein's assets, which assets are necessary for the Trustee to satisfy his fraudulent transfer claims against Weinstein; and (ii) without a Court order granting the relief proposed in the Application, the Trustee, the Debtor's creditors, and other parties in interest will be substantially harmed;

3.      The Trustee has demonstrated that no injury will result to any party that is greater than the harm to the Trustee in the absence of the requested relief, and that the interests of the public will be served by this Court's granting of the relief requested;

4.      The Court finds that no security is required under Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules");

Accordingly**,** after due deliberation, and good and sufficient cause appearing therefor, it is hereby

61386053.9

- 21 -

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Trustee's Application is GRANTED.

2.      A hearing (the "Hearing") on the Trustee's application for a preliminary injunction extending the relief in this order until the entry of a final order shall be held at _____ _.m. on _____, 2017 in Courtroom 1539, United States Bankruptcy Court, 255 East Temple Street, Los Angeles, CA 90012.

3.      Pending the Hearing, pursuant to sections 7065 and 105(a) of the Bankruptcy Code and section 3439.07(a)(3) of the California Civil Code, Weinstein and their respective agents, employees and representatives are enjoined from using, transferring, encumbering, or otherwise disposing of Weinstein's respective assets, debt, or equity interests outside the ordinary course of business unless either (a) the Trustee consents in writing, or (b) pursuant to Order of this Court.

4.      Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure, the security provisions of Rule 65(c) of the Federal Rules of Civil Procedure are waived.

5.      The Trustee shall cause notice of the entry of this Order to be served by United States mail, first-class postage prepaid or by overnight courier, on _____.

6.      Service in accordance with this Order shall constitute adequate and sufficient service and notice.

7.      Responses or objections to the Trustee's request for a preliminary injunction must be made pursuant to the Bankruptcy Code, the local rules of the Court, and the Bankruptcy Rules and in writing describing the basis therefore, which objection or response must be filed with the Bankruptcy Court electronically by registered users of the court's ECF System and served upon counsel for the Trustee so as to be received by _____, at 5:00 p.m., Pacific Standard Time, in accordance with the requirements of Bankruptcy Rule 1011(b). Notices to counsel for the Trustee should be addressed to Robins Kaplan, LLP, 2049 Century Park East, Suite 3400, Los Angeles CA 90067 Attention: David B. Shemano and James P. Menton Jr.

8.      The Trustee's reply to any response or objection to the Trustee's request for a preliminary injunction must be made pursuant to the Bankruptcy Code, the local rules of the Court, and the Bankruptcy Rules and in writing describing the basis therefore, which reply must be filed

1  with the Bankruptcy Court electronically by registered users of the court's ECF System and served

2  upon counsel for Weinstein so as to be received by _____, at 5:00 p.m., Pacific Standard

3  Time, in accordance with the requirements of Bankruptcy Rule 1011(b).

4      9.      The Court retains jurisdiction and power with respect to all matters arising from or

5  related to the implementation or interpretation of this Order.

###

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit B**

**Appendix of Unpublished Cases**

1.      *Wimbledon Fund, SPC (Class TT) v. Graybox, LLC*, 2015 U.S. Dist. LEXIS 134966 (C.D. Cal. September 29, 2017)

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

⚠ Caution
As of: November 3, 2017 2:29 AM Z

# *Wimbledon Fund, SPC (Class TT) v. Graybox, LLC*

United States District Court for the Central District of California

September 29, 2015, Decided; September 29, 2015, Filed

2:15-cv-06633-CAS(AJWx)

**Reporter**
2015 U.S. Dist. LEXIS 134966 *

THE WIMBLEDON FUND, SPC (CLASS TT) v. GRAYBOX, L.L.C., ET AL.

**Subsequent History:** Petition denied by, Injunction granted at *Wimbledon Fund, SPC (Class TT) v. Graybox, L.L.C., 2015 U.S. Dist. LEXIS 143363 (C.D. Cal., Oct. 20, 2015)*

Motion denied by *Wimbledon Fund, SPC v. GRAYBOX, L.L.C., 2015 U.S. Dist. LEXIS 157348 (C.D. Cal., Nov. 19, 2015)*

Motion denied by *Wimbledon Fund, SPC (CLASS TT) v. Graybox, LLC, 2016 U.S. Dist. LEXIS 186326 (C.D. Cal., June 13, 2016)*

Related proceeding at *Wimbledon Fund, SPC (Class TT) v. Bergstein, 2016 U.S. Dist. LEXIS 81405 (C.D. Cal., June 21, 2016)*

