ROBINS KAPLAN LLP
David B. Shemano (State Bar No. 176020)
dshemano@robinskaplan.com
James P. Menton, Jr. (State Bar No. 159032)
jmenton@robinskaplan.com
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone: 310-552-0130
Facsimile: 310-229-5800

Special Litigation Counsel for Alfred H. Siegel,
Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re | Case No. 2:11-bk-62283-BB |
| GENIUS PRODUCTS, LLC, | Chapter 7 |
| Debtor. | |
| ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE FOR THE ESTATE OF GENIUS PRODUCTS, LLC, | Adv. No. 2:15-ap-01241-BB |
| Plaintiff, | **DECLARATION OF HOWARD J. KAPLAN IN SUPPORT OF APPLICATION OF CHAPTER 7 TRUSTEE FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| v. | |
| THE WEINSTEIN COMPANY LLC, and THE WEINSTEIN COMPANY HOLDINGS LLC, | |
| Defendants. | Date: November 28, 2017 Time: 2:00 p.m. Place: Courtroom 1539 United States Bankruptcy Court 255 East Temple Street Los Angeles, CA |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61387737.1

## DECLARATION OF HOWARD J. KAPLAN

I, Howard J. Kaplan, declare as follows:

1. I am a retained expert in the above-captioned matter. I submit this Declaration in support of the motion for injunctive relief brought by plaintiff Alfred H. Siegel (the "Trustee'), chapter 7 trustee for the estate of Genius Products, LLC ("Genius").

2. Attached as Exhibit 1 is a true and correct copy of my initial Expert Report dated November 2, 2017 (the "Expert Report"). I hereby incorporate by reference the contents of the Expert Report as if fully rewritten herein.

3. A true and correct description of my background and qualifications is set forth in the Expert Report on pages 1-3, inclusive and Exhibit A.

4. The opinions rendered in my Expert Report and the bases thereof are detailed in various sections of my Expert Report. Terms not defined herein shall have the meanings ascribed to them in my Expert Report. I summarize my opinions below.

5. Based on a review of available documents, I conclude the TWC Distribution Agreement (a) contains numerous below market terms (including a below market distribution fee) at the time of its execution; and (b) the amount of identifiable loss resulting from the difference in value to Genius, between the terms reflected in the TWC Distribution Agreement and actual market, approached $50 million. This computation does not include quantification of numerous below market terms for which documentation necessary to identify the loss was unavailable.

6. Based on my experience, the fee set forth in the TWC Distribution Agreement is meaningfully and substantially below market. This is also buttressed by comparing the TWC Distribution Agreement fee with the fees set forth in other Genius distribution agreements. The TWC Distribution Fee typically represents a discount of 50% or more over Genius' distribution agreements with its other significant customers.

7. I have a very high degree of confidence (nearing certainty) that arm's length distribution fees set forth in output agreements with TWC and other Weinstein-controlled (including Miramax and Dimension Films) entities are materially in excess of the fee set forth in the TWC Distribution Agreement. I understand that TWC has produced a limited number of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

distribution or similar agreements to the Trustee in discovery.

8.    I also have a high degree of confidence (nearing certainty) that with respect to acquired properties, the arbitrage between what TWC paid a third party producer and what Genius charged TWC for the same feature film product, will be in excess of 100% and, more often than not, a multiple of the TWC Distribution Agreement fee.  This is true even though there will probably be cases where TWC acquired the particular property for no up-front fee. In other words, TWC simply agreed to distribute the particular film, and then sub distributed the product through its agreement with Genius placing the distribution burden and risk on Genius.

9.    The loss resulting from the below market distribution fee is at least $31,915,687.

10.    In contravention of typical market terms, the TWC Distribution Agreement improperly permitted TWC to include or exclude items that would be covered by the agreement. The most significant of these was Inglourious Basterds.  The damages resulting from lost distribution fee income on this film was at least $8 million.

11.    Market distribution agreements typically provide for the cross collateralization of titles.  That is, gains from one title can be used to offset losses on another title.  This is typically thought to be one of the benefits of a multi-picture output arrangement.  The TWC Distribution Agreement prohibits cross collateralization. The loss resulting from this prohibition is at least $2.1 million.

12.    Numerous terms of the TWC Distribution Agreement were used to defer payments of expenses from TWC to Genius.  I estimate the loss resulting from Genius having to carry these costs at $5 million.  This does not include any interest on damages.  For example, interest has not been calculated on loss resulting from the below market distribution fee.

13.    Terms that were not quantifiable as of the date of the Expert Report include (a) the failure to have Harvey Weinstein ("HW") listed as a Key Man to the TWC Distribution Agreement; (b) excess losses resulting from TWC's ability to force Genius to include a substantial amount of non-theatrical product through its distribution system (non-theatrical films are more costly to distribute and can put downward pressure on the profits of a company such as Genius especially when the distribution fee is below market in contemplation of receiving

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

substantial theatrical feature films); (c) the failure to include new technology rights; (d) the inclusion of an excessive amount of dedicated staff; (e) the loss on the disposal or distribution of inventory at the conclusion of the TWC deal; and (f) a below market return reserve. All of these items are substantial exposure/expense items for which a distributor would typically receive protection in a distribution agreement with a production company.

14.    The failure to include a key man provision for HW is an example of a typical contract item missing from the TWC Distribution Agreement but which is critical to Genius' interests. HW's value to TWC is readily/publicly available for all to see as his actions have had an immediate and toxic effect on the TWC brand and its overall viability as a going concern. Had these events occurred during the term of the TWC Distribution Agreement, the effect on Genius could have been catastrophic. The inclusion or exclusion of items such as a Key Man clause and the exposure created by foregoing such protection has monetary value. Moreover, other terms that I have not quantified as of the date of the Expert Report have potential meaningful effect that are further illustrated by recent events. The failure to include a copyright mortgage in the TWC Distribution Agreement to secure Genius' distribution rights would have posed meaningful challenges to Genius as TWC's creditors sought to secure their interests in the wake of the disclosure of HW's activities.

15.    The TWC Distribution Agreement required that Genius maintain a large dedicated staff. The size and experience level of this staff were subject to TWC's approval. This approval gave TWC meaningful control over overhead items associated with product that was already being distributed at below market rates.

16.    I can say with reasonable certainty that when discovery is completed and distribution documents pertaining to TWC's (and other Weinstein controlled entities') are produced, the evidence will be overwhelming that the distribution fee and numerous other terms included in the TWC Distribution Agreement were substantially below market. It is already clear that adjusting the fee in the TWC Distribution Agreement to market would have had a meaningful effect on Genius's financial position.

17.    Recent press reports have suggested a potential sale of all or a significant portion

of TWC's assets may occur in a matter of weeks. Such an expedited asset sale will almost certainly be detrimental to TWC's unsecured creditors.

18.     This type of sale is unusual in the entertainment industry and what appears contemplated is a "fire sale" that will result in a write off of goodwill and going concern values.

19.     TWC is probably in material default under one or more of its lender agreements. It is standard for loan and security documents in the entertainment industry to contain numerous debt covenants. In the case of TWC, these covenants would include that HW as a Key Man, remain materially active in TWC's trade/business. HW was terminated by TWC. There is no evidence that TWC's financiers waived this provision, so it is safe to assume that TWC is in violation of this debt covenant. In addition, these covenants would include various financial thresholds relating to (a) security under its credit facilities; (b) financial performance; and (c) liquidity. Notwithstanding that the need for a financial infusion from Colony Capital was an indicator that financial performance and liquidity covenants were probably violated, the sale of "all or a significant portion of TWC's assets" would be a standard debt covenant violation.

20.     In my experience, officers and lenders of a company will frequently undertake a transaction that benefits their interest and not necessarily protect going concern value. The manner and timing of TWC's expected asset sale is important because the approval process is in the hands of those who may be motivated to shelter the assets from litigation liability rather than protect the entity as a going concern.

21.     Based on the foregoing, I can reasonably conclude that (a) TWC is in possession of at least $45 million of assets that rightfully belong to Genius; (b) those assets were employed in TWC's business enterprise and were placed at risk; (c) the risk increased as a result of HW's wrongdoing; (d) the sale of assets under the circumstances described in the press is not being conducted in a manner typical of library/ business entity sales in the entertainment industry and will likely wipe out a meaningful amount of TWC equity and reduce the value of TWC's assets to a level that makes recovery of Genius's funds highly improbable; and (e) the prevention of an asset "fire sale", as opposed to the sale of stock, is unlikely to harm secured creditors while it will provide needed protection to TWC's unsecured creditors by preventing the corporate financial

drain associated with a "fire sale".

22.     I affirm that the findings, statements, conclusions and opinions in the Expert Report and in this Declaration are truthful and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of November 2017 at Las Vegas, Nevada.

Howard J. Kaplan

61387737.1

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**Exhibit 1**

# EXPERT WITNESS REPORT OF HOWARD J. KAPLAN

## INITIAL STATEMENT

The preparation of this draft report was accelerated for use in the upcoming mediation. The report is based on incomplete information. I have not had the opportunity to completely review all available documents and understand that further relevant documents and testimony may become available. This additional information could impact my opinion. As such, I reserve the right to change this report in the future as I review additional materials.