Motion denied by *Wimbledon Fund, SPC (Class TT) v. Graybox, L.L.C., 2016 U.S. Dist. LEXIS 106492 (C.D. Cal., Aug. 11, 2016)*

Stay granted by, Request denied by, Motion granted by *Wimbledon Fund, SPC v. Graybox, LLC, 2017 U.S. Dist. LEXIS 5517 (C.D. Cal., Jan. 9, 2017)*

Related proceeding at *United States v. Bergstein, 2017 U.S. Dist. LEXIS 67582 (S.D.N.Y., May 3, 2017)*

Motion granted by *The Wimbledon Fund, SPC (Class TT) v. Graybox, LLC, 2017 U.S. Dist. LEXIS 102958 (C.D. Cal., June 30, 2017)*

## Core Terms

transferred, funds, injunction, preliminary injunction, freezing, entities, argues, requests, parties, settlement, fraudulent transfer, settlement proceeds, alleges, Reply,

dissipating, fraudulent, services, manage, asserts, public interest, bank account, contends, irreparable, Trustees', attorneys

**Counsel:** **[*1]** Attorneys for Plaintiffs: Not Present.

Attorneys for Defendants: Not Present.

**Judges:** CHRISTINA A. SNYDER.

**Opinion by:** CHRISTINA A. SNYDER

# Opinion

**CIVIL MINUTES - GENERAL**

**Proceedings**: (IN CHAMBERS) - PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

Plaintiff, The Wimbledon Fund, SPC (Class TT) ("Wimbledon"), filed this action on August 28, 2015 against defendants Graybox, L.L.C. ("Graybox"), Integrated Administration, Eugene Scher, as trustee of the Bergstein Trust, and Cascade Technologies, Corp. (collectively, "defendants"). Dkt. 1. In brief, the complaint alleges that Wimbledon was the victim of a fraudulent investment scheme involving an investment advisory company named Swartz IP Services Group ("SIP"). See generally Id. Wimbledon asserts that in November and December 2011, it invested $17.7 million dollars with SIP pursuant to a note purchase agreement, but that subsequently SIP caused this investment to be transferred to various third parties, including defendants. Id. at 4-6. Wimbledon asserts that these transfers violated its agreement with SIP and constituted

Case 2:15-ap-01241-BB    Doc 125    Filed 11/02/17    Entered 11/02/17 22:20:58    Desc
Main Document    Page 30 of 38

Page 2 of 8
2015 U.S. Dist. LEXIS 194966, *1

fraudulent transfers in violation of the California Uniform Fraudulent Transfer Act ("CUFTA"). See id. Accordingly, Wimbledon asserts claims against [*2] defendants for recovery of fraudulent transfers pursuant to *California Civil Code §§ 3439.04*, *3439.05*, and *3439.07*. Id. at 7-12.

In the instant motion, Wimbledon requests a preliminary injunction freezing the assets of defendant Graybox in order to prevent Graybox from dissipating a $2.9 million wire transfer it is expected to receive in the coming weeks. Mot., at 1. Wimbledon believes that these funds are the only assets likely to satisfy its fraudulent transfer claim against Graybox. Id.

On September 9, 2015, Wimbledon filed the instant motion for a preliminary injunction against Graybox. Dkt. 16. On September 25, 2015, Graybox filed an opposition, Dkt. 50, and on September 28, 2015, Wimbledon filed a reply, Dkt. 52.

## II. BACKGROUND

### A. SIP, Graybox, and the Note Purchase Agreement

According to Graybox, SIP was formed on December 10, 2010 for the purpose of providing advisory services and making investments. Dkt. 50-2, Decl. of David Bergstein ("Bergstein Decl."), ¶ 3. During the period relevant to this suit, the president and secretary of SIP was David Bergstein ("Bergstein"). Dkt. 16, Ex. E, SIP Resolution. Bergstein was also the founder of Graybox and, since its founding, has always been the primary manager of Graybox. See Bergstein Decl., [*3] ¶¶ 2-3. Shortly after SIP was formed it entered into a consulting agreement with Graybox whereby Graybox would provide consulting services to SIP in exchange for a quarterly fee of at least $50,000. Opp'n., at 4. In accordance with this and other agreements, SIP and Graybox engaged in a number of collaborate investment activities during the period relevant to this action. See Opp'n., at 4-7.