## QUALIFICATIONS:

As outlined in the attached resume (Exhibit "A"), the following experience, in particular, qualifies me to act as an expert witness in the current litigation:

From 1997 to 2008, I was employed full-time as the Chief Financial Officer of Morgan Creek Productions, Inc. and Morgan Creek International, Inc. In 2001, I also became Chief Operating Officer of Morgan Creek International. My responsibilities during my tenure at Morgan Creek included overseeing all matters involving the business and legal side of acquiring, producing and distributing films. This included overseeing legal and business affairs, and all finance functions, including those associated with physical production and film budgets, distribution and marketing. During my tenure, Morgan Creek was considered by most to be a "Mini Major". While there are multiple definitions for this phrase, the title is used primarily to describe a company that had theatrical distribution capabilities and the ability to control and/or direct the domestic/U.S. distribution of its product. Additionally, due to its financial resources, Morgan Creek was self financed and, together with its distribution capabilities, had the ability to green light its films. During my tenure, Morgan Creek exercised its distribution control through "rent-a-system" arrangements with Warner Bros. and Universal Pictures. Additionally, it distributed library titles via two other studios: Fox and Paramount. We also had a couple of titles distributed through predecessor entities to Lions Gate. My experience with these entities allowed me to become acquainted with their video distribution systems. Additionally, I oversaw

EXHIBIT 1
PAGE 7

and actively participated in the negotiation and audit of all distribution arrangements. Finally, Morgan Creek was constantly looking to acquire titles so I was regularly examining third party distribution deals from both studio and non-studio distributors. Morgan Creek also negotiated the right to use our system as a mechanism for rights acquisition throughout my tenure.

Morgan Creek distributed its pictures using both studio distribution and independent distributors in international territories. I am particularly familiar with the distinctions between studio distribution and independent distribution. Moreover, I negotiated and oversaw the documentation of a significant number of distribution agreements.

From 2009 to the present, I have been an independent producer of feature films and remain involved in all aspects of production and distribution of independent film product. During this period, I produced two movies, Odd Thomas and Anon and have several others in various stages of development.

For nearly 20 years, I have sold and licensed theatrical films at the following film markets: Cannes, the AFM, MIPCOM, MIPTV, NATPE, as well as the Milan and Berlin Film Festivals. During my tenure at Morgan Creek, I was responsible for negotiating nearly $1 billion in film financing. Additionally, I oversaw all reporting for participations and residuals.

I was the Vice Chairman, Finance, of the Independent Film and Television Alliance ("IFTA") from 2001 to 2005. IFTA is the organization best known throughout the world as a strong advocate for the independent film and television industry and supports its members' ability to finance, produce, distribute and market independent films and television programs worldwide. It is also the organization that organizes the American Film Market held annually in Santa Monica, California.

From 1993 to 1997, I was a senior manager in the entertainment department of PriceWaterhouseCoopers, where I performed and oversaw tax and accounting services to many well known entertainment clients including MGM, Disney and Spelling Entertainment. During the period of my involvement, Disney acquired ABC, MGM was sold and Viacom sold Spelling Entertainment. One of my clients, Morgan Creek, was one of the bidders for MGM, but MGM wanted me on its side of the transaction and the customary walls within PriceWaterHouseCoopers were established.

EXHIBIT 1
PAGE 8

From 1990 to 1993, I was a Senior Tax Specialist in KPMG's retail group. In that capacity, I provided tax and accounting services to large retail clients including Vons, Thrifty (Pacific Enterprises) and Neutrogena. I also provided similar services to two studios - Universal and MGM.

I am a licensed attorney and have been formally trained and practiced as a CPA (currently inactive). Additional relevant experience includes: Adjunct Professor at Southwestern Law School, where I taught a course on Entertainment Production and Finance; Panelist at the 2004 Savannah Film Festival discussion entitled "The Business of the Biz: Financing Your Dream"; Panelist at the 2004 American Film Market discussion entitled "The Magic Behind the Dream"; and Panelist at the 2008 DGA and IFTA sponsored discussion entitled "Being a Secure Filmmaker in an Insecure World: Financing & Selling Your Film in Today's Economy."

## OPINION SUMMARY

I was retained to opine on whether the TWC Distribution Agreement 1) reflected market at the time of its execution; and, 2) if it did not reflect market, estimate the amount of payments that Genius paid to or for the benefit of TWC that Genius would not have paid if the TWC Distribution Agreement was market. After reviewing those documents, my opinion is:

I.   The fee set forth in the TWC Distribution Agreement represents a discount of more than 50% from then existing market rates;

II.  The definition of Covered Product in the TWC Distribution Agreement is inconsistent with prevailing market terms and breaks with customary business practices by permitting TWC to 1) include or exclude theatrical product in its sole and absolute discretion; and 2) include any individual DTV feature, or any number of DTV features, TWC chooses with Genius having no refusal right.

III. TWC, whether knowingly or otherwise, provided unrealistic box office projections for the slate of films to be covered by the TWC Distribution Agreement both during negotiation of the agreement and continuing through execution of the agreement. In my

EXHIBIT 1
PAGE 9

experience, TWC knew or should have known, these projections were relied upon in structuring Genius LLC affairs at inception, and on an ongoing basis for Genius to plan, execute and report its financial affairs.

IV. There are numerous additional examples where the TWC Distribution Agreement either 1) contains terms that are inconsistent with market provisions; or 2) is missing terms that are customarily included in agreements of this nature. These include:

A. Cross Collateralization is not permitted;

B. There is no sell off period at the end of the Term;

C. Failure to allow a security interest such as a Copyright Mortgage;

D. Below market return reserve and bad debt provision;

E. Failure to include a Key Man clause;

F. Paragraph 7R prevents Genius from engaging in Content Acquisition Opportunities;

G. Various clauses turn over marketing and operational control to the licensor;

H. There is an extreme amount of dedicated staff;

I. The new technologies provisions are less comprehensive than market;

J. Genius acquires no distribution interest in derivative productions; and

K. Genius is required to cash flow numerous items and there is no interest provision.

V. The combined effect of I-IV, above, is that Genius never had a realistic opportunity to profit from the agreement; rather, Genius was likely to (and in fact did) lose substantial sums in executing the TWC Distribution Agreement. I estimated that Genius paid in excess of $45 million to or for the benefit of Weinstein that should have been retained by Genius if the Agreement reflected market terms.[1]

---

[1] This amount is the sum of those issues for which a reasonable good faith estimate can currently be made. Other amounts are currently not calculable based solely on the information I reviewed. Upon review of further information, this amount is likely to materially increase since the estimate of $45 million assumes no value for several of the below market clauses at this time.

EXHIBIT 1
PAGE 10

## OPINION

## I.    THE FEE SET FORTH IN THE TWC DISTRIBUTION AGREEMENT REPRESENTS A DISCOUNT OF MORE THAN 50% OVER THEN EXISTING MARKET RATES.

The ultimate term negotiated in any distribution agreement is the fee.  In my experience, in the time period of 2005-09, well-funded feature film companies with a strong history of delivering quality theatrical feature films could negotiate distribution fees in the range of 10-15% from a major studio (or other top level distributor) depending on other terms and financial concessions included in the overall agreement.  Less established or less well-funded companies would be subject to higher distribution fees; often 25% to 30%, or more.[2]  Outside of the TWC Distribution Agreement, I have never seen or heard of an arm's-length market[3] fee of 5%[4] or less.   While it is possible to hypothesize other deal terms that could justify such a fee, a review of the other terms in the TWC Distribution Agreement are not such terms.  To the contrary, the other deal terms should have required a significantly higher fee to justify the deal terms.[5]

 I had the opportunity to review several agreements between Genius and major third party licensors entered into during the term of the TWC Distribution Agreement.  Not only is the fee in the TWC Distribution Agreement well below market, the fee is materially less than each of the other Genius agreements I reviewed. The chart below illustrates this disparity.

---

[2] Talent and other participants in a particular film's revenue waterfall are often subject to distribution fees over 30% and sometimes over 50%.

[3] By "arms'-length market fee", I mean what a willing buyer and willing seller would agree upon during the 2005-2008 time period where the parties to the transaction are independent and neither under any duress compelling a transaction.

[4] The Restated TWC Distribution Agreement, effective January 1, 2009, increases the fee from 5% to 8% for theatrical feature films subject to certain Licensor Incentive Amounts; the distribution fee is reduced to 7% during a specified revenue corridor.

[5] These terms will be discussed in future sections; however, the key point here is that all financial terms in the TWC Distribution Agreement were heavily weighted to the benefit of TWC.

EXHIBIT 1
PAGE 11

| Licensor | Base Fee | Performance Range |
|---|---|---|
| The Weinstein Company | 5%[6] | 3%-6% |
| RHI Entertainment Distribution | 20% | No Adjustment |
| Discovery Communications, Inc. | 10% | 10%-14% |
| World Wrestling Entertainment, Inc.[7] | 10% | 10%-12% |
| ESPN Enterprises, Inc. | 10% | 10%-15% |
| Sesame Workshop | 12.50%[8] | N/A |
| ImaginAsian Entertainment, Inc. | 20% | 18%-20% |
| Gold Key Home Video, Inc. | 12% | 12%-17.5% |

The above table highlights that the next best deal from well-known and well-funded entities was more than double the fee in the TWC Distribution Agreement.[9]  What is also important to note in the marketplace is that where the distributor receives fees at the lower end of market, the distributor typically negotiates (and the licensor typically permits) an increased fee in success.[10] Here, there is a potential fee increase of 1% that would still leave the overall fee at roughly half of market.