On or about November 14, 2011, Wimbledon and SIP entered into a Note Purchase Agreement (the "NPA"). Dkt. 16, Ex. A, NPA. Pursuant to this agreement, Wimbledon had the right to purchase up to $25 million worth of reference notes issued by SIP (the "SIP Notes"). Id. at 1. The NPA stated that the value of the SIP notes would be tied to the performance of the Tewksbury Investment Fund. Id. at 9. Wimbledon states that the Tewksbury Investment Fund is a multi-billion

dollar hedge fund, well-known in financial circles for its stability and successful annual returns. Dkt. 16, Ex. B, Decl. of Vincent King ("King Decl.").

Pursuant to the NPA, the SIP notes were scheduled to become due and payable in full as of November 14, 2016, although Wimbledon could extend this date to November 14, 2021. Id. Notwithstanding these provisions, the NPA permitted [*4] that on or after December 1, 2011 and with thirty days written notice, Wimbledon could make a "redemption request" upon SIP. Id. at 11. Upon receipt of a valid redemption request, SIP was required to pay a portion of the value of the SIP Notes to Wimbledon. Id. Furthermore, in the event that SIP failed to comply with any of the terms of the NPA, and failed to resume compliance within thirty days, Wimbledon was entitled to declare the SIP Notes immediately due and payable in full. Id.

In November and December 2011, Wimbledon made payments of $12.5 and $5.2 million, respectively, to SIP to purchase SIP Notes. King Decl., ¶ 4. Bank account statements provided by Wimbledon appear to indicate that at or around the time Wimbledon purchased the SIP Notes, SIP opened bank accounts with Wells Fargo and Deutsche Bank and made deposits in the amount of Wimbledon's investment. Dkt. 16, Ex. H, Wells Fargo Acct. Statement; Dkt. 16, Ex. I, Deutsche Bank Acct. Statement. Wimbledon contends that shortly after these funds were deposited, through a series of withdrawals and wire transfers SIP transferred virtually all of these funds to third parties. Mot., at 1. Wimbledon alleges that Bergstein authorized the [*5] majority of these transfers and that many of the transfers were made to Bergstein's company, Graybox. Mot., at 3-4. In total, Wimbledon contends that between November 2011 and July 2012 Bergstein directed the transfer of $2,412,000 to Graybox and that these transfers (the "Graybox Transfers") were inconsistent with and violated the NPA. Mot., at 3.[1]

---

[1] In support of these allegations, Wimbledon has produced a number of account statements and summaries purportedly from SIP's accounts with Wells Fargo and Deutsche Bank. The Wells Fargo statement indicates that a deposit of $5.2 million was made on December 8, 2011. Dkt. 16, Ex. H, Wells Fargo Acct. Statement, at 2. Through a series of wire transfers and withdrawals, over the next fifteen days all but $67,875 was removed from this account. Id. The statement indicates that $300,000 was transferred to Graybox via two wire transfers. Id. Similarly, the Deutsche Bank statements indicate that a cash deposit of $12,500,000 was made in late November 2011. Dkt. 16, Ex. I, Deutsche Bank Acct. Statement. Summaries of these accounts indicate that within

Case 2:15-ap-01241-BB    Doc 125    Filed 11/02/17    Entered 11/02/17 22:20:58    Desc
Main Document    Page 31 of 38

Page 5 of 8
2015 U.S. Dist. LEXIS 194966, *5

In August and October 2012 and in January 2013, Wimbledon made redemption requests on SIP to return portions of Wimbledon's investment. King Decl. ¶ 5. Wimbledon contends that SIP ignored these requests. Id. In February 2013, Wimbledon declared the notes immediately due and payable. Id. ¶ 6. Wimbledon contends that SIP ignored their request to accelerate payment of the notes. Id. On February 8, 2013, Wimbledon filed suit in New York state court asserting a claim for breach of contract against SIP. Dkt. 16, Ex. C. In the New York action, Wimbledon alleged that SIP's failure to comply with Wimbledon's redemption requests and notice to accelerate payment of the SIP Notes constituted a breach of the NPA. Id. Accordingly, Wimbledon requested damages [*7] in the amount of the unpaid balance of the SIP Notes. Id. Wimbledon alleges that on July 14, 2015, the New York state court entered judgment in its favor. Dkt. 16, Ex. C, Decl. James Walker ("Walker Decl.").