---

[6] TWC entered into an agreement with Vivendi Entertainment effective September 15, 2009 (the "Vivendi Distribution Agreement").  That agreement called for a 10% distribution fee and contained no minimum guarantee/advance payment.  Among other things, the agreement permitted crossing, provided for a security interest for the benefit of Vivendi and did not require Vivendi to utilize a minimum level of staffing approved by TWC.
[7] In an amendment effective January 1, 2009, a new fee schedule ranging from 8% to 11% was agreed.  The amendment also approved Genius' Change in Control (TWC was disposing of its interest) and a payment schedule for over $5 million in receipts payable to WWE.
[8] Sesame's basic fee was reduced to 10% in an Amendment effective October 1, 2008.  The Amendment also included a consent to Change in Control (TWC was disposing of its interest) and a payment for unpaid receipts owing to Sesame in the amount of $5.5 million.  During the same time period, Sesame also entered into an agreement to distribute and Elmo Christmas picture for a fee of 17%.
[9] I also reviewed the Discovery Licensing, Inc. distribution agreement.  That agreement was structured with a large advance.  After recoupment of the advance, the Licensor was paid on a royalty basis ranging from 28% to 35% of defined sales.  It was not included in the above chart as the royalty is not readily comparable to a fee based deal. Nonetheless, in my experience, a royalty in the foregoing range results in a distribution fee well in excess of 25%.
[10] In many distribution agreements, in addition to, or in lieu of, a fee enhancement, the distributor will receive other benefits such as an interest in derivative productions (e.g. sequel or remake distribution rights).  There is no such comparable provision in this agreement.

EXHIBIT 1
PAGE 12

The same provision that allows a 1% fee increase in success, provides for a decrease of 2% if certain distribution parameters are not achieved.[11] Although the stated fee is 5% there is a true up required to adjust to the distribution percentage based on a defined term: the Annual Video Ratio ("AVR"). If the AVR is less than or equal to 50%, then the fee is 3%; if the AVR is greater than 50% but less than or equal to 60%, then the fee is 4%. If the AVR is greater than 60% but less than or equal to 75%, then the fee remains at 5%. Finally, if the AVR is greater than 75%, then the fee is 6%. The AVR is computed using the aggregate of all Covered Films and is defined as:

$$AVR = \text{Adjusted Net Contribution}^{12}/\text{Aggregate domestic box office}$$

I do not have true up payment information to confirm that a 75% AVR level was achieved by Genius nor do I have information that if it was achieved that the calculations were approved by TWC. This formula was not market, and fundamentally unfair to Genius, given the totality of the uncustomary terms in the agreement. Because the AVR is a net concept and therefore computed after expenses, and because TWC (not Genius) is the ultimate approver of marketing and distribution expenses, achieving target AVR results was not necessarily within Genius' control. Paragraph 5 of the TWC Distribution Agreement (relating to marketing and advertising expenses) in conjunction with paragraph 7 (relating to approvals and controls) conveys absolute approval to TWC.

Additionally, the revenue side percentages are heavily impacted by box office and theatrical marketing spend. That is, it may be difficult to hit AVR levels for theatrical blockbusters. Likewise, AVR levels may be easily attainable for films at the lower end of the box office spectrum (e.g. films with less than $1 million of DBO) even though those films may be revenue challenged.

---

[11] The Restated TWC Distribution Agreement eliminates the AVR concept after the effective date of that agreement – January 1, 2009.

[12] The Net Contribution is effectively the amount of money TWC receives after all allowable costs, expenses and fees are considered. See paragraph 10(E) of the TWC Distribution Agreement. There is a further adjustment of .85 or .90 that, while important to the computation, is not relevant to the instant discussion.

EXHIBIT 1
PAGE 13

Placing performance issues of the licensor on the shoulders of the distributor is simply not customary or industry practice.

## II.     THE DEFINITION OF COVERED PRODUCT IN THE TWC DISTRIBUTION AGREEMENT IS INCONSISTENT WITH PREVAILING MARKET TERMS AND BREAKS WITH CUSTOMARY BUSINESS PRACTICES BY PERMITTING TWC TO 1) CHERRYPICK THEATRICAL PRODUCT AND 2) INCLUDE ANY INDIVIDUAL DTV FEATURE, OR ANY NUMBER OF DTV FEATURES, TWC CHOOSES WITH GENIUS HAVING NO REFUSAL RIGHT.

Genius negotiated the below market fee in the TWC Distribution Agreement with the full expectation of TWC delivering a significant number of quality theatrical feature films. As noted on page 31 of the Proxy Statement, the "ability to realize the anticipated benefits of the Transaction will depend substantially on the performance of TWC's theatrical releases because the success of home video distribution is generally directly related to how well the applicable film performs at the box."

In my experience, where a distributor's expectations under a contractual distribution agreement is for theatrical product, the distributor always seeks representations and/or other assurances that the product to be delivered has a good faith chance of achieving theatrical success.[13] It is clear from the documents I reviewed that Genius was expecting to receive TWC product that had a meaningful theatrical component. Given these expectations, the TWC Distribution Agreement falls short of customary market terms in two critical areas. First, there are no representations regarding the theatrical nature of the product to be delivered. Second, and equally as critical, TWC has a full "put" with no limitations on the product to be delivered. Both of these shortcomings potentially allow Genius to become overwhelmed with underperforming product.

---

[13] No one can foresee the future and guarantee theatrical performance of one or more feature films. Nonetheless, it is customary to obtain representations or other assurances that the feature films to be delivered have the elements necessary to achieve expectations.

EXHIBIT 1
PAGE 14

The product definition is designed to protect TWC without conceding much to Genius at all. Genius acquired the exclusive Videogram rights to Covered Product.[14]  While, on its face, this seems like a solid definition, it contains inherent problems that are not customary in distribution agreements of this type.

Most significantly, the definition of Excluded Product is so broad that TWC could include or exclude any film in its sole and absolute discretion:

> With respect to any Motion picture initially theatrically released by Licensor or any Licensor Controlled Affiliate, any such Motion Picture for which Licensor or any Licensor Controlled Affiliate does not own or control, *at the time of initial theatrical release* of such Motion Picture in the Territory, the right to distribute Videograms in the Territory, including without limitation because of co-finance arrrangements, split-rights arrangements *or for any other reason …*" *emphasis added*

This exclusion permits TWC to contractually grant Videogram distribution rights to the theatrical distributor (or anyone else for that matter) at any time up to the theatrical release of the film. Consequently, a film can actually complete photography and meaningful advertising can commence in the Territory with Genius believing it owns the Videogram distribution rights. Then, without explanation and without getting the opportunity to secure the Videogram distribution rights for a given picture,[15] TWC can license or sell those rights to whomever it chooses.

By industry standards, identifying Videogram rights at theatrical release is extraordinarily late in the production and distribution process.  The broad nature of this exclusion is not customary and is impractical for a distributor.  In managing customer relationships, a distributor needs to know

---

[14] The definition section of the TWC Agreement defines Covered Product as "all Motion Pictures for (i) which Licensor or a licensor Controlled Affiliate owns or controls the right to distribute Videograms embodying such Motion Pictures in the Territory; and (ii) which Licensor or any Licensor Controlled Affiliate elects to, in its sole discretion, to release during the Output Term for distribution by means of Videograms in the Territory …"  Covered Product does not include Excluded Product.

[15] The TWC Distribution Agreement does not permit Genius a first right of negotiation, a matching right or any other mechanism to obtain a particular picture that TWC structures as, or otherwise intends to treat as, an Excluded Product.

EXHIBIT 1
PAGE 15

well ahead of the market (and certainly ahead of its customers) if the distributor is not going to receive a theatrical feature film. Since Genius customers were undoubtedly aware of the exclusive relationship between TWC and Genius, the explanation of why Genius was not distributing a particular TWC theatrical feature film would, depending on the circumstances, be a tricky management issue.

For example, Genius fully expected to be distributing the film *Inglourious Basterds*.[16] In fact, there is no doubt that it would have been a key title (if not the best TWC title) for Genius to exploit. Both the film elements (i.e. the director, stars and budget) and film projections pegged this feature at $80+ million of domestic box office. Genius included *Inglourious Basterds* in financial data, projections and other documentation.[17] *Inglourious Basterds* was the exact type of title that purportedly justified the low distribution fee.

*Inglourious Basterds* was projected to have a box office of $80 million (the next highest box office projection for a TWC film for 2009 was $35 million). If the movie achieved $50 million at the domestic box office, well under expectations, the expected Videogram revenue would have been $40 million with fees to Genius of $2.4 million[18]. *Inglourious Basterds* ultimately outperformed projections and achieved domestic box office of $120 million. Nonetheless, while Genius expected to receive distribution rights to *Inglourious Basterds*,[19] Weinstein granted the rights to a major studio without any advance warning to Genius.

With respect to Covered Product, there are simply no parameters providing comfort that the TWC slate will have a good faith possibility of theatrical success. Theatrical film parameters are customary in a contract where the distributor is expecting a meaningful number of theatrical

---

[16] See January 4, 2009 email from Trevor Drinkwater to Larry Madden (TWC 179905), Drinkwater February 11, 2009 email to John Hecker (Quadrant 5189) and March 4, 2009 email from Alan Quasha to Mitch Budin (Quadrant 4356).