Graybox argues that the transfers Wimbledon identifies were in fact legitimate and that they were approved by Wimbledon's managing entity, Weston Capital Management L.L.C and/or Weston Capital Asset Management, L.L.C. (collectively, "Weston"). Opp'n., at 4-6. During the period relevant to this suit, Wimbledon retained Weston to manage its investments. Bisconti Decl., Ex. 29, ¶ 10; Reply, at 1. Beginning around October 2011, SIP and Graybox entered into several agreements with Weston and another entity controlled by Weston, Pineboard Holdings ("Pineboard"). Graybox argues that the Graybox Transfers were made pursuant to these agreements.

Specifically, on October 1, 2011, Graybox and Pineboard entered into a funding and services agreement. Opp'n., at 5. Pursuant to this agreement, Graybox advanced funds for a number of Pineboard's expenses and then submitted requests to Pineboard for reimbursement. Id. On November 18, 2011, SIP and Pineboard arranged for SIP to purchase a $5 million [*8] note from Pineboard. Id. SIP and Pineboard agreed that, as partial payment for the note, SIP would

assume Pineboard's obligation to reimburse Graybox under the funding and services agreement. Id. Graybox claims that the majority of the Graybox Transfers were made pursuant to this arrangement between SIP and Pineboard. Id. at 5-6.

Additionally, on July 2, 2012, SIP and another company, Glendon Group, Inc. ("Glendon"), entered into a Stock Purchase Agreement (the "Glendon SPA"). Id. at 6. Pursuant to this agreement, SIP agreed to purchase $1 million worth of Glendon's common stock. Id. In order to facilitate this purchase, SIP, Weston, and Graybox agreed that Graybox would cause a loan of $1 million to be made to SIP and that this loan would be financed by advancing up to $900,000 to Graybox. Id. Graybox argues that many of the Graybox Transfers were made in connection with this arrangement to advance funds to Graybox to finance the Glendon SPA. Id. Furthermore, Graybox argues that, because Weston managed Wimbledon during this period, Weston's knowledge and approval of these agreements should be imputed to Wimbledon. Id. [2]

Wimbledon responds that a closer look at these transactions indicates that the entities involved were primarily owned and operated by principals at SIP, including Bergstein. Reply, at 4. For example, Bergstein is the founder and president of Pineboard. Reply, Ex. 1, ¶ 42. Similarly, Glendon is an entity controlled by Kiarash Jam ("Jam"). Reply, at 4. Wimbledon alleges that Jam was one of the founders of SIP. Mot., at 1. And at all times relevant to these agreements, Bergstein was the primary manager of both Graybox and SIP. Reply, at 4. Accordingly, Wimbledon argues that these were not legitimate transactions. Id. With regard to Weston, Wimbledon argues that Weston was a participant in SIP's alleged fraud and accordingly, its actions or knowledge should not be imputed to Wimbledon. Id. In June 2014, the Securities and [*10] Exchange Commission ("SEC") filed a complaint against Weston based, in part, on its actions managing Wimbledon. Reply, Ex. 3, SEC Compl. In its complaint, the SEC alleges that:

[b]eginning in August 2011, Weston . . . and its

---

eight months this account was virtually depleted. Dkt. 16, Exs. O, P. Wimbledon has also produced [*6] a series of communications from this period in which Bergstein directed Deutsche Bank to transfer funds from the Deutsche bank accounts to Graybox. See, e.g. Dkt. 16, Ex. R (requesting transfer of $75,000 to Graybox on December 6, 2011); Ex. S (requesting transfer of $200,000 to Graybox on January 4, 2012); Ex. X (requesting transfer of $160,000 to Graybox on March 20, 2012); Ex. BB (requesting transfer of $600,000 to Graybox on June 4, 2012).

---

[2] Graybox also argues that between November 22, 2011 and May 31, 2012 at Weston's direction, [*9] at least $7,275,675 was transferred to various Weston-managed entities including Wimbledon. Opp'n. at 7. However, Graybox identifies only $1 million which was actually transferred to Wimbledon. Bergstein Decl. ¶ 16. Wimbledon argues that this money was not actually transferred to Wimbledon, and that Weston directed these transfers for its own benefit. Reply, at 5 n.4.

principal Albert Hallac perpetuated a fraud at a cost of more than $17 million to a hedge fund they manage. Under a purported swap transaction with a consulting and investment firm known as Swartz IP Services Group Inc., they drained the Weston-managed hedge fund Wimbledon Fund."