[17] See TWC 164409, March 14, 2009 letter from Trevor Drinkwater to Harvey and Bob Weinstein: "This was the foundation for our estimates given to our investors and bank lender. After that report we requested and received many updates up until closing our restructuring in December 2008. Never at any time did TWC remove or even indicate that "*Inglourious Basterds*" would no longer be part of the slate."

[18] See March 4, 2009 email from Mitch Budin to Alan Quasha (Quadrant 4356)

[19] See Drinkwater Examination, page 98.

EXHIBIT 1
PAGE 16

films. Here, one of the attractions to the TWC deal was the desire to acquire a large number of theatrical product from a single respected source. Nonetheless, there are virtually no contractual parameters that insure that Genius will receive either a minimum number of theatrical films or that a certain percentage of the films will be theatrical.

While no one can guarantee theatrical results, there are customary deal points in contracts involving theatrical product that provide reasonable assurances that 1) the Covered Product will be released theatrically and 2) the films will have a good faith possibility of achieving theatrical success. These include 1) budget; 2) talent parameters such as pre-approved actors or directors; 3) rating, genre and feature length parameters; 4) print and advertising spend (or other indicia of a theatrical release) parameters; and 5) minimum screen release commitments. These parameters are designed to insure that product being "put" through a distributor's system have quality elements consistent with the negotiated fee and have a good faith chance at theatrical success. Nonetheless, these terms are noticeably absent from the agreement.

This points out the flip side of the equation. Not only were there no parameters ensuring Covered Product would have theatrical elements, the definition is so broad that there were no limitations on the amount of DTV product that TWC could put through the system. TWC could acquire as much DTV product as it desired and compel Genius to release the films at a 10% fee. Since the TWC Distribution Agreement prevented crossing of losses on any single film with the profits of other TWC titles, there were no meaningful marketing and distribution risks to TWC in employing an acquisition and distribution strategy[20] that materially and negatively impacted Genius. These deal terms were not market.

---

[20] For example, TWC could, and probably did, acquire some titles on a distribution fee basis without making any advance payments. It could charge the producer or other rights holder a 20%-30% fee and then subdistribute through Genius at a 5% fee (10% for DTV product) thereby having a significant upside with very little downside risk.

EXHIBIT 1
PAGE 17

III.    **TWC, WHETHER KNOWINGLY OR OTHERWISE, PROVIDED UNREALISTIC BOX OFFICE PROJECTIONS FOR THE SLATE OF FILMS TO BE INCLUDED IN THE TWC DISTRIBUTION AGREEMENT BOTH DURING NEGOTIATION OF THE AGREEMENT AND CONTINUING THROUGH EXECUTION OF THE AGREEMENT.**

There is a meaningful difference between 1) not achieving good faith box office estimates, and 2) providing unrealistic and unachievable box office estimates in the first instance. It is customary for box office estimates to be provided by the licensor in conjunction with the theatrical distributor as they are the parties most knowledgeable about a particular film and its theatrical release plans. In many cases, at the time the estimates are prepared, producers and theatrical distributors form opinions based on seeing the film and use their industry experience[21] to establish reasonable estimates of box office. Additionally, as part of the production process, films with anticipated theatrical potential are subject to one or more audience recruited screenings in which statistical methods are used to analyze a film's potential and determine what changes, if any, are needed to achieve theatrical success. It is also reasonable and customary for a distributor to rely on box office estimates provided by the licensor to further use those estimates to project Videogram sales to be used in structuring its business affairs as well as in a variety of financial planning and reporting.

I have prepared and reviewed box office estimates for individual films and slates of films. Based on my experience, it is my opinion that the aggregate TWC box office estimates were unrealistic and likely unachievable from the outset. While full projections were not available to me for each year, I did look at information used in the Proxy Statement as well as the 2009 projections. In both cases, my analysis of the projections is that, as a slate, TWC's projections were wholly unrealistic.

---

[21] In addition, theatrical distributors and producers use a variety of extrinsic evidence such as box office results for comparable films and competitive theatrical release schedules.

EXHIBIT 1
PAGE 18

Box office projections were not detailed in the Proxy Statement. However, the Jefferies model supporting calculations/conclusions in the Proxy Statement has information indicative of what the underlying box office projections may have been. The LLC income statement in that document projects TWC Videogram Revenue for TWC Covered Product by year as:

| | |
|---|---|
| 2006 | $ 644,741,261[22] |
| 2007 | $ 1,263,072,598 |
| 2008 | $ 1,132,831,847 |

For illustrative purposes, it is reasonable to assume that Videogram gross revenue would be approximately equal to box office. Accordingly, the box office projections for these years was represented to be in excess of $1 billion.[23] This is not realistic. For example, in 2004, total aggregate domestic box office was $9.3 billion with nearly half of that revenue derived from the top 25 films (largely big budget, major studio blockbusters). That means the projections in the Proxy Statement have TWC securing 20% of the remaining $5 billion in domestic box office while competing for those dollars against 6 major studios, New Line, Lions Gate and numerous independent producers and distributors. There was no realistic chance for this to occur.

The 2009 box office film estimates provided by TWC were, in the aggregate, much lower than those apparently provided at inception of the deal, but nonetheless reflect an extreme blue sky view. The chart below reflects those estimates together with actual results and screen release counts.

---

[22] 2007 would be the first full year TWC was distributing Videograms through Genius. The 2006 estimate was a partial year.
[23] These numbers are rough estimates. However, even if this methodology produced a variance in the box office estimates of 50% (which it certainly does not), it would still be my opinion that the TWC estimates were unrealistic and attaining the projected results highly improbable. This is especially true given the discussion in Section II of this opinion. I believe that any larger budget films with a chance of significant theatrical success (becoming a "blockbuster") would ultimately end up at a major studio in the same way the home distribution rights to *Inglorious Basterds* found its way to a major studio instead of Genius.

EXHIBIT 1
PAGE 19

| Title (2009 Releases) | Projected | Actual | Screens |
|---|---|---|---|
| Vicki Christina Barcelona | $20,000 | $23,200 | 726 |
| Zac and Mini | $25,000 | $31,500 | 2735 |
| Soul Men | $20,000 | $12,000 | 2048 |
| Reader | $35,000 | $34,200 | 1203 |
| Hurricane Season/Patriots | $27,500 | $0 | 0 |
| Youth in Revolt | $25,000 | $15,200 | 1873 |
| The Road | $19,000 | $8,000 | 396 |
| Shanghai | $25,000 | $46 | 103 |
| Janky Promoters | $22,500 | $9 | 22 |
| All Good Things | $22,500 | $582 | 35 |
| Inglourious Basterds | $80,000 | N/A | N/A |
| Panic | $27,500 | $779 | 11 |
| Diary: Mad Black Woman | $22,500 | N/A | N/A |
| **Total** | **$371,500** | **$125,516** | |

** Above reflected in 000's; the highlighted titles were not delivered to Genius.

As can be seen from the chart, only 3 of 11 films delivered to Genius achieved their box office projections. While considered underperforming by TWC and Genius management, the fact is, what occurred was also the probable result. There are numerous ways to examine this. From 2004 though 2007, 18-21 films per year would achieve the $20-$30 million box office range. This is a very consistent number and reflects the nature of the theatrical market. The above estimates assume TWC will control half this market (or alternatively find a way to break market trends) in the face of competition from the major studios, Lions Gate, New Line and numerous independent production companies and producers. Again, such an occurrence is highly improbable.

A second quick check on the viability of estimates is to look at the marketing plan for each of the films. To hit the target levels (for TWC, generally a minimum of $20 million of domestic box office), films generally need to be released on 1,000 screens. One TWC film, a Woody Allen film with a specialized audience, hit its target with fewer screens (726). To be released on this

EXHIBIT 1
PAGE 20

number of screens also typically requires a minimum print and advertising spend of $15 to $20 million per picture (perhaps more). This means in addition to the budget of the film, which, on average appears to be $20+ million, TWC would need to spend a minimum of $25 million in print and advertising per firm to have a reasonable chance to achieve these targets. While Weinstein purportedly had $1 billion in resources (combined debt and equity), they undoubtedly would not be laying out $500 million for these 11 films. Some would simply be better served, as they were, without the support of a wide theatrical release. In my opinion, it was highly improbable from a financial or creative point of view that all 11 (delivered) pictures in the slate would be supported by the wide theatrical releases necessary for the films to achieve the projected box office.

What was probable is what typically occurred. TWC had 3-5 films in the $20-$30 million range with an occasional film over performing in the $35-$60 million range. Films with the budget and advertising support to achieve success over $60 million would likely be theatrically distributed by a major studio (such at what occurred with *Inglourious Basterds*) with Genius losing out on the Videogram rights.

IV. **THERE ARE NUMEROUS ADDITIONAL EXAMPLES WHERE THE TWC DISTRIBUTION AGREEMENT EITHER 1) CONTAINS TERMS THAT ARE INCONSISTENT WITH MARKET PROVISIONS; OR 2) IS MISSING TERMS THAT ARE CUSTOMARILY INCLUDED IN AGREEMENTS OF THIS NATURE.**

Following is a discussion of material terms in the TWC Distribution Agreement that were not market and heavily favored Weinstein.