Id. ¶ 1. The complaint also alleged that "Hallac, his son Jeffrey Hallac, and [Weston's counsel] collectively received $750,000 from Swartz IP. This money was investor money . . . which had been transfered to Swartz IP." Id. ¶ 2

## B. Graybox's Corporate Activities

Wimbledon contends that there is substantial evidence that Graybox is a "sham" corporation used primarily as a vehicle for Bergstein to route funds for his personal expenses and business ventures. Mot., at 6. In support of these accusations, Wimbledon relies primarily on a report generated by the trustees in a bankruptcy proceeding to which Graybox was a party. Mot., at 7-8. This report concluded that "Graybox is . . . a shell," "lacked substance," **[*11]** and was "a conduit used to route funds . . . to Bergstein." Dkt. 16, Ex. MM, Trustees' Report, at 354, 371. The trustees based their findings, in part, on evidence that Graybox had transferred funds to Las Vegas casinos to satisfy Bergstein's gambling debts. For example, the trustees identified a payment of $470,000 to the Venetian, two payments of $250,000 to the Wynn Casino, and another payment of $63,000 to the Wynn Casino. Id. at 86, 120, 130, 280. In a declaration submitted in response to the Trustee's report, Bergstein admitted that funds from Graybox were occasionally transferred to Las Vegas casinos to pay for his personal entertainment and gaming activities. Dkt. 16, Ex. D, ¶¶ 6,11. The report also found that Bergstein, and many of the entities he controlled had (1) withheld or deleted numerous computer files during the course of the bankruptcy proceeding, Ex. MM, Trustees' Report, at 6-7, 34-35, 260-63; (2) filed incomplete tax returns, Id. at 284-94; and (3) "likely" backdated documents in an effort to misrepresent when certain assets had been transferred by one of Bergstein's entities, Id. at 295-317.

Graybox responds that many of the allegations contained in this report have never been proven. Opp'n., at 9. Moreover, Graybox notes that subsequent **[*12]** to issuing this report, the Bankruptcy Judge overseeing these proceedings, Judge Russell, determined that the trustees were untrustworthy. Bergstein Decl., Ex. 22, at 13. Among other things, Judge Russell found that the

trustees had failed to exercise "due diligence in attending to the administration of the estate," and could not "be trusted to properly manage [the estate]." Nonetheless, Judge Russell's order made no findings with regard to the trustees' report or the evidence on which the trustees relied in creating their report.

## C. The Aramid Settlement

Bergstein, Graybox, and a number of other entities connected with Bergstein are parties to an ongoing bankruptcy proceeding, In re Aramid Entertainment Fund Limited, et al., in the Bankruptcy Court for the Southern District of New York. Mot., at 5. On August 18, 2015, a number of the parties to this proceeding, including Graybox, reached a settlement. Id. Pursuant to this settlement Graybox is expected to receive $2.9 million. Id.

The Bankruptcy Court approved the settlement on September 16, 2015. Dkt. 32, at 12. Pursuant to *Federal Rule of Bankruptcy Procedure 8002*, the settlement will become effective fourteen days later on September 30, 2015, at which point the settlement **[*13]** funds will begin to be distributed. Id. Wimbledon believes that the proceeds of this settlement agreement are the only funds from which it will likely be able to satisfy its fraudulent transfer claim against Graybox. Mot., at 1. Accordingly, Wimbledon requests a preliminary injunction freezing the assets of defendant Graybox in order to prevent Graybox from dissipating the funds it will receive in the settlement. Id.

## III. LEGAL STANDARD

A court may issue a preliminary injunction to preserve the status quo pending trial. *L.A. Mem'l Coliseum Comm'n. v. Nat'l Football League, 634 F.2d 1197, 1200 (9th Cir. 1980)*. Nonetheless, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc., 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*. "A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter, 555 U.S. at 20*; *Am. Trucking Ass'ns v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009)*. Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support

issuance of an injunction, assuming the other two elements of the Winter test are also met." *Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1132 (9th Cir. 2011)* (interpreting Winter and explaining that the **[\*14]** "sliding scale" test for preliminary injunctive relief remains valid). "Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Repub. of the Phil. v. Marcos, 862 F.2d 1355, 1362 (9th Cir. 1988)* (citations omitted).

Due to the exigent nature of a preliminary injunction, "a court may properly consider evidence that would otherwise be inadmissible at trial." *Cherokee Inc. v. Wilson Sporting Goods Co., 2015 U.S. Dist. LEXIS 82915, 2015 WL 3930041, at \*3.* The Court has discretion "weigh [this] evidence as required to reflect its reliability." *Dr. Seuss Ents. v. Penguin Books USA, Inc., 924 F. Supp. 1559, 1562 (S.D. Cal. 1996).*

## IV. ANALYSIS

### A. Authority to Issue an Injunction Freezing Assets

As an initial matter, Graybox argues that the requested injunction is an inappropriate form of relief. Opp'n., at 11. Specifically, Graybox argues that because the settlement proceeds are not the assets which Wimbledon alleges were fraudulently transferred (i.e. the Graybox Transfers), Wimbledon does not possess a lien or equitable interest in these funds. Id. at 12-13. Accordingly, Graybox contends that the Court may not issue an injunction freezing the settlement proceeds. Id.