A. <u>Cross Collateralization is not Permitted</u>

Cross Collateralization is a key benefit to obtaining the distribution rights of a mini major or other well-funded entity, and distribution companies customarily require that titles in a multipicture distribution arrangement be cross collateralized if the licensor is to obtain the lower

EXHIBIT 1
PAGE 21

distribution fee associated with multipicture arrangements. The reason is simple - multipicture arrangements with cross collateralization generally all but eliminate the loss risk associated with a single picture as slates of films tend not to lose money, in the aggregate, on marketing and distribution expenses. If the distributor bears the risk of loss on each individual picture in the slate, then those losses will effectively serve to reduce, often significantly, the effective distribution fee the distributor receives.

Crossing losses on films with successful films has become a key component of multipicture arrangements and is considered a necessity for any entity that is well represented. Crossing of film rights among a slate is modeled and usually required by both film financiers (banks, Wall Street investors, etc.) and, of course distributors. Financiers and distributors customarily charge significantly higher interest and fees for arrangements not involving a cross collateralized slate. Single pictures often will see distribution fees of 20%-30%, or higher, in the absence of other mitigating factors.

Cross collateralization for larger film production companies has become so prevalent in the film industry that often a slate of films has been crossed among multiple parties. In addition to the distributor, one or more financiers may cross collateralize the same slate while the participants in each individual film in the slate retain their position. Parties typically enter into an interparty agreement defining their agreed position in the film slate's revenue waterfall. Because multiple claims to the same film slate revenue stream do not prevent cross collateralization, the presence of significant talent participations in the same slate also would not prevent crossing.

Those modeling the film business have all determined that slate financing provides much greater benefits than individual film finance. Slate financing is a term that espouses the benefits of cross collateralizing feature films. In my experience, this is a fact also recognized by studios and other distributors. I note that Trevor Drinkwater in his 2004 Examination stated that cross collateralization could not occur in the feature film business due to the presence of participants. While this statement may be true in the case of the typical thinly funded independent project, it does not apply in the case of a mini major with the funding capabilities of TWC. Moreover,

EXHIBIT 1
PAGE 22

even if TWC did not have the financial resources I suggest, in the context of a slate, there was nothing to prevent crossing of TWC's revenue share from the slate (e.g., crossing the films after payment of residuals and participations).

The unnecessary risk assumed by Genius was not hypothetical. In a February 28, 2008, email from Ed Byrnes (TWC 25632), Mr. Byrnes notes that there are several loss titles and in the case of the bolded titles (*Alex rider, Project Runway, Shanghai Express*, etc.) these are real losses. "The balance of the loss titles is ($13.9M). **This is truly a disaster.**" *Emphasis in original.*

Genius was fully aware of the benefits of cross collateralization. While not present in the TWC deal, cross collateralization was a key component of several of Genius' larger multipicture deals negotiated during the same relative time period as the TWC Distribution Agreement. These include the February 26, 2007 Sesame Workshop agreement (TWC 60312), the July 6, 2006 ESPN Enterprise agreement (TWC108928),[24] the October 4, 2006 Discovery Communications agreement (TWC 163819).[25] Paragraph 10 of the February 16, 2007 Sesame Workshop deal contains typical explicit language on the cross collateralization matter:

> All Distribution Expenses paid with respect to each Picture will be cross collateralized among and applied against the Net Receipts derived from all Pictures hereunder in any or all Contract Years. For the avoidance of doubt, if Genius has not recouped all Distribution Expenses with respect to any Picture, Genius shall be entitled to recoup such unrecouped portion from the Sesame Receipts or other monies otherwise payable to Sesame hereunder with respect to all Pictures in any or all Contract Years.

It is inexplicable to me why cross collateralization was not included (in fact prohibited) in the TWC distribution arrangement especially when consideration is given to the below market fee. Obviously, among other issues, the "disastrous" 13.9 million loss would have been meaningfully

---

[24] See the ESPN Enterprise Agreement at paragraph 12 (TWC 108935).
[25] See the Discovery Communications Agreement at paragraph 11 (TWC 163828). It should be noted that two other deals I examined (the WWE and the ImaginAsian agreements), did not have crossing (See TWC163850 and TWC 60312).

EXHIBIT 1
PAGE 23

mitigated for Genius had the customary cross collateralization provision been included in the agreement.

Finally, in TWC's major multipicture arrangements with other video distributors, it is a near certainty that crossing was an included provision[26]. In the only such deal produced by TWC in Discovery, a deal with Vivendi Entertainment, entered into immediately following the TWC Distribution Agreement and effective September 19, 2009 (the "Vivendi Distribution Agreement"), crossing was permitted. That agreement placed films in two categories and crossing was permitted within (but not between) each category. There was an ample number of films within both categories to provide the customary level of risk protection to the distributor normally associated with crossing provisions.

### B. There is no Sell Off Period at the Conclusion of the Term

It is customary for distributors to have a sell off period, typically six months, at the conclusion of the distribution term. In fact, prior to reviewing the TWC Distribution Agreement, I do not recall seeing a distribution agreement that failed to include a sell off period. Distributors need time, at the conclusion of the distribution term, to transition business including settling accounts with customers and responsibly disposing of inventory. Nonetheless, the TWC Distribution Agreement has no sell off period.

Once again, in addition to my prior industry experience, I examined the agreements of several larger Genius distribution agreements. *As the below chart illustrates, the TWC Distribution Agreement is the only Genius agreement that fails to include a customary sell off period.*

---

[26] I understand that TWC has produced a limited number of distribution or similar agreements to the Trustee in discovery.

EXHIBIT 1
PAGE 24

| LICENSOR | SELL OFF PERIOD | LENGTH |
|---|---|---|
| The Weinstein Company | NO | None |
| RHI Entertainment | YES | 6 Months |
| Discovery Communications | YES | 6 Months |
| World Wrestling Entertainment, Inc. | YES | 6 Months |
| ESPN Enterprises, Inc. | YES | 6 Months |
| Sesame Workshop | YES | 6 Months |
| ImaginAsian Entertainment, Inc. | YES | 6 Months |

Every agreement, save for the TWC agreement, contains both the customary sell off provision and the customary 6 month sell off term. The lack of a sell off period is not only conspicuous, it is particularly onerous in light of other non-customary terms in the TWC Distribution Agreement. Paragraph 4(b) defines ownership of Inventory:

> Subject always to the terms of this Agreement, the inventory of finished goods of Videograms hereunder, whether delivered to Distributor by Licensor, manufactured by Licensor or Distributor or otherwise (the "**Inventory**") shall be Distributor's sole property, and **Distributor shall bear all costs and risks attributable thereto. Emphasis added**.

This definition places inventory risk at the conclusion of the term squarely on Genius. This is not the market norm and I am unaware of any other distribution agreement in which a distributor assumed such a risk, even with an above-market fee. Pursuant to Paragraph 19, there are numerous provisions, some which are wholly or partially in control of TWC, that allow TWC to terminate the TWC Distribution Agreement early (e.g. if there is a change in control cause by TWC selling its interest). If it does so, pursuant to paragraph 20(B), TWC can either purchase

EXHIBIT 1
PAGE 25

inventory at the lesser of actual cost or FMV or have the inventory destroyed. Assuming the inventory is not obsolete, this could have a meaningful impact on Genius.

What is clearly not customary industry practice here is for Genius to put itself at the mercy of the licensor. Pursuant to the TWC Distribution Agreement, TWC can control inventory levels at Genius' expense, terminate the agreement and then order the inventory destroyed. This is not customary and, from an industry perspective, absurd on its face.

## C. Failure to Allow a Security Interest such as a Copyright Mortgage

All major distributors recognize that their distribution right is a valuable asset and almost always seek to secure this intangible asset as well as any marketing and distribution expenses with a recorded security interest – generally a copyright mortgage. There is no provision in the TWC Distribution Agreement for the filing of a copyright mortgage. In fact, the filing of liens of any type are strictly prohibited. Strangely, this customary principle has been turned on its head. Pursuant to the TWC Distribution Agreement, it is TWC who obtained security interests over Genius. See paragraph 12 of the TWC Distribution Agreement.

The Vivendi Distribution Agreement not only provided for a copyright mortgage, but one was attached to, and executed concurrently with, that agreement. This is the customary way security in such distribution agreements are handled.

The recent very public financial woes experienced by TWC as a result of the wrongdoing of Harvey Weinstein ("HW") illustrates one example of why Copyright Mortgages are typically obtained from producers to secure the distributor's distribution rights. Distribution rights have significant value. If the financial troubles TWC is experiencing today had occurred during the output term of the TWC Distribution Agreement, Genius would have been in an unsecured position that could have resulted in millions of dollars in additional loss.

EXHIBIT 1
PAGE 26

### D. __Below Market Return Reserve and Bad Debt Provision__

The return reserve provision is below market, below Genius' other return reserve levels and exposes Genius to meaningful liability. If a reserve is set too low, a distributor will be required to unnecessarily advance significant cash to the licensor without recouping that unnecessary advance until a later time period, thereby impacting the distributor's cash flow. Paragraph 7(G) sets a reserve return for each covered product at 17.5%[27] with a five month liquidation period. Customary market return reserves range from 20% to 25% and sometimes higher, with a 12 month liquidation period. The below chart once again illustrates that Genius return reserves are at market levels with the exception of the TWC Distribution Agreement.

| Licensor | Return Reserve | Liquidation Period |
|---|---|---|
| The Weinstein Company | 17.5% | 5 months |
| RHI Entertainment Distribution | 20% | 12 months |
| Discovery Communications, Inc. | 20% | 12 months |
| World Wrestling Entertainment, Inc. | 25% | 12 months |
| ESPN Enterprises, Inc. | 20% | 12 months |
| Sesame Workshop | 20% | 12 months |
| ImaginAsian Entertainment, Inc. | 20% | 12 months |

---

[27] The Restated TWC Distribution Agreement provides for a 25% Return Reserve for pictures released after January 1, 2009. 85% of the return reserve is to be liquidated within six months; the balance to be liquidated within 9 months. This provision more closely reflects market as well as the terms of the other Genius distribution agreements.