In support of this contention, Graybox cites Grupo Mexicano de Desarrollo S.A., v. Alliance Bond Fund, Inc., in which **[\*15]** the Supreme Court held that a district court lacks authority "to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." *527 U.S. 308, 310, 333, 119 S. Ct. 1961, 144 L. Ed. 2d 319 (1999).* However, the Court expressly stated that its holding was limited to cases in which only monetary damages are requested and did not apply where equitable relief is sought. *Id. at 324-25.* And the Court stated that its ruling did not apply to cases in which a fraudulent transfer is alleged. *Id. at 324, n.7* ("Several States have adopted the Uniform Fraudulent Conveyance Act . . . which has been interpreted as conferring on a nonjudgment creditor the right to bring a fraudulent conveyance claim . . . Because this case

does not involve a claim of fraudulent conveyance, we express no opinion on the point.").

Accordingly, the Ninth Circuit has held that Grupo Mexicano does not prevent a court from issuing a preliminary injunction freezing assets where a fraudulent-transfer claim is asserted. See *In re Focus Media, Inc., 387 F.3d 1077, 1085 (9th Cir. 2004)* ("Grupo Mexicano thus exempts from its proscription against preliminary injunctions freezing assets [,] cases involving bankruptcy and fraudulent conveyances, and cases in which equitable relief is sought."). Here, Wimbledon **[\*16]** asserts a claim for recovery of fraudulent transfers against Graybox and accordingly Graybox's reliance on *Grupo Mexicano* is unavailing.

Moreover, Wimbledon is not specifically targeting the settlement proceeds as the only Graybox asset to be frozen. See Reply, at 9. Rather, it is seeking to freeze any and all assets Graybox may possess to prevent Graybox from dissipating those assets prior to resolution of this action. See id. Significant case law supports that a district court may freeze a defendant's assets where there is "a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not ganted." *Johnson v. Couturier, 572 F.3d 1067, 1085 (9th Cir. 2009)* (citing *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 881 (9th Cir.2003)*; see also *In re Focus Media, Inc., 387 F.3d at 1085* (affirming preliminary injunction freezing assets where there was "substantial evidence that assets were being dissipated"); *Kremen v. Cohen, 2011 U.S. Dist. LEXIS 141273, 2011 WL 6113198. At \*6 (N.D. Cal Dec. 7, 2011)* (freezing assets where "there is an appreciable risk that defendants" will dissipate assets). Accordingly, the Court finds that it has the authority to issue the requested injunction.

### B. Likelihood of Success

The Court finds that Wimbledon has demonstrated that, at a minimum, there are "serious questions going to the merits" regarding its claim for fraudulent transfers **[\*17]** against Graybox. Pursuant to *California Civil Code § 3439.04(a)(1)*, a transfer is fraudulent as to a creditor if it is made "with actual intent to hinder, delay, or defraud any creditor of the debtor." In determining whether the transferor acted with "actual intent" the statute provides that a court may consider, among other factors, "(1) Whether the transfer or obligation was to an insider; (2) Whether the debtor retained possession or control of the property transferred after the transfer; . . . (4) Whether

before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit; (5) Whether the transfer was of substantially all the debtor's assets; . . . (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; . . . (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred." *Cal. Civ. Code § 3439.04(b)*.

Here, each of these factors weighs in favor of finding that SIP transferred assets to Graybox with the intent to "hinder, delay, or defraud" Wimbledon. For example, Bergstein was both the president of SIP and the principal manager of Graybox. Accordingly, it **[*18]** appears that the Graybox Transfers were made not only between insiders, but between the same person. See id. *§ 3439.04(b)(1)*. Moreover, through Bergstein, SIP likely retained control over Wimbledon's funds even after they were transferred to Graybox. See id. *§ 3439.04(b)(2)*. SIP also made many of these transfers after receiving requests to return funds to Wimbledon and after Wimbledon declared the SIP Notes immediately due and payable in full. See id. *§ 3439.04(b)(4)*. Finally, the bank account statements provided by Wimbledon indicate that many of these transfers were made shortly after Wimbledon invested funds with SIP (i.e. shortly after SIP incurred its obligation to repay the SIP Notes by 2016) and that after the transfers SIP's bank accounts were virtually depleted. See id. *§§ 3439.04(b)(5)*, *(10)*.