EXHIBIT 1
PAGE 27

As can be seen from the above, once again the TWC treatment was below market[28] and below Genius' typical concessions.

### E. Failure to Include a Key Man Clause

Key Man clauses are customarily sought where the licensor company is creatively and/or financially dependent on one of more individuals. In the case of TWC, it is well known that Harvey Weinstein and Robert Weinstein provide material support to the company that would have investors, financiers and distributors requiring a Key Man clause. Page 28 of the Proxy Statement recognizes this reality: "TWC is substantially dependent upon the services of Robert Weinstein and Harvey Weinstein." While it is noted that the Weinsteins entered into employment agreements with TWC, it is inexplicable why the Key Man clauses were not included in the TWC Distribution Agreement.

Although the Key Man clause appears to have had no direct impact on Genius during the distribution term since the Weinsteins remained active[29], it nonetheless demonstrates another customary market term that is missing and could have been impactful if the circumstance arose. What could have occurred is readily apparent for all to see in the wake of numerous disclosures of bad behavior by HW, and the subsequent termination of HW's employment with TWC. That announcement and HW's termination was immediately followed by a press release indicating the necessity of a capital infusion as well as a potential asset sale.

---

[28] The Vivendi Distribution Agreement provided for a return reserve of 25-30%. Moreover, another provision allowed Vivendi to adjust this return reserve up or down, in its reasonable discretion (based on good faith estimates) following the sixth billing month of the Term.

[29] Nonetheless, there was some evidence of potential restructuring of the Weinstein's activities away from TWC. The Restated TWC Distribution Agreement allows the Weinsteins to produce films that are not subject to that agreement.

EXHIBIT 1
PAGE 28

## F. **Paragraph 7R Prevents Genius From Engaging in Content Acquisition Opportunities**

Executives of Genius believed that if they secured the TWC Distribution Agreement, it would lead to other business.[30] Nonetheless, Paragraph 7R of the TWC Distribution Agreement prevents Genius from engaging in Content Acquisition Opportunities and requires that any Content Acquisition Opportunity that arises be presented to TWC.

A Content Acquisition Opportunity is "the acquisition of any distribution of other rights in any audio, visual and/or audiovisual works of any kind or character, including, without limitation, Motion Pictures." In other words, Paragraph 7R undermines one of the reasons for the TWC deal in that it presumably conveys all opportunities arising from the deal to TWC. This clause is far from customary in the Videogram distribution business.

## G. **Turning over Marketing and Operational Controls to the Licensor**

In distribution agreements of this nature, it is custom and practice for the licensor to have "reasonable" approval rights. In the TWC Distribution Agreement, this market approval term is turned on its head by giving ultimate approval for virtually all marketing and operating decisions associated with Covered Product to TWC. In some cases, even the form of the request must be in a form approved by TWC. See Paragraph 5(A) relating to marketing and advertising approvals. Even in those cases where approval is mutual, TWC had the tiebreaker.

The problem with varying from custom and practice with respect to the approval process is that the licensor (TWC) ends up approving items that create liability for the distributor (Genius). This is apparent from both the actual operations and the face of the agreement. For example, TWC retained the right to extend credit to customers, but as addressed in paragraph IV(D), above, the bad debt risk rested with Genius. TWC has numerous controls over personnel, but

---

[30] See Drinkwater 2004 Examination, page 53.

EXHIBIT 1
PAGE 29

TWC can put through an unlimited number of non-performing (and not cross collateralized) DTV product (See Section III, above) straining both resources and financial results. The number of videos to be produced and shipped is in TWC's control, but inventory costs and associated risks, rest with Genius.

These examples serve to illustrate why the controls set forth in the TWC Distribution Agreement are not customarily ceded to the licensor, and why the overall approval process fails to meet industry standards.

## H. There is an Extreme Amount of Dedicated Staff

Paragraph 7(O) of the TWC Distribution Agreement required that Genius maintain a large dedicated staff. The size, level and personnel of the unit were subject to TWC's prior written approval and the initial list attached as Exhibit "B" to the agreement. While Genius retained the ability to control compensation, they obviously did not control market conditions for these employees whose aggregate salaries exceeded $2 million.

From the outset of the agreement, personnel cost relative to the quality of Covered Product became a huge issue. As noted in Genius' Summary of Financial Highlights (See Genius 173302):

> "The workload requirements in 2007 to service the TWC business has significantly increased as the title count is substantially higher year on year and specifically in the lower revenue DTV category as opposed to theatrical releases."

In other words, despite an uncustomary large dedicated staff, TWC's decision to exploit the TWC Distribution Agreement by delivering large numbers of low revenue DTV product heavily impacted Genius' operations. This is an example of uncustomary terms combining to handcuff Genius in protecting its financial affairs. Because TWC had a full "put" with no limit on the number of DTV films it could include as Covered Product and had full control over the level of

EXHIBIT 1
PAGE 30

dedicated staff, Genius' maneuverability was hampered. This is the precise issue Trevor Drinkwater highlighted in his 2004 Examination at page 215:

> I'm not criticizing the Weinsteins per se, but the fact that their titles didn't perform in the first couple of years the way any of us thought [as well as] growing the infrastructure, not being able to cut the infrastructure back fast enough and lots of other variables [led to Genius financial woes].

## I.   **The New Technology Provisions are less Comprehensive than Market**

While the TWC Distribution Agreement recognizes new technologies are important by using customary "now known or hereinafter devised" language in the Videogram definition, the agreement fails to convey the actual rights to the emerging and competing technology. The primary examples are digital rights and Blu-Ray.

During the period in question, digital downloads and Blu-Ray were beginning to replace DVD and the industry was highly aware that the future of Videogram rights rested in these newer technologies.[31] The Apple TV was released in 2007; Netflix began releasing HD films that could stream to a TV and Blockbuster followed with its own direct to TV player. This new delivery system was in its infancy and defining the difference between what were essentially digital video distribution rights and television rights were still being developed. A good rule of thumb was a download of 24-48 hours (or less) was a television right and anything longer than 24-48 hours was a video right. While digital rights in these early years were granted, it was also not uncommon for the licensor and the distributor to fail to agree on terms. In such cases, it was customary for there to be a holdback (neither party could exploit digital rights) and/or a first right of negotiation provided to the video distributor.

---

[31] PWC Global Entertainment and Media Outlook, 10th Annual Edition.

EXHIBIT 1
PAGE 31

Additionally, several larger deals including the RHI, Gold Key and ImaginAsian distribution agreements conveyed digital rights.[32]

In the documents I examined, there was no explanation why Genius was unable to obtain the distribution right or a holdback. Certainly, Genius would not want to be competing for the same product against newer technology and they further would not want to leave a clearly valuable distribution right on the table. Nonetheless, digital rights were not only excluded, but prohibited in the arrangement.

With respect to Blu-Ray, the industry was fully aware of what previously occurred to VHS when DVD became mainstream. It was therefore custom and practice to include Blu-Ray in Videogram rights, and a distributor who did not receive these rights would be hard pressed to conclude a deal.

Nonetheless, despite the "now known or hereinafter devised" language and the apparent grant of Blu-Ray rights, Paragraph 7(A) of the TWC Distribution Agreement potentially grants all or a significant portion of the Blu-Ray revenue stream to TWC. That paragraph provides, in relevant part "[TWC] may (i) negotiate separately with respect to any new format or technology (e.g. Blu-Ray) for Videograms of Covered Product (in which case [Genius] will have no right to share or otherwise participate in the results." This effectively could be deemed a failure to grant meaningful Blu-Ray rights and is certainly not customary.

## J. Genius Acquired no Interest in Derivative Productions

Distributors typically want to have an ongoing interest in the intellectual property they helped to create through their marketing and distribution efforts. Typically, this was done via a renewal option at the end of the term and/or a grant of distribution rights in any derivative works

---

[32] It appears that most of the larger deals that failed to convey digital rights involved television product such as the ESPN, Sesame and Discovery distribution agreements. This makes sense as TV was competing with the video market for digital download content.

EXHIBIT 1
PAGE 32

(sequels, prequels, remakes). Alternatively, a first right of negotiation with respect to any of these rights may be conferred. None of these rights were granted to Genius in the TWC Distribution Agreement. While not absolutely present in all such deals, this represents another case where scales tipped to TWC.

### K. Genius is Required to Cash Flow Numerous Items and there is no Interest Provision

There is no provision in the TWC Agreement to allow Genius to recover interest on moneys advanced from Genius to TWC. As a result, many of the uncustomary terms in the agreement led directly to Genius incurring millions (in the aggregate, probably tens of millions) of dollars in interest charges. While I have not received documents that show a complete calculation of this amount by either TWC or Genius, I did review document that show numerous examples of interest charges running into the millions of dollars incurred by Genius that could not be recouped, as would be the market norm.