Graybox argues that the Graybox Transfers were not fraudulent because they were made pursuant to ongoing agreements with various investment companies and with the approval of Weston, Wimbledon's managing entity. Opp'n., at 16. However, Graybox's attempt to legitimize these transfers does not cure them of the appearance of impropriety. First, even assuming that Graybox's agreements with Pineboard, Glendon, and Weston, were valid, Graybox provides no **[*19]** explanation of how these agreements comported with the provisions of the NPA. Moreover, it appears that these transactions are merely further instances of insider transactions between SIP and companies owned by its members and directors.

Finally, to the extent Weston may have participated in SIP's alleged scheme to defraud Wimbledon, its conduct may not be imputed to Wimbledon. See *F.D.I.C. v. O'Melveny & Myers, 969 F.2d 744, 750 (9th Cir. 1992)* ("[T]he knowledge acquired by the agent who is acting adversely to his principal will not be attributed to the principal") (rev'd on other grounds by, *512 U.S. 79, 114 S. Ct. 2048, 129 L. Ed. 2d 67 (1994))*; *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton L.L.P., 133 Cal. App. 4th 658, 679, 35 Cal. Rptr. 3d 31 (2005)* ("Nor is a corporation chargeable with the knowledge of an officer who collaborates with outsiders to defraud the corporation."). Furthermore, while the Court does not accept the allegations in the SEC's complaint for their truth, at a minimum, the fact that the SEC has filed a complaint against Weston based on its involvement with SIP raises "serious questions" regarding the propriety of the SIP agreements to which Weston was a party and whether Westons' approval of these agreements may be imputed to Wimbledon.

## C. Irreparable Harm

Wimbledon has also demonstrated that irreparable injury is "likely" in the absence of preliminary relief. *Winter, 555 U.S. at 22*. Generally, monetary injury **[*20]** is not considered to be irreparable. *Nelson v. NASA, 530 F.3d 865, 881 (9th Cir. 2008)*. However, where "there [is] substantial danger that the defendants would transfer or conceal its funds, resulting in denying recovery to the plaintiffs," a preliminary injunction may be appropriate. *In re Estate of Ferdinand Marco, Human Rights Litig., 25 F.3d at 1480*; see also *Johnson, 572 F.3d at 1085* ("A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted.").

In determining whether an asset freeze is appropriate, Courts have frequently looked to evidence of the defendants prior conduct. For example, in Johnson v. Couturier, defendant, the CEO of a corporation, had on prior occasions successfully persuaded his fellow directors and trustees to divert funds from an employee stock ownership plan to his personal bank account. *572 F.3d, at 1085*. The Ninth Circuit found that "[s]uch an individual is presumably more than capable of placing assets in his personal possession beyond the reach of a judgment. Accordingly, [defendant's] own *prior conduct* establishes a likelihood that in the absence of an asset freeze and accounting, Plaintiffs will not be able to recover the improperly diverted funds and will thus be irreparably harmed." Id. (emphasis added); **[*21]** See also *F.T.C. v. Affordable Media, 179 F.3d 1228, 1236 (9th Cir. 1999)* (affirming preliminary injunction "[g]iven the [defendants'] history of spiriting their commissions away to a Cook Islands trust").

Here, Wimbledon has presented evidence that Graybox's manager Bergstein has regularly transferred assets between Graybox and various other entities which he controls, such as SIP and Pineboard. Moreover, while the Court has reservations regarding the trustworthiness of the trustee's report that Wimbledon relies upon, the Court notes that it contains serious accusations regarding the corporate integrity of Graybox and other entities controlled and/or managed by Bergstein. And it appears that Bergstein admits to using Graybox funds on at least several occasions to pay for his personal gambling expenses. Taken together, this evidence supports an inference that there is a "substantial danger" that Graybox, upon receipt of the settlement proceeds, will transfer or otherwise dissipate those funds, before this action is concluded.

## D. Balance of the Equities

In balancing the equities, the Court must evaluate the interim harm defendant is likely to sustain if the injunction is granted, and compare it with the harm plaintiff is likely to suffer if an injunction is **[\*22]** denied. *Winter, 555 U.S. at 24*. As stated above, the Court finds that, absent an injunction, Wimbledon will likely have no means of recovering on its fraudulent transfer claim against Graybox. Accordingly, the harm to Graybox from freezing its assets pending resolution of this action is outweighed by the potential harm to Wimbledon if the injunction is not granted. See also *Arch Ins. Co., 2012 U.S. Dist. LEXIS 162294, 2012 WL 5897327, at \*5* ("[T]he danger that [plaintiff] would not be able to recover on its claims against defendants is greater than the harm to defendants from freezing their assets before trial.").