## V. AS A RESULT OF THE BELOW MARKET FEES AND TERMS SET FORTH IN THE TWC DISTRIBUTION AGREEMENT, GENIUS WAS DESTINED TO OVERPAY TO OR FOR THE BENEFIT OF WEINTEIN WELL IN EXCESS OF $45 MILLION

Based on the above discussion, I estimate that if the TWD Distribution Agreement reflected minimal market terms, Genius would have received or retained the following amounts that it did not receive or retain under the TWC Distribution Agreement[33] as follows:

| | |
|---|---|
| Adjust TWC Theatrical Product fee to market: | $31,915,687 |
| Below market DTV Fee | Unknown/TBD |
| Adjust for Loss on Excess Covered Product: | Unknown/TBD |

---

[33] For purposes of this exercise, the amounts calculated are the lesser of the actual payment required of Genius or the payment not received by Genius resulting from the below market provisions identified in my opinion. There is no adjustment for several items listed as uncustomary in my opinion as 1) the payments were included in the adjustments for other below market terms or 2) they ultimately had no impact (i.e. the Key Man Clause and derivative rights).

EXHIBIT 1
PAGE 33

| | |
|---|---|
| Lost distribution fee on *Inglourious Basterds:* | $ 8,000,000 |
| New Technology Rights | Unknown/TBD |
| Extensive Dedicated Staff | Unknown/TBD |
| Adjust to cross collateralize loss films: | $ 2,100,000 |
| Estimated Interest Incurred: | $ 5,000,000 |
| Loss on Inventory at termination of deal: | Unknown/TBD |
| Loss on below market return reserve: | Unknown/TBD |

**Total Losses *Excluding* Currently Unknown or TBD Amounts:**     **$47,015,687**

**Adjust Fee on TWC Covered Product to Market** – The distribution fee charged for Covered Product in the TWC Distribution Agreement is 5%. There is an indication from documents reviewed that the Direct to Video Covered Product was subject to a 10% fee.

Exhibit "C" analyzes the Covered Product that was charged at a 5% fee in the September 30, 2009 TWC participation statement (the "TWC 2009 Statement") and the December 31, 2008 TWC participation statement (the "TWC 2008 Statement"). See TWC 23524 and TWC 134215, respectively. Exhibit "C" uses as its starting point, the picture by picture fee charged on these two TWC statements for theatrical product. The first column, labeled "9/30/09 Contract Fee 5%", is the distribution fee reflected on the TWC 2009 Statement which appears to cover the period January 1, 2009 through September 30, 2009. The second column labeled "12/31/08 Contract Fee 5%" is the distribution fee reflected on the TWC 2008 Statement which appears to reflect the fees actually earned by Genius from the street date of the Videogram through the end of calendar year 2008. The third column, labeled "Restated Fee 8%", is what the distribution fee for each title would have been pursuant to the Restated TWC Distribution Agreement (8%) and is for information purposes only. The final column, labeled "Market Fee 10%" conservatively reflects the fee at the low end of market rates for theatrical features.

EXHIBIT 1
PAGE 34

The difference between the Contract Fee and the Market Fee is $31,915,687.[34]

**Below Market DTV Fee**– I currently believe that the fee charged for DTV product is also below market. However, I do not have sufficient information at this time to make a final determination as to a proper market fee and/or to calculate the amount of the Genius losses resulting from this below market rate.

**Lost distribution fee on *Inglourious Basterds*** - The March 4, 2009 email from Mitch Budin to Alan Quasha (Quadrant 4356) pegs the loss in fees to Genius at $2.4 million assuming a domestic box office of $50 million and a 6% distribution fee. Actual box office was $120 million (projected box office was $80 million). As an estimate, I assumed that this increased box office would double the fee revenue to Genius (e.g. the actual lost fee revenue at 6% would be $4.8 million). The fee pursuant to the Restated Distribution Agreement that would be in effect at the Videogram street date would be 8%, so contractually, the lost fee revenue to Genius would be $6.4 million. If the fee is conservatively adjusted to the low end of market, or 10%, the lost fee revenue increases to $8 million.

**Adjustment to Cross Collateralize Loss Films** – This adjustment assumes an add back against the TWC participations instead of a cost incurred by Genius. TWC 99773, and its supporting schedules, are a summary by film, of all TWC Titles. It reflects the aggregate of loss films in 2006 of just under $900,000, in 2007 of approximately $340,000 and in 2008 of $2.2 million. Assuming that Genius can claw back the 2008 loss to 2006 levels over time, the aggregate loss on failure to properly cross collateralize these films is approximately $2,140,000 ($900,000+$340,000+$900,000).

---

[34] I could not confirm whether the distribution fee for each picture in these two TWC statements had been adjusted for the AVR provisions in the TWC Distribution Agreement. I accepted the fee reflected on the face of these statements – 5% - as accurate.

EXHIBIT 1
PAGE 35

The costs incurred by Genius resulting from films often suffering losses in the first reporting period of their release (but which are subsequently recovered) has been considered an interest issue and is addressed in that section.

**Estimated Interest Incurred** – In large part, the interest issue resulted from a combination of factors. Several of those factors intersect with the crossing issue. For example, titles release in the quarter for which reporting occurred were more likely to reflect a temporary loss since substantial revenue oftentimes was not received by the end of the quarter. Nonetheless, Genius was prevented from offsetting this loss against profitable titles effectively causing a loan from Genius to TWC. I estimate the cash flow resulting from this issue at a recurring $5-$10 million over the life of the TWC Distribution Agreement. That would result in interest at Genius' borrowing rate of approximately $1-2 million. In addition, there was interest associated with the loss early in the relationship on Alex Rider and other titles. In his February 28, 2008 email, Ed Byrnes computed this amount at $2.5 million. Overall, there is insufficient information available at this time to perform a precise identification and calculation of all interest related issues. Nonetheless, I can confidently estimate the lost interest at no less than $5 million.

In Larry Madden's March 16, 2008 email to Ernst and Young (TWC 33596), he states that in support of Genius, TWC "has allowed [Genius] to pay The Weinstein Company 15-45 days after amounts are due, and plans to continue to provide a similar level of support through 2008." According to the letter, the "deferral has ranged from $20-40m over the past 12-18 months." It is my opinion that this asserted deferral would, in fact, be reversed if the fee and other market adjustments were made to the TWC Distribution Agreement. Consequently, any interest or other quantifiable concessions made by Genius for these deferrals would also be an element of loss to be considered in the total interest computation. Currently, I have insufficient information to quantify this portion of the interest incurred adjustment.

EXHIBIT 1
PAGE 36

## VI.  **RECENT EVENTS AND THE POTENTIAL SALE OF TWC**

### A.    **News of Harvey Weinstein's Termination and Need for Capital to Stabilize TWC Operations.**

In early October 2017, it was widely reported that HW had been having inappropriate contact with women for decades.  The allegations in these reports ranged from claims of a hostile work environment to rape.  Although HW is reported to own 23% of TWC, the TWC board terminated HW's employment with the Company.  HW's brother, Robert (Bob) Weinstein, who also owns 23% of TWC, voted for the termination and called him a "bully".  Despite these actions/confessions, the public disclosure of HW's alleged activities together with the belief of many in the industry that the board members knew of HW's bad behavior, had an immediate and catastrophic impact on the TWC and Weinstein brands.

On October 16, 2017, TWC and Colony Capital issued a joint press release announcing that the two entities had entered into a preliminary agreement for Colony Capital to provide an "immediate capital infusion" and that the two had entered into a negotiating period to sell all or a significant portion of TWC's assets (the "Press Release").  The purpose of the transaction was to help "stabilize the Company's current operations" and to provide comfort to those in business with TWC.

### B.    **Need for Capital Infusion**[35]

It is highly probable that the need for an "immediate capital infusion" was precipitated by the public revelations of HW's wrongdoing and related disclosures. HW's illicit activities

---

[35] While I have not examined any financial statements of the company, based on public information and my experience, the following discussion seems highly probable. If financial statements or other solutions are provided to Genius or the Court, I remain available to examine those statements and modify or expand upon the below conclusions based on such new information.

EXHIBIT 1
PAGE 37

probably led to numerous debt covenant violations that caused TWC to be in default of its senior credit facility (or senior lender agreements). Most Loan and Security Agreements (or other primary lending documents) provide numerous debt covenants that require the borrower to continue operating under certain parameters. In the case of TWC, this would almost assuredly have included a Key Man Clause, requiring that HW remain materially active in TWC's operations, and numerous financial covenants that require TWC to meet various financial performance and liquidity levels. Since TWC terminated HW's employment with the company, it is clear that the Key Man provisions have been violated.[36]

The Press Release makes clear that TWC has a need for an immediate cash infusion. Moreover, there are numerous reports that TWC has lost key relationships including those with talent agencies. It is also widely reported that talent partners with productions affiliated with TWC have either asked to be let out of their contracts, or, if no binding contract exists, are simply leaving the company or withdrawing from negotiations.[37] This is equivalent to a retailer losing its supply of product. If TWC does not have the necessary liquidity for ongoing operations, and/or needs further liquidity to "stabilize operations", it is probably not only in default of several financial debt covenants, but is probably in, or about to be in, breach of numerous other executory agreements.

**C.** **A sale of the Type (and in the manner) described in the Press Release, will more probably than not, be extremely harmful to the potential recovery of unsecured creditors.**

A sale of a company the size of TWC is extraordinarily complex, and requires an

---

[36] As stated earlier in my report, a Key Man clause for TWC should have been a component of the TWC Distribution Agreement. Undoubtedly, it was included in numerous TWC agreements with financial, operational, production and distribution partners. The covenants relating to HW may also have included stock ownership/option parameters and limitations on compensation, loans and other financial transactions between HW and TWC.
[37] These reports are separate from the actions taken against HW. For example, HW Academy membership was revoked as was him membership in the Producers Guild of America.