Nonetheless, Graybox argues that if the Court grants Wimbledon's request for an injunction, multiple non-parties will be adversely affected. Opp'n., at 24. These third parties include twenty-four entities who Graybox asserts have an interest in the settlement proceeds. Id. However, a closer look at the settlement agreement indicates that each of these parties is identified as a "Bergstein Related Party." Bisconti Decl., Ex. 24 § 1.3. Moreover, in the settlement agreement, the signatory for each of these entities was Bergstein. Id. at 16-20. Accordingly, the Court is not persuaded that the alleged harm to these third parties is not simply a harm to Bergstein.

Graybox also argues that **[\*23]** various attorneys claim liens on the settlement proceeds based on legal

services they have provided to Bergstein and his related entities. Opp'n., at 24. Several of these attorneys have produced declarations asserting that they are presently owed fees for their services and that they are entitled to have those fees paid out of the settlement proceeds. Bisconti Decl., Ex. 37, at ¶ 10; Bisconti Decl., Ex. 38, at ¶ 9. However, other than these declarations, Graybox provides no evidence that these attorneys are entitled to the fees they claim.

In any event, Graybox does not explain why the hardship these attorneys will suffer outweighs the potential that Wimbledon will have no basis for obtaining adequate relief if an injunction does not issue. Furthermore, Graybox's assertion that it intends to transfer the settlement proceeds to these attorneys and third-parties only serves to bolster Wimbledon's argument that an injunction is necessary to ensure that Wimbledon may recover on its claims. Accordingly, the Court finds that the balance of the equities favors Wimbledon.

## E. The Public Interest

"When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, **[\*24]** the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.'" *Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138-39 (9th Cir. 2009)* (quoting *Bernhardt v. L.A. County, 339 F.3d 920, 931 (9th Cir.2003))*. "If, however, the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Id. at 1139* (citing *Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 965 (9th Cir. 2002))*.

Here, Graybox argues that the requested injunction is not in the public interest because it will affect the distribution of the settlement proceeds to non-parties. Opp'n., at 24-25. However, for the reasons stated above, the Court finds that the interests of these parties are outweighed by the potential that Wimbledon will not be able to obtain adequate relief on its claims against Graybox. Accordingly, the public interest is not a significant factor in this case.

## V. CONCLUSION

In accordance with the foregoing, plaintiff's motion for a preliminary injunction is GRANTED. Plaintiff is directed to submit a proposed order granting the requested injunction. In addition, the parties are instructed to submit additional briefing, not to exceed 10 pages, regarding an appropriate bond, if any.

IT IS SO ORDERED. **[*25]**

---

**End of Document**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): **APPLICATION OF CHAPTER 7 TRUSTEE FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **November 2, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Alan R Friedman    afriedman@foxrothschild.com, dkatz@foxrothschild.com
- Benjamin R. King    bking@loeb.com, karnote@loeb.com; ladocket@loeb.com
- Mette H Kurth    mkurth@foxrothschild.com, pchlum@foxrothschild.com
- James P Menton    JPMenton@rkmc.com
- Manoj D Ramia    manoj.ramia@klgates.com, klgatesbankruptcy@klgates.com
- David B Shemano    dshemano@robinskaplan.com
- Alfred H Siegel (TR)    Al.siegel@asiegelandassoc.com, Lisa.irving@asiegelandassoc.com;Margo.tzeng@asiegelandassoc.com;asiegel@ecf.epiqsystems.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **November 2, 2017** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**Judge:**
Hon. Sheri Bluebond
United States Bankruptcy Court
Central District of California
255 E. Temple Street, Suite 1534 / Courtroom 1539
Los Angeles, CA 90012

**Counsel for Weinstein:**
William H. Stassen, Esq.
Fox Rothschild LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103

Alan Friedman, Esq.
Fox Rothschild LLP
101 Park Avenue, 17th Floor
New York, NY 10178

**Office of United States Trustee:**
United States Trustee (LA)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 2, 2017 | Kevin D. Meek | /s/ Kevin D. Meek |
|:---:|:---:|:---:|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
61387946.1

**F 9013-3.1.PROOF.SERVICE**