EXHIBIT 1
PAGE 38

extraordinary amount of due diligence requiring literally thousands of hours to be expended by both TWC and the potential suitor(s). The buyer will want to insure its investment is protected in the sales contracts or otherwise. The documents it will want to examine include:

- All financial/ borrowing documents and evidence of performance with respect to those contracts. These documents will not only include corporate level debt borrowings but may involve production loans, joint venture arrangements[38] and structured "off balance sheet" arrangements.
- All banking documents including bank statements and an examination of restricted funds[39].
- Chain of title documents for each title in TWC's library. Tangential to chain of title is an examination of all reversion provisions and the identification and value of derivative (sequel, remake, etc.) production rights, among other things.
- All distribution documents associated with TWC's library including licensing agreements for television and video in every country/territory.
- All distribution statements relating to each distribution document.
- All lease agreements including an analysis by the buyer of which leases are critical to the buyer's plans for post acquisition operations, the terms under which those agreements are assignable and any liabilities associate with such leasehold before and after the contemplated acquisition.
- A thorough review of all other operational assets from trucks and buildings to projects in development.

---

[38] See, for example, the Rainbow Media Holdings LLC deal (GENIUS00167009) was a 2 year deal for $20 million per year for direct to video product. Although TWC and Rainbow shared acquisition costs, TWC was able to retain a 15% distribution fee. Derivative production rights and ongoing financial reporting are among the many ongoing issues associated with that joint venture.

[39] Production and distribution companies involved in worldwide operations often find funds earned in a particular country may not be readily transferred to the U.S. The nature of the restrictions and the use of those funds should be examined.

EXHIBIT 1
PAGE 39

- Documents necessary to review the tax basis and other tax information associated with the business and its assets in order to structure any potential asset sale..

- All employment agreements including all documents necessary to analyze employment related costs[40] associated with a change in control including pension, health and welfare implications.

- The status of any guild[41] payments, guild audits, and potential guild exposure.

- The status of any participation payments, participation audits and any potential participation audit exposure.

- A review of all contingent liabilities including civil litigation, tax liabilities/exposure and similar exposure and whether those liabilities will subject the purchased assets to ongoing liability under the contemplated acquisition structure.

This is just a partial list, for illustrative purposes, to demonstrate what types of issues a serious, prudent buyer will want to examine through its due diligence. A very detailed due diligence checklist would typically be prepared and updated throughout the acquisition process. Any buyer who cannot examine a particular area to the level of scrutiny necessary to gain transactional comfort will likely discount the value associated with the area that was not satisfied. In my experience, the three weeks described in the Press Release is insufficient for TWC to gather and organize the necessary documents let alone for the seller to complete minimum due diligence. This type of rushed transaction can only result in a reduced price for the assets sale, however structured.

---

[40] This area can be quite complex for a going concern. It requires a review of operations to determine what employees should be effectively included in the sale and an analysis of the costs necessary to maintain their employment through the sale and for an operationally reasonable period thereafter. It also requires a review of the existing agreements to determine, what payments (in cash, stock or otherwise) might be triggered by a change in control (however defined in the particular employment agreement) of the company.

[41] These would include SAG, the WGA, DGA and IATSE, among others. These entities typically have priority liens that follow the film and/or television asset.

EXHIBIT 1
PAGE 40

The second serious problem with the announced sale in the Press Release is that it is not a competitive situation. There was no announced sale and no competing bids. It is highly improbable that management, negotiating with a single buyer, will maximize the consideration received. This is especially true under the circumstances TWC is currently facing. Again, this manner of sale will likely result in further discounting of the purchase price, however structured.

Because a senior secured lender (and potentially other secured parties) will have approval over any potential sale, it is unlikely that a sale will occur below acceptable levels for the particular secured party. However, those parties have no interest in protecting unsecured creditors. The parties most at risk, and most harmed, by the discounting associated with the announced potential sale are the unsecured creditors. For a variety of reasons, these risks are typically exacerbated when the transaction is structured as a pure sale of assets, rather than another structure (such as a sale of stock). The Press Release announced an asset sale.

Finally, aside from the issues discussed above, the due diligence required under the current situation is greater than normal. If the assets were purchased in a bankruptcy, the buyer gets assurances regarding title from the court. Under the current circumstances the buyer faces challenges not present in the context of a bankruptcy including 1) it must perform a more detailed review of liens and encumbrances and 2) in the context of an asset acquisition, the transaction, once completed, can be scrutinized by the Court using hindsight. These items add further cost and risk to the transaction creating downward pressure on a purchase price and putting unsecured creditors in further peril.

Respectfully Submitted,

Dated: 11/2/17

Howard J. Kaplan

EXHIBIT 1
PAGE 41

## EXHIBIT A — RESUME

### HOWARD JAY KAPLAN

9030 W. Sahara Ave, Suite 410, Las Vegas, Nevada 89117
Phone (818) 435-2043          Email hjkaplan@aol.com


## WORK EXPERIENCE

*2009 - Present*   Independent Producer


1997 - 2008      Morgan Creek Productions, Inc.
                 *Chief Financial Officer*

                 Morgan Creek International
                 *Chief Financial Officer*
                 *Chief Operations Officer*

1993 - 1997      PriceWaterhouseCoopers
                 *Senior Manager*

1990 - 1993      KPMG Peat Marwick
                 *Manager*

## ADDITIONAL EXPERIENCE

2001 - 2005      Independent Film and Television Alliance (IFTA)
                 *Vice Chairman, Finance*

2000             Southwestern Law School
                 *Adjunct Professor - Entertainment Production and*
                 *Finance*

## EDUCATION

1990             Juris Doctorate
                 *Southwestern Law School*

1990             Member of California State Bar; No. 149278

1990             Certified Public Accountant (currently inactive)

1985             Bachelor of Science, Accounting
                 *California State University, Northridge*

EXHIBIT 1
PAGE 42

## EXHIBIT B – SUPPLEMENTAL INFORMATION

### A. MATERIALS REVIEWED:

1. Complaint

2. Genius Productions, Inc. Proxy Statement dated June 29, 2006 (the "Proxy Statement")

3. Distribution Agreement dated July 17, 2006 between The Weinstein Company and Genius Products LLC. (the "TWC Distribution Agreement")

4. The Amended and Restated Distribution Agreement between The Weinstein Company and Genius Products, LLC (the "Restated TWC Distribution Agreement")

5. Various third party distribution agreements of Genius Products LLC

6. Various third party distribution or similar agreements of TWC

7. The Salter Group reports and drafts.

8. Trevor Joseph Drinkwater 2004 Examination dated August 12, 2016 (the "Drinkwater 2004 Examination")

9. PriceWaterHouseCoopers Global Entertainment and Media Outlook – 10th Annual Edition

10. IMDB Pro Information on The Weinstein Company and Miramax films

11. Box Office Mojo Information on The Weinstein Company and Miramax films

12. Various other participation statements, emails, excel spreadsheets, letters and other documents.

### B. PRIOR EXPERT TESTIMONY:

During the last four years, I have testified as an expert (by deposition) in three cases: Sonja Productions, LLC et al. v. Browne Woods George LLP et al. (JAMS Arbitration); MIME Investments, LLC v. GK Films, LLC (IFTA Arbitration No. 12-87); U.S. Specialty Insurance Company v. Capitol Films U.S., LLC (Cal. Superior Court Case CV 07-07206 AHM); and various confidential arbitrations involving the Directors Guild of America and the MPIP.

EXHIBIT 1
PAGE 43

## C. COMPENSATION STATEMENT

I am being paid a fee of five hundred dollars ($500.00) an hour to review the above materials and prepare this report.

EXHIBIT 1
PAGE 44

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

Robins Kaplan LLP, 2049 Century Park East, Suite 3400, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **DECLARATION OF HOWARD J. KAPLAN IN SUPPORT OF APPLICATION OF CHAPTER 7 TRUSTEE FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On November 7, 2017, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

•Alan R Friedman    afriedman@foxrothschild.com, mburke@foxrothschild.com
•Benjamin R King    bking@loeb.com, karnote@loeb.com;ladocket@loeb.com
•Mette H Kurth    mkurth@foxrothschild.com, pchlum@foxrothschild.com;mette-kurth-7580@ecf.pacerpro.com
•James P Menton    JPMenton@rkmc.com, dvaughn@robinskaplan.com
•Manoj D Ramia    manoj.ramia@klgates.com, klgatesbankruptcy@klgates.com
•David B Shemano    dshemano@robinskaplan.com
•Alfred H Siegel (TR)    Al.siegel@asiegelandassoc.com,
Lisa.irving@asiegelandassoc.com;Margo.tzeng@asiegelandassoc.com;asiegel@ecf.epiqsystems.com
• United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**N/A**

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on November 7, 2017, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA MESSENGER DELIVERY**
Hon. Sheri Bluebond
U.S. Bankruptcy Court, Central District of California
255 E. Temple Street, Ctrm 1539 – Suite 1534
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 7, 2017 | Angela Matsuoka | /s/ Angela Matsuoka |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                     **F 9013-3.1.PROOF.SERVICE